STATE OF NORTH CAROLINA

FORSYTH COUNTY

FILED

2017 AUG -1 A 8: 31

FORSYTH CO., C.S.C.

BY *Nicole Gatto*

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
CASE NO. 4738

REBECCA KOVALICH and SUZANNE
NAGELSKI,

                Plaintiffs,

        v.

PREFERRED PAIN MANAGEMENT &
SPINE CARE, P.A., DR. DAVID SPIVEY,
individually, and SHERRY SPIVEY,
individually.

                Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

### I.    INTRODUCTION

1. Enough is enough. Plaintiffs Rebecca Kovalich ("Rebecca" or "Plaintiff Kovalich") and Suzanne Nagelski ("Suzanne" or "Plaintiff Nagelski") have suffered silently for too long. Defendants Preferred Pain Management & Spine Care, P.A. ("PPM" or "Defendant PPM"), Dr. David Spivey ("Dr. Spivey" or "Defendant Dr. Spivey"), and Mrs. Sherry Spivey ("Mrs. Spivey" or "Defendant Mrs. Spivey") illegally terminated Plaintiffs' employment and, as a result, Plaintiffs have suffered tremendously.

2. Furthermore, Dr. Spivey subjected Plaintiff Kovalich to persistent sexual harassment and propositions while Mrs. Spivey retaliated against Plaintiff Nagelski for opposing, what she believed to be, unethical and potentially discriminatory behavior. It wasn't long before Defendants fired Plaintiff Nagelski. Then, when Plaintiff Nagelski exercised her legal rights and obtained counsel, Defendants pressured Plaintiff Kovalich to convince Plaintiff Nagelski to

1

"drop it." When Plaintiff Kovalich refused Defendants' demand and rejected Dr. Spivey's sexual advances, Defendants terminated her employment as well.

3. Accordingly, Plaintiffs turn to this Court to be made whole for their harms and losses and ask that it hold Defendants accountable for their actions. Plaintiffs brings claims against Defendants for violations of the Age Discrimination in Employment Act of 1976 ("ADEA"), 29 U.S.C. § 621 *et seq.* (Count I); violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count II); Wrongful Discharge in Violation of North Carolina Public Policy (Count III); Tortious Interference with Contract (Count IV); and violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140 (Count V).

## II.   PARTIES, JURISDICTION, AND VENUE

4. Plaintiff Kovalich is a resident of Charleston County, South Carolina, and also resides in Forsyth County, North Carolina part-time.

5. Plaintiff Nagelski is a resident of Mecklenburg County, North Carolina.

6. Defendant PPM is a North Carolina Professional Association with its principal place of business located in Winston-Salem, Forsyth County, North Carolina and has locations in Greensboro, Guilford County, North Carolina.

7. Defendant Dr. Spivey resides in Forsyth County, North Carolina.

8. Defendant Mrs. Spivey resides in Forsyth County, North Carolina.

9. The events giving rise to this Complaint largely took place in Forsyth County, North Carolina.

10. Plaintiffs worked for Defendants at their building located at: 2912 Maplewood Avenue, Winston-Salem, North Carolina 27103.

2

11. According to the North Carolina Department of the Secretary of State, Defendant PPM's registered agent is Defendant Dr. Spivey at 2912 Maplewood Avenue, Winston-Salem, North Carolina 27103.

12. Plaintiffs seek damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

13. Venue is proper in Forsyth County Superior Court pursuant to N.C. Gen. Stat. § 1-79(a)(1)-(2) and N.C. Gen. Stat. § 1-82.

### III.    FACTUAL STATEMENT

**A.    <u>General Background on Rebecca and Suzanne.</u>**

14. Rebecca was born on October 16, 1944, in Greensboro, North Carolina, and grew up in Winston-Salem. After high school, Rebecca earned a Bachelor of Science in Management Information Systems from Gardner Webb in 1986. In 1988, Rebecca went on to obtain a Master of Business Administration from Wake Forest University.

15. Rebecca worked as a Practice Administrator at Salem Gastroenterology while studying for her MBA. She used the Health Administration experience to develop two laboratories for Salem Gastro (Salem Laboratory and Highland Oaks) where she acted as Managing Partner. Novant Health bought both labs in 1991. Rebecca then started at Triad Clinical Laboratory and later became a shareholder of Select Laboratory Partners, which were both thriving successes.

16. Rebecca's daughter Suzanne was born on December 8, 1966, in Winston-Salem, North Carolina. Suzanne graduated from Forsyth County Day School and went on to obtain a Bachelor of Science degree in Environmental Science from UNC Charlotte in 1989.

3

17. Suzanne's career began in Philadelphia, working in hazardous materials and groundwater cleanup. Suzanne then returned to North Carolina for a similar position with National Environmental Technologies. She stayed there for five and a half years until the birth of her daughter. In 1996, Suzanne started with AMEC Earth and Environmental, and moved to a position with a veterinary clinic in 2002. Suzanne followed in her mother's footsteps and obtained her MBA from Wake Forest University in 2006.

**B.  Dr. Spivey Recruits Rebecca and Suzanne to His Practice.**

18. In or around July 2006, Dr. Spivey began recruiting Rebecca. He wanted her to help him build his new practice, Preferred Pain Management. She assented and began working as a contract employee. In fact, Mrs. Spivey referred Rebecca to him. She personally knew Rebecca and boasted of her previous successes in medical practice administration and clinical laboratory development.

19. When Rebecca told Dr. Spivey that it would take at least six months to get PPM up and running, he was adamant that PPM needed to start in October—only three months later. Rebecca told Dr. Spivey that she could reach out to an administration group called Piedmont Community Physicians. She explained that this would be the quickest way to start the practice and open it by October. Dr. Spivey agreed, and PPM opened its doors as a care center of Piedmont Community Physicians in or around October 2006.

20. In late 2006, Dr. Spivey contacted Suzanne and asked her to help with PPM's management and operations. Suzanne obliged and began working with Dr. Spivey and her mother in December 2006. Suzanne acted as PPM's business manager.

4

C.    **PPM Illegally Terminates Suzanne.**

21. From the onset of her tenure with PPM in December 2006, Suzanne's employment record was terrific. She even took on the responsibilities of Human Resources and IT in addition to her primary role. Like her mother, Suzanne was instrumental in PPM's success.

22. In or around December 2014, a domestic violence incident occurred between Dr. and Mrs. Spivey. As a result, authorities took Dr. Spivey to Forsyth County Jail for a mandatory 72-hour holding, leading to the NC Medical Board Consent Order (signed September 11, 2015, and revised February 5, 2016). At this point, Mrs. Spivey became directly involved in the running of PPM.

23. Following his return to work, Dr. Spivey withdrew $100,000 from PPM, which he kept hidden from Mrs. Spivey. He confided in Suzanne that he previously tried to take money from his personal joint checking account and Mrs. Spivey became enraged, prompting Dr. Spivey to return all monies to his personal account. This is what prompted him to withdraw $100,000 from the PPM account.

24. Suzanne's issues at PPM began around this time. Mrs. Spivey started to assume a prominent role in the medical practice. She called Suzanne and asked for confidential information pertaining to payroll and PPM's financials. Suzanne informed Mrs. Spivey that these requests were inappropriate, as Mrs. Spivey was also an employee of PPM who supervised all clinic staff. When Suzanne refused to provide the information, Mrs. Spivey became irate and began screaming at Suzanne over the phone, demanding that Suzanne sit down with Mrs. Spivey and her attorney and provide access to PPM's books. This incident was overheard by Suzanne's father—former FBI agent Robert Drdak—and daughter, who were both with her at the time.

5

25. In or around March 2015, Dr. Spivey instructed Suzanne to provide Mrs. Spivey with the information that she wanted. Suzanne told Dr. Spivey that she still did not feel comfortable releasing confidential company records to Mrs. Spivey during the Spivey's personal, domestic legal issues and Dr. Spivey's ongoing criminal investigation, leading to his North Carolina Medical Board sanctioned consent order. Suzanne suggested that Dr. Spivey request the information himself so that he could make the decision whether to grant his wife access.

26. On May 12, 2015, Mrs. Spivey gained access to Suzanne's email account with the help of another employee, Jennifer Bailey. Fearing that Mrs. Spivey had accessed confidential HR information, Suzanne informed Dr. Spivey of the breach and asked for his direction. Dr. Spivey did not provide Suzanne with any instruction. Suzanne then deleted her company email account in order to protect private employee information. Subsequently, Mrs. Spivey stripped Suzanne of all IT responsibilities. Ms. Bailey then sent a letter to one of PPM's vendors stating that Suzanne did not have the authority to enter into agreements on behalf of the company.

27. On May 13, 2015, Suzanne received a call from Susan Martinez, an employee of FlexPay (PPM's payroll company), informing her that Mrs. Spivey called to demand access to PPM's payroll information. The Flex-Pay employee informed Suzanne that Mrs. Spivey had identified herself as the owner of PPM and became very aggressive and threatened to terminate PPM's use of Flex-Pay's payroll services if Flex-Pay did not grant her the requested access. Suzanne immediately made Dr. Spivey aware of the incident. Dr. Spivey did not comment.

28. On May 20, 2015, Flex-Pay again contacted Suzanne and informed her that Mrs. Spivey made a second attempt to gain access to PPM's payroll information. The Flex-Pay employee reiterated that Mrs. Spivey was exceedingly aggressive in her demands. Again,

6

Suzanne informed Dr. Spivey of Mrs. Spivey's attempts to access confidential information, and again Dr. Spivey took no action.

29. Mrs. Spivey, in early 2015, abruptly began making—or, at a minimum, having significant influence upon—key personnel decisions.

30. On or around July 23, 2015, Mrs. Spivey informed Suzanne that on or around July 31, 2015, PPM would be terminating three employees. Mrs. Spivey planned to terminate these employees without cause, and prearranged their replacements to begin the next business day. The employees had clean work records at PPM and there were no performance-related termination reasons. As the company's Human Resources representative, Suzanne expressed that she did not feel comfortable with these terminations, and added that at least one of the employees belonged to a protected class (over 40, gay). In other words, Suzanne engaged in protected activity by opposing a PPM decision that she believed, in good faith, would violate federal anti-discrimination laws.

31. On December 1, 2015, PPM removed Suzanne as head of HR and replaced her with a 44-year-old former Belk Department Store bridal sales consultant with no HR experience. Then, on January 19, 2016, PPM terminated Suzanne's employment. Suzanne was 49 years old at the time.

32. Suzanne filed a charge with the EEOC on May 27, 2016, for age and sex discrimination and retaliation (Charge No. 430-2016-01529).

D.     **Dr. Spivey Subjects Rebecca to Sexual Harassment and Otherwise Illegally Fires Her.**

7

33. In or around 2006, while Rebecca was a PPM employee, Dr. Spivey began regularly hugging and complimenting her. He made sexual innuendos. Rebecca did her best to ignore Dr. Spivey's inappropriate behavior.

34. However, Dr. Spivey's harassment accelerated in or around 2013 and into 2014 after Rebecca became a PPM employee. Dr. Spivey began sending Rebecca emails that were, essentially, love letters. These letters contained statements like "I want to be your lover" and "what are you wearing?"

35. In or around late 2013, possibly angered by her husband's sexual advances towards Rebecca, Mrs. Spivey berated Rebecca in a conference room full of other employees. As Rebecca tried to leave, Mrs. Spivey repeatedly slammed the door and screamed, "Fuck you, Rebecca!" This was at around 5:15 p.m. while PPM employees were still attending to patients.

36. In or around May 2014, while Rebecca was in Charleston, Dr. Spivey called her and said that he had to see her. He said that he was coming to Charleston. When Rebecca told him not to come, Dr. Spivey interrupted and asked, "What are you wearing?"

37. In or around November 2014, Rebecca found herself in a conference room with Dr. Spivey and another physician. When the other doctor left the room, Dr. Spivey said, "You know, Rebecca, I gave you a chance." He then stood up and walked out of the conference room. The "chance" that he was referring to was a relationship with him.

38. In 2014, Mrs. Spivey began blatantly targeting Rebecca. Mrs. Spivey brought in a new contract employee, Mary Benton, and assigned her some of Rebecca's tasks. Then Mrs. Spivey took control of the lab and informed Gretchen Hawks, MT that she should be contacting Mrs. Spivey directly with lab issues.

8

39. In or around October 2015, Rebecca entered Dr. Spivey's office to ask him a question. The office door was open, but he was undeterred. While standing in his office, Dr. Spivey snapped. He grabbed Rebecca and started kissing her. In complete shock, Rebecca froze with terror. She looked at Dr. Spivey, informed him that this was inappropriate, and told him that she needed to leave.

40. In or around March 2016, following Suzanne's termination, Dr. Spivey called Rebecca with concerns after Suzanne retained legal counsel in relation to her termination. Dr. Spivey told Rebecca that he was not allowed to approach Suzanne. Therefore, he wanted Rebecca to persuade Suzanne to drop the charge. Rebecca told Dr. Spivey that the issue was between him and Suzanne. She said that his request was inappropriate and made it clear to Dr. Spivey that she did not want to get involved.

41. Dr. Spivey refused to drop the issue. He asked Rebecca if she would hurt his practice over this matter. He elaborated, telling Rebecca that she could allege that he was retaliating against her because Suzanne was threatening to file an EEOC charge. Rebecca told him that this was nonsensical.

42. On June 9, 2016, within two weeks of Suzanne's filing with the EEOC, PPM terminated Rebecca's employment. Rebecca was 71 years old at the time. Rebecca was replaced by Gretchen Hawks, a significantly younger employee (age ~48).

E. **PPM's Decisions to Terminate Rebecca and Suzanne Violate a Sweeping Range of Federal and State Laws.**

43. These terminations were not motivated by legitimate, non-retaliatory or non-discriminatory reasons.

44. First, PPM fired Rebecca almost immediately after she refused to convince her daughter to forego legal action against PPM. This also motivated the termination decision and clearly shows third-party retaliation under Title VII.

45. Second, Rebecca repeatedly opposed Dr. Spivey's sexual harassment. Not only did she tell him it was inappropriate, but she also repeatedly rebuffed his advances. Rebecca's actions here also caused PPM to fire her, giving rise to additional retaliation, hostile work environment, and quid pro quo sexual harassment claims.

46. Finally, it seems apparent that age played a role in the decisions to fire both Rebecca and Suzanne. Both women were in a protected class (over 40) and they were replaced by Wendy Huffman-Yontz and Gretchen Hawks, significantly younger employees.

47. What's more, PPM has established a significant pattern of terminating employees—beyond Suzanne and Rebecca—in this protected class, including Jennifer Bailey (DOB, upon information and belief, April 15, 1956); Sheridan Allen (DOB, upon information and belief, October 19, 1970); Mary Pike (DOB, upon information and belief, January 27, 1955); Susan Sanders (DOB, upon information and belief, June 5, 1956); Katherine Skowronski (DOB, upon information and belief, June 17, 1952); Lisa Palmer (DOB, upon information and belief, June 17, 1957); and Scarlet Link (DOB, upon information and belief, January 9, 1957). These individuals, upon information and belief, were all terminated between January and September 2016.

48. These age-based termination decisions are interwoven with PPM's retirement plans for its employees, specifically its newest employer tax incentive plan, known as the cash balance plan.

10

49. The cash balance plan, which was enacted in 2014 and retroactively incorporated 2013, has a three-year cliff vesting. Individuals non-electively enrolled in this plan, who were actively employed in 2013 and on PPM's payroll as of December 31, 2016, would be eligible for full benefits at retirement, regardless of future employment status. The amount of money eligible to an employee fully vested in the cash balance plan was based on a predetermined formula that factored in employee specific earning history, tenure, and age.

50. Both Dr. Spivey and Mrs. Spivey participated in a plan which set aside corporate tax-deferred sums of money for themselves. On top of that, PPM employees who quit or were terminated prior to full vesting in the cash balance plan, forfeited any of PPM's tax-exempt monies already put in their pension plans. This forfeited money, contributed annually by PPM, reverted directly back to Dr. Spivey, Mrs. Spivey, and their daughter, Jennifer Spivey McGraw, per the articles incorporated in PPM's cash balance summary plan description.

51. The funding of each individual employee's plan was based on age—the older the employee, the more money that PPM put in. Simply put, PPM, Dr. Spivey, and Mrs. Spivey benefited financially by firing older employees.

52. On December 5, 2016, Rebecca filed a Charge of Discrimination (435-2017-00151) with the EEOC, alleging unlawful retaliation, sexual harassment, and discrimination in violation of the ADEA and Title VII. She specifically alleged that PPM had a pattern and practice of terminating older employees.

53. Previously, on May 27, 2016, Suzanne filed a Charge of Discrimination (430-2016-01529) with the EEOC, alleging unlawful retaliation and discrimination in violation of the ADEA and Title VII. She also specifically alleged that PPM had a pattern and practice of terminating older employees.

54. On May 11, 2017, the EEOC sent Rebecca a Right to Sue letter, stating that it is terminating its processing of the Charge (435-2017-00151) because it determined that it would be unlikely to complete its administrative processing within 180 days from the filing of that Charge.

55. On May 22, 2017, the EEOC sent Suzanne a Right to Sue letter on Charge (430-2016-01529).

**First Cause of Action**
*Violation of the Age Discrimination in Employment Act*
**(Both Plaintiffs against Defendant PPM)**

56. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

57. Plaintiff Kovalich is, and at all relevant times was, an employee covered by the protections of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et. seq.* ("ADEA").

58. Plaintiff Nagelski is, and at all relevant times was, an employee covered by the protections of the ADEA.

59. Defendant PPM employed at least 20 employees and was engaged in commerce at all relevant times.

60. Plaintiff Kovalich was a 71-year-old employee at the time of her termination.

61. Plaintiff Nagelski was a 49-year-old employee at the time of her termination.

62. Plaintiffs were qualified for their positions at all relevant times.

12

63. Defendant PPM treated Plaintiff Kovalich disparately in relation to her similarly situated peers that were under the age of 40 and/or peers who were significantly younger than Plaintiff Kovalich.

64. Defendant PPM treated Plaintiff Nagelski disparately in relation to her similarly situated peers that were under the age of 40 and/or peers who were significantly younger than Plaintiff Nagelski.

65. Defendant PPM otherwise exhibited age bias by, but not limited to, explicitly seeking to employ a younger workforce, systematically terminating older employees, demoting Plaintiffs, and ultimately terminating Plaintiffs.

66. Defendant PPM violated the ADEA by demoting, terminating, and otherwise treating disparately Plaintiff Kovalich because of her age.

67. Defendant PPM violated the ADEA by demoting, terminating, and otherwise treating disparately Plaintiff Nagelski because of her age.

68. Defendant PPM also engaged in a pattern or practice of age discrimination which resulted in Plaintiffs' terminations, which also violated the ADEA.

69. Defendant PPM's explanations for Plaintiff Kovalich's termination and otherwise disparate treatment amount to pretext for unlawful age discrimination.

70. Defendant PPM's explanations for Plaintiff Nagelski's termination and otherwise disparate treatment amount to pretext for unlawful age discrimination.

71. Moreover, Defendant PPM violated the ADEA when it terminated Plaintiff Kovalich because it did so in retaliation for Plaintiff Nagelski's protected activity under the ADEA. Defendant PPM went so far as to pressure Plaintiff Kovalich into talking Plaintiff Nagelski out of

13

pursuing an age discrimination claim. When Plaintiff Kovalich refused, Defendant PPM illegally fired her.

72. As an actual, proximate, and foreseeable result of Defendant PPM's wrongful conduct, Plaintiff Kovalich has suffered lost income and other fringe benefits, damage to reputation, medical expenses, consequential damages, and other damages in an amount sufficient to invoke Superior Court jurisdiction under N.C.G.S. §7A-243, and is otherwise entitled to recover compensatory damages in a sufficient amount to invoke Superior Court jurisdiction under N.C.G.S. §7A-243.

73. As an actual, proximate, and foreseeable result of Defendant PPM's wrongful conduct, Plaintiff Nagelski has suffered lost income and other fringe benefits, damage to reputation, medical expenses, consequential damages, and other damages in an amount sufficient to invoke Superior Court jurisdiction under N.C.G.S. §7A-243, and is otherwise entitled to recover compensatory damages in a sufficient amount to invoke Superior Court jurisdiction under N.C.G.S. §7A-243.

74. Defendant PPM's actions were done willfully and in a manner that demonstrates a reckless disregard for Plaintiff Kovalich's rights under the ADEA. As a result of Defendant PPM's conduct, Plaintiff Kovalich is entitled to recover liquidated damages and other damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

75. Defendant PPM's actions were done willfully and in a manner that demonstrates a reckless disregard for Plaintiff Nagelski's rights under the ADEA. As a result of Defendant PPM's conduct, Plaintiff Kovalich is entitled to recover liquidated damages and other damages in

14

a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

**Second Cause of Action**
*Violation of Title VII of the Civil Rights Act of 1964*
**(Both Plaintiffs Against Defendant PPM)**

76. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

77. Defendant Dr. Spivey's sexual advances were intentionally directed at Plaintiff Kovalich.

78. He directed those unwanted advances towards Plaintiff Kovalich because she is a female.

79. Plaintiff Kovalich suffered intentional, unwanted harassment because of her sex; the harassment was severe or pervasive; the harassment negatively affected the terms, conditions, or privileges of her employment; the harassment would detrimentally affect a reasonable person of the same sex; and management knew about the harassment or should have known, and failed to take prompt, remedial action.

80. As a result of the harassment, Plaintiff Kovalich suffered severe emotional distress.

81. Defendant PPM violated Title VII by subjecting Plaintiff Kovalich to a hostile work environment on the basis of her sex.

82. What's more, Defendant PPM demoted, terminated, and otherwise subjected Plaintiff Kovalich to disparate treatment and/or retaliation because she refused to assent to his sexual advances and propositions.

15

83. In other words, Plaintiff Kovalich also advances on a quid pro quo sexual harassment theory.

84. Defendant PPM further unlawfully retaliated against Plaintiff Kovalich, in violation of Title VII, by terminating Plaintiff Kovalich's employment because she rejected Dr. Spivey's sexual advances or otherwise engaged in protected activity by opposing the advances and behavior.

85. Defendant PPM also unlawfully terminated Plaintiff Nagelski's employment because she objected to terminating an employee on the basis of that employee's sexual orientation. Plaintiff Nagelski's opposition to this termination, in good faith, amounts to protected activity under Title VII.

86. Defendant PPM violated Title VII by retaliating against Plaintiff Nagelski for engaging in protected activity and terminating her employment.

87. Moreover, Defendant PPM violated Title VII when it terminated Plaintiff Kovalich because it did so in retaliation for Plaintiff Nagelski's protected activity under Title VII. Defendant PPM went so far as to pressure Plaintiff Kovalich into talking Plaintiff Nagelski out of pursuing a discrimination claim. When Plaintiff Kovalich refused, Defendant PPM illegally fired her.

88. As an actual, proximate, and foreseeable result of Defendant PPM's wrongful conduct, Plaintiff Kovalich has suffered lost income and other fringe benefits, damage to reputation, medical expenses, consequential damages, and other damages in an amount sufficient to invoke Superior Court jurisdiction under N.C.G.S. §7A-243, and is otherwise entitled to

recover compensatory damages in a sufficient amount to invoke Superior Court jurisdiction under N.C.G.S. §7A-243.

89. As an actual, proximate, and foreseeable result of Defendant PPM's wrongful conduct, Plaintiff Nagelski has suffered lost income and other fringe benefits, damage to reputation, medical expenses, consequential damages, and other damages in an amount sufficient to invoke Superior Court jurisdiction under N.C.G.S. §7A-243, and is otherwise entitled to recover compensatory damages in a sufficient amount to invoke Superior Court jurisdiction under N.C.G.S. §7A-243.

90. Defendant PPM's actions were done maliciously, willfully, or wantonly or in a manner that demonstrates a reckless disregard for Plaintiff Kovalich's rights. As a result of Defendant PPM's conduct, Plaintiff Kovalich is entitled to recover punitive damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

91. Defendant PPM's actions were done maliciously, willfully, or wantonly or in a manner that demonstrates a reckless disregard for Plaintiff Nagelski's rights. As a result of Defendant PPM's conduct, Plaintiff Nagelski is entitled to recover punitive damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

### Third Cause of Action
*Wrongful Discharge in Violation of Public Policy*
**(Both Plaintiffs Against Defendant PPM)**

92. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

93. Plaintiff Kovalich was an at-will employee.

94. Plaintiff Nagelski was an at-will employee.

95. The public policy of the State of North Carolina, as set forth in N.C.G.S. § 143-422.1 *et seq.*, North Carolina's Equal Employment Practices Act, prohibits employers from discriminating against employees on the basis of their age and sex.

96. Defendant PPM violated North Carolina public policy by terminating Plaintiff Kovalich because of her age and on the basis of her sex.

97. Defendant PPM violated North Carolina public policy by terminating Plaintiff Nagelski because of her age and on the basis of her sex.

98. Defendant PPM violated the public policy of North Carolina as set forth in N.C. Gen. Stat. § 95-151 (Occupational Safety and Health Act) by terminating Plaintiff Nagelski on the basis of her gender.

99. Defendant PPM violated the public policy of North Carolina as set forth in N.C. Gen. Stat. § 95-151 (Occupational Safety and Health Act) by terminating Plaintiff Kovalich on the basis of her gender.

100. Defendant PPM violated the public policy of North Carolina as set in N.C. Gen. Stat. § 14-203 *et seq.* by terminating Plaintiff Kovalich for opposing quid pro quo sexual harassment.

101. As an actual, proximate, and foreseeable result of Defendant PPM's actions, Plaintiff Kovalich has suffered lost income and other fringe benefits, damage to reputation, severe emotional distress, severe mental distress and anxiety, depression, embarrassment, humiliation,

18

and other compensatory damages in an amount in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

102. As an actual, proximate, and foreseeable result of Defendant PPM's actions, Plaintiff Nagelski has suffered lost income and other fringe benefits, damage to reputation, severe emotional distress, severe mental distress and anxiety, depression, embarrassment, humiliation, and other compensatory damages in an amount in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

103. Defendant PPM's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff Kovalich's rights. As a result of Defendant PPM's conduct, Plaintiff Kovalich is entitled to recover punitive damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243. Defendant PPM's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

104. Defendant PPM's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff Nagelski's rights. As a result of Defendant PPM's conduct, Plaintiff Nagelski is entitled to recover punitive damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243. The Company's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## Fourth Cause of Action
### *Tortious Interference with Contract*
### (Both Plaintiffs Against Defendants Dr. Spivey and Mrs. Spivey)

105. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

106. Plaintiff Nagelski had an at-will employment contract with Defendant PPM.

107. Plaintiff Kovalich had an at-will employment contract with Defendant PPM.

108. Defendant Dr. Spivey, without justification, maliciously induced Defendant PPM to terminate its at-will employment contract with Plaintiff Kovalich.

109. Defendant Dr. Spivey, without justification, maliciously induced Defendant PPM to terminate its at-will employment contract with Plaintiff Nagelski.

110. Defendant Mrs. Spivey, without justification, maliciously induced Defendant PPM to terminate its at-will employment contract with Plaintiff Kovalich.

111. Defendant Mrs. Spivey, without justification, maliciously induced Defendant PPM to terminate its at-will employment contract with Plaintiff Nagelski.

112. Defendants Dr. Spivey and Mrs. Spivey acted with design to injure Plaintiffs and to gain an advantage at their expense. Specifically, Defendant Mrs. Spivey interfered with Plaintiff Nagelski's at-will employment contract with Defendant PPM in an effort to retaliate against her for resisting unethical and discriminatory behavior, and/or for their own financial gain

113. Defendant Mrs. Spivey interfered with Plaintiff Kovalich's at-will employment contract with Defendant PPM for being the target of Defendant Dr. Spivey's sexual harassment, and/or for her own financial gain.

20

114. Defendant Dr. Spivey interfered with Plaintiff Nagelski's at-will employment contract with Defendant PPM in an effort to retaliate against her for resisting unethical and discriminatory behavior, and/or for his own financial gain.

115. Defendant Dr. Spivey interfered with Plaintiff Kovalich's at-will employment contract with Defendant PPM for failing to convince Defendant Nagelski to drop her potential case against Defendant PPM and for refusing his sexual advances.

116. Defendant Dr. Spivey's means and motives for interfering with Plaintiff Kovalich's contract were improper. Defendant Dr. Spivey acted for his own benefit in interfering with Plaintiff Kovalich's contract, rather than in the best interest of Defendant PPM. Defendant Dr. Spivey exceeded the scope of his authority when demoting and ultimately terminating Plaintiff Kovalich for these reasons.

117. Defendant Mrs. Spivey's means and motives for interfering with Plaintiff Kovalich's contract were improper. Defendant Mrs. Spivey acted for her own benefit in interfering with Plaintiff Kovalich's contract, rather than in the best interest of Defendant PPM. Defendant Mrs. Spivey exceeded the scope of her authority when demoting and ultimately terminating Plaintiff Kovalich for these reasons.

118. Defendant Dr. Spivey's means and motives for interfering with Plaintiff Nagelski's contract were improper. Defendant Dr. Spivey acted for his own benefit in interfering with Plaintiff Nagelski's contract, rather than in the best interest of Defendant PPM. Defendant Dr. Spivey exceeded the scope of his authority when demoting and ultimately terminating Plaintiff Nagelski for these reasons.

119. Defendant Mrs. Spivey's means and motives for interfering with Plaintiff Nagelski's contract were improper. Defendant Mrs. Spivey acted for her own benefit in interfering with Plaintiff Nagelski's contract, rather than in the best interest of Defendant PPM. Defendant Mrs. Spivey exceeded the scope of her authority when demoting and ultimately terminating Plaintiff Nagelski for these reasons.

120. As an actual, proximate, and foreseeable result of Defendant PPM's actions, Plaintiff Kovalich has suffered lost income and other fringe benefits, damage to reputation, severe emotional distress, severe mental distress and anxiety, depression, embarrassment, humiliation, and other compensatory damages in an amount in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

121. As an actual, proximate, and foreseeable result of Defendant PPM's actions, Plaintiff Nagelski has suffered lost income and other fringe benefits, damage to reputation, severe emotional distress, severe mental distress and anxiety, depression, embarrassment, humiliation, and other compensatory damages in an amount in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

122. Defendant PPM's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff Kovalich's rights. As a result of Defendant PPM's conduct, Plaintiff Kovalich is entitled to recover punitive damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243. Defendant PPM's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

123. Defendant PPM's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff Nagelski's rights. As a result of Defendant PPM's conduct, Plaintiff Nagelski is entitled to recover punitive damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243. The Company's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

**Fifth Cause of Action**
*Violation of ERISA, 29 U.S.C. § 1140*
**(Both Plaintiffs Against Defendants)**

124. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

125. Defendant PPM granted employee benefits to Plaintiff Kovalich, including defined benefits retirement programs, separate and apart from 401k and safe harbor plans. As such, Kovalich belonged to a protected class under ERISA.

126. Defendant PPM granted employee benefits to Plaintiff Nagelski, including defined benefits retirement programs, separate and apart from 401k and safe harbor plans. As such, Nagelski belonged to a protected class under ERISA.

127. Plaintiff Kovalich was qualified for her position.

128. Plaintiff Nagelski was qualified for her position.

129. Defendant PPM's plan at issue had three-year cliff vesting, which it made retroactive to 2013.

130. Individuals enrolled in that plan in Defendant PPM's payroll as of December 31, 2016, would be fully enrolled regardless of future employment status.

131. Defendants Dr. Spivey and Mrs. Spivey set aside tax deferred sums of money for themselves. Moreover, Defendant PPM employees who quit or were terminated prior to full vesting forfeited tax exempt money already put in their plans back to Defendant Dr. Spivey.

132. Each individual employee's money funded into this plan was based on age—i.e., the older the employee, the more money that Defendant PPM put into the plan.

133. Defendants terminated Plaintiff Kovalich to prevent her benefits from vesting.

134. Defendants terminated Plaintiff Nagelski to prevent her benefits from vesting.

135. Defendant's decision to terminate Plaintiff Kovalich was specifically intended to interfere with Plaintiff Kovalich's attainment of an entitled right under the statute.

136. Defendant's decision to terminate Plaintiff Nagelski was specifically intended to interfere with Plaintiff Nagelski's attainment of an entitled right under the statute.

137. As an actual, proximate, and foreseeable result of Defendants' actions, Plaintiff Kovalich has suffered lost income and other fringe benefits, damage to reputation, severe emotional distress, severe mental distress and anxiety, depression, embarrassment, humiliation, and other compensatory damages in an amount in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

138. As an actual, proximate, and foreseeable result of Defendantss actions, Plaintiff Nagelski has suffered lost income and other fringe benefits, damage to reputation, severe emotional distress, severe mental distress and anxiety, depression, embarrassment, humiliation, and other compensatory damages in an amount in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

139. Defendants' actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff Kovalich's rights. As a result of Defendants'

24

conduct, Plaintiff Kovalich is entitled to recover punitive damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

140. Defendants' actions were done maliciously, willfully, wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff Nagelski's rights. As a result of Defendants' conduct, Plaintiff Nagelski is entitled to recover punitive damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243. The Company's officers, directors, and managers participated in and condoned the malicious, willful, wanton, and reckless conduct alleged above.

## JURY TRIAL DEMANDED

WHEREFORE, the Plaintiffs pray the Court to:

1. Enter a judgment against Defendant PPM and order Defendant PPM to pay Plaintiff Kovalich compensatory damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243;

2. Enter a judgment against Defendant PPM and order Defendant PPM to pay Plaintiff Nagelski compensatory damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243;

3. Enter a judgment against Defendant Dr. Spivey and order Defendant Dr. Spivey to pay Plaintiff Kovalich compensatory damages in excess of the sum sufficient for subject

matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243;

4. Enter a judgment against Defendant Dr. Spivey and order Defendant Dr. Spivey to pay Plaintiff Nagelski compensatory damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243;

5. Enter a judgment against Defendant Mrs. Spivey and order Defendant Mrs. Spivey to pay Plaintiff Kovalich compensatory damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243;

6. Enter a judgment against Defendant Mrs. Spivey and order Defendant Mrs. Spivey to pay Plaintiff Nagelski compensatory damages in excess of the sum sufficient for subject matter jurisdiction to be properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243;

7. Award Plaintiff Kovalich punitive damages pursuant to N.C.G.S. § 1D-1 *et seq.* and under any other claim above allowing the recover of punitive damages;

8. Award Plaintiff Nagelski punitive damages pursuant to N.C.G.S. § 1D-1 *et seq.* and under any other claim above allowing the recover of punitive damages;

9. Award Plaintiff Kovalich liquidated damages pursuant to the ADEA;

10. Award Plaintiff Nagelski liquidated damages pursuant to the ADEA;

11. Award Plaintiff Kovalich treble damages pursuant to ERISA;

12. Award Plaintiff Nagelski treble damages pursuant to ERISA;

13. Award Plaintiff Kovalich all reasonable costs and attorney's fees incurred in connection with this action;

14. Award Plaintiff Nagelski all reasonable costs and attorney's fees incurred in connection with this action;

15. Award Plaintiff Kovalich such other and further equitable relief as the Court deems appropriate under the circumstances;

16. Award Plaintiff Nagelski such other and further equitable relief as the Court deems appropriate under the circumstances; and

17. Grant Plaintiff Kovalich a trial of this matter by a jury.

18. Grant Plaintiff Nagelski a trial of this matter by a jury.

This the 28th day of July, 2017.

Sean F. Herrmann (NC Bar No. 44453)
sean@vankampenlaw.com
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Fax: (704) 749-2638
*Attorney for Plaintiffs*