IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and          )
SUZANNE NAGELSKI,             )
                             )
          Plaintiffs,         )     **MEMORANDUM OF LAW IN**
                             )     **SUPPORT OF PREFERRED PAIN**
vs.                          )     **MANAGEMENT'S MOTION FOR**
                             )     **SUMMARY JUDGMENT AS TO**
PREFERRED PAIN MANAGEMENT     )     **SUZANNE NAGELSKI'S CLAIMS**
& SPINE CARE, P.A., *et al.*, )
                             )
          Defendants.         )

NOW COMES Preferred Pain Management & Spine Care, P.A. ("Defendant" or "PPM"), and pursuant to Local Rule 7.2, MDNC, files this Memorandum of Law. PPM respectfully contends its Motion for Summary Judgment should be granted as to all claims asserted by Plaintiff Suzanne Nagelski ("Nagelski").

## I.    STATEMENT OF THE CASE

Plaintiffs Nagelski and Rebecca Kovalich ("Kovalich") filed their Complaint on August 1, 2017 in Forsyth County Superior Court alleging claims against PPM, Dr. Spivey, and Sherry Spivey. [DE #6]. Nagelski alleged claims for: age discrimination under the Age Discrimination in Employment Act; violation of Title VII of the Civil Rights Act; wrongful discharge on the basis of age and sex in violation of North Carolina Public Policy; and violations of the Employment Retirement Income Security Act against PPM. [*Id.*] Nagelski seeks both compensatory and punitive damages. On September 25, 2017, PPM removed Nagelski's Complaint. [DE # 1]. PPM filed its Answer on November 1, 2017.

1

[DE # 10]. On December 1, 2017, Judge Auld entered an order approving the parties' joint Rule 26(f) report, setting a dispositive motions deadline 30 days after discovery closed. [DE # 14]. On July 2, 2018, Judge Auld granted Plaintiffs' motion to amend the case management order setting a discovery deadline of August 31, 2018. [DE # 22]. On September 12, 2018, PPM filed its Notice of Intent to File Summary Judgment Motion as to Nagelski. [DE # 25]. PPM filed a Motion for Summary Judgment, [DE # 30] and files this Memorandum of Law in support of its Motion.

## II.    STATEMENT OF FACTS

### *Nagelski's Background*

The Plaintiffs and individual Defendants are family. In 1966, Kovalich (age 71) married Sherry Spivey's brother and gave birth to Nagelski (age 49)[1], Sherry Spivey's niece. (Kovalich Dep. 23:8-11; 14-15).

Prior to earning her Master's in Business Administration ("MBA") in 2006, Nagelski worked several jobs outside the medical field: staff scientist, project manager for various environmental service companies, middle school science teacher, and assistance at a veterinary clinic. (Nagelski Dep. 42:17-25; 64-70).

During Nagelski's MBA program, she took two courses on human resources ("HR") and some classes on finance and business operations. (*Id.* 48:3-49:23). Nagelski labels IT as a hobby. (*Id.* 47:8-22; 48:25-49:3). She has no certifications in IT, finance, or HR. (*Id.* 47:4-48:2). While Nagelski was in graduate school, Sherry Spivey provided childcare for

---

[1] All ages referenced *infra* are at the time of Nagelski's termination.

2

Nagelski's only daughter. (*Id.* 42:23-43:15). Nagelski began working for PPM after obtaining her MBA. (*Id.* 70:1-3).

***The Spiveys' Background***

Dr. Spivey (age 63) and Sherry Spivey (age 64) married in 1980. (Dr. Spivey Decl. ¶¶ 3, 29; Sherry Spivey Decl. ¶¶ 4, 27). Sherry Spivey graduated and was working as a Registered Nurse. (Sherry Spivey Decl. ¶ 3). Dr. Spivey graduated medical school in 1981. (Dr. Spivey Dep. 18:11-16). The Spiveys moved to the west coast and worked in medicine for several decades. (*Id.* 18:17-25; Dr. Spivey Decl. ¶ 5).

In 2005, the Spiveys returned to North Carolina. (Dr. Spivey Dep. 32:18-25). In 2006, the Spiveys decided Dr. Spivey could start a pain management practice in Winston-Salem. (Dr. Spivey Decl. ¶ 7). They consulted with Kovalich and utilized her contacts in the medical community to begin PPM. Compl. ¶ 18. Later, the Spiveys engaged Nagelski to perform administrative functions for PPM. Compl. ¶ 20.

PPM is a medical clinic providing patients with treatments to reduce pain and increase functionality. (Dr. Spivey Decl. ¶ 8). PPM began with one clinic in Winston-Salem and now has another clinic in Greensboro. (*Id.* ¶ 9). PPM operates a laboratory at a separate location in Greensboro. (*Id.*)

***Nagelski's Duties at PPM***

Initially, PPM engaged Nagelski as an independent contractor to perform various administrative functions. (Nagelski Dep. 77:17-18:1; 113:9-19). As PPM grew, Nagelski's duties evolved. (*Id.* 82:12-15; 85:9-11). Nagelski assisted with electronic IT security and

3

compliance issues (*Id.* 84:5-6); served as a financial consultant and a liaison between PPM and PPM's banks and accountants (*Id.* 84:8-16; 117-120).; and performed human resource functions (*Id.* 80:21-25). In 2013, Nagelski became a W-2 employee. (*Id.* 81:1-5).

As PPM grew, several functions assigned to Nagelski were assigned to other service providers or on-site employees. (Dr. Spivey Decl. ¶ 15). In January 2014, Nagelski's IT duties were reassigned a female employee (age 62) who also handled compliance. (Yontz Decl. Exs. 7 and 10). Additionally, PPM contracted with an IT vendor. (Dr. Spivey Dep. 101:21-102:15; Sherry Spivey Dep. 159:14-160:3). Nagelski's HR duties were assigned to a full-time on-site employee. (Dr. Spivey Decl. ¶ 24). Prior to her termination, Nagelski was only serving as PPM's liaison to PPM's banks and accountants. (*Id.* ¶ 27). Nagelski's position was eliminated. (*Id.*)

### Issues Throughout Nagelski's Employment

While at PPM, Nagelski frequently overstepped her authority. Nagelski signed contracts on behalf of PPM without authority. (Yontz Decl. 2635; Nagelski Dep. Ex. 18). Without approval, Nagelski instructed staff to reassign patient scheduling duties to front desk employees. (*Id.* Ex. 6). Dr. Spivey told Nagelski "[i]t troubles me that a decision of this nature would be made without consulting the owner of the practice (me) and the person most directed affected (me)." *Id.* Nagelski responded she was resigning from PPM because she had no support from Dr. Spivey. *Id.* Nagelski threatened to resign again unless two employees (females over 40) were fired. (Sherry Spivey Decl. Ex. 1).

4

Nagelski frequently butted heads with Company personnel. For example, Sherry Spivey asked to see information about the Paid Time Off ("PTO") accrued and used by employees Sherry Spivey supervised. (Nagelski Dep. 203:15-17). Some employees were complaining their PTO balances were inaccurate. (*Id.* 202:1-204:23; Sherry Spivey Dep. 120:2-10). When Sherry Spivey asked Nagelski for this information, Nagelski provided it after Dr. Spivey ordered Nagelski to do so. (Dr. Spivey Dep. 188:21-189:5; Nagelski Dep. 203:18-204:23). Nagelski engaged in suspicious behavior which caused the Spiveys to lose trust in her. (Dr. Spivey Decl. ¶¶ 20-23).

PPM's growth necessitated on-site human resources support. (*Id.* ¶ 15). PPM repeatedly asked Nagelski to report to Winston-Salem to perform HR duties. (Dr. Spivey Dep. 189:6-10; 190:18-14). When PPM moved into new office space in 2014, Dr. Spivey created an office for Nagelski with special floors so she could bring her dogs to work. (*Id.* 187:24-188:20; Sherry Spivey Decl. ¶ 15).

Nagelski refused to physically report to the office on a consistent basis, claiming "[m]any companies keep HR faceless." (Nagelski Dep. 175:15-176:12; Exs. 7-9, 11; Yontz Decl. Ex. 8). At all times, Nagelski lived in Huntersville, North Carolina. (Nagelski Dep. 34:14-17). Nagelski did not work a set schedule, but instead planned her hours around scheduled meetings, working half the time from her home and the other half either at PPM or at off-site meetings. (*Id.* 92:9-93:12). Nagelski claimed she worked in the office twice a week. (*Id.* 94:4-6).

For years, Nagelski shirked HR duties, leaving them to be handled by other employees working on-site. In her HR role, Nagelski did not: post job openings, review applications, manage employee reviews, meet in person with employees, or arrange anti-discrimination, harassment, or retaliation trainings. (*Id.* 123:8-17; 126:22-127:6; 128:2-140:20; Sherry Spivey Decl. Ex. 2; PPM Dep. Vol. I 59:7-60:12). Former employee Vicki Swicegood (female, age 68) and longtime friend of Kovalich, (Swicegood Dep. 62:12-17; 89:1-13), testified when she began at PPM in 2011 "[t]here w[ere] no HR files to speak of." (*Id.* 15:8-9). Swicegood testified: "I was doing HR" while employed with PPM. (*Id.* 15:20). Swicegood hired full-time and temporary staff, created and maintained personnel files, handled employee complaints, and disciplined and terminated staff, all while Nagelski worked remotely. (*Id.* 95:1-4; 167:5-7; 73:5-23; 75:25-76:9; 80:7-9; 81:23-82:24; 63:8-14l; Nagelski Dep. 133:16-134:9). According to Swicegood, Nagelski was CEO of PPM. (Swicegood Dep. 70:17-19). After Swicegood, Nagelski relied on employee Stephanie Vaughn to handle on-site HR functions. (Nagelski Dep. 126:1-4; 130:14-25; 131:22-134:9; Yontz Ex. 3).

In 2014, the Spiveys began discussing the reassignment of Nagelski's HR duties. (Dr. Spivey Dep. 187:10-189:17). Sherry Spivey asked Nagelski multiple times if she would give up her HR duties so PPM could have someone on-site. (Nagelski Dep. 155:14-22; Ex. 10; Sherry Spivey Dep. Ex. 67; Sherry Spivey Decl. ¶ 15). PPM considered outsourcing HR to an outside vendor. (Yontz Decl. Ex. 15; Sherry Spivey Decl. ¶ 26). The

Case 1:17-cv-00854-TDS-LPA   Document 31   Filed 10/01/18   Page 6 of 27

Spiveys also asked their BB&T wealth management advisor for a recommendation of someone to handle Nagelski's roles. (Yontz Decl. Ex. 17).

Around November 2014, the Spiveys had multiple discussions with their niece, Wendy Yontz (female, age 44), about the assuming the HR role at PPM. (Yontz Dep. 36:12-37:18; 39:18-40:15). Yontz is the adopted daughter of Nagelski's biological father. (*Id.* 35:14-20). Initially, Yontz was not interested as she was doing HR at Belk. (*Id.* 37:13-18). In September 2015, Yontz called Sherry Spivey and inquired if the position was still available. (*Id.* 39:18-40:4). On November 23, 2015, PPM hired Yontz to provide on-site HR. (*Id*. 42:7-44:10; Sherry Spivey Dep. 112:5-10; 216:12-19). Had Nagelski not been a relative, Dr. Spivey would have separated her employment long before. (Dr. Spivey Decl. ¶ 18). Dr. Spivey tolerated behaviors from Nagelski he would not have tolerated from any other employee. (*Id.*; Nagelski Dep. Ex. 12; Yontz Decl. Exs. 4 and 5; Dr. Spivey Dep. 203-6-10).

***Nagelski's Financial Liaison Position Was No Longer Necessary***

PPM began feeling "the effects of a number of factors that were impacting the practice from a reimbursement standpoint and also from a volume standpoint." (Dr. Spivey Dep. 13:14-17). Beginning in late 2014, insurance reimbursements dropped. (*Id*. 90:22-93:24; Kovalich Dep. 171:6-172:11). Additionally, there was more pain management competition in the area, less outside referrals, and decreased patient volume. (Dr. Spivey Dep. 13:13-14:3). "[B]eginning around 2015, [PPM] had to make significant reductions

in personnel and reassignment of duties … to keep the practice profitable and survive." (*Id.* 13:25-14:3).

In late 2015, Mary Benton (female, age 64) began advising PPM on operational strategy. (Benton Decl. ¶ 6 and Ex. 2). Benton had been providing services for PPM since 2013. (*Id.* ¶ 5 and Ex. 2; Dr. Spivey Dep. 103:1-6; Benton Dep. 30:3-18; 32:16-24). Dr. Spivey instructed Benton to look ways to reorganize PPM. (Dr. Spivey Dep. 70:17-22). Benton's role "was to look at different positions and the need for them" and find "opportunities to control cost." (Benton Dep. 97:3-98:3; 107:25-108:4). Benton developed an Action Plan recommending PPM evaluate the need and timeline of staffing. (Benton Decl. ¶¶ 6-8 and Exs. 1 and 2). Benton "looked at each one of the positions that got eliminated based on reorganization the same way. It wasn't about the person. It was about the function and the need to cut costs as part of the reorganization." (Benton Dep. 125:7-11).

After PPM hired full-time on-site HR, Nagelski's only job function was serving as PPM's financial liaison. (Dr. Spivey Decl. ¶ 27). PPM paid Nagelski $5,000 a month to provide monthly profit and loss statements and compile the bank statements for the accountant to reconcile. (Nagelski Dep. 118:11-25). In addition to his ongoing conversations with Benton and Sherry Spivey, Dr. Spivey consulted with his BB&T wealth management advisors and accountants whether a financial liaison position was necessary. (Dr. Spivey Dep. 182:19-184:10; 196:23-200:7). Dr. Spivey described the process he used to decide to eliminate Nagelski's position as follows:

8

[Y]ou have people that you're paying that you can't just pay if they're not doing something, and with the reorganization that was going, Ms. Nagelski's duties had been reassigned. We had HR full-time in-house. The IT had been reassigned. And then finally the only duty that she was performing was sort of the liaison between PPMSC; our accountancy,….and then BB&T, the wealth management people who managed our financing, loans and that sort of thing. Right? And that was her only duties. So I'm paying her, you know, $5,000 a month, I believe it was, for all these three things….So we're looking at ways, where can we cut costs, who do we need, who do we not need? And that was one of the positions. So I went to folks at – and that's why they're on the list – the folks at BB&T and Turlington & Company people, and said "Look, is this position still required for us to do business?" And they said, "No." So now, finally, her final duty was eliminated, and so I terminated her.

(*Id.* 115:22-116:24).

When her position was eliminated, Nagelski recognized her IT duties had been outsourced, full-time on-site HR had been hired, and "[i]t's very clear that [PPM] developed and formalized their relationship with their accountancy and bank resources." (Nagelski Dep. 233:22-234:5). Dr. Spivey did not completely sever the relationship. In the termination letter, he indicated he wanted to use Nagelski as a consultant on an as-needed basis. (*Id.* Ex. 29). Nagelski never contacted Dr. Spivey regarding provision of consulting services. (*Id.* 233:11-17). Instead, Nagelski retained counsel and sent PPM a demand letter. (Dr. Spivey Dep. 238:4-12).

### *Lack of Evidence Supporting Nagelski's Discrimination Claims*

No one from PPM ever told Nagelski the reasons for her termination or for any other actions had anything to do with her age, sex, or in retaliation for any protected activity. Nagelski never complained about unlawful discrimination, whether based on her age or otherwise, during her employment at PPM. (Dr. Spivey Decl. ¶ 29; Benton Decl. ¶ 12).

9

Plaintiff has no evidence other than her own belief showing PPM eliminated her position because of her age, sex, or retaliatory reasons. Instead, Plaintiff believes she was discriminated against because she was a female, over 40, and was dismissed. (Nagelski Dep. 231:10-232:16).

### *Lack of Evidence Supporting Nagelski's Retaliation Claim*

Nagelski has no evidence showing PPM decided to terminate Nagelski in retaliation for opposing the July 2015 termination of an employee over 40 and allegedly gay. (*Id.* 29:10-16; 232:17-23). Dr. Spivey asked Nagelski to sit in on the terminations of three PPM Greensboro employees. (*Id.* 181:3-8; 189:5-11). Plaintiff responded she was visiting her daughter in Pennsylvania and could not do so. (*Id.* 33:14-34:25; 181:9-12; 191:11-20; Ex. 13). The Spiveys insisted Nagelski appear in person for the terminations. (*Id.* 181:3-8; Sherry Spivey Dep. Ex. 63). Nagelski wanted to move the termination date, claiming she was uncomfortable with one of the terminations because the employee was in a protected class. (Nagelski Dep. 188:10-189:4). The employee's termination was part of the ongoing reorganization. (Dr. Spivey Dep. 124:9-20; 132:3-5). The employee was a licensed practical nurse. (*Id.*) PPM could save money by staffing the role with someone with lesser credentials. (*Id*). Sherry Spivey told Nagelski the reason for the employee's termination. (Nagelski Dep. Ex. 12).

Nagelski admitted she did not tell Sherry Spivey, the employee's supervisor, that this employee was in a protected class. Instead, without identifying the employee or any alleged unlawful basis, Nagelski told Sherry Spivey she felt one of the terminations may

10

not be legal. (*Id.* 187:8-18; 189:19-25; 190:1-5; Ex. 11). Nagelski asserts she shared her concerns with PPM's corporate attorney whose office counseled PPM on the terminations and prepared severance agreements. (*Id.* 187:1-188:9; Exs. 10-12, 15). Nagelski admitted as HR, it was her duty to remind managers, about potential legal issues when separating an employee. (*Id.* 189:19-190:11). Nagelski did not raise any allegations of discrimination; instead, she questioned the Spiveys on the wisdom of terminating an employee in a protected class. (*Id.* Ex. 14; Dr. Spivey Decl. ¶ 19; Sherry Spivey Decl. ¶ 22).

After losing her flexible, work from home, $5,000 a month position, Nagelski sued her family and their business.

***The Cash Balance Plan***

The Cash Balance Plan ("the Plan") is a way for PPM to provide additional retirement benefits to employees. (Dr. Spivey Dep. Ex. 90; Nagelski Dep. 150:22-25). The Newport Group, Inc. ("Newport Group") is the third-party administrator which oversees the Plan's administration and legal compliance. (Dr. Spivey Decl. ¶ 33). PPM and Dr. Spivey rely on Newport Group to manage the Plan. (*Id.*)

Once an employee has been employed by PPM for one year or 1,000 hours, they are eligible for the Plan ("Plan Participant"). (*Id.* ¶ 35). The Plan Participants make no contributions; PPM fully funds the Plan. (*Id.*) After three years, the Plan Participant becomes 100% vested. (*Id.*)

### III.   QUESTIONS PRESENTED

11

Has Nagelski proffered evidence creating a genuine issue of material fact as to the four claims she alleged against PPM?

## IV.     ARGUMENT

### A.     Standard of Review

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Holland v. Wash. Homes, Inc.*, 487 F.2d 208, 213 (4th Cir. 2007). Although the Court must construe facts in the light most favorable to Kovalich, "there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50).

### B.     Nagelski's Sex Discrimination Claims Fail

Nagelski alleges federal and state claims of sex discrimination. The state claim is analyzed concurrently under the federal standard. *Alexander v. Carolina Fire Control Inc.*, 112 F. Supp. 3d 340, 350 (M.D.N.C. 2015). To establish a *prima facie* case, Nagelski must show: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action . . .; and (4) that similarly-situated employees outside the protected class received more favorable treatment." *White v. BFI Waste Servs.*, LLC, 375 F.3d 288, 295 (4th Cir. 2004).

12

### i.    Nagelski Was Not Meeting PPM's Legitimate Expectations

The Fourth Circuit requires a plaintiff to demonstrate she was meeting her employer's "legitimate expectations" in order to establish a *prima facie* case of discriminatory discharge. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006). "[B]ecause a plaintiff must show by a preponderance of the evidence that [she] met the employer's legitimate job expectations to prove [her] prima facie case, the employer may counter with evidence defining the expectations as well as evidence that the employee was not meeting those expectations." *Id.* at 515-16. "To require otherwise would turn the plaintiff's burden at the prima facie stage into a mere burden of production, making it difficult to imagine a case where an employee could not satisfy the 'qualified' or legitimate expectation element . . . ." *Id.* (internal quotation and alterations omitted).

Nagelski did not meet PPM's legitimate job expectations, and she only offers her personal opinion to dispute it. A plaintiff's self-serving testimony regarding her own job performance "cannot establish a genuine issue as to whether [the plaintiff] was meeting [the employer's] expectations." *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

For years, Nagelski was asked to provide on-site HR services; she refused, believing HR could be "faceless." (Nagelski Dep. 175:15-176:12; Exs. 7-9, 11; Yontz Decl. Ex. 8). If Plaintiff had not been related to Dr. Spivey, she would have been terminated for insubordination. (Dr. Spivey Decl. ¶ 18). Additionally, Nagelski overstepped her authority and engaged in combative behavior with personnel. (Yontz Decl. Ex. 9; Nagelski Dep. Exs. 6, 18). As the ultimate decision-maker, Dr. Spivey perceived Nagelski needed to report to

13

the office on a consistent basis. Working remotely may have worked fine in the early years, but with PPM's growth, Nagelski's belief HR could remain off-site is nonsensical. It is undisputed Dr. Spivey repeatedly requested Nagelski's physical attendance. Nagelski refused these requests, resulting in her HR duties being reassigned. (Dr. Spivey Dep. 189:6-10; 190:18-24). As for Plaintiff's financial liaison duties, the evidence demonstrates that the financial pressures on PPM, the expense of Nagelski's salary, and the cemented relationship between Dr. Spivey and the financial advisers made Nagelski's role unnecessary. (Nagelski Dep. 233:22-234:5).

### ii. There is No Evidence of Similarly-Situated Employees

Nagelski cannot demonstrate similarly-situated individuals outside the class received more favorable treatment. Where a plaintiff seeks to prove a discrimination claim by comparison to other employees, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008). Thus, plaintiff must establish "evidence that the employees' dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Dawkins v. SBV, LLC*, 2016 U.S. Dist. LEXIS 24138, at *17 (M.D.N.C. Feb. 26, 2016) (internal quotations and citations omitted).

Nagelski has not identified a single comparator who was treated more favorably. Instead, Nagelski's evidence is was female and was dismissed. (Nagelski Dep. 231:10-

232:16).  The fact Nagelski was replaced by a female, completely undermines any gender discrimination claim. See *Miles v. Dell, Inc.*, 429 F.3d 480, 488 (4th Cir. 2005) ("when a female plaintiff is fired and the employer replaces her with another woman, that fact at least tends to show that the employer's motivation for firing the plaintiff was not her sex").

### iii.  Nagelski Cannot Show Pretext

"Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006).  Nagelski's bare subjective belief she was the victim of discrimination is insufficient. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988).  Nagelski "must present substantial evidence to support as a reasonable probability, rather than as a mere possibility, her employer discriminated against her." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).

Nagelski produces no evidence that anyone who had direct or indirect input into her termination were motivated by discriminatory animus, especially given PPM's flexibility with Nagelski for years.  Dispelling any notion of sex discrimination, Nagelski was female when hired as a W-2 employee.  "[E]mployers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991).

### C.  Nagelski's Age Discrimination Claim Fails

15

Nagelski alleges federal and state claims of age discrimination. Courts "apply the same standards that apply under the ADEA" when considering wrongful-discharge claim on the basis of age under North Carolina law. *Alderman v. Inmar Enters., Inc.*, 201 F. Supp.2d 532, 546 (M.D.N.C. 2002). A *prima facie* case under the ADEA requires Nagelski to show she was (1) forty years of age or older when (2) her employer terminated her, (3) she was performing her duties at a level that met her employer's legitimate expectations, and (4) her former position remained open or was filled by a substantially younger person. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-285 (4th Cir. 2004). A plaintiff must prove "but for" her employer's motive to discriminate, she would not have suffered an adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

If Nagelski establishes a *prima facie* case, the *McDonnell Douglas* analysis requires consideration of whether PPM can show a legitimate, non-discriminatory reason for Nagelski's termination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). If the employer does so, the burden shifts back to the employee to show pretext. *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citations omitted).

### i. Nagelski Cannot Establish a *Prima Facie* Case

Nagelski alleges PPM engaged in a pattern or practice of age discrimination. However, the court must first determine whether Plaintiff has established a prima facie case. "A pattern or practice case is not a separate and free-standing cause of action . . . but

Case 1:17-cv-00854-TDS-LPA   Document 31   Filed 10/01/18   Page 16 of 27

is really 'merely another method by which disparate treatment can be shown.'" *EEOC v. Pbm Graphics*, 877 F. Supp.2d 334, 343 (M.D.N.C. 2012) (citations omitted).

Nagelski cannot make out a prima facie case because she cannot show she was replaced by a ***substantially younger individual***. Fourth Circuit district courts have held age differences of less than 10 years are not substantial. *Darnell v. Tyson Foods, Inc.*, 2012 U.S. Dist. LEXIS 173779, at *16-18 (W.D.N.C. Dec. 7, 2012) (six year age difference not "substantially younger"); *Rothrock v. Caldwell Cty./Caldwell Cty. Library*, 2012 U.S. Dist. LEXIS 119674, at *8-9 n.2 (W.D.N.C. Aug. 21, 2012) ("A five year age difference is not considered substantially younger."); *Robinson v. Greenwood Cty.*, 2011 U.S. Dist. LEXIS 145031, at *12-13 (D.S.C. Nov. 22, 2011) (holding a replacement who was 49 years old was not "substantially younger" than the 56-year-old plaintiff).

At the time of termination, Nagelski was 49 years old, while Yontz, who assumed Nagelski's HR duties, was 44. (Compl. ¶ 31). With five years difference, Yontz was not "substantially younger" than Nagelski. Nagelski proffers no other evidence aside from this insignificant age difference. Nagelski cannot establish her prima facie case.

### ii. PPM Articulates Legitimate, Nondiscriminatory Reasons for Nagleki's Termination

The decision terminating Nagelski's employment was legitimate and nondiscriminatory. PPM needed full-time on-site HR. After years of refusal, PPM was forced to hire someone who would be physically available to ensure PPM had competent and accessible HR. Nagelski recognized at the end of her employment she was merely

serving as the financial liaison. Even then, Plaintiff understood PPM had solidified a relationship with its financial representatives. (Nagelski Dep. 233:22-234:5).

Plaintiff may disagree with PPM's reasons, but mere disagreement is not evidence. *See DeJarnette*, 133 F.3d at 299. An employer need not prove its stated reason was "wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Id.* Neither Nagelski nor the courts "sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id.* Nagelski cannot substitute her own judgment for PPM's, and she cannot expect mere opinion, unsupported by any evidence, to support a claim that PPM's reason for her termination is untrue. PPM's legitimate reason for Plaintiff's termination defeats her discrimination claim requiring dismissal of her claim.

### iii. <u>Nagelski Has No Evidence of Pretext</u>

In proving PPM's stated reason was pretext for intentional discrimination, Nagelski must establish age was the "but-for" reason for her termination. *Gross*, 557 U.S. at 176. Nagelski's bare subjective belief she was the victim of discrimination is insufficient. *Goldberg*, 836 F.2d at 848.

Nagelski was 46 when hired as a W-2 employee (Nagelski Dep. 81:1-5), creating a strong inference that Nagelski's termination was not pretextual. *Proud*, 945 F.2d at 798. Nagelski further attempts to demonstrate pretext by inferring age discrimination from the terminations of seven PPM employees between January and September of 2016. Compl. ¶¶ 47, 65, 68. Alleging the existence of a pattern or practice of discrimination does not

18

automatically give rise to a presumption Nagelski was subject to a discriminatory practice. *Muhammed v. Giant Food Inc*., 108 Fed. Appx. 757, 764 (4th Cir. Aug. 12, 2004) (unpublished opinion) (citation omitted). Instead, that "presumption arises only when the evidence establishes that a pattern or practice of discrimination exists." *Id.* (emphasis in the original); *Coker v. Charleston County School Dist.*, 1993 U.S. App. LEXIS 20836 (4th Cir. Aug. 16, 1993) (unpublished opinion) (affirming summary judgment on pattern or practice claim because plaintiffs failed to provide sufficient evidence discrimination was defendant's standard operating procedure when plaintiffs only provided deposition testimony along with flawed statistical evidence).

The evidence belies any evidence of a pattern or practice of age discrimination. As illustrated by Yontz Decl. Ex. 18, of the seven employees referenced in the Complaint, six were terminated in the reorganization,[2] and their duties reassigned to others. Of these six employees, the duties of three employees were assigned to employees over the age of forty. *Id.* None of these employees had the same position as Nagelski, and none of the employee's positions have been replaced. *Id.* Nagelski has no knowledge of why these employees were separated. (Nagelski Dep. 27:17-30:10, 19-20, 32:17-19). Moreover, Nagelski had no information about how many people applied or were hired that were over 40 versus under 40 during the time. (*Id.* 232:10-16). Nagelski is limited to only her belief there was a pattern. (*Id.* 231:10-21). Nagelski has not shown pretext.

**D.** **Nagelski's Retaliation Claim Fails**

---

[2]PPM terminated one employee for performance reasons.

To prove retaliation, Nagelski must demonstrate (1) she engaged in protected activity; (2) PPM took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse employment action. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989). Retaliation may be shown through direct evidence or by utilizing the *McDonnel Douglas* burden-shifting framework. *Castonguay,* 2014 U.S. Dist. LEXIS 59881, at *16. If Plaintiff satisfies her initial burden, PPM must then "articulate a legitimate, non-retaliatory justification." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). Kovalich must then prove PPM's reason is pretext. The ultimate burden of persuasion remains with Plaintiff *at all times*. *St. Mary's Honor Ctr.*, 509 U.S. at 508. Retaliation claims require proof of but-for causation. *Nassar*, 133 S.Ct. at 2533.

### i.      Nagelski Did Not Engage in Protected Activity

An employee must show she engaged in protected activity. *Burlington N. and Santa Fe Ry Co. v. White*, 548 U.S. 52 (2006). The Fourth Circuit follows a two-step process to determine whether an employee has engaged in protected conduct. *Bowman v. Baltimore City Bd. of Sch. Comm'rs.*, 2017 U.S. Dist. LEXIS 127650, at *11-12 (D. Md. Aug. 11, 2017) (citation omitted).

Nagelski claims she objected to the termination of an employee on the basis of his sexual orientation.[3] Compl. ¶ 85. Prior to the termination, both Spiveys told Nagelski the employee was being terminated because the position did not require a nurse. (Dr. Spivey

---

[3] Sexual orientation is not a protected category under Title VII. 42 U.S.C. § 2000e-2(a).

Dep. 124:9-20, 132:3-5; Nagelski Dep. Ex. 12). Nagelski knew nothing about why the employee was terminated. (Nagelski Dep. 29:10-16). Nagelski admitted she never told the employee's supervisor, Sherry Spivey, the employee was in a protected class. (*Id.* 187:8-18; 189:19-25; 190:1-5; Ex. 11). Even though Plaintiff told Dr. Spivey the employee was in a protected class, she never elaborated. Dr. Spivey perceived Nagelski's alleged concern as an excuse to avoid rescheduling her Philadelphia trip. (Dr. Spivey Decl. ¶ 19; Sherry Spivey Dep. Ex. 63). Neither the ADEA nor Title VII prohibit separation of employees simply because they are in a protected class. Expressing concern about the termination of an employee for the mere fact they are in a protected class, without more, is not enough to constitute protected activity—particularly where sexual orientation is not even a protected category under Title VII.

### ii. Causal Connection

"[R]etaliation claims require proof that the desire to retaliate was *the* but-for cause of the challenged employment action." *Nassar*, 133 S. Ct. at 2528-30 (emphasis added). "When causation is dispositive, a case should proceed to the jury only where circumstantial evidence supports a probability, both reasonable and substantial, of an impermissible motive rather than its mere possibility so as to insure the jury will not rely on speculation or conjecture." *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 2017 U.S. App. LEXIS 15521, at *19 (4th Cir. Aug. 17, 2017) (unpublished) (citation omitted).

Temporal proximity alone may "satisf[y] the less onerous burden of making a prima facie case of causality." *Williams*, 871 F.2d at 457. "[T]emporal proximity must be very

21

close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). A temporal gap of "more than three months" is "too long to establish causation, without more." *Perry v. Kappos*, 489 F.App'x 637, 643 (4th Cir. 2012); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F.App'x 229, 233 (4th Cir. 2006) (three to four months insufficient).

Because Nagelski was terminated *five months* after objecting to terminating an employee, she cannot rely on temporal proximity alone. Where temporal proximity is missing, a plaintiff may use other relevant evidence during the intervening period to establish causation. *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

Nagelski points to no other direct or circumstantial evidence supporting a causal connection aside from the fact in July 2015 she expressed she was uncomfortable with an employee's termination. Without sufficient proof of a causal connection, Nagelski's *prima facie* case fails.

### iii. Nagelski Cannot Overcome the Legitimate Non-retaliatory Reason for Her Termination

"[W]hen an employer articulates a reason for discharging the plaintiff that [Title VII] does not proscribe, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900-01 (4th Cir. 2017). As detailed *supra*, Nagelski was repeatedly asked to provide on-site HR *prior* to engaging in alleged protected activity. Likewise, prior to Nagelski's July 2015 objection, the Spiveys communicated with their wealth management advisor their thoughts on replacing Nagelski. (Yontz Decl.

22

Ex. 17).  Without showing evidence contradicting these critical facts, Nagelski's retaliation claim fails.

**E.**     **Nagelski's ERISA Claim Fails**

Nagelski seeks damages under § 510 of ERISA, 29 U.S.C. § 1140, because PPM terminated her employment in order to intentionally deprive her of rights in PPM's Cash Balance Plan.  Section 510 provides in pertinent part: "It shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right."  29 U.S.C. § 1140.  A § 510 claim requires proof of specific intent, *i.e.*, the employer discharged the employee with the purpose of interfering with the employee's pension rights. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir. 1991).  The Fourth Circuit applies the *McDonnell Douglas* burden-shifting proof scheme to § 510 claims. *Id.* at 239 (citations omitted).

Nagelski fails to proffer evidence PPM specifically intended to interfere with her vesting in the Plan.  Employees alleging interference with ERISA rights must make a *prima facie* case showing (1) a defendant performed a prohibited action (2) for the purpose of interfering (3) with the attainment of a right to which the employee is currently, or in the future may become, entitled. *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3d Cir. 1987) (citations omitted).  Once plaintiff establishes a prima facie case, the burden shifts to the defendant to state a legitimate, nondiscriminatory explanation. *Id.*  Once defendant carries this burden, the burden shifts back to the plaintiff to establish the pretext. *Id.*  If plaintiff

23

fails to present facts permitting a reasonable inference of pretext, summary judgment is proper.

Nagelski contends PPM specifically intended to interfere with the impending vesting of her rights under the Plan. This claim fails because Nagelski cannot demonstrate pretext. Nagelski has not developed evidence showing any decision-makers thought about the Plan when deciding to eliminate her position. (Dr. Spivey Decl. ¶ 29; Benton Decl. ¶ 12). Nagelski's claim is nonsensical because the Spiveys did not gain from her termination because any monies forfeited by Plan Participants stayed in the Plan and were used to fund benefits of vested employees. (Dr. Spivey Dep. 179:2-9; 180:1-7).

Ultimately, Nagelski's argument is her termination saved PPM money which is insufficient "evidence" of pretext. As noted in *Conkwright*,

> While plaintiff's termination probably did save [the Company] money, this is not enough to carry the day...[P]laintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent.

*Conkwright*, 933 F.2d at 239 (citations omitted).

Further, Nagelski fails to supply any connection between her discharge, and PPM's alleged attempt to prevent her from attaining ERISA-protected benefits.[4] No reasonable jury could find unlawful intent. Summary judgment is appropriate.

**F.**     **Punitive Damages**

---

[4] Had Nagelski vested, her benefit would have been $5,193. (PPM Dep. Vol. II, 150:13-23).

By statute, punitive damages may be awarded "only if the Plaintiff proves that the defendant is liable for compensatory damages" and is limited to cases involving fraud, malice or willful or wanton conduct. N.C. Gen. Stat. § 1D-15. "If the injured party has no cause of action independent of a supposed right to recover punitive damages, then she has no cause of action at all." *Hawkins v. Hawkins*, 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991) (citations omitted). Because Nagelski's claim for punitive damages is derivative of her other claims, which all fail, her claim for punitive damages is barred.

Further, N.C. Gen. Stat. § 1D-1 *et seq*. provides punitive damages may only be awarded if plaintiff proves the existence of fraud, malice, or willful or wanton conduct. Nagelski has not proffered any such evidence, requiring dismissal of this claim.

<u>**CONCLUSION**</u>

For the above-stated reasons, PPM's Motion for Summary Judgment should be ALLOWED, and Nagelski's action should be dismissed with prejudice.

Respectfully submitted this the 1st day of October, 2018.

JACKSON LEWIS P.C.

*/s/ Ann H. Smith*
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

25

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and )
SUZANNE NAGELSKI, )
 )
        Plaintiffs, )
vs. ) **CERTIFICATE OF**
 ) **SERVICE COMPLIANCE**
PREFERRED PAIN MANAGEMENT )
& SPINE CARE, P.A., *et al.*, )
 )
        Defendants. )

     The undersigned counsel hereby certifies compliance with, Local Rule 7.3(d)(1).

The undersigned counsel further certifies this Memorandum, including the body of the

brief, headings, and footnotes does not exceed 6,250 words.

               JACKSON LEWIS P.C.


               */s/ Ann H. Smith*
               ANN H. SMITH
               N.C. State Bar No. 23090
               CAITLIN M. GOFORTH
               N.C. State Bar No. 49227
               *Attorneys for Defendants*
               3737 Glenwood Avenue, Suite 450
               Raleigh, NC 27612
               Telephone:  (919) 760-6460
               Facsimile:   (919) 760-6461
               Email:   Ann.Smith@jacksonlewis.com
               Email: Caitlin.Goforth@jacksonlewis.com

Case 1:17-cv-00854-TDS-LPA   Document 31   Filed 10/01/18   Page 26 of 27

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

| | | |
|---|---|---|
| REBECCA KOVALICH and<br>SUZANNE NAGELSKI, | ) | |
| | ) | |
| Plaintiffs, | ) | **CERTIFICATE OF** |
| vs. | ) | **SERVICE** |
| | ) | |
| PREFERRED PAIN MANAGEMENT<br>& SPINE CARE, P.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned certifies that on October 1, 2018, the foregoing *Memorandum of Law in Support of Preferred Pain Management's Motion for Summary Judgment as to Suzanne Nagelski's Claims* was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system, which will send notification of such filing as follows:

Sean F. Herrmann, Esq.
Van Kampen Law P.C.
315 East Worthington Avenue
Charlotte, NC 28203
sean@vankampenlaw.com
*Attorney for Plaintiffs*

/s/ Ann H. Smith
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
Jackson Lewis P.C.
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

4840-6340-1589, v. 2

27