IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and                    )
SUZANNE NAGELSKI,                        )
                                         )
          Plaintiffs,                    )     **MEMORANDUM OF LAW IN**
                                         )     **SUPPORT OF PREFERRED PAIN**
vs.                                      )     **MANAGEMENT'S MOTION FOR**
                                         )     **SUMMARY JUDGMENT AS TO**
PREFERRED PAIN MANAGEMENT                )     **REBECCA KOVALICH'S CLAIMS**
& SPINE CARE, P.A., *et al.*,            )
                                         )
          Defendants.                    )

NOW COMES Preferred Pain Management & Spine Care, P.A. ("Defendant" or "PPM"), and pursuant to Local Rule 7.2, MDNC, files this Memorandum of Law. PPM respectfully contends its Motion for Summary Judgment should be granted as to all claims asserted by Plaintiff Rebecca Kovalich ("Kovalich").

## I.     STATEMENT OF THE CASE

Plaintiffs Suzanne Nagelski ("Nagelski") and Kovalich filed their Complaint on August 1, 2017, in Forsyth County Superior Court alleging claims against PPM, Dr. Spivey, and Sherry Spivey. [DE #6]. Kovalich alleged claims for: age discrimination under the Age Discrimination in Employment Act; violation of Title VII of the Civil Rights Act; wrongful discharge on the basis of age and sex in violation of North Carolina Public Policy; and violations of the Employment Retirement Income Security Act against PPM. [DE # 6]. Kovalich seeks compensatory and punitive damages. On September 25, 2017, PPM removed Kovalich's Complaint. [DE # 1]. PPM filed its Answer on November 1,

2017. [DE # 10].  On December 1, 2017, Judge Auld entered a text order approving the joint Rule 26(f) report [DE # 14], setting a dispositive motions deadline 30 days after discovery closed.  On July 2, 2018, Judge Auld entered a text order granting Plaintiffs' motion to amend case management order setting a discovery deadline of August 31, 2018. [DE # 22].  On September 12, 2018, PPM filed its Notice of Intent to File Summary Judgment Motion. [DE # 24]. PPM filed a Motion for Summary Judgment, [DE # 32] and files this Memorandum of Law in support.

## II.  STATEMENT OF FACTS

*Kovalich's Background*

The Plaintiffs and individual Defendants are family.  In 1966, Kovalich (age 71)[1] married Sherry Spivey's brother and gave birth to Nagelski (age 49), Sherry Spivey's niece. (Kovalich Dep. 23:8-11; 14-15).

In the 80s and 90s, Kovalich worked in the healthcare industry in Winston-Salem and started Triad Clinical Laboratory, which performed clinical lab testing. (*Id*. 34-37; 40:4-17).  Kovalich never conducted any lab testing as she is not a licensed physician or medical technologist. (*Id*. 41:14-42:25).  In 2003, Kovalich sold the business for approximately $10 million. (*Id*. 43:9-25).

*The Spiveys' Background*

Dr. Spivey (age 64) and Sherry Spivey (age 64) married in 1980. (Dr. Spivey Decl. ¶¶ 3, 32; Sherry Spivey Dec. ¶ 27).  Sherry Spivey graduated and was working as a

---

[1] All ages referenced *infra* are at the time of Kovalich's termination.

Registered Nurse. (Sherry Spivey Decl. ¶ 3). Dr. Spivey graduated medical school in 1981. (Dr. Spivey Dep. 18:11-16). The Spiveys moved to the west coast and resided there for several decades where they worked in medicine. (*Id.* 18:17-25; Sherry Spivey Decl. ¶ 5).

In 2005, the Spiveys returned to North Carolina. (Dr. Spivey Dep. 32:18-25). In 2006, the Spiveys decided Dr. Spivey could start a pain management practice in Winston-Salem. (Dr. Spivey Decl. ¶ 7). They consulted with Kovalich and utilized her contacts in the medical community to begin PPM. Compl. ¶ 18. Later, the Spiveys engaged Nagelski, a recent MBA graduate, to perform administrative functions for PPM. Compl. ¶ 20.

PPM is a medical clinic providing patients with treatments to reduce levels of pain and increase functionality. (Dr. Spivey Decl. ¶ 8). PPM began with one clinic in Winston-Salem but now has another clinic in Greensboro. (*Id.* ¶ 9). PPM operates a laboratory at a separate location in Greensboro. (*Id.*)

### *Kovalich's Development of the Laboratory*

Kovalich's principal role was assisting PPM in developing the laboratory which opened in 2013. (*Id.* ¶ 12). She performed various tasks, including hiring for the lab. (*Id.*; Kovalich Dep. 121:18-123; Hawks Dep. 15:10-16:6).

Kovalich began as an independent contractor providing consulting services to PPM. (Kovalich Dep. 123:15-127:9). Later, Nagelski changed Kovalich's status to employee effective December 1, 2013. (Dr. Spivey Decl. ¶ 13; Nagelski Dep. 221:17-223:16). Kovalich never had an official title or job description. (Dr. Spivey Decl. ¶ 13). She never had a schedule or number of hours to work. (Kovalich Dep. 140:21-141:5, 162:5-163:7,

3

164:1-15, 165:22-25; 166:18-167:23). Kovalich owned homes in Charleston, South Carolina area, and spent significant time there instead of working at the Greensboro lab. (*Id.* 161:2-165:25).

Kovalich assisted in hiring Medical Technologist Gretchan Hawks (female, age 47), and five other lab personnel all over forty. (Yontz Decl. ¶ 17, Ex. 19). After the lab opened in 2013, it operated on auto pilot, and the hours Kovalich worked "got less and less." (Kovalich Dep. 166:7-167:18). By 2016, Kovalich estimated she worked ten to twenty hours a week. (*Id.* 167:7-18). Hawks was able to handle most things and would contact Kovalich if an issue arose. (*Id.* 166:22-167:6). Kovalich was initially paid $60,000 per year and then $72,000 per year. (*Id.* 234:21-236:18).

### Kovalich's Relationship with Dr. Spivey

Kovalich believed Dr. Spivey went through a period around 2013 where he needed a friend and wanted more out of their relationship. (*Id.* 199-200). Kovalich and Dr. Spivey exchanged flirty text messages where Dr. Spivey sometimes greeted Plaintiff with "Rebecca my beauty" or "Object of my desire." (Kovalich Dep. Exs. 10, 11). Kovalich claimed she "did her best to ignore Dr. Spivey's inappropriate behavior." Compl. ¶ 33. However, she responded to Dr. Spivey's texts with "hello Mr. Handsome or Mr. GQ or something like that." (Kovalich Dep. 246: 2-9). Kovalich complimented Dr. Spivey's appearance because "[w]hen he first started, he had on green scrubs and looked scruffy. And then he started wearing suit and tie and he really – I mean, he – he looked very, very, very handsome." (*Id.* 246, 247:1-5). Dr. Spivey would return compliments to Kovalich.

4

(*Id*. 246:15-17). Their relationship was one of "mutual admiration" where they exchanged texts with flirtatious salutations, but the substance focused on business. (Dr. Spivey Dep. 258:11-19).

Kovalich found Dr. Spivey to be "a very handsome man" and there was nothing wrong with him "except that he's married and [Kovalich] was not romantically interested in him." (Kovalich Dep. 245:2-4). Kovalich testified the communications from Dr. Spivey made her sad because he seemed desperate and unhappy in his marriage. (*Id*. 202:7-24). Kovalich believed Dr. Spivey "wanted more out of a relationship" and thought "he needed something that [she] couldn't give him." (*Id*. 200:2-11). Kovalich knew Dr. Spivey was married to Sherry Spivey and expressed "the last thing I want is to – to destroy, you know, your relationship or what relationship you have with your family." (*Id*. 201:7-202:6). Dr. Spivey never asked Plaintiff on a date. (*Id*. 209:3-9). The closest thing to a proposition was when Dr. Spivey referred to himself as Plaintiff's "wannabe lover" to which Plaintiff called him "Mr GQ" in response. (*Id*. Ex. 12). On October 24, 2013, Plaintiff texted Dr. Spivey "as desirable as u are …it would be too much Hell to pay!" (*Id*.) Dr. Spivey agreed. (*Id*.)

In 2014, Kovalich was talking with Dr. Spivey when he said he wanted to come see her. (*Id*. 204:6-20, 247:14-24). Kovalich declined because friends were visiting. (*Id*.) They discussed office issues, then Dr. Spivey allegedly asked Kovalich what she was wearing. (*Id*.) In November 2014, Plaintiff alleges Dr. Spivey said to her "you know, I gave you a chance," and the two said nothing further. (*Id*. 219:10-221:11; Compl. ¶ 37).

5

In February 2015, Dr. Spivey hugged Plaintiff in the parking lot. (Kovalich Dep. 259:5-18). Plaintiff admitted "it was nothing romantic or sexual, it was just – it was just fun." (*Id.*) Eight months later, on a busy work day in October 2015, Kovalich alleges she was in Dr. Spivey's office with the door open when he suddenly kissed her. (*Id.* 207:5-208:11, 260:11-13, 261:22-25). Kovalich did not report any of these incidents while employed. (*Id.* 208:12-14, 260:14-261:12).

***Kovalich's Issues with Sherry Spivey***

Kovalich testified about a number of incidents with Sherry Spivey while Kovalich was a PPM employee. (*Id.* 173-199; 218:25-219:9). In 2012 or 2013, Sherry Spivey told Kovalich if Kovalich needed anything to bring it to her, and she would take it to Dr. Spivey. (*Id.* 173:7-174:19). Kovalich responded she reported to Dr. Spivey and could go to him herself. (*Id.*) In 2013, Sherry Spivey (1) got upset with Kovalich for hiring a nurse without her permission (*Id.* 175:3-177:8); (2) cursed at Kovalich as she was walking down the hall for no reason (*Id.* 179:3-183:4); and (3) called Kovalich and began screaming at another employee for not doing her job (*Id.* 183:5-185:21). This same year, Sherry Spivey directed an employee to cancel a repair of lab equipment. (*Id.* 188:3-189:14). When Kovalich alerted Dr. Spivey, he was angry and told Sherry Spivey to "stay the f*** out of the laboratory." (*Id.* 189:6-17). Kovalich was frustrated Sherry Spivey "was just bouncing in, bouncing out, giving a few orders, taking off. And not being accountable...." (*Id.* 177:12-18).

6

When Kovalich approached Dr. Spivey about these issues, Dr. Spivey said he could not get involved because it was either his marriage or his practice. (*Id*. 184:20-23). Kovalich testified at this point Sherry Spivey wanted to get rid of her and was "coming after her" because of the lab and "because of other things too" including the fact Kovalich felt Dr. Spivey "really liked her," and he needed her friendship. (*Id*. 190:24-191:6, 198:19-199:5).

Sherry Spivey was not aware of any alleged inappropriate conduct between Kovalich and Dr. Spivey while Kovalich worked at PPM. (Sherry Spivey Dep. 236:14-17; 238:2-239:9). Sherry Spivey did not know about: (1) the "flirty" text messages (*Id*. 235:10-21, 236:2-13); the alleged phone call when Dr. Spivey allegedly asked Kovalich what she was wearing; and (3) any alleged kiss between Dr. Spivey and Plaintiff. (*Id*. 240:12-20).

***PPM Forced to Decrease Costs***

PPM began feeling "the effects of a number of factors that were impacting the practice from a reimbursement standpoint and also from a volume standpoint." (Dr. Spivey Dep. 13:14-17). Beginning in late 2014, insurance reimbursements dropped. (*Id*. 90:22-93:24; Kovalich Dep. 171:6-172:11). Additionally, there was more pain management competition in the area, less outside referrals, and decreased patient volume. (Dr. Spivey Dep. 13:13-14:3). "[B]eginning around 2015, [PPM] had to make significant reductions in personnel and reassignment of duties … to keep the practice profitable and survive." (*Id*. 13:25-14:3). By 2016, Kovalich understood the financial pressures PPM faced because of

reduce reimbursement rates resulting in the lab becoming less profitable. (Kovalich Dep. 172:3-11, 232:25-233:3).

In late 2015, Mary Benton (female, age 64) began advising PPM on operational strategy. (Benton Decl. ¶ 6; Ex. 1). Benton had been providing services for PPM since 2013 at Kovalich's recommendation. (Dr. Spivey Dep. 103:1-6; Benton Decl. ¶ 5; Benton Dep. 30:3-18; 32:16-24). Dr. Spivey instructed Benton to look for ways to reorganize PPM. (Dr. Spivey Dep. 70:17-22). Benton's role "was to look at different positions and the need for them" and find "opportunities to control cost." (Benton Dep. 97:3-98:3; 107:25-108:4). Benton developed an Action Plan recommending PPM evaluate the need and timeline of staffing. (Benton Decl. Ex. 1). Benton "looked at each one of the positions that got eliminated based on reorganization the same way. It wasn't about the person. It was about the function and the need to cut costs as part of the reorganization." (Benton Dep. 125:7-11).

In November 2015, PPM hired Wendy Yontz (female, age 44) to provide full-time on-site HR. "Reorganization was a topic from the moment [Yontz] started" as there were "issues that [she] saw that needed to be addressed." (Yontz Dep. 37:20-23; 49:1-11). Yontz spent time "observing different positions and learning what people did and the need or lack of need for certain positions." (*Id.* 47:7-15). Yontz talked with Benton, and within Yontz's first two months, she suggested elimination of certain positions. (*Id.* 47:14-48:5; 50:9-25; 71:20-25). Benton and Yontz discussed their thoughts on reorganization with Dr. Spivey, and he realized the need to reorganize. (*Id.* 48:20-22; 49:22-24; Dr. Spivey Dep. 70:5-11).

8

*Elimination of Nagelski's Position*

On January 16, 2016, Dr. Spivey sent Nagelski a letter stating as of February 1, 2016, she was no longer a PPM employee. (Nagelski Dep. Ex. 29). PPM eliminated Nagelski's position because her HR duties were previously reassigned, and PPM had formalized its relationship with its accountancy and banking resources. (*Id.*) Dr. Spivey indicated he wanted to continue to use Nagelski as a consultant on an as-needed basis. (*Id.*) Nagelski never contacted Dr. Spivey regarding this offer. (Nagelski Dep. 233:11-17). Instead, Nagelski retained counsel and sent a demand letter to PPM. (Dr. Spivey Dep. 238:4-12).

Kovalich did not know why Nagelski was separated, but felt the manner Dr. Spivey notified Nagelski was callous. (Kovalich Dep. 96:22-97:8). In March 2016, worried Kovalich may sabotage lab operations in response to Nagelski's termination, Dr. Spivey called Kovalich. (Dr. Spivey Dep. 246:6-248:9). Dr. Spivey asked Kovalich to confirm Nagelski's termination would not prompt Kovalich to retaliate against PPM. (*Id.* 248:4-9; Kovalich Dep. 76:5-18; Ex. 13).

When Kovalich complained Nagelski was not informed of her termination in-person, Dr. Spivey told Kovalich the termination happened that way because Nagelski was rarely physically present in the office. (Kovalich Dep. 75:8-19; Dr. Spivey Dep. 242:10-18). Dr. Spivey informed Kovalich PPM could benefit from Nagelski working as a consultant as needed. (Dr. Spivey Dep. 253:3-10; Kovalich Dep. Ex. 13). Kovalich testified Dr. Spivey requested she communicate with Nagelski since he was not allowed to

9

contact Nagelski. (Kovalich Dep. 75:20-76:3; Ex. 13). Kovalich claims Dr. Spivey told Kovalich he would pay whatever Nagelski wanted to drop her charge against PPM. (*Id.*) Kovalich responded she did not want to get involved in any dispute between PPM and Nagelski. (*Id.* 75:25-76:3; Ex. 13).

Kovalich and Dr. Spivey did not speak about the matter again. (*Id*. 76:19-24). Several months later on June 6, 2016, the EEOC notified PPM Nagelski filed a Charge. (Sherry Spivey Dep. Ex. 97).

### *Kovalich's Position Was Eliminated*

Kovalich's duties ended when lab development ceased in 2015. (Dr. Spivey Dep. 217:10-223:2). Dr. Spivey began considering terminating Kovalich, (*Id.* 225:9-11), but he "kept paying … to compensate her for things she had done earlier on in the practice for which [he] felt she had not been adequately compensated." (*Id.* 219:11-16; 219:17-222:17). Dr. Spivey sought alternative methods to compensate Kovalich, including ownership in a new lab and a lump sum, but she declined. (*Id.* 221:22-222:8; Kovalich Dep: 228:16-229:16; Ex. 17). Kovalich was unqualified to be the medical or clinical director of the lab. (Hawks Dep. 44:4-45:18). Kovalich was unqualified to conduct screenings or confirmation testing. (*Id.* 45:19-25).

In early 2016, Benton discussed with Dr. Spivey her "concerns of Rebecca not being involved as much in the lab, the fact that we were looking at costs." (Benton Dep. 119:1-10; Dr. Spivey Dep. 224:18-225:4). On March 29, 2016, Benton visited the lab to observe operations. (Benton Decl. ¶ 10; Ex. 2). Benton questioned PPM's need for a lab manager

after learning Kovalich was rarely physically present, and Hawks was overseeing day-to-day operations. (Yontz Decl. Exs. 1 and 12; Benton Dep: 120:14-18, 123:15-124:19). Benton evaluated the lab budget and need for Kovalich's position. (Benton Dep. 119:11-19; Benton Decl. Ex. 1).

On June 1, 2016, after discussing with Dr. Spivey, Benton memorialized her concerns regarding Kovalich's position. (Yontz Decl. Ex. 12; Benton Dep. 126:7-127:11). By June 2, 2016, Dr. Spivey decided to eliminate Kovalich's position. (Yontz Decl. Ex. 13; Benton Decl. Ex. 2). Given the financial pressures, PPM needed to cut costs which, included eliminating pay for unnecessary services. (Dr. Spivey Decl. ¶ 31). On June 9, 2016, Kovalich's position was eliminated because "the position was not needed." (Yontz Decl. Ex. 12; Benton Decl. Ex. 2; Yontz Dep. 74:16-23). Lab employees now report to Dr. Spivey. (Hawks Dep. 26:23-27:13). Kovalich's position no longer exists. (*Id.* 48:16-49:1; Dr. Spivey Dep. 265:6-266:16).

### *The Cash Balance Plan*

The Cash Balance Plan ("the Plan") is a way for PPM to provide additional retirement benefits to employees. (Dr. Spivey Dep. Ex. 90; Nagelski Dep. 150:22-25). The Newport Group, Inc. ("Newport Group") is the third-party administrator which oversees the Plan's administration and legal compliance. (Dr. Spivey Decl. ¶ 33). PPM and Dr. Spivey rely on Newport Group to manage the Plan. (*Id.*)

Once an employee has been employed by PPM for one year or 1,000 hours, they are eligible for the Plan ("Plan Participant"). (*Id.* ¶ 35). The Plan Participants make no

contributions; PPM fully funds the Plan. (*Id.*) After three years, the Plan Participant becomes 100% vested. (*Id.*)

## III.    QUESTIONS PRESENTED

Has Kovalich proffered evidence creating a genuine issue of material fact as to the four claims she alleged against PPM?

## IV.    ARGUMENT

### A.    Standard of Review

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Holland v. Wash. Homes, Inc.*, 487 F.2d 208, 213 (4th Cir. 2007). Although the Court must construe facts in the light most favorable to Kovalich, "there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50).

### B.    Kovalich's Sex Discrimination Claims Fail

Kovalich alleges a state wrongful discharge claim on the basis of sex as well as Title VII sex discrimination. DE # 6, ¶¶ 81, 83. The state claim is analyzed concurrently under the federal standard. *Alexander v. Carolina Fire Control Inc.*, 112 F. Supp. 3d 340, 350 (M.D.N.C. 2015). Kovalich must show: (1) she belongs to a protected group; (2) she has

12

been subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Maya v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir. 2001).

### i. Kovalich's Title VII Claims Are Untimely

To pursue her Title VII claim, Kovalich must have filed an EEOC Charge of Discrimination within 180 days of the last alleged incident or the claims are time-barred. 42 U.S.C. § 2000e-5(e)(1)(1994); *McCollough v. Branch Banking & Trust Co.*, 35 F.3d 127, 131 (4th Cir. 1994).

Kovalich executed her Charge on December 1, 2016. (Kovalich Dep. Ex. 19). Counting backwards 180-days is June 4, 2016. PPM terminated Plaintiff on June 9, 2016. This leaves only a five day window, from June 4 until June 9, 2015, in which unlawful conduct could have occurred and not be time-barred.

Kovalich has no evidence of harassment during this period. The latest incident of alleged inappropriate conduct occurred in October 2015—over one year before she filed her Charge. (*Id.* 207-208, 259-261). Kovalich's Title VII sexual harassment claims must be dismissed as untimely.

### ii. The Alleged Conduct Was Not Unwelcome

Kovalich's claims fail because the conduct was not unwelcome. Whether Dr. Spivey's alleged sexual behavior was "unwelcome" must be determined by whether

13

Kovalich "by her conduct indicated that the alleged sexual advances were unwelcome." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68; *cf. EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 314 (4th Cir. 2008).

Kovalich and Dr. Spivey exchanged playful communications. While Kovalich testified she "was not romantically interested in him", she engaged in flirtatious conduct towards Dr. Spivey telling him he was "desirable", calling him "Mr. GQ", and complimenting him because he looked "very, very, very handsome." (Kovalich Dep. 245:2-4, 246:2-17). Kovalich's actions demonstrate the conduct was not unwelcome.

### iii.  The Alleged Conduct Was Not Severe Or Pervasive

Kovalich has not proffered evidence to show the alleged conduct was severe or pervasive to alter the work environment and create an abusive working environment. *Meritor Sav. Bank, FSB*, 477 U.S. at 67 (citations omitted). Courts must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Harassment must be *both* objectively and subjectively severe and pervasive. *Id.* at 21. Objective harassment is determined by the perspective of a reasonable person. *Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81 (1998). Kovalich "must clear a high bar to satisfy the severe or pervasive test." *EEOC*, 521 F.3d at 315. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" are insufficient to

14

alter the terms and conditions of employment. *Faragher v. City of Boca Rotan*, 524 U.S. 775, 788 (1998)). "[C]onduct must be extreme." *Id.*

A claim involving touching is sometimes sufficient to survive summary judgment. At most, Kovalich claims one inappropriate touching, the October 2015 kiss. Isolated touching incidents are insufficient to satisfy the severe or pervasive test. *Castonguay v. Long Term Care Mgmt. Servs., LLC*, 2014 U.S. Dist. LEXIS 59881, at *41-42 (M.D.N.C. Apr. 30, 2014) (three incidents of buttocks touching insufficient for a hostile work environment claim); *Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 747, 753 (4th Cir. 1996) (conduct over several years, including a kiss on the mouth insufficient for a hostile work environment claim). Here, a single kiss, mutual compliments, and one "what are you wearing?" comment equates to nothing more than evidence of flirting—and not severe or pervasive conduct. Kovalich never complained of sexual harassment while employed, nor did she ever ask her own daughter, who was over HR, to investigate the behavior. (Kovalich Dep. 205:20-207:2, 208:12-24). Even after Kovalich shared the text messages with Nagelski, neither took any action while they were employees. (*Id.*) Conduct that was easily disregarded by Kovalich and Nagelski cannot meet the severe or pervasive test.

## C. <u>Kovalich's Age Discrimination Claims Fail</u>

Kovalich alleges federal and state claims of age discrimination. Courts "apply the same standards that apply under the ADEA" when considering wrongful-discharge claim on the basis of age under North Carolina law. *Alderman v. Inmar Enters., Inc.*, 201 F. Supp.2d 532, 546 (M.D.N.C. 2002). A *prima facie* case under the ADEA requires Plaintiff

15

to show she was (1) forty years of age or older when (2) her employer terminated her, (3) she was performing her duties at a level that met her employer's legitimate expectations, and (4) her former position remained open or was filled by a substantially younger person. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284-285 (4th Cir. 2004).  A plaintiff must prove "but for" her employer's motive to discriminate, she would not have suffered an adverse employment action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009).

If Kovalich establishes a *prima facie* case, the *McDonnell Douglas* analysis requires consideration of whether PPM can show a legitimate, non-discriminatory reason for Kovalich's termination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993). If the employer does so, the burden shifts back to the employee to show pretext. *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citations omitted).

### i.   Kovalich Cannot Establish a *Prima Facie* Case

Kovalich alleges PPM engaged in a pattern or practice of age discrimination. However, the court must first determine whether Plaintiff has established a prima facie case.  "A pattern or practice case is not a separate and free-standing cause of action . . . but is really 'merely another method by which disparate treatment can be shown.'" *EEOC v. Pbm Graphics*, 877 F. Supp.2d 334, 343 (M.D.N.C. 2012) (citations omitted).

Kovalich cannot demonstrate her position remained open or was filled by a substantially younger person because it was never filled. (Hawks Dep. 48:16-49:1).

16

Kovalich's duties were obsolete. (Dr. Spivey Dep. 217:10-223:2; Benton Dep. 119:11-19; Benton Decl. Ex. 2; Yontz Decl. Ex. 12). When Kovalich's position was eliminated, the lab was running "like a well-oiled machine." (Hawks Dep. 30:12-31:8).

Two years have passed since Kovalich's separation, and her position remains unfilled. Elimination of a position, particularly given PPM's financial pressures, cannot be discrimination. PPM's decisions regarding workplace organization are the type of business decisions which are not to be second-guessed. *Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir. 1995).

### ii. PPM Articulates Legitimate, Nondiscriminatory Reasons for Kovalich's Termination

PPM terminated Kovalich because her position was unnecessary. By 2015, lab development had ceased, and Kovalich was working little. (Kovalich Dep. 166:7-167:18; Dr. Spivey Dep. 217:10-223:2, Yontz Decl. Exs. 1 and 12; Benton Dep. 120:14-18, 123:15-124:19). The lab staff did not need Kovalich's oversight. (Kovalich Dep. 166:22-167:6). Because of decreasing insurance reimbursement rates, the lab's profitability declined. (*Id.* 171:6-172:11, 232:25-233:3; Dr. Spivey 90:22-93:24). Given these considerations, PPM could not afford to pay Kovalich thousands of dollars each month for no work. Kovalich acknowledged the financial pressures faced by PPM when her position was eliminated, and thus cannot dispute PPM's need to reduce costs. (Kovalich Dep. 171:6-172:11, 232:25-233:3). PPM has articulated legitimate, non-discriminatory reasons for terminating Kovalich.

### iii. Kovalich Has No Evidence of Pretext

17

"Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006). Kovalich must provide sufficient evidence some unlawful discrimination was the *real* reason for her termination. *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2528 (2013). In proving PPM's stated reason was pretext for intentional discrimination, Plaintiff must establish age was the "but-for" reason for her termination. *Gross*, 557 U.S. at 176. Kovalich's bare subjective belief she was the victim of discrimination is insufficient. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). Kovalich "must present substantial evidence to support as a reasonable probability, rather than as a mere possibility, her employer discriminated against her." *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).

Kovalich's arguments of pretext ring hollow. Kovalich admitted when she was terminated, Dr. Spivey told her he was cutting costs. (Kovalich Dep. 232:25-233-3; 242:10). Kovalich has not offered evidence showing this information was false or unjustified. Kovalich admitted she did not know why she was terminated, just that it was "financial." (*Id.* 242:9-10). When she was hired, she was over forty and only seven years older than the Spiveys. PPM is entitled to a compelling inference of non-discrimination as it is highly unlikely Kovalich would be hired and then terminated in an attempt to discriminate. *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991).

18

Kovalich attempts to demonstrate pretext by inferring age discrimination from the terminations of seven PPM employees between January and September of 2016. Compl. ¶¶ 47, 65, 68. Alleging the existence of a pattern or practice of discrimination does not automatically give rise to a presumption Kovalich was subject to a discriminatory practice. *Muhammed v. Giant Food Inc.*, 108 Fed. Appx. 757, 764 (4th Cir. Aug. 12, 2004) (unpublished opinion) (citation omitted). Instead, that "presumption arises only when the evidence establishes that a pattern or practice of discrimination exists." *Id.* (emphasis in the original); *Coker v. Charleston County School Dist.*, 1993 U.S. App. LEXIS 20836 (4th Cir. Aug. 16, 1993) (unpublished opinion) (affirming summary judgment on pattern or practice claim because plaintiffs failed to provide sufficient evidence discrimination was defendant's standard operating procedure when plaintiffs only provided deposition testimony along with flawed statistical evidence).

The evidence belies any evidence of a pattern or practice of age discrimination. As illustrated by Yontz Decl. Ex. 18, of the seven employees referenced in the Complaint, six were terminated in the reorganization,[2] and their duties reassigned to others. (*Id.* ¶¶ 7-14; Frey Decl. ¶¶ 4-8). Of these six employees, the duties of three employees were assigned to employees over the age of forty. (*Id.* Ex. 18). None of these employees had the same position as Kovalich, and none of the employee's positions have been replaced. (*Id.*) Kovalich has no knowledge of why these employees were separated or their work performance. (Kovalich Dep. 96:17-19, 99:25-100:-16, 101:18-20, 105:2-13; 238:13-

---

[2] One employee was terminated for performance reasons.

19

241:4).  Critically absent is *any* evidence of discrimination in the terminations of other employees over 40.  (*Id.* 100:9-106:1).  Kovalich offers no evidence except her unsubstantiated belief "[t]he older you are, the more expensive you are to PPM." (*Id.* 239:9-12).  Kovalich has not shown pretext.

## D.   <u>Plaintiff's Retaliation Claims Fails</u>

Kovalich claims retaliation against for (1) declining Dr. Spivey's sexual advances; (2) refusing to convince Nagelski not to file an EEOC Charge; and (3) because Nagelski filed an EEOC Charge.  To state a claim for retaliation, Kovalich must show: (1) she engaged in protected activity; (2) PPM took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the adverse employment action. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).  Retaliation may be shown through direct evidence or by utilizing the *McDonnel Douglas* burden-shifting framework. *Castonguay,* 2014 U.S. Dist. LEXIS 59881, at *16.  If Plaintiff satisfies her initial burden, PPM must then "articulate a legitimate, non-retaliatory justification." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  Kovalich must then prove PPM's reason is pretext.  The ultimate burden of persuasion remains with Plaintiff *at all times*. *St. Mary's Honor Ctr.*, 509 U.S. at 508.  Retaliation claims require proof of but-for causation. *Nassar*, 133 S.Ct. at 2533.

### i.   <u>Kovalich Did Not Engage in Protected Activity</u>

An employee must show she engaged in protected activity. *Burlington N. and Santa Fe Ry Co. v. White*, 548 U.S. 52 (2006).  The Fourth Circuit follows a two-step process to

determine whether an employee has engaged in protected conduct. *Bowman v. Baltimore City Bd. of Sch. Comm'rs.*, 2017 U.S. Dist. LEXIS 127650, at *11-12 (D. Md. Aug. 11, 2017) (citation omitted).

Kovalich is unable to show she engaged in protected activity when she rejected Dr. Spivey's alleged sexual advances. Kovalich never complained about Dr. Spivey's conduct nor did she rebuff him. Even with the alleged kiss, Kovalich was only concerned with someone seeing them in the office. (Kovalich Dep. 207:13-208:11).

Likewise, Kovalich cannot show protected activity related to Nagelski's retaining counsel or filing an EEOC Charge. Kovalich claims Dr. Spivey asked her to convince Nagelski to not sue PPM. Kovalich was upset with the manner in which Nagelski was terminated instead of a "gentle way." (*Id.* 96:22-97:8; 237:24-238:6). Kovalich reached out to Nagelski the same day Kovalich spoke with Dr. Spivey and discussed a possible severance package. (*Id.* Ex. 13). Kovalich did not oppose Dr. Spivey's request, but served as the intermediary between Dr. Spivey and Nagelski. Regardless, there was no further discussion about this matter. When PPM received notice of Nagelski's EEOC Charge, the decision eliminating Kovalich's position had been made. PPM could not have retaliated against Kovalich related to Nagelski's EEOC Charge because PPM did not know about it.

### ii. Causal Connection

"[R]etaliation claims require proof that the desire to retaliate was *the* but-for cause of the challenged employment action." *Nassar*, 133 S. Ct. at 2528-30 (emphasis added). "When causation is dispositive, a case should proceed to the jury only where circumstantial

evidence supports a probability, both reasonable and substantial, of an impermissible motive rather than its mere possibility so as to insure the jury will not rely on speculation or conjecture." *Smyth-Riding v. Scis. & Eng'g Servs., LLC*, 2017 U.S. App. LEXIS 15521, at *19 (4th Cir. Aug. 17, 2017) (unpublished) (citation omitted).

Temporal proximity alone may "satisf[y] the less onerous burden of making a prima facie case of causality." *Williams*, 871 F.2d at 457. "[T]emporal proximity must be very close." *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). A temporal gap of "more than three months" is "too long to establish causation, without more." *Perry v. Kappos*, 489 F.App'x 637, 643 (4th Cir. 2012); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F.App'x 229, 233 (4th Cir. 2006) (three to four months insufficient).

Because Kovalich was terminated *three months* after her March 2016 conversation with Dr. Spivey, she cannot rely on temporal proximity alone. Where temporal proximity is missing, a plaintiff may use other relevant evidence during the intervening period to establish causation. *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007).

Even if Dr. Spivey asked Kovalich to convince Nagelski to drop her claim, this discussion occurred at the latest on March 12, 2016. (Kovalich Dep. Ex. 13). Kovalich's termination was three months later, even though Dr. Spivey had been considering it since 2015. (Dr. Spivey Dep. 225:9-11). When PPM received notice of Nagelski's EEOC Charge, PPM had already decided to eliminate Kovalich's position. PPM could not have retaliated against Kovalich for Nagelski's EEOC Charge because PPM had not yet received notification of it. When Benton recommended elimination of Kovalich's position, Benton

22

had no knowledge Nagelski filed an EEOC Charge.  (Benton Decl. ¶ 15).  Kovalich cannot establish causal connection.

### iii. Plaintiff Cannot Overcome the Legitimate Non-retaliatory Reasons for Her Termination

"[W]hen an employer articulates a reason for discharging the plaintiff that [Title VII] does not proscribe, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 900-01 (4th Cir. 2017).  As detailed *supra*, Kovalich worked little because the lab was running like a "well-oiled machine" and lab development had ceased.  Kovalich agrees PPM was facing lost profits due to drastic decreases in reimbursement rates.   PPM's reasons for Kovalich's termination were financial—not retaliatory.

### E. Kovalich's ERISA Claim Fails.

Kovalich seeks damages under § 510 of ERISA, 29 U.S.C. § 1140, because PPM terminated her to intentionally deprive her of rights in PPM's Cash Balance Plan.  Section 510 provides: "It shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right."  29 U.S.C. § 1140.  A § 510 claim requires proof of specific intent, *i.e.*, the employer discharged the employee with the purpose of interfering with the employee's pension rights. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir. 1991).  The Fourth Circuit applies the *McDonnell Douglas* burden-shifting proof scheme to § 510 claims. *Id.* at 239 (citations omitted).

23

Kovalich fails to proffer evidence PPM specifically intended to interfere with her vesting in the Plan. Employees alleging interference with ERISA rights must make a *prima facie* case showing (1) a defendant performed a prohibited action (2) for the purpose of interfering (3) with the attainment of a right to which the employee is currently, or in the future may become, entitled. *Gavalik v. Cont'l Can Co*., 812 F.2d 834, 852 (3d Cir. 1987) (citations omitted). Once plaintiff establishes a prima facie case, the burden shifts to defendant to state a legitimate, nondiscriminatory explanation. *Id*. Once defendant carries this burden, the burden shifts back to plaintiff to establish the pretext. *Id*. If plaintiff fails to present facts permitting a reasonable inference of pretext, summary judgment is proper.

Kovalich contends PPM specifically intended to interfere with the impending vesting of her rights under the Plan. This claim fails because Kovalich cannot demonstrate pretext. Kovalich has not developed evidence showing any decision-makers thought about the Plan when deciding to eliminate her position. (Benton Decl. ¶ 12; Dr. Spivey Decl. ¶ 32). Kovalich's claim is nonsensical because the Spiveys did not gain from her termination because any monies forfeited by Plan Participants stayed in the Plan and were used to fund benefits of vested employees. (Dr. Spivey Dep. 179:2-9; 180:1-7).

Ultimately, Kovalich's argument is her termination saved PPM money which is insufficient "evidence" of pretext. Kovalich testified "I think the office as a whole w[as] getting rid of over-40 people. Because they tax the insurance. I mean, they're more expensive. . . . it was just better to get rid of the older people because they're sicker." (Kovalich Dep. 238:23-239:5). "While plaintiff's termination probably did save [the

24

Company] money, this is not enough to carry the day." *Conkwright*, 933 F.2d at 239 (citations omitted).

Kovalich fails to supply any connection between her discharge, and PPM's alleged attempt to prevent her from attaining ERISA-protected benefits.[3] No reasonable jury could find unlawful intent. Summary judgment is appropriate.

## F.  The Punitive Damages Claim

By statute, punitive damages may be awarded "only if the Plaintiff proves that the defendant is liable for compensatory damages" and is limited to cases involving fraud, malice or willful or wanton conduct. N.C. Gen. Stat. § 1D-15. "If the injured party has no cause of action independent of a supposed right to recover punitive damages, then she has no cause of action at all." *Hawkins v. Hawkins*, 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991) (citations omitted).  Because Kovalich's claim for punitive damages is derivative of her other claims, which all fail, her claim for punitive damages is barred.

Further, N.C. Gen. Stat. § 1D-1 *et seq*. provides punitive damages may only be awarded if plaintiff proves the existence of fraud, malice, or willful or wanton conduct. Kovalich has not proffered any such evidence, requiring dismissal of this claim.

## CONCLUSION

WHEREFORE, Defendant PPM requests that PPM's Motion for Summary Judgment GRANTED, that Plaintiff Rebecca Kovalich's claims should be DISMISSED

---

[3] Had Kovalich vested, her benefit would have been $3,682. (PPM Dep. Vol. II, 150:13-151:3).

WITH PREJUDICE, and for such other and further relief as the Court deems just and proper.

Respectfully submitted this the 1st day of October, 2018.

JACKSON LEWIS P.C.

/s/ Ann H. Smith
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and )
SUZANNE NAGELSKI, )
)
        Plaintiffs, )
vs. ) **CERTIFICATE OF**
) **COMPLIANCE**
PREFERRED PAIN MANAGEMENT )
& SPINE CARE, P.A., *et al.*, )
)
        Defendants. )


The undersigned counsel hereby certifies pursuant, Local Rule 7.3(d)(1), that this

Memorandum does not exceed 6,250 words including the body of the brief, headings, and

footnotes.


                */s/ Ann H. Smith*
                ANN H. SMITH
                N.C. State Bar No. 23090
                CAITLIN M. GOFORTH
                N.C. State Bar No. 49227
                Jackson Lewis P.C.
                *Attorneys for Defendants*
                3737 Glenwood Avenue, Suite 450
                Raleigh, NC 27612
                Telephone:  (919) 760-6460
                Facsimile:   (919) 760-6461
                Email: Ann.Smith@jacksonlewis.com
                Email: Caitlin.Goforth@jacksonlewis.com

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

| | | |
|---|---|---|
| REBECCA KOVALICH and | ) | |
| SUZANNE NAGELSKI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | **CERTIFICATE OF** |
| | ) | **SERVICE** |
| PREFERRED PAIN MANAGEMENT | ) | |
| & SPINE CARE, P.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned certifies that on October 1, 2018, the foregoing *Memorandum of Law in Support of Preferred Pain Management's Motion for Summary Judgment as to Rebecca Kovalich's Claims* was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system, which will send notification of such filing as follows:

Sean F. Herrmann, Esq.
Van Kampen Law P.C.
315 East Worthington Avenue
Charlotte, NC 28203
sean@vankampenlaw.com
*Attorney for Plaintiffs*

/s/ Ann H. Smith
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
Jackson Lewis P.C.
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone:  (919) 760-6460
Facsimile:   (919) 760-6461
Email: Ann.Smith@jacksonlewis.com

28

Email: Caitlin.Goforth@jacksonlewis.com

4823-3758-3221, v. 2

29