IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and ) 
SUZANNE NAGELSKI, )
 )
   Plaintiffs, )  **MEMORANDUM OF LAW IN**
 )  **SUPPORT OF DR. DAVID SPIVEY'S**
vs. )  **MOTION FOR SUMMARY**
 )  **JUDGMENT AS TO SUZANNE**
PREFERRED PAIN MANAGEMENT )  **NAGELSKI'S CLAIMS**
& SPINE CARE, P.A., *et al.*, )
 )
   Defendants. )

   NOW COMES Dr. David Spivey ("Defendant" or "Dr. Spivey"), and pursuant to Local Rule 7.2, MDNC, files this Memorandum of Law.  Dr. Spivey respectfully contends his Motion for Summary Judgment should be granted as to all claims asserted by Plaintiff Suzanne Nagelski ("Nagelski").

## I. STATEMENT OF THE CASE

   Plaintiffs Nagelski and Rebecca Kovalich ("Kovalich") filed their Complaint on August 1, 2017 in Forsyth County Superior Court alleging claims against Preferred Pain Management and Spine Care, P.A. ("PPM"), Dr. Spivey, and Sherry Spivey. [DE #6]. Nagelski alleged claims for tortious interference with contract and violations of the Employment Retirement Income Security Act against Dr. Spivey.  Nagelski seeks both compensatory and punitive damages.  On September 25, 2017, Dr. Spivey removed Plaintiff's Complaint. [DE # 1].  Dr. Spivey filed his Answer on November 1, 2017. [DE # 11].  On December 1, 2017, Judge Auld entered an order approving the parties' joint Rule

26(f) report, setting a dispositive motions deadline 30 days after discovery closed. [DE # 14]. On July 2, 2018, Judge Auld granted Plaintiffs' motion to amend the case management order setting a discovery deadline of August 31, 2018. [DE # 22]. On September 12, 2018, Dr. Spivey filed his Notice of Intent to File Summary Judgment Motion as to Nagelski. [DE # 27]. Dr. Spivey filed a Motion for Summary Judgment [DE # 34] and files this Memorandum of Law in support of his Motion.

## II.     STATEMENT OF FACTS

***Nagelski's Background***

The Plaintiffs and individual Defendants are family. In 1966, Kovalich (age 71)[1] married Sherry Spivey's brother and gave birth to Nagelski (age 49), Sherry Spivey's niece. (Kovalich Dep. 23:8-11; 14-15).

Prior to earning her Master's in Business Administration ("MBA") in 2006, Nagelski worked several jobs outside the medical field: staff scientist, project manager for environmental service companies, middle school teacher, and assisted at a veterinary clinic. (Nagelski Dep. 42:17-25; 64-70).

During Nagelski's MBA program, she took two courses on human resources ("HR") and some classes on finance and business operations. (*Id.* 48:3-49:23). Nagelski labels IT as a personal hobby. (*Id.* 47:8-22; 48:25-49:3). She has no certifications in IT, finance, or HR. (*Id.* 47:4-48:2). While Nagelski was in graduate school, Sherry Spivey provided

---

[1] All ages referenced *infra* are at the time of Nagelski's termination.

childcare for Nagelski's only daughter. (*Id.* 42:23-43:15). Nagelski began working for PPM after obtaining her MBA. (*Id.* 70:1-3).

### The Spiveys' Background

Dr. Spivey (age 63) and Sherry Spivey (age 64) married in 1980. (Dr. Spivey Decl. ¶¶ 3, 32; Sherry Spivey Decl. ¶¶ 4, 27). Sherry Spivey graduated and was working as a Registered Nurse. (Sherry Spivey Decl. ¶ 3). Dr. Spivey graduated medical school in 1981. (Dr. Spivey Dep. 18:11-16). The Spiveys moved to the west coast and resided there for several decades where they worked in medicine. (Dr. Spivey Decl. ¶ 5).

In 2005, the Spiveys returned to North Carolina. (*Id.* ¶ 6). In 2006, the Spiveys decided Dr. Spivey could start a pain management practice in Winston-Salem. (*Id.* ¶ 7). They consulted with Kovalich and utilized her contacts in the medical community to begin PPM. Compl. ¶ 18. Later, the Spiveys engaged Nagelski, a recent MBA graduate, to perform administrative functions for PPM. Compl. ¶ 20.

PPM is a medical clinic providing patients with treatments to reduce levels of pain and increase functionality. (Dr. Spivey Decl. ¶ 8)). PPM began with one clinic in Winston-Salem but now has another clinic in Greensboro. (*Id.* ¶ 9). PPM operates a laboratory at a separate location in Greensboro. (*Id.*).

### Nagelski's Duties at PPM

Initially, the Spiveys engaged Nagelski as an independent contractor to perform various administrative functions for the practice, including assistance with technology contracts and payroll for the practice. (Nagelski Dep. 77:17-18:1; 113:9-19). Over time,

as the practice grew, Nagelski's duties with PPM evolved. (*Id.* 82:12-15; 85:9-11). For example, Nagelski assisted with electronic IT security and compliance issues. (*Id.* 84:5-6). She also served as a financial consultant and liaison between PPM and its banks and accountants. (*Id.* 84:8-16; 117-120). Additionally, she performed HR functions for the practice, despite not having any specific HR training. (*Id.* 80:21-25). In 2013, Nagelski became a W-2 employee. (*Id.* 81:1-5).

As the practice grew, several of the functions originally assigned to Nagelski were assigned to other service providers or on-site employees. (Dr. Spivey Decl. ¶ 15). ). In January 2014, Nagelski's IT duties were reassigned a female employee (age 62) who also handled compliance. (Yontz Decl. Exs. 7 and 10). Additionally, PPM contracted with an IT vendor. (Dr. Spivey Dep. 101:21-102:15; Sherry Spivey Dep. 159:14-160:3). Nagelski's HR duties were assigned to a full-time on-site employee. (Dr. Spivey Decl. ¶ 24). Prior to her termination, Nagelski was only serving as PPM's liaison to PPM's banks and accountants. (*Id.* ¶ 27). Nagelski's position was eliminated. (*Id.*)

*Issues Throughout Nagelski's Employment*

While at PPM, Nagelski frequently overstepped her authority. Nagelski signed contracts on behalf of PPM without authority. (Yontz Decl. Ex. 9; Nagelski Dep. Ex. 18). Without approval, Nagelski instructed staff to reassign patient scheduling duties to front desk employees. (Nagelski Dep. Ex. 6). Dr. Spivey told Nagelski "[i]t troubles me that a decision of this nature would be made without consulting the owner of the practice (me) and the person most directed affected (me)." *Id.* Nagelski responded she was resigning

4

from PPM because she had no support from Dr. Spivey. *Id.* Nagelski threatened to resign again unless two employees (females over 40) were fired. (Sherry Spivey Decl. Ex. 1).

Nagelski frequently butted heads with Company personnel. For example, Sherry Spivey asked to see information about the Paid Time Off ("PTO") accrued and used by employees Sherry Spivey supervised. (Nagelski Dep. 203:15-17). Some employees were complaining their PTO balances were inaccurate. (*Id.* 202:1-204:23; Sherry Spivey Dep. 120:2-10). When Sherry Spivey asked Nagelski for this information, Nagelski provided it after Dr. Spivey ordered Nagelski to do so. (Dr. Spivey Dep. 188:21-189:5; Nagelski Dep. 203:18-204:23). Nagelski engaged in suspicious behavior which caused the Spiveys to lose trust in her. (Dr. Spivey Decl. ¶¶ 20-23).

PPM's growth necessitated on-site human resources support. (*Id.* ¶ 15). PPM repeatedly asked Nagelski to report to Winston-Salem to perform HR duties; she refused. (Dr. Spivey Dep. 189:6-10; 190:18-14). When PPM moved into new office space in 2014, Dr. Spivey created an office for Nagelski with special floors so she could bring her dogs to work. (*Id.* 187:24-188:20; Sherry Spivey Decl. ¶ 15).

Nagelski refused to physically report to the office on a consistent basis, claiming "[m]any companies keep HR faceless." (Nagelski Dep. 175:15-176:12; Exs. 7-9, 11; Yontz Decl. Ex. 8). At all times, Nagelski lived in Huntersville, North Carolina. (Nagelski Dep. 34:14-17). Nagelski did not work a set schedule, but instead planned her hours around scheduled meetings, working half the time from her home and the other half either at PPM

5

or at off-site meetings. (*Id.* 92:9-93:12). Nagelski claimed she worked in the office twice a week. (*Id.* 94:4-6).

For years, Nagelski shirked HR duties, leaving them to be handled by other employees working on-site. In her HR role, Nagelski did not: post job openings, review applications, manage employee reviews, meet in person with employees, or arrange anti-discrimination, harassment, or retaliation trainings. (*Id.* 123:8-17; 126:22-127:6; 128:2-140:20; Sherry Spivey Decl. ¶ Ex. 2; PPM Dep. 59:7-60:12). Former employee Vicki Swicegood (female, age 68) and longtime friend of Kovalich, (Swicegood Dep. 62:12-17; 89:1-13), testified when she began at PPM in 2011 "[t]here w[ere] no HR files to speak of." (*Id.* 15:8-9). Swicegood testified: "I was doing HR" while employed with PPM. (*Id.* 15:20). Swicegood hired full-time and temporary staff, created and maintained personnel files, handled employee complaints, and disciplined and terminated staff, all while Nagelski worked remotely. (*Id.* 95:1-4; 167:5-7; 73:5-23; 75:25-76:9; 80:7-9; 81:23-82:24; 63:8-14l; Nagelski Dep. 133:16-134:9). According to Swicegood, Nagelski was CEO of PPM—although Nagelski never had any such title. (Swicegood Dep. 70:17-19). After Swicegood, Nagelski relied on employee Stephanie Vaughn to handle on-site HR functions. (Nagelski Dep. 126:1-4; 130:14-25, 131:22-134:9; Yontz Decl. Ex. 3).

In 2014, the Spiveys began discussing the reassignment of Nagelski's HR duties. (Dr. Spivey Dep. 187:10-189:17). Sherry Spivey asked Nagelski multiple times if she would give up her HR duties so PPM could have someone on-site. (Nagelski Dep. 155:14-22, Ex. 10; Sherry Sp;ivey Dep. Ex. 67; Sherry Spivey Decl. ¶ 15). PPM considered

outsourcing HR to an outside vendor. (Yontz Decl. Ex. 15; Sherry Spivey Decl. ¶ 26). The Spiveys also asked their BB&T wealth management advisor for a recommendation of someone to handle Nagelski's roles. (Yontz Decl. Ex. 17).

Around November 2014, the Spiveys had multiple discussions with their niece, Wendy Yontz (female, age 44), about the assuming the HR role at PPM. (Yontz Dep. 36:12-37:18; 39:18-40:15). Yontz is the adopted daughter of Nagelski's biological father. (*Id.* 35:14-20). Initially, Yontz was not interested as she was doing HR at Belk. (*Id.* 37:13-18). In September 2015, Yontz called Sherry Spivey and inquired if the position was still available. (*Id.* 39:18-40:4). On November 23, 2015, PPM hired Yontz to provide on-site HR. (*Id.* 42:7-44:10; Sherry Spivey Dep. 112:5-10; 216:12-19). Had Nagelski not been a relative, Dr. Spivey would have separated her employment long before. (Dr. Spivey Decl. ¶ 18). Dr. Spivey tolerated behaviors from Nagelski he would not have tolerated from any other employee. (*Id.*; Nagelski Dep. Ex. 12; Yontz Decl. Exs. 4 and 5; Dr. Spivey Dep. 203:6-10).

***The Spiveys Develop a Lack of Trust with Nagelski***

Nagelski engaged in a pattern of suspicious behavior, especially related to the Company's finances, which resulted in the loss of the Spiveys' trust. (Dr. Spivey Decl. ¶¶ 20-23; Sherry Spivey Decl. ¶ 23-25). For example, while Dr. Spivey was on leave, Nagelski told Dr. Spivey he should give her power of attorney so she could handle matters in his absence. (Nagelski Dep. 103:6-104:3, 20-108:18). PPM's attorney advised otherwise. (Dr. Spivey Decl. ¶ 20). During this time, Kovalich and Nagelski attempted to

gain access to the Company's patient billing account Ebridge without any authority. (Dr. Spivey Dep. 111:6-15). PPM's billing vendor Physician Discoveries, which Kovalich arranged through a contact, managed Ebridge. (*Id.* 112:20-113:2; Nagelski Dep. 107:6-9). Shortly after this incident, Nagelski tried convincing Dr. Spivey that bringing billing in-house would be a complete failure despite significant cost savings to PPM. (Dr. Spivey Dep. 111:16-24). Nagelski also frequently had closed door meetings with the employee over accounts payable, and shared confidential information with her mother, while refusing to share information with Sherry Spivey. (Dr. Spivey Dep. 205:17-24; Dr. Spivey Decl. ¶ 21). In late 2015, BB&T advisors alerted Dr. Spivey that there was vulnerability in accounts payable. (Dr. Spivey Dep. 205:13-17). Dr. Spivey also discovered Nagelski had purchased an expensive laptop without approval. (*Id.* 206:1-25). Further, once PPM hired Yontz, Nagelski was extremely resistant to turn over payroll. (*Id.* 208:14-209:12).

On another occasion, employees reported disappearing emails. (Sherry Spivey Decl. ¶ 25). Dr. Spivey had observed Nagelski with a computer icon labeled "e-mail forwarding" and a network investigation concluded that there were unidentified email accounts routing on the server suggesting Nagelski's involvement. (Dr. Spivey Dep. 114:2-25).

### Nagelski's Financial Liaison Position Was No Longer Necessary

PPM began feeling "the effects of a number of factors that were impacting the practice from a reimbursement standpoint and also from a volume standpoint." (*Id.* 13:14-17). Beginning in late 2014, insurance reimbursements dropped. (*Id.* 90:22-93:24; Kovalich Dep. 171:6-172:11). Additionally, there was more pain management competition

8

in the area, less outside referrals, and decreased patient volume. (Dr. Spivey Dep. 13:13-14:3). "[B]eginning around 2015, [PPM] had to make significant reductions in personnel and reassignment of duties…to keep the practice profitable and survive." (*Id*. 13:25-14:3). By fall 2014, Nagelski understood PPM was looking for ways to reduce expenses and even participated in staff reorganization decisions. (Yontz Decl. Exs. 2 and 16).

In late 2015, Mary Benton (female, age 64) began advising PPM on operational strategy. (Benton Decl. ¶ 6 and Ex. 2). Benton had been providing services for PPM since 2013 at Kovalich's recommendation. (Dr. Spivey Dep. 103:1-6; Benton Decl. ¶ 5 and Ex. 2; Benton Dep. 30:3-18; 32:16-24). Dr. Spivey instructed Benton to look for ways to reorganize PPM. (Dr. Spivey Dep. 70:17-22). Benton's role "was to look at different positions and the need for them" and find "opportunities to control cost." (Benton Dep. 97:3-98:3; 107:25-108:4). Benton developed an Action Plan recommending PPM evaluate the need and timeline of staffing. (Benton Decl. Exs. 1 and 2). Benton "looked at each one of the positions that got eliminated based on reorganization the same way. It wasn't about the person. It was about the function and the need to cut costs as part of the reorganization." (Benton Dep. 125:7-11).

After PPM hired full-time on-site HR, Nagelski's only job function was serving as PPM's financial liaison. (Dr. Spivey Decl. ¶ 27). PPM paid Nagelski $5,000 a month to provide monthly profit and loss statements and compile the bank statements for the accountant to reconcile. (Nagelski Dep. 118:11-25). In addition to his ongoing conversations with Benton and Sherry Spivey, Dr. Spivey consulted with his BB&T wealth

9

management advisors and accountants whether a financial liaison position was necessary. (Dr. Spivey Dep. 182:19-184:10; 196:23-200:7). Dr. Spivey described the process he used to decide to eliminate Nagelski's position as follows:

> [Y]ou have people that you're paying that you can't just pay if they're not doing something, and with the reorganization that was going, Ms. Nagelski's duties had been reassigned. We had HR full-time in-house. The IT had been reassigned. And then finally the only duty that she was performing was sort of the liaison between PPMSC; our accountancy,…and then BB&T, the wealth management people who managed our financing, loans and that sort of thing. Right? And that was her only duties. So I'm paying her, you know, $5,000 a month, I believe it was, for all these three things....So we're looking at ways, where can we cut costs, who do we need, who do we not need? And that was one of the positions. So I went to folks at – and that's why they're on the list – the folks at BB&T and Turlington & Company people, and said "Look, is this position still required for us to do business?" And they said, "No." So now, finally, her final duty was eliminated, and so I terminated her.

(*Id.* 115:22-116:24).

When her position was eliminated, Nagelski recognized her IT duties had been outsourced, full-time on-site HR had been hired, and "[i]t's very clear that [PPM] developed and formalized their relationship with their accountancy and bank resources." (Nagelski Dep. 233:22-234:5). Dr. Spivey did not completely sever the relationship. In the termination letter, he indicated he wanted to use Nagelski as a consultant on an as-needed basis. (*Id.* Ex. 29). Nagelski never contacted Dr. Spivey regarding consulting services. (*Id.* 233:11-17). Instead, Nagelski retained counsel and sent PPM a demand letter. (*Id.* 238:4-12).

***Lack of Evidence Supporting Nagelski's Allegation Dr. Spivey Tortiously Interfered with Her Contract in Retaliation for Resisting Unethical and Discriminatory Behavior***

Nagelski alleges Dr. Spivey interfered with her at-will employment contract in an effort to retaliate against her for resisting unethical and discriminatory behavior. Compl. ¶ 109. To support these allegations, Nagelski offers her belief that Dr. Spivey did not provide her with a response to Sherry Spivey's demands and was instead silent when Nagelski sought his advice. (Nagelski Dep. 236:11-23). In addition, Plaintiff claimed that Dr. Spivey tortiously interfered by bringing in Yontz to handle HR and not allowing Nagelski to train her. (*Id.* 236:24-235:5).

Nagelski claims sometime in 2014, Sherry Spivey began asking for company financials, which Nagelski refused to provide. (Nagelski Dep. 234: 17-23). Nagelski asked Dr. Spivey how to respond to Sherry Spivey's requests, and Dr. Spivey ordered Nagelski to provide Sherry Spivey with whatever she wanted. (*Id.* 234:23-235:1). Instead of complying, Nagelski decided to provide the information to Dr. Spivey to allow him to decide what to share. (*Id.* 235:3-10).

On March 1, 2015, Sherry Spivey requested Nagelski give her access to the time clock records for the third time. (Yontz Decl. Ex. 5). Nagelski testified department managers had access to timeclock records through either Nagelski or Flex-Pay, PPM's payroll vendor. (Nagelski Dep. 113:20-114:5, 115:11-16). Even Dr. Spivey was unable to access Flex-Pay (Dr. Spivey Dep. 208:20-209:2). Several employees were concerned whether their PTO balance was accurate, and they asked the Spiveys to assist. (*Id.* 188:21-25; Nagelski Dep. 203:3-14; Sherry Spivey Dep. 120:2-15). According to Nagelski, the database would usually show an employee's PTO as two weeks off from what it really was.

11

(Nagelski Dep. 203:3-14). Eventually on March 13, 2015, Nagelski provided Sherry Spivey the time clock and PTO information for the clinic employees that she needed. (Yontz Decl. Ex. 11).

Shortly after, there were additional issues regarding payroll and PTO. On May 11, 2015, Jennifer Bailey emailed Plaintiff inquiring about PTO discrepancies. (*Id.* Ex. 6). Sherry Spivey assisted Bailey with the matter. (Sherry Spivey Decl. ¶ 19). Sherry Spivey attempted to gain access to PPM's payroll information by calling Flex-Pay, but was denied access. (*Id.*) Sherry Spivey called Flex-Pay a second time at the direction of Dr. Spivey to request certain account information and was again denied access because only Nagelski, Vicki Swicegood, Stephanie Vaughn, and another former employee were authorized users. (*Id.*; Dr. Spivey Dep. 208:20-209:12). Nagelski received two calls from Flex-Pay notifying her Sherry Spivey was requesting access to PPM's payroll information. Compl. ¶¶ 27-28; (Nagelski Dep. 199:15-202:24). Yet, Nagelski testified she has no knowledge as to the reason why Sherry Spivey tried to contact Flex-Pay. (Nagelski Dep. 202:25-203:2).

Nagelksi also testified that Sherry Spivey requested access to company emails. (*Id.* 235:13-14). In early 2015, while Bailey and Sherry Spivey were on the phone with PPM's Attorney, they noticed emails from Bailey's account suddenly disappear. (Sherry Spivey Dep. 157:22-159:13). Sherry Spivey noticed emails related to Nagelski's Philadelphia flight schedule were received, but then were gone. (*Id.* 160:4-9, 161:12-163:5). Dr. Spivey testified Nagelski was not fired for the disappearing emails incident. (Dr. Spivey Dep. 115:15-17).

Nagelski has no evidence other than her own belief to show that Dr. Spivey tortiously interfered with her at-will employment in retaliation for opposing the July 2015 termination of an employee that was over 40 and allegedly gay. (Nagelski Dep. 29:10-16; 232:17-23). Dr. Spivey asked Nagelski to sit in on the terminations of three PPM Greensboro employees. (*Id.* 181:3-8; 189:5-11). Plaintiff responded she was visiting her daughter in Pennsylvania and could not do so. (*Id.* 33:14-34:25; 181:9-12; 191:11-20; Ex. 13). The Spiveys insisted Nagelski appear in person for the terminations. (*Id.* 181:3-8; Sherry Spivey Dep. Ex. 63). Nagelski wanted to move the date of the terminations, claiming she was uncomfortable with one of the terminations because the employee was in a protected class. (Nagelski Dep. 188:10-189:4). The employee's termination was part of the ongoing reorganization. (Dr. Spivey Dep. 124:9-20; 132:3-5). The employee was a licensed practical nurse and PPM could save money by staffing the role with someone with lesser credentials. (*Id.*) Sherry Spivey told Nagelski the reason for the employee's termination. (Nagelski Dep. Ex. 12).

Nagelski admitted she did not tell Sherry Spivey, who was the employee's supervisor, that this employee was in a protected class, but she claims she did tell PPM's corporate attorney whose office counseled Dr. Spivey on the terminations and prepared the severance agreements. (*Id.* 187:1-188:9; Exs. 10-12, 15). Nevertheless, Nagelski admitted that as HR, it was her duty to remind managers, about potential legal issues when separating an employee. (*Id.* 189:19-190:11). Nagelski did not raise any specific allegations of discrimination, but instead claimed she questioned the Spiveys on the wisdom of

13

terminating an employee simply because he was in a protected class. (*Id.* Ex. 14; Dr. Spivey Decl. ¶ 19; Sherry Spivey Decl. ¶ 22). Nagelski has offered no evidence that the employee was being terminated on the basis of his sexual orientation or that she objected to his termination because he was being terminated on this alleged basis.

***Lack of Evidence Supporting Allegation Dr. Spivey Interfered with Nagelski's Contract for His Own Financial Gain or to Prevent Her from Vesting in the Company's Cash Balance Plan***

Nagelski also lacks any factual basis to support her allegation that Dr. Spivey tortiously interfered with her at-will employment in the interest of his own financial gain or to prevent Plaintiff's benefits from vesting. Compl. ¶¶ 109, 112, 114, 134, 136; (Nagelski Dep. 29:17-32:19; PPM Dep. Vol. I, 16:2-19:9). Nagelski's own understanding of the Company's benefits plan is patently incorrect. The Cash Balance Plan ("the Plan") is a way for PPM to provide additional retirement benefits to employees. (Dr. Spivey Dep. Ex. 90; Nagelski Dep. 150:22-25). The Newport Group, Inc. ("Newport Group") is the third-party administrator which oversees the Plan's administration and legal compliance. (Dr. Spivey Decl. ¶ 33). PPM and Dr. Spivey rely on Newport Group to manage the Plan. (*Id.*)

Once an employee has been employed by PPM for one year or 1,000 hours, they are eligible for the Plan ("Plan Participant"). (*Id.* ¶ 35). The Plan Participants make no contributions; PPM fully funds the Plan. (*Id.*) After three years, the Plan Participant becomes 100% vested. (*Id.*)

14

Nagelski was in Participant Group E. (*Id.*) Nagelski testified that "the older you are, the more you would have to put in versus the younger employees." (Nagelski Dep. 152:1-13). In reality, age is not a factor in the Plan. (PPM Dep. Vol. II, Ex. 102). Contributions to the Plan for a Plan Participant do not vary at all depending upon age. (*Id.*) Since its existence, the Plan contributions made have been a percentage of compensation. (*Id.*) Further, the evidence shows that of the 23 Group E Plan Participants fully vested, 12 are 40 and older. (*Id.*) Had Nagelski remain employed through the end of 2016 and vested in the Plan, her total benefit would have been $5,193. (*Id.* 150:13-151:3). If an employee separated prior to vesting, the monies allocated to that employee reverted back to the Plan and not to the Spiveys. (Dr. Spivey Dep. 179:2-9; 180:1-7).

### III.     QUESTIONS PRESENTED

Has Nagelski proffered evidence creating a genuine issue of material fact as to the two claims she alleged against Dr. Spivey?

### IV.     ARGUMENT

#### A.     Standard of Review

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Holland v. Wash. Homes, Inc.*, 487 F.2d 208, 213 (4th Cir. 2007). Although the Court must construe facts in the light most favorable to Nagelski, "there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

15

party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).

## B. <u>The Tortious Interference Claim</u>

To establish a claim for tortious interference with a contract, a plaintiff must show:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*White v. Cross Sales & Eng'g Co.*, 177 N.C. App. 765, 768-69, 629 S.E.2d 898, 901 (2006) (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)). A plaintiff may maintain a claim for tortious interference with contract even if the employment contract is terminable at will. *Lenzer v. Flaherty*, 106 N.C. App. 496, 512, 418 S.E.2d 276, 286, *disc. review denied*, 332 N.C. 345, 421 S.E.2d 348 (1992).

A party who induces one party "'to terminate or fail to renew a contract with another may be held liable for malicious interference with the party's contractual rights if the third party acts without justification.'" *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850, *disc. review denied*, 348 N.C. 695, 511 S.E.2d 649 (1998) (citations omitted). Whether a defendant is justified in interfering with a plaintiff's contract depends upon "'the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor[,] and the contractual interests of the other party.'" *Id.* at 317-18, 498

16

S.E.2d at 850 (quoting *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650, *reh'g denied*, 322 N.C. 486, 370 S.E.2d 227 (1988)). "A person is justified in inducing the termination of a contract of a third party if he does so for a reason reasonably related to a legitimate business interest." *Fitzgerald v. Wolf*, 40 N.C. App. 197, 200, 252 S.E.2d 523, 524 (1979).

As a general rule, "'non-outsiders' [to the contract] often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." *Lenzer* 106 N.C. App. at 513, 418 S.E.2d at 286 (citations omitted). However, "[t]he qualified privilege of a non-outsider is lost if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with." *Id.* (citations omitted).

In order to hold a "non-outsider" liable for tortious interference with contract, a plaintiff must establish that the defendant acted with legal malice, that "'he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties.'" *Robinson, Bradshaw & Hinson, P.A.*, 129 N.C. App. at 318, 498 S.E.2d at 851 (quoting *Varner v. Bryan*, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994)). "The plaintiff's evidence must show that the defendant acted without any legal justification for his action." *Varner*, 113 N.C. App. at 702, 440 S.E.2d at 298 (citation omitted).

Here, Dr. Spivey is a non-outsider to the contract and is entitled to qualified immunity. It is undisputed that Dr. Spivey is the owner, President, and CEO of PPM. (Dr.

17

Spivey Dep. 51:9-52:2). He testified that when it comes to running PPM, the "buck" stops with him. *Id.* Accordingly, Dr. Spivey has a vested interest in the practice because the financial health of the practice directly impacts the livelihood of him, his wife, and other employees. These undisputed facts evidence Dr. Spivey's status as a non-outsider to the contract.

Once the defendant has established insider status, the burden is on the plaintiff to come forward with evidence of legal malice to defeat the qualified privilege. *Varner*, 113 N.C. App. at 702, 440 S.E.2d at 297. Courts have repeatedly recognized a plaintiff's unsubstantiated allegations and bald assertions are insufficient to defeat a motion for summary judgment, *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996), because a party cannot create a genuine dispute of material fact through "mere speculation or compilation of inferences." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008). In order to defeat this qualified privilege, Nagelski must proffer evidence to show Dr. Spivey acted with legal malice in terminating her employment. Nagelski has failed to proffer any such evidence.

If anything, the evidence shows Dr. Spivey acted in a manner opposite of one who had legal malice toward Nagelski. Although Dr. Spivey was at times extremely frustrated with Nagelski over the course of her employment, Dr. Spivey was extraordinarily lenient toward Nagelski. Dr. Spivey's generosity was based in part on the fact that Nagelski was Dr. Spivey's niece, and he had worked with Nagelski and her mother for a number of years. Dr. Spivey's decision to continue to employ Nagelski in light of multiple incidents of

18

insubordinate behavior and a growing lack of trust demonstrate extreme generosity and benevolence, not malice. Ultimately, the financial pressures of PPM—coupled with Nagelski's repeated refusal to work on-site to provide HR duties—resulted in her position being eliminated.

Additionally, Dr. Spivey acted within his authority and in a lawful manner. As PPM's President and owner, it was squarely within Dr. Spivey's duties and authority to recommend the discontinuation of Plaintiff's employment for poor performance, unprofessional conduct, and increased financial pressures. While Dr. Spivey did not need any reason to propose discontinuation of Nagelski's at-will employment, Dr. Spivey's assessment that Nagelski's position was unnecessary in light of the undisputed evidence was lawful justification for termination. After PPM hired full-time on-site HR, Nagelski's only job function was serving as PPM's financial liaison—a position deemed unnecessary by the wealth management advisors and accountants. Nagelski understood PPM was looking for ways to reduce expenses and even participated in staff reorganization decisions. Further, Nagelski admitted the legitimate need to eliminate her position because Nagelski recognized her IT duties had been outsourced, full-time on-site HR had been hired, and "[i]t's very clear that [PPM] developed and formalized their relationship with their accountancy and bank resources." (Nagelski Dep. 233:22-234:5). Dr. Spivey's decision to terminate Plaintiff's at-will employment was neither wrongful nor outside the scope of his authority. Accordingly, summary judgment in favor of Dr. Spivey is warranted.

**C.   The ERISA Claim**

19

Nagelski seeks damages under § 510 of ERISA, 29 U.S.C. § 1140, on the ground that Dr. Spivey terminated her employment in order to intentionally deprive her of rights in PPM's Cash Balance Plan (the "Plan"). Section 510 provides in pertinent part:

> It shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.... The provisions of section 1132 of this title [which provides for civil enforcement] shall be applicable in the enforcement of this section.

29 U.S.C. § 1140. A § 510 claim requires proof of specific intent, *i.e.*, the employer discharged the employee with the purpose of interfering with the employee's pension rights. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir. 1991). The Fourth Circuit applies the *McDonnell Douglas* burden-shifting proof scheme to § 510 claims. *Id.* at 239 (citations omitted).

First, Dr. Spivey cannot be liable for the § 510 claim because he was not Nagelski's employer. Nagelski's § 510 claim is premised on allegations that she was unlawfully discharged in violation of the statute. The term "discharge" as used in § 510 presupposes an employment relationship, and only an employer can discharge an employee. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675 (7th Cir. 2011) (recognizing that discharge is "what an employer does to an employee"); *Teamsters Local Union No. 705 v. BNSF, LLC*, 741 F.3d 819, 823 (7th Cir. 2014) (affirming dismissal of § 510 claim which rests entirely on allegations of unlawful discharge where the defendants did not have an employment relationship with the plaintiffs); *Andes v. Ford Motor Co.*, 70 F.3d 1332, 1337 (D.C. Cir. 1995) (recognizing "discharge" as involving "employment termination").

20

Because Dr. Spivey is not the employer, and only an employer can terminate employment, Nagelski's § 510 claim against Dr. Spivey must be dismissed.

Even if Nagelski could overcome this hurdle, her claim must still fail as she has failed to proffer evidence to create a genuine issue of fact that Dr. Spivey specifically intended to interfere with Nagelski vesting in the Cash Balance Plan. Employees alleging interference with ERISA rights must make a *prima facie* case showing (1) a defendant performed a prohibited action (2) for the purpose of interfering (3) with the attainment of a right to which the employee is currently, or in the future may become, entitled. *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3d Cir. 1987) (citations omitted). Once plaintiff establishes a prima facie case, the burden shifts to the defendant to state a legitimate, nondiscriminatory explanation. *Id.* Should defendant carry this burden, the burden shifts back to the plaintiff to establish pretext. *Id.* If plaintiff fails to present facts permitting a reasonable inference of pretext, summary judgment is proper.

Nagelski contends Dr. Spivey specifically intended to interfere with the impending vesting of her rights under the Plan. This claim fails because Nagelski cannot demonstrate pretext. Nagelski has not developed evidence showing any decision-makers thought about the Plan when deciding to eliminate her position. (Dr. Spivey Decl. ¶ 29). Nagelski's claim is nonsensical because the Spiveys did not gain from her termination because any monies forfeited by Plan Participants stayed in the Plan and were used to fund benefits of vested employees. (Dr. Spivey Dep. 179:2-9; 180:1-7).

21

Nagelski has not developed any evidence to show Dr. Spivey even thought about the Plan when he participated in the decision to terminate her employment. (Dr. Spivey Decl. ¶ 29). Dr. Spivey had a basic understanding of the Plan, but he and PPM relies on a Third Party Administrator who administers the Plan. (*Id.* ¶ 33). If an employee separated from employment prior to vesting, the monies allocated to that employee reverted back to the Plan and not to the Spiveys. (Dr. Spivey Dep. 179:2-9; 180:1-7).

Ultimately, Nagelski's argument is her termination saved PPM money which is insufficient "evidence" of pretext. As noted in *Conkwright*,

> While plaintiff's termination probably did save [the Company] money, this is not enough to carry the day...[P]laintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent.

*Conkwright*, 933 F.2d at 239 (citations omitted).

Further, Nagelski fails to supply any connection, either through direct or circumstantial evidence, between her discharge and Dr. Spivey's alleged attempt to prevent her from attaining ERISA-protected benefits. No reasonable jury could find unlawful intent, even after taking as true Nagelski's assertions. Therefore, summary judgment is appropriate.

## D.   The Punitive Damages Claim

By statute, punitive damages may be awarded "only if the Plaintiff proves that the defendant is liable for compensatory damages" and is limited to cases involving fraud, malice or willful or wanton conduct. N.C. Gen. Stat. § 1D-15. "If the injured party has no

cause of action independent of a supposed right to recover punitive damages, then she has no cause of action at all." *Hawkins v. Hawkins*, 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991) (citations omitted). Because Nagelski's claim for punitive damages is derivative of her other claims, which all fail, her claim for punitive damages is barred.

Further, N.C. Gen. Stat. § 1D-1 *et seq*. provides punitive damages may only be awarded if plaintiff proves the existence of fraud, malice, or willful or wanton conduct. Nagelski has not proffered any such evidence, requiring dismissal of this claim.

## V.    CONCLUSION

WHEREFORE, Dr. Spivey respectfully requests that his Motion for Summary Judgment GRANTED, that Suzanne Nagelski's claims be DISMISSED WITH PREJUDICE, and for such other and further relief as the Court deems just and proper.

Respectfully submitted this the 1st day of October, 2018.

JACKSON LEWIS P.C.

*/s/ Ann H. Smith*
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone:  (919) 760-6460
Facsimile:   (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

| | | |
|---|---|---|
| REBECCA KOVALICH and | ) | |
| SUZANNE NAGELSKI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | **CERTIFICATE OF** |
| | ) | **COMPLIANCE** |
| PREFERRED PAIN MANAGEMENT | ) | |
| & SPINE CARE, P.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned counsel hereby certifies compliance with, Local Rule 7.3(d)(1).

The undersigned counsel further certifies this Memorandum, including the body of the

brief, headings, and footnotes does not exceed 6,250 words.

JACKSON LEWIS P.C.

*/s/ Ann H. Smith*
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

24

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and           )
SUZANNE NAGELSKI,              )
                               )
              Plaintiffs,      )
vs.                            )        **CERTIFICATE OF**
                               )          **SERVICE**
PREFERRED PAIN MANAGEMENT      )
& SPINE CARE, P.A., *et al.*,  )
                               )
              Defendants.      )

The undersigned certifies that on October 1, 2018, the foregoing *Memorandum of Law in Support of Dr. David Spivey's Motion for Summary Judgment as to Suzanne Nagelski's Claims* was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system, which will send notification of such filing as follows:

Sean F. Herrmann, Esq.
Van Kampen Law P.C.
315 East Worthington Avenue
Charlotte, NC 28203
sean@vankampenlaw.com
*Attorney for Plaintiffs*

/s/ Ann H. Smith
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
Jackson Lewis P.C.
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone:  (919) 760-6460
Facsimile:   (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

4830-0259-1601, v. 4

25