IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and          )
SUZANNE NAGELSKI,             )
                             )
          Plaintiffs,         )     **<u>MEMORANDUM OF LAW IN</u>**
                             )     **<u>SUPPORT OF DR. DAVID SPIVEY'S</u>**
vs.                          )     **<u>MOTION FOR SUMMARY</u>**
                             )     **<u>JUDGMENT AS TO REBECCA</u>**
PREFERRED PAIN MANAGEMENT     )     **<u>KOVALICH'S CLAIMS</u>**
& SPINE CARE, P.A., *et al.*, )
                             )
          Defendants.         )

NOW COMES Defendant Dr. David Spivey ("Defendant" or "Dr. Spivey"), and pursuant to Local Rule 7.2, MDNC, files this Memorandum of Law. Dr. Spivey respectfully contends its Motion for Summary Judgment should be granted as to all claims asserted by Plaintiff Rebecca Kovalich ("Kovalich").

## I.  <u>STATEMENT OF THE CASE</u>

Plaintiffs Suzanne Nagelski ("Nagelski") and Kovalich filed their Complaint on August 1, 2017, in Forsyth County Superior Court alleging claims against Preferred Pain Management & Spine Care, P.A. ("PPM"), Dr. Spivey, and Sherry Spivey. [DE #6]. Kovalich alleged claims for tortious interference with contract and violation of the Employment Retirement Income Security Act ("ERISA") against Dr. Spivey. [*Id.*] Kovalich seeks both compensatory and punitive damages. On September 25, 2017, Dr. Spivey removed Kovalich's Complaint. [DE # 1]. Dr. Spivey filed his Answer on November 1, 2017. [DE # 11]. On December 1, 2017, Judge Auld entered a text order

approving the parties' joint Rule 26(f) report [DE # 14], setting a dispositive motion deadline 30 days after the close of discovery. On July 2, 2018, Judge Auld entered a text order granting Plaintiffs' motion to amend the case management order setting a discovery deadline of August 31, 2018. [DE # 22]. On September 12, 2018, Dr. Spivey filed his Notice of Intent to File Summary Judgment Motion. [DE # 26]. Dr. Spivey filed a Motion for Summary Judgment [DE # 36], and files this Memorandum of Law in support.

## II.  STATEMENT OF FACTS

*Kovalich's Background*

The Plaintiffs and individual Defendants are family. In 1966, Kovalich (age 71)[1] married Sherry Spivey's brother and gave birth to Nagelski (age 49), Sherry Spivey's niece. (Kovalich Dep. 23:8-11; 14-15).

In the 80s and 90s, Kovalich worked in the healthcare industry in Winston-Salem and started Triad Clinical Laboratory, which performed clinical lab testing. (*Id*. 34-37; 40:4-17). Kovalich never conducted any lab testing as she is not a licensed physician or medical technologist. (*Id*. 41:14-42:25). In 2003, Kovalich sold the business for approximately $10 million. (*Id*. 43:9-25).

*The Spiveys' Background*

Dr. Spivey (age 64) and Sherry Spivey (age 64) married in 1980. (Dr. Spivey Decl. ¶¶ 3, 32; Sherry Spivey Dec. ¶¶ 4, 27). Sherry Spivey graduated and was working as a Registered Nurse. (Sherry Spivey Decl. ¶ 3). Dr. Spivey graduated medical school in 1981.

---

[1] All ages referenced *infra* are at the time of Kovalich's termination.

2

(Dr. Spivey Dep. 18:11-16). The Spiveys moved to the west coast and resided there for several decades where they worked in medicine. (Dr. Spivey Decl. ¶ 5).

In 2005, the Spiveys returned to North Carolina. (*Id.* ¶ 6). In 2006, the Spiveys decided Dr. Spivey could start a pain management practice in Winston-Salem. (*Id.* ¶ 7). They consulted with Kovalich and utilized her contacts in the medical community to begin PPM. Compl. ¶ 18. Later, the Spiveys engaged Nagelski, a recent MBA graduate, to perform administrative functions for PPM. Compl. ¶ 20.

PPM is a medical clinic providing patients with treatments to reduce levels of pain and increase functionality. (Dr. Spivey Decl. ¶ 8). PPM began with one clinic in Winston-Salem but now has another clinic in Greensboro. (*Id.* ¶ 9). PPM operates a laboratory at a separate location in Greensboro. (*Id.*)

### Kovalich's Development of the PPM Laboratory

Kovalich's principal role was assisting PPM in developing the laboratory which opened in 2013. (*Id.* ¶ 12). She performed various tasks, including hiring for the lab. (*Id.*; Kovalich Dep. 121:18-123; Hawks Dep. 15:10-16:6).

Kovalich began as an independent contractor providing consulting services to PPM. (Kovalich Dep. 123:15-127:9). Later, Nagelski changed Kovalich's status to employee effective December 1, 2013. (Nagelski Dep. 221:17-223:16). Kovalich never had an official title or job description. (Dr. Spivey Decl. ¶ 13). She never had a schedule or number of hours to work. (Kovalich Dep. 140:21-141:5, 162:5-163:7, 164:1-15, 165:22-25; 166:18-167:23). Kovalich owned homes in Charleston, South Carolina area, and spent significant time there instead of working at the Greensboro lab. (*Id.* 161:2-165:25).

3

Kovalich assisted in hiring Medical Technologist Gretchan Hawks (female, age 47), and five other lab personnel all over forty. (Yontz Decl. Ex. 19). After the lab opened in 2013, it operated on auto pilot, and the hours Kovalich worked "got less and less." (Kovalich Dep. 166:7-167:18). By 2016, Kovalich estimated she worked ten to twenty hours a week. (*Id*. 167:7-18). Hawks was able to handle most things and would contact Kovalich if an issue arose. (*Id*. 166:22-167:6). Kovalich was initially paid $60,000 per year and then $72,000 per year. (*Id*. 234:21-236:18).

### Kovalich's Relationship with Dr. Spivey

Kovalich believed Dr. Spivey went through a period around 2013 where he needed a friend and wanted more out of their relationship. (*Id*. 199-200). Kovalich and Dr. Spivey exchanged flirty text messages where Dr. Spivey sometimes greeted Plaintiff with "Rebecca my beauty" or "Object of my desire." (*Id.* Exs. 10, 11). Kovalich claimed she "did her best to ignore Dr. Spivey's inappropriate behavior." Compl. ¶ 33. However, she responded to Dr. Spivey's texts with "hello Mr. Handsome or Mr. GQ or something like that." (Kovalich Dep. 246: 2-9). Kovalich complimented Dr. Spivey's appearance because "[w]hen he first started, he had on green scrubs and looked scruffy. And then he started wearing suit and tie and he really – I mean, he – he looked very, very, very handsome." (*Id*. 246, 247:1-5). Dr. Spivey would return compliments to Kovalich. (*Id*. 246:15-17). Their relationship was one of "mutual admiration" where they sent each other texts with flirtatious salutations, but the substance focused on business. (Dr. Spivey Dep. 258:11-19).

Kovalich found Dr. Spivey to be "a very handsome man" and there was nothing wrong with him "except that he's married and [Kovalich] was not romantically interested

4

in him." (Kovalich Dep. 245:2-4). Kovalich testified the communications from Dr. Spivey made her sad because he seemed desperate and unhappy in his marriage. (*Id.* 202:7-24). Kovalich believed Dr. Spivey "wanted more out of a relationship" and thought "he needed something that [she] couldn't give him." (*Id.* 200:2-11). Kovalich knew Dr. Spivey was married to Sherry Spivey and expressed to him "the last thing I want is to – to destroy, you know, your relationship or what relationship you have with your family." (*Id.* 201:7-202:6). Dr. Spivey never asked Plaintiff on a date. (*Id.* 209:3-9). The closest thing to a proposition was when Dr. Spivey referred to himself as Plaintiff's "wannabe lover" to which Plaintiff called him "Mr GQ" in response. (*Id.* Ex. 12). On October 24, 2013, Plaintiff texted Dr. Spivey "as desirable as u are …it would be too much Hell to pay!" (*Id.*) Dr. Spivey agreed. (*Id.*)

In 2014, Kovalich was talking with Dr. Spivey when he said he wanted to come see her. (*Id.* 204:6-20, 247:14-24). Kovalich declined because friends were visiting. (*Id.*) They discussed office issues, then Dr. Spivey allegedly asked Kovalich what she was wearing. (*Id.*) In November 2014, Kovalich alleges Dr. Spivey told her "you know, I gave you a chance," and the two said nothing further. (*Id.* 219:10-221:11; Compl. ¶ 37).

In February 2015, Dr. Spivey hugged Plaintiff in the parking lot. (Kovalich Dep. 259:5-18). Plaintiff admitted "it was nothing romantic or sexual, it was just – it was just fun." (*Id.*) Eight months later, on a busy work day in October 2015, Kovalich alleges she was in Dr. Spivey's office with the door open when he suddenly kissed her. (*Id.* 207:5-208:11, 260:11-13, 261:22-25). Kovalich did not report any of these incidents while employed. (*Id.* 208:12-14, 260:14-261:12).

5

***Kovalich's Issues with Sherry Spivey***

Kovalich testified about a number of incidents she had with Sherry Spivey while Kovalich was a PPM employee. (*Id.* 173-199; 218:25-219:9). In 2012 or 2013, Sherry Spivey told Kovalich if Kovalich needed anything to bring it to her, and she would take it to Dr. Spivey. (*Id.* 173:7-174:19). Kovalich responded she reported to Dr. Spivey and could go to him herself. (*Id.*) In 2013, Sherry Spivey (1) got upset with Kovalich for hiring a nurse without her permission (*Id.* 175:3-177:8); (2) cursed at Kovalich as she was walking down the hall after a meeting for no reason (*Id.* 179:3-183:4); and (3) called Kovalich and began screaming at another employee for not doing her job (*Id.* 183:5-185:21). This same year, Sherry Spivey directed an employee to cancel a repair of lab equipment. (*Id.* 188:3-189:14). When Kovalich alerted Dr. Spivey, he was angry and told Sherry Spivey to "stay the f*** out of the laboratory." (*Id.* 189:6-17). Kovalich was frustrated Sherry Spivey "was just bouncing in, bouncing out, giving a few orders, taking off. And not being accountable...." (*Id.* 177:12-18). When Kovalich approached Dr. Spivey about these issues, she testified Dr. Spivey said he could not get involved because it was either his marriage or his practice. (*Id.* 184:20-23).

***PPM Forced to Decrease Costs***

PPM began feeling "the effects of a number of factors that were impacting the practice from a reimbursement standpoint and also from a volume standpoint." (Dr. Spivey Dep. 13:14-17). Beginning in late 2014, insurance reimbursements dropped. (*Id.* 90:22-93:24; Kovalich Dep. 171:6-172:11). Additionally, there was more pain management competition in the area, less outside referrals, and decreased patient volume. (Dr. Spivey

Dep. 13:13-14:3). "[B]eginning around 2015, [PPM] had to make significant reductions in personnel and reassignment of duties … to keep the practice profitable and survive." (*Id*. 13:25-14:3). By 2016, Kovalich understood the financial pressures PPM faced because of reduce reimbursement rates resulting in the lab becoming less profitable. (Kovalich Dep. 172:3-11, 232:25-233:3).

In late 2015, Mary Benton (female, age 64) began advising PPM on operational strategy. (Benton Decl. ¶ 6; Ex. 2). Benton had been providing services for PPM since 2013 at Kovalich's recommendation. (Dr. Spivey Dep. 103:1-6; Benton Decl. ¶ 5; Ex. 6277; Benton Dep. 30:3-18; 32:16-24). Dr. Spivey instructed Benton to look for ways to reorganize PPM. (Dr. Spivey Dep. 70:17-22). Benton's role "was to look at different positions and the need for them" and find "opportunities to control cost." (Benton Dep. 97:3-98:3; 107:25-108:4). Benton developed an Action Plan recommending PPM evaluate the need and timeline of staffing. (Benton Decl. Ex. 1). Benton "looked at each one of the positions that got eliminated based on reorganization the same way. It wasn't about the person. It was about the function and the need to cut costs as part of the reorganization." (Benton Dep. 125:7-11).

In November 2015, PPM hired Wendy Yontz (female, age 44) to provide full-time on-site HR. (Dr. Spivey Decl. ¶ 24; Yontz Decl. ¶ 15). "Reorganization was a topic from the moment [Yontz] started" as there were "issues that [she] saw that needed to be addressed." (Yontz Dep. 37:20-23; 49:1-11). Yontz spent time "observing different positions and learning what people did and the need or lack of need for certain positions." (*Id*. 47:7-15). Yontz talked with Benton, and within Yontz's first two months, she

7

suggested elimination of certain positions. (*Id*. 47:14-48:5; 50:9-25; 71:20-25). Benton and Yontz discussed their thoughts on reorganization with Dr. Spivey, and he realized the need to reorganize. (*Id.* 48:20-22; 49:22-24; Dr. Spivey Dep. 70:5-11).

***Elimination of Nagelski's Position***

On January 16, 2016, Dr. Spivey sent Nagelski a letter stating as of February 1, 2016, she was no longer a PPM employee. (Nagelski Dep. Ex. 29). PPM eliminated Nagelski's position because her HR duties were previously reassigned, and PPM had formalized its relationship with its accountancy and banking resources. (*Id.*) Dr. Spivey indicated he wanted to continue to use Nagelski as a consultant on an as-needed basis. (*Id.*) Nagelski never contacted Dr. Spivey regarding this offer. (Nagelski Dep. 233:11-17). Instead, Nagelski retained counsel and sent a demand letter to PPM. (Dr. Spivey Dep. 238:4-12).

Kovalich did not know why Nagelski was separated, but felt the manner Dr. Spivey notified Nagelski was callous. (Kovalich Dep. 96:22-97:8). In March 2016, worried Kovalich may sabotage lab operations in response to Nagelski's termination, Dr. Spivey called Kovalich. (Dr. Spivey Dep. 246:6-248:9). Dr. Spivey asked Kovalich to confirm Nagelski's termination would not prompt Kovalich to retaliate against PPM. (*Id.* 248:4-9; Kovalich 76:5-18; Ex. 13).

When Kovalich complained Nagelski was not informed of her termination in-person, Dr. Spivey told Kovalich the termination happened that way because Nagelski was rarely physically present in the office. (*Id.* 75:8-19; Dr. Spivey Dep. 242:10-18). Dr. Spivey informed Kovalich PPM could benefit from Nagelski working as a consultant as

8

needed. (Dr. Spivey Dep. 253:3-10; Kovalich Dep. Ex. 13). Kovalich testified Dr. Spivey requested she communicate with Nagelski since he was not allowed to contact Nagelski. (*Id.* 75:20-76:3; Ex. 13). Kovalich claims Dr. Spivey told Kovalich he would pay whatever Nagelski wanted to drop her charge against PPM. (*Id.*) Kovalich responded she did not want to get involved in any dispute between PPM and Nagelski. (*Id.*)

Kovalich and Dr. Spivey did not speak about the matter again. (*Id.* 76:19-24). Several months later on June 6, 2016, the EEOC notified PPM Nagelski filed a Charge. (Sherry Spivey Dep. Ex. 97).

### Kovalich's Position Was No Longer Necessary

Kovalich's duties ended when lab development ceased in 2015. (Dr. Spivey Dep. 217:10-223:2). Dr. Spivey began considering terminating Kovalich, (*Id.* 225:9-11), but he "kept paying … to compensate her for things she had done earlier on in the practice for which [he] felt she had not been adequately compensated." (*Id.* 219:11-16; 219:17-222:17). Dr. Spivey sought alternative methods to compensate Kovalich, including ownership in a new lab and a lump sum, but she declined. (*Id.* 221:22-222:8; Kovalich Dep: 228:16-229:16; Ex. 17). Kovalich was unqualified to be the medical or clinical director of the lab. (Hawks Dep. 44:4-45:18). Kovalich was unqualified to conduct screenings or confirmation testing. (*Id.* 45:19-25).

In early 2016, Benton discussed with Dr. Spivey her "concerns of Rebecca not being involved as much in the lab, the fact that we were looking at costs." (Benton Dep. 119:1-10; Dr. Spivey Dep. 224:18-225:4). On March 29, 2016, Benton visited the lab to observe operations. (Benton Decl. ¶ 6 and Ex. 2). Benton questioned PPM's need for a lab manager

9

after learning Kovalich was rarely physically present, and Hawks was overseeing day-to-day operations. (Yontz Decl. Exs. 1 and 12; Benton Dep: 120:14-18, 123:15-124:19). Benton evaluated the lab budget and need for Kovalich's position. (Benton Dep. 119:11-19; Benton Decl. Ex. 2).

On June 1, 2016, after discussing with Dr. Spivey, Benton memorialized her concerns regarding Kovalich's position. (Yontz Decl. 12; Benton Dep. 126:7-127:11). By June 2, 2016, Dr. Spivey decided to eliminate Kovalich's position. (Yontz Decl. Ex. 13; Benton Decl. Ex. 2). Given the financial pressures, PPM needed to cut costs which, included eliminating pay for unnecessary services. (Dr. Spivey Decl. ¶ 31). On June 9, 2016, Kovalich's position was eliminated because "the position was not needed." (Benton Decl. Ex. 2; Yontz Dep. 74:16-23; Yontz Decl. Ex. 12). Lab employees now report to Dr. Spivey. (Hawks Dep. 26:23-27:13). Kovalich's position no longer exists. (*Id.* 48:16-49:1; Dr. Spivey Dep. 265:6-266:16).

### The Cash Balance Plan

The Preferred Pain Management, PA Cash Balance Plan ("the Plan") was created as a way for PPM to provide employee benefits in addition to retirement. (Dr. Spivey Decl. ¶ 33). The Plan is administered by an outside third-party, The Newport Group, Inc. ("Newport Group"). (*Id.*) As the third-party administrator, Newport Group oversees the administration of the Plan and its legal compliance. (*Id.*) PPM and Dr. Spivey rely on Newport Group and its expertise in managing the Plan. (*Id.*)

The Plan consists of five Participant Groups, A-E. (*Id.* ¶ 34). Dr. Spivey is the sole Participant in Group A, which receives a contribution of 76% of his compensation. (*Id.*)

Sherry Spivey is the sole Participant in Group B, receiving a contribution of 30% of her compensation. (*Id.*) Group C consists of lineal ascendants and descendants of more than 5% owners, which is the Spiveys' daughter Jennifer Spivey McGraw, who receives no contribution. (*Id.*) Group D consists of non-owner highly compensated employees, who also receive no contribution. (*Id.*) All others not in Groups A, B, C, or D, are in Participant Group E, and receive a 3% contribution of their compensation. (*Id.*) Prior to December 2016, Participants in Group E received a 2% contribution. (*Id.*)

Once an employee has been employed by PPM for one year or 1,000 hours, they are eligible to participate in the Plan ("Plan Participant"). (*Id.* ¶ 35). The Plan Participants make no contribution themselves. (*Id.*) Instead, PPM contributes a percentage of a Plan Participant's compensation into the Plan, depending on which Participant Group they are in as defined by the Plan. (*Id.*) After three years of service, the Plan Participant becomes 100% vested in the Plan. (*Id.*) Kovalich was in Participant Group E. (*Id.*)

Kovalich testified "I think the office as a whole w[as] getting rid of over-40 people. Because they tax the insurance. I mean, they're more expensive. . . . it was just better to get rid of the older people because they're sicker." (Kovalich Dep. 238:23-239:5). In reality, age is not a factor in the Plan. (PPM Dep. Vol II, Ex. 102). Since the Plan has been in existence, the contributions have been a percentage of compensation. *Id.* Contributions do not vary depending upon age. *Id.* Of the twenty-three Group E Plan Participants who are fully vested, twelve are 40 and older. *Id.* Had Kovalich remained employed through the end of 2016 and vested in the Plan, her total benefit would have been $3,682. (*Id.* 150:13-151:3). If an employee separated from employment prior to vesting, the monies

11

allocated to that employee revert back to the Plan and not to the Spiveys. (Dr. Spivey Dep. 179:2-9; 180:1-7). Regardless, Dr. Spivey's benefits under the Plan are not affected by other Participants' participation in the Plan. (PPM Dep. Vol. II, Ex. 102).

### III.     QUESTIONS PRESENTED

Has Kovalich proffered evidence creating a genuine issue of material fact as to the two claims she alleged against Dr. Spivey?

### IV.     ARGUMENT

#### A.     Standard of Review

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Holland v. Wash. Homes, Inc.*, 487 F.2d 208, 213 (4th Cir. 2007). Although the Court must construe facts in the light most favorable to Kovalich, "there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50).

#### B.     Tortious Interference with Contract Claim.

To establish a claim for tortious interference with a contract, a plaintiff must show:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

12

*White v. Cross Sales & Eng'g Co.*, 177 N.C. App. 765, 768-69, 629 S.E.2d 898, 901 (2006) (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)). A plaintiff may maintain a claim for tortious interference with contract even if the employment contract is terminable at will. *Lenzer v. Flaherty*, 106 N.C. App. 496, 512, 418 S.E.2d 276, 286, disc. review denied, 332 N.C. 345, 421 S.E.2d 348 (1992).

A party who induces one party "'to terminate or fail to renew a contract with another may be held liable for malicious interference with the party's contractual rights if the third party acts without justification.'" *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850, disc. review denied, 348 N.C. 695, 511 S.E.2d 649 (1998) (citations omitted). Whether a defendant is justified in interfering with a plaintiff's contract depends upon "'the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor[,] and the contractual interests of the other party.'" *Id.* at 317-18, 498 S.E.2d at 850 (quoting *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 60*60 S.E.2d 647, 650, reh'g denied, 322 N.C. 486, 370 S.E.2d 227 (1988)). "A person is justified in inducing the termination of a contract of a third party if he does so for a reason reasonably related to a legitimate business interest." *Fitzgerald v. Wolf*, 40 N.C. App. 197, 200, 252 S.E.2d 523, 524 (1979).

As a general rule, "'non-outsiders' [to the contract] often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." *Lenzer* 106 N.C. App. at 513, 418 S.E.2d at 286 (citations omitted). However, "[t]he qualified privilege of a non-outsider is lost if exercised for motives other than

reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with." Id. (citations omitted).

In order to hold a "non-outsider" liable for tortious interference with contract, a plaintiff must establish that the defendant acted with legal malice, that "'he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties.'" *Robinson, Bradshaw & Hinson, P.A.*, 129 N.C. App. at 318, 498 S.E.2d at 851 (quoting *Varner v. Bryan*, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994)). "The plaintiff's evidence must show that the defendant acted without any legal justification for his action." *Varner*, 113 N.C. App. at 702, 440 S.E.2d at 298 (citation omitted).

Here, Dr. Spivey is a non-outsider to the contract and is entitled to qualified immunity. It is undisputed that Dr. Spivey is the owner, President, and CEO of PPM. (Dr. Spivey Depo. 51:9-52:2). He testified that when it comes to running PPM, the "buck" stops with him. *Id.* Accordingly, Dr. Spivey has a vested interest in the practice because the financial health of the practice directly impacts the livelihood of him, his wife, and other employees. These undisputed facts evidence Dr. Spivey's status as a non-outsider to the contract.

Once the defendant has established insider status, the burden is on the plaintiff to come forward with evidence of legal malice to defeat the qualified privilege. *Varner*, 113 N.C. App. at 702, 440 S.E.2d at 297. In order to defeat this qualified privilege, Kovalich must proffer evidence to show Dr. Spivey acted with legal malice in terminating her employment. Kovalich has failed to proffer any such evidence.

14

First, Kovalich admitted that when PPM terminated her employment, Dr. Spivey told her that with declining insurance reimbursement rates, he was cutting costs. (Kovalich Dep. 232:25-233:3; 242:10). Kovalich admitted she did not know why she was terminated; only that Dr. Spivey told her it was "financial." (*Id.* 242:9-10). Kovalich admitted that by 2016, she was working only ten to twenty hours a week. (Kovalich Dep. 167:7-18). When her position was eliminated, the lab was running "like a well-oiled machine." (Hawks Dep. 30:12-31:8). Kovalich has not proffered any evidence to show that this information was false, unjustified, or evidence of a wrongful purpose. The fact that Kovalich's position was not replaced is further evidence that PPM's termination of Kovalich was a reasonable, good faith attempt to protect PPM's ongoing business interests and not indicative of any alleged tortious interference on the part of Dr. Spivey.

Kovalich claims Dr. Spivey tortiously interfered because she rebuffed his advances. Kovalich proffers no such evidence to support this claim other than her mere speculation and unsupported allegations. *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir.1996); *Othentec Ltd. v. Phelan,* 526 F.3d 135, 140 (4th Cir. 2008) (citations omitted). While Kovalich testified she "was not romantically interested in him", she admittedly engaged in flirtatious conduct towards Dr. Spivey telling him he was "desirable", calling him "Mr. GQ", and complimenting his dress because he looked "very, very, very handsome." (Kovalich Dep. 245:2-4, 246:2-17). In February 2015, Dr. Spivey hugged Plaintiff and spun her around in the parking lot. (Kovalich Dep. 259:5-18). Plaintiff admitted "it was nothing romantic or sexual, it was just – it was just fun." (*Id.*) Even after Kovalich shared the text messages with Nagelski, neither took any action while they were

employees. (*Id.*)  Even during the alleged October 2015 kiss, Plaintiff was only concerned with someone seeing them in the office. (*Id.* 207:13-208:11).  The undisputed evidence shows Kovalich never lodged any complaint of sexual harassment while employed with PPM, nor did she ever ask her own daughter, who was over HR, to investigate Dr. Spivey's alleged behavior. (*Id.* 205:20-207:2, 208:12-24).  Conduct that was easily disregarded by Kovalich and her daughter cannot support her claim for tortious interference.

Kovalich's claim as to Dr. Spivey is nonsensical.  On October 24, 2013, Kovalich texted Dr. Spivey "as desirable as u are …it would be too much Hell to pay!" (Kovalich Dep. Ex. 12).  Dr. Spivey agreed. (*Id.*)  After Kovalich "rejected" Dr. Spivey in this manner, two months later PPM *hired* Kovalich as a W-2 employee.  Such facts completely undercut any claim of tortious interference.  Further the last act of alleged harassment occurred in October 2015 when Dr. Spivey "all of a sudden" kissed her.  (*Id.* 207:13-208:11).  Finally, the eight month time gap between the "kiss" and the termination further weaken Kovalich's claim of tortious interference.  *Perry v. Kappos*, 489 F.App'x 637, 643 (4th Cir. 2012); *Pascual v. Lowe's Home Ctrs., Inc.*, 193 F.App'x 229, 233 (4th Cir. 2006) (three to four months insufficient).

Dr. Spivey could not have tortiously interfered with Kovalich's at-will employment contract on the alleged basis that she failed to convince Nagelski to drop her potential case against PPM. Compl. ¶ 115.  By June 2, 2016—before PPM ever received notice of Nagelski's EEOC Charge, Dr. Spivey—in consultation with Benton—had decided it would be in the best interest of PPM to eliminate Kovalich's position. (Yontz Decl. Ex. 13; Benton Decl. Ex. 2).  The need for Kovalich's services significantly decreased and

16

eventually became obsolete to the extent her services were no longer needed. (Dr. Spivey Decl. ¶ 31). In addition because of changing health insurance reimbursement rates, the lab's profitability declined. (Kovalich Dep. 172:3-11, 232:25-233:3). Given the financial pressures, PPM needed to cut costs in order to become financially viable—which, included eliminating pay for services that were not necessary to the business. (Dr. Spivey Decl. ¶ 31). As such, on June 9, 2016, Kovalich's position was eliminated. (*Id.*) Prior to Kovalich's termination, Dr. Spivey made it known that "the reason for termination, was that the position was not needed." (Yontz Dep. 74:16-23).

In short, Kovalich has not proffered any evidence—other than her own speculation and baseless allegations in her Complaint—that Dr. Spivey acted with legal malice and interfered with Kovalich's at-will employment contract. Dr. Spivey as the President and CEO had the legal authority to terminate Kovalich's employment. Given the foregoing, Kovalich has not proffered any evidence to create a genuine issue of material fact that Dr. Spivey tortiously interfered with her at-will employment contract on any basis.

## C.    The ERISA Claim

Kovalich seeks damages under § 510 of ERISA, 29 U.S.C. § 1140, on the ground that Dr. Spivey terminated her employment in order to intentionally deprive her of rights in PPM's Cash Balance Plan (the "Plan"). Section 510 provides in pertinent part:

> It shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.... The provisions of section 1132 of this title [which provides for civil enforcement] shall be applicable in the enforcement of this section.

17

29 U.S.C. § 1140. A § 510 claim requires proof of specific intent, *i.e.*, the employer discharged the employee with the purpose of interfering with the employee's pension rights. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir. 1991). The Fourth Circuit applies the *McDonnell Douglas* burden-shifting proof scheme to § 510 claims. *Id.* at 239 (citations omitted).

First, Dr. Spivey cannot be liable for the § 510 claim because he was not Kovalich's employer. Kovalich's § 510 claim here is premised on allegations that she was unlawfully discharged in violation of the statute. The term "discharge" as used in § 510 presupposes an employment relationship, and only an employer can discharge an employee. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675 (7th Cir. 2011) (recognizing that discharge is "what an employer does to an employee"); *Teamsters Local Union No. 705 v. BNSF, LLC*, 741 F.3d 819, 823 (7th Cir. 2014) (affirming dismissal of § 510 claim which rests entirely on allegations of unlawful discharge where the defendants did not have an employment relationship with the plaintiffs); *Andes v. Ford Motor Co.*, 70 F.3d 1332, 1337 (D.C.Cir.1995) (recognizing "discharge" as involving "employment termination"). Because Dr. Spivey is not the employer, and only an employer can terminate employment, Kovalich's § 510 claim against Dr. Spivey must be dismissed.

Even if Kovalich could overcome this hurdle, her claim must still fail as she has failed to proffer evidence to create a genuine issue of fact that Dr. Spivey specifically intended to interfere with Kovalich's vesting in the Cash Balance Plan. As in the Title VII context, employees alleging interference with rights under ERISA bear the initial burden of making out a prima facie case. *Gavalik v. Cont'l Can Co.,* 812 F.2d 834, 852 (3d Cir.

1987) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Thus to establish a *prima facie* case under § 510, an employee must demonstrate that (1) a defendant performed a prohibited action (2) for the purpose of interfering (3) with the attainment of a right to which the employee is currently, or in the future may become, entitled. *Id*. If the plaintiff establishes a prima facie case by a preponderance of the evidence, the burden shifts to the defendant to state a legitimate, nondiscriminatory explanation for the challenged conduct. *Id*. If the defendant carries its burden and successfully demonstrates a legitimate, nondiscriminatory explanation, the burden then shifts back to the plaintiff, who is given the opportunity to establish by a preponderance of the evidence that the defendant's explanation is pretextual. *Id*. If the plaintiff fails to present facts that permit a reasonable inference of pretext, summary judgment should be granted for defendant. On summary judgment a § 510 claim comes down to plaintiff's evidence supporting pretext. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Here, Kovalich asserts her discharge was a willful attempt to deprive her of rights protected by ERISA. More precisely, she contends that Dr. Spivey specifically intended to interfere with the impending vesting of her rights under the Cash Balance Plan, and that her impending vesting of her rights under the Plan was a motivating factor in her discharge.[2] Under the *McDonnell Douglas* scheme, Kovalich's § 510 claim ultimately fails because she cannot demonstrate a genuine issue on the matter of pretext.

---

[2] Had Kovalich become vested in the plan, her benefit would have been $3,682. (PPM Dep. Vol. II, 150:20-23).

19

Kovalich has not developed any evidence to show that Dr. Spivey even thought about the Cash Balance Plan when he, along with Benton, decided that it be in PPM's best interest to terminate Kovalich's employment. (Dr. Spivey, Decl. ¶ 32). Dr. Spivey testified that he had a basic understanding of the Plan, but that PPM relies on a Third Party Administrator who administers the Plan. (Dr. Spivey Depo. 162:15-163:11) Dr. Spivey did not know if any of the contributions made on behalf of employees who were separated prior to their vesting in the Plan reverted back to PPM. (*Id.* 180:1-15). Dr. Spivey testified he thought the monies stayed in the Plan and were used to fund the benefits to vested employees. (*Id.* 179:2-9) He did not know whether the money would go to credit him. (*Id.* 180:13-15).

Ultimately, Kovalich's argument boils down to the fact her termination would have saved PPM money. Such "evidence" of pretext is insufficient. As noted in *Conkwright*,

> While plaintiff's termination probably did save [the Company] money, this is not enough to carry the day...[P]laintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent.

*Conkwright*, 933 F.2d at 239 (citations omitted).

Further, Kovalcih fails to supply any connection, either through direct or circumstantial evidence, between her discharge and Dr. Spivey's alleged attempt to prevent her from attaining ERISA-protected benefits. No reasonable jury could find unlawful intent, even after taking as true Kovalich's assertions. Therefore, summary judgment is appropriate.

### D.     The Punitive Damages Claim

By statute, punitive damages may be awarded "only if the Plaintiff proves that the defendant is liable for compensatory damages" and is limited to cases involving fraud, malice or willful or wanton conduct. N.C. Gen. Stat. § 1D-15. "If the injured party has no cause of action independent of a supposed right to recover punitive damages, then she has no cause of action at all." *Hawkins v. Hawkins*, 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991) (citations omitted). Because Nagelski's claim for punitive damages is derivative of her other claims, which all fail, her claim for punitive damages is barred.

Further, N.C. Gen. Stat. § 1D-1 *et seq.* provides punitive damages may only be awarded if plaintiff proves the existence of fraud, malice, or willful or wanton conduct. Kovalich has not proffered any such evidence, requiring dismissal of this claim.

<u>CONCLUSION</u>

For the above-stated reasons, Dr. Spivey's Motion for Summary Judgment should be ALLOWED, and Plaintiff's action should be dismissed with prejudice.

Respectfully submitted this the 1st day of October, 2018.

JACKSON LEWIS P.C.

*/s/ Ann H. Smith*
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

21

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and )
SUZANNE NAGELSKI, )
)
Plaintiffs, )
)
vs. )
) **CERTIFICATE OF**
PREFERRED PAIN MANAGEMENT ) **COMPLIANCE**
& SPINE CARE, P.A., DR. DAVID )
SPIVEY, individually, and SHERRY )
SPIVEY, individually, )
)
Defendants. )

The undersigned counsel hereby certifies pursuant, Local Rule 7.3(d)(1), that this

Memorandum does not exceed 6,250 words including the body of the brief, headings, and

footnotes.

/s/ Ann H. Smith
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
Jackson Lewis P.C.
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

22

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

| | | |
|---|---|---|
| REBECCA KOVALICH and | ) | |
| SUZANNE NAGELSKI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | **CERTIFICATE OF** |
| PREFERRED PAIN MANAGEMENT | ) | **SERVICE** |
| & SPINE CARE, P.A., DR. DAVID | ) | |
| SPIVEY, individually, and SHERRY | ) | |
| SPIVEY, individually, | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned certifies that on October 1, 2018, the foregoing *Memorandum of Law in Support of Dr. David Spivey's Motion for Summary Judgment as to Rebecca Kovalich's Claims* was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system, which will send notification of such filing as follows:

Sean F. Herrmann, Esq.
Van Kampen Law P.C.
315 East Worthington Avenue
Charlotte, NC 28203
sean@vankampenlaw.com
*Attorney for Plaintiffs*

/s/ Ann H. Smith
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
Jackson Lewis P.C.
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone: (919) 760-6460
Facsimile: (919) 760-6461
Email:Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

4846-6196-3121, v. 3

23