IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

| | | |
|---|---|---|
| REBECCA KOVALICH and<br>SUZANNE NAGELSKI, | ) | |
| | ) | |
| | ) | **MEMORANDUM OF LAW IN** |
| Plaintiffs, | ) | **SUPPORT OF DEFENDANT** |
| | ) | **SHERRY SPIVEY'S MOTION FOR** |
| vs. | ) | **SUMMARY JUDGMENT AS TO** |
| | ) | **PLAINTIFF REBECCA** |
| PREFERRED PAIN MANAGEMENT | ) | **KOVALICH'S CLAIMS** |
| & SPINE CARE, P.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

NOW COMES Defendant Sherry Spivey ("Defendant" or "Sherry Spivey"), and pursuant to Local Rule 7.2, MDNC, files this Memorandum of Law. Sherry Spivey respectfully contends its Motion for Summary Judgment should be granted as to all claims asserted by Plaintiff Rebecca Kovalich ("Kovalich").

## I. STATEMENT OF THE CASE

Plaintiffs Suzanne Nagelski ("Nagelski") and Kovalich filed their Complaint on August 1, 2017 in Forsyth County Superior Court alleging claims against Preferred Pain Management & Spine Care, P.A. ("PPM"), Dr. David Spivey, and Sherry Spivey. [DE # 6]. Kovalich alleged claims for tortious interference with contract and violation of the Employment Retirement Income Security Act ("ERISA") against Sherry Spivey. [DE # 6]. Kovlich seeks both compensatory and punitive damages. On September 25, 2017, Sherry Spivey removed Kovalich's Complaint. [DE # 1]. Sherry Spivey filed her Answer on November 1, 2017. [DE # 12]. On December 1, 2017, Judge Auld entered a text order

approving the parties' joint Rule 26(f) report [DE # 14], setting a dispositive motions deadline 30 days after the close of discovery. On July 2, 2018, Judge Auld entered a text order granting Plaintiffs' motion to amend case management order setting a discovery deadline of August 31, 2018. [DE # 22]. On September 12, 2018, Sherry Spivey filed her Notice of Intent to File Summary Judgment Motion. [DE # 28]. Sherry Spivey filed a Motion for Summary Judgment [DE # 40], and files this Memorandum of Law in support.

## II.  <u>STATEMENT OF FACTS</u>

*Kovalich's Background*

The Plaintiffs and individual Defendants are family. In 1966, Kovalich (age 71)[1] married Sherry Spivey's brother and gave birth to Nagelski (age 49), Sherry Spivey's niece. (Kovalich Dep. 23:8-11; 14-15).

In the 80s and 90s, Kovalich worked in the healthcare industry in Winston-Salem and started Triad Clinical Laboratory, which performed clinical lab testing. (*Id*. 34-37; 40:4-17). Kovalich never conducted any lab testing as she is not a licensed physician or medical technologist. (*Id*. 41:14-42:25). In 2003, Kovalich sold the business for approximately $10 million. (*Id*. 43:9-25).

*The Spiveys' Background*

Dr. Spivey (age 63) and Sherry Spivey (age 64) married in 1980. (Dr. Spivey Decl. ¶¶ 3, 29; Sherry Spivey Dec. ¶¶ 4, 27). Sherry Spivey graduated and was working as a Registered Nurse. (Sherry Spivey Decl. ¶ 3). Dr. Spivey graduated medical school in 1981.

---

[1] All ages referenced *infra* are at the time of Kovalich's termination.

(Dr. Spivey Dep. 18:11-16). The Spiveys moved to the west coast and resided there for several decades where they worked in medicine. (Dr. Spivey Decl. ¶ 5).

In 2005, the Spiveys returned to North Carolina. (*Id.* ¶ 6). In 2006, the Spiveys decided Dr. Spivey could start a pain management practice in Winston-Salem. (*Id.* ¶ 7). They consulted with Kovalich and utilized her contacts in the medical community to begin PPM. Compl. ¶ 18. Later, the Spiveys engaged Nagelski, a recent MBA graduate, to perform administrative functions for PPM. Compl. ¶ 20.

PPM is a medical clinic providing patients with treatments to reduce levels of pain and increase functionality. (Dr. Spivey Decl. ¶ 8). PPM began with one clinic in Winston-Salem but now has another clinic in Greensboro. (*Id.* ¶ 9). PPM operates a laboratory at a separate location in Greensboro. (*Id.*)

### Kovalich's Development of the PPM Laboratory

Kovalich's principal role was assisting PPM in developing the laboratory which opened in 2013. (*Id.* ¶ 12). She performed various tasks, including hiring for the lab. (*Id.*; Kovalich Dep. 121:18-123; Hawks Dep. 15:10-16:6).

Kovalich began as an independent contractor providing consulting services to PPM. (Kovalich Dep. 123:15-127:9). Later, Nagelski changed Kovalich's status to employee effective December 1, 2013. (Nagelski Dep. 221:17-223:16). Kovalich never had an official title or job description. (Dr. Spivey Decl. ¶ 13). She never had a schedule or number of hours to work. (Kovalich Dep. 140:21-141:5, 162:5-163:7, 164:1-15, 165:22-

3

25; 166:18-167:23). Kovalich owned homes in Charleston, South Carolina area, and spent significant time there instead of working at the Greensboro lab. (*Id*. 161:2-165:25).

Kovalich assisted in hiring Medical Technologist Gretchan Hawks (female, age 47), and five other lab personnel all over forty. (Yontz Decl. Ex. 19). After the lab opened in 2013, it operated on auto pilot, and the hours Kovalich worked "got less and less." (Kovalich Dep. 166:7-167:18). By 2016, Kovalich estimated she worked ten to twenty hours a week. (*Id*. 167:7-18). Hawks was able to handle most things and would contact Kovalich if an issue arose. (*Id*. 166:22-167:6). Kovalich was initially paid $60,000 per year and then $72,000 per year. (*Id*. 234:21-236:18).

### *Kovalich's Relationship with Dr. Spivey*

Kovalich believed Dr. Spivey went through a period around 2013 where he needed a friend and wanted more out of their relationship. (*Id*. 199-200). Kovalich and Dr. Spivey exchanged flirty text messages where Dr. Spivey sometimes greeted Plaintiff with "Rebecca my beauty" or "Object of my desire." (*Id*. Exs. 10, 11). Kovalich claimed she "did her best to ignore Dr. Spivey's inappropriate behavior." Compl. ¶ 33. However, she responded to Dr. Spivey's texts with "hello Mr. Handsome or Mr. GQ or something like that." (Kovalich Dep. 246: 2-9). Kovalich complimented Dr. Spivey's appearance because "[w]hen he first started, he had on green scrubs and looked scruffy. And then he started wearing suit and tie and he really – I mean, he – he looked very, very, very handsome." (*Id*. 246, 247:1-5). Dr. Spivey would return compliments to Kovalich. (*Id*. 246:15-17).

Their relationship was one of "mutual admiration" where they sent each other texts with flirtatious salutations, but the substance focused on business. (Dr. Spivey Dep. 258:11-19).

Kovalich found Dr. Spivey to be "a very handsome man" and there was nothing wrong with him "except that he's married and [Kovalich] was not romantically interested in him." (Kovalich Dep. 245:2-4). Kovalich testified the communications from Dr. Spivey made her sad because he seemed desperate and unhappy in his marriage. (*Id.* 202:7-24). Kovalich believed Dr. Spivey "wanted more out of a relationship" and thought "he needed something that [she] couldn't give him." (*Id*. 200:2-11). Kovalich knew Dr. Spivey was married to Sherry Spivey and expressed to him "the last thing I want is to – to destroy, you know, your relationship or what relationship you have with your family." (*Id*. 201:7-202:6). Dr. Spivey never asked Plaintiff on a date. (*Id*. 209:3-9). The closest thing to a proposition was when Dr. Spivey referred to himself as Plaintiff's "wannabe lover" to which Plaintiff called him "Mr GQ" in response. (*Id.* Ex. 12). On October 24, 2013, Plaintiff texted Dr. Spivey "as desirable as u are …it would be too much Hell to pay!" (*Id.*) Dr. Spivey agreed. (*Id.*)

In 2014, Kovalich was talking with Dr. Spivey when he said he wanted to come see her. (*Id.* 204:6-20, 247:14-24). Kovalich declined because friends were visiting. (*Id.*) They discussed office issues, then Dr. Spivey allegedly asked Kovalich what she was wearing. (*Id.*) In November 2014, Plaintiff alleges Dr. Spivey said to her "you know, I gave you a chance," and the two said nothing further. (*Id.* 219:10-221:11; Compl. ¶ 37).

5

In February 2015, Dr. Spivey hugged Plaintiff in the parking lot. (Kovalich Dep. 259:5-18). Plaintiff admitted "it was nothing romantic or sexual, it was just – it was just fun." (*Id.*) Eight months later, on a busy work day in October 2015, Kovalich alleges she was in Dr. Spivey's office with the door open when he suddenly kissed her. (*Id.* 207:5-208:11, 260:11-13, 261:22-25). Kovalich did not report any of these incidents while employed. (*Id.* 208:12-14, 260:14-261:12).

***Kovalich's Issues with Sherry Spivey***

Kovalich testified about a number of incidents she had with Sherry Spivey while Kovalich was a PPM employee. (*Id.* 173-199; 218:25-219:9). In 2012 or 2013, Sherry Spivey told Kovalich if Kovalich needed anything to bring it to her, and she would take it to Dr. Spivey. (*Id.* 173:7-174:19). Kovalich responded she reported to Dr. Spivey and could go to him herself. (*Id.*) In 2013, Sherry Spivey (1) got upset with Kovalich for hiring a nurse without her permission (*Id.* 175:3-177:8); (2) cursed at Kovalich as she was walking down the hall after a meeting for no reason (*Id.* 179:3-183:4); and (3) called Kovalich and began screaming at another employee for not doing her job (*Id.* 183:5-185:21). This same year, Sherry Spivey directed an employee to cancel a repair of lab equipment. (*Id.* 188:3-189:14). When Kovalich alerted Dr. Spivey, he was angry and told Sherry Spivey to "stay the f*** out of the laboratory." (*Id.* 189:6-17). Kovalich was frustrated Sherry Spivey "was just bouncing in, bouncing out, giving a few orders, taking off. And not being accountable...." (*Id.* 177:12-18). When Kovalich approached Dr. Spivey about these

issues, she testified Dr. Spivey said he could not get involved because it was either his marriage or his practice. (*Id*. 184:20-23).

Kovalich testified it was at this point Sherry Spivey wanted to get rid of her and was "coming after her" because of the lab and "because of other things too" including the fact Kovalich felt Dr. Spivey "really liked her," and he needed her friendship. (*Id*. 190:24-191:6, 198:19-199:5).

Sherry Spivey was not aware of any alleged inappropriate conduct between Kovalich and Dr. Spivey while Kovalich worked at PPM. (Sherry Spivey Dep. 236:14-17; 238:2-239:9). Sherry Spivey did not know about: (1) the "flirty" text messages (*Id*. 235:10-21, 236:2-13); the alleged phone call when Dr. Spivey allegedly asked Kovalich what she was wearing; and (3) any alleged kiss between Dr. Spivey and Plaintiff. (*Id*. 240:12-20).

***PPM Forced to Decrease Costs***

PPM began feeling "the effects of a number of factors that were impacting the practice from a reimbursement standpoint and also from a volume standpoint." (Dr. Spivey Dep. 13:14-17). Beginning in late 2014, insurance reimbursements dropped. (*Id*. 90:22-93:24; Kovalich Dep. 171:6-172:11). Additionally, there was more pain management competition in the area, less outside referrals, and decreased patient volume. (Dr. Spivey Dep. 13:13-14:3). "[B]eginning around 2015, [PPM] had to make significant reductions in personnel and reassignment of duties … to keep the practice profitable and survive." (*Id*. 13:25-14:3). By 2016, Kovalich understood the financial pressures PPM faced because of

reduce reimbursement rates resulting in the lab becoming less profitable. (Kovalich Dep. 172:3-11, 232:25-233:3).

In late 2015, Mary Benton (female, age 64) began advising PPM on operational strategy. (Benton Decl. ¶ 6 and Ex. 2). Benton had been providing services for PPM since 2013 at Kovalich's recommendation. (Dr. Spivey Dep. 103:1-6; Benton Decl. ¶ 5 and Ex. 2; Benton Dep. 30:3-18; 32:16-24). Dr. Spivey instructed Benton to look for ways to reorganize PPM. (Dr. Spivey Dep. 70:17-22). Benton's role "was to look at different positions and the need for them" and find "opportunities to control cost." (Benton Dep. 97:3-98:3; 107:25-108:4). Benton developed an Action Plan recommending PPM evaluate the need and timeline of staffing. (Benton Decl. Exs. 1 and 2). Benton "looked at each one of the positions that got eliminated based on reorganization the same way. It wasn't about the person. It was about the function and the need to cut costs as part of the reorganization." (Benton Dep. 125:7-11).

In November 2015, PPM hired Wendy Yontz (female, age 44) to provide full-time on-site HR. (Dr. Spivey Decl. ¶ 24; Yontz Decl. ¶ 15). "Reorganization was a topic from the moment [Yontz] started" as there were "issues that [she] saw that needed to be addressed." (Yontz Dep. 37:20-23; 49:1-11). Yontz spent time "observing different positions and learning what people did and the need or lack of need for certain positions." (*Id*. 47:7-15). Yontz talked with Benton, and within Yontz's first two months, she suggested elimination of certain positions. (*Id*. 47:14-48:5; 50:9-25; 71:20-25). Benton

and Yontz discussed their thoughts on reorganization with Dr. Spivey, and he realized the need to reorganize. (*Id.* 48:20-22; 49:22-24; Dr. Spivey Dep. 70:5-11).

***Elimination of Nagelski's Position***

On January 16, 2016, Dr. Spivey sent Nagelski a letter stating as of February 1, 2016, she was no longer a PPM employee. (Nagelski Dep. Ex. 29). PPM eliminated Nagelski's position because her HR duties were previously reassigned, and PPM had formalized its relationship with its accountancy and banking resources. (*Id.*) Dr. Spivey indicated he wanted to continue to use Nagelski as a consultant on an as-needed basis. (*Id.*) Nagelski never contacted Dr. Spivey regarding this offer. (Nagelski Dep. 233:11-17). Instead, Nagelski retained counsel and sent a demand letter to PPM. (Dr. Spivey Dep. 238:4-12).

Kovalich did not know why Nagelski was separated, but felt the manner Dr. Spivey notified Nagelski was callous. (Kovalich Dep. 96:22-97:8). In March 2016, worried Kovalich may sabotage lab operations in response to Nagelski's termination, Dr. Spivey called Kovalich. (Dr. Spivey Dep. 246:6-248:9). Dr. Spivey asked Kovalich to confirm Nagelski's termination would not prompt Kovalich to retaliate against PPM. (*Id.* 248:4-9; Kovalich 76:5-18; Ex. 13). Kovalich claims to have heard Sherry Spivey in the background of the call, however both Dr. and Sherry Spivey deny this. (Kovalich Dep. 76:4-12; Dr. Spivey Dep. 248:10-249:18; Sherry Spivey Dep. 225:24-228:15).

When Kovalich complained Nagelski was not informed of her termination in-person, Dr. Spivey told Kovalich the termination happened that way because Nagelski was

rarely physically present in the office. (*Id.* 75:8-19; Dr. Spivey Dep. 242:10-18). Dr. Spivey informed Kovalich PPM could benefit from Nagelski working as a consultant as needed. (Dr. Spivey Dep. 253:3-10; Kovalich Dep. Ex. 13). Kovalich testified Dr. Spivey requested she communicate with Nagelski since he was not allowed to contact Nagelski. (*Id.* 75:20-76:3; Ex. 13). Kovalich claims Dr. Spivey told Kovalich he would pay whatever Nagelski wanted to drop her charge against PPM. (*Id.*) Kovalich responded she did not want to get involved in any dispute between PPM and Nagelski. (*Id.*)

Kovalich and Dr. Spivey did not speak about the matter again. (Kovalich Dep. 76:19-24). Several months later on June 6, 2016, the EEOC notified PPM Nagelski filed a Charge. (Sherry Spivey Dep. Ex. 97).

### Kovalich's Position Was No Longer Necessary

Kovalich's duties ended when lab development ceased in 2015. (Dr. Spivey Dep. 217:10-223:2). Dr. Spivey began considering terminating Kovalich, (*Id.* 225:9-11), but he "kept paying … to compensate her for things she had done earlier on in the practice for which [he] felt she had not been adequately compensated." (*Id.* 219:11-16; 219:17-222:17). Dr. Spivey sought alternative methods to compensate Kovalich, including ownership in a new lab and a lump sum, but she declined. (*Id.* 221:22-222:8; Kovalich Dep: 228:16-229:16; Ex. 17). Kovalich was unqualified to be the medical or clinical director of the lab. (Hawks Dep. 44:4-45:18). Kovalich was unqualified to conduct screenings or confirmation testing. (*Id.* 45:19-25).

10

In early 2016, Benton discussed with Dr. Spivey her "concerns of Rebecca not being involved as much in the lab, the fact that we were looking at costs." (Benton Dep. 119:1-10; Dr. Spivey Dep. 224:18-225:4). On March 29, 2016, Benton visited the lab to observe operations. (Benton Decl. ¶ 6 and Ex. 2). Benton questioned PPM's need for a lab manager after learning Kovalich was rarely physically present, and Hawks was overseeing day-to-day operations. (Yontz Decl. Exs. 1 and 12; Benton Dep: 120:14-18, 123:15-124:19). Benton evaluated the lab budget and need for Kovalich's position. (Benton Dep. 119:11-19; Benton Decl. Ex. 2).

On June 1, 2016, after discussing with Dr. Spivey, Benton memorialized her concerns regarding Kovalich's position. (Yontz Decl. Ex. 12; Benton Dep. 126:7-127:11). By June 2, 2016, Dr. Spivey decided to eliminate Kovalich's position. (Yontz Decl. Ex. 13; Benton Decl. Ex. 2). Given the financial pressures, PPM needed to cut costs which included eliminating pay for unnecessary services. (Dr. Spivey Decl. ¶ 31). On June 9, 2016, Kovalich's position was eliminated because "the position was not needed." (Benton Decl. Ex. 2; Yontz Dep. 74:16-23). Lab employees now report to Dr. Spivey. (Hawks Dep. 26:23-27:13). Kovalich's position no longer exists. (*Id.* 48:16-49:1; Dr. Spivey Dep. 265:6-266:16).

***Lack of Evidence Supporting Kovalich's Allegation That Sherry Spivey Tortiously Interfered With Her At-Will Employment For Being The Target Of Dr. Spivey's Alleged Sexual Harassment***

Kovalich has put forth no evidence to support her allegation that Sherry Spivey began blatantly targeting Kovalich because she was angered by Dr. Spivey's alleged sexual

11

advances towards Kovalich. (Compl. ¶¶ 35, 38). The record shows Sherry Spivey was not aware of any of the inappropriate conduct Kovalich alleged occurred between herself and Dr. Spivey while Kovalich was employed at PPM. (Sherry Spivey Dep. 236:14-17; 238:2-239:9). In fact, Sherry Spivey testified she could not "even entertain that vision" of a romantic relationship between the two because she's known both Kovalich and her husband for a long time and just could not see it. (*Id.* 236:17-25). Sherry Spivey had no knowledge prior to this lawsuit of the "flirty" text messages Kovalich and Dr. Spivey exchanged. (*Id.* 235:10-21, 236:2-13). Nor did Sherry Spivey know about alleged phone calls from Dr. Spivey to Kovalich asking her what she was wearing. (*Id*. 239:10-240:11). Likewise, Sherry Spivey had no prior knowledge of any alleged kiss between Dr. Spivey and Kovalich. (*Id.* 240:12-20).

Further, considering their relationship, Sherry Spivey did not think it was inappropriate for Dr. Spivey to text compliments to Kovalich in the manner he did. (*Id.* 237:7-21). When questioned about her response since first learning of these texts during Kovalich's deposition, Sherry Spivey testified that she was initially "[p]issed off", but no longer has any animosity because it is hard to remain angry with someone. (*Id.* 235:22-236:1). Ultimately, Sherry Spivey testified she was not aware of any of these incidents, but the conduct did not sound like her husband. (*Id*. 240:9-241:10).

### The Cash Balance Plan

The Preferred Pain Management, PA Cash Balance Plan ("the Plan") was created as a way for PPM to provide employee benefits in addition to retirement. (Dr. Spivey Decl.

¶ 33).  The Plan is administered by an outside third-party, The Newport Group, Inc. ("Newport Group"). (*Id.*)  As the third-party administrator, Newport Group oversees the administration of the Plan and its legal compliance. (*Id.*)  PPM and Dr. Spivey rely on Newport Group and its expertise in managing the Plan. (*Id.*)  Sherry Spivey participates in the Plan, but does not serve in any administrative capacity. (Sherry Spivey Decl. ¶ 29).

The Plan consists of five Participant Groups, A-E. (Dr. Spivey Decl. ¶ 34).  Dr. Spivey is the sole Participant in Group A, which receives a contribution of 76% of his compensation. (*Id.*)  Sherry Spivey is the sole Participant in Group B, receiving a contribution of 30% of her compensation. (*Id.*)  Group C consists of lineal ascendants and descendants of more than 5% owners, which is the Spiveys' daughter Jennifer Spivey McGraw, who receives no contribution. (*Id.*)  Group D consists of non-owner highly compensated employees, who also receive no contribution. (*Id.*)  All others not in Groups A, B, C, or D, are in Participant Group E, and receive a 3% contribution of their compensation. (*Id.*)  Prior to December 2016, Participants in Group E received a 2% contribution. (*Id.*)

Once an employee has been employed by PPM for one year or 1,000 hours, they are eligible to participate in the Plan ("Plan Participant"). (*Id.* ¶ 35).  The Plan Participants make no contribution themselves. (*Id.*)  Instead, PPM contributes a percentage of a Plan Participant's compensation into the Plan, depending on which Participant Group they are in as defined by the Plan. (*Id.*)  After three years of service, the Plan Participant becomes 100% vested in the Plan. (*Id.*)  Kovalich was in Participant Group E. (*Id.*)

13

Kovalich testified "I think the office as a whole w[as] getting rid of over-40 people. Because they tax the insurance. I mean, they're more expensive. . . . it was just better to get rid of the older people because they're sicker." (Kovalich Dep. 238:23-239:5).  In reality, age is not a factor in the Plan. (PPM Dep. Vol II, Ex. 102).  Since the Plan has been in existence, the contributions have been a percentage of compensation. *Id.*  Contributions do not vary depending upon age. *Id.*  Of the twenty-three Group E Plan Participants who are fully vested, twelve are 40 and older. *Id.*  Had Kovalich remained employed through the end of 2016 and vested in the Plan, her total benefit would have been $3,682. (*Id.* 150:13-151:3).  If an employee separated from employment prior to vesting, the monies allocated to that employee revert back to the Plan and not to the Spiveys.  (Dr. Spivey Dep. 179:2-9; 180:1-7).  Regardless, Sherry Spivey's benefits under the Plan are not affected by other Participants' participation in the Plan. (PPM Dep. Vol. II, Ex. 102).

### III.     QUESTIONS PRESENTED

Has Kovalich proffered evidence creating a genuine issue of material fact as to the two claims she alleged against Sherry Spivey?

### IV.     ARGUMENT

#### A.     Standard of Review

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Holland v. Wash. Homes, Inc.*, 487 F.2d 208, 213 (4th Cir. 2007).

14

Although the Court must construe facts in the light most favorable to Kovalich, "there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" *Id.* (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50).

### B.    Tortious Interference with Contract Claim

To establish a claim for tortious interference with a contract, a plaintiff must show:

> (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*White v. Cross Sales & Eng'g Co.*, 177 N.C. App. 765, 768-69, 629 S.E.2d 898, 901 (2006) (citing *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)). A plaintiff may maintain a claim for tortious interference with contract even if the employment contract is terminable at will. *Lenzer v. Flaherty*, 106 N.C. App. 496, 512, 418 S.E.2d 276, 286, disc. review denied, 332 N.C. 345, 421 S.E.2d 348 (1992).

A party who induces one party "'to terminate or fail to renew a contract with another may be held liable for malicious interference with the party's contractual rights if the third party acts without justification.'" *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850, disc. review denied, 348 N.C. 695, 511 S.E.2d 649 (1998) (citations omitted). Whether a defendant is justified in interfering with a plaintiff's contract depends upon "'the circumstances surrounding the interference, the actor's motive

or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the actor[,] and the contractual interests of the other party.'" *Id.* at 317-18, 498 S.E.2d at 850 (quoting *Peoples Security Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 60*60 S.E.2d 647, 650, reh'g denied, 322 N.C. 486, 370 S.E.2d 227 (1988)). "A person is justified in inducing the termination of a contract of a third party if he does so for a reason reasonably related to a legitimate business interest." *Fitzgerald v. Wolf*, 40 N.C. App. 197, 200, 252 S.E.2d 523, 524 (1979).

As a general rule, "'non-outsiders' [to the contract] often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." *Lenzer* 106 N.C. App. at 513, 418 S.E.2d at 286 (citations omitted). However, "[t]he qualified privilege of a non-outsider is lost if exercised for motives other than reasonable, good faith attempts to protect the non-outsider's interests in the contract interfered with." Id. (citations omitted).

In order to hold a "non-outsider" liable for tortious interference with contract, a plaintiff must establish that the defendant acted with legal malice, that "'he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties.'" *Robinson, Bradshaw & Hinson, P.A.*, 129 N.C. App. at 318, 498 S.E.2d at 851 (quoting *Varner v. Bryan*, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994)). "The plaintiff's evidence must show that the defendant acted without any legal justification for his action." *Varner*, 113 N.C. App. at 702, 440 S.E.2d at 298 (citation omitted).

16

Here, Sherry Spivey is a non-outsider to the contract and is entitled to qualified immunity. It is undisputed Sherry Spivey is married to the owner of PPM. (Sherry Spivey Decl. ¶¶ 4 and 8). Sherry Spivey is employed by and serves as the Clinical Coordinator of PPM. *Id.* Accordingly, Sherry Spivey has a vested interest in the practice because its success directly impacts her livelihood. These undisputed facts evidence Sherry Spivey's status as a non-outsider to the contract.

Once the defendant has established insider status, the burden is on the plaintiff to come forward with evidence of legal malice to defeat the qualified privilege. *Varner*, 113 N.C. App. at 702, 440 S.E.2d at 297. In order to defeat this qualified privilege, Kovalich must proffer evidence to show Sherry Spivey acted with legal malice in terminating her employment. Kovalich has failed to proffer any such evidence.

First, Kovalich admitted that when PPM terminated her employment, Dr. Spivey told her that with declining insurance reimbursement rates, he was cutting costs. (Kovalich Dep. 232:25-233-3; 242:10). Kovalich admitted she did not know why she was terminated; only that Dr. Spivey told her it was "financial." (*Id.* 242:9-10). Kovalich admitted that by 2016, she was working only ten to twenty hours a week. (*Id.* 167:7-18). When her position was eliminated, the lab was running "like a well-oiled machine." (Hawks Dep. 30:12-31:8). Kovalich has not proffered any evidence to show that this information was false, unjustified, or evidence of a wrongful purpose. Additionally, Sherry Spivey only had "indirect input" into the decision to terminate Kovalich's employment. (Sherry Spivey Decl. ¶ 27). Dr. Spivey testified that he could not recall Sherry Spivey ever directly

17

recommending that Kovalich be terminated, although he acknowledged that Sherry Spivey would have had indirect input into the decision. (Dr. Spivey Dep. 225:7-227:1). Sherry Spivey testified that PPM terminated Kovlich's employment because her "jobs were done." (Sherry Spivey Dep. 189:21-190:6). Sherry Spivey could not recall being consulted about whether Kovalich should be terminated—although she complained she did not know when Nagelski had converted Kovalich to an employee. (*Id.* 192:3-8). Kovalich's position was not replaced. This is further evidence PPM's termination of Kovalich was a reasonable, good faith attempt to protect PPM's ongoing business interests and not indicative of any alleged tortious interference on the part of Sherry Spivey.

As recounted above, Kovalich's claim that Sherry Spivey allegedly tortiously interfered with Kovalich's at-will employment contract because Sherry Spivey was angered by Dr. Spivey's alleged sexual advances towards Kovalich has no factual basis. Compl. ¶¶ 35, 38. The record shows Sherry Spivey was unaware of any of the inappropriate conduct Kovalich alleged occurred between herself and Dr. Spivey during Kovalich's employment. (Sherry Spivey Dep. 236:14-17; 238:2-239:9). Without knowledge, Sherry Spivey would have had no basis to tortiously interfere with Kovalich's contract on this ground. *See, e.g. Ross v. Communications Satellite Corp.,* 795 F.2d 355, 364 at n. 9 (4th Cir. 1985) (noting that if the employer did not know of the protected activity, a causal connection to the adverse action cannot be established.)

Similarly, Kovalich has failed to proffer any evidence showing Sherry Spivey tortiously interfered with Kovalich's at-will employment for Sherry Spivey's own financial

18

gain or to prevent Kovalich from vesting in PPM's Plan. As explained above, the Plan was created as a way for PPM to provide more employee benefits in addition to retirement. The Plan is administered by a third-party, and Sherry Spivey's only role with regards to the Plan is as a Plan Participant. (Sherry Spivey Decl. ¶¶ 28, 29).

Sherry Spivey testified she did not know how the Plan worked or how long it would take for someone to become vested. (Sherry Spivey Dep. 192:23-194:19). Without knowledge as to when (or even if) Kovalich could become vested in the Plan, Sherry Spivey could not have had any grounds to tortiously interfere with Kovalich's at-will employment contract on this basis. *Ross,* 795 F.2d at 364, n. 9.

In support of her allegations, Kovalich testified "the office as a whole w[as] getting rid of over-40 people. Because they tax the insurance. I mean, they're more expensive. . . . it was just better to get rid of the older people because they're sicker." (Kovalich Dep. 238:23-239:5). In reality, age is not a factor in the Plan. (PPM Dep. Vol. II, Ex. 102). Regardless, Sherry Spivey's benefits under the Plan are not affected by other Participants' participation in the Plan. (*Id.*) If an employee separated from employment prior to vesting, the monies allocated to that employee revert back to the Plan and not to Dr. Spivey or Sherry Spivey. (Dr. Spivey Dep. 179:2-9; 180:1-7). Accordingly, Plaintiff has failed to proffer any evidence as to how Sherry Spivey would have benefitted financially from Kovalich's failure to vest in the Plan.

Given the foregoing, Kovalich has not proffered any evidence to create a genuine issue of material fact that Sherry Spivey tortiously interfered with her at-will employment

contract on any basis. Even if Kovalich could have made this showing, the evidence proves Sherry Spivey is protected by a qualified privilege because she was not an outsider to the contract. Even if Sherry Spivey was not an outsider to the contract, Kovalich's tortious interference with contract claim must fail because Kovalich has not proffered evidence creating a genuine issue of material fact that Sherry Spivey acted without justification. In short, Kovalich has not proffered any evidence—other than her own speculation and baseless allegations in her Complaint—that Sherry Spivey interfered with Kovalich's at-will employment contract. Unsubstantiated allegations and bald assertions are insufficient to defeat a motion for summary judgment, *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir.1996), because a party cannot create a genuine dispute of material fact through "mere speculation or compilation of inferences." *Othentec Ltd. v. Phelan,* 526 F.3d 135, 140 (4th Cir. 2008) (citations omitted). Accordingly, Sherry Spivey is entitled to summary judgment on this claim.

### C.    The ERISA Claim

Kovalich seeks damages under § 510 of ERISA, 29 U.S.C. § 1140, on the ground that Sherry Spivey terminated her employment in order to intentionally deprive her of rights in PPM's Cash Balance Plan (the "Plan"). Section 510 provides in pertinent part:

> It shall be unlawful for any person to discharge ... a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.... The provisions of section 1132 of this title [which provides for civil enforcement] shall be applicable in the enforcement of this section.

20

29 U.S.C. § 1140. A § 510 claim requires proof of the employer's specific intent, *i.e.*, that the employer discharged the employee with the purpose of interfering with the employee's pension rights. *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 238 (4th Cir. 1991) ("[I]t is necessary to separate the firings which have an incidental, albeit important effect on employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision."). The Fourth Circuit applies the *McDonnell Douglas* burden-shifting proof scheme to § 510 claims discrimination cases. *Conkwright*, 933 F.2d at 239 (citing *Dister v. Continental Group. Inc.*, 859 F.2d 1108 (2nd Cir.1988)).

As a preliminary matter, Sherry Spivey cannot be liable for the § 510 claim because she was not Kovalich's employer. Kovalich's § 510 claim here is premised on allegations that she was unlawfully discharged in violation of the statute. The term "discharge" as used in § 510 presupposes an employment relationship, and only an employer can discharge an employee. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675 (7th Cir. 2011) (recognizing that discharge is "what an employer does to an employee"); *Teamsters Local Union No. 705 v. BNSF, LLC*, 741 F.3d 819, 823 (7th Cir. 2014) (affirming dismissal of § 510 claim which rests entirely on allegations of unlawful discharge where the defendants did not have an employment relationship with the plaintiffs); *Andes v. Ford Motor Co.*, 70 F.3d 1332, 1337 (D.C.Cir.1995) (recognizing "discharge" as involving "employment termination"). Because Sherry Spivey is not the employer, and only an employer can terminate employment, Kovalich's § 510 claim against Sherry Spivey must be dismissed.

Even if Kovalich could overcome this hurdle, her claim must still fail as she has failed to proffer evidence to create a genuine issue of fact Sherry Spivey specifically intended to interfere with Kovalich's vesting in the Plan. As in the Title VII context, employees alleging interference with rights under ERISA bear the initial burden of making out a prima facie case. *Gavalik v. Cont'l Can Co.*, 812 F.2d 834, 852 (3d Cir. 1987) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). To establish a *prima facie* case under § 510, an employee must demonstrate (1) a defendant performed a prohibited action (2) for the purpose of interfering (3) with the attainment of a right to which the employee is currently, or in the future may become, entitled. *Id*. If the plaintiff establishes a prima facie case by a preponderance of the evidence, the burden shifts to defendant to state a legitimate, nondiscriminatory explanation for the challenged conduct. *Id*. If the defendant carries its burden and successfully demonstrates a legitimate, nondiscriminatory explanation, the burden then shifts back to plaintiff, who is given the opportunity to establish by a preponderance of the evidence that defendant's explanation is pretextual. *Id*. If the plaintiff fails to present facts permitting a reasonable inference of pretext, summary judgment should be granted for defendant. On summary judgment a § 510 claim comes down to plaintiff's evidence supporting pretext. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Kovalich contends Sherry Spivey specifically intended to interfere with the impending vesting of her rights under the Plan. This claim fails because Kovalich cannot demonstrate pretext. Kovalich has not developed evidence showing any decision-makers

22

thought about the Plan when deciding to eliminate her position. (Dr. Spivey Decl. ¶ 32) Kovalich claim's is nonsensical because the Spiveys did not gain from her termination because any monies forfeited by Plan Participants stayed in the Plan and were used to fund benefits of vested employees. (Dr. Spivey Dep. 179:2-9; 180:1-7).

Further, Sherry Spivey testified she did not know much about how the Plan worked and did not know how long it would take for someone to become vested in the Plan. (Sherry Spivey Dep. 192:23-194:19). Without knowledge as to when (or even if) Kovalich could become vested in the Cash Balance Plan, Sherry Spivey could not have had a specific intent to keep Kovalich from vesting in the Plan. Kovalich has proffered no evidence showing otherwise.

Ultimately, Kovalich argument is her termination saved PPM money which is insufficient "evidence" of pretext. As noted in *Conkwright*,

> While plaintiff's termination probably did save [the Company] money, this is not enough to carry the day...[P]laintiff must adduce facts, which if taken as true, could enable a jury to identify unlawful intent from the other various reasons why an employer might have terminated plaintiff, and to conclude that the employer harbored the requisite unlawful intent.

*Conkwright*, 933 F.2d at 239 (citations omitted).

Further, Kovalich fails to supply any connection, either through direct or circumstantial evidence, between her discharge and Sherry Spivey's alleged attempt to prevent her from attaining ERISA-protected benefits. No reasonable jury could find unlawful intent, even after taking as true Kovalich's assertions. Summary judgment is appropriate.

23

### D.     <u>The Punitive Damages Claim</u>

By statute, punitive damages may be awarded "only if the Plaintiff proves that the defendant is liable for compensatory damages" and is limited to cases involving fraud, malice or willful or wanton conduct. N.C. Gen. Stat. § 1D-15. "If the injured party has no cause of action independent of a supposed right to recover punitive damages, then she has no cause of action at all." *Hawkins v. Hawkins*, 101 N.C. App. 529, 532, 400 S.E.2d 472, 474 (1991) (citations omitted). Because Nagelski's claim for punitive damages is derivative of her other claims, which all fail, her claim for punitive damages is barred.

Further, N.C. Gen. Stat. § 1D-1 *et seq*. provides punitive damages may only be awarded if plaintiff proves the existence of fraud, malice, or willful or wanton conduct. Kovalich has not proffered any such evidence, requiring dismissal of this claim.

### <u>CONCLUSION</u>

For the above-stated reasons, Sherry Spivey's Motion for Summary Judgment should be ALLOWED, and Plaintiff's action should be dismissed with prejudice.

Respectfully submitted this the 1st day of October, 2018.

JACKSON LEWIS P.C.


/s/ Ann H. Smith
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone:  (919) 760-6460
Facsimile:   (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and )
SUZANNE NAGELSKI, )
 )
            Plaintiffs, )
 )
vs. )
 )          **CERTIFICATE OF**
 )          **COMPLIANCE**
PREFERRED PAIN MANAGEMENT )
& SPINE CARE, P.A., DR. DAVID )
SPIVEY, individually, and SHERRY )
SPIVEY, individually, )
 )
            Defendants. )

The undersigned counsel hereby certifies pursuant, Local Rule 7.3(d)(1), that this

Memorandum does not exceed 6,250 words including the body of the brief, headings, and

footnotes.

/s/  Ann H. Smith
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
Jackson Lewis P.C.
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone:  (919) 760-6460
Facsimile:   (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com

26

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

| | | |
|---|---|---|
| REBECCA KOVALICH and | ) | |
| SUZANNE NAGELSKI, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | **CERTIFICATE OF** |
| | ) | **SERVICE** |
| PREFERRED PAIN MANAGEMENT | ) | |
| & SPINE CARE, P.A., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

The undersigned certifies that on October 1, 2018, the foregoing *Memorandum of Law in Support of Defendant Sherry Spivey's Motion for Summary Judgment as to Plaintiff Rebecca Kovalich's Claims* was electronically filed with the Clerk of the Court, using the Court's CM/ECF electronic service system, which will send notification of such filing as follows:

Sean F. Herrmann, Esq.
Van Kampen Law P.C.
315 East Worthington Avenue
Charlotte, NC 28203
sean@vankampenlaw.com
*Attorney for Plaintiffs*

*/s/  Ann H. Smith*
ANN H. SMITH
N.C. State Bar No. 23090
CAITLIN M. GOFORTH
N.C. State Bar No. 49227
Jackson Lewis P.C.
*Attorneys for Defendants*
3737 Glenwood Avenue, Suite 450
Raleigh, NC 27612
Telephone:  (919) 760-6460
Facsimile:   (919) 760-6461
Email: Ann.Smith@jacksonlewis.com
Email: Caitlin.Goforth@jacksonlewis.com