# EXHIBIT

# A

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
File No. 1:17-CV-00854-UA-LPA

REBECCA KOVALICH AND    )
SUZANNE NAGELSKI,       )
                        )
        Plaintiffs,     )
                        )
vs.                     )
                        )
PREFERRED PAIN          )
MANAGEMENT & SPINE      )
CARE, P.A., DR. DAVID   )
SPIVEY, individually,   )
and SHERRY SPIVEY,      )
individually,           )
                        )
        Defendants.     )
_____)

Videotaped Deposition of SUZANNE D. NAGELSKI

(Taken by Defendants)

Charlotte, North Carolina

Thursday, May 17, 2018

Job No. CS2907300
Reported in Stenotype by
Carolyn M. Beam
Transcript produced by computer-aided transcription

1     Q.   Okay.  Have you spoken with your mom about

2 this lawsuit without your counsel present?

3     A.   My coplaintiff?

4     Q.   Yes.

5     A.   No.

6     Q.   Okay.  Your coplaintiff is Rebecca Kovalich;

7 is that correct?

8     A.   Correct.

9     Q.   And she is your mother; is that correct?

10     A.   Correct.

11     Q.   Okay.  Okay.  So is it your testimony that

12 you've not spoken with anyone else about this lawsuit

13 other than your attorney and Ms. Kovalich?

14     A.   I believe my spouse knows, without going

15 into detail.

16     Q.   Anyone else?

17     A.   No.

18     Q.   Was anyone present when you spoke with your

19 spouse about the lawsuit?

20     A.   It -- no.  There were no details.  Just --

21 no.

22     Q.   Are you working anywhere now?

23     A.   No.

24     Q.   What are you doing to find a job?

25     A.   I am really sending out resumes.

Page 29

1     A.    No.

2     Q.    -- who created it?

3     A.    No.  Not at this time.

4     Q.    Now I'll go ahead and mention this:  If at

5 some point, you realize that something you testified

6 to earlier maybe is not correct or you've got

7 something to add to it, feel free to stop me; we can

8 go back to that portion of your testimony.  Okay?

9     A.    Fine.  Thank -- correct.  Thank you.

10    Q.    Uh-huh.  Do you know any reason -- or what

11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

12    A.    I don't.

13    Q.    He was separated before you left, correct?

14    A.    Correct.

15    Q.    You know nothing about that?

16    A.    I know nothing about why he was terminated.

17 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

18 she was separated?

19    A.    No.

20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

22    A.    No.

23 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24    A.    No.

25 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**CONFIDENTIAL**

```
1        A.      No.
2
3    name.
4
5    BY MS. SMITH:
6
7
8        A.      Huh-uh.
9        Q.      You don't know why she was separated?
10       A.      No.
11       Q.      Do you know why Ms. Kovalich was separated?
12       A.      Financial reasons, per...
13       Q.      What do you mean by that?
14       A.      She said that she was terminated based upon
15   PPM's financial situation.  But that was the reason
16   they gave to her.
17       Q.      Do you know anything else about that?
18       A.      No, I was not there.
19
20       A.      No.
21
22       A.      Not -- do I know?  No, I don't.  I just know
23   from what she told me.
24       Q.      And what did she tell you?
25       A.      It's been a -- she -- oh, I can't recall the
```

1  exact words she was using or I can't recall the exact

2  point of her termination.

3      Q.    If at any time you do remember, please let

4  me know.  Okay?

5      A.    Sure, yes.

6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7  she was separated?

8      A.    I -- I will have to get back to counsel on

9  that one.

10      Q.    Do you have notes of these conversations?

11      A.    No.  No, I don't.  I didn't -- I had

12  originally taken notes -- a note as of -- you called,

13  this is what was said.  Or I'm sorry, you called this

14  is the time.  And that, after the meeting, I just

15  never retained them.

16      Q.    So you threw them away?

17      A.    Well, they weren't relevant.

18      Q.    And these notes of these conversations, who

19  did you take notes of the conversation --

20      A.    It was --

21      Q.    -- with?

22  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

23  called and was asking me, you know, if unemployment --

24  if she's denied unemployment, should she appeal.

25      Q.    Okay.  Did you take notes of your

CONFIDENTIAL

1

2          A.     That was family.  No.

3          Q.     I'm just asking if you did.

4

5     was really family and her daughter.

6          Q.     Did you take any notes of your conversations

7

8          A.     That, no.

9          Q.     So when you say that you would have to get

10

11    was separated from PPM, what are you going to do to

12    refresh your recollection as to the reasons why she

13    was separated?

14         A.     I will probably spend a few minutes -- well,

15    some time thinking about it.  It's been so long.  I

16    mean, I -- I will have to think through that one.

17

18    she was separated?

19         A.     No.

20         Q.     Did you take any notes of the conversations

21    with her?

22         A.     No.

23         Q.     What is your full legal name?

24         A.     My full legal name, Suzanne Drdak Nagelski.

25         Q.     Okay.  And when were you born?

```
 1     A.    December 8th, 1966.
 2     Q.    Okay.  Where were you born?
 3     A.    Forsyth county.
 4     Q.    Okay.  And are you married?
 5     A.    Yes.
 6     Q.    What's your husband's name?
 7     A.    Keith.
 8     Q.    Nagelski?
 9     A.    Yes.
10     Q.    And when and where were you married?
11     A.    We were married in 1991 in South Carolina.
12     Q.    And do you have any children?
13     A.    One.
14     Q.    And what is your child's name?
15     A.    Alexandra.
16     Q.    And where does she live?
17     A.    Right now, she's still in school.  So she
18   would be in Connecticut.
19     Q.    Where is she attending school?
20     A.    Yale.
21     Q.    And what is she studying?
22     A.    Inorganic chemistry.
23     Q.    And has she attended any other schools?
24     A.    Undergraduate.
25     Q.    And where was that?
```

Page 34

```
1       A.      Bryn Mawr.

2       Q.      And where is that located?

3       A.      Philadelphia.

4       Q.      Okay.  And did she play any sports while she

5   was there?

6       A.      Yes.

7       Q.      And what -- what sport did she play?

8       A.      Volleyball.

9       Q.      And did she have a scholarship?

10      A.      No.  She -- no, not for a D3 school.

11      Q.      Did she get any financial assistance for

12  playing a sport?

13      A.      No.

14      Q.      Okay.  What is your current address?

15      A.      15109 Chilgrove Lane, Huntersville.

16      Q.      And how long have you lived there?

17      A.      Since I -- '91.

18      Q.      And did you ever travel to any of Aly's

19  volleyball games?

20      A.      Yes.

21      Q.      Okay.  And how often would you say you would

22  do that?

23      A.      I would have to look at travel records.  I

24  tried to get up to many of them, when she was eligible

25  to play her sophomore year.
```

```
 1       A.    Darrell Huffman.
 2       Q.    And is he related to any of the defendants
 3  in this action?
 4       A.    That would be both of them.
 5       Q.    Okay.  And can you describe the
 6  relationship?
 7       A.    That would be Dr. Spivey's brother-in-law
 8  and Mrs. Spivey's brother.
 9       Q.    And do you have any relationship with
10  Mr. Huffman?
11       A.    No.
12       Q.    How long have you known Sherry Spivey?
13       A.    Personally, since most of -- I want to
14  recall.  Since I was 17, I had some sort of a
15  relationship with her.  Before that, you will have to
16  ask her.
17       Q.    And how is it that you came to have a
18  relationship with her when you were 17?  What happened
19  then?
20       A.    I was back in North Carolina.
21       Q.    When did you move away from North Carolina?
22       A.    1989.
23       Q.    And how old were you at the time?
24       A.    Hold, let me back up.
25       Q.    Sure.
```

1    A.    Can -- do you want to know when I moved away

2  as an adult?

3    Q.    Well, you said that you had known her since

4  you were 17 approximately, and that you had a

5  relationship with her.  And I had asked you what --

6    A.    Uh-huh.

7    Q.    -- changed and you said, I was back in North

8  Carolina, implying to me that you had moved away prior

9  to age 17?

10    A.    Growing up, we moved frequently.

11    Q.    And it's your testimony, up until age 17,

12  you did not really know --

13    A.    About 17.

14    Q.    -- Mrs. Spivey?

15    A.    Right.

16    Q.    Okay.  So you don't --

17    A.    Correct.

18    Q.    Okay.  You don't recall staying at her house

19  when you were seven years old or...

20    A.    Vaguely, I recall that.  But that's how long

21  ago?

22    Q.    So vague recollections of some interaction

23  when you were a child?

24    A.    Correct.

25    Q.    But from your perspective, the relationship

1    really began when you were around 17 years old, when

2    you moved back --

3        A.    Correct.

4        Q.    -- to North Carolina?  Okay.  And how long

5    have you know David Spivey?

6        A.    Oh, I would say -- let's see.  19 -- he -- I

7    can't give you a date for as long as I've known him.

8    I can go back to the mid '90s.

9        Q.    So you have an earlier recollection of a

10    relationship with Sherry Spivey than David Spivey; is

11    that correct?

12        A.    Correct.

13        Q.    And how would you describe your relationship

14    with Sherry Spivey and David Spivey during that time

15    period, the early time period, that you can recall?

16        A.    Other than I went -- I did go to Wilmington

17    and stay with them in Wilmington for Christmas.  I

18    believe -- no, it was Thanksgiving.  I believe it was

19    Thanksgiving.  They were -- it was before they went to

20    California.  I believe I was -- I was 18 or 19.

21        Q.    So before they moved to California, how

22    would you describe your relationship with them?

23        A.    She -- it was -- it was fine.  I mean,

24    how -- how do you --

25        Q.    I mean, would you describe it as a loving

Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 12 of 88

1  family relationship?

2      A.    No.  But it was fine.  We -- we didn't

3  really know each other very well, if that makes any

4  sense.

5      Q.    But you knew her enough and David Spivey

6  enough to go and spend Thanksgiving with them --

7      A.    Sure.

8      Q.    -- in Wilmington, away from your other

9  family?

10      A.    Well, yes.  And Sherry's brother was

11  present.

12      Q.    Your dad, Darrell?

13      A.    He's not my dad.

14      Q.    Your biological --

15      A.    Yes.

16      Q.    -- father?

17      A.    Yes.

18      Q.    Okay.  Was that the first time you had met

19  him?

20      A.    No.

21      Q.    Do you have any brothers or sisters?

22      A.    No.

23      Q.    And who lives with you in Huntersville?  Is

24  it just you and your husband?

25      A.    Yes.

Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 13 of 88

1    Q.    Do you belong to any clubs, organizations or

2    churches?

3    A.    No.

4    Q.    And did you graduate from high school?

5    A.    Yes.

6    Q.    When and where?

7    A.    1985, Forsyth Country Day.

8    Q.    And did you attend college?

9    A.    Yes.

10   Q.    And --

11   A.    1989, from UNC Charlotte.

12   Q.    And what was the degree again, a BS in

13   environmental --

14   A.    Science, earth science, environmental

15   science.  It was interchangeable at that time.

16   Q.    And do you have any advanced degrees?

17   A.    I have a MBA from Wake Forest.

18   Q.    When did you obtain that degree?

19   A.    2006.  Formal graduation would have been

20   2007.

21   Q.    Okay.  And when was your daughter born?

22   A.    1995.

23   Q.    And did Sherry Spivey assist with child care

24   when you were in the MBA program at Wake Forest?

25   A.    Yes.

1    Q.    Can you tell me about that?

2    A.    I was gone two nights.  And either Sherry or

3  Jennifer, her daughter, would pick up Aly from school

4  and either get her home to Huntersville or let her

5  stay there, whichever she preferred.

6    Q.    And where was Ms. Kovalich living at the

7  time that you were in MBA school?

8    A.    She was in -- 2005, 2006.  She was in

9  Wins -- or Charleston, Charleston and Winston.

10    Q.    And did she also assist with childcare while

11  you were in MBA school?

12    A.    Sure.

13    Q.    And what kind of childcare did she provide?

14    A.    She would be there on the weekend.  But she

15  did not -- she was not as available as Sherry Spivey.

16    Q.    And Jennifer?

17    A.    And Jennifer and Elizabeth.

18    Q.    And Elizabeth is another daughter of David

19  and Sherry Spivey?

20    A.    Yes.

21    Q.    And why was Ms. Kovalich not as available at

22  that time?

23    A.    Location.

24    Q.    You mean in Charleston?

25    A.    Yes.

1     SPAM that have followed with the Yahoo over the years.

2        Q.     Okay.

3        A.     It's just a cleaner account.

4        Q.     Gotcha. Do you have any other training or

5     certifications, other than the degrees that we've

6     talked about?

7        A.     No.

8        Q.     Okay. So any IT certifications at all?

9        A.     No. But IT has been a hobby. So...

10       Q.     And how long has it been a hobby?

11       A.     Well, it's been -- I -- let me back up. I

12     used the Linux system in college. And in my first

13     job, I was -- we used Apple computers, and I was the

14     only one to get a PC and start working with that,

15     because of -- because of modeling, water --

16     groundwater modeling.

17       Q.     You were the only one to get a PC and use

18     the Linux system --

19       A.     No, I was the only one to get a PC and use

20     the DOS system after -- in my first job.

21       Q.     But no special certifications, just a hobby?

22       A.     No. Uh-huh.

23       Q.     Any certifications in human resources?

24       A.     No.

25       Q.     Any certifications dealing with financial

1   planning or finances?

2       A.    No.

3       Q.    Okay.  Tell me about your MBA program.

4   Approximately how many hours did you have to -- have

5   to get your MBA?

6       A.    I can tell you, it was the executive

7   program.  It would -- it -- it was the same as any

8   other MB program, MBA program, they just did it at an

9   accelerated rate.

10      Q.    And what types of classes did you take to

11  get your MBA?

12      A.    Oh, everything from quantitative analysis,

13  macro, micro econ, operations, international business,

14  managerial finance, financial accounting, business

15  law.  Oh, they had some electives in there.  And I

16  would have to go back and look at the other ones.

17      Q.    Any classes in human resources?

18      A.    Yes.  They -- yes, they did have the -- I

19  called them the -- what were they called?  Oh, I can't

20  think.  I will let you know.  I can't think of the

21  name.  But there were a lot -- there were two classes

22  in -- yes, there were two classes.  I'm trying to --

23  it's not coming to me.  But I can let you know what

24  they were.

25      Q.    Okay.  So it sounds as if your IT experience

1    then was -- came from working with computers on the

2    job and also you said it was a hobby?

3          A.    Yes.

4          Q.    Okay.  And the human resources experience,

5    you had some classes in the MBA program --

6          A.    Uh-huh.

7          Q.    -- two classes that related to human

8    resources.  And with finance, it sounds like you had

9    several finance --

10         A.    Uh-huh.

11         Q.    -- and accounting classes --

12         A.    Yes.

13         Q.    -- in the MBA program?  Okay.

14         A.    Did I say operations too?

15         Q.    I'm sorry, what was that?

16         A.    Operations.

17         Q.    What type of operation?

18         A.    Oh, it was an operations class.

19         Q.    And what -- what kind of operations?  What

20   do you mean by that?

21         A.    Oh, just business operations, whether you're

22   a factory -- or factory management, whether you're

23   looking at inventory management.

24         Q.    Okay.  Have you ever served in the military?

25         A.    No.

1    issued against you?

2        A.    No.

3        Q.    Can you -- since you graduated from college,

4    give me your list of employers, start, you know, with

5    the first one that you had after college and then

6    we'll work your way through it.

7        A.    Okay.  My first employer after college was

8    in Pennsylvania.  Do you need their name?

9        Q.    Yes, please.

10        A.    Groundwater Environmental Services.

11        Q.    And what did you do there?

12        A.    I was a staff scientist.

13        Q.    And what was your salary?

14        A.    At that time?  That was 18-, 19,000.

15        Q.    And how long were you employed?

16        A.    I was there a little more than a year

17    before -- right.  I was there a year, a little more

18    than a year.

19        Q.    And where was Groundwater Environment

20    Services located?

21        A.    Exton, Pennsylvania.

22        Q.    And who was your supervisor?

23        A.    I -- I can't -- I couldn't tell you his

24    name.

25        Q.    Why did you leave?

CONFIDENTIAL

1      A.     I left because I got a really good offer

2    from a company in Charlotte.

3      Q.     Were you looking for a job at the time or

4    did they reach out to you?

5      A.     It was a little bit of both.

6      Q.     Tell me how you came to get the job.

7      A.     When I was an undergrad at UNC Charlotte,

8    there were graduate students that we had classes with.

9    And one of them was in Charlotte still, after

10   graduating.  And I had made the comment about wanting

11   to get back to Charlotte.  And he said:  We have a

12   position here, and I'm recommending you.  And would

13   you be interested in flying down to interview?

14     Q.     And what was the employer?

15     A.     National Environmental Technologies.

16     Q.     And who was the individual that recommended

17   you?

18     A.     Jeff Tepsik and Chris Repte.

19     Q.     And Chris -- what was the last name?

20     A.     Repte.

21     Q.     Repte, okay.  And what was your position?

22     A.     Project manager.

23     Q.     And who was your supervisor?

24     A.     Robert Martin.

25     Q.     And what was your salary?

```
 1    A.    27.

 2    Q.    And when did you start there?

 3    A.    Let's see.  Sometime around 1991.

 4    Q.    And why did you leave?

 5    A.    Actually, it would have been around 1990.

 6  So it was 1990, excuse me.

 7    Q.    Uh-huh.

 8    A.    I -- my daughter was born in '95.

 9    Q.    So you left when your daughter was born?

10    A.    Not -- well, not at that time.  I was out on

11  leave and then I came back after leave, and realized

12  that I had to do some balancing.

13    Q.    How long did you work after your daughter

14  was born?

15    A.    I actually only stopped six months, six to

16  eight months.  I left NET.  Yes.

17    Q.    You left NET when?

18    A.    '96.

19    Q.    And your daughter was born in 1995?

20    A.    Right.

21    Q.    Okay.  What was your next job after NET?

22    A.    I worked with Ogden Environmental Services.

23    Q.    When did you start there?

24    A.    '96?

25    Q.    And what did you do there?
```

1     A.    Project manager.

2     Q.    Did you voluntarily leave NET?

3     A.    Yes.

4     Q.    Okay.  Did you sign any sort of severance

5 agreement?

6     A.    With NET?  No.

7     Q.    Have you ever signed a severance agreement

8 with any employer?

9     A.    No.

10     Q.    So how long did you work for Ogden

11 Environmental?

12     A.    Well, probably three to four years.

13     Q.    And what was your salary?

14     A.    That's a tough one.  I can't -- I can't

15 recall.

16     Q.    Do you know if it was more, less or about

17 the same as NET?

18     A.    It was more.

19     Q.    And who was your supervisor?

20     A.    Robert Martin.

21     Q.    Did he recruit you to Ogden?

22     A.    Yes.  But NET was being sold off, consumed

23 by another environmental company.

24     Q.    Okay.  Not Ogden?

25     A.    No.

CONFIDENTIAL

1    Q.    Okay.  And when did you leave Ogden?

2    A.    Around -- I -- I want to say approximately

3  2001, 2000, 2001.

4    Q.    Why did you leave?

5    A.    Because the job was no longer challenging.

6    Q.    Where is the next job that you had?

7    A.    I actually took a job at the veterinary

8  clinic.

9    Q.    When was that?

10    A.    Oh, 2002.

11    Q.    And what was your position?

12    A.    I worked with the avian vet and performed

13  their chemical hygiene -- wrote their chemical hygiene

14  plan.

15    Q.    How long did you work in that position?

16    A.    2004 or '5, 2005, 2005.

17    Q.    So two to three years?

18    A.    Yes.

19    Q.    And what was your salary?

20    A.    It -- I can't recall.  It wasn't much.

21    Q.    What vet clinic did you work at?

22    A.    Lake Cross.

23    Q.    And are all these positions in the Charlotte

24  area that we've talked about, NET, Ogden and Lake

25  Cross?

Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 23 of 88

CONFIDENTIAL

1    A.    NET.  Ogden was in Huntersville.  Lake Cross

2  is in Huntersville.

3    Q.    Where did you go to work after Lake Cross?

4    A.    Oh, I went to -- I went back for my master's

5  degree in 2005.

6    Q.    Did you work while you were getting your

7  master's degree?

8    A.    No.

9    Q.    Did you ever take a position teaching math

10  or science at a school?

11    A.    Oh, that, I did.  That would have been in

12  2000 -- or 1997.

13    Q.    Where was that?

14    A.    Alexander Middle School.

15    Q.    In Charlotte?

16    A.    It was in Huntersville.

17    Q.    What grade did you teach?

18    A.    Middle school.

19    Q.    Subject?

20    A.    Science.

21    Q.    And was that just the one school year?

22    A.    Yes.

23    Q.    Why did you leave?

24    A.    Oh, well, we had no support from the admin.

25  It was very difficult.

Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 24 of 88

1    Q.    Okay.  Okay.  After you got your MBA, did

2   you work anywhere before you began working with PPM?

3    A.    No.

4    Q.    Okay.  So we've talked about all the

5   employers that you've had prior to PPM; is that

6   correct?

7    A.    Correct.

8    Q.    Okay.

9         THE WITNESS:  Can -- can -- can I take a

10  break?

11        MS. SMITH:  Sure.

12        THE WITNESS:  I'm going to grab some water

13  and --

14        MS. SMITH:  Yes.  That's fine.

15        THE WITNESS:  Okay.

16        MS. SMITH:  But wait just one moment.

17        THE VIDEOGRAPHER:  We're going off the

18  record.  The time -- excuse me -- on the video monitor

19  is 11:39 a.m.

20             (A recess transpired.)

21        THE VIDEOGRAPHER:  This is the beginning of

22  media unit number two in the videotaped deposition of

23  Suzanne Nagelski, May the 17th, 2018.  We're back on

24  the record at 11:59 a.m.  Please continue.

25             (NAGELSKI EXH. 2, resume, KN 00002 and 3,

1    his wife had mentioned, had said, you know, we're
2    gonna need help.
3         Q.    Who did she mention that to?
4         A.    To me.
5         Q.    And what kind of help did she say that they
6    would need?
7         A.    She said financial help, office -- whatever
8    we need.  And I -- I'm paraphrasing that, because I
9    don't recall the exact conversation.
10        Q.    Did you have an interview or application or
11   anything with Dr. or Mrs. Spivey prior to your
12   affiliation with PPM?
13        A.    No.
14        Q.    At first, when you began working with PPM,
15   were you a 1099 independent contractor?
16        A.    Yes.
17        Q.    When approximately did you start working as
18   a 1099 independent contractor?
19        A.    I -- it was 2007, end of 2006, starting
20   2007.  I have -- I -- I'm -- around that time.
21        Q.    Okay.  And who did you have most
22   communication with about what your duties and that
23   sort of thing was going to be?
24        A.    Both.
25        Q.    Both Dr. Spivey and Mrs. Spivey?

Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 26 of 88

1    A.    Uh-huh.

2    Q.    Tell me what you understood your duties to

3  be when you started as an independent contractor at

4  the end of 2006 to the beginning of 2007?

5    A.    My duties at that time were working with the

6  parent company, PCP, as -- as -- and making sure our

7  books and theirs -- I want to say sync, for lack of a

8  better term.  But keeping an eye on our -- the money

9  coming in.

10          I did -- well, we interviewed.  I hired

11  Rebecca and I hired Lisa and interviewed several

12  people for the clinic.  So it was part HR.  And then

13  we had an IT vendor I was working with to network our

14  computers.  All the way down to, I wrote the

15  fluoroscopy manual that he edited and used for the

16  longest time.  So when you're a company of five

17  people, you wear many hats.

18    Q.    Where was the initial location for PPMC

19  or --

20    A.    On Charlotte Boulevard.

21    Q.    Okay.  And were they affiliated with -- you

22  said there was another parent company?

23    A.    He was affiliated with Piedmont Community

24  Physicians, which gave the money for the startup.  So

25  they were really a centralized -- they were the -- the

1    Q.    Did Dr. Spivey or Ms. Spivey participate?

2    A.    No.

3    Q.    And how many folks were hired at this time?

4    A.    I think just one.  Sorry.  I believe, at

5    this time, we hired Lisa because of her past

6    experience with the front office.  And -- and I can't

7    recall who else at that time was hired.

8    Q.    And how much were you getting paid as a 1099

9    independent contractor?

10    A.    Oh, 25, 30 dollars an hour.

11    Q.    And did you have an offer letter?  Did you

12    prepare any paperwork?

13    A.    No.  The only paperwork was my detailed

14    invoice at the end of the month.

15    Q.    So you would keep track of your hours and

16    then you would bill PPM --

17    A.    Uh-huh.

18    Q.    -- for whatever you worked at the agreed

19    upon rate?

20    A.    Right.

21    Q.    Okay.  And it sounds like you did lots of

22    things for PPM, from HR, helping with the IT network,

23    getting vendors in place for that, and also dealing

24    with financials?

25    A.    Yes.

1    Q.    At some point, did your status as an

2    independent contractor change?

3    A.    Yes.

4    Q.    When did that happen?

5    A.    2013.

6    Q.    And what was the reason for the change?

7    A.    The reason for the change was with the onset

8    of the Affordable Care Act.  The IRS was cutting

9    down -- cutting -- cracking down on independent

10   contractors who were being kept as either employees at

11   bay or did not have more than one client.

12   Q.    Uh-huh.

13   A.    So if they -- they could have potentially

14   come down and fined both me and Dr. Spivey.  So I told

15   him I was just -- I was going on payroll.

16   Q.    Uh-huh.  Do you remember when you had this

17   conversation with him?

18   A.    Oh, it would have been around February of

19   '13.

20   Q.    And at that time, did you discuss a salary?

21   A.    It was still my rate is -- I think that's

22   what we agreed upon, was my current rate.

23   Q.    Which was what?

24   A.    It was 25 or 30.  I -- I have to go back and

25   look.  Well, actually I can't look.  It should be --

CONFIDENTIAL

1    it would have been my current rate on payroll.

2       Q.    So when you became an employee, did you do

3    an offer letter for yourself or, you know --

4       A.    No.

5       Q.    -- do sign employee --

6       A.    No.

7       Q.    -- handbook acknowledgements?

8       A.    No.

9       Q.    Do you know when PPM moved to the Maplewood

10   location?

11      A.    January or February of 2014.

12      Q.    At some point, did your duties change from

13   the initial startup time period?

14      A.    They just developed; they didn't really

15   change.

16      Q.    Tell me about that.

17      A.    In 2011, we separated from Piedmont

18   Community Physicians.  So we had to take on our own

19   employees.  I had to set up benefit plans, get

20   payrolls transferred, make sure nobody loses anything

21   on their 401(k).  PPM had to buy out the employees.

22   And -- and then, of course, the insurance contracts

23   had to be changed as well.

24      Q.    What do you mean, PPM had to buy out the

25   employees?

CONFIDENTIAL

1    A.    Right.  They can --

2    Q.    Okay.  And you were saying that your duties

3    had developed and you cited this example in 2011.  Is

4    there any other ways that your duties developed?

5    A.    We had -- well, I -- I oversaw the IT

6    vendors and the networking and putting -- giving

7    employees, you know, user access, which goes right on

8    with payroll and HR work.  And then, going through

9    monthly financials and looking at the overall

10   production of the company, in trying to do basically

11   end-of-the-year analysis on our taxes and a cash flow

12   projection.

13   Q.    Any other ways that your duties developed?

14   A.    I did quite a bit of work with the

15   accountants, as far as, you know, mitigating any tax

16   liabilities.  Doctor -- in 2008, 2009 -- oh, wait, let

17   me back up.  I did -- 2013.  Hmm.  Give me just a

18   minute.  2013, we switched financial institutions.

19   Let me back that up.  Let me back that up to 2012, we

20   did.  Early 2012, we switched financial institutions.

21         And, yes, we started gathering, looking at

22   spinning off the different business unit -- or not

23   spinning off the business unit.  We looked at adding

24   an ancillary service, a physician-owned lab, to the

25   practice.

1    Q.    Any other ways your duties developed?

2    A.    I'm not sure I understand.  Any more than

3  what I just gave you?

4    Q.    Okay.  Well, I was trying to understand the

5  way -- because I had asked if your duties changed over

6  time and you had said that they just developed.  And I

7  was trying to get your understanding as -- of how they

8  developed.

9    A.    They would -- well, they would develop and

10  change when you go from a few employees to more than

11  20.

12    Q.    Okay.  So your employment with PPM was

13  separated in January 2016; is that correct?

14    A.    Correct.

15    Q.    Approximately how many employees did PPM

16  have at that time?

17    A.    I couldn't tell you now.  I would have to

18  count.

19    Q.    It was more than the five you started with?

20    A.    Oh, definitely more than five.  I want to

21  say it was, at the time, more than 30.  But that

22  didn't include any temp help.

23    Q.    And was there also a Greensboro location?

24    A.    There was a Greensboro location that

25  opened -- well, he had been leasing space in

1    not certain.  I would have to look.  It wasn't
2    full-time at the time.
3        Q.    And did it change to full-time at some
4    point?
5        A.    Yes.
6        Q.    When?
7        A.    I can't tell you that.  I have to -- I would
8    have to have those time records.
9        Q.    And when you were performing work for PPM
10   at -- when you were an independent contractor, was the
11   majority of the work performed at your home in
12   Huntersville?
13       A.    I would be in the office a few days.  I
14   would be in meetings at BB&T or with the accountant.
15   So I'm going to say I was half-time.
16       Q.    So half of the time you were working at your
17   home in Huntersville, and half of the time you were
18   out of the home?
19       A.    Right.
20       Q.    Either at the office at PPM or in meetings
21   with accountants?
22       A.    Or at a BB&T meeting or, you know, I can
23   think of a sundry of things why -- but I would either
24   be offsite for a meeting up there or in the office
25   somewhere working or at my home working.

1    Q.    Okay.  Did you ever have a schedule where

2    you would come to the Winston-Salem office on any

3    particular day?

4    A.    It wasn't a set schedule.  It was -- it

5    was -- I formulated the schedule around meetings.

6    Q.    Tell me about that.

7    A.    Okay.  If -- if Dr. Spivey wanted to meet,

8    then I would be in Winston.  If he had a wealth

9    management meeting in the evening, I would be in

10   Winston all day.  I mean, it's how -- whatever.  If I

11   had an accountant meeting at 10:00 in the morning, I

12   would be in Winston.

13   Q.    And did you submit mileage reimbursements

14   for the times that you would drive to Winston?

15   A.    Yes.

16   Q.    And when you came to Winston, was there a

17   sign-in sheet or anything that you had to do when you

18   came to Winston?

19   A.    No.

20   Q.    So there's no documentation that would

21   verify whether you were in the Winston-Salem office on

22   a particular day or not?

23   A.    Other than people saw me, talked to me or

24   if -- there's a number of ways.  I mean, if I remotely

25   accessed, you know, the server files, you could tell

1   that I was on site from that IP address.  I mean, I

2   basically went in and sat in the conference room; you

3   couldn't miss me.

4       Q.    And then it's your testimony you were there

5   approximately how often a week?

6       A.    At least twice.

7       Q.    And from what period of time would you say

8   you were there in the office at least two times a

9   week?

10      A.    It -- I can't answer that directly.  It

11  would depend on what I was working on.  For example,

12  the move.  I was there three days, four days.

13      Q.    To help with the move between the Thursday

14  and the Monday?

15      A.    Well, even preceding that.  It all had to go

16  off without a hitch.  So if the demand was there

17  for -- I was there.

18      Q.    Okay.  In the complaint, you reference a

**Not Cited in Brief**

19

20

21

22

23

24

25

**Not Cited in Brief**

```
 1
 2
 3
 4
 5
 6
 7
 8
 9      Q.    Can you describe your duties in reference to
10   payroll?
11      A.    My duties were to execute payroll verify
12   hours, make sure punches were done, follow up with
13   managers, execute the payroll and provide reports to
14   Dr. Spivey.
15      Q.    And when you say execute the payroll, what
16   does that mean?
17      A.    That means run the preprocess, register,
18   review it, make sure it's in sync and then execute
19   payroll.
20      Q.    And did the company have a payroll vendor
21   that it used?
22      A.    We had Flex-Pay.  They're the ones the --
23   they did the transfers.
24      Q.    And when did the company started using
25   Flex-Pay?
```

1  A.    They always did.  We did it with PCP, when
2  we were a care center of Piedmont Community
3  Physicians, when we started up.  And I was able to
4  work with them to port out the employees, without too
5  much trouble.
6  Q.    What did you do to verify the hours?
7  A.    Everybody punched their hours.
8  Q.    What do you mean?
9  A.    Well, they -- you had a timeclock.  And if
10  they didn't have a punch, I would have to hunt them,
11  track them down.  Or if there was a punch that I
12  questioned, I would track them down.  Any override or
13  notations to those punches were always made into the
14  system.
15  Q.    Did every --
16  A.    Who I spoke with, the time I spoke with --
17  or the time I spoke to.
18  Q.    Did you -- did everyone have to use the
19  timeclock?
20  A.    Yes.  Well, yes and no.  Dr. Spivey didn't
21  use the timeclock.  For the longest time, his -- some
22  of his -- one of his PAs used it loosely.  Mrs. Spivey
23  did not.  Jennifer Bailey would not.  And I just -- I
24  recorded my hours.
25  Q.    How did you record your hours?

1      A.     Oh, I would either jot them down or I would

2   know what I was working on and when I started.

3      Q.     So you did not use the timeclock either?

4      A.     No.

5      Q.     So were salaried employees required to use

6   the timeclock?

7      A.     Yes.  Well, yes and no.  Dr. Spivey wanted,

8   for example, Ms. Bailey to use a timeclock.  And we

9   didn't -- she wouldn't use a timeclock, so he let it

10  go.

11     Q.     Who had access to the timeclock records?

12     A.     Department managers.

13     Q.     And how was access given?

14     A.     Either I or Flex-Pay would give it to them.

15     Q.     So either you or Flex-Pay, is that --

16     A.     Yes.

17     Q.     -- what you said?  Okay.  I'm sorry.  Did

18  Mrs. Spivey have -- have access to the timeclock

19  records?

20     A.     I sent up access for Mrs. Spivey.  I set up

21  access for Mrs. Spivey three times.  Mrs. Spivey

22  complained that she could not access the timeclock.  I

23  set up her access.  I verified her access.  And I

24  don't know why she did not have access to the

25  timeclock.

1   to track.

2       Q.      So are you saying that the database would

3   automatically calculated once you earned PTO and it

4   would automatically populate?

5       A.      By payroll period.

6       Q.      By payroll period, okay.

7       A.      We would earn, I believe, 4.62 hours every

8   two weeks.

9       Q.      And so, if an employee was using PTO, then

10  you -- when you were reviewing the payroll, if they

11  were absent, you would see if it was going -- supposed

12  it to be PTO and mark it against that; is that

13  correct?

14      A.      Yes.

15      Q.      Okay.  And any questions about that, you

16  would confer with a supervisor or managers?

17      A.      Whoever, yes.

18      Q.      Okay.  You have talked about the fact that

19  you helped out with the finances of PPM.

20      A.      Uh-huh.

21      Q.      How did you -- what did you do with the

22  finances?

23      A.      Well, we had actually -- just, I don't -- I

24  couldn't -- Dr. Spivey was interested in building his

25  personal wealth management, given the fact the last

1    couple years were very good years for him.  He wanted

2    to somehow, you know, kind of do more than just the

3    401(k) safe harbor.  So we looked at acquiring a

4    building that PPM could lease, that he and his wife

5    could set up an LLC.  We looked at, well, his personal

6    wealth management.  And he was introduced to Jonathan

7    Cochran over at BB&T.

8        Q.    Do you remember when this was?

9        A.    I think they originally met -- I want to say

10   2012, 2013.

11       Q.    What types of financial records did you deal

12   with?

13       A.    Other than P&L, cash flows and things like

14   that, the database for everything PPM was in

15   QuickBooks online.  The accountant had access to

16   QuickBooks.

17       Q.    Who was the accountant?

18       A.    Turlington and Company.

19       Q.    And you worked with them?

20       A.    Well, I was the liaison between Dr. Spivey's

21   office and the accountants.

22       Q.    Okay.  How often would you provide profit

23   and loss statements to Dr. Spivey?

24       A.    Well, once a month, was done.  If he wanted

25   it monthly, he could get it monthly.  He could get

1  period again, of the transition between Piedmont

2  Community Physicians and becoming our own practice

3  took place in just under four months, which was -- it

4  was incredibly chaotic and unheard of.

5      Q.    When a new employee was hired, can you

6  describe the role in the onboarding process?

7      A.    When a new employee was hired --

8      Q.    Actually, let me back up for a moment.  Even

9  before they're hired, let talk about the prehire

10  process, you know, posting positions and all that.

11  What was your role?

12      A.    I didn't post the positions.  It was

13  whoever -- if clinic -- clinic was looking for an

14  employee, they would post the position through Indeed.

15  I know a former employee had an Indeed account, front

16  office manager -- or front office person.  And she

17  would post through that as well.

18      Q.    And who was that?

19      A.    Stephanie Vaughn.  So that's -- that's how

20  they would.  Or the other way is to use a temporary

21  agency to do the background and seek -- seek them out

22  and do a background as needed.

23      Q.    So if a new employee -- if they're looking

24  for a new employee or a new employee is hired, when in

25  this process would you learn about this?

1   think at the -- in 2013, we had somebody that would do

2   some of the -- the training, the walk-around and

3   whatnot.  2014, I know Stephanie did a lot of that.

4       Q.    Stephanie Vaughn?

5       A.    Yes.  And 2015 would have been -- actually

6   2015, we had a lot of temps.

7       Q.    And that process is different, dealing with

8   the temporary agencies?

9       A.    A little bit, because they were running in

10  and out.  We were transitioning to an EHR system.  And

11  Mrs. Spivey did not know how many people we would need

12  to let go or how many people we'd need to fill the

13  holes or logistics of the EHR and its affect on

14  operations.

15      Q.    So it was difficult to predict the number of

16  employees that were going to be needed because of the

17  impact --

18      A.    Or dis --

19      Q.    -- of the EHR?

20      A.    Right.  And 2015 -- right.  Because the EHR

21  did not begin until fall, end of summer, fall of 2015.

22      Q.    So did you review any resumes?

23      A.    I reviewed resumes.

24      Q.    Did PPM have an application?

25      A.    We did have an application.

1    Q.    Did you develop that?

2    A.    I don't believe I did.

3    Q.    Do you know who did?

4    A.    No.

5    Q.    Did you review the applications?

6    A.    I reviewed the resumes.

7    Q.    Did you write offer letters?

8    A.    Yes.

9    Q.    For all employees?

10    A.    When they wanted -- this is the one, when it

11 got down to their final decision, yes.

12    Q.    And who would set up payroll for the

13 employee?

14    A.    Oh, I would.  Based upon my conversation

15 with Dr. Spivey.  If he's confirmed the need for this

16 person and how much did he want to pay them.

17    Q.    And who would set up the benefits or go over

18 the benefits with the employee?

19    A.    I would at the time of hire.

20    Q.    And was this always a sit-down conversation

21 or did it sometimes occur on the phone?

22    A.    It was primarily a sit-down conversation.

23 Yes, it was primarily a sit-down conversation.  There

24 may have been an anomaly.  Or -- yes, there may have

25 been some anomalies.

Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 43 of 88

1      Q.    And would they open the door and you'd put

2   the information in there?

3      A.    Yes.

4      Q.    Did you ever keep any employee information

5   at your home in Huntersville?

6      A.    No.  If -- if documents were faxed to me,

7   they always ended up in the file.

8      Q.    And how would they end up in the file if

9   they were faxed to you?

10     A.    I would manually put them there, what was

11  faxed to me.

12     Q.    And what kind of information would you keep

13  in employee personnel files?

14     A.    Well, their new hire package, their benefit

15  information, any -- really what -- if anything changed

16  with their status.  I would put any comments by, you

17  know, from their payroll tax stuff, whatever tax

18  exemptions they would have.  Actually, if their -- if

19  they had a review, it would go in there.  Any

20  comments -- any hand -- any handwritten comments even

21  that I would make would go in there.

22     Q.    Did anyone else have access to the personnel

23  files?

24     A.    It -- Stephanie had a key.  Let's see.  Lisa

25  Palmer had a key.  I didn't have a key.  So that would

CONFIDENTIAL

1    just be two people.  But you -- you know, a department

2    manager could get the key.

3         Q.    And when you say that they had a key, is

4    that a key to the room or were the files also in a

5    locked filing cabinet?

6         A.    In a locked filing cabinet.

7         Q.    So Stephanie Vaughn and Lisa Palmer had keys

8    both to the room that was kept locked --

9         A.    Right.

10        Q.    -- and the filing cabinet --

11        A.    Right.

12        Q.    -- was kept locked?  Did anyone else, other

13   than yourself, have responsibility for filing

14   information in personnel files?

15        A.    If a department manager did a review or if

16   there were any notation changes, it would go in there.

17        Q.    But would they have responsibility to put it

18   in a personnel file or would that be your

19   responsibility after receiving it from a department

20   manager?

21        A.    Ah, good question.  If I knew about it, then

22   it would be me.

23        Q.    Okay.  So you've said that information would

24   be faxed to you from time to time at your --

25        A.    Uh-huh.

1    Q.    -- home in Huntersville?

2    A.    Uh-huh.

3    Q.    What type of information would you receive

4    via fax?

5    A.    Oh, it would be -- usually their -- whether

6    it be their resumé, their driver's license, anything I

7    would need to set up payroll.

8    Q.    And so then, after you got the fax,

9    eventually you would pack that information up?

10    A.    And take it to --

11    Q.    And when you went to Winston, you would take

12    it there and --

13    A.    Yes.

14    Q.    -- and file it in the --

15    A.    They would have a file.

16    Q.    So when you would -- would you give anybody

17    else the paperwork to file or would you always file

18    that information?

19    A.    There would -- I would -- there would --

20    there was only one other person that would file that.

21    Q.    Who would that be?

22    A.    She's Vicky Sweisgood.

23    Q.    Okay.  And when did she work for the

24    company?

25    A.    2011 and -- through two-thousand-and -- or

1    2012 through 2014.  I -- I don't know the exact date.

2          Q.    July 2011 to February 2014, does that sound

3    about right?

4          A.    Yes.

5          Q.    So after Ms. Sweisgood left in February

6    2014, was there anyone else, other than yourself, that

7    would have been responsible for filing this faxed

8    information that you would receive at home?

9          A.    Stephanie Vaughn.

10         Q.    And did she come on board after

11   Ms. Sweisgood?

12         A.    She worked at PPM when we were a care center

13   of Piedmont Community Physicians.  She had a brief

14   tenure and then she reapplied when she moved back to

15   North Carolina.  So that would have been right about

16   the time -- at the -- she was there in -- while

17   Ms. Sweisgood was there.

18         Q.    And what was Vicky Sweisgood's position?

19         A.    She was office manager.

20         Q.    And what does that mean exactly?

21         A.    I don't know.  It took on many roles.

22   Sometimes she did act as the office manager, but

23   sometimes it would be corrected that she would be

24   front office manager and -- it would be very loose.

25         Q.    Did you know Ms. Sweisgood before she

1    rate them.

2         Q.    Did you set up a performance review system?

3         A.    I don't understand.

4         Q.    In other words, did you help set up a time

5    for employees to be reviewed?  In other words, were

6    they reviewed on a yearly basis from date of hire?

7    Was it reviewed on a calendar basis?

8         A.    I would -- it was -- they were -- and

9    reviewed after their 90 days.  And then, from there,

10   it would have been nice to do a year if -- but that's

11   on the department manager.  I can sit in on those

12   reviews; I can't do those reviews.

13        Q.    Would you send email reminders to the

14   department managers, letting them know that their

15   employee has been on board for a year and that they

16   needed to conduct a performance review?

17        A.    Would I do that?  They would know.  I

18   wouldn't do it per your formal words.  But if you

19   have, like, five people in a department, you kind of

20   know where you all stand.

21        Q.    So you were relying on the department

22   managers to recall dates of hire and when the year's

23   up, so that they would know to do the performance --

24        A.    Well, they --

25        Q.    -- review?

1    A.    -- had dates of hire.  They had all of that.

2    Q.    Did you review the performance reviews prior

3    to presentation of them to the employee?

4    A.    I would have reviewed what performance

5    reviews I received and discuss the raise that

6    Dr. Spivey would want to give them.

7    Q.    Did you get input into the performance

8    reviews?

9    A.    I had no -- no.  If I -- no.

10    Q.    Why not?

11    A.    I -- why would I?  I -- I -- I don't

12    understand the question again.  I'm sorry.

13    Q.    Well, I mean, as HR, would you not want to

14    review the performance reviews, to make sure that they

15    were okay prior to giving them to the employee?

16    A.    I reviewed them.  Usually it was -- how

17    things worked was the department manager would give a

18    review.  Now whether I was told that they were going

19    to review this person, it -- I didn't know.  So if I

20    don't know, then I'm reading the review after the

21    fact.  Except neither the employer -- or employee or

22    the manager would know what they would be getting as a

23    merit raise.  That would be, you know, Dr. Spivey's

24    decision.

25    Q.    So Dr. Spivey made the decision as to the

CONFIDENTIAL

1  raise?

2      A.    As to the raise, yes.

3      Q.    Based on the performance review?

4      A.    Yes, and whatever -- yes.  To my knowledge,

5  yes.

6      Q.    Okay.  So it sounds like you had this

7  performance review document that folks could use?

8      A.    Uh-huh.

9      Q.    Is that correct?

10      A.    Uh-huh.

11      Q.    But you didn't email it to the managers on a

12  yearly basis or whenever someone was coming up for

13  performance review time, to remind them about the

14  performance review?

15      A.    We had a company intranet.  And that's where

16  all the information and resources were housed.

17      Q.    But you didn't communicate with the

18  department managers to let them know it's time for the

19  review?

20      A.    No.

21      Q.    Now you had said that there were also

22  nondiscriminatory raises, annual nondiscriminatory

23  raises.  Tell me about that.

24      A.    I would do a spreadsheet for just

25  nondiscriminatory raises if there hadn't been a review

Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 50 of 88

1    those -- yeah, they stayed within the employee file,
2    confidential.
3        Q.    Would pay information be confidential?
4        A.    Yes.  Unless it is Dr. Spivey or -- he would
5    be the only one that, like, I would share that
6    information with, because he got payroll reports.
7        Q.    How would you say you did at your job at
8    PPM?
9        A.    I would say I was qualified for my job.  I
10   would say that I think I did my job very well for
11   being one person in two departments and trying to be
12   stable and consistent.
13       Q.    In your role as HR, did you have to deal
14   with employee grievances?
15       A.    I had -- yes.
16       Q.    Can you give me some examples?
17       A.    Well, I had one employee that would -- was
18   put out by some of the changing dynamics in
19   Greensboro.  She -- she was afraid that she was going
20   to be terminated.  And she did not -- there were some
21   treatment issues she divulged that she -- she thought
22   that the encounters would prompt her to be terminated.
23   She had been with the company for a while.
24       Q.    Who was this employee?
25

1    A.    -- check her file.

2    Q.    What about after that?

3    A.    Not to my knowledge.

1    Q.    Explain your understanding of how this

2  works.

3    A.    It's a hybrid pension plan.  And the older

4  you are, the more you would have to put in versus the

5  younger employees.  And it's for -- there's -- they

6  have to be completely vested after three years of

7  working at PPM.  And then they would have funds for

8  their retirement.  So much is put away.  If they leave

9  PPM, they do have access -- I believe they have access

10  to them.  I'd have to go back and look at the plan.

11  If you were vested, you would have access to how many

12  years you were employed at -- and a hundred percent

13  vested and based upon your age and time served.

14    Q.    Okay.  And what did you have to do to become

15  one hundred percent vested?

16    A.    You had to be employed for three years.  We

17  actually retro-ed it one year, when we -- the year we

18  initiated it.  We retro-ed it to the previous year.

19  Because you could do that.  And then that would at

20  least chew up some of our tax liability and provide

21  more retirement benefits for the Spiveys.

22    Q.    And do you know when the cash balance plan

23  was put into place?

24    A.    Oh, gosh.  Let's see.  I remember working on

25  it.  I remember getting it into place for 2014.  So it

1    Q.    You don't remember that or it didn't happen?

2    A.    I don't recall that.  If -- if I said

3    faceless, I would have meant -- no, I would never have

4    said that.

5    Q.    Did Sherry Spivey ever communicate with you

6    that she wanted a credentialed HR person working for

7    PPM?

8    A.    Yes.

9    Q.    Do you remember when that would have

10   occurred?

11   A.    2015.

12   Q.    Do you think it occurred prior to 2015?

13   A.    I can't be certain without looking at the...

14   Q.    Okay.  Did Sherry Spivey ever talk with you

15   about relinquishing your role in HR?

16   A.    She had mentioned it several times, yes.

17   She wanted me to give my role up.

18   Q.    And did she say why?

19   A.    I can't remember the first reason or the

20   first time.  The second time, she said Jennifer Bailey

21   can do it.  The third time, she said, I want a

22   credentialed HR person.  Which --

23   Q.    Did you ever resign from your employment

24   with PPM?

25   A.    No.

1  would confide in at -- that it would be very quite.

2  Because at this time period that I sent them to her,

3  Dr. Spivey had just gotten out of jail and Mrs. Spivey

4  was taking more of a role in the business.  I was very

5  hesitant to get between either Spivey at this time

6  period.

7      Q.  And your mother even states that it would be

8  interesting to find out how Katie got everyone's PTO?

9      A.  But see, that's the irony of it.  We don't

10  know if Katie got PTO because PTO isn't kept --

11  everybody had, like, their maximum accrual amount in

12  there, if I recall.  But they don't have cumulative

13  PTO.  I mean, all that would be in the payroll

14  database.  So what she's saying to me does not fit.

15      Q.  And does Ms. Spivey also express, during

16  these exchanges, her frustration that HR is not on

17  site?

18      A.  And she will continue to do that, since

19  it -- this is December 21st, 2014.  Referring back to

20  Exhibit 8 is another time that she's trying to get me

21  to give up HR.  Months before.  I mean, it goes on.

22      Q.  Uh-huh.  And did you write to Ms. Spivey, I

23  am sick of these HR-has-to-be-on-site games.  Many

24  companies keep HR faceless?

25      A.  Oh, I guess I did write that if it's in

1    here.

2         Q.    I direct your attention to KM 29.

3         A.    Which page are you on?  Oh.

4         Q.    29, if you look at the bottom?

5         A.    Many companies probably do.  Doesn't mean

6    that I believe in doing that.

7         Q.    Number five?

8         A.    Uh-huh.

9         Q.    Do you remember writing that?

10        A.    Okay.  So I don't.  But I'm not saying I

11   believe that companies do; I was using this as an

12   example.

13             (The proceedings were interrupted by the

14   videographer.)

15   BY MS. SMITH:

16        Q.    Let's turn our attention.  I believe there

17   was an issue in July 2015 about some folks in the

18   Greensboro office.  Do you remember that?

19        A.    I do remember that.

20             (NAGELSKI EXH. 10, text messages, KN 00355,

21   marked for identification.)

22   BY MS. SMITH:

23        Q.    Okay.  Let me show you the document which

24   we'll mark as Exhibit Number 10 and ask if you

25   recognize that, please.  Do you recognize this

Page 181





Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 58 of 88



Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 59 of 88



CONFIDENTIAL

Page 190



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 62 of 88

1

2

3

4

5

6

7

8

9

10

11

12      Q.      Okay.  Were there also some issues regarding

13   payroll and Flex-Pay?

14      A.      I'm not sure I know what you mean.

15      Q.      Okay.  In the complaint, you reference -- or

16   I believe it's in the complaint, it's somewhere in the

17   documentation, that apparently Sherry Spivey had

18   called and spoke with someone at Flex-Pay regarding

19   access to payroll information?

20      A.      Yes.  I got a call from Flex-Pay that said

21   they were contacted by somebody claiming to be the

22   owner of the company.  I think she -- it was her

23   mobile phone that she called from first.

24      Q.      Why do you think that?

25      A.      Well, they record that.

1    Q.    Did you hear the recording?

2    A.    No.  That Ms. Spivey had called, claiming to

3    be the owner of the company, and wanted access to

4    payroll.  So I contacted Dr. Spivey, in trying to --

5    what should I do?

6    Q.    And what did he tell you?

7    A.    I heard nothing.

8    Q.    How did you try to contact him?

9    A.    It was -- I believe it was -- I know it was

10   a phone call first, then email, or text -- or text.  I

11   have to check my records.  What did I say?  I don't

12   recall at this time.  I'll have to go back and look.

13   Q.    Okay.  And but you said you didn't hear

14   anything back from Dr. Spivey?

15   A.    Correct.

16   Q.    Okay.  And I believe there was another

17   attempt, according to this complaint that Ms. Spivey

18   had made, to contact Flex-Pay about a week later?

19   A.    A week later, she called on behalf of the

20   owner of the company, was the statement.

21   Q.    Okay.  So Susan Martinez, is that the

22   employee that contacted you?

23   A.    Flex-Pay contacted me.  One of their --

24   whoever took the phone call and documented it.  And

25   then Susan Martinez contacted me.

1    Q.    So Susan Martinez did not necessarily speak

2  with Ms. Spivey --

3    A.    Right.

4    Q.    -- but she was the one that contacted --

5    A.    Right.

6    Q.    -- you?

7    A.    Correct.

8    Q.    And what is Susan's position with Flex-Pay?

9    A.    She was our client service manager.

10    Q.    And tell me about the conversation with

11  Susan Martinez?

12    A.    Just what I said.  And that Mrs. Spivey,

13  claiming to be the owner of the company, and wanting

14  access to payroll.

15    Q.    And what was Flex-Pay's response?  Did they

16  give it to her?

17    A.    No.

18    Q.    Okay.  How did you find out about the second

19  attempt to gain access to the payroll information with

20  Flex-Pay?

21    A.    Same way the first.

22    Q.    Who contacted you?

23    A.    That was Susan.

24    Q.    So she contacted you both times?

25    A.    Yes, I believe she did.

1    Q.    Who had access to the payroll information on

2  Flex-Pay?

3    A.    Me, Susan and Dr. Spivey.

4    Q.    And how do you know that -- and Susan, who

5  are you talking about?

6    A.    Or our client manager at Flex-Pay.  Who --

7  who was Susan Martinez.

8    Q.    Oh, so when you say Susan, it's not Susan

9  Sanders, it's Susan Martinez?

10    A.    Right.  It's Susan Martinez.

11    Q.    Okay.  And you said Dr. Spivey had access?

12    A.    Per them -- per Flex-Pay, if he called, he

13  can access his files.

14    Q.    Do you know if he ever attempted?

15    A.    I don't know.  I -- as I said earlier in

16  this deposition, I sent him payroll reports every two

17  weeks, if -- nothing further.

18    Q.    Okay.  And did you confirm with Susan

19  Martinez that Dr. Spivey had access?

20    A.    It was always understood.  He calls, he

21  gives his name, his information, account number.  He

22  was on there -- I would have to have him on there

23  anyway to set up a contract with Flex-Pay.  He signed

24  the original contract.

25    Q.    Do you know why Ms. Spivey was trying to

1    contact Flex-Pay?

2        A.    No, I do not.

3        Q.    Do you recall there being issues about

4    employees being concerned about the balance of their

5    PTO and whether that was correct?

6        A.    It would always be something, yes.  I

7    manually -- Flex-Pay -- the way the -- the payroll

8    database system worked is it would be updated with

9    their PTO back to, you know, right before the pay

10   period.  So it was usually two weeks off.  So they

11   were 4.62 hours off from the time that payroll was

12   closed and the time they got a check.  At the end of

13   the year, and different times throughout the year, we

14   would always crosscheck that to make sure.

15       Q.    Did Ms. Spivey ever ask you to get printouts

16   of the PTO balances for her clinic employees?

17       A.    Yes.

18       Q.    And did you provide that information to her?

19       A.    Well, yes.

20       Q.    When?

21       A.    Let me back up.  I provided her the

22   information, I provided for her employees.  And I

23   think there was some discrepancy about not having all

24   of her employees or too many employees on that

25   printout.  I do remember that.  I want -- and that

1 would have been 2015.

2     Q.    Do you know if that would have been before

3 or after Ms. Spivey tried to contact Flex-Pay in

4 approximately May of 2015?

5     A.    I don't know.  I do recall Dr. Spivey

6 calling and wanting Mrs. -- information for

7 Mrs. Spivey, for me to send Mrs. Spivey -- I believe

8 it was date of hire and pay history for her employees.

9 And I sent it to her.

10     Q.    Had she previously requested that?

11     A.    He requested it.

12     Q.    My --

13     A.    Had she?  I don't recall.  He did.

14     Q.    Okay.  So you don't recall Ms. Spivey asking

15 for that same information prior to Dr. Spivey telling

16 you to give it to her?

17     A.    Correct.  But I remember I sent the file.

18 And I had this back-and-forth discussion with

19 Dr. Spivey.  And I said, well, fax it to me.  And I

20 said, I wasn't in a place to print it out, but I sent

21 you the Excel file.  He said, my wife can't open it.

22 So I opened it and we both figured out that she didn't

23 widen the columns.

24     Q.    So let's talk just a moment about PTO.  How

25 does an employee -- like an employee wants to take

Case 1:17-cv-00854-TDS-LPA   Document 42-1   Filed 10/01/18   Page 68 of 88

Page 221

1   copiers.

2       Q.    And did Mr. Shackleford give you any more

3   details about what they were saying?

4       A.    No.  He just said he thought I should know.

5       Q.    And did you talk with anybody else,

6   Dr. Spivey or anyone else, about what happened?

7       A.    No.  There was no need to.

8       Q.    Did you make any notes regarding the

9   situation?

10      A.    No.  Because it was a vendor calling me.

11  And I was going to -- it would have been about me.  So

12  why bother?  Mr. Westmoreland can confirm some of the

13  events of that day.

14      Q.    John Westmoreland from Piedmont IT

15  Solutions?

16      A.    Yes.

17      Q.    Tell me how Ms. Kovalich came to be hired at

18  PPM.

19      A.    She -- Dr. Spivey had contacted her, it's my

20  belief, I -- if I recall, that he contacted her about

21  opening an office in Winston-Salem.

22      Q.    Well, how did she come to be an employee of

23  PPM?

24      A.    Oh.  My -- well, she -- if -- how did she --

25  it had to do with the contract.  She and Dr. Spivey

1   had agreed initially about getting paid per month for

2   laboratory work.  How did that one go?  She had a

3   contract drawn up for an agreement.  And I -- you --

4   you will have to ask her.  And I don't know the

5   details of their discussion.

6       Q.    Okay.  Do you have a copy of the contract?

7       A.    No.  Because it wasn't signed.

8       Q.    Okay.  Would that have been something that

9   would have been important for you to have as HR?

10      A.    But it doesn't exist.  And she -- they

11   didn't maintain their contract -- there was no

12   contract.

13      Q.    Oh, okay.  There was never a contract?

14      A.    Huh-uh, no.

15      Q.    Okay.  And then you said that they had --

16   she and Dr. Spivey had agreed for her to be paid per

17   month for lab work.  When was that agreement?  When

18   was that agreement?

19      A.    I can't tell you.

20      Q.    And when Ms. Kovalich came to be hired at

21   PPM, was she initially a 1099 independent contractor?

22      A.    Correct.

23      Q.    And when would that have been?

24      A.    You'll -- I don't have her employment

25   records.  You'll have to --

1    Q.   And at some point, did that change?

2    A.   When we purchased an LCMS and started

3 developing our -- the physician-owned laboratory.

4 Setting that up, getting that going, doing all of

5 the -- gosh, that was so long ago -- all of the -- oh,

6 preliminaries, that's when we put her on payroll,

7 because it would be in our advantage to have her

8 in-house and not as a contractor.  And I pitched the

9 same thing to Dr. Spivey at the time.  One, it was

10 important to keep her close if this project is

11 successful.  And also, if she was the only person we

12 were consulting with, she would be under the same --

13 if she -- if we -- if PPM was her only client in 2013,

14 with the onset of the Affordable Care Act, you know,

15 then she would either have to be -- we could get

16 fined.  Sorry.  My -- my words are twisting.

17          MS. SMITH:  That's fine.  Do you need a

18 break?

19          THE WITNESS:  You know what?  I would love

20 to take one right now, if that's okay.

21          MS. SMITH:  Okay.  That's fine.  Thank you.

22          THE WITNESS:  We're going off the record.

23 The time on the video monitor is 5:21 p.m.

24          (A luncheon recess transpired.)

25          THE VIDEOGRAPHER:  This is the beginning of

1  BY MS. SMITH:

2      Q.    Let me show you a document we'll mark as

3  Exhibit 29 and ask if you recognize it.

4      A.    Yes.

5      Q.    Can you tell me what that is please?

6      A.    This is my just -- well, my termination

7  letter from PPM.

8      Q.    Okay.  And in this letter -- and this is

9  from Dr. Spivey, correct?

10      A.    Yes, his signature is on it.

11      Q.    Okay.  And in the letter, Dr. Spivey asks

12  you to provide a scheduled estimated fees for

13  financial service, including quarterly P and Ls,

14  liaison for Verisight or cash planning, et cetera.

15  Did you ever provide Dr. Spivey with a scheduled of

16  estimated fees?

17      A.    No, I did not.

18      Q.    Why?

19      A.    Because it said, in the future, we may

20  choose to use your services.  I was basically being

21  shifted from a W-2 to a 1099, which would -- and being

22  dismissed.  By this time, Mrs. Spivey had contracted

23  another IT company; I was taken off of IT.  Human

24  resources was taken away.  Payroll was taken away

25  immediately, with no ability to transition.  And being

1    in the middle of end-of-the-year financials, it wasn't

2    -- it was -- it was basically, you are dismissed.

3    It's very clear that they developed and formalized

4    their relationship with their accountancy and bank

5    resources.

6            (NAGELSKI EXH. 30, Complaint, marked for

7    identification.)

8    BY MS. SMITH:

9        Q.    Let me show you a document we'll mark as

10    Exhibit 30, and ask if you recognize that, please.

11        A.    Yes.

12        Q.    Can you tell me what this is?

13        A.    This is our filing.

14        Q.    Okay.  What is the factual basis that

15    Dr. Spivey and Sherry Spivey tortuously interfered

16    with your at-will employment contract?

17        A.    Mrs. Spivey, when I would not -- or she

18    didn't seem -- if I did not -- if I was not compliant

19    with payroll -- she wanted information to company

20    financials, especially during their 2014 incident and

21    his 2015 recovery, for which I did not want to get

22    involved.  She would ask me for company financials,

23    and I wouldn't give them to her.  I asked Dr. Spivey

24    what to do.  He said, just, whatever she wants.

25        Q.    He said, give her whatever she wants?

**CONFIDENTIAL**

1    A.    Right.

2    Q.    Okay.

3    A.    And I said, here's what, ethically, morally,

4    why don't you ask me for whatever it is, I'll give it

5    to you.  And you can make that decision to give it to

6    her, since she isn't a company owner, officer, he is.

7    That's how I would feel much better approaching that

8    data -- or that data transaction -- transition, sorry,

9    that data transition.  It -- it never -- it never came

10   out.  It never...

11   Q.    So Mrs. Spivey was angry at you because you

12   would not provide her company financial information?

13   A.    Correct.  She took IT away.  She wanted

14   access to email, to information, to -- can I have a

15   break?  Do I have to finish answering this one first?

16   Q.    It would be nice if you could finish

17   answering the question, but if you're --

18   A.    Yes.  Sorry, I'm just really getting tired,

19   so.

20   Q.    I understand.  So she got angry because you

21   would not provide the company financials?

22   A.    That was -- yes.

23         MS. SMITH:  Okay.  All right.  If you want

24   to take a break now, that's fine.

25         THE WITNESS:  And I can amend that in a

1    minute, can't I?

2            MS. SMITH:  Yeah, I don't know if you want

3    to get some caffeine.

4            THE VIDEOGRAPHER:  We're going off the

5    record at 6:09 p.m.

6                (A recess transpired.)

7            THE VIDEOGRAPHER:  We're going back on the

8    record.  The time on the video monitor is 6:19 p.m.

9    Please continue.

10   BY MS. SMITH:

11       Q.    Okay.  I had asked you before the break how

12   Ms. Spivey and Dr. Spivey had tortuously interfered

13   with your at-will employment contact.  You had

14   responded in reference to Ms. Spivey.  What is the

15   basis for how Dr. Spivey tortuously interfered with

16   your at-will contract?

17       A.    I was placed between Spivey versus Spivey.

18   I would seek his guidance on issues and she -- and he

19   would either be silent -- or actually, it was mostly

20   the silence.  I was left out there not understanding

21   what I needed to do in response to Mrs. Spivey's, you

22   know, any of her demands.  She wasn't my supervisor;

23   he was.

24       Q.    Any other way that Dr. Spivey tortuously

25   interfered with your at-will contract, other than his

1    any sort of a phone reference.  Most places will go

2    ahead and call.  A lot of the HSIS systems can -- you

3    have everybody's information right there.  Given what

4

5

6

7

8

9

10

11

12

13

14        Q.    Okay.  You talked -- earlier you referenced

15   you were looking for work in Charleston, South

16   Carolina; is that right?

17        A.    Correct.

18        Q.    Have you also applied -- looked for work in

19   North Carolina before now shifting to South Carolina?

20        A.    I have just -- I have networked in North

21   Carolina, and I'm -- but nothing's solid.  I'm really

22   trying to focus on Charleston at this point.

23        Q.    So nothing's materialized for you in North

24   Carolina?

25        A.    No.

Nagelski Dep. Ex. 6
07/25/2013 Email
from Dr. Spivey

FILED UNDER
SEAL

**Sue Nagelski**

So I don't get a computer until I conform to your schedule ?
Why would I change my habits when they have worked well for ppm for last 10 yrs

10:29 PM

**Sue Nagelski**

In fact - don't even worry -
Just worry when my netbook crashes and my job doesn't get done by end of year.
Why all of a sudden do u need me?

10:32 PM

**Spivey, Sherry**

You don't have to conform to MY schedule.
Our problem is that you refuse to spend even one day in the office, for needed HR descriptions.
It's worked well for you maybe, but it has been VERY difficult @ PPM.
I don't believe that working @ any other company you would be approved to work totally outside the office when needed there at times

10:36 PM

**Sue Nagelski**

IBM - blackbaud - CH2M Hill.   Yes - other companies do.
Besides 18 months ago - you said you & Jennifer did all job descriptions.
When anyone has an HR question - believe me - they find me at my extension

10:52 PM

**Sue Nagelski**

Yes -  I work 4 PPM but all my work is done outside the day to day internal ops.

We can chat later - I am off to play my bow & arrow.

10:54 PM

Tuesday, August 04, 2015

**Sue Nagelski**

Though u may have already talked to Meg - 2 packages down & 1 to go

8:25 PM

**Spivey, Sherry**

No, had eye surgery today.
Out for the week.
But thanks for the update

8:28 PM

**Sue Nagelski**

Dr Temas?   Take care of yourself.   You only have 2.

8:31 PM



DEPOSITION
EXHIBIT 5/17/8
7
Nagelski

KN 00365

# Nagelski Dep. Ex. 8
# Text Messages

# FILED UNDER SEAL

Nagelski Dep. Ex. 9
12/21/2014 Email
from Nagelski

**FILED UNDER SEAL**

**Tuesday, July 14, 2015**

Spivey, Sherry

Hi Sue. I was wondering if you wanted to give up HR.
What brought it to mind was when you said in your last text
that "maybe Dr. Adams could work with the personnel in
GSO, to possibly improve leadership & development."
He is not coming on board to do that.
It's we who need to help him with all that.
Also, (and I'm truly not trying to be antagonistic,) that is an
HR task.
Additionally Katie, Mary, Sheri, Betty, and myself have tried
to help them over there by remedial training, and support.
It has made absolutely no difference.
We are spending all our efforts focusing on what we feel to
be a futile situation.
Not having seen or talked with you in months, I think I have
finally grasped the situation.
So please give it some thought, and let me know. Or
David.
Thanks

1:20 PM



Sue Nagelski

Nope. I also don't think GSO issues can easily be solved
by changing or involving HR more.

1:24 PM

Spivey, Sherry

How could you possibly make that statement, never
having spent a day there?

1:30 PM

Sue Nagelski

I have & I can

1:31 PM

Sue Nagelski

Dont confuse HR with the duties of management.

1:39 PM

Spivey, Sherry

Well then perhaps you you were confused about dr Adams
job role

2:01 PM

Sue Nagelski

I must be.

2:09 PM

**Wednesday, July 15, 2015**

Spivey, Sherry

Did U tell DLS that you already bought the computer?

2:56 PM

Spivey, Sherry

If you "forgot," I'll be glad to let him know

2:58 PM

DEPOSITION
EXHIBIT
Nagelski
PENGAD 800-631-6989

Nagelski Dep. Ex. 11
Text Messages

FILED UNDER
SEAL

# Nagelski Dep. Ex. 12
# Text Messages

# FILED UNDER SEAL

Nagelski Dep. Ex. 13
07/27/2015 Email
from Nagelski

# FILED UNDER SEAL

Nagelski Dep. Ex. 14
07/28/2015 Email
from Nagelski

FILED UNDER
SEAL

# Nagelski Dep. Ex. 15
# Text Messages

# FILED UNDER SEAL

*David L. Spivey, MD*
*Anesthesiology & Pain*

*Mark H. Scheutzow, MD*
*PHD, MHA, MPH*

*Chad Caldwell, PA-C*
*Deonna Faucette, PA-C*
*Anne Thomas, PA-C*
*Patricia L. Deskin, FNP-BC*

# Preferred

## PAIN MANAGEMENT & SPINE CARE, P.A.
*Relieve Pain. Restore Function. . . Resume Life*

www.PreferredPainManagement.com

*2912 Maplewood Ave.*
*Winston Salem, NC 27103*
*Telephone: 336/760-0706*
*Fax: 336/760-1927*

*1511 Westover Terrace, Suite 107*
*Greensboro, NC 27408*
*Telephone: 336/398-5155*
*Fax: 336/398-5156*

May 6, 2015

Mr. Darren Boyd
TRI-TEL Communications, Inc.
P.O. Box 24122
Winston Salem, NC 27114

Dear Mr. Boyd:

Dr. Spivey, Owner and CEO, received a TRI-TEL COMMUNICATIONS, INC. contract this afternoon that was signed by Ms. Sue Nagelski on May 6th. Dr. Spivey had no prior knowledge of such a contract. He did not authorize her to sign the contract.

Accordingly, he forwarded the matter to me so that I may inform you of the following:

- Ms. Nagelski is not authorized to represent herself as the VP/CFO or Business Manager for the Practice, as indicated in the contract.
- As mentioned previously, she is not authorized to enter into any verbal or written agreements on behalf of the Practice.
- Only Dr. Spivey may sign contracts that concern the Practice. He requires a review prior to doing so.

Regrettably, we will not be able to honor the contract. Please consider it null and void.

We will revisit this issue with you after we have had the opportunity to gain an understanding of our contractual agreements with Windstream; the unresolved problem with the phone system; the need for testing and any other remedies that need to be pursued.

We apologize for the misunderstanding and appreciate your cooperation.

Sincerely,

Jennifer Bailey
Compliance Officer

cc: David Spivey, MD
    Ms. Sherry Spivey, RN
    Ms. Sue Nagelski



DEPOSITION
EXHIBIT 5/17/16
18
Nagelski

KN 00483

*David L. Spivey, MD*
*Medical Director*
*Anesthesiology and Pain Medicine*

*Mark H. Scheutzow, MD, PhD*
*Addictionology and Pain Medicine*

*Jeffery A. Adams, MD*
*Anesthesiology and Pain Medicine*

# Preferred

## PAIN MANAGEMENT & SPINE CARE, P.A.
*Relieve Pain. Restore Function. . . Resume Life*

www.PreferredPainManagement.com

*Chad Caldwell, PA-C*
*Deonna Faucette, PA-C*
*Anne Thomas, MPA-S*
*Patricia Deskin, FNP-BC*

January 17, 2016

Sue Nagelski
15129 Chilgrove Lane
Huntersville, NC  28078

Sue,

Preferred Pain Management and Spine Care, PA is undergoing management reorganization. As you know, we now have a full-time on-site Director of Human Resources. In addition, we have developed and formalized our relationship with our accountancy and banking resources.

As a result, your responsibilities to PPM&SC have been reassigned. Beginning February 1st, 2016 you will no longer be an employee of PPM&SC.

In the future we may choose to use your services as a financial consultant with fee-for-service compensation. Toward that end, please provide a schedule of estimated fees for financial services, ie quarterly P&L, liason with Verisight re cash flow planning, etc.

We greatly appreciate the contribution you have made toward the development of PPM&SC.

David L. Spivey, M.D.
Preferred Pain Management and Spine Care, P.A.



DEPOSITION
CS EXHIBIT 5/17/18
29
Nagelski

2912 Maplewood Avenue • Winston Salem, NC  27103 • Telephone: 336.760.0706 • Fax: 336.760.1927
1511 Westover Terrace; Suite 107 • Greensboro, NC  27408 • Telephone: 336.398.5155 • Fax: 336.398.5156

KN 00482