# EXHIBIT

# B

1          IN THE UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF NORTH CAROLINA
2              File No. 1:17-CV-00854-UA-LPA
3

REBECCA KOVALICH AND      )
4  SUZANNE NAGELSKI,         )
                            )
5        Plaintiffs,         )
                            )
6  vs.                       )
                            )
7  PREFERRED PAIN            )
   MANAGEMENT & SPINE        )
8  CARE, P.A., DR. DAVID     )
   SPIVEY, individually,     )
9  and SHERRY SPIVEY,        )
   individually,             )
10                           )
          Defendants.        )
11 _____   )
12
13
14
15

        Videotaped Deposition of REBECCA L. KOVALICH
16
              (Taken by Defendants)
17
          Charlotte, North Carolina
18
          Friday, May 18, 2018
19
20
21
22
23          Job No. CS2907304
24      Reported in Stenotype by
           Carolyn M. Beam
25  Transcript produced by computer-aided transcription

1          THE VIDEOGRAPHER:  Good morning.  We are

2     going on the record.  The time on the video monitor is

3     9:33 a.m.  Today is May the 18th, 2018.  Please note

4     that the microphones are sensitive and may pick up

5     whispering, private conversations and cellular

6     interference.  Please turn off all cellphones or place

7     them away from the microphones, as they can interfere

8     with the deposition audio.  Audio and video recording

9     will continue to take place unless all parties agree

10    to go off the record.

11          This is media unit number one of the video

12    recorded deposition of Rebecca Kovalich taken by the

13    defendant in the matter of Rebecca Kovalich and

14    Suzanne Nagelski, plaintiffs, versus Preferred Pain

15    Management & Spine Care, P.A., Dr. David Spivey,

16    individually and Sherry Spivey, individually,

17    Defendants, Civil Action Number 1:17-CV-00854-UA-LPA,

18    in the United States District Court, Middle District

19    of North Carolina.  The deposition is being held at

20    315 East Worthington Avenue at Charlotte, North

21    Carolina.

22          My name is Brad Cartner.  I'm the

23    videographer from Veritext.  The court reporter is

24    Carrie Beam, also for Veritext.  I'm not authorized to

25    administer an oath.  I am not related to any party in

CONFIDENTIAL

1    A.    He lives in Lake Wylie, South Carolina.

2    Q.    And did the two of you have any children

3    together?

4    A.    Well, he -- he adopted Suzanne.

5    Q.    Other than --

6    A.    No.

7    Q.    -- Ms. Nagelski?  Any other marriages?

8    A.    I was married to -- briefly to Darrell C.

9    Huffman.

10    Q.    And when did you get married?

11    A.    Around the 1st of April 1966.

12    Q.    And when did you get divorced?

13    A.    Somewhere around 1970.

14    Q.    And did the two of you have any children?

15    A.    Well, biologically, we had Suzanne.

16    Q.    Was there any other children?

17    A.    No.

18    Q.    And do you know where Mr. Huffman is

19    currently living?

20    A.    In Winston-Salem.

21    Q.    Do you know if he works anywhere?

22    A.    I don't know.

23    Q.    Any other marriages?

24    A.    When I was a teenager, I -- I married.  But

25    my parents jumped in and had it remedied.

1      A.    No.

2      Q.    Okay.  How long have you known Sherry

3    Spivey?

4      A.    A long time.  Somewhere in the '60s, when I

5    was dating her brother.

6      Q.    Is that how you met her?

7      A.    Yes.

8      Q.    And how would you describe your relationship

9    at that time?

10      A.    We really didn't have one.  She was at

11    school or doing other things.  We never went in the

12    same circles.

13      Q.    But you knew who she was; she knew who you

14    were?

15      A.    Uh-huh, yes.

16      Q.    How long have you known David Spivey?

17      A.    I met him -- they were in California.  Came

18    in for their parents' 50th anniversary.  And that was

19    the first time I met him.

20      Q.    Do you remember approximately what year?

21      A.    I can't remember what year.

22      Q.    Do you remember how old Ms. Nagelski was at

23    the time?

24            THE WITNESS:  I think you were married.

25            She was married.  So early marriage, so it

1      A.     It's more or less ad hoc.  I go to their

2   meetings and -- and occasionally, barring the

3   circumstances and whether I'm there, sit with people

4   who are looking to start a business or they have a

5   business and they're not doing well.  So they come for

6   free help from the chamber.

7      Q.     I see.

8      A.     It's more or less an advisor with the

9   chamber.

10      Q.     What kind of involvement have you had with

11   the North Carolina Medical Group Managers Association?

12      A.     I've been a pretty active member.

13      Q.     And what have you done as a member?

14      A.     Well, attend a lot of their functions over

15   the years.

16      Q.     Were you ever an officer or anything of that

17   nature?

18      A.     No.

19      Q.     What about the Winston-Salem Medical Group

20   Managers?  I know you said that you initiated --

21      A.     Uh-huh.

22      Q.     -- the organization.  Tell me about that.

23      A.     Well, it's grown to about 50, 60 people,

24   administrators from medical practices.  And we all

25   started -- we started small, very -- just three people

1  and then six and then it just added on.  So the

2  president and then we -- vice president, secretary and

3  treasurer.  But -- so we all rotated the -- the

4  positions.

5      Q.    So I take it you've been an officer of that

6  organization?

7      A.    At that time, it wasn't affiliated with the

8  North Carolina; it was just a very loosely run,

9  growing group of medical office managers.  But I

10  wasn't really an officer.  We just -- by the time we

11  got to the officers status, to where we were

12  recognized by the North Carolina Medical Group

13  Managers, someone else was in the officer positions.

14  We weren't big enough to even have officers.

15      Q.    So you were never an officer in that

16  organization, even though it sounds like you were

17  there from the beginning?

18      A.    Yes, I was never an officer.  Because there

19  were no such things as officers.

20      Q.    Okay.  And with the Charleston Chamber of

21  Commerce, do you have any -- were you ever an officer

22  or member of committees or anything of that nature?

23      A.    No.

24      Q.    Okay.  Any other churches, organizations or

25  clubs that you're a member of?

1  we were all over the place.  So I would just grab jobs

2  as we moved.  That was '71 to about '74.

3          And but Philadelphia, I worked at Abington

4  OB/G as the practice administrator.

5      Q.    And how long did you do that?

6      A.    Until we moved, I was going to school at

7  Temple part-time in -- too.  We moved back to

8  Winston-Salem in 1981.

9      Q.    And when you moved back to Winston-Salem in

10  1981, did you start working somewhere?

11      A.    Yes.  Salem Gastroenterology Associates.

12      Q.    And what was your position there?

13      A.    The practice administrator.

14      Q.    And how long did you hold that position?

15      A.    I held that until 19 -- through the end of

16  1991.

17      Q.    So for about ten years you were in that

18  position?

19      A.    Yes.

20      Q.    Why did you leave?

21      A.    Because I started my own business.

22      Q.    And what was that business?

23      A.    Triad Clinical Laboratory.

24      Q.    And when was that?

25      A.    The official opening date was July 1991.

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 8 of 127

1    Q.    And tell me a little bit about how you went

2    about starting your own business.

3    A.    Well, I had experience because, while I was

4    a practice administrator at Salem Gastroenterology,

5    the doctors wanted a laboratory where I worked.  And

6    Roesch came in and I suggested we -- we set one up but

7    let it be a -- when the word got out, other doctors

8    wanted to do it.  So Roesch came in and helped me set

9    up the first physician office laboratory.  And it was

10    called Salem Laboratory, with 27 physicians.

11    Q.    And it was called Salem Laboratory?

12    A.    Yes.

13    Q.    When did that start?

14    A.    That started in 1984.

15    Q.    So you -- what was your role at Salem

16    Laboratory?

17    A.    I was managing partner.  We were all equal

18    partners.  They put in the money; I put in the sweat

19    equity.  And I became the managing partner of Salem

20    Laboratory.

21    Q.    And when -- when you say, they put in the

22    money, who are you talking about?

23    A.    The 27 physicians.

24    Q.    Were you an officer or director of the

25    company?

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 9 of 127

1    A.    I was managing partner.  That's what my
2    title was.
3        Q.    And who was the director of the lab?
4        A.    The director of the lab was Dr. William
5    Austin.
6        Q.    And do you need to be a physician in order
7    to be the director of a lab?
8        A.    Yes.  Well, the medical director of the lab.
9    But he -- he was the president, but he was also the
10    medical director.
11        Q.    So were you working as the managing partner
12    for Salem Laboratory at the same time you were
13    practice administrator --
14        A.    Uh-huh.
15        Q.    -- for Salem Gastro?
16        A.    Yes.
17        Q.    Okay.  How did that work?
18        A.    Well, they encouraged me.  Because the
19    doctors that I worked for were also partners of this
20    laboratory.  So -- so -- and basically, when it
21    started, other doctors wanted to come in too, I mean.
22    So -- and it was good for the physician referrals.
23    So, yes, I had two jobs.
24        Q.    So why did you leave Salem Gastro and Triad
25    Clinical?

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 10 of 127

1    A.    Well, I left Salem Gastro because the Stark
2 rule came in, where doctors could not own their own
3 laboratories and refer to themselves.  So I started my
4 own.
5    Q.    Why did you leave --
6    A.    I sold Salem Gastro; I didn't leave Salem
7 Gastro.
8    Q.    I'm sorry?
9    A.    I mean, I sold Triad Clinical; I didn't
10 leave Triad Clinical.
11    Q.    I see.  Okay.  You said you sold Triad
12 Clinical?
13    A.    Yes.  In 2003.
14    Q.    Let me make sure I got this.  So the two
15 jobs that you had were Salem Gastroenterology's
16 practice administrator, and then you were the managing
17 partner of the Salem Laboratory?
18    A.    Yes.
19    Q.    Okay.  So when you left Salem Laboratory to
20 start Triad Clinical --
21    A.    They -- they closed it down.  I mean, the --
22 the government said, you -- in 1991, we had to
23 dissolve Salem Laboratory because it became a Stark
24 issue.
25    Q.    Were you given any profits or payout or

1    buyout or anything at that time?

2         A.    Well, we just basically, as sub S, we just

3    dissolved it and -- and each -- each shareholder had

4    an equal share.

5         Q.    And were you a shareholder?

6         A.    Yes.

7         Q.    What percentage share were you?

8         A.    Well, each had to have equal shares,

9    everybody had one share.

10        Q.    So there were a hundred -- how many

11   shares --

12        A.    20 -- 27.

13        Q.    I see.  So you were one of 27 shareholder?

14        A.    Yes.

15        Q.    And then you started Triad Clinical?

16        A.    Yes.

17        Q.    Did you have any investors?

18        A.    I had a physician that I bought out.  That

19   was Dr. William Austin.  And I had three investors

20   that I bought out.

21        Q.    So when you say that you bought these folks

22   out, did they invest initially in Triad Clinical?

23        A.    Yes.  Instead of getting a bank loan, they

24   came and -- and invested their money.  It was a very

25   expensive laboratory.  And they invested.  And then

1  time period.  And I -- and Dr. Austin about the same

2  time.  I mean, it was profitable but not that

3  profitable.

4      Q.    And what types of things did you do at Triad

5  Clinical?

6      A.    It evolved too.  It was clinical chemistry

7  mainly.

8      Q.    And what do you mean by that?

9      A.    Well, clinical -- if you go to your doctor,

10  CBCs.  We call it SMA 12s, which everybody has a

11  different names for, SMA 6s.  But just individual

12  chemistry, when you go to your doctor and have your

13  blood work, if you look on the sheet, we did it.  I

14  mean, we -- we did the testing.  Potassium, low doses,

15  da, da, da, da, da, da.

16      Q.    Cholesterol --

17      A.    Yeah.

18      Q.    -- et cetera?  Okay.  So any lab type

19  testing.  So that's what the lab did.  What was your

20  role at Triad Clinical?

21      A.    Well, to start out, I -- lots of hats.  But

22  as it grew, I had -- oh, I had -- did have a med tech

23  that was -- started out with me.  And I lent her the

24  money to buy in.  And then she wanted the money back,

25  so I bought her out.

1     Q.    Who was that?

2     A.    It was Trish -- Patricia Garris.

3     Q.    So you said you wore lots of hats.  What

4 kind of things or what kind of duties did you have at

5 Triad Clinical?

6     A.    Everything from the -- from the currier to

7 the reception to the -- hiring the staff, except Trish

8 would hire the clinical people and I'd hire the

9 support staff.  And it -- it was incredibly small, but

10 it grew.

11    Q.    At the time that you sold Triad Clinical,

12 approximately how many employees?

13    A.    Over a hundred.

14    Q.    Did you ever do any of the lab testing?

15    A.    Myself?

16    Q.    Uh-huh.

17    A.    No.  I am not a medical technologist.  And

18 only -- only certified medical technologists were

19 allowed to do our testing.  That was --

20    Q.    Is that --

21    A.    -- our --

22    Q.    -- rule of Triad Clinical or is that --

23    A.    That's a rule --

24    Q.    -- a legal rule?

25    A.    -- of Triad Clinical.  Many large

1    laboratories don't use certified technologists, they

2    OJT, and are supervised by a certified technologist.

3         Q.    So is it your testimony then that it's --

4    whether the lab is big or small, you have to have a

5    certified medical technologist, at some point, in the

6    lab to -- to supervise folks?

7         A.    Well, the state had -- had a rule that labs

8    at least have one medical technologist to sign off on

9    the nontechnologists' work once every 24 hours.  And

10   Triad Clinical didn't do that; all of our techs were

11   certified.  We didn't have OJTs.

12        Q.    I see.  And you also had to have a medical

13   director of the lab that was a licensed physician.  Is

14   that --

15        A.    Oh, yes.

16        Q.    Who was the medical director of Triad

17   Clinical?

18        A.    Dr. Louis Randall at that time.

19        Q.    And did that change at some point?

20        A.    Yes.  We -- then we had Dr. Shahabi, Shahabi

21   from Baptist Hospital.

22        Q.    Any other medical directors?

23        A.    We had another one.  And I can't -- I want

24   to say Dr. Wong, but it wasn't Dr. Wong.  Dr. Kim.

25   And he was the pathologist.  We rotated pathologists.

Page 43

1    Because pathologists, at that time, and probably

2    still, are -- can only be a medical director of up to

3    five labs, at that time.  So they -- if they get a

4    better opportunity, they have to drop one of the labs.

5         Q.    I see.  And these medical directors, were

6    they actual employees of Triad Clinical or were they

7    1099?

8         A.    They were 1099.

9         Q.    And when you sold Triad Clinical, how much

10   did you sell that for?

11        A.    I sold the laboratory -- the laboratory was

12   sold -- did you want the total?

13        Q.    Uh-huh.

14        A.    It was all broken up.

15        Q.    Whatever you remember.

16        A.    Well, in parts.  But the whole thing came

17   to -- depending on whether it was receivables,

18   whatever, close to $10 million.

19        Q.    And was that profit to you at that point?

20        A.    Oh, yeah.

21        Q.    Were there any other owners at that time

22   or --

23        A.    No.

24        Q.    -- were you the sole owner?

25        A.    I was the sole owner.

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 16 of 127

```
 1      A.     In March -- and I think it was March 14th,
 2   2016, Dr. Spivey called me on -- I think it was
 3   Saturday.  It was Saturday morning.  I think it was
 4   the 14th.  I have to look at the calendar.  And said,
 5   oh, I guess you know I fired Suzanne.  And I said to
 6   him, I think that was a very, very mean thing you did.
 7   The way you did it.
 8          You can -- I said, Dr. Spivey, you can fire
 9   anybody you want to.  I mean, it's your company.  But
10   the -- the brutal way you did it, for someone that has
11   helped you grow your practice and done everything that
12   you've wanted to do and kept your accounting and --
13   and coordinated all of the vendors and -- and did what
14   you -- what Suzanne did, for you to let her go by
15   FedEx letter.  I said, at least you could have just
16   sit down and talked to her and said, Sue, there's no
17   job for you here or doing bad financially, as he told
18   me, or whatever.  But you two needed -- you don't fire
19   somebody by FedEx letter.  And I told him that.
20          And then he said, well, my attorney told me
21   I cannot contact Suzanne now.  But I want you to do a
22   favor.  I want you to get ahold of her and tell her I
23   will pay her whatever she wants if she will drop this
24   lawsuit.  Because Suzanne had gone to Sean and -- with
25   the lawsuit.  And I said, Dr. Spivey, I cannot do that
```

1    because I -- this is between you and she.  I have no
2    dog in that fight.  I mean, I cannot get in the middle
3    of this situation.

4              And I heard in the back Sherry saying,
5    retaliation, retaliation.  And he said, would you
6    retaliate?  Would you hurt my practice?  I said,
7    Dr. Spivey, why would I -- why would I hurt your
8    practice?  He said, I didn't ask you that, Rebecca.  I
9    asked you, will you hurt my practice?  And I said,
10   there is just no way.  I told you -- you say it yes or
11   no and you speak clearly, yes or no, will you hurt my
12   practice?  I said, no.

13             Well, what's this, a retaliation?  I said, I
14   have no idea.  Why would I retaliate?  I'm employed.
15   I mean, I was thinking, why would I retaliate?  He
16   hadn't fired me, you know.  But nevertheless, we left
17   it at that.  And -- and it was not a very nice phone
18   call.

19        Q.    Is that the only phone call that you had
20   with him about Ms. Nagelski's separation of
21   employment?

22        A.    Yes.

23        Q.    And that's everything you remember about it?

24        A.    Yes.

25        Q.    Okay.  And I had asked you why you had

1  And I said, let me talk to Michael and we can work

2  this out.  And he -- he commented about how good

3  Michael was, how organized he was.  How -- and it was

4  a -- it was a good situation.  And I talked to Michael

5  about putting the folders in a blue envelope instead

6  of just going over into a clear one, that can be

7  overlooked.

8        And, you know, the very few times that I had

9  any interaction with him, he was very efficient.

10  And -- and anytime there was a -- a lab situation, to

11  where something got crossed up, he was right on it,

12  got it straightened out.  I -- I liked working with

13  him, even though I didn't know him personally or had

14  really had any real contact with him face-to-face.  He

15  just did a good job, as far as being on top of any

16  little issue which I was involved.

17      Q.    Gotcha.  Okay.  What do you know about why

18

19

20

21      A.    I got along with her just fine.

22      Q.    What do you know about why Ms. Nagelski is

23  no longer there?

24      A.    I do not know.  That was between she and

25  Dr. Spivey.

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 19 of 127

1    Q.    Did you see the termination letter or --

2    A.    She --

3    Q.    -- the letter separating her employment?

4    A.    She was devastated that he would be the type

5    of person that, as professional as he can be

6    otherwise, that he -- and as long as she worked for

7    him and did for him, that he would fire her in that

8    callous way.  And -- and I related that to Dr. Spivey.

9    Q.    Did you see the letter separating her

10    employment?

11    A.    Yes.

12    Q.    Okay.  When did you see the letter?

13    A.    She called me and was absolutely in tears.

14    And she said, well, I guess I'm gone, or something to

15    that effect.  I said, what?  She said, FedEx guy came

16    and hand me my -- I was fired by the FedEx guy.

17    And -- and of course, I said -- and I said, well, fax

18    it over to me, let me look at it.

19         And I will say, I have known this beautiful

20    personality all my life.  And I've never seen her

21    buckle.  And what he did to her and the way he did to

22    her and what I saw and the way Mrs. Spivey treated her

23    and played with her mind -- you saw in the email

24    yesterday, oh, I'm just -- I'm just playing with you,

25    I just wanted to -- little mind games.  She played

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 20 of 127

1  strapped and your -- your services are wonderful and

2  everything, but can we just negotiate on your pricing?

3  Can -- can you go -- I mean, there was so many things

4  you could do.  You just sit down there and talk to her

5  and say, would you be interested in -- in doing

6  some -- some of this that you're doing, but on a

7  part-time basis because -- and I'm -- I'm kind of

8  making this up -- but we don't have the financial

9  stability and -- and -- and -- and we got somebody

10  else for HR, but you're very good at whatever she --

11  you know, the other things.  Let's -- let's talk.  You

12  don't do it in a FedEx letter.

13      Q.    So did you give Ms. Nagelski any

14  recommendations --

15      A.    No.

16      Q.    -- as to whether she should --

17      A.    No.

18      Q.    -- submit her consulting rates?

19      A.    No, I did not.  She's a grown woman.  I did

20  not.  But that's the way she felt, that -- that, if

21  they were sincere about this, if Dr. Spivey was

22  sincere about this, he would have sat down with her,

23  and they could have negotiated right then and there,

24  not send this.

25

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 21 of 127

CONFIDENTIAL

1  no longer with PPM?

2      A.    I have no idea.  She was excellent.  She

3  worked her little self to death.  She was a hard

4  worker and -- and if you went into medical records,

5  she was pulling -- I mean, she never even stopped to

6  the chitchat.  I mean, she was going.

7      Q.    So she worked in medical records?

8      A.    Yes.

9

10  why she's no longer --

11      A.    No, I didn't --

12      Q.    -- working --

13

14

15

16

17

18

19

20

21  when I was with her, she'd get phone calls and more

22  work would come down, more work would come down.

23          And then one day, she says, the problem is

24  is it -- with the old billing service, we never had to

25  take phone calls.  We never had to take bill calls

1    from patients, you know, fussing about the bill or

2    wanting to know what this or that.  And because the

3    billing service did now, they're having to take bills.

4            And -- and Susan said, I can't answer the

5    telephone, post these lab charges, research this,

6    research that, do this, do that.  And -- and -- and

7    Brandy came through and she said, she just said, I --

8    you know, I can't keep answering the phone and get

9    these -- this work upstairs, you know, for the new

10   patients.  I mean, they had her doing everything.  And

11   -- and Brandy just turned to her and said, oh, I just

12   let it ring.  She said, it was a bill call.  Brandy

13   said, eh, just let it ring.

14       Q.    And is this Brandy Frey --

15       A.    Uh-huh.

16       Q.    -- or Brandy Thomas?

17       A.    Brandy Frey.

18       Q.    Why -- do you know why Katherine Skalronski

19   is no longer with PPM?

20       A.    That was a sad story, but I don't know why.

21   I don't know.  She had -- little Katherine --

22   Dr. Charles Colbreth, before he retired -- well, he --

23   he had Katherine Skalronski as his receptionist for

24   many years.  She knew so many people in this

25   community.  And she was a love.  And her -- and she

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 23 of 127

CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1    A.    No.

2    Q.    -- at PPM?

3    A.    No.

4    Q.    How did you know that she had all these

5    relationships with everyone?

6    A.    Because she had been in the community.  And

7    when I talked to her, she -- she knew the right

8    people.  Because working with Dr. Colbreth, she met so

9    many -- when you work in a physician's office,

10   especially near -- at the front, you get to know

11   people in the community.  And -- and the staff at

12   Dr. Spivey's office dearly loved her.

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL



Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 26 of 127

CONFIDENTIAL



Veritext Legal Solutions

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 27 of 127

**CONFIDENTIAL**

1     A.    No, she didn't.  But she is another

2  person -- she is one of the successful people that

3  has -- well, she -- she has another job.  She -- after

4  a -- a period of time, she went to work at an

5  engineering company.  And -- but she called me up and

6  she gave me the name and -- of the engineering

7  company.  And she said, would you do me a favor?  May

8  I use you as a reference?  Because you're well-known

9  in this town, and very well-respected; because I don't

10  want to use Dr. Spivey, because he'll trash me like

11  he's done everybody else.  And I said, I'll be more

12  than happy to.

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 28 of 127

1  people and train them and all this stuff. So -- but

2  -- and again, this -- this with a growing practice,

3  this evolved very slowly.

4          So then Lisa came in. And -- and staff

5  started being hired. And -- and Lisa would call

6  Suzanne for help. She was very supportive and try to

7  come in and help Lisa out. I mean, we were all kind

8  of helping each other. Because what we wanted to do

9  at that time, all of us wanted to see this practice

10 succeed.

11    Q.   So how often during the summer of 2007 -- or

12 how many weeks during the summer of 2007 would you say

13 that you were helping out, holding the fort?

14    A.   I can't tell you because I can't remember.

15 But, and I need another date to -- the next time I got

16 a call, actually, it was from Sherry. I think the

17 office was running pretty well and I was out of it.

18 Then -- that Dr. Spivey had somehow, for some reason,

19 decided that he was going to buy a piece of lab

20 equipment.

21          And that's all well and good, but you think

22 he'd call me and say, I'm going to buy some lab

23

24

25







Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 32 of 127

CONFIDENTIAL

Page 125



Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 33 of 127





Veritext Legal Solutions
800-567-8658                973-410-4098

1    when you're a tech, you don't have this vision; you've

2    got this.  And -- and -- and to oversee it with

3    Dr. Spivey's office and then the Greensboro office.

4    And again, it coordinated to where, when patients came

5    in, he would have the result is as soon as possible or

6    he could at least pick up the telephone and say, I

7    have a patient here I really need to know, you know,

8    the results of his urine drug test.  And he could have

9    it.

10       Q.    How did you oversee the technologists?  What

11   did you --

12       A.    Because I --

13       Q.    -- mean by that?

14       A.    I oversaw, more or less, the personnel.  And

15   being in a laboratory for so many years, you -- you

16   know what to look for.  But I mean, I did not operate

17   the machine.  But I do know what to look for.

18       Q.    So you were like dealing with scheduling and

19   personality issues and things of that nature?

20       A.    Yes.

21       Q.    Okay.  How many hours a week would you say,

22   during this time period, you were working in the

23   Greensboro location?

24       A.    During this -- for a while, I didn't have to

25   be physically there all the time, but I had to be

1    available.  But at that time, I can't tell you how

2    many hours I was there.  But it was at least 30, 35

3    hours a week.

4         Q.    And this was in the 2013 timeframe?

5         A.    Yes.

6         Q.    Or whenever the -- the machine --

7         A.    Yeah.

8         Q.    -- the machine was initially purchased?

9         A.    Yeah.

10        Q.    We can get records of that?

11        A.    Yes.

12        Q.    I think you said it was 2012, 2013

13   timeframe.  And so you said you were working 30 to 35

14   hours per week.  And this was in the Greensboro

15   location, where the lab was located; is that correct?

16        A.    That was -- yes.

17        Q.    Okay.  And how long did that continue?  In

18   other words, how many weeks were you working this 30

19   to 35 hours per week?

20        A.    Well, that's when I had said to Dr. Spivey,

21   I will oversee this because, again, so many things can

22   go wrong because you've got so much -- many needed

23   parts.  I'm not going to do it for $750 a month.  I

24   mean, you can find somebody else.  I mean -- but --

25        Q.    And so is that when you had the conversation

CONFIDENTIAL



Page 161

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Veritext Legal Solutions

800-567-8658                                        973-410-4098

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 38 of 127

CONFIDENTIAL

```
1
2
3
4
5
6
7
8
9
```

10      A.      Are you talking about being physically

11  present in the laboratory or -- or -- or working to

12  get all the -- the coordination of the -- just the

13  whole thing?

14      Q.      Yeah, the whole thing.

15      A.      Over the first six months, it was a good 40

16  hours.

17      Q.      But not all of that was in the office, it

18  sounds like?

19      A.      Not all of that was in the office.

20      Q.      Did you keep track of your hours, a log of

21  your hours or anything?

22      A.      No, I -- no.  I mean, at that time --

23      Q.      At any time, did you keep a log of your

24  hours that you were working?

25      A.      No.  No one asked me to.  And I had -- one

1    of the negotiating points for -- for doing this

2    machine and even the other one with Dr. Spivey is, I

3    can't be here all the time. I'll get the job done.

4    You're paying me to get the job done, whether it's 20

5    hours a week or 80 hours a week, all you want is, get

6    the job done.

7        Q.    Right.

8        A.    And I got the job done. So...

9        Q.    And when you say you couldn't be there all

10   the time, was that because you were down in South

11   Carolina?

12       A.    Well, I stayed -- during the critical part,

13   I stayed up here. And then, as things loosened up, I

14   would go back -- back down there. But I still stayed

15   where I didn't have to be hands-on.

16       Q.    Uh-huh.

17       A.    Anytime I felt like I had to be more

18   hands-on, I was in Winston-Salem. If I could go and

19   work for the -- from any other source, because, after

20   we -- after we purchased that, there came another

21   laboratory information system. Okay. Now, there

22   were, at that time, only one or two, Fletcher-Flora

23   being one, that would even interface with a Shimadzu.

24   I mean, you -- seems like once you get one -- one

25   issue working, then there's always another add-on.

1    Q.    So after the first six months, where you

2   were working approximately 40 hours per week to get

3   the LCMS synced up, how many hours were you working

4   after that first six-month period, when everything was

5   up and running?

6    A.    20, 30.  And I'm just guessing.  Because

7   every week's different.  Because at that time,

8   Gered -- then we had to move the -- one of the

9   machines, had to move the -- and -- and because the

10  LCMS was in Greensboro and the little chemistry was in

11  Winston-Salem.  So that's causing a lot of problems.

12  And so we moved the little -- with Dr. Spivey's

13  permission, we moved the little analyzer to -- to

14  Greensboro.  And they're -- they -- even now, they're

15  sitting side-by-side.

16    Q.    Is that analyzer called the IR 500?

17    A.    Yes.  Thank you so much.  Thank you.

18    Q.    Okay.  Okay.  So after you got the LCMS up

19  and running, after that first six months, you said

20  that, after that time, you were working probably about

21  20 to 30 hours per week, overseeing the lab and these

22  two machines.  At any point in time, did that 20 to 30

23  hours per week change?

24    A.    It was -- it was a -- a dynamic situation.

25  We'd have Dr. Wong to come in.  We'd meet with

1  Dr. Wong. He stayed on top of -- made sure that the

2  machine -- both of them were -- were running

3  correctly. The LCMS was very difficult because -- I'm

4  trying to think of layman's terms to -- to -- because

5  it's very hard to understand. Because it was a

6  nitrogen, I mean a liquid nitrogen. It -- it wasn't

7  an analyzer where you just put a little prepaid packet

8  in there and -- and say -- and say press a button.

9  But it was all done in kind of logarithms.

10      Q.   Okay. All right. So in 2014 -- let's talk

11  about that timeframe. How many hours would you say

12  you were working approximately per week?

13      A.   2014. Depending on what I needed to do to

14  research L -- LIS's to -- and I think the inventory

15  system was -- was always a headache too, to make sure

16  that we stocked enough -- we stocked enough and not

17  overstocked and certain things could be on standing

18  order, certain things not, to oversee that. And --

19  and authorize and sign off on every purchase that was

20  made; my signature was on every purchase that was made

21  for the supplies.

22      Q.   So my question was, during the 2014 time

23  period, approximately how many hours do you -- would

24  you say you would work on average?

25      A.   20 to 30.

1    Q.    Okay.

2    A.    But as things -- then -- then Gered quit.  I

3  had to go find another chemist.  And that took --

4  so --

5    Q.    And was that Rodney that you hired?

6    A.    Yes.  Yes.

7    Q.    Okay.  But so it sounds like, at some point,

8  things kind of got on auto pilot --

9    A.    Uh-huh.

10   Q.    -- from the standpoint that you had your

11  policies and your procedures in place and payers had

12  approved the machine.  So all of that paperwork was

13  done.  So you were overseeing the folks in the lab --

14   A.    Uh-huh.

15   Q.    And dealing with the purchases and the stock

16  and, you know, whatever day-to-day operational things

17  might come up that might need your attention; is that

18  correct?  Okay.  In 2015, how many hours a week would

19  you say you were working?

20   A.    Well, it got less and less.  I would

21  probably say 20 hours week.

22   Q.    And what about 2016?

23   A.    I can't -- that -- 2016.  Things were

24  running well.  Gretchen, the med tech, would call me

25  when she had a problem.  And I said to her, I will

1  come in there and I will do what you need for me to

2  do.  All you have to do -- and -- and I checked with

3  her probably every few days.

4      Q.    It sounds like she could handle most things.

5  By that point, she had been there a number of years?

6      A.    Yes.  She -- she could.  She -- she could.

7      Q.    So approximately how many hours do you think

8  you were working, on average, in 2016?

9      A.    That's hard to say.  But I'm gonna still say

10  around the 20 hours.  Because there was always

11  something with that laboratory.  And that -- that

12  Gretchen -- Gretchen's excellent, she is.  But people

13  think that, just because you can run a machine, you

14  can run a laboratory.  That's not so.

15          But it was set up to where that, if there

16  were no real -- if they was doing

17  day-to-day-to-day-to-day, 10, 20 hours a week would

18  have been fine.  That's in my opinion, just to be

19  there when something did go wrong, because Gretchen

20  could not cover a lot of things.  And she said to me,

21  I can't do what you do.  And I said, well, I can't do

22  what you do either, so there.

23      Q.    How -- in 2014, how often would you say you

24  went to the lab per week?

25      A.    In 2014.

CONFIDENTIAL

1      Q.     So basically, it's just your memory at this

2   point?

3      A.     It's basically --

4      Q.     And --

5      A.     And it's going quick.

6      Q.     And it sounds like you don't have a very

7   good recollection as to how many times you were going

8   into the lab per week?

9      A.     Well, I tried to be in Winston-Salem at

10  least two weeks a month.  So that was 80 hours.  Now,

11  depending, would I go in there -- sometimes I would

12  even go into the main office in Winston, and -- and

13  talk with Dr. Spivey about what he's looking at for

14  the lab and -- and then -- and then on top of that,

15  about this time, Dr. Spivey said, I think we need to

16  do a hormone laboratory.  So I worked with Dr. Mark

17  Scherzo and Dr. Spivey to do his age management.

18  Fine.

19         I worked with Dr. Scherzo.  And -- and

20  Dr. Scherzo was giving me different tests.  Some -- it

21  was kind of interesting.  He -- Dr. Scherzo and I were

22  working on a battery of tests for a new piece of

23  equipment.  Dr. Spivey gave me authorization to -- he

24

25

4          Get it set up.  Decide which test, I

5    remember Dr. Scherzo and I would -- would talk about

6    which test we wanted.  We'd ask Dr. Spivey.  We met

7    sometime in November in the conference room.  Now

8    how --

9          Q.    November of what year?

10         A.    November -- it was a new -- it was the new

11   conference room.  So it had to be 2014-ish.

20   that time period, did Medicaid make changes in the

21   reimbursement rates for the various tests?

22         A.    In what date?  What year?

23         Q.    Around the 2015, 2016 timeframe.

24         A.    They changed -- yes.  I mean, that's a --

25   that is not exactly an easy answer -- because so

1   dynamic.  All insurances were changing the way that

2   they wanted.  In fact, they were pretty consistent.

3   If one wanted this, the other one -- it was pretty

4   consistent, with a few tweaks.  But then every

5   insurance wanted everything done differently.

6       Q.    And so were these Medicare reimbursement

7   rates, were they going down?  For the tests that

8   Dr. Spivey was performing?

CONFIDENTIAL

Page 172



7    Q.    Ms. Kovalich, did you ever have any issues

8  with working with Sherry Spivey?

9    A.    I -- yes.

10   Q.    Okay.  Can you tell me about those.

11   A.    When Sherry first came into the office, I

12  would say not the first day, but the first maybe month

13  or so, I was walking down the hall.  And she said, oh,

14  Rebecca, I would -- anything you need, you come to me.

15  I'll get you anything you need.  I'll go to David and

16  get whatever you need.

17   Q.    And this was in the 2006, 2007 timeframe

18  that we're talking about?

19   A.    Well, she -- she was kind of not in the

20  office and in the office a little bit and not in the

21  office.  And then we had -- we lost a couple nurses

22  and then she came in the office more.  So it -- it was

23  kind of a little -- kind of a little -- you know, it

24  kind of built up.

25   Q.    Well, I'm -- I'm just asking about this

1    incident that you're talking about, when you were

2    walking down the hall and Sherry Spivey said anything

3    you need --

4        A.    Yeah.

5        Q.    -- come to me.  I'm just trying to figure

6    out what timeframe we're talking about there.

7        A.    She and Jennifer had that office -- maybe

8    20 -- we were -- we were still in the old office.  So

9    it had to be 2012, or '13, right in there.

10            MR. HERRMANN:  Ann, when we get to a good

11   spot, do you mind taking a break?

12            MS. SMITH:  Sure.

13            THE WITNESS:  And -- and I -- I mean, that

14   was probably the first -- well, let's see.  No, it may

15   not be the first.  But -- and I said to her, I said,

16   Sherry, I don't need an interpreter.  I report to him,

17   always have.  I don't need to go to you for you to go

18   to him to go back to me.  I said, I can do that

19   myself.

20            And -- and it -- now, this is -- it seemed

21   like -- and for whatever reason, it would have been

22   okay if we'd known about it.  All the -- suddenly, she

23   was there more and more and took more and more

24   responsibility or whatever -- for the office.  And

25   started basically -- it seemed to me -- and to a lot

1    of the staff, but to me, that she was usurping a lot

2    of managers' jobs.

3          Case in point:  We needed a nurse.  Well,

4    she would come in at that time and fill in and help.

5    And she had really had no role.

6    BY MS. SMITH:

7          Q.    Ms. Spivey would come in and --

8          A.    Yes.  And -- and so Vicky Sweisgood was

9    there at -- in her office.  And we interviewed a girl

10   named Cathy.  And I can't think of her last name.

11   And -- and she -- she had worked at another doctor's

12   office that Vicky had know and had glowing

13   recommendations from that office.  And she had quit

14   for whatever reason.  And they said, yes, they would

15   hire her back and she's great.  So, yeah -- so Sherry

16   comes in and -- and throws a fit because we didn't --

17   we hired her without her permission.

18          Well, if we'd known we needed her

19   permission, we wouldn't have hired her.  And so

20   eventually, I remember Dr. Spivey, when the nurse was

21   working, and he was standing in his office.  Said,

22   yeah, I like her.  I --

23          Q.    Was that Cathy Stowers you're talking about?

24          A.    Red-headed, Cathy --

25          Q.    Stowers, Stowers.

1    A.    I know her first name was Cathy, and it

2  probably is that lady.

3    Q.    And so this would have been about January

4  2013?

5    A.    I -- we were still in the old office.

6  That's how I have to keep my dates.  So it probably

7  was.  And but -- it's -- I -- I like to operate on the

8  clear and direct.  And for -- for her to come in and

9  say -- and have a fit.  And Dr. Spivey said the next

10 day that it was miserable at home, and why, da, da,

11 da, da, da, da, da.  And well -- well, we didn't know

12 she had made herself clinic manager.

13      Because at that time, Vicky Sweisgood did

14 the -- did the hiring of the nurses.  I mean, she did

15 the hiring of practically all the staff.  And she

16 helped Dr. Spivey when he hired any doctors or PAs.

17 She would recruit him and she would get -- I mean --

18 and -- and suddenly, from us, if someone had made an

19 announcement, Dr. Spivey made an announcement:  Sherry

20 Spivey is going to start working here, da, da, da.

21 She'll be here full-time.  She's going to run the

22 clinic.  Okay.

23      But without -- from the clear blue, she

24 throws a fit because we hire a nurse without her okay.

25 Well, we've been doing it for how many years.  And

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 52 of 127

1    but -- so it -- it just -- the contentiousness, as I

2    see it, it was just -- it -- it kept on.  It was

3    almost like she came in, as far as I was concerned, to

4    torment, harass -- I hate to say harass.  That's not a

5    good term.  Just -- basically to take over, without

6    formally taking over.  So nobody in the -- in the

7    operation at that time knew what's her role.  What's

8    she doing here?

9         She's in a couple hours, and she's gone.

10   And then she's -- wants to run the show.  So again,

11   it's like she wants to run the office, but on her --

12   whenever she's ready to run it.  And then -- so this

13   is what bothered me.  There was no consistency.  It

14   was just bouncing in, bouncing out, giving a few

15   orders, taking off.  And not being accountable or

16   follow through what she was supposed to be responsible

17   for.  I mean, outside -- I mean, that would have

18   happened no matter who, you know, who she was.

19        Q.    All right.

20        A.    Meaning -- meaning it wasn't her personally;

21   it was just the way it was done.  She just kind of

22   came in and did what she wanted to and disappeared.

23   Nobody knows when she's coming again.  Then she'd come

24   in, do what she want to, da, da, da, da, da, change

25   this, change that, da, da, da, da and disappear.

**CONFIDENTIAL**

1  Well, either you're in or you're out. Either you're a

2  manager or you're not. You know, what is your role?

3  And that's what bothered me. Because she really

4  didn't have a role initially; she just -- so...

5           MS. SMITH: Okay. Your attorney has asked

6  for a break, Ms. Kovalich. We'll go ahead and take a

7  break now. And I'll have some questions for you after

8  the break.

9           THE VIDEOGRAPHER: Don't forget your

10  microphones. The time -- we're going off the record

11  at 3:16 p.m.

12               (A recess transpired.)

13           THE VIDEOGRAPHER: We're going back on the

14  record. The time on the video monitoring is 3:37 p.m.

15  Please continue.

16  BY MS. SMITH:

17     Q.    Ms. Kovalich, prior to the break, we were

18  talking about Ms. Spivey, and if you had any issues

19  working with Ms. Spivey. And you had relayed this --

20  this one incident about the hiring of this nurse. And

21  you said that Ms. Spivey had threw -- thrown a fit at

22  this point. And I believe this was back in the 2013

23  timeframe. Maybe I've got that date wrong. Let me

24  check that. Yeah, 2013 timeframe. Did you have any

25  other issues with Ms. Spivey?

1    A.    Oh, yes.

2    Q.    Okay.  Can you tell me about those?

3    A.    It was probably around the same time period.

4  Excuse me.  Excuse me.  There was a meeting and we

5  were all -- I mean, we were all -- Dr. -- I mean,

6  Sherry Spivey, Brandy, we were having kind of an

7  all-purpose little, maybe an office meeting, kind of

8  coordinating meeting in the conference room.  Okay.

9  And --

10    Q.    At the old location?

11    A.    At the old location.  I forgot what we were

12  talking about.  But it was just a little business

13  thing, keep everybody together.  And for some instant,

14  Sherry Spivey jumps up and she starts needle, needle,

15  needle.  And I can't even remember what she said, it

16  was -- (onomatopoeia).  And she -- I mean, it was

17  like, I'm going to pick a fight with you; I'm gonna

18  pick a fight with you; I'm going to pick a fight with

19  you.  And so what I did --

20    Q.    And was this, she was trying to pick a fight

21  with you?

22    A.    Yes.  And -- and there was no reason.  In

23  other words, we hadn't had an argument, everything was

24  fine, we were sitting around, just talking.  And --

25  and -- and she was -- prior to that, she sat on her --

1    her phone.  And she was doing this the whole meeting.

2    And -- and then, when the meeting was over, she just

3    approached me and started bitching.

4            And -- and it was that needle, needle,

5    needle, you know, trying to get a rise out of me, you

6    know.  I'm going to make you jump or do something or

7    get mad.  I don't know.  And I just ignored her.  I

8    walked into Vicky Sweisgood's office, picked up my

9    coat and started down the hall and never made, you

10   know, eye contact or anything.  I just completely

11   ignored her behavior.

12           And about 15, 20 steps down the hall, where

13   you have to go out the back door.  I hear, fuck you,

14   Rebecca, kaboom.  And I mean the whole wall shook.  I

15   mean, I could not believe what I heard.  And then I

16   was -- I just kept walking.  First thing I did when

17   that happened, I looked at my watch to see the time.

18   Like, who all is in this building?  Who is hearing

19   this?  And it was, I remember, 5:15.

20           So I kept walking at a steady pace.  And by

21   the time I was to the break room, fuck you, Rebecca,

22   kaboom.  And I just -- just walked right on out the

23   door, got in the car.  Now, the next day -- and -- and

24   Brandy was there.

25           Q.    Let me stop you for just one moment.

1   Because you said you were having this all-purpose

2   meeting.  And I do want to know who was there.  I -- I

3   think you said that it was you and Ms. Spivey and

4   Brandy.  Was there anyone else?

5       A.    There were other people at the -- at the

6   meeting.  But -- but and that was in the conference

7   room.  And everybody stayed in the conference room

8   while Sherry was following me out to Vicky Sweisgood's

9   office, needle, needle, needle.

10      Q.    Was Vicky in her office?

11      A.    Yes, she was sitting in her office.  And --

12      Q.    Was Ms. Nagelski present for this meeting?

13      A.    No.  And --

14      Q.    Do you remember anyone else present for the

15  meeting?

16      A.    I -- there were about three or four other

17  people.  But this didn't happen -- I mean, they stayed

18  in the conference room.  We went out, went down the

19  hall, got my jacket and just politely walked out the

20  door.  Vicky was in her office and everybody seemed to

21  stay in that conference room.  Nobody came out.

22            And so I heard her say it twice, and then I

23  just kept going out the door.  And Vicky said the next

24  day, she said, I'll tell you, this is the first time

25  I've seen this wall shake.  I've never seen a wall

1    shake.  This building is -- and -- and what prompted

2    it, it wasn't like we had an argument, got mad, da,

3    da, da, it was like -- and --

4        Q.    So she went off for no reason.

5        A.    She definitely went off for no reason.

6    Because we had not had a contentious, everything

7    was -- you know, we were talking.  And the whole time

8    though, we were -- we were having this meeting, it was

9    kind of like a end-of-day office meeting, who's on

10    first or whatever.  And I can't even -- I don't even

11    know what was discussed.  She kept on her phone

12    texting, texting, texting, texting.  And -- and it

13    seemed like that texting was working her up, working

14    her up, working her up.

15        And so -- and so when the meeting is over,

16    most of the girls -- all of us girls that I can

17    remember, still sat there, were talking to each other,

18    the social talk.  And I -- and she starts on me in

19    front of everybody, and then she follows me to Vicky's

20    office, still, you know, needling.  And I just walked

21    out the door.

22        Q.    And you don't recall what she was needling

23    you about?

24        A.    It -- no, I don't.

25        Q.    Was Dr. Spivey present for the meeting?

Page 183

1      A.     No.

2      Q.     Any -- and you said this was in the old

3    building, 2013 timeframe?

4      A.     Uh-huh.

5      Q.     Any other issues that you've had working

6    with Sherry Spivey?

7      A.     Oh, yeah.  And I'm just picking out the --

8    the ones that stand out the most.  I was in Vicky's

9    office, getting ready to leave one evening.

10     Q.     Do you remember the timeframe?

11     A.     Yes, it was about 5:30-ish.

12     Q.     Year?  Do you know what year?

13     A.     It was around the same time as this

14   happened.  So it was, say, 2013-ish.

15     Q.     Okay.  In the old building?

16     A.     Yes, in the old building.  And my phone

17   rang.  I was in Vicky's office.  My cellphone rang.

18   And I answered.  And she just started in on what a

19   basically worthless person Vicky Sweisgood was.  And

20   Vicky's there.  So I put this on speaker, I put it on

21   the desk.  And I said, Sherry, Vicky's here.  Okay.

22   And she starts screaming at Vicky, you don't do your

23   job.  I checked your drawer.  You don't do this; you

24   don't do that.  You're just nothing.

25          I mean, you're just -- oh, I -- it was

1  horrible.  And this went on -- it totally went on

2  probably -- it seemed like at least 30 minutes of her

3  on my cellphone on Vicky's desk.  And she's screaming

4  at Vicky.  She's not screaming at me.  She's screaming

5  at Vicky.

6         And we had all these problems.  And you're

7  causing all these problems.  And you're doing this and

8  you're doing -- well, it got so bad that I went back

9  to the back.  And Dr. Spivey is in there in his

10  office.  And I said, Dr. Spivey, you need to get this

11  stopped and you get -- need to get this stopped now.

12  Either Vicky's going to end up quitting or -- or

13  something bad is going to happen.  Nothing good is

14  going to come of this.

15         And he's said, what happening?  And I'm

16  saying -- and he said, okay, let's go.  So he goes --

17  he follows me down the hall.  And all of a sudden, I

18  don't hear his footsteps anymore.  So I turn around

19  and he's not there.  So I go back into his office and

20  I said, what -- where'd you go?  And he said, I can't

21  get involved.  It's -- it's either -- and he did this

22  exactly, it's my marriage or my practice; it's my

23  marriage or my practice.

24         Well, by that time, when I got back to

25  Vicky's office, the conversation had ended.  And she

1  went into -- I think Dr. Spivey called her afterward.

2  I got out of there. But -- and then the next day --

3  the next day, Vicky said Dr. Spivey was very nice and

4  apologized for Sherry's behavior. And I think Sherry

5  actually called Vicky back and said, I don't know what

6  happened. I don't know what happened just...

7      Q.    And how you do you know that? Did Vicky

8  tell you that?

9      A.    Yes. And I think there was an email to --

10  that tell -- I think Dr. Spivey -- oh, I emailed Vicky

11  and I said, Dr. Spivey said tonight -- or said to me

12  today that -- and I can't remember. That it wasn't

13  you, Vicky, it's her. It's not you, Vicky, it's her.

14      And so -- but Sherry had come back and

15  talked to Vicky or whatever and -- and apologized. So

16  but issues like this were just -- it was just

17  progressing.

18      Q.    So they had gotten worse from 2013?

19      A.    I -- I can't recall any more screaming

20  outbursts like that. But she was at the office more

21  and more. Oh, there was --

22      (KOVALICH EXH. 6, text message, KN 00268,

23  marked for identification.)

24  BY MS. SMITH:

25      Q.    I'm sorry, Ms. Kovalich, let me interrupt

1    you for just one moment.  And we'll come back to that.

2    Let me show you a document.  We'll mark this as

3    Exhibit Number 6, and ask if you recognize that,

4    please.

5          A.    Oh, yes.  I remember that.

6          Q.    Is this the -- I think you had called it an

7    email.  But was this the communication --

8          A.    The text.

9          Q.    -- that you were referring to?

10         A.    Yes.

11         Q.    And so is this -- the green, is that you,

12   your message?

13         A.    Yes, it is my message.

14         Q.    Okay.  And you were communicating with

15   Ms. Sweisgood?

16         A.    Yes.

17         Q.    And this was July 2013?

18         A.    Yes.

19         Q.    And you said that Dr. Spivey told him how

20   miserable his life has been with her --

21         A.    Uh-huh.

22         Q.    -- it's not anything to do with you; it's

23   her.  I told Sherry when I -- and I'm not sure what

24   that next thing is supposed to be.

25         A.    I don't either.  I told Sherry when --

1     Q.    But basically --

2     A.    -- if anything --

3     Q.    -- if anything --

4     A.    -- happened to you --

5     Q.    -- happened to you, Vicky, I would never

6 come back there.  So you're telling Vicky that if she

7 left, you were leaving too?

8     A.    Well, yes.  Yeah, I can't -- I can't -- I

9 can't take this unacceptable behavior any more than

10 Vicky could.  I mean, even though that was not -- that

11 one was not directed at me.  Let's see, July 24th.

12     Q.    So was this a phone conversation that you

13 had with Dr. Spivey?  Because you -- you say I slammed

14 the phone.

15     A.    I -- and I -- I said if Vicky leaves, I will

16 leave, and I slammed the phone, yes.

17     Q.    Okay.  So you were having a phone

18 conversation with Dr. Spivey?

19     A.    Yes.

20     Q.    Okay.  And so prior to the introduction of

21 that exhibit, you were -- said you did not recall any

22 more screaming outbursts from Ms. Spivey?

23     A.    I can't recall right now.  I'm sure that

24 something will -- will pop up.  But right now -- the

25 other issue -- and I think it's significant.  I'm

1  trying to pull out the significant ones, meaning the

2  ones that -- well, the ones that stand out in my mind.

Page 189

1 And I said, I think I know who it was. And I said I

2 think it was -- oh, oh, yes. I know what it was

3 because he -- she had said Jennifer. So I didn't know

4 Jennifer ran the lab, you know. Surprise, Jennifer

5 runs our lab.

6 So Dr. Spivey was very hot because the

7 ongoingness of PPM depended a lot on that piece of

8 equipment. And went back to Sherry's office and

9 Jennifer's sitting there. And he was angry. And I --

10 who -- who called? Who -- you know. And -- and

11 Sherry stepped up and she said, I told Jennifer to

12 call and represent me, you know, and not to come out,

13 because it's just too much to pay to have that machine

14 fixed.

15 Well, with that, Dr. Spivey flew into a

16 rage. And he said to both Jennifer and he said to

17 Sherry, stay the fuck out of the laboratory. And then

18 he went back to his office. And then later he said, I

19 have never said that to her before in my life. After

20 that, and what makes this so significant is then the

21 relationship went straight downhill. I mean, there

22 wasn't -- after that, it was open warfare she had with

23 me.

24 Q. So -- and when you say she, you're talking

25 about Sherry Spivey?

1    A.    Yes.    She, in my opinion, she wanted to get

2  rid of me.    She was going to put -- she had already

3  really put Jennifer in charge of the laboratory.

4  And --

5    Q.    What timeframe was this?

6    A.    This was 2013.

7    Q.    2013, okay.  Do you recall an incident where

8  you and Ms. Spivey were talking about Whitney running

9  the office?  Do you remember a conversation about

10  Whitney?

11    A.    I remember one.  Well, Whitney running the

12  office.  She -- if I'm not mistaken, she oversaw the

13  Greensboro office, not the Winston office.

14    Q.    Right.  Do you recall a conversation with

15  Mrs. Spivey about Whitney and an argument about that?

16    A.    Well, there was one when -- I'm not sure

17  it's the same one we're talking about -- where Sherry

18  Spivey flew into Dr. Spivey and -- and said -- accused

19  him of ogling Whitney.  And said, all you want to do

20  is look at those big tits and four-inch heels.

21        And -- and Suzanne was there.  Vicky was

22  there.  Brandy happened to be standing there.  And

23  that was when we went down -- went down the hallway.

24  We got out of there.  She was in such a rage.  We went

25  down the hall, out the back door.  So --

1    Q.    Do you remember what timeframe that was?

2    A.    That was in the evening around, I'm going to

3    guess, 5:30-ish.

4    Q.    Do you know what year?

5    A.    It -- we were in the old office, we're

6    talking about 2013.

7    Q.    Do you recall an incident in 2014 where you

8    had indicated to Ms. Spivey that Brandy was thinking

9    about resigning because of her behavior?

10    A.    Brandy never said that to me.  She might

11    have said to it to somebody else, but she sure didn't

12    say it to me.

13    Q.    Do you remember a conversation or a

14    communication with Ms. Spivey about that?

15    A.    I think that it's something that somebody

16    went to Dr. Spivey.  Dr. Spivey said that's not so or

17    something.  And I remember the email that came -- or

18    text message or what had came through.  Either David

19    or you is lying.  And I mean that's -- and that's

20    all -- that was the end of it.  I mean, I heard -- I

21    mean, that was it.  Because --

22          (KOVALICH EXH. 7, email string, 00069,

23    marked for identification.)

24    BY MS. SMITH:

25    Q.    Let me you show a document we'll -- which

CONFIDENTIAL

1   we'll mark as Exhibit 7.  And ask if you recognize

2   that, please.  Is this an email that you were

3   referring to?

4       A.    Yes.

5       Q.    And you're saying that you did not tell

6   Ms. Spivey that Brandy was thinking about resigning

7   because of Ms. Spivey's behavior?

8       A.    I don't recall saying it.  I mean --

9       Q.    Do you recall saying anything like that?

10      A.    No.  I -- Brandy and I never -- that --

11  that's not a normal -- if Brandy wanted -- quit for

12  Sherry's behavior, she wouldn't be telling me about

13  it.  She'd maybe tell somebody else.  But I wasn't in

14  her -- she didn't talk with me about things like that.

15            (KOVALICH EXH. 8, email, KN 00015 and 00016

16  marked for identification.)

17  BY MS. SMITH:

18      Q.    Let me show you a document.  We'll mark this

19  as Exhibit 8 and ask you if you recognize this.

20      A.    Oh yeah, I remember this one.

21      Q.    Okay.  Can you tell me what happened with

22  this?

23      A.    Well, really nothing happened.  I didn't --

24  she was saying I was out in the community, talking

25  about her, and her -- her family, friends, dogs, cats,

1  everything.  And -- and I said, wait a minute, where

2  did you get -- I don't think it's this one.  I said,

3  where did you get all that?  And she couldn't tell me.

4  I said, just -- just tell me who said it.  And she

5  couldn't tell me who said it.

6      Q.   And so you -- you denied that you were

7  saying bad or derogatory things in the community about

8  Ms. Spivey and Dr. Spivey and PPM?

9      A.   Why would I?  I mean, no, I didn't say

10  anything out in the community about it.

11      Q.   Did you and Ms. Spivey ever discuss this

12  email?

13      A.   I'm not sure if we discussed it directly or

14  indirectly.  But I remember one -- one incident she --

15  I kept saying, well, just tell me who said it.  I

16  mean, I'm listening.  Who said it?  I won't go to them

17  or anything, but just tell me who said it.  And -- oh,

18  somebody at Salem Gastroenterology.  Well, I don't

19  talk to anybody at Salem Gastroenterology.  But she

20  wouldn't tell me who said it.

21          And I felt like, if, you know -- I mean, I

22  didn't say it.  But she wouldn't tell me who the

23  person was that relayed to her that I was talking

24  about -- about her.

25          (KOVALICH EXH. 9, email, KN 00034, marked

CONFIDENTIAL

1  for identification.)

2  BY MS. SMITH:

3      Q.    Okay.  Let me show you a document.  We'll

4  mark this as Defendant's Exhibit Number 9 and ask if

5  you can -- ask if you recognize that.

6      A.    Well, I don't know if this is what she's

7  talking about.

8      Q.    No.  This is an email that you sent to

9  Jonathan --

10     A.    Yes.

11     Q.    Cochran --

12     A.    Yes.

13     Q.    -- at BB&T; is that correct?

14     A.    Yes.  But I don't know if there's any

15  connection with her saying I'm out there.  But things

16  got very -- as you can tell, in the -- in the last

17  paragraph, it was very difficult, with Sherry's

18  behavior and -- and what was going on, it --

19     Q.    Let me ask you a question:  Going back, you

20  had referenced Jennifer in the lab.  And that's

21  Jennifer Bailey --

22     A.    Yes.  Yes.

23     Q.    -- not Jennifer Spivey --

24     A.    No.

25     Q.    -- correct?

**CONFIDENTIAL**

1    A.    Jennifer Bailey.

2    Q.    Okay.  Okay.  But Jennifer Bailey was never

3    put in charge of the lab; is that correct?

4    A.    Well, she was put on as financial manager

5    and then to as charge of the lab.  I mean, she had a

6    different title every -- very frequently.  But she was

7    the one that -- that Sherry put in charge of all this,

8    you know, you know, dealing with the Shimadzu, dealing

9    with any financial issues with the laboratory.  I

10   think she was financial coordinator and -- and --

11   Q.    I mean, Jennifer Bailey didn't have the

12   credentials to operate any of the machines in the lab

13   and perform lab testing, did she?

14   A.    She actually -- this is a time we didn't

15   check out her background, because she was sent over to

16   us because -- from Carolina Liquid Chemistries.  How

17   we ended up with Jennifer is Susan Freeny needed to

18   take vacation.  And this was before Gretchen came in.

19   And so we needed someone and -- that knew the machine.

20   So Carolina Liquid Chemistry sent over Jennifer.

21         And said, well, you know, she worked, you

22

23

24

25



Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 72 of 127

1    Greensboro when somebody's out, to fill in.  I mean,

2    this is -- this is basically reception, take patients

3    back or whatever.  Anyway, not having first-hand

4    information, it seemed -- it did seem like

5    every position Jennifer was placed, problems resulted.

6    So and, in fact, Sherry got the basically -- started

7    utilizing her and -- and they started sharing an

8    office together.  And lo and behold, Sherry found a --

9    a niche, as she felt, for Jennifer.  And -- and that's

10   how we ended up with Jennifer.  I never did -- Vicky,

11   nobody did background checks or anything or if she

12   even had an MT degree or whatever.  Because she was

13   loaned to us.

14       Q.    Getting back to Exhibit Number 9.  Why did

15   you send this email to Jonathan Cochran?

16       A.    Outside of just -- okay.  This was -- dated

17   because I have to go think back, May 2015.  As -- as I

18   said before, after that confrontation with -- with

19   Sherry, Dr. Spivey had with Sherry, there was --

20   this -- everything was downhill from then.

21       Q.    So this incident where Dr. Spivey told

22   Mrs. Spivey -- I'm sorry, I forgot the phrase you

23   used?

24       A.    Stay out of the lab.

25       Q.    Stay the eff out of the lab.  When -- when

1   Dr. Spivey told Ms. Spivey, stay the eff out of the

2   lab, that's when -- that's the turning point for

3   your -- for you?

4        A.   In my opinion.  In my opinion, at that time,

5   she just -- when that happened, it was like, you know,

6   to me, it was like, you're gonna go.  I mean, that's

7   the way I felt with Sherry, you are gonna go.  And

8   so -- and I didn't -- you know, I don't -- I didn't

9   mind going.  And if Dr. Spivey had sat down with me

10  and said, Rebecca, you know, let's renegotiate or

11  whatever -- it wasn't me.

12       But the way they were dealing with Suzanne,

13  it's -- now again, this is my perception, doesn't mean

14  it's true.  My permission is, if I can't get to

15  Rebecca, I'm gonna go after her, I'm going to go after

16  the daughter.  And that's -- that's the way I --

17  again, it's perception.  But that's the way I felt.

18  That was --

19       Q.   And that you felt the Sherry was coming

20  after you because of the lab?

21       A.   Sherry was coming after me because of other

22  things too.  And I think, for several years -- I liked

23  working with Dr. Spivey, I respected him.  He is one

24  of the hardest working physicians I've ever been

25  around.  But I think there was a period in his life

1   that he was -- that he -- I will say, I hate to say

2   infatuated, but he -- he really liked me.  I'll just

3   say he -- 'cause I can't -- I can't tell you how he

4   felt.  But it was like, I need a friend.  I -- I need,

5   you know, I just -- and he had said --

6        Q.    Was this in the fall of 2013?

7        A.    Fall of 2013.  I can't --

8              (KOVALICH EXH. 10, text messages, KN 0027?

9   Marked for identification.)

10  BY MS. SMITH:

11       Q.    Let me show you a document --

12       A.    Okay.

13       Q.    -- we'll mark --

14       A.    Thank you.  I can't remember the date.

15       Q.    -- as Exhibit 10.  Do you recognize this

16  document, Ms. Kovalich?

17       A.    Yeah.

18       Q.    And does this refresh your recollection as

19  to the time period that Dr. Spivey needed a friend, to

20  use your phrase?

21       A.    Yes, he did.  And there were other -- there

22  was -- there were emails.  They're -- they're gone

23  now.  But this was a text.  And there had been other

24  texts.  And, yes, I appreciated him as a physician.  I

25  respected him as a physician.  And he was very,

1    overall, good to me.  But I think he -- now, this

2    is -- I think he wanted more out of a relationship

3    than -- than -- as I said to him in an email, you

4    know, you're -- you're a married man.  And -- and

5    you'd have hell to pay.

6         It was just -- it was just not a doable

7    thing.  And also, too, at that time, with -- with

8    Suzanne there -- I mean, I was not romantically -- I

9    liked him and respected him, but he needed more.

10    And -- and -- and -- and I couldn't do it.  I couldn't

11    do it.

12      Q.    So this Exhibit 10 is a text message

13    exchange between you and Dr. Spivey; is that correct?

14      A.    Yes.  And there were others.

15         (KOVALICH EXH. 11, text messages, KN 00301,

16    marked for identification.)

17    BY MS. SMITH:

18      Q.    Okay.  Let me show you a document which

19    we'll mark as Exhibit 11, and ask if you recognize

20    that?

21      A.    Yes.

22      Q.    This is a text message exchange between you

23    and Dr. Spivey?

24      A.    Yes.

25      Q.    In October of 2013?

CONFIDENTIAL

Page 201

1      A.    Yes.

2            (KOVALICH EXH. 12, text messages, KN 00302,

3      marked for identification.)

4      BY MS. SMITH:

5      Q.    Okay.  Let me show a document which we'll

6      mark as Exhibit 12, and ask if you recognize that.

7      A.    Yes, that was it.  As desirable as you

8      are -- because Dr. Spivey, in my opinion, is an

9      extremely attractive man.  But I just -- I -- I

10     couldn't -- it just wasn't going to happen.  It just

11     wasn't going to happen.

12     Q.    So in your -- so it's your testimony that

13     you thought that Dr. Spivey was wanting to have an

14     affair with you?

15     A.    Yes.  And -- yes, I think an affair might be

16     a -- a light word.  I think he just needed, at that

17     time, somebody else, whether it was me or anybody

18     else.  I mean, he -- he needed something that I

19     couldn't give him.

20     Q.    So when you received these text messages, I

21     mean, do you still have these on your phone?

22     A.    I don't know.  I don't know -- no, I don't

23     have this one on the phone.  I --

24     Q.    Do you know how you got these documents?

25     A.    I thought -- and -- and for some reason, I

1   thought that I had eliminated them.  Because it, to

2   me, it was a -- you know, what can you say?  You're

3   good to me.  I like you.  I respect you.  You --

4   you -- but you're a married man and the last thing I

5   want is to -- to destroy, you know, your relationship

6   or what relationship you have with your family.

7        Q.    And what was your reaction when you got

8   these text messages from Dr. Spivey?

9        A.    Very uncomfortable and very sad.

10       Q.    Why were you sad?

11       A.    I was sad because, you know, again, this is

12  my perception, he -- he was so desperate, he was

13  unhappy.  And he had said to me that -- that he --

14  when he was in California, he tried to leave Sherry

15  and he found someone that he fell in love with.  And

16  he went to a psychiatrist to help him get away from

17  her.  But the psychiatrist had a -- or

18  psychologists -- the psychologists had a stroke.  And

19  he felt like that was a omen that he needed to go

20  back.

21            And so it seemed like he's had this

22  struggle.  And from the way he talked to me -- and he

23  talked to me early on about a lot of the problems.

24  It's just been a struggle.  And he said to me and to

25  Vicky Sweisgood and to Anne Thomas during her

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 78 of 127

CONFIDENTIAL

1    Q.    Okay.

2    A.    I'm sorry, I got them -- my definitions are

3  horrible.

4    Q.    Okay.  So do you recall any other

5  communications in writing between you and Dr. Spivey?

6    A.    I can't.  We just -- another -- and this was

7  in March 2014.  I've got that -- was that '14 -- I was

8  at -- in Charleston.  And I had four -- five

9  girlfriends.  And we were on the porch.  We were at

10  the -- jumping in and out of the pool, we were having

11  a good time.  And the cellphone rang.  And it was him.

12        He said, I got to see you and I'm coming

13  down.  I said, no, you're not.  I've got a house full

14  of girls here and you're not -- you're not going to do

15  it.  And -- and -- and we started talking a little bit

16  about the office.  And I remember, I said, just --

17  there's some people there, Dr. Spivey, they're just

18  not pulling their weight, they're not doing anything,

19  there's no -- no oversight with them, da, da, da, da.

20  And he said, oh, what you wearing?

21        So and that's why it's sad.  Because I

22  wasn't -- I mean, I am not the person that can do for

23  him what he needs.

24    Q.    Did Dr. Spivey ever have any conversation

25  with you where he said that the relationship just

1   needed to be professional and that the two of you

2   needed to stop flirting with each other?

3        A.   Never.

4        Q.   You don't recall that at all?

5        A.   No.  If you got that in writing, I'd like to

6   see it.

7

8                    **Not Cited in Brief**

9

10

11

12

13

14

15

16

17

18

19

20        Q.   Did you tell Ms. Nagelski about the text

21   messages?

22        A.   At first, I did not.  Because I -- I that

23                    **Not Cited in Brief**

24

25

1   you know, mom's, you know, having a -- a fling with

2   Dr. Spivey.  You know, it's -- so that's why I thought

3   that I had gotten rid of -- of several of them, but

4   obviously, I didn't.  But, no, she did not know till

5   ███████████████████████████

6       Q.    And that's when you told her about the text

7   messages?

8       A.    Yes.  And I told her why I didn't tell her.

9   And I just --

10      Q.    Did you -- was there anything else you

11  shared with her about Dr. Spivey, other than the text

12  messages?

13      A.    No.

14      Q.    Okay.

15      A.    No, absolutely not.

16      Q.    And after you told her about the text

17  messages, did she ask to see them?

18      A.    No.

19      Q.    Did you show them to her?

20      A.    No.

21      Q.    Do you know if Ms. Nagelski ever initiated

22  any sort of investigation related to the text

23  messages?

24      A.    Wait.  Who -- who did what?

25      Q.    Did Ms. Nagelski ever complete an

1    investigation relating to the text messages?

2        A.    No.  No.  No.

3        Q.    Okay.  Is there anything else that happened

4    with Dr. Spivey?

5        A.    Well, October of 2015, it was kind of an

6    interesting little -- very interesting situation, in

7    that I had walked into his office during the day,

8    active, and -- and he was on the phone with Jennifer

9    Bailey, and they were having a little bit of

10   a (onomatopoeia), Jennifer Bailey (onomatopoeia).

11   And -- and he hung up and he was a little -- I was

12   standing in front of his desk.

13            He was a little bit irritated with Jennifer.

14   And he said, oh, I apologize for Jennifer.  She was a

15   little pissy today.  And I laughed and I said, well,

16   Dr. Spivey, anybody can be pissy.  I can be pissy.

17   You can be pissy.  And then with that, it was like, he

18   became fixated, stood up, walked around the desk

19   and -- and the door was open.  And he grabbed me up

20   and he gave me a smooch.

21            And I mean -- my eyes were open.  I'm

22   looking down the hall because it's a highly active

23   hall.  And I'm just waiting for Sherry or Jennifer or

24   somebody to come down the hall.  And that -- that --

25   it would have been all over.  It would have been all

CONFIDENTIAL

Page 208

1    over.  And I just said to him, I think I better go.

2    And I walked off.  It was very --

3        Q.    Do you know what day of the week it was?

4        A.    I don't know.  I want to say it was the end

5    of the week.  But I can't -- I can't -- I do know it

6    was October, the leaves were turning.  And -- and then

7    also -- well --

8        Q.    Do you remember what time of day it was?

9        A.    Actually, it was about one or two o'clock in

10   the afternoon.  I mean, it wasn't at the end of the

11   day or the beginning of the day.  It was a busy time.

12       Q.    Did you tell Ms. Nagelski about this

13   incident?

14       A.    No.

15       Q.    Any reason why?

16       A.    Well, even though I think there's a

17   assumption that Susan and I talk more than we do, we

18   don't.  She is in Huntersville.  I'm in Winston-Salem.

19   She'll go -- most I've really seen her when we were

20   working with PPM was when she'd come into the office.

21   She had her life and -- and she enjoyed her job and

22   she was very busy.  And I was back and forth to

23   Charleston.  So we did not -- I mean, we didn't hang

24   together.

25       Q.    Anything else happen with Dr. Spivey?

Veritext Legal Solutions
800-567-8658                                      973-410-4098

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 83 of 127

CONFIDENTIAL

1    A.    Those were the main ones.  And I can't think

2  of others.

3    Q.    Did Dr. Spivey ever ask you out on a date?

4    A.    No.  We did go -- well, he interviewed a

5  doctor and I was there, and walked me out to the car.

6  It was -- it was -- gave me a hug.  But it was not --

7  but the only date was with -- when we took a doctor to

8  dinner.  I'll say a date, meaning the only time we

9  were outside the office together.

10    Q.    Do you remember the name of the doctor?

11    A.    He was -- we were interviewing him.  And we

12  went to -- oh, we'd go to different places.  One --

13  here we go, Nobles Grill, Melders.  That's the only

14  two that -- that I think Dr. Spivey enjoyed going to.

15    Q.    Do you remember the name of the doctor that

16  you were interviewing when Dr. Spivey gave you this

17  hug?

18    A.    Well, no.  But I -- I see his face.  He's --

19  but no.  I don't know why I keep thinking he's from

20  Texas.  But he was very -- Dr. Spivey liked him and

21  was hoping that he would be a viable candidate.

22  But --

23    Q.    Do you remember when this was?  The year is

24  fine.

25    A.    I was standing out in the parking lot at

Page 210

1   Nobles but I can't give you the -- the year.  I

2   can't --

3       Q.    Was this when you were at the old building

4   or the new building?

5       A.    That -- usually I can always think back, I

6   could say, okay, were we inside the new building, were

7   we inside the old building?  We were outside.  I'm

8   going to guess it was sometime around 2013 or '14.

9   But I -- that's only a guess.

10      Q.    So the only time that you and Dr. Spivey

11  went to dinner alone -- or excuse me, went to dinner

12  was when you were interviewing a doctor; is that

13  correct?

14      A.    Yes.  But we only did that -- how many times

15  did we do that?  Two or three times.  I mean, it's

16  like it was an every week thing.  I think it was only

17  a total of two or three times.

18      Q.    And was Mrs. Spivey also present for these

19  dinners?

20      A.    She was present for one or two.  But there

21  were two or three times that we went together -- or

22  met.  We didn't drive together.  We -- we met at the

23  restaurant.

24      Q.    Did Dr. Spivey ever call you into his

25  office?

1    A.    Well, yes, but for business purposes.

2    Q.    And was it ever just the two of you?

3    A.    A lot of times, it was just the -- the two

4    of us.  But usually the door was open.  I don't recall

5    a time -- and I -- and I -- I don't recall that I was

6    ever in his office with the door closed.  The office

7    door stayed -- his office door stayed open most of the

8    time.

9    Q.    So the door was open when you were in there?

10   A.    Yes.

11   Q.    Anything else involving Dr. Spivey?

12   A.    That's all that just jumps right out, unless

13   you have more information.  But that's all that --

14   that I can recall at this time.

15   Q.    Okay.  Was there ever a time that you were

16   in doctor's office -- in, excuse me, Dr. Spivey's

17   office at the old office, laying on the floor, looking

18   at some plans for the new office?

19   A.    Uh-huh.  Yeah, I remember that.

20   Q.    And you were discussing the plans for the

21   new office?

22   A.    Yes.  And the floor was the only place you

23   could roll those things out.  And he was at his desk.

24   He did not leave his desk.  And I was sitting on the

25   floor with the -- the plans rolled out.  So he was not

1    on the floor with me or anything.  He was very

2    professionally sitting behind his desk.

3         Q.    Was there a conference room at the old

4    building?

5         A.    Yes.  But it was on the other side.  I mean,

6    it was -- it was -- and -- and they usually cut the

7    lights off too over there on that side.  But...

8         Q.    Okay.  Earlier today, I think you had

9    started talking with us about a conversation that you

10   had had with Dr. Spivey after Ms. Nagelski was

11   separated from employment.  Do you recall that?

12        A.    Oh, yes.

13              (KOVALICH EXH. 13, email, KN 00039 through

14   41, marked for identification.)

15   BY MS. SMITH:

16        Q.    Okay.  Let me show you a document.  We'll

17   mark this as Exhibit Number 13, and ask if you

18   recognize it.  Do you recognize this document, Ms. --

19        A.    Yes.

20        Q.    -- Kovalich?

21        A.    I'm just reading it right along, yes.

22        Q.    Okay.

23        A.    Yes, I had stated a lot of this earlier.

24        Q.    Okay.  And did you send this email the same

25   day of the conversation?

1    A.    If that is the date I sent it.  I'm going to

2    say that would be in or around the same day.  Because

3    I knew it was -- I was thinking it was the 14th, but

4    I -- I don't remember speaking of it.  And that call

5    was on the 14th.  But I -- this says the 12th.

6    Q.    And it does say Dr. Spivey called me this

7    morning --

8    A.    Yes.

9    Q.    -- does it not?

10    A.    This may be the same call.

11    Q.    Okay.  So earlier, when you testified it was

12    March 14th, does this refresh your recollection that

13    it is more likely March the 12th?

14    A.    It's probably March the 12th.

15    Q.    Okay.  And does this email accurately

16    reflect your conversation with Dr. Spivey on that

17    date?

18    A.    So far, yes.  This, yes.  Yes.

19    Q.    Okay.  And after you sent this email, did

20    you have a conversation with Ms. Nagelski about the

21    conversation with Dr. Spivey?

22    A.    I don't recall, but I probably did.  I mean,

23    that would be -- the damage was already done.

24    Q.    What do you mean by that?

25    A.    With -- with Suzanne.  As I said earlier, I

1    had never seen her being so tortured and having all

2    her hard work -- and she kept Dr. Spivey -- I mean,

3    she kept those records, she kept everything -- and I

4    think he just took it for granted that anybody could

5    do it.  And after he fired her, he realized, my God, I

6    need her.  I mean, she did it all.  Whoever I hired to

7    replace her can't do it so, you know.

8            And so -- but the damage was already done.

9    There was no going back.  There was no going back.

10   And Vicky did say that -- and Stephanie did say that

11   they were given one-month salary for every year they

12   were there.  Well, it's really easy, because Vicky was

13   there just two, maybe three years.  It was -- but

14   Suzanne was there almost nine.

15       Q.    Did you see the paperwork?

16       A.    No, I did not.

17       Q.    So you don't know if that's true or not?

18       A.    Well, Vicky, I trust very much.  As far as

19   Stephanie, I didn't know her that well.  But Vicky, I

20   would believe.

21       Q.    So it's Vicky telling you that this is what

22   she received and you believed her?

23       A.    Yes.

24

25

**CONFIDENTIAL**

Page 215



Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 90 of 127

1    she left.

2        Q.    So why could Ms. Nagelski not use Dr. Spivey

3    as a reference?  What was the belief that he would not

4    give her a good reference?  What was basis for that,

5    in that your opinion?

6

7

8    And -- and we didn't know if it was him.  Now -- or if

9    it was someone like Sherry, Mary Benton or Wendy to

10   be -- I think Dr. Spivey would have done the right

11   thing.  But you never know, when you call in for a

12   reference, who you're going to get.  Because, you

13   know -- she didn't want to take that chance.  She did

14   not want to take that chance.  If he had just written

15   her a nice letter, appreciated her, given her a nice

16   severance, I don't think there'd be a problem.

17       Q.    Okay.  Earlier, you had said that the folks

18   had not been trained to give references?

19       A.    I -- I -- I didn't say they hadn't.  I said

20   obviously someone -- if -- if Brandy or anyone was

21   telling a potential employer that someone's work

22   wasn't good enough, I mean, that is a very litigious

23   situation.  I mean --

24       Q.    I understand.  But you had said that it was

25   obvious that the folks had not been trained, I

1    believe.

2        A.    In my perception, it was obvious.  Because I

3    do believe if -- if Dr. Spivey or whomever is

4    Dr. Spivey's representative, had -- had said -- and

5    that would have been -- this is something you don't

6    do.  Train the people --

7        Q.    And isn't that the job of human resources,

8    to take care of references and train folks in giving

9    references?

10       A.    Well, yes, unless there is something --

11   there was divided loyalty in the office.  There was,

12   in my opinion, this is what I saw.  It doesn't mean

13   it's true.  There was divided loyalty.  It was either

14   her staff or his staff.  And if you were his staff,

15   she had nothing to do with you.  If you were -- you

16   know, you had -- you couldn't serve two masters.  He

17   would say to do something.  She would come and say,

18   don't do it.

19   ████████████████████████████████████████████████████

20   was given out, your daughter, Ms. Nagelski, was in

21   charge of human resources, correct?

22       A.    Yes, she was.

23             MS. SMITH:  Okay.  The court reporter only

24   has about five more minutes, so we'll and go ahead and

25   take a break right now.

1    THE VIDEOGRAPHER:  We're going off the

2  record at 4:43 p.m.

3              (A recess transpired.)

4    THE VIDEOGRAPHER:  This is the beginning of

5  media unit number four of the videotaped deposition of

6  Rebecca Kovalich, May the 18th, 2018.  We are on the

7  record at 5:02 p.m.  Please continue.

8  BY MS. SMITH:

9    Q.    Ms. Kovalich, prior to the break, you were

10  talking about the fact that there was a divided

11  loyalty and it was either her staff or his staff.  Who

12  was the her and the his that you were referring to?

13    A.    Well, I understand the first part of your

14  question.  What was the last part?

15    Q.    Yes, ma'am.  Prior to the break you had

16  given some testimony.  And you said that there was a

17  divided loyalty and that it was either her staff or

18  his staff.  And I'm just trying to figure out who the

19  her was.  Is that Sherry --

20    A.    Yes.

21    Q.    -- Spivey?

22    A.    Yes.

23    Q.    And the his, was that Dr. Spivey?

24    A.    Yes.

25    Q.    Okay.  And we talked about some instances

1    that you had some issues with Ms. Spivey.  Do you

2    remember any in 2015?

3        A.    I don't recall.  I -- it may have been, but

4    the ones most outstanding, I have already articulated

5    to you.  But there probably have been more.

6        Q.    Okay.  And on -- just to ask the question,

7    were there any issues that you recall with Sherry

8    Spivey in 2016?

9        A.    I don't recall.

10       Q.    And as I said before, if we're going through

11   the deposition, if you remember something and need to

12   go back and refresh your -- rechange your answer,

13   whatever, let me know.  Okay?  You had talked about

14   some various incidents with Dr. Spivey.  And there in

15   the complaint, you talk about an incident November

16   2014.  Said that you were in a conference room with

17   Dr. Spivey and another physician.  Do you remember

18   anything about this?

19       A.    What 2014?  What date?

20       Q.    November 2014.

21       A.    Oh, that was with Dr. Scherzo.  We were

22   looking at what test he felt we needed for

23   Dr. Spivey's age management.

24       Q.    And where were you meeting?

25       A.    We were meeting in the -- the conference

1    room in the new office.

2         Q.    At Maplewood?

3         A.    Yes.  Oh, yes.  There was a -- a small

4    incident there.

5         Q.    And do you remember what time of day this

6    was?

7         A.    This was around six o'clock at night.

8         Q.    Were there any folks there, other than you,

9    Dr. Spivey and Dr. Scherzo?  And I can't say his name,

10   I'm sorry.

11        A.    Scherzo.  Here's the thing, it's so short,

12   short-so.

13        Q.    Short-so, okay, thank you.

14        A.    Not that I know of.  It was Dr. Spivey,

15   Dr. Scherzo and me.  And I don't know if anybody else

16   was in the building or not.  You couldn't tell.

17        Q.    And was the door to the conference room

18   open?

19        A.    Yes.

20        Q.    Tell me what happened?  You said there was a

21   little incident.

22        A.    Well, Dr. Scherzo -- that's why we called

23   him Dr. Mark, took a -- had to take a phone call.  And

24   he went outside the conference room, down the hall to

25   his office.  And Dr. Spivey sat there and said, you

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 95 of 127

1   know, I gave you a chance.  And he got up, walked out

2   the door.  Just -- I mean, it was very small, but it

3   was just so like, this is it, you know, this is it.

4   So I don't know.  He said, you know, I gave you a

5   chance.  And that was all he said and he got up and

6   left.

7       Q.    So those were the only words when the two of

8   you were together?

9       A.    Uh-huh.

10      Q.    Did you say anything in response?

11      A.    No.  There was nothing to say.

12            (KOVALICH EXH. 14, Verification, marked for

13   identification.)

14   BY MS. SMITH:

15      Q.    Let me show you a document, Ms. Kovalich.

16   We'll mark this as Exhibit Number 14.  And ask if you

17   recognize that.

18      A.    I had read it.  I mean, I -- I know what

19   this is.

20      Q.    And is that your signature?

21      A.    Yes, it is.

22      Q.    Okay.  And is that just an -- and

23   affirmation that your interrogatory responses are

24   correct to -- and true, to your knowledge?

25      A.    I say, yes, I mean, they're -- I don't know

1  if there's any little -- little innuendoes.  But --
2  but when I read it, it was pretty cut and dried of
3  what -- but I need to go back and -- and refresh it
4  before I say to you, this is absolutely a hundred
5  percent.
6       Q.    But as of the time you submitted your
7  verification pages, the answers were true, to the best
8  of your knowledge?
9       A.    Yes, I had read it.  I had read it, that --
10           (KOVALICH EXH. 15, email, KN 00044 through
11  46, marked for identification.)
12  BY MS. SMITH:
13       Q.    Let me show you a document.  We'll go ahead
14  and mark this as Exhibit Number 15, and ask if you
15  recognize that, please?  Do you recognize this
16  document, Ms. Kovalich?
17       A.    Okay.  This is -- I have to read it because
18  it's not that I haven't seen, I just -- it doesn't --
19  it doesn't flash in front me.
20       Q.    No, that's fine.  Is this an email from Sue
21  Nagelski to you?
22       A.    Well, obviously it's an email from Sue to
23  me.  I have to...
24       Q.    And was it dated April 28th, 2017?
25       A.    Well, it says so here.  So you can't

CONFIDENTIAL

1    disagree with that.

2         Q.    Do you know --

3         A.    Yes, ma'am.

4         Q.    Do you know why Ms. Nagelski sent this email

5    to you at that time?

6         A.    Well, one, she had just been --

7         Q.    Did you ask Ms. Nagelski to send you this

8    email?

9         A.    No.

10        Q.    Do you know if Jennifer Bailey worked for

11   RJR?

12        A.    I never did a background check on her.  And

13   I have no idea where she worked before, except for

14   Carolina Liquid Chemistries, because she came --

15        Q.    So if she wrote software for RJR, you would

16   not have any reason to dispute that?

17        A.    Well, I'd need to -- if I were hiring her, I

18   would definitely have checked out her -- her

19   background.  And I can't dispute that.

20        Q.    Did you ever have any problems with

21   Ms. Bailey yourself?

22        A.    No, I didn't.  She -- except when

23   Dr. Spivey -- well, she -- she never -- she --

24   Jennifer Bailey never confronted me.  She and I had

25   no -- we gave each other wide birth.  I mean, we just

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 98 of 127

CONFIDENTIAL

1    didn't get -- our paths didn't cross that much after

2    she left the laboratory.  And I was very nice to her

3    when she moved over to work with Sherry at clinical.

4        Q.    Did you recommend her for hire in the lab?

5        A.    No.  Again, Carolina Liquid Chemistries sent

6    her over to fill in when Sue Freeny was out.  And it's

7    one of those situations that she just stayed.  And --

8    and most of the time, for the first month or whatever

9    -- I can't give you a timeframe -- she was being

10   trained by -- by Sue Freeny.  And -- and because Sue

11   was getting ready to go on vacation, she wanted to

12   make sure that Jennifer knew how to do everything.

13   And -- and she felt comfortable that she did.  And

14   then, when she went on vacation, she found out -- we

15   found out -- I found out that Jennifer had trouble

16   remembering what to do.  And it may be I would too if

17   somebody just trained me.

18

19

20

21

22

23   was told that she could do it.  So we needed her.

24   We -- we brought her in.  And -- and the rest is

25   history.

CONFIDENTIAL

Page 228



Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 100 of 127

Page 229



CONFIDENTIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1    with the lab reimbursement reducing, he was cutting

2    costs?

3        A.    Yes.  And I couldn't understand later --

4    well, why didn't he say -- make me an offer, this is

5    what I thought.  Just it's -- it's like in this email,

6    he was telling me how wonderful I was, how he couldn't

7    have made it without me, da, da, da, da.  And he's

8    sitting there just telling me that I built his company

9    and da, da, and all this wonderful thing.  And I'm

10   sitting there while he's saying this, thinking, if I

11   was saying this to an employee, that employee wouldn't

12   be fired.  I mean why would you fire somebody that --

13   that you felt this way about?

14           That -- and but he said, oh, I paid you over

15   a $100,000.  Well, that, yeah, but like, what, that's

16   like $10,000 a year?  I mean, he felt like he -- he

17   said it was been -- right here -- I've been more

18   than -- he, me -- I've been more than adequately

19   compensated.  Well, for what I did, that would be like

20   $10 a year -- I mean $10,000 a year.  I was -- and if

21   you want to research the job market, people who do

22   what I do, is well over 150, 175, 200,000 to get

23   something up and going like that.  Depending on the

24   size.  And maybe not with Dr. Spivey.  But a large

25   practice or a hospital.  And he felt like he -- he had

1    just done a good, great deal for $10,000 a year for

2    the whole time I was there.

3            And yes, he made a lot of money off that

4    laboratory.  And that was all well and good.  I didn't

5    want part of that.  I would just like a little -- just

6    negotiate with me.  Say, you could do over -- why

7    don't you go on retainer, 2- or $300 a month, make

8    sure that everything's fine, come visit here once a

9    month.  Just something on that -- and -- and that

10    really hurt as -- for -- it would have been very

11    difficult, not impossible, for him to have got to

12    where he got without the help of someone that had the

13    competency that I did.

14            And not too many people have -- in fact, at

15    one time, I was the only woman that was not a doctor

16    or a med tech that ever owned their own laboratory.

17    So he -- he had a very -- to me, now of course, I'm

18    marking myself.  But he had the best of the best.  And

19    I made it look so easy, he felt like, eh, anybody can

20    do that.  So it hurt.

21        Q.    Ms. Kovalich, so I know you had testified

22    that, at one point, you were making $5,000 per month.

23    I think that was beginning around 2013?

24        A.    Yes.  And I think he resented paying that to

25    me because, as we -- we discussed, well, you're kind

1 of not needed.

2     Q.    And then in 2014, I think your compensation

3 was raised to $6,000 per month; is that correct?

4     A.    Yes, it was. He was doing it as a -- he was

5 very happy because that year -- and he told me, he

6 said -- basically he said, I made the most this year.

7 And I think, from what he said, he compensated other

8 people too. But that wasn't my business. But he was

9 very happy that -- that that practice was doing so

10 well.

11     Q.    And as a matter of fact, you were paid well

12 more than a $100,000; isn't that correct?

13     A.    Well, give or take. I didn't add it up.

14 What -- if -- to add it up, I think I worked there

15 three years with -- for nothing. And then $750 a

16 month when the first analyzer came in. It's probably

17 120, 130. But this is over a ten-year period.

18     Q.    Well, if you got paid $5,000 per month for

19 2013, that's like $60,000 per year --

20     A.    Yes.

21     Q.    -- is that correct?

22     A.    Uh-huh.

23     Q.    Okay. And if got paid $6,000 per month for

24 2014, that's $72,000 per year; is that correct?

25     A.    Yes.

CONFIDENTIAL

1      Q.    And if you got paid 6,000 per month for

2   2015, that's another $72,000, correct?

3      A.    Well, yes, the addition is correct.  But

4   with that -- I think if -- if Dr. Spivey had -- had --

5   had communicated a lot to me -- I really didn't buy

6   that it was financial.  But yes, his -- the money was

7   coming down.

8      Q.    So --

9      A.    But I --

10     Q.    Just those three years, you would have made

11  close to $200,000 or more, correct?

12     A.    What in -- over -- over a ten-year period.

13     Q.    Over -- from 2013, 2014 and 2015, if you add

14  those up, you would have made --

15     A.    Okay.

16     Q.    -- around $200,000 or more for those three

17  year, correct?

18     A.    Yes.  But when he gave me -- when he was

19  giving me the raise, well, all -- everybody the raise,

20  I didn't want a raise.  I mean, really, at that

21  time -- I mean, I took it; I thought that was great.

22  But -- and if he had just said, why don't we start

23  reducing -- would you -- let's look at some options.

24  Why don't you just work on a, you know, PRN or

25  let's -- let's do something.  We could have -- and but

CONFIDENTIAL

1  just to basically -- and he never sat down with me at

2  anytime prior to that and said, you know, Rebecca, you

3  know, is there a way that you can cut your -- your

4  cost -- my cost?  My expense is going up, my income is

5  coming down.

6          Is there anything, you know, we could -- is

7  there any enhancement or, if there's not, would you

8  like to go back to your part-time position?  You know,

9  the thing is we just -- we just needed to sit down and

10 talk, not just walk in the door, oh, I got a note from

11 him, oh, show up at the lab at two o'clock or one

12 o'clock or whatever time.  And just get swept -- swept

13 out.

14         That's not the way to do it, unless

15 you're -- to me, unless you're hostile.  You -- you

16 need to prepare somebody.  And then let me have the

17 option, well, Dr. Spivey, I don't think $300 a month

18 to come in here and see that -- you know, fine.  There

19 were so many ways to shake hands and -- and -- and --

20 and do the right thing.  But just throwing me out with

21 the dishwater, like I felt like he did Suzanne, me

22 and -- and I perceived he did others, it was just not

23 the way -- it's not firing.

24         Dr. Spivey -- he can fire anybody he wants

25 to fire; if he employees them, he can fire them.  But

1   there is a gentle way of doing it, especially a good

2   employee that has enhanced his income significantly.

3   A little bit of gratitude. And he did say, oh, I

4   could do all this stuff. But if he really meant it,

5   he would have kept me on, even on a -- a limited

6   basis, just by minimal basis.

7         Because thing is, if something goes wrong,

8   he could always call me, da, da, da, quiz me. And --

9   or I want to add this machine, I want to do that. He

10   could just pick up the phone, say, for a hundred, $200

11   a month. But he never thought of that. He just

12   wanted to get rid of me.

13     Q.   In your complaint, you have brought a claim

14   for age discrimination. What's the factual basis for

15   your cause of action that you were discriminated

16   against on the basis of age?

17     A.   Well, there were -- it was more than one. I

18   think -- I think the people that were being let go

19   that had good work -- or no problems in their work

20   record were over 40. And some of them felt like if --

21   if they stayed any longer, they would be fully vested

22   and more difficult to -- more expensive for

23   Dr. Spivey. I don't know. But I think the office as

24   a whole were getting rid of over-40 people. Because

25   they tax the insurance. I mean, they're more

1    expensive.  They're -- they tax the insurance.  He has

2    to pay more for them.  Many of them have the -- the --

3    would be eligible that December for vesting.  There

4    was just -- it was -- it was just better to get rid of

5    the older people because they're sicker and they're

6    not as --

7        Q.    And that's just your belief; is that

8    correct?

9        A.    That's my belief.  But -- but insurance

10   companies, many of them -- and I don't know how this

11   was set up.  The older you are, the more expensive you

12   are to the company.

13       Q.    Okay.  Now you had testified that you

14   couldn't even remember how many hours you were working

15   in the office during the 2015 and 2016 timeframe.  Is

16   it safe to say, based on your recollection of the

17   times that you were in the office, that you would not

18   have a real good idea as to how these employees were

19   performing?

20       A.    Oh, no.  I -- I didn't have that many

21   employees, but I knew how they were -- I mean, oh --

22       Q.    I'm not talking about your employees in the

23   lab; I'm talking about other employees.  I mean, the

24   lab was in Greensboro, correct?

25       A.    Well, yes.  The laboratory is in Greensboro.

1    You're talking about the office as a whole?

2        Q.    Yeah, and these other folks that were being

3    let go were mainly in Winston-Salem; is that correct?

4        A.    Yes.

5        Q.    Okay.  And you would have had limited

6    interaction with the employees in Winston-Salem; is

7    that correct?

8        A.    Well, many of them had been there a long

9    time, had been hired, had been there a long time, had

10   not had any -- well, I said not had any, but very few

11   if any issues.  And --

12       Q.    But you weren't there on a day-to-day basis,

13   to know how folks were performing in the Winston-Salem

14   office?

15       A.    I wasn't there -- at one time, I was there

16   on a day-to-day-to-day basis.  When -- when --

17       Q.    I'm talking about 2015, 2016 --

18       A.    No.

19       Q.    -- timeframe?

20       A.    I was not.

21       Q.    Okay.  So if these folks had performance

22   problems, it was something that you may or may not

23   know about, given your --

24       A.    Oh, that's true.

25       Q.    -- limited travel to the Winston-Salem

1    office.  Okay.  And you were mainly concerned about

2    the employees in the lab; is that correct?  Because

3    that's who you oversaw?

4         A.    Oh, yes.

5         Q.    Okay.  And none of the employees in the lab

6    were let go, were they?

7         A.    Oh, absolutely not.

8         Q.    Okay.  And Gretchen Hawks is over 40; is she

9    not?

10        A.    She may be.  I don't know, right off the top

11   of my head.  But Dr. Spivey is very fortunate to have

12   her and Rodney.

13        Q.    Okay.  And I've asked you what the factual

14   basis was for your claim of age discrimination.  And

15   you said that, basically, it was your belief that it

16   was better to get rid of the older people.  Was there

17   anything else?

18        A.    Well, Dr. Spivey was so concerned about

19   finances that -- here -- here we go.  It was going to

20   cost him a lot more to keep these people.

21        Q.    Do you know if your position has been

22   filled?

23        A.    It's not been filled and it -- yes and no.

24   It depends on -- on your definition.  Dr. Spivey

25   offered Gretchen my job.  And -- and I had talked to

1   Gretchen because -- and she said Dr. Spivey offered me
2   your job.  And I told him, I cannot do your job, if
3   you're looking at me to do what you could do.  And
4   that's when I said, well, Gretchen, I couldn't do your
5   job either, you know, hands-on, so we're -- we're
6   there.  And so, right after I was fired, she was very
7   scared because she did not know what to expect, she
8   didn't know if she was next.  She didn't know why I
9   got fired.  And I didn't either, except what
10  Dr. Spivey told me, it was financial.  And -- where I
11  didn't share that with her.  I just said, I don't
12  know.
13          So it -- there was an amount of uncertainty
14  at that time.  But Gretchen did say that Dr. Spivey
15  gave her a significant raise and for her to take over.
16  Which she deserves, in my opinion.  And to -- to
17  basically take over as many of my duties as she was
18  comfortable doing.  And again, he's not growing in the
19  lab, then -- then I can understand it.
20      Q.    In your complaint, you also make a claim for
21  sex discrimination.  What is the factual basis for
22  your claim of sex discrimination?
23      A.    The claim is, I do -- and that is only my
24  belief, again, my perception, that Dr. Spivey had to
25  get rid of me -- maybe for financial reasons.  I mean,

1   the email that caused me to tell him that -- and he's

2   a very handsome man and he's very -- there's nothing

3   wrong with Dr. Spivey, except that he's married and I

4   was not romantically interested in him.  And I thought

5   it was causing a lot of rift in the office with

6   Sherry.  Now, what I perceived is she got wind of it

7   somehow, whether she read his email or what, and came

8   in the office with a vengeance.  That's my perception.

9   So it may not be true, but that's my perception.

10          And anybody that had anything to do with me,

11  Suzanne, Vicky, anybody -- anybody that I hired or was

12  loyal to me or what -- friends and family all had to

13  go.  I mean, that was my perception.  And it may not

14  be right, but that's what I truly believe and I

15  believe right now.

16      Q.    In paragraph four, you state that you

17  repeatedly rebuffed Dr. Spivey's --

18      A.    Yes.

19      Q.    -- advances?

20      A.    Yes.

21      Q.    Okay.  And it -- let's go back,

22  Ms. Kovalich, to Exhibit Number 12.

23      A.    Okay.

24      Q.    Okay.  So when Dr. Spivey texted you, he

25  said, at the top, by the way -- or BTW is actually

**CONFIDENTIAL**

1  what he says.  Thanks for the, quote, handsome

2  moniker.  Do you recall --

3       A.     Yeah.

4       Q.     -- calling him handsome?

5       A.     Yeah.  He called me -- he -- when he'd call

6  me, he said, he would usually -- on the phone or

7  something, he'll say, good morning, beautiful.  I

8  said, well, hello Mr. Handsome or Mr. GQ or something

9  like that.  And if -- you know, so that was -- you

10 know.

11      Q.     That was a typical exchange between the two

12 of you?

13      A.     Well, not often.  I would say, you look good

14 today, you got a great tie on.  And if -- I was

15 sincere.  I mean, I always said sincere things.

16 And -- and he would say, oh, you look just beautiful

17 today.  I think you -- you look pretty darn good

18 yourself.  I mean, just little play back and forth.

19 But -- and this is the way it started.  And --

20      Q.     You called him Mr. GQ in one of the text

21 messages --

22      A.     Yeah, I know.

23      Q.     -- isn't that correct?

24      A.     Yes.

25      Q.     Okay.

**CONFIDENTIAL**

1    A.    And sometimes he'd come in.  When he first

2    started, he had on green scrubs and looked scruffy.

3    And then he started wearing suit and tie and he

4    really -- I mean, he -- he looked very, very, very

5    handsome.

6    Q.    Paragraph five, you recount an incident in

7    the winter of 2013, when Ms. Spivey slammed the door.

8    Is that what --

9    A.    Uh-huh.

10    Q.    -- you had already testified to --

11    A.    Yes.

12    Q.    -- today?

13    A.    Yes, yes.

14    Q.    Okay.  You also reference, in paragraph 6,

15    in May of 2014, he called you when you were in

16    Charleston and asked what you were wearing?

17    A.    He wanted to come to Charleston.  And I

18    said, I've got a house full of girls.  Absolutely not.

19    Q.    And are you sure that that was in 2014?

20    A.    I -- yes.  Because -- and I can double-check

21    this.  I was taking pictures of the girls jumping in

22    and out of the pool.  And that was where I pulled the

23    -- it's the same date.

24    Q.    Okay.

25    A.    And that's how I could say -- be certain

1    very good organizational skills.  And Dr. -- I mean,

2    Gretchen said Sherry and Mary Benton came out to the

3    lab -- now this is while I'm supposed to be -- I'm

4    still working, have no idea that they're getting ready

5    to fire me.  Come out there.  And Sherry hands

6    Gretchen her card.  And said, from now on, you start

7    calling me if you have a problem.  And --

8        Q.    And who said that?  Sherry said that?

9        A.    Yes.

10       Q.    Okay.

11       A.    And she had Mary Benton.  And Gretchen told

12   me later that she said, I -- I -- after you left, I

13   chose to stay on one condition.  I told Dr. Spivey the

14   condition:  I never have to deal with Sherry or Mary

15   Benton.  I will only deal with you.  I will not have

16   them come in here and tell me what to do, what not to

17   do, as my boss.  And Dr. Spivey agreed, which is the

18   right way to do it, if he wants to keep the lab going.

19       Q.    In 2014, you said that Ms. Spivey brought in

20   another employee and gave her my -- my tasks.  Okay.

21   And was that Mary Benton --

22       A.    Yes.

23       Q.    -- in 2014?

24       A.    Yes.

25       Q.    Okay.  And what tasks of yours did Mary

1      Q.    Okay.

2      A.    But he felt like -- well, I know, he felt

3  like he was going to be saving a lot of money doing it

4  himself.

5      Q.    Paragraph nine, you said that, in February

6  2015, you were walking to your car, Dr. Spivey pulled

7  up in his car, he got out, he grabbed me, picked me up

8  and spun me around in circles?

9      A.    Yes.  He had just gotten out of rehab for a

10  couple week.  And I was walking to my car.  It was

11  during the day.  And he was so happy to see me --

12  which was -- and -- and he started -- he got out of

13  his car, he started laughing.  And he just picked me

14  up and started swinging me around the parking lot.  I

15  mean, it was nothing romantic or sexual, it was

16  just -- it was just fun.  But I was very apprehensive

17  about somebody walking out the door and

18  misinterpreting that little -- that little swing.

19      Q.    Okay.  And then you say, in October 2015,

20  that you walked into Dr. Spivey's office to ask him a

21  question.  He was on the intercom.  He looked at you

22  said, she's pissy today.  And who was that -- I think

23  you testified this --

24      A.    Yes.

25      Q.    -- earlier --

Case 1:17-cv-00854-TDS-LPA   Document 42-2   Filed 10/01/18   Page 117 of 127

1  A.   Yes.

2  Q.   -- is that in reference --

3  A.   That was Jennifer.  He was having a few

4  words with Jennifer.  And he -- I mean it wasn't hot

5  or anything.  But he apologized for her because I

6  could hear her on the speaker phone, and she was

7  pretty short with him.  And he said, well, she just --

8  she's -- you know, excuse her, Rebecca, she's just

9  pissy today.  So, yes, that was Jennifer Bailey.

10  Q.   And then Dr. Spivey, according to your EEOC

11  charge, he grabbed you and kissed you?

12  A.   Oh, yes.  At that -- oh, absolutely, at that

13  time.

14  Q.   Did you report this to Sue Nagelski?

15  A.   No, I mean, kind of -- why -- why?

16  Q.   Did you consider that you were being

17  sexually harassed?

18  A.   Well, who do I report it to?  What was

19  Suzanne going to do?  She was getting ready to get

20  fired.  I mean, what was -- I mean, what could she do,

21  go to Dr. Spivey and say, keep your hands off my mom.

22  I mean, what could she do?

23  Q.   That was not the question.  The question

24  was:  Did you consider that you were being sexually

25  harassed?

```
 1      A.    I felt like I was -- I hate to use the word
 2   harass because Dr. Spivey never grabbed me up, threw
 3   me in the closet or -- or anything.  But it was
 4   sexually -- it was uncomfortable, unprofessional and
 5   it put me a -- a bad situation, knowing that Lisa and
 6   Suzanne were working in that office.  And it -- it was
 7   just not a good thing.  But -- but who do I report it
 8   to?  I mean, the -- the chart -- organizational chart,
 9   I report directly to Dr. Spivey, everything I do, I
10   report direct to Dr. Spivey.  And...
11      Q.    So you did not report it to human resources?
12      A.    No.
13      Q.    Did you tell anyone about that?
14      A.    I -- I can't recall.  I think I was so
15   stunned -- I can't recall.  I can't recall if I said
16   anything to -- I wouldn't -- I don't think I would
17   have said it to anybody.  I wouldn't say -- if I was
18   going to say it to somebody, I would have told
19   Suzanne.  But there was no purpose at that time.
20      Q.    Did you tell Vicky?
21      A.    I don't know.
22      Q.    Where did Dr. Spivey kiss you?
23      A.    On the lips.
24      Q.    And it was just one kiss?
25      A.    Yes..
```

 

Salem this afternoon. I'm not freaked out, I think our situation differs from this one.

But I think we might want to make sure.

Oct 22, 2013, 7:57 PM

Rebecca my beauty,

I never heard back from you today about the Jered situation.

Sorry I couldn't talk more today but things were hectic in Greensboro.



   

Thursday, October 24, 2013

Rebecca Kovalich

Jered has results you need. Left it on Vicki voicemail. But she is in meeting

1:04 PM

David Spivey, MD

Object of my desire,

I am texting you rather than calling Jared because of your request that lab problems be routed through you.

I tried to reach Jered today unsuccessfully both by land line (1406) and cell phone.

This is unacceptable.

Where are you?

6:09 PM

Rebecca Kovalich

Briefly in IOP. Didn't u get my message that he sent the results? The nitrogen generator makes a lot of noise. I will go to GSO as soon as I return and but a Cow Bell on his phone.

6:27 PM

DEPOSITION
EXHIBIT 3/18/18
11
Kovalich

KN 00301

Kovalich Dep. Ex. 12
Text Messages

FILED UNDER
SEAL

Kovalich Dep. Ex. 13
03/12/2016 Email
from Kovalich

**FILED UNDER
SEAL**

Kovalich Dep. Ex. 17

FILED UNDER
SEAL

EEOC Form 5 (4/009)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |
| | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) Ms. Rebecca Kovalich | Home Phone (Incl. Area Code) (336) 817-3999 | Date of Birth 1944 |
|---|---|---|
| Street Address 141 Mayfield Road | City, State and ZIP Code Winston-Salem, NC 27104 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name Preferred Pain Management & Spine Care, P.A. | No. Employees, Members 20+ | Phone No. (Include Area Code) 336-760-0706 |
|---|---|---|
| Street Address 2912 Maplewood Avenue | City, State and ZIP Code Winston-Salem, NC 27103 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Street Address | City, State and ZIP Code | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 2013  Latest: June 9, 2016

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)).

See Attached.

DEPOSITION EXHIBIT 5/18/
19
Kovalich

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

12/1/16  *[signature]*
Date  Charging Party Signature

NOTARY – When necessary for State and Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT *[signature]*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

KN 0772

## Rebecca Kovalich v. Preferred Pain Management & Spine Care, P.A.

### EEOC Charge Attachment

1. In or around 2013, the Company hired me to be a Lab Administrator at the Charlois Boulevard location in Winston-Salem, North Carolina. Prior to that, I had done regular contract work with the Company for many years. By all accounts, I was a terrific employee and never received any sort of written or verbal discipline during my time with the Company.

2. Starting in 2006 or 2007, while I was doing contract work for Dr. Spivey, my boss, he began regularly hugging me. He would make innuendos, and engage in other behavior that would qualify as inappropriate, but I did my best to ignore it.

3. However, in 2013 and 2014, Dr. Spivey's sexual harassment accelerated. Dr. Spivey began emailing me what were, essentially, love letters.

4. I repeatedly rebuffed these advances.

5. In the winter of 2013, Mrs. Spivey—Dr. Spivey's wife who also worked for the Company— berated me in a conference room in front of other employees. As I tried to leave, she repeatedly slammed the door and yelled, "Fuck you, Rebecca!"

6. In May 2014, Dr. Spivey called me while I was in Charleston, South Carolina. He told me that he was coming to Charleston and said that he had to see me. I told him "no." On this same call, he interrupted me and said, "What are you wearing?"

7. In November 2014, I was in a conference room with Dr. Spivey and another doctor. The other doctor left the room to take a phone call, and Dr. Spivey looked at me and said, "You know, Rebecca, I gave you a chance." He then stood up and walked out of the room.

8. In 2014, Mrs. Spivey began blatantly targeting me. For example, she brought in another employee and gave her my tasks. Then, Mrs. Spivey took charge of the lab, which I had previously controlled. I was also responsible for lab billing coordination with the billing service Physician Directions, and they took that away from me in February 2015. Ultimately, I ended up doing that job again because no one else could do it.

9. In February 2015, I was walking to my car in the parking lot. Dr. Spivey pulled up in his car. He got out, grabbed me, picked me up, and swung me around in circles.

10. In October 2015, I walked into Dr. Spivey's office to ask him a question. He was on the intercom. I was standing in front of his desk. Then, he disconnected the call, came around the desk, looked at me and said, "Excuse her; she's pissy today." I said, "Dr. Spivey, everybody can be pissy." All of a sudden, he snapped, looked at me intensely, grabbed me, pulled me

1

close, and started kissing me. His door was open and I was facing his door, scared to death that somebody would see what was happening. I froze. Then, I looked at him and said, "I think I need to leave."

11. In March 2016, Dr. Spivey called me and told me that my daughter, Sue Nagelski, was being let go. I told him that it was between him and Sue. She retained counsel and was alleging that her termination violated the ADEA, Title VII, and other various employment statutes.

12. He then said, "My attorney told me not to approach Sue; would you please see what you can do to get her to drop it?" He said, "Tell her that I will give her whatever she wants as long as she drops it." I told him that I did not want to get involved. I also told him that I thought he was very cruel in how he handled Sue's case.

13. He wouldn't drop it. He stated that I could alleged that he was retaliating against me because Sue was threatening to file a Charge. I again told him that it was between him and Sue. However, his odd statement turned out to be a self-fulfilling prophecy.

14. On May 27, 2016, Sue filed a Charge of Discrimination with the EEOC (Charge No.: 430-20156-01529). Dr. Spivey quickly retaliated against me for this.

15. On June 9, 2016, the Company terminated my employment. At that time I was 71 years old.

16. I was replaced by a significantly younger employee.

17. I perceived, and still perceive, a Company pattern and practice of terminating employees in my protected class, namely employees over 40 years old.

18. Accordingly, I believe that the Company terminated me because of my age in violation of the Age Discrimination in Employment Act. I also believe that the Company violated Title VII of the Civil Rights Act by (1) retaliating against and terminating me for engaging in protected activity (declining Dr. Spivey's sexual advances), (2) retaliating against and terminating me in retaliation for opposing discrimination against Sue (also an ADEA violation), (3) retaliating against and terminating me in retaliation for Sue engaging in protected activity (also an ADEA violation), and (4) subjecting me to unlawful sexual harassment.

2