# EXHIBIT

# C

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and SUZANNE )
NAGELSKI, )
                              )
         Plaintiffs, )
                              )
   vs. )
                              )
PREFERRED PAIN MANAGEMENT & SPINE )
CARE, P.A., DR. DAVID SPIVEY, )
individually, and SHERRY SPIVEY, )
individually, )
                              )
         Defendants. )
_____ )

VIDEOTAPED DEPOSITION

OF

**DAVID SPIVEY, M.D.**

At Raleigh, North Carolina

Friday, August 10, 2018

REPORTER:   VONDA L. REED, CVR-M
                 Notary Public

**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC 28105
980-339-3575

1    Q.   When did that conversation take place?

2    A.   Oh, in the past week or two.

3    Q.   About how long did it last?

4    A.   Five minutes each, on each subject.

5    Q.   What did you talk about with Mary Benton?

6    A.   I talked with her mostly to get in my mind sort of

7         time frames and dates and so on about when we had

8         talked about the effects that -- I'm sorry.  Was the

9         question when did I talk with her or --

10   Q.   What did you talk about?

11   A.   -- what was it about?  Sorry.  Excuse me.

12   Q.   That's all right.

13   A.   Let me regroup.  Exactly when we began to discuss the

14        need for reorganization and cost savings as we began

15        to feel the effects of a number of factors that were

16        impacting the practice from a reimbursement

17        standpoint and also from a volume standpoint, because

18        the large players in the area, Wake Forest Baptist

19        Health, who had established a pain practice sometime

20        before, we had seen a falloff in referrals from their

21        physician offices.  And also, more recently, Novant

22        Health has established a pain practice, and they are

23        referring within their organizations.

24             And so referrals have fallen off, so volume

25        has fallen.  We've, over the past, since beginning

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 3 of 66

1       around 2015, have had to make significant reductions

2       in personnel and reassignment of duties and just

3       trying to keep the practice profitable and survive.

4       So I discussed some of that with her, about when all

5       that had occurred, and that's pretty much it.

6  Q.   When did you have that conversation with Mary Benton?

7  A.   I can't tell you exactly when, but it's been over a

8       period of weeks off and on.  I would think of

9       something and just ask her, you know, "Hey, when did

10      this happen?" and so on.

11 Q.   Sure.  How -- well, it was just probably hard to put

12      a time on it because it was --

13 A.   Total time?

14 Q.   Yeah, if you had to --

15 A.   Sorry.  I'm supposed to let you ask the question.

16 Q.   No, that's all right.

17 A.   So do it.

18 Q.   Yeah.  About how much total time do you think you

19      spoke with Mary Benton about -- to prepare for your

20      deposition for today?

21 A.   30 minutes to an hour.  Maybe longer.  I'm not sure.

22 Q.   All right.  What did you discuss with Sherry Spivey

23      related to your deposition?

24 A.   Oh.  Again, trying to firm up in my mind dates when

25      certain people came on board and when things

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 4 of 66

1   A.   1970.

2   Q.   What did you do after you graduated from high school?

3   A.   Matriculated at the University of North Carolina at

4        Greensboro.

5   Q.   Did you graduate from there?

6   A.   I did.

7   Q.   What year?

8   A.   1976, B.A., biology; 1977, M.A., biology.

9   Q.   After you got your M.A. in biology, then what did you

10       do?

11  A.   Matriculated at the University of North Carolina

12       School of Medicine.

13  Q.   And did you start that in '77 as well?

14  A.   Yes.

15  Q.   When did you graduate?

16  A.   1981.

17  Q.   After you graduated from UNC, what was your kind of

18       first job?  Or maybe -- did you start working while

19       you were at UNC for a hospital or clinic or something

20       like that?

21  A.   No.

22  Q.   Okay.  What was your first job?

23  A.   If you consider internship and residency a job -- I

24       guess I was paid, so I went to San Diego, to Mercy

25       Hospital, to do a rotating or flexible internship.

1         or the other of those surgery centers.  And so that

2         was the nature of my practice at that time.

3    Q.   What was the name of your pain practice?

4    A.   PMS, Pain Management Specialists of Oklahoma.  Kind

5         of a bad choice, huh, PMS.

6    Q.   Was that the first practice that you had set up?

7    A.   Yes.

8    Q.   And did you have employees?

9    A.   I had one.

10   Q.   Who was that?

11   A.   I can't remember her name.  She was a nice older

12        woman who Robin and Sean had recommended, who had

13        worked for them in the past.  I wish I could remember

14        her name.  She basically did the scheduling and

15        billing, which was very rudimentary compared to what

16        exists now in my practice.  Anyway.

17   Q.   In 2005, what did you do then?

18   A.   2005, I went to -- came back to North Carolina and

19        joined, as a 1099 employee, a pain practice in the

20        Conover area, the name of which is Pain Relief

21        Centers; owner, Hans Hansen.

22   Q.   Why did you come back to North Carolina?

23   A.   Both Sherry's and my parents -- well, my mother has

24        been dead for years.  But my father was aging and had

25        had lung cancer, and his health was failing.  My

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 6 of 66

1    A.    Yes, Nathan Hull.

2    Q.    Nathan Hull.

3    A.    Hull & Chandler, I think, is the name of the firm.

4          It's actually a firm to whom I was referred by

5          Ms. Kovalich at one time.

6    Q.    Where is it located?

7    A.    Charlotte.

8    Q.    Hull & Chandler.  Do you know what part of Charlotte?

9    A.    I do not.

10   Q.    Tell me about your current job responsibilities at

11         PPM.  Like, describe just broadly what you do.

12   A.    I review referrals as they come in to assess their

13         appropriateness for the practice, and then have my

14         new patient scheduling person schedule them.  At that

15         time, I will assign them to either be seen by me or

16         one of the other practitioners.

17               I see patients on a daily basis, both new

18         patients and in follow-up; manage their pain

19         pharmacologically and nonpharmacologically through

20         bracing, interventional procedures, referral for

21         physical therapy, referral for surgery.  Do

22         interventional procedures such as epidural steroid

23         injections, transforaminal epidural steroid

24         injections, diagnostic radio -- diagnostic injections

25         of the lumbar facette joints, both cervical and

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 7 of 66

1    lumbar.  A number of different interventional

2    procedures to treat pain that is -- 90 percent of any

3    pain practice relates to the spine, either pain in

4    the spine or pain emanating from the spine -- up to

5    and including spinal cord stimulator trials,

6    kyphoplasties for vertebral compression fractures,

7    all done in the office.

8         So my day is spent running around seeing

9    patients, doing procedures, answering messages about

10   different questions that come to me over the

11   electronic health record from clinic people and other

12   people about a patient who, for example, couldn't get

13   their drug covered because of insurance issues and

14   what other drug could we prescribe, and different

15   things like that.

16        I mean, I also -- any entrepreneurial

17   additions to the practice, anything that we might

18   want to add.  For example, right now BlueCross

19   BlueShield and other commercial payors are now, just

20   out of the blue, as of July 1st, requiring four weeks

21   of physical therapy as a part of their medical policy

22   that they just arbitrarily changed on July 1 that

23   requires four weeks of physical therapy before you

24   can even do something as simple as a single

25   injection.  Most of those medical policies have very

1

2    Q.    Any Medicaid?

3    A.

4

5

6

7

8

9    Q.    Sure.  All right.  Getting back to your day-to-day,

10         do you manage -- well, let me back up.  Are you the

11         owner of PPM?

12   A.    Yes.

13   Q.    Do you have any other titles that you've given

14         yourself as the owner/president; I mean, just --

15   A.    I don't know if I agree with the term "given myself,"

16         but I don't know who else would have given it to me.

17         I'm referred to as president and CEO.

18   Q.    Okay.  That's what I was asking.  Yeah, and I

19         wasn't -- since you're the owner, I wasn't trying to

20         be disparaging with that, but I don't know who else

21         would do it.

22   A.    I understand.

23   Q.    So as the owner, president, and CEO of PPM, would it

24         be fair to say, with just running the clinic, the

25         buck stops with you?  Is that fair?

1    A.    I guess so, yeah.  Everything stops with me if I'm

2          the president and CEO.

3    Q.    Yeah.  And are you involved in personnel decisions?

4    A.    Sometimes, yes.

5    Q.    Tell me about that.

6                MS. SMITH:  That's kind of a broad question.

7    Q.    Sure.  How are you involved in personnel decisions?

8    A.    Well, particularly, if it is a person who has

9          applied -- do you mean for hiring, for example?

10   Q.    Yeah.  Let's go with hiring first.

11   A.    Let's say we have a position open in the clinic for a

12         medical assistant, and I delegate all of the search

13         for that person and -- for example, Wendy, HR, may

14         get a number of applicants, and she'll get their

15         resumes and she'll bring them to me, and I'll look

16         them over.  And I may be involved in the process that

17         early on, saying, "Well, I don't think this is a good

18         fit," or "Based on education and experience, this

19         might be a good one."

20                Then that person will be brought in and

21         interviewed by the appropriate head in the case of

22         the clinic.  Sherry Spivey might be involved.  The

23         clinical -- I can never remember the terms, clinical

24         director versus clinical manager.  I can never keep

25         those two straight.  Sorry.  But, anyway, Sherry

1  A.
2  Q.
3  A.
4  Q.
5  A.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1          truthful until they convince me otherwise.  And I

2          have no reason to believe that Scarlet would lie, but

3          all I know is, if she says that she wasn't given any

4          train- -- again, I don't know what she has said.  If

5          she says she was given no training on PrognoCIS, that

6          is an untruth.

7     Q.   When you say "on PrognoCIS," that is the same exact

8          thing as EHR?

9     A.   Correct.  That's our EHR.

10    Q.

11    A.

12

13    Q.

14    A.

15    Q.

16    A.

17

18

19

20

21

22    Q.   Why was it rapid and necessary?

23    A.   The reorganization?

24    Q.   Yes.

25    A.   Beginning in, actually, late 2014, but on through

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 12 of 66

1       2015, we began to not only see reimbursement drop,

2       not only in the lab, but in other CPT -- other areas

3       as well.  We also would get these notifications from

4       commercial carriers and also from Medicare.  And I'm

5       going to paraphrase, if I may, because I can't quote

6       them.  "By the way, July 1st, we're going to be

7       cutting your reimbursement for filling in the CPT

8       code by X amount."  In particular, they were

9       targeting urine toxicology testing, which was, as

10      mentioned yesterday, at one point over half of our

11      revenue.

12              So we knew -- and they were going to be very

13      aggressive about it.  And they told us they were

14      going to be aggressive about it.  And so we knew that

15      we had to get leaner very quickly.  And at the same

16      time, we're still going through the process of

17      implementing the EHR and everything, and so it was a

18      major reorganization.

19  Q.  Yesterday, your wife testified that it's still

20      ongoing today.  Do you recall that?

21  A.  Yes, I do.

22  Q.  Is that true?

23  A.  Yes.

24  Q.  So tell me how it's rapid.

25  A.  Well, maybe it's not as rapid today as it was

1      during -- during late '15 on into mid '16, it was

2      rapid, because we were getting all of these

3      notifications, and we were already seeing, you know,

4      issues with revenue.  We tried to support that and

5      ameliorate that somewhat by adding some additional

6      services.  For example, biomarker testing was added.

7      That was another revenue stream.

8          So if you look back at our month-to-month

9      revenues, you know, it doesn't -- it may not show

10     this early on just dramatic drop, but we were

11     somewhat offsetting that with additional services.

12         I've lost track of your question now.  Forgive

13     me.

14  Q.   No, that's okay.

15  A.   So you asked why it was rapid or why it's ongoing

16     today.  Why it's ongoing today is for the same

17     reason.  They continued to reduce -- as I mentioned

18     earlier in my testimony, not only has Wake Forest

19     Baptist Health formed a pain practice and reduced our

20     referral base, Novant has now also formed such a

21     practice and has reduced our referral base.  All of

22     this happening at the same time that we've got

23     reductions in reimbursement.  And costs don't go

24     down, by the way, you know, from vendors.

25  Q.   Yeah.  And going back to 2015, when Medicare started

1       changing their reimbursements, did you tweak what you

2       did with the UDT at all, like what you tested for,

3       that sort of thing?

4    A.  Not in response to that, no.

5    Q.  Did you tweak it at that point?

6    A.  We did a lot of tweaking of not -- let me see here.

7       We did some tweaking in not what we were testing, but

8       there were changes.  The urine toxicology testing was

9       in such a state of flux from the time we went into

10      it, like in 2013 -- we started looking into

11      confirmation testing, the LC-MS/MS, the big machine,

12      the million dollar machine or whatever, you know, way

13      back in 2012.  Finally went active with it in '13.

14      And all during that time, and even up to almost to

15      present, it was very difficult to get information

16      from CMS and from the commercial carriers as well.

17          At one time, in fact, if I may digress just a

18      little bit, even on the -- not the confirmation

19      testing, which was a list of codes this long

20      (indicating), okay -- even on the screening testing,

21      you had to bill certain commercial carriers with

22      completely different codes and in a completely

23      different way than you had to bill Medicare, okay?

24      That was an evolving process.

25          At one point, they didn't even know what they

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 15 of 66

1        been in charge of choosing -- investigating and

2        selecting the electronic health record that we were

3        going to use in the practice.  She had gone through a

4        process of bringing different vendors in to make

5        presentations, for which I would attend.  She

6        developed spreadsheets showing the advantages and

7        disadvantages of each and what they could and

8        couldn't do.

9            For example, some of them, you could already

10       do electronic drug prescription, PrognoCIS being one

11       of them.  Some of them couldn't.  Some said they were

12       never going to make that available.  Some said that

13       "By March of next year," for example, "we'll have

14       that available."  That kind of thing.  And also

15       looking at their support, their up-front cost, their

16       support teams and what they did as far as training.

17       We talked about training earlier.  You know, how much

18       they would come in and do training of your employees

19       and so on.  So she did all of that.

20            Then we made the decision to go with PrognoCIS

21       and had started doing the contracting and all.  We

22       had moved our IT provider from Piedmont IT Solutions,

23       who, by their own admission, had never -- my

24       recollection is, had never done an EHR, and certainly

25       had not done one for -- I think they had never done

1           one at all, but had not done one for the size and

2           complexity of the one that we were going to do.

3                   And so we had looked at other vendors, and

4           Jennifer Bailey had been involved in that.  And we

5           had gone and visited on-site at least two, I believe,

6           IT providers.  The one we chose, which is now called

7           Solace IT Solutions, was at that time called

8           Eastridge, and they were in downtown Winston-Salem.

9           They were a -- one of the reasons we chose them is

10          that the PrognoCIS systems is a Microsoft base --

11          based, and they were a -- I don't remember the

12          terminology -- a Microsoft-approved whatever.  You

13          know, they were an IT company that had the

14          endorsement of Microsoft.  And so we had chosen to go

15          with them.

16                  So she had gone through all that.  All of that

17          was done and we were ready for implementation of the

18          EHR.  She had, a long time before that, made plans to

19          go to Europe -- I believe it was Austria -- for some

20          kind of biking tour or a bicycle race or something,

21          and was very vested in making that trip.  And so,

22          unfortunately, that dovetailed with the time when we

23          were going to be implementing the EHR.  So she had

24          gone and had come back, but while she was gone, we

25          had to implement the EHR, right?

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 17 of 66

1          So fortunately -- Mary Benton had not been too

2     involved at that point, but she had helped us move to

3     the new building and everything.  And I knew that she

4     had -- she was also recommended by Ms. Kovalich and

5     introduced to her.  She had great organizational

6     skills; Mary Benton did.  For example, when we moved

7     from our old building to new, we didn't lose a single

8     day of work.  It was in the middle of winter, the

9     coldest day of 2013, I believe it was.  And

10     everything was numbered.  It went just smooth.  I

11     mean, didn't miss a single hour of clinic.

12          So I knew that she could do that sort of

13     thing.  So when Jennifer Bailey took off and we were

14     kind of left in a lurch, she came in, at my request,

15     and organized the implementation of the EHR and

16     interfaced with PrognoCIS and arranged all of those

17     training sessions and so forth and so on.

18          And also interfaced with Solace IT Solutions,

19     Eastridge at the time.  We had chosen the computer

20     systems and all that we were going to use for EHR in

21     each exam room and all that, but it hadn't been

22     installed.  So she went through that process of

23     getting them installed and all that.

24          So basically, when Ms. Bailey came back, the

25     other major project that she had was -- hang on a

1       Austria or she was watching a bike race?  What do you

2       remember about why she was going to Austria?

3    A. My recollection, she was riding.  Whether it was a

4       race or not, I can't remember.  But my recollection,

5       she was actually riding a bike.

6    Q. Do you recall the details of what she was going to

7       do?

8    A. No.

9    Q.

10

11   A.

12   Q.

13   A.

14   Q.

15   A.

16

17

18

19

20

21   Q. Let's go to Exhibit 59.  It should be in your book.

22   A. Okay.

23   Q. Now, this was something that was reviewed yesterday,

24      but it's an e-mail chain that involves Michael

25      Jacobson and an employee named Sara Wilson.  Do you

1   A.   I've already answered that, sir.

2   Q.   Do it again.

3   A.

4

5

6   Q.   So did you fire a lot of the workers and brought in

7        younger, cheaper people.  Is that what you did?

8             MS. SMITH:  Objection.  That's a

9                  mischaracterization of his testimony.

10            MR. HERRMANN:  I didn't --

11  Q.   Answer the question.  Is that what you did?

12  A.   Would you repeat the question, please?

13  Q.   Did you fire these older workers and bring in

14       younger, cheaper people to replace them?

15            MS. SMITH:  Objection.

16  Q.   Is that what PPM did?

17            MS. SMITH:  Objection.

18  A.   I don't know that we necessarily hired younger

19       people, but if we could find someone to do a job

20       adequately whose credentials qualified for that job,

21       then obviously we would do that, yes.

22  Q.   Sir, you saw the ages of the people you've hired

23       since this reorganization started yesterday, right?

24  A.   Yes.

25  Q.   It's much younger than the ages of people terminated,

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 20 of 66

1  A.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20  Q.    All right.  So let's go to the second page, these

21        people.

22  A.    Okay.

23  Q.    And while we're going there --

24  A.    Pardon me?

25  Q.    How does this work for employees?  In other words, do

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 21 of 66

1          they put money in that PPM matches?  Or just describe

2          kind of how that works.

3    A.    We put money in based on their salary or

4          compensation.  And it's a percentage of -- they don't

5          fund it at all.  We fund it completely for them.

6    Q.    So a hundred percent funded by PPM?

7    A.    Yes.

8    Q.    What determines the level of funding that PPM puts

9          into the individual accounts?  And you can refer to

10          the policy if you need to.

11    A.    Yeah.  There's a -- uh-oh, where was that?

12    Q.    It's that one.

13    A.    Oh, this one.  Sorry.

14    Q.    That's all right.

15    A.    There are categories or -- I've forgotten the term

16          for it -- groups.  There's a summary page somewhere

17          that has that.  I hope it's a part of this because I

18          had it at one time.

19              MS. SMITH:  Do you mind me pointing to the

20                  right page?

21              MR. HERRMANN:  Huh-uh.

22              MS. SMITH:  Dr. Spivey, you may want to look

23                  at page 812.

24              THE WITNESS:  Okay.

25              MS. SMITH:  That might be helpful.  I think

1                    that's --

2              THE WITNESS:  Oh, there it is.  The last page,

3                   of course.  Thank you.

4          MS. SMITH:  Yeah.

5    A.    So there are categories.  You know what?  This is not

6          the one that describes the different groups.  Oh,

7          yeah, it is.  Okay.  "Hypothetical allocation."

8              So there are groups, groups A, B, C, D, and E;

9          and they are allocated as a percentage of their

10         annual compensation based on which group, into which

11         group they -- in which group they lie.

12   Q.    Is the A, B, C, D, E grouping purely based on their

13         annual compensation?

14             MS. SMITH:  I'm not quite sure I understand

15                 that question.

16   Q.    How do you group people into A, B, C, D, and E?  Who

17         makes that determination?  Let's start with who.

18   A.    I think they are defined somewhere whereby, for

19         example, A would be owners.  Another one would be

20         non-owner, highly compensated -- oh, they're defined

21         right there.  So, for example, a non-owner but highly

22         compensated employee such as another physician or

23         midlevel would fall into group D.

24             Group C is lineal ascendants and descendants,

25         which means direct blood relatives, I believe, either

1      sibling or, you know, a child.

2   Q.   Okay.

3   A.   Group E is all others that don't fall in the other

4        four groups.

5   Q.   Would C include Jennifer McGraw?

6   A.   Yes.

7   Q.   And who would fall, if you know, into group D?

8   A.   You mean the name of the individual --

9   Q.   Yeah.

10  A.   -- or the person?  Chad Caldwell, Pamela Campbell,

11       Michael Roche.

12  Q.   And what you're just looking at there, that

13       completely -- I'm assuming something here, but I want

14       to see if you agree with it.  I'm not trying to throw

15       you off.  Does that completely determine the amount

16       that PPM puts in the cash balance plan for the

17       employee, or are there other factors?

18  A.   I think it's based solely upon which group and their

19       annual compensation.  And the percentage thereof is

20       determined by which group they -- in which group they

21       belong.

22  Q.   Are years of service at PPM taken into account?

23  A.   In regard to assigning them to a group?

24  Q.   In regard to the amount of money that PPM puts into

25       the cash balance plan.

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 24 of 66

1    A.    I don't think so.

2    Q.    Is an employee's age taken into account?

3    A.    No.

4    Q.    Let's go back to 814.

5    A.    I'm sorry.  What was the number again?

6    Q.    So go back to Exhibit 27, and we'll go to 814.

7    A.    Oh, I'm sorry.

8    Q.    That's my fault.

9    A.    Okay.

10   Q.    So I think it's pretty self-explanatory, the ones

11         that say, under the status column, "N=Term

12         NonVested."  For those people -- correct me if I'm

13         wrong -- those would be people who were terminated

14         and they also were not a hundred percent vested in

15         the plan, right?

16   A.    Uh-huh.

17   Q.    Yes?

18   A.    Yes.  I'm sorry.

19   Q.    That's okay.  Where it says "S=Min. Service," do you

20         know what that stands for or tries to denote?

21   A.    I don't.  (Witness reviews document.)

22   Q.    And if you don't know, that's okay.

23   A.    I said I don't.  I'm sorry.

24   Q.    Oh, you don't know?  Okay.

25   A.    Yeah.

1   A.   Looks like Chad Caldwell, $9,591.28.

2   Q.   If someone is a plan participant and they are

3        terminated before 100 percent vesting, what happens

4        to their balance?

5   A.   It's my understanding it stays in the fund and is

6        used at -- it's used to fund the plan.

7   Q.   What do you mean by that?

8   A.   That if and when there are payouts, that money

9        remains in the plan and is used as the payout.

10   Q.   Does it go to some other account that -- in other

11        words, is this one big bank account that has all this

12        money in it, and there's just an accounting within

13        it, or are there separate accounts?  Tell me a little

14        bit more about that.

15   A.   I think it's one account, but honestly, I'm not

16        certain about that.  That would be a good question

17        for our third-party administrator.  I didn't get that

18        explained to me.

19   Q.   So do you -- so if it's in one account -- let me

20        strike that.  Someone else will have to answer that

21        question about kind of where the -- I guess we'll

22        call it forfeited contributions go?

23   A.   Uh-huh.

24   Q.   Yes?

25   A.   Yes.  I'm sorry.

1   Q.   Does it benefit you in any way?  Do you know one way

2        or the other?  In other words, does PPM get that

3        money?

4   A.   I don't think so.  I think it just stays in

5        the -- it's my understanding it stays in the cash

6        balance account and is to be used as I described

7        before.

8   Q.   Is it accounted for somewhere?  I mean, is there a

9        line item saying how much money is in the account

10       that is not assigned to an employee that has been

11       forfeited?

12  A.   Yeah.  I don't know.

13  Q.   Do you know whether or not that money would go to

14       your credit?

15  A.   I don't.

16  Q.   Why did you -- well, nah.  Go to Exhibit 68.  So this

17       is an e-mail.  It looks like -- well, first I'll say

18       this e-mail was provided to me by your counsel.  But

19       the bottom, there's an e-mail from Sue Nagelski to

20       you talking about the EPLI policy and the Sue [sic]

21       Tackett, you know, EEOC matter.  Is that a fair

22       summary of that e-mail?

23  A.   Does this run bottom to top or --

24  Q.   Yeah, bottom to top.

25  A.   Okay.  (Witness reviews document.)  I've read it.

1    Q.    And I described it as an e-mail from Sue Nagelski to

2          you discussing the EPLI renewal and also the Faye

3          Tackett EEOC matter.  Is that a fair summary of this

4          e-mail?

5    A.    Yes.

6    Q.    And on January 8th, 2016, you forwarded it to Wendy

7          Yontz, right?  If you look at the top, it says

8          "forward."

9    A.    Yeah, yeah.

10   Q.    Yeah?

11   A.    Well, I'm looking.  Just a moment, please.  Where

12         does it say "forwarded"?

13   Q.    In the subject, "Fwd."

14   A.    Oh, EPLI.  Okay.  Got you.

15   Q.    So do you agree that you forwarded this to Wendy

16         Yontz?

17   A.    It looks like, uh-huh.

18   Q.    And here you said, "I will be sending Sue an e-mail

19         later today terminating her position at the end of

20         January."  Right?

21   A.    Yes.

22   Q.    Then you go on to say, "Make sure we have all the

23         ████████████████████████████████████████████████

24         Correct?

25   A.    Yes, yes.

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 28 of 66

1  Q.   Why did you, in your forward of this e-mail to Wendy

2       Yontz, announce that you were firing or planning to

3       fire Sue Nagelski?

4  A.   ████████████████████████████████████████████████████

5       ████████████████████████████████████████████████████

6       ████████████████████████████████████████████████████

7       ████████████████████████████████████████████████████

8       ████████████████████████████████████████████████████

9       since it was still an ongoing thing and since it was

10      an open case and had not been resolved, and Sue was

11      going to be terminated, I felt it important that we

12      ████████████████████████████████████████████████████

13      Wendy could then assume handling of that and

14      interfacing with the attorney and finding out what

15      was going on and so on.

16 Q.   When did you decide to fire Sue?

17 A.   I guess sometime toward the end of 2015 or early

18      January of 2016.

19 Q.   Tell me about that decision.  Did you consult with

20      anybody to make the decision?

21 A.   Yes.

22 Q.   Who did you consult with?

23 A.   I consulted with the BB&T people.  I consulted with

24      Turlington & Company.  That's pretty much it.

25 Q.   Did you talk to Sherry Spivey about the decision?

1   A.   Probably did.  And, in fact, I did -- I talked with
2        Mary Benton too.
3   Q.   The BB&T people, who were the BB&T people?  What are
4        their names?
5   A.   Jonathan Cochrane, Rob Davis.  I don't remember if I
6        specifically spoke with Brett Hoge.  Probably just
7        those two.
8   Q.   When did you consult with Jonathan Cochrane?
9   A.   Sometime before this.  I don't know.
10  Q.   Do you think it was more than a month before this
11       January 8th e-mail?
12  A.   I don't know.
13  Q.   Two months before?
14  A.   I don't know.
15  Q.   Three months before?
16  A.   I don't know.  Not -- I don't think it was three
17       months before, no.
18  Q.   Would you put it in late -- let's say the fall of
19       2015?  Is that too exact?
20  A.   It's not too exact.  Sometime probably late fall,
21       early -- late fall, early winter of 2015.
22  Q.   Tell me about the conversation you had with
23       Mr. Cochrane.
24  A.   It was just basically, "I know that Sue has been sort
25       of a liaison between us and Turlington, our

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 30 of 66

1          accountancy, Turlington & Company, and you guys."

2          And "Can we do business without someone in that

3          position, without that position?"

4     Q.   And what did he say?

5     A.   "Yes."

6     Q.   Did you request this -- was it a phone call or an

7          in-person meeting?

8     A.   Phone call.

9     Q.   Did you call him?

10    A.   Yes.

11    Q.   What prompted you to call him?

12    A.   I wanted to make sure, since Ms. Nagelski -- you

13         know, we're, again, right in the middle of this

14         reorganization.  Mary Benton and I are looking for

15         where can we cut costs.  I knew that Ms. Nagelski's

16         other duties had been reassigned, including HR and

17         IT.  And sort of compliance and all that had been

18         reassigned to other folks.  And so the remaining duty

19         that she had was this position as the liaison.  And

20         so I wanted to make sure that I wasn't going to cast

21         myself off into a sea of -- you know, anyway.  I

22         wanted to make sure that we could still communicate

23         and do business and everything, that there wasn't

24         some function that she was performing that would

25         otherwise be required.

1    A.    I don't.

2    Q.    And if Sue was the HR person, should she have been

3          consulted before these terminations were carried out?

4    A.    Probably, had she been available.

5    Q.    Was Sue unavailable by phone when she worked for PPM?

6    A.    Sometimes.

7    Q.    How often?

8    A.    I don't know.

9    Q.    Can you estimate?

10   A.    There were times when I would try to get hold of her

11         and couldn't.  How many times, I don't know.

12   Q.    Do you think it was more than ten?

13   A.    No.  Well, over what period?

14   Q.    The whole time she was doing HR.

15   A.    It was probably ten.

16   Q.    Did you ever counsel her on that?

17   A.    Yes.

18   Q.    Did you ever issue her a written warning on that?

19   A.    No.

20   Q.    Did you ever document any of the counseling you gave

21         her on that?

22   A.    No.

23   Q.    So Rob Davis was the next person that you listed,

24         someone you consulted with at BB&T.  When did you

25         speak with Rob Davis?

1    A.    About the same time I spoke with Jonathan Cochrane.

2    Q.    Was it a phone call?

3    A.    Yes.

4    Q.    Do you think it was before or after you spoke to

5          Cochrane?

6    A.    Actually, let me back up.  I may have spoken with one

7          or both of them face-to-face.  We had meetings with

8          them on a regular basis, and this would have been

9          toward the end of the year in '15.  It's quite

10         possible that both of those conversations were not

11         phone calls, but were rather face-to-face.

12   Q.    Do you think it was multiple conversations or one

13         where they were both present?

14   A.    One.  In fact, I'm pretty sure, now that I think

15         about it, if I may back up -- sorry, memories come

16         back.

17   Q.    That's okay.

18   A.    I think it was at one of the meetings that we had,

19         you know, where the accountants and we were together.

20   Q.    So who was present for this meeting?

21   A.    No, hold on just one moment.  Let me think.  I'm

22         sorry.

23   Q.    That's okay.

24   A.    I'm just trying to be as accurate as possible.  That

25         might not make sense because I certainly wouldn't

1        have had that conversation in Sue's presence, and she

2        might have been there for that meeting.  It's

3        possible that it was after the meeting.  But my

4        recollection is that there was a conversation in

5        person.

6    Q.  And who was there for that conversation?

7    A.  Those two, Rob Davis and Jonathan Cochrane.

8    Q.  So just to maybe speed this along, what you just

9        described talking about with Cochrane, you talked

10        about the same thing with Davis because it was one

11        conversation?

12    A.  Either the same conversation or a similar

13        conversation at a different time, yes.

14    Q.  Was there any different input that you received from

15        Rob Davis that you didn't also receive from

16        Mr. Cochrane?

17    A.  No.

18    Q.  Okay.  Who did you speak with at Turlington &

19        Company?

20    A.  Scott Hummel.

21    Q.  When did you speak to Mr. Hummel?

22    A.  Along about the same time period.  And it's quite

23        possible that that conversation was face-to-face,

24        too, at or after one of those meetings where we were

25        all present.

1    Q.   Do you know whether or not that conversation was with

2         just Scott Hummel, or were other people present?

3    A.   Brenda Thrower.  I had a conversation with Brenda

4         Thrower too.

5    Q.   The same conversation, or was she --

6    A.   Pretty much.  They're the two folks that we deal with

7         at Turlington & Company.

8    Q.   Sure.  And I asked that poorly.  Was it -- not the

9         content of it being the same, but was it in fact one

10        meeting that you remember that you had with

11        Mr. Hummel and Mrs. Thrower at the same time, or they

12        were separate conversations?

13   A.   I don't remember.

14   Q.   And what did you speak with Mr. Hummel about

15        regarding Sue Nagelski's termination?

16   A.   Well, I didn't ask him about her termination

17        specifically.  What I asked was, you know, "Do we

18        need someone in the position of liaison between

19        PPMSC, BB&T, and Turlington & Company in order to do

20        business?"

21   Q.   And Mr. Hummel said you don't?

22   A.   Correct.

23   Q.   And you had the same conversation with Ms. Thrower?

24   A.   Correct.

25   Q.   And this would have also been in late 2015?

1   A.   Correct.

2   Q.   Same question with Hummel, Thrower, and Brown.  If

3        you need to separate it out, that's fine.  Or, sorry,

4        not Brown, Davis.  Do you know whether or not those

5        conversations were before or after Ms. Yontz started

6        with PPM?

7   A.   I'm not sure.  About the same time, though.

8   Q.   Sherry Spivey, I know you said that you got input

9        from her too.  When did you --

10  A.   Regarding what?

11  Q.   Sue Nagelski's termination.

12  A.   Okay.

13  Q.   When did you first speak with Sherry Spivey about the

14       possibility of terminating Sue Nagelski?

15  A.   Long time before that.

16  Q.   When do you think that was?

17  A.   2012, 2013.  I'm not sure.  Well, that may be a

18       little early.  Probably '13, '14, along in there.

19  Q.   Going back to 2013 or '14, did Ms. Spivey, back then,

20       want to terminate Sue Nagelski?

21  A.   She expressed -- she didn't specifically say she

22       wanted to terminate her, but she expressed

23       dissatisfaction with her lack of presence in the

24       office.  And there were also some communication

25       issues between Mrs. Spivey and Ms. Nagelski regarding

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 36 of 66

1   Q.   What was she angry about?

2   A.   Sue didn't show Mrs. Spivey the respect that she

3        thought she should, in part, as the clinical

4        coordinator and the wife of the owner of the

5        practice, and someone who is vested in the practice

6        in regards to her livelihood, her ability to live.

7   Q.   Was that conversation in person?

8   A.   Which conversation?

9   Q.   The one that we're describing from late --

10  A.   Between my wife and me?

11  Q.   Yeah.

12  A.   In person, yeah.

13  Q.   Was there anything else that she was dissatisfied

14       with that she expressed to you in that conversation?

15  A.   Again, time frame here I'm not sure about, but she

16       became very concerned about the e-mail situation and

17       the eBridge account thing, and all of that that I've

18       already described in great detail, I believe, and why

19       one would be concerned about it.  She brought that up

20       as a concern.

21            And she would from time to time come to me and

22       say, you know, "Look, I've told you this stuff is

23       going on, and it's a concern and we need to do

24       something about it."

25            And, in part, especially until I began to have

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 37 of 66

1        some of the same concerns, you know, I tried to act

2        as a peacekeeper, basically.  In fact, I had Sue come

3        in one time and had a conference with Sherry and her

4        and acted sort of as a mediator and tried to get them

5        to kiss and make up.  This was after we had moved

6        into the new office on Maplewood.  You know, this

7        family squabbling and family strife and everything

8        was being created.  I was beginning to regret ever

9        having brought anyone that's a member of the family,

10       you know, into the practice.

11            And then, of course, when Ms. Yontz came on

12       board, she's not a blood relative and all that, but

13       still I'm thinking -- anyway.  I was just trying to

14       keep peace among the family.

15   Q.  When did that meeting where you acted as a mediator,

16       when did that happen?

17   A.  I'm not sure.  It was after we moved into the new

18       building.  We moved in there in January of '14?  Yes.

19       So probably in 2014.  So some of this had been going

20       on for some time too.

21   Q.  Did that predate the first time that Sherry came to

22       you and said she wanted Sue fired, that meeting where

23       you were the peacekeeper?

24   A.  Not sure.

25   Q.  So I think you said late 2014 or early 2015 was the

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 38 of 66

1          to look a little more suspicious to me.  And so I

2          thought, as a part of the reorganization, this just

3          fits.  You know, it's time to cut the cord here.

4    Q.    Do you know whether you expressed that you agreed,

5          you know, and she was going to be fired before or

6          after Ms. Yontz started?  Because I know that was

7          November of 2015.  Or was it just like those other

8          conversations around the same time?

9    A.    Well, it may have come up at the time Ms. Yontz was

10         coming on board because that's one of the bones of

11         contention, you know, that we wanted someone, an HR

12         person, on-site, and so now we've got one.  So those

13         duties were now reassigned.

14                Although, I will say that Ms. Nagelski -- and

15         that's another thing that became suspicious, by the

16         way.  I'll add this, is that Ms. Nagelski was very

17         resistant to turning over payroll to Ms. Yontz.  In

18         fact, she said, "I'll give up the rest of HR, but I'm

19         keeping payroll."  I'm paraphrasing here.

20                And, in fact, learned later that the way the

21         Flex-Pay account had been set up, I didn't even have

22         access to the account.  Only Ms. Nagelski and, I

23         think, one other person.  It may have been Vicki

24         Swicegood.  But only a few people had access to the

25         payroll account, and I wasn't one of them.  And this

1       came up in part at a time when Mrs. Spivey was trying

2       to gain access to check on PTO and things like that.

3            Then when Ms. Yontz came on board, she

4       couldn't -- they wouldn't even talk to her.  And when

5       I decided that she was going to assume the role also

6       of payroll, Flex-Pay wouldn't even talk to her.  So

7       we had to go through quite an ordeal gaining access

8       to the account and then getting it switched over to

9       our current payroll provider whose name I can't

10      recall.  AC something, or whatever it is, ADC or

11      something.  So this would have been all around that

12      time and sort of dovetailed, you know.

13  Q.  To kind of wrap up, I have one more input person,

14      Mary Benton.

15  A.  Uh-huh.

16  Q.  When did you first discuss the prospect of

17      terminating Sue Nagelski with Mary Benton?

18  A.  Probably mid to late '15.  Again, we were looking

19      at -- Mary had come on board to implement the EHR

20      start-up and everything.  And we were starting to

21      look at how we could reorganize the practice and save

22      money and make it more effective, more efficient, put

23      in processes that were -- Mary is a very astute

24      businessperson, and she knew -- for example, it was

25      she who pointed out that we had some problems in

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 40 of 66

1   Q.   Sure.  Why did you terminate -- well, let me back up.

2        Did you decide to terminate Rebecca Kovalich?

3   A.   Yes.

4   Q.   Why did you decide to terminate her?

5   A.   Because her duties were done, nothing for her to do.

6   Q.   Yesterday you heard testimony that she was terminated

7        in -- we'll just call it early June of 2016.  Does

8        that sound right?

9   A.   Yes.

10  Q.   And in relation to that, when did you decide to

11       terminate her employment?

12            MS. SMITH:  I do not understand that question.

13            MR. HERRMANN:  Sure.

14  Q.   Do you agree with me, and even if it's not -- well,

15       do you have any reason to doubt that her termination

16       date was June 6th of 2016?

17  A.   I don't.

18  Q.   My question is, how long prior to that date had you

19       decided to fire Ms. Kovalich?

20  A.   I don't recall, but it was in around that time.  We

21       did -- because Ms. Kovalich was more available to

22       come to the office, it seemed, and because she has a

23       residence there in Winston-Salem, I did go through

24       the process of -- as I had in other cases, of having

25       an attorney present and doing a formal sit-down

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 41 of 66

1        meeting wherein, you know, she was offered a

2        severance package, I believe, and so on.

3                And so that probably took some time to put

4        together, to get that arranged.  And so it was

5        certainly not the day before.  You know, it would

6        have been a week or two prior to that, I would think,

7        so that we could make the appropriate arrangements to

8        get the attorney and get the separation agreement

9        drawn up and all of that.  So sometime before that.

10   Q.  Did you say that you fired her because -- well, let

11       me back up.  Her termination was part of the

12       reorganization?

13   A.  Yes.

14   Q.  And her duties had ended?  Or what was it you said?

15   A.  Her duties had ended, yes.

16   Q.  Which duties ended in June of 2016?

17   A.  Well, the duties had actually ended before that

18       probably, but it was laboratory development.

19   Q.  When did the laboratory development duty end?

20   A.  Sometime before that, when I realized that

21       Dr. Scheutzow was not going to be able to do the age

22       management; and so, therefore, the laboratory

23       development that Ms. Kovalich and I had been working

24       on -- and it wasn't just age management.  We were

25       also looking at -- we bought a chemistry machine, a

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 42 of 66

1      Tosoh, T-o-s-o-h, machine, and in fact even had it to

2      the point where it had been -- what's the term?  It

3      had been qualified.  It had been certified that it

4      was okay to use it to do certain chemistries.  And it

5      was a fairly large expense, like $50,000.  So we had

6      been working on that.

7           And then -- but a large part of the use of

8      that machine was going to be to do the chemistries

9      that were required to monitor patients in the age

10     management part of the practice, a part of

11     RegenerAge.  And so once I had decided to pull the

12     plug on that -- and then we looked into reimbursement

13     for pain management things that could be done in lieu

14     of or as a less comprehensive laboratory package,

15     such as thyroid function, vitamin D, things like

16     that, testosterone levels, which would have been

17     both, you see.  Testosterone would have been both

18     pain management and age management.

19          So we went through that process.  And then it

20     didn't look like it was going to be -- that it was

21     not a good return on investment.  In fact, it was not

22     going to be a moneymaker.  And so once we shut that

23     down, there was no more laboratory development to be

24     done at that time.

25  Q.  When do you think that happened?  And so for some

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 43 of 66

1          reference points, June 9th would be Rebecca's --

2    A.    Of '16.

3    Q.    Of '16 --

4    A.    Right.

5    Q.    -- is the termination date.  Sue's termination

6          date --

7    A.    January.

8    Q.    -- I guess the official, January, you know.

9    A.    Right.

10   Q.    Between the two of those or even before?

11   A.    Well, quite honestly, the decision to not do any more

12         lab development was probably earlier than that, and

13         so -- but Ms. Kovalich, I kept paying her because, in

14         part, her salary was to compensate her for things

15         that she had done earlier on in the practice for

16         which I felt she had not been adequately compensated.

17              For example, when she came in and straightened

18         out the Carolina Liquid Chemistries' BioLis machine

19         that had the problems with the software, that's when

20         she came back into the practice, when we were over at

21         the old office.  And she didn't -- she got very

22         little, if any, compensation for that.  She said at

23         the time -- and I believe that -- I believe that she

24         had missed being in the game.  And she had had some

25         time off and done some traveling, and she was kind of

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 44 of 66

1        anxious to get back in the game.  And it was exciting

2        for her to do that, and she enjoyed it.

3              She was also learning about urine toxicology

4        testing, which although she had a lot of experience

5        with lab, she had not done heretofore, and neither of

6        us had.  And so we were kind of learning that

7        together.  And Dickson Capps would come in, and we

8        were figuring out how to do all of that.  It was an

9        exciting time.

10              And then when we decided to do the LC-MS, when

11       it became more doable because the cost of the machine

12       had come down, plus Ms. Kovalich's relationship with

13       Ernie Knesel at Select Laboratory.  He became a

14       broker or -- I'm not sure what the terminology was,

15       but for the Shimadzu machine, which was a less

16       expensive liquid chromatography tandem mass

17       spectroscopy machine.  It's like half the cost.

18       Instead of a million dollars, it's about half a

19       million.

20              So we had been doing that, and she had helped

21       us get that.  And, of course, the laboratory, as I

22       have said more than once, was generating over half

23       our revenue.  So I was indebted to her for that.

24              And by way of explanation of why she didn't

25       want any compensation or more reasonable compensation

1      back then, she was learning from us, as we were

2      learning from her.  And, plus, I believe that our

3      introduction of urine toxicology testing gave Select

4      Laboratory, with whom she had a relationship, an

5      opportunity to develop their business in that area.

6      In fact, I know it was so because I went and had

7      dinner meetings with Ernie Knesel and John Merritt

8      more than once.  Went over to the lab and met with

9      them and gave them information about what would be

10     tested and why it was important and what pain

11     management meetings they could attend in order to

12     promote their business and all that.  And so I think

13     that that sort of perhaps raised her value with

14     Select Lab a little bit, and, you know.  But so,

15     anyway, I felt that she had not been adequately

16     compensated during that time.

17          I think, also, she was grateful to us for

18     bringing Suzanne in and giving her an opportunity for

19     employment and some experience after she had finished

20     her MBA.  So, you know, it was a win-win situation,

21     so to speak.

22          But I didn't think that she -- in fact, at one

23     point I offered her, which I have learned since was

24     foolish -- she probably couldn't have, but I offered

25     to -- because this was a physician-owned laboratory,

1          I offered to, you know, have her -- to give her part

2          of the lab business, you know.  But she said no, that

3          would be a tax issue.  I offered to give her a lump

4          sum, and she indicated that would be a tax issue for

5          her.  And so we agreed to a pay of $5,000 a month for

6          some period of time until we felt that she was

7          adequately compensated.  I remember her comment at

8          that time.  She said, "That's a good start."

9              So, anyway, so part of the reason for

10         continuing to pay her, even though her duties were

11         done, essentially, was that I wanted to make sure

12         that I had adequately compensated her.  Now we're

13         getting into the area where we're reorganizing, the

14         reimbursement is dropping, we're getting into trouble

15         financially, and we see that on the horizon, if not

16         happening already.  And so it became time to take a

17         closer look at that, and so we did.

18    Q.   Okay.  And you think those duties you described ended

19         in early 2015, or roughly when do you think that sort

20         of lab development was over?

21    A.   I'm not sure.  I was thinking maybe we could look at

22         Dr. Scheutzow's termination, but I kept him on for

23         some time after that, as I said, because he was doing

24         other things.  It probably would have been -- I'm not

25         sure.  We probably made the decision to not continue

1      with age management in the lab maybe in -- yeah,

2      sometime in '15.  I'm not sure.

3   Q.  Do you think that was before or after firing the

4      three Greensboro employees?

5   A.  That what was before?

6   Q.  The decision --

7   A.  That we decided to stop developing the lab?

8   Q.  Yes.

9   A.  I'm not sure.

10  Q.  Could it have been about the same time?

11  A.  Could have been.

12  Q.  So let's take a look -- I don't know if we've done it

13      yet, but it should be in the book -- at the -- back

14      to Number 5, Exhibit 5.  And go to page 9.

15  A.  Okay.

16  Q.  And on page 9, do you see an interrogatory that asks

17      to identify individuals who had direct or indirect

18      input into your decision to terminate Plaintiff

19      Kovalich's employment?

20  A.  Yes.

21  Q.  And then there are -- Sherry Spivey, Mary Benton,

22      Gretchan Culler Hawks, Rodney Leftwich, and Steven

23      Wong are all listed?

24  A.  Yes.

25  Q.  Is that accurate, that those people had input in the

1          decision to terminate Ms. Kovalich?

2     A.   Yes, except somewhere in here I thought it said

3          either -- oh, it does say direct or indirect.  Yes.

4     Q.   Yeah.  And we'll get into that.  I just want to go

5          through each one.

6     A.   Yeah.

7     Q.   So Mary Benton, when did you first specifically

8          discuss the prospect of terminating Rebecca

9          Kovalich's employment?  When did you first have that

10         conversation with Mary Benton, if you did?

11    A.   Probably early '16, spring of '16.

12    Q.   Okay.  And do you recall one conversation or multiple

13         conversations about that with Mary Benton?

14    A.   More than one.

15    Q.   The first one that you recall, do you know if that

16         was in person or over the phone?

17    A.   They were all in person.

18    Q.   What do you recall about the first conversation where

19         you specifically talked about terminating

20         Ms. Kovalich?

21    A.   Mary Benton, as a part of the reorganization process,

22         said, "Why are you paying her?  What is she doing?"

23         And I explained that she was very essential in our

24         development of the laboratory and that I was

25         continuing to pay her for the reason I've already

1          described, to which Ms. Benton likely replied,

2          "You've got a business to run here and you're about

3          to run it into the ground.  You better -- you've got

4          to look at this a little more carefully."  So --

5     Q.   Before Mary Benton made that recommendation, had you

6          considered terminating Ms. Kovalich?

7     A.   Yes.  I considered a lot of different people,

8          terminating a number of different employees.

9     Q.   When was the first time that you considered

10         terminating Ms. Kovalich?

11    A.   Probably in mid to late 2015.

12    Q.   Do you recall a second meeting with Ms. Benton where

13         you discussed terminating Ms. Kovalich?

14    A.   I recall several meetings with Ms. Benton wherein we

15         discussed how we needed to reorganize.  And

16         specifically about Ms. Kovalich, no.  I do recall

17         that she sent me an e-mail expressing some concerns.

18         That may be one of the -- I don't know.  I recall

19         seeing an e-mail where she expressed some concerns

20         about, you know, "Why are you still paying her?"

21         Again, same sort of idea.  And -- anyway.

22    Q.   Would that e-mail have happened after your in-person

23         talk where she said, "Why are you paying her?  What

24         is she doing"?

25    A.   Most likely, yeah.  I'm not certain of that, but most

Case 1:17-cv-00854-TDS-LPA   Document 42-3   Filed 10/01/18   Page 50 of 66

1       likely.

2   Q.  What else do you recall about your conversations with

3       Mary Benton regarding terminating Rebecca Kovalich?

4   A.  I don't recall any other specifics.

5   Q.  Okay.  Sherry Spivey, what input did she have into

6       the decision to terminate Ms. Kovalich?

7   A.  Well, again, direct or indirect input, I'm sure that,

8       you know, the whole mistrust issue and everything,

9       she probably brought that up more than once, and also

10      probably brought up, you know, our revenues are

11      dropping.  So Ms. Spivey, you know, has some

12      information about what's going on with the practice

13      because we live together and I talk to her about

14      things, you know.  And so she probably heard me say

15      that we're looking at this, we're looking at that,

16      revenues are dropping, here's why.  And so she may

17      have said at some point, "Then why are you keeping

18      Ms. -- why are you keeping Rebecca on board?"

19  Q.  Do you recall her saying that?

20  A.  Not specifically, no.

21  Q.  So do you know one way or the other whether she ever

22      said that to you?

23  A.  No.

24  Q.  Do you know if she ever recommended terminating

25      Ms. Kovalich to you?

1   A.   Specifically, no, I don't.

2   Q.   And from your answer, I just want to clarify.  It's

3        possible she did and it's possible she didn't?

4   A.   Yes.

5   Q.   You just don't remember?

6   A.   Yeah.

7   Q.   Okay.  Gretchan Culler Hawks, what input did she have

8        into the decision to terminate Ms. Kovalich?

9   A.   I asked her if the lab was able to run okay if

10       Ms. Kovalich was gone.

11  Q.   When did you ask her that?

12  A.   I don't remember.  Sometime probably around the same

13       time I was talking with Ms. Benton about

14       reorganization, so probably -- it may have been on

15       into 2016.  Sometime late '15, early '16.

16  Q.   What did she say in response?

17  A.   She said that the lab could run okay, that a lot the

18       duties she was doing -- she was doing a lot of the

19       ordering herself and things like that.  And Select

20       was doing all the compliance, regulatory things, and

21       so -- that was my understanding at the time.  And so

22       it didn't look like the position was necessary.  If

23       we weren't developing any new things, if the lab was

24       just sort of running on its own, that they were okay.

25            She is a medical technologist and is certainly

1  A.  May 24th of '16?

2  Q.  No.  May 27th of 2016.

3  A.  Oh, filed, yes.  Okay.

4  Q.  And prior to this EEOC charge being filed, for at

5      least two months before this, you were aware that

6      Ms. Nagelski was asserting age discrimination claims

7      and other legal claims related to her termination

8      against PPM, right?

9  A.  Well, I recall getting a -- receiving a letter from

10     your firm, maybe from you personally.

11  Q.  Yeah.

12  A.  I think it was in February.

13  Q.  Yeah.  Let's go to Exhibit 90.  That will just help

14     refresh.  You can keep answering, but just flip to

15     that.

16  A.  Okay.  Sure.  9-0?

17  Q.  9-0.

18  A.  I don't have that.

19  Q.  I see it there.  It might be under 91.

20          MS. SMITH:  I don't know that that's the right

21              number because I've got 90 as the cash

22              balance plan.

23  Q.  Oh, 91.  91.  Sorry.

24  A.  91?  Okay.

25  Q.  Yeah.  My fault.

1    A.    Yes.

2    Q.    Why?

3    A.    Because, despite the more recent sort of ill will or

4          whatever between Sherry and Suzanne in particular,

5          and some things that went on even between Suzanne and

6          me, like some disrespect, I thought, and so forth and

7          so on, I felt that our relationship was still pretty

8          good.  I thought I had done a good job of letting her

9          know in advance.  She knew that a lot of her duties

10         had been reassigned.  She, I believe, had knowledge

11         of the fact that, you know, our revenue, we were

12         going to have problems with revenue going forward and

13         everything with the lab and all.  And particularly

14         since mother/daughter, I'm sure that Ms. Kovalich let

15         her know about those things.

16               And so in the letter that I had sent her --

17         although I will admit, I could have done a better job

18         of that -- I was trying to sort of be conciliatory

19         and offer an olive branch.  And it surprised me,

20         quite frankly, that she had done this.  So I was

21         surprised by it.

22   Q.    Did it upset you?

23   A.    A little bit.

24   Q.    How so?

25   A.    I was kind of hurt, actually.

1          VIDEOGRAPHER:  On record at 6:02 p.m.

2     By Mr. Herrmann:

3     Q.    I think before the break, I think you said you had

4           some regrets about the way you terminated

5           Ms. Nagelski and you could have done it better.  And

6           I think you explained what you meant by that.  You

7           could have sat down with her or something like that.

8           Is that right?

9     A.    Yes.

10    Q.    Why do you think it would have been better to sit

11          down with her?

12    A.    More personal, personable, you know.  It's kind of

13          hard to convey things adequately in a letter.  Part

14          of my reasoning at the time was spiteful, to a

15          certain extent, in that she can't come here when I

16          need her to be here, so I'm not going to go to her or

17          set up a meeting face-to-face.  I'll just send her

18          this letter, you know?

19    Q.    Uh-huh.

20    A.    But I thought that I had been adequately conciliatory

21          and all that.  In retrospect, I probably could have

22          done a better job of it.

23    Q.    Did you consider giving her a phone call?

24    A.    No.

25    Q.    Is that something else you think you could have done

1    A.    If you say so.

2    Q.    Go ahead and take a look at it.

3    A.    I'll take your word for it.

4    Q.    Well, go ahead and look at Exhibit 20.

5    A.    All right.  We're talking Cindy Ingold, right?

6    Q.    Yeah.

7    A.    Okay.  (Witness reviews document.)  Yes.

8    Q.

9

10

11   A.

12   Q.    Now, was it different for you when you learned that

13         Ms. Nagelski had accused PPM of age discrimination

14         than it was for these other employees that had done

15         it?

16   A.    Yes.

17   Q.    Why so?

18   A.    Because I felt that we had a -- we, as a practice,

19         and we, as a family, and I personally had a different

20         relationship with her than I did with these other

21         employees.  She was family.  She had a special

22         status, if you will.

23   Q.    And when you learned that she had accused PPM of age

24         discrimination, her mother was still working for PPM,

25         right?

1   A.   Yes.

2   Q.   I mean, maybe it's just a normal reaction.  But, I

3        mean, was that awkward for you?

4   A.   A little bit, yes.

5   Q.   What do you mean by that?

6   A.   Well, I was concerned that -- well, two things.  One,

7        I percolated and -- not percolated.  I thought about

8        this, you know, for some time, so it wasn't an

9        immediate thing.  But I wanted to talk with Sue.  But

10       I knew that I couldn't because she started this

11       action.  So now it's too late.  I can't go back.  I

12       can't talk with her.

13            But I knew that her mother and she, most

14       likely, communicated fairly regularly.  So I called

15       Ms. Kovalich, and I said to her, basically, "I don't

16       understand why Sue has done this.  Please make sure

17       she has read my letter carefully," and that --

18       because in my mind at that time, I wasn't even

19       terminating her.  I realize now that it was a

20       termination of employment.  But I guess in my mind at

21       the time, there was more of a, "Hey, let's still work

22       together, but on a different -- with a different

23       business arrangement," sort of as on a project basis,

24       let's say.

25            So all I -- what I asked Ms. Kovalich to do

1    is, "Please make sure Suzanne has read this.  I know

2    I can't talk with her because of this.  Please make

3    sure she's read this."  And that was about it.

4         There was a later conversation wherein -- as

5    you said, it was awkward that Ms. Kovalich was still

6    employed and we had terminated her daughter.  And

7    Ms. Kovalich was in a position where, at that time

8    with the lab and with our relationship with Select

9    Laboratory and all of that, where if she had wanted

10   to retaliate against us for firing her daughter, my

11   concern was that she could hurt us.  She could have

12   sabotaged the lab.  She could have -- I don't know.

13   I don't mean, you know, mechanically sabotaged it.

14   But I really didn't feel that she would do that

15   because, as I had said before, I had a lot of respect

16   for her as a businesswoman and all that.

17        So as I thought about this, I thought,

18   "There's really no way I can make this perfectly safe

19   for us," but what I wanted to do was just hear from

20   her that despite the fact that I had terminated

21   Suzanne, that she was still in our camp and would

22   still do the -- you know, not do anything to sabotage

23   our laboratory billing.  Because, again, even though

24   our revenue was dropping as a result of the changes

25   in reimbursement for laboratory services, it

1          still -- and still is an important part of our

2          revenue stream for the practice.  It allows us to do

3          other things that we don't get paid for.

4                So I called her back and I just said, "I need

5          to hear from you that my firing of Suzanne is not

6          going to cause you to do anything to retaliate

7          against us, to do anything to hurt us.  I just need

8          to hear you say that."  And she did.  And I said,

9          "Thank you."  And that was it.

10   Q.    Was Ms. Spivey around when you were talking -- when

11         this second call happened; in other words -- let me

12         clarify.  During Ms. Kovalich's deposition, I think

13         she testified to not the exact conversation but

14         something similar.  But one thing she said was that

15         Ms. Spivey was in the background also expressing

16         fears about retaliation.

17   A.    I don't recall that at all.

18   Q.    You don't recall that testimony?

19   A.    Yes, I recall the testimony.

20   Q.    Do you know one way or the other whether Ms. Spivey

21         was there when you had that conversation with

22         Rebecca?  And by "there," I mean like close in

23         proximity to you.

24   A.    The first -- I know I've muddied the waters here with

25         my --

1    Q.    That's okay.

2    A.    The first phone call or the second one?

3    Q.    Yeah.  Let's go through both of them.

4    A.    Okay.

5    Q.    So was Ms. Spivey present -- and when I say

6          "present," again, let's say within the same room as

7          you.

8    A.    Earshot?

9    Q.    Earshot.  That's a good way to put it.  Was she

10         within earshot of you for the first call?

11   A.    No.

12   Q.    Was she within earshot of you for the second call?

13   A.    No.

14   Q.    Are there any other calls that you're aware of?

15   A.    No.  Well, what do you -- time out.  Calls to

16         Ms. Kovalich about those two subjects?

17   Q.    Yes.

18   A.    No.

19   Q.    When in relation to receiving this -- because I know

20         you said that you were aware that Sue was

21         represented, so you couldn't talk to her.

22   A.    Right.

23   Q.    How long do you think after receiving this that you

24         made that first call to Rebecca?

25   A.    I think it was after I had received the second letter

1          her to intervene on my behalf and beg Sue, or

2          whatever, to drop these.  And I never did that.

3               My recollection is that the main thrust of my

4          conversation, the main point, was please make sure

5          Sue has read this.  Because, again, I thought that

6          I -- you know, I was a nice guy and had offered her a

7          conciliatory letter.  And I felt bad about having to

8          terminate her, but -- anyway.  So I did not ask

9          Ms. Kovalich to intervene, to talk Sue out of

10         anything.

11    Q.   Sure.

12    A.   I mean, here's the thing.  She had already done it.

13         How could I have her undo it, was the way I was

14         thinking.  It was already done.  She had already

15         retained an attorney.  And at that point, had she

16         already filed an EEOC complaint?  I think she had.

17         So the ball was rolling.  But I just wanted her to

18         look over things, to make sure that she understood,

19         had read the letter.

20    Q.   Yeah.  Just to refresh your recollection, go back to

21         Exhibit 13.

22    A.   Which one?

23    Q.   13.

24    A.   Okay.

25    Q.   Just to show you that Sue's EEOC charge was filed in

1      messages to Ms. Spivey.  And, you know, these are

2      different, but have you seen these text messages

3      where it says, "Rebecca, my beauty, object of my

4      desire, your wannabe lover"?

5   A.  Yes, I have.

6   Q.  And do you deny sending those to Ms. Kovalich?

7   A.  I do not.

8   Q.  Do you feel it was appropriate to send those to her?

9   A.  Yes and no.

10  Q.  And you can go ahead and explain that.

11  A.  Okay.  Ms. Kovalich and I had a mutual admiration

12      society sort of thing.  I admired her for her

13      business acumen and for her success in basically a

14      male-dominated field of laboratory medicine.  I

15      admired her people skills.  I think she admired

16      my -- or at least she said so -- entrepreneurial bent

17      and my willingness to take risks, you know, and

18      develop the business, the practice.  And she greatly

19      assisted me in that.

20          We teasingly sent each other these messages,

21      which you will note in the ones from me, in the body

22      of it, it's all about business, questions about labs

23      and all that.  But basically there would be

24      salutations there, things like "my beauty" and things

25      like that.  And I would sign off with other things,

1           Certainly didn't say anything to Rebecca about

2       having given her a chance, and certainly did not mean

3       to imply that she had had a chance to have a

4       relationship with me.  And that was it.  So I deny

5       that emphatically.

6    Q.  Did Mary Benton take over some of Rebecca Kovalich's

7       tasks, as paragraph 38 alleges?

8    A.  Let me think a minute.  It was '14.  2014?

9    Q.  Well, just for this question, I'll say forget the

10      year here.  Was there any point where Mary Benton

11      took over some of Rebecca Kovalich's tasks?

12   A.  Only in that historically Ms. Kovalich had been a

13      mentor and consultant regarding business things and

14      business development; in particular, lab development.

15      And insofar as Ms. Kovalich in the past had helped us

16      in terms of reorganization of the practice, not

17      insofar as savings because of reimbursement loss and

18      all that, but rather -- you know, she came in even

19      back when we were at the old building, and I didn't

20      know how to run an office.  I didn't know who should

21      be doing what, and she did.  And so she helped us

22      assign people to different duties and sort of

23      reorganize our work flow.

24           So when Ms. Benton, in '14 -- I don't think

25      the date is right.  I think she came back on board in

1       '15 as we were implementing the EHR, so that date may

2       be wrong.  But certainly, once Mary Benton was back

3       in doing that, she did assist us in that same sort of

4       thing.  She certainly had nothing to do with the lab.

5       And at that time Ms. Kovalich's duties were

6       essentially lab development, so I don't see how Mary

7       Benton could have done any of that.

8            Now, let's see.  After Ms. Kovalich was

9       terminated, my recollection is that Ms. Benton did

10      sit in a time or two, was a part of the conversations

11      with Dr. Scheutzow, you know, when we were still

12      trying to get that going.  So, I mean, we strung that

13      along for a long time.  And it may have been after

14      '16, after June '16, when Ms. Kovalich was terminated

15      that Mary Benton was doing that.  But I don't know if

16      that refers to that or not.

17  Q.  Paragraph 39 on page 9.

18  A.  May we return to 38 for a moment?

19  Q.  Oh, sure.

20  A.  I completely dispute the statement that Mrs. Spivey

21      took control of the lab.

22  Q.  Okay.  Why?

23  A.  She has no lab experience.  She has nothing to do

24      with the lab.  Certainly couldn't take control of it.

25  Q.  Was there a time -- I know the answer to this.  I

Dr. Spivey Dep. Ex. 27
PPM Cash Balance
Plan 2017

FILED UNDER
SEAL

Dr. Spivey Dep. Ex. 90
PPM Cash Balance
Plan – Summary Plan
Description

FILED UNDER
SEAL