# EXHIBIT
# D

**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and SUZANNE )
NAGELSKI,                     )
                              )
            Plaintiffs,       )
                              )
    vs.                       )
                              )
PREFERRED PAIN MANAGEMENT & SPINE )
CARE, P.A., DR. DAVID SPIVEY, )
individually, and SHERRY SPIVEY, )
individually,                 )
                              )
            Defendants.       )
_____)

VIDEOTAPED DEPOSITION

OF

**SHERRY SPIVEY**

At Raleigh, North Carolina

Thursday, August 9, 2018

REPORTER:    ELAINE F. HAYES
             Notary Public

**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC  28105
980-339-3575

1    Q.    How long had you been back before you started working

2          in October of 2006?  Like what part of 2005 did you

3          move back?

4    A.    Moved back in May, I believe.  It was -- yeah, May.

5          And then what was the question after that?

6    Q.    That answers the question of just how long between.

7          So did you and Dr. Spivey move together in

8          May of 2005?

9    A.    Yes.

10   Q.    And were either of you working in that year from --

11         or that period from May 2005 until October of 2006?

12   A.    Yes.

13   Q.    Okay.  What was the income at that point?

14   A.    It was just his income.

15   Q.    What was he doing?

16   A.    He was practicing pain?

17   Q.    Where at?

18   A.    In Conover.

19   Q.    At what -- was it a clinic or hospital?

20   A.    It was a private practice.

21   Q.    I should have asked you this earlier because I know

22         it came up in the timeline.  When did you two meet?

23         What year would that have been?

24   A.    July 1979.

25   Q.    And when did you get married?

1   A.   December 31st, 1980.

2   Q.   So I think you just testified that you started

3        working at PPM in October of 2006; is that right?

4   A.   Right.

5   Q.   And what job did you have in the beginning?

6   A.   Well, there was just David, myself, and an office

7        person.  And what did I do, was a little bit of

8        everything from patient care to charts, paperwork,

9        getting patients registered, learning to run the

10       fluoroscopy machine, assisting David with procedures,

11       and just a little bit of everything because there was

12       only three of us.

13  Q.   And where was your -- what physical location were you

14       working at?

15  A.   At that time?

16  Q.   Yeah.

17  A.   On Charlois Boulevard in Winston-Salem.

18  Q.   Winston-Salem?

19  A.   Uh-huh.

20  Q.   Was that the only office in the beginning?

21  A.   Yes.

22  Q.   All right.  And the job duties that you just

23       described, did you have a job title in the beginning?

24  A.   No.

25  Q.   At some point did you have a job title?

1    A.    She was an employee at the Belk in Lexington, and she

2          did HR, payroll, and various HR-related duties there.

3    Q.    So she did HR --

4    A.    At Belk in Lexington.

5    Q.    Why did you hire her?

6    A.    We needed someone who was on site, and we were not

7          able to get that from Suzanne, and so we hired Wendy

8          because she could commit to being there full-time and

9          available to the employees rather than just by e-mail

10         or otherwise.

11   Q.    Who's Jennifer McGraw?

12   A.    She is my daughter.

13   Q.    Is she an employee of PPM?

14   A.    Yes, she is.

15   Q.    When did she start there?

16   A.    Two thousand -- probably 2012 or 2013.  It was during

17         when she was doing her master's degree and some

18         marketing and web.

19   Q.    And does she make about 70,000 per year?

20   A.    I don't think so.  I don't think it's that much, but

21         I don't really know.

22   Q.    You think it's probably less than that?

23   A.    Probably.

24   Q.    What does she do at PPM?

25   A.    She reviews a lot of statements in publication that

1    A.    No.

2    Q.    Why did you ask her to come to the office?

3    A.    Because there were employees who wanted to know why

4          their salaries and their PTO were not correct.  They

5          had questions, and she -- her comment would be to

6          either have them send her an e-mail or catch her when

7          she was there, but she was never available for a

8          face-to-face meeting with an employee that I'm aware

9          of that was one of those who was very insistent on

10         having a face-to-face with her.

11   Q.    But none of that was your concern, though, right,

12         because you didn't supervise her?

13   A.    I didn't supervise her, but a couple of those

14         employees were mine, and they were chewing on me

15         about it.

16   Q.    So was Sue different than Vicki Swicegood in that she

17         wasn't free to disregard what you told her to do?

18   A.    She could do whatever she wanted to do that was in

19         agreement with David.  I didn't have any authority

20         over Suzanne.  All I asked was, "I just need your

21         help with these employees," because one of them was

22         so angry she wanted to file suit, but she did not

23         want to file suit against PPM.

24   Q.    Sure.  But you agree you couldn't tell her what to

25         do?

1       it escalated between Katie and Suzanne around the

2       time -- it could have been December or January -- I

3       don't know -- of '13, '14, because it was before the

4       baby was born --

5   Q.  I got you.

6   A.  -- but after she had had her emergency surgery.

7   Q.  So likely late 2013 or early 2014?

8   A.  Probably, yes.

9   Q.  Were there any other employee issues that you can

10      recall sitting here today?

11  A.  Do you mean with HR or just in general?

12  Q.  So about eight minutes ago, I asked you kind of your

13      input --

14  A.  Uh-huh.

15  Q.  -- into the decision.  I know you said you didn't

16      make the decision --

17  A.  No.

18  Q.  -- but you gave input on these things, and you listed

19      disgruntled employees, the Philadelphia/we'll call it

20      tax thing where you had to come on a Monday on tax

21      day.  I guess I'm asking, is there anything else?

22  A.  You mean about the e-mails disappearing off of the

23      computers?

24  Q.  Sure.  Tell me about that.

25  A.  Well, on one instance -- well, Suzanne had a very

1     good working relationship with our IT company at the

2     time and was allowing them to use a room in the lower

3     floor of our building for their office, but was -- I

4     believe they were not paying rent, and so they would

5     be more available to us, was part of the reasoning

6     for that and -- but Jennifer Bailey happened to be --

7     and myself as well -- there was one evening we were

8     working and it was maybe the first or second time for

9     me, because I really didn't pay a lot of attention

10    because of the e-mails flying back and forth and the

11    information and all that, and we were still

12    researching.

13         And Jennifer Bailey happened to be on the

14    phone with Sarah Crotts, who's an employment attorney

15    with the firm that we use as our corporate attorney,

16    and her e-mails would be there and then when she got

17    ready to send them or if she received, they were

18    gone.

19         And she called Sarah on the phone to verify

20    that it wasn't a technical problem and asked were

21    they coming back and forth.  And I know at one point

22    Sarah said no, they were not, because I was in the

23    office with Jennifer while she was talking with Sarah

24    on the phone.

25         And as far as my e-mails, a couple of them --

Case 1:17-cv-00854-TDS-LPA   Document 42-4   Filed 10/01/18   Page 8 of 36

1       one of them in particular was a flight schedule that

2       was under the name of PPM with Sue's name on it, and

3       it just came across my e-mail, and it was about

4       frequent flyer miles and that sort of thing.  And it

5       was to Philadelphia.  And I didn't pay a whole lot of

6       attention to it.  I just kind of figure, "Well, this

7       is an errant e-mail," because as I said, you know, I

8       would go around and use different computers.

9           But then before I had time to file it or put

10      it on unread, star it, it was gone.  The next day it

11      was gone, specifically, because that was sort of late

12      in the evening.  And those are the -- I think, most

13      of the issues.

14          And also one night I had decided to audit the

15      amount of money that year that had been paid to the

16      IT company, and instead of it going through a work

17      ticket and being generated and the invoice coming in

18      and being reconciled so that it could be signed off

19      and paid, they just sort of had carte blanche, so any

20      employee in the office would just call them up and

21      say, "Well, my key is stuck," and they would come

22      over.  And they charged on, I believe, the half hour.

23      It could have been the quarter hour.  I'm not sure.

24          And so in auditing one night and pulling all

25      of the old invoices, we had paid them $55,000 that

1       year, and they only did -- except for troubleshooting

2       and repairs, they did maintenance on the computers

3       once a month.

4   Q.  The e-mail incident where the e-mail with the

5       Philadelphia stuff came in and then it was gone, when

6       did that happen?

7   A.  Early -- it was in the early months of the winter.

8   Q.  Of what year, do you think?

9   A.  '15.

10  Q.  Okay.  And when you did that audit, when did you do

11      the audit?

12  A.  In April.

13  Q.  Of 2015?

14  A.  Uh-huh.

15  Q.  Yes?

16  A.  Uh-huh, yes.  I'm sorry.

17  Q.  Do you have any IT training?

18  A.  Not any more than anyone else in the office does.

19      Just training on the software and how to navigate

20      our -- everything we do there.

21  Q.  Was an IT audit part of your job responsibilities?

22  A.  No, it was not.

23  Q.  Why did you do that?

24  A.  Because it just seemed to me that every time you

25      looked around the guys were in the office, and it

Case 1:17-cv-00854-TDS-LPA   Document 42-4   Filed 10/01/18   Page 10 of 36

1    would be maybe for the stroke of a key, not -- and

2    then the bills would come.  And Jennifer Bailey was

3    starting to notice because of compliance and making

4    sure that our BAAs were in place, and we didn't have

5    one with their company.

6  Q.  Okay.

7  A.  And there was a little bit of resistance and some

8    friction there to get that done, but they finally did

9    get it done.

10 Q.  And so with the e-mail incident from early 2015, are

11    you saying that -- what are accusing Sue of?

12 A.  I wasn't accusing her of anything.  I'm just saying

13    that that e-mail came to me, and it was obviously not

14    for me.

15 Q.  So otherwise, you have really no idea?

16 A.  I just figured it was an -- I was curious became it

17    had PPM across the top and Suzanne's name, and it was

18    during that length of time where I knew she was going

19    to Philadelphia a lot.  Allie had been really sick

20    and had had a surgery, if I've got my time frame

21    correct, and Sue was spending a lot of time up there.

22 Q.  Did you investigate it?

23 A.  Investigate what?

24 Q.  Whatever, the disappearing e-mails.

25 A.  Jennifer Bailey did most of that.  I just gave Donald

Case 1:17-cv-00854-TDS-LPA   Document 42-4   Filed 10/01/18   Page 11 of 36

1    and Michael the information that I had, and they did

2    a server interrogation.  There were two weeks worth

3    of info that somehow or another didn't get ported

4    over when we had switched from one server that was

5    old.  And there was also -- as far as investigating,

6    did you say the IT work or --

7  Q.  Yeah.  I'm just -- so you're saying you handed off

8    the investigation to Jennifer Bailey and somebody

9    else?

10 A.  I just told her what I knew.  I didn't hand her

11   anything.  I just -- and the fact that I'd had a

12   couple of e-mails that just were there and just kind

13   of went through and were gone.

14 Q.  And did they ever find any wrongdoing on the part of

15   Sue that you know of?

16 A.  We had a meeting with Donald Westmoreland, who owned

17   the company, and Michael Boles, who was -- I don't

18   know if he was a partner or an assistant or whatever.

19   And we had a meeting with Donald and David and

20   Suzanne and myself.  I believe Jennifer Bailey may

21   have been there, but I'm not sure who else was in

22   attendance.  Suzanne was there.

23       And it was very awkward because Donald

24   presented information that there were five user IDs

25   that could not be identified that seemed to be

Case 1:17-cv-00854-TDS-LPA   Document 42-4   Filed 10/01/18   Page 12 of 36

1     traceable back to Suzanne.

2  Q.  And then what happened?

3  A.  I don't know what happened after that.

4  Q.  Do you know if Suzanne was disciplined?

5  A.  I have no idea.

6  Q.  Okay.  What did you do in response to your IT audit

7     that you did on your own in April of 2015 when you

8     found out what the bill was?  Did you take any

9     action?

10  A.  I just told David that I just didn't get it.  They

11     just did not seem to have performed $55,000 worth of

12     work that year, and pulled the receipts and looked at

13     a lot of -- there would be things kind of scribbled

14     on as to what the description was of what they had

15     come for, repaired, or whatever, and they would round

16     it up to the -- like I said, I don't know if it was a

17     quarter hour or a half hour, but they'd round it up.

18  Q.  All right.

19  A.  And they did not have to have -- a work ticket was

20     not being generated.

21  Q.  With all the things we've just been through, the

22     hourly cap -- and you tell me if I'm missing

23     anything -- the disgruntled employees including

24     Jennifer Bailey in 2013, Brandi Frey in late '13

25     or '14, Katie Johnson about the same time, the

1    Q.   Did you have requisition forms for that?

2    A.   I don't remember that, but I do remember -- the lab

3         was -- I wasn't involved that much, and I don't

4         really remember why I was asking about the Medicare

5         codes other than the fact that a couple of the girls

6         in the clinic wanted to make sure that they had

7         checked off the proper codes, panels, or whatever.

8              And I didn't really have a lot to do with it

9         except for the fact that Medicare was not the most

10        friendly payor sometimes.  You had to submit it

11        correctly because it could take three months for a

12        turnaround if you didn't.  Is that what you're

13        asking?

14   Q.   Yeah.  Would Dr. Spivey know more about than you?

15   A.   Oh, absolutely.

16   Q.   And did he want to use the lab to make money?

17   A.   Absolutely.  And also because it was the best way to

18        monitor our patients and prescribe safely.

19   Q.   All right.

20   A.   And it also helped patients with their costs.

21   Q.   Why did PPM terminate Ms. Kovalich's employment?

22   A.   Her jobs were done.  She was hired for -- now, my

23        understanding -- mostly lab development, marketing

24        the business, that sort of thing, and working, I

25        assume -- if I don't misunderstand, going over

1        contracts and deciding what would be good with our

2        vendors as far as how the equipment was to be

3        handled, who was going to run them, how to get our

4        reagents, those kinds of things.

5    Q.  So her job was just done?

6    A.  After all that was finished, yes.

7    Q.  Again, you're listed as someone who had input --

8    A.  Yeah.

9    Q.  -- in the decision.

10   A.  Uh-huh.

11   Q.  Do you agree that you should be listed there for --

12       and this is number 5 on page 9 on the discovery, so

13       let's go ahead and flip back to that.  It's

14       Exhibit 5.

15   A.  I'm sorry.  What page?

16   Q.  Page 9.  It lists Dr. David Spivey, Sherry Spivey,

17       Mary Benton, Gretchan Hawks, Rodney Leftwich, and

18       Steven Wong, as people who had input into the --

19   A.  You're talking about the list?  I'm not sure what

20       you're referring to on this page.

21   Q.  Yeah.  I'm talking -- I guess -- let me rephrase.

22   A.  Okay.

23   Q.  What input did you have in the decision to fire

24       Rebecca?

25   A.  Only that she -- we were getting feedback from

1      Gretchan that Rebecca wasn't there very much, but she

2      said she was there a lot.  So who are you going to

3      believe on that?  And that was not my area.  I was

4      not ever involved in the lab.

5   Q.  Never?

6   A.  Never except going over to meet Rodney, and I knew

7      Gretchan because we had had the IR-500 in our office

8      in Winston, but when we got the mass spec and moved

9      over, we had a new chemist I had not met and I had

10     not seen where the lab was.  I didn't really

11     understand the equipment and how complicated it was

12     and how long it takes to learn to run it.  That's

13     while you have a chemist.

14  Q.  Did you have access to the lab billing?

15  A.  No.

16  Q.  Never?

17  A.  Never.

18  Q.  Did Rebecca?

19  A.  Yes.

20  Q.  Was that taken away from her at some point?

21  A.  After we brought billing in-house, we did that, is my

22     understanding, but I don't know about prior to that,

23     what that arrangement was, because that's one of the

24     areas that they worked closely on that I really

25     didn't have anything to do with --

1  Q.  Sure.  So Dr. Spivey --

2  A.  -- because it was an area that was foreign to me.

3  Q.  Aside from what you just described, any other input

4      that you had into Rebecca Kovalich's termination?

5  A.  I don't know that I was ever asked for any input.  I

6      may have been -- oh, I did complain that I did not

7      know when she went from independent contractor to

8      employee.

9  Q.  When did that happen?

10 A.  I don't remember when it was, but David could

11     probably tell you around the exact time.

12 Q.  And you made that complaint to David?

13 A.  Uh-huh.

14 Q.  Yes?

15 A.  Yes, because he didn't know.  I guess -- I don't know

16     if there was miscommunication or what, but he seemed

17     to be completely unaware.

18 Q.  Just a few minutes ago, you mentioned kind of some

19     input from Gretchan Hawks.

20 A.  Uh-huh.

21 Q.  Is there any other -- that you're aware of, any other

22     input she had in the decision to terminate Rebecca?

23 A.  Meaning Gretchan?

24 Q.  Gretchan.

25 A.  I don't have any idea.

1   Q.   What about Mary Benton?  What input did she have, as

2        far as you know?

3   A.   You know, I really don't know that one either except

4        for the fact that Mary went over budgets and we went

5        over what we needed to do, where we were

6        reorganizing, and what we needed to eliminate and

7        what we needed to add and move forward.  Our revenue

8        was down because of the payors and that sort of

9        thing.  And there was really just no need for her

10       position.  She had done all of her jobs up front.

11  Q.   What about Rodney Leftwich?  Do you know what input

12       he had?

13  A.   I have no idea.

14  Q.   Do you have any idea what input Dr. Steven Wong had?

15  A.   He was our pathologist.  And I only met Dr. Wong, I

16       think, twice ever.  And he was there for meetings,

17       and I was not involved in those.

18  Q.   So you don't know other than --

19  A.   Huh-uh.

20  Q.   Okay.  Is that a no?

21  A.   Pardon me?

22  Q.   Is that a no?

23  A.   It's a no.  I'm sorry.

24  Q.   So I was going to talk with you about the cash

25       balance plan --

1    A.   Okay.

2    Q.   -- and go through the document and everything.  Is

3         that something that Dr. Spivey would be able to

4         answer better than you?

5    A.   Absolutely.  He and Suzanne because she set it up,

6         and I really -- while I'm trying to be clinic, he's

7         trying to build a practice and that sort of thing.

8    Q.   Are you enrolled in the plan?

9    A.   Yes.

10   Q.   Do you know anything about how it works?

11   A.   Not really, and I know that probably sounds pathetic,

12        but I really don't --

13   Q.   No.  That's okay.

14   A.   -- because I was never involved in the business end

15        of it per se.

16   Q.   And do you know how long it would -- how many years

17        of service it would take someone to be in the plan

18        before they're vested in it?

19   A.   No.

20   Q.   Then I won't talk a whole lot about it.

21   A.   I think that's the one that you can't sign up for in

22        the middle of the year.  I'm not sure.  I don't know.

23        That may be the 401(k).  Sorry.

24             (Plaintiff's Exhibit 59 was marked.)

25   Q.   Take a look at Exhibit 59.  Now, this is an e-mail

1       to be going forward.  I didn't know.

2   Q.  You thought that her hiring a lawyer was spiteful?

3   A.  No, not her -- not him -- not you.

4   Q.  What are you saying was spiteful?

5   A.  That she did that, that she was going to sue us.

6   Q.  Right.  Did that upset you?

7   A.  Pardon me?

8   Q.  Did that upset you?

9   A.  Absolutely.

10          MR. HERRMANN:  This will be Exhibit 94.

11          (Plaintiff's Exhibit 94 was marked.)

12  Q.  And at the time, I mean, her mother, Rebecca, was

13      still working for PPM, right?

14  A.  That's correct.

15  Q.  This is a letter to me from James Wall.  Have you

16      seen this before?

17  A.  No.

18  Q.  It's from March 14th, 2016, just responding to the

19      allegations, right?

20  A.  Right.

21  Q.  And it says, "To the February 16, 2016, letter."  Do

22      you see that reference in the main body?

23  A.  I do.

24  Q.  All right.  Now, you were present for Rebecca

25      Kovalich's deposition, right?

Case 1:17-cv-00854-TDS-LPA   Document 42-4   Filed 10/01/18   Page 20 of 36

1   A.   Yes.

2   Q.   Do you recall her testifying that in March of 2016

3        Dr. Spivey had a call with her in which he asked her

4        to talk to Sue to drop the EEOC and legal

5        allegations?  Do you recall her testifying about

6        that?

7   A.   I'm sorry.  Say that again.

8   Q.   Sure.

9   A.   Do I recall her testifying about that?

10  Q.   Yeah.

11  A.   Yes.

12  Q.   And do you recall her testifying that you were in the

13       room, and I think you were in the background saying

14       something along the lines of, "Retaliation,

15       retaliation"?  Do you remember her testifying about

16       that?

17  A.   I don't remember that and -- I remember -- I remember

18       her saying that it was overheard by some other

19       parties, but the only time I can ever remember

20       Rebecca being on the other end of the phone and she

21       and I having a rather heated conversation was once

22       when she was angry with Suzanne and me and she was

23       screaming so loud into the phone -- David walked

24       through the living room, and I don't know if he

25       thought we were just messing or what, but, "Is that

1      Rebecca?"  And that's how loud it was, and it was

2      over Lisa.

3  Q.  When was that?

4  A.  I don't remember it being -- and she didn't talk

5      to -- Rebecca didn't talk to me for three months.  I

6      know she didn't talk to Sue for a while, but I don't

7      know how long, because Suzanne had been asking Lisa

8      to please keep a time sheet, is all she wanted, so

9      she could verify employment because, supposing she

10     went somewhere else, she would have nothing to prove

11     her employment with us, and it was a source of

12     contention.

13          And that's the only time I ever remember being

14     on the phone or the other end of anything, and I

15     don't remember anything about -- I remember Rebecca

16     saying "retaliation," but I never said that.

17 Q.  In Rebecca's EEOC charge -- I think it's just the way

18     they kind of summarize it -- there's a paragraph that

19     starts -- you have it.  It's Exhibit 14, if you want

20     to look.  Paragraph 11 says, "In March of 2016,

21     Dr. Spivey called me and told me that my daughter,

22     Sue Nagelski, was being let go.  I told him that was

23     between him and Sue.  She retained counsel and was

24     alleging that her termination violated the ADEA,

25     Title VII, and other various employment statutes."

1       Are you aware of that allegation?

2   A.  Yes.

3   Q.  And then it goes on and says, "He then said, 'My

4       attorney told me not to approach Sue.  Would you

5       please see what you can do to get her to drop it?'

6       He said," quote, "'Tell her that I will give her

7       whatever she wants as long as she drops it.'  I told

8       him I did not want to get involved.  I also told him

9       that I thought he was very cruel in how he handled

10      Sue's case."  All right.

11          Were you present for that conversation?

12  A.  No.

13  Q.  Do you know one way or the other whether that

14      conversation took place?

15  A.  No.

16  Q.  Okay.  Go ahead.

17  A.  It was my understanding that it was not David's

18      intention to actually fire and cut ties with Suzanne.

19      It was purely reorganization and the way her job

20      duties had been handled in the past, but he still

21      wanted to have her as a consultant.

22  Q.  Do you have Exhibit 68 in that stack in front of you?

23      I think you do.

24  A.  Let's see.

25  Q.  Go ahead and take a look at that.

1          MR. HERRMANN:  This will be Exhibit 36.

2          (Plaintiff's Exhibit 36 was marked.)

3    Q.    Do you recognize this?  I believe it was discussed

4          during Ms. Kovalich's deposition.  You might have

5          seen it there, but you can go ahead and just flip to

6          the one that says 274 in the bottom right-hand

7          corner.  It's in very small font, so it's three pages

8          in.

9    A.    Okay.  Okay.

10   Q.    All right.  And do you see a text from Dr. Spivey on

11         October 22nd, 2013, that starts with, quote, "Rebecca

12         my beauty"?

13   A.    Yes.

14   Q.    And do you remember that being discussed in

15         Ms. Kovalich's deposition?

16   A.    Yes.

17   Q.    In 2013, were you aware that Dr. Spivey was talking

18         to Rebecca and using those types of words?

19   A.    No.

20   Q.    When did you first learn about that?

21   A.    In her deposition.

22   Q.    How did that make you feel?

23   A.    Pissed off.

24   Q.    Do you still feel that way?

25   A.    No.  I don't have any animosity.  It's hard to remain

1       angry with someone.

2  Q.  And on the next page, 275, do you see where it says

3       "Object of my desire"?

4  A.  I do.

5  Q.  Is it the same thing?  You learned about that for the

6       first time in Ms. Kovalich's deposition?

7  A.  Yes.

8  Q.  And then on the next page, 276, there's a, "By the

9       way, thanks for the," quote/unquote, "'handsome'

10      moniker.  If business weren't so f...ing important,

11      Your wannabe lover."  Again, you saw that for the

12      first time in Ms. Kovalich's deposition?

13  A.  I did.

14  Q.  All right.  Were you aware of any inappropriate

15      conduct between Dr. Spivey and Ms. Kovalich while she

16      was still working at PPM?

17  A.  No.  I can't even entertain that vision.

18  Q.  Why is that?

19  A.  Well, I've known Rebecca for a long time, and I think

20      I know my husband for a long time.  And I just don't

21      see that.  The commonality was work.  And I could

22      see -- I could see the teasing going back and forth

23      and that sort of thing, but not a serious

24      relation- -- personal relationship, if that's what

25      you're saying.

1    Q.   Right.  And they were both -- well, you can correct

2         me if I'm wrong -- both PPM employees when this was

3         happening; is that right?

4    A.   Suzanne and Rebecca?

5    Q.   Rebecca and Dr. Spivey.

6    A.   I guess so.

7    Q.   Would you consider those text messages to be

8         inappropriate between coworkers?

9    A.   It would depend on the context of -- well, or how you

10        knew the people back and forth.  I think it could be

11        interpreted, if you didn't know them, in lots of

12        different ways, and until -- you know, when I first

13        heard it, of course I was not happy, but after it was

14        explained to me, then I -- yes.

15   Q.   What was the explanation?

16   A.   That it was just teasing back and forth, and she had

17        been very helpful to him and he wanted to compliment

18        her, but only in a way that would be appropriate to

19        communicate things to her like that, but not in a

20        romantic way.  Does that make sense?

21   Q.   Yeah.

22   A.   I'm not sure I verbalized that very well.

23              MR. HERRMANN:  This will be Exhibit 1.

24              (Plaintiff's Exhibit 1 was marked.)

25   Q.   Do you recognize this?

1   A.   Yes.

2   Q.   And it's the complaint filed by Rebecca Kovalich and

3        Suzanne Nagelski, right?

4   A.   Yes.

5   Q.   Go ahead and flip to page 8.

6   A.   Okay.

7   Q.   You know, it looks like paragraph 34, kind of

8        referencing -- it says, you know, love letters,

9        e-mail, that sort of thing.  We've talked about text

10       messages.  In paragraph 35, it says, "In or around

11       late 2013, possibly angered by her husband's sexual

12       advances towards Rebecca, Mrs. Spivey berated Rebecca

13       in a conference room full of other employees.  As

14       Rebecca tried to leave, Mrs. Spivey repeatedly

15       slammed the door and screamed," quote, "'Fuck you,

16       Rebecca.'  This was around 5:15 p.m. while PPM

17       employees were still attending to patients."

18            Do you dispute that that happened?

19  A.   Yes.  This is the incident that we talked about

20       earlier.  There was -- it was 5:25.  I had asked her

21       about the Medicare.  There were no patients in the

22       office and just Brandi on the other side who could

23       hear our voices but not what we were saying.  And no.

24       I disagree with this completely except yes, I did

25       slam the door and say that.

Case 1:17-cv-00854-TDS-LPA   Document 42-4   Filed 10/01/18   Page 27 of 36

1   Q.   You did say that?

2   A.   I did.

3   Q.   And you're saying this was related to Medicare?

4   A.   It was the incident that happened that we talked

5        about earlier when I was sitting at the checkout desk

6        and when I was asking about the Medicare coding.

7        This, I dispute.

8   Q.   Okay.

9   A.   I don't dispute my behavior.

10  Q.   Okay.  Understood.  In paragraph 36, it says, "In or

11       around May 2014, while Rebecca was in Charleston,

12       Dr. Spivey called her and said he had to see her.  He

13       said he was coming to Charleston.  When Rebecca told

14       him not to come, Dr. Spivey interrupted and asked,"

15       quote, "'What are you wearing?'"

16            So, you know, I know we talked about text

17       messages earlier, but did you discuss this allegation

18       with Dr. Spivey?

19  A.   I think this is when he was there for a meeting in

20       Charleston, and I was there with him.  And we were

21       staying in one of her beachfront houses.  And I

22       don't -- I don't know anything about this phone call

23       to her.

24  Q.   When did you stay in one of Rebecca's beachfront

25       houses?

1   A.   It was around this time of year because we had gone

2        down -- if I am remembering correctly, we had gone

3        down to a meeting, and I had food poisoning the night

4        before.  And so I did not go to the conference the

5        next day.  Rebecca drove him downtown, picked him up

6        and drove him downtown because she had a friend who

7        she said she could park at their home because they

8        were in Europe for the summer.

9             But I don't know anything about this, and I

10       may have my time frame wrong, but this doesn't sound

11       much like David.

12  Q.   On the next page, paragraph 39, it says, "In or

13       around October 2015, Rebecca entered Dr. Spivey's

14       office to ask him a question.  The office door was

15       open, but he was undeterred.  While standing in his

16       office, Dr. Spivey snapped.  He grabbed Rebecca and

17       started kissing her.  In complete shock, Rebecca

18       froze with terror.  She looked at Dr. Spivey,

19       informed him that this was inappropriate, and told

20       him that she needed to leave."

21            Have you discussed that with Dr. Spivey?

22  A.   No.

23  Q.   Do you recall that testimony during Rebecca's

24       deposition about this incident?

25  A.   Yes.

1    Q.   Was that the first time you had heard about this?

2    A.   In her deposition?

3    Q.   Yeah.

4    A.   Yes.

5    Q.   Had you reviewed it in the complaint before then?

6    A.   I can't remember.

7    Q.   Do you know one way or the other whether that

8         happened?

9    A.   I wouldn't know that at all.  I mean, I would have no

10        idea.

11             MR. HERRMANN:  This will be Exhibit 35.

12             (Plaintiff's Exhibit 35 was marked.)

13   Q.   All right.  This is some text messages from Rebecca

14        and Vicki Swicegood that were produced in discovery.

15        At the bottom of the first page, do you see the

16        July 24th, 2013, stamp on there?

17   A.   Yes.

18   Q.   I'll ask you to go to the page that has 282 in the

19        bottom left-hand corner.  It's in very small numbers.

20        It looks like this.  All right.

21             It looks like from January 23rd, 2014, there's

22        a text from Vicki to Rebecca that says, quote,

23        "Brandi was shocked by Sherry's yelling 'Fuck it,'

24        then slamming the door.  Take care."

25             Do you think this relates to that same

S. Spivey Dep. Ex. 63
Text Messages

FILED UNDER
SEAL

S. Spivey Dep. Ex. 67
10/27/2016 Email
from S. Spivey

FILED UNDER
SEAL

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION     Page   1   of   1

## ACTIVITY LOG

### 430-2016-01529C

| Date | User | Event |
|------|------|-------|
| 05/27/16 09:57 | Martin, Jamilah | Uploaded CP's Affidavit, Form 283, Charge Questionnaire, and documents submitted |
| 06/06/16 10:11 | Martin, Jamilah | Uploaded Charge of Discrimination |
| 06/06/16 10:11 | Martin, Jamilah | Uploaded Intra- and inter-agency memoranda and letters |
| 06/06/16 10:11 | Martin, Jamilah | Uploaded Intra- and inter-agency memoranda and letters |
| 06/06/16 10:11 | Martin, Jamilah | Created Notice of Charge |
| 06/06/16 10:11 | Martin, Jamilah | Uploaded Notice of Charge |
| 06/06/16 10:11 | Martin, Jamilah | Emailed Notice of Charge to wyontz@ppmandsc.com |



PLAINTIFF'S DEPOSITION EXHIBIT
97
S. Spivey

KN 1885



**U.S. Equal Employment Opportunity Commission**
**Charlotte District Office**

129 W. Trade Street
Suite 400
Charlotte, NC 28202
(704) 344-6682
TDD: 1-800-669-6820
Fax: (704) 954-6410
1-800-669-4000

MEMORANDUM                                    DATE:    **JUN – 6 2016**

TO:                 Arlene Glover, Director for Greensboro Local Office

FROM:               Sandra Chavez, Intake Supervisor for Charlotte District Office

SUBJECT:       TRANSFER OF:        ( X )  CHARGES (S)

                                   (  )   CORRESPONDENCE

                                   (  )   OTHER _____

Please find the above indicated subject matter (s) enclosed herein. We are forwarding said subject matter(s) to your office for processing because it has been determined that the responsibility for scope and plan of the investigation based on:

                                   ( X )  RESPONDENT (S)

                                   (  )   SIGNATORY (S)

                                   (  )   OTHER

Is located within your jurisdiction.

| CHARGE NO. | CHARGING PARTY | RESPONDENT |
|---|---|---|
| 430-2016-01529 | Sue Nagelski | Preferred Pain Management |

*CP/PC (S)      ( X ) HAVE      ( ) HAVE NOT BEEN NOTIFIED

*RESPONDENT    ( X ) HAVE      ( ) HAVE NOT BEEN NOTIFIED

KN 1886

 **U.S. Equal Employment Opportunity Commission**
**Charlotte District Office**
129 W. Trade Street
Suite 400
Charlotte, NC 28202

## NOTICE OF CHARGE OF DISCRIMINATION

(This Notice replaces EEOC FORM 131)

### DIGITAL CHARGE SYSTEM

June 6, 2016

**To:** Wendy Yonce
Human Resources Director
PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A.
wyontz@ppmandsc.com

This is notice that a charge of employment discrimination has been filed with the EEOC against your organization by Sue Nagelski, under: Title VII of the Civil Rights Act (Title VII) and The Age Discrimination in Employment Act (ADEA). The circumstances of the alleged discrimination are based on Retaliation, Age, and Sex, and involve issues of Demotion and Discharge that are alleged to have occurred on or about Jan 19, 2016.

The Digital Charge System makes investigations and communications with charging parties and respondents more efficient by digitizing charge documents. The charge is available for you to download from the EEOC Respondent Portal, EEOC's secure online system.

Please follow these instructions to view the charge within ten (10) days of receiving this Notice:

1. Access EEOC's secure online system: **https://nxg.eeoc.gov/rsp/login.jsf**
2. Enter this EEOC Charge No.: **430-2016-01529**
3. Enter this password: (b)(6);(b)(7)(

Once you log into the system, you can view and download the charge, and electronically submit documents to EEOC. The system will also advise you of possible actions or responses, and identify your EEOC point of contact for this charge.

If you are unable to log into the EEOC Respondent Portal or have any questions regarding the Digital Charge System, you can send an email to Charlotte@eeoc.gov.

KN 1887

## Preservation of Records Requirement

EEOC regulations require respondents to preserve all payroll and personnel records relevant to the charge until final disposition of the charge or litigation. 29 CFR §1602.14. For more information on your obligation to preserve records, see http://eeoc.gov/employers/recordkeeping.cfm.

## Non-Retaliation Requirements

The laws enforced by the EEOC prohibit retaliation against any individual because s/he has filed a charge, testified, assisted or participated in an investigation, proceeding or hearing under these laws. Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. For more information, see http://www.eeoc.gov/laws/types/facts-retal.cfm.

## Legal Representation

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please provide the attorney's contact information when you log in to the online system.

Please retain this notice for your records.

KN 1888