# EXHIBIT
# E

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:17-cv-00854-TDS-LPA


REBECCA KOVALICH and SUZANNE        )
NAGELSKI,                           )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             )
                                    )
PREFERRED PAIN MANAGEMENT & SPINE   )
CARE, P.A., DR. DAVID SPIVEY,       )
individually, and SHERRY SPIVEY,    )
individually,                       )
                                    )
            Defendants.             )
_____)




D E P O S I T I O N

OF

**MARY BENTON**




At Winston-Salem, North Carolina

Monday, August 27, 2018


REPORTER:    ELAINE F. HAYES
             Notary Public



**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC  28105
980-339-3575

1       the termination?

2   A.  I needed advice on a noncompete.

3   Q.  After Novant, what was your next job?

4   A.  I've been self-employed since March of 2012.

5   Q.  What are you self-employed at doing?

6   A.  I started a company in 2008 called Zaytoun,

7       Z-a-y-t-o-u-n -- it's my maiden name -- Zaytoun

8       Development, Inc., Incorporated.

9   Q.  You started that in 2008?

10  A.  I did.

11  Q.  Was Novant aware that you had started that company?

12  A.  They were.

13  Q.  And what -- well, let me back up.  Do you still

14      provide services through Zaytoun Development, Inc.?

15  A.  I do.

16  Q.  And what types of work do you do?

17  A.  Consulting, business consulting, space planning, and

18      programming.  I represent tenants and buyers.

19  Q.  Do you do any real estate work?

20  A.  In real estate.  That's correct.

21  Q.  What percentage of your work through Zaytoun

22      Development is dedicated to real estate?

23  A.  Probably 60 percent.

24  Q.  And has that been the same since you started it, or

25      has that percentage changed from 2008 to the present?

1          and Vicki Swicegood in preparation for their move

2          from Charlois Boulevard to Maplewood Avenue.

3    Q.    Do you recall roughly how much that invoice was for?

4    A.    I do not.  The very first invoice was from August

5          through January.  I don't recall how much it was for.

6    Q.    And what sort of services had you provided between

7          August and January 2014?

8    A.    I was beginning to work with them, providing move

9          management services, preparing them for the move.  In

10         addition, I was asked to review the renovation of the

11         Maplewood building.

12   Q.    Anything else?

13   A.    Huh-uh.

14   Q.    No?

15   A.    No.

16   Q.    All right.  How did you first come to work for -- to

17         provide services for PPM?

18   A.    I had known Rebecca Kovalich and Vicki Swicegood in

19         prior years when they were with other practices.  And

20         they contacted me through knowledge of my experience,

21         I would presume, to come help with the move.  I was

22         first contacted in August of '13.

23   Q.    Of '13?

24   A.    Yes.

25   Q.    When was the first time that you met Dr. Spivey?

1      their appointment was transferred over to the person

2      in scheduling.

3   Q.  ████████████████████████████████████████████

4      give him some feedback about her position, or what

5      prompted you to kind of go through the stuff that we

6      talked about earlier with regard to her role and

7      whether it was needed?

8   A.  I felt like my job as a consultant and part of the

9      reorganization was to look at different positions and

10     the need for them.  And so I gave him input into that

11     in writing.

12  Q.  Did he ask for that input?

13  A.  We discussed it, and he did say, "Would you put --"

14     I discussed it with him, and then he said, "Why don't

15     you put that in writing," which I gave and indicated

16     it was my opinion.

17  Q.  And I guess my -- before you came to that opinion and

18     you, I guess, voiced it and it wasn't in writing yet,

19     was that something that you kind of did on your own

20     or did someone ask you to do it?

21  A.  No.  I did that on my own.

22  Q.  Okay.  Would the same thing go for Ms. Skowronski?

23     Did you do that on your own -- in other words, look

24     into whether her position was needed, that sort of

25     thing?

Case 1:17-cv-00854-TDS-LPA   Document 42-5   Filed 10/01/18   Page 5 of 15

1    A.   We talked about it with Betty and Wendy.   I was

2         looking for opportunities to control costs.   That was

3         one of them.

4    Q.   ████████████████████████████████████████████

5    A.   ████████████████████████████████████████████

6    Q.   Yeah.

7    A.   She worked in medical records in Winston as well as

8         in Greensboro.

9    Q.   Did you give input into the decision to terminate

10        her?

11   A.   I did not.

12   Q.   Who would have, if you know?

13   A.   The people that she reported to.   That would be Wendy

14        and Betty.

15   Q.   Was her termination part of the reorganization?

16   A.   It was not.

17   Q.   Do you know why she was terminated?

18   A.   I believe because of performance.

19   Q.   ████████████████████████████████████████████

20   A.   ████████████████████████████████████████████

21        ████████████████████████████████████████████

22   Q.   Do you know why she was terminated?

23   A.   For reorganization.

24   Q.   And were you a part of the discussions leading up to

25        the decision to terminate her?

1    speak, or completed and signed off by the physician.

2    PAs cannot close encounters.  Their encounters have

3    to be closed by a physician, either Dr. Spivey,

4    ████████████████████████████████████████████████

5    many, many days and sometimes weeks of delay for

6    ████████████████████████████████████████████

7    cash flow because we couldn't bill.

8  Q.  ██████████████████████████████████████████

9    reorganization?

10 A.  Part of it was, yes.

11 Q.  And what was the other part?

12 A.  Well, that would be between him and Dr. Spivey.  I

13    didn't sit in on those conversations.

14 Q.  And just to be clear, for all these that we've talked

15    about today, terminations that you've had input, you

16    never made the final decision, correct?

17 A.  I never made the final decision.  I acted in the

18    consulting role, gave my opinion.  Dr. Spivey made

19    the decision.  I did not.

20 Q.  Dr. Spivey made those decisions?

21 A.  Uh-huh.

22 Q.  Yes?

23 A.  Yes, Dr. Spivey made those decisions.  It's his

24    practice.

25 Q.  So is your testimony that you've been part of the

1          reorganization since, I don't know, early 2016?

2    A.    That's correct.

3    Q.    And it's still ongoing today?

4    A.    We're always looking, yes.

5    Q.    During that time, what steps has PPM taken to ensure

6          that the reorganization hasn't had a discriminatory

7          impact on the basis of age?

8    A.    That's not my responsibility.  I think you'd have to

9          ask Dr. Spivey or Wendy.

10   Q.    So Dr. Spivey or Wendy would be better to talk to

11         about that?

12   A.    Yes.  Age never came into my conversations that

13         I -- you know, that I had.

14   Q.    Sure.  I just want to make sure.  But you're just

15         not -- you don't know, but you're not aware of steps

16         that were taken to ensure that there wasn't a

17         discriminatory impact?

18   A.    Based on what?

19   Q.    The reorganization since you've been a part of it.

20   A.    A discriminatory impact based on what?  Age, sex?

21   Q.    Age.

22   A.    Age?  No.  You know, I myself had been through it.  I

23         was 61 years old when I got -- when my position was

24         eliminated at Novant.

25   Q.    Right.  Understood.  Do you know one way or the other

1    A.    I talked with Dr. Spivey about my concerns of Rebecca

2          not being involved as much in the lab, the fact that

3          we were looking at costs.  As a matter of fact,

4          Rebecca knew I was looking at a budget for the lab

5          and wanting to control costs, looking at expenses and

6          income.

7    Q.    Do you recall roughly when conversations like that

8          would have started happening with Dr. Spivey?

9    A.    Probably the February, March, April kind of time

10         frame of 2016.

11   Q.    Do you recall whether you were asked to look into

12         Ms. Kovalich and the necessity for her being there

13         going forward, or did you do that on your own?

14   A.    I did that on my own.  I was asked to look into the

15         budget for the lab, including rent and management

16         fees being paid to Select Laboratory Partners, cost

17         of reagents, cost of outside vendors who managed

18         their lab information system.  So I was looking at

19         all the costs associated with running the lab.

20   Q.    And when did you start looking into that?

21   A.    That was in that end of that first quarter of '16.

22   Q.    And who asked you to do that?

23   A.    Dr. Spivey.  He did not specifically ask me to do the

24         budget.  As we began talking about it, I offered to

25         put together that budget.

1   Q.   Talking about what?

2   A.   We were talking about costs.

3   Q.   With regard to the lab?

4   A.   With regard to the practice.  At that point we were

5        talking about the lab.

6   Q.   What did you do to find out, you know, kind of what

7        Rebecca was contributing to the lab?

8   A.   I asked Gretchan and Rodney because I went to them

9        for the information regarding costs.

10  Q.   What did Gretchan tell you?

11  A.   Well, they gave me cost figures.  At that point I was

12       not paying invoices, so I didn't know what lab

13       charges were without going to them for those costs.

14  Q.   Aside from the cost figures, what other information

15       did Gretchan and Rodney give you?

16  A.   I asked them if Rebecca came very often to the lab.

17       Now, this is in '16.  And they told me that she

18       didn't come very often.

19  Q.   Any other input they gave you about Rebecca?

20  A.   No.

21  Q.   Did you ask if Rebecca was doing work from outside

22       the lab?

23  A.   I did not.

24  Q.   Was it important to you that she was not physically

25       at the lab?

1       lab, and one of those expenses would have been

2       Rebecca's salary.

3   Q.  Did you ever meet with Rebecca to learn about her

4       background?

5   A.  Not specifically.  I mean, I knew that she had helped

6       Dr. Spivey set the lab up.  I knew that she had set

7       up other labs in the past, that she had been a

8       practice manager.  But I didn't -- after I started

9       working with Dr. Spivey and Preferred Pain, I don't

10      recall that I sat down and interviewed with her, that

11      kind of thing.

12  Q.  Did you ever ask her what services she was providing

13      for PPM?

14  A.  I didn't.

15  Q.  Did you ever ask anyone else what services Rebecca

16      was providing?

17  A.  I asked Gretchan and Rodney when I went and asked

18      them did she come, what is she doing, you know, and I

19      asked, you know, in terms of the day-to-day

20      responsibilities.

21  Q.  When you asked them what she was doing, what did

22      Gretchan tell you?

23  A.  For instance, I asked about invoices, and Gretchan

24      indicated that she handled all the -- she, Gretchan,

25      handled all the invoices, the interaction with Select

 1     as it relates to providing reagents, that kind of

 2     thing.

 3  Q.  Did you ever ask Gretchan if she thought she could do

 4     Rebecca's job?

 5  A.  No, I don't recall asking her directly that question

 6     at all.

 7  Q.  Did you ever ask them kind of open endedly, "What

 8     does Rebecca do?"

 9  A.  Yes.  And actually it ended up -- I got a list of

10     what Gretchan was doing, some of which I thought

11     might have been what Rebecca did, but Gretchan was

12     doing those functions.

13  Q.  What did they tell you in response to what

14     Ms. Kovalich was doing?

15  A.  They didn't tell me specifically what she was doing.

16  Q.  But you asked and they didn't answer?

17  A.  I don't recall that I asked specifically what does

18     she do versus what the list of responsibilities were

19     that Gretchan provided.

20  Q.  What is your background with regard to laboratories,

21     other than what we discussed earlier?

22  A.  That's all.

23  Q.  How did you evaluate Rebecca's, I guess,

24     contributions to PPM?

25  A.  I don't think I said I did that.

1  Q.   Okay.  Did you think that was unimportant for your

2        decision to eliminate her position?

3  A.   I didn't recommend eliminating her.  I recommended

4        eliminating the position.

5  Q.   And you knew Rebecca was in the position?

6  A.   Yeah, of course I knew Rebecca was in the position,

7        uh-huh.  But I looked at each one of the positions

8        that got eliminated based on reorganization the same

9        way.  It wasn't about the person.  It was about

10       function and the need to cut costs as part of the

11       reorganization.

12  Q.  After Rebecca was terminated, were you given the job

13       of creating a budget for the laboratory?

14              MS. SMITH:  Objection.

15  A.  I created the bud- -- I looked at the budget for the

16       lab prior to her termination.

17  Q.  Did you continue to do that after her termination?

18  A.  Yes.

19  Q.  Did your role in doing that increase after she was

20       terminated?

21  A.  No.

22  Q.  Have you ever gone to the lab and count specimens?

23       Is that something you would do?

24  A.  No, that's not anything I would do.

25  Q.  Would you ever stop a courier from picking up

1       specimens?

2   A.  No.

3   Q.  Would you ever call Gretchan or Rodney and ask them

4       to make sure a courier didn't pick up a specimen?

5   A.  Not that I recall.  I would have -- I wasn't involved

6       in that process.

7   Q.  Do you recall sending a memo regarding whether or not

8       Ms. Kovalich was doing her job in the lab?

9   A.  Yes.  I sent a memo to Dr. Spivey about that.

10  Q.  And what do you recall saying?

11  A.  I recall saying that it was my opinion that I didn't

12      feel like she was there.  I wasn't aware, as I was

13      putting together the budget, that there were any

14      costs being cut or looked at.  For instance, I had

15      found out that we were paying Comtron, which was part

16      of the LIS, a monthly fee for services to the

17      Tosoh -- that's T-o-s-o-h -- machine.  It wasn't even

18      in use.

19          And we had been paying $75 a month for that.

20      I believe it was 75.  And so I looked and ended up

21      terminating that part of the invoicing with Comtron.

22      To my knowledge, they have not ever activated the

23      Tosoh machine.  It was bought for lab work but never

24      put into service.

25  Q.  Did you do anything else in preparing that memo other

1        than what we've already discussed?

2    A.  I don't believe so.  Looked at the budget and looked

3        at Rebecca's interaction and attendance in

4        Greensboro.  Those were the things I commented on.

5    Q.  Okay.  Why was her physical attendance something that

6        you were concerned with?

7    A.  Well, because this was a group of employees that

8        didn't -- that had a manager that, it was my opinion,

9        they weren't seeing because Gretchan and Rodney told

10       me that she didn't come very often.  And that was a

11       concern to me.

12   Q.  And why was that a concern?

13   A.  That there was -- the leadership that they would

14       need.  I thought that was concerning.

15   Q.  But you didn't ask them, either Gretchan or Rodney,

16       any questions about Ms. Kovalich's accessibility when

17       she's outside the office, did you?

18   A.  I asked them did she come.  Now, what she did

19       otherwise outside the office, I wasn't privy to.

20   Q.  And my question was just, yes or no, you didn't ask

21       either Gretchan or Rodney about Ms. Kovalich's

22       availability when she was not physically present in

23       the office, correct?

24   A.  I did not.  Whether she was available by phone or

25       e-mail, I did not.  I don't recall.