# EXHIBIT F

**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and SUZANNE )
NAGELSKI, )
                                      )
        Plaintiffs, )
                                      )
  vs. )
                                      )
PREFERRED PAIN MANAGEMENT & SPINE )
CARE, P.A., DR. DAVID SPIVEY, )
individually, and SHERRY SPIVEY, )
individually, )
                                      )
        Defendants. )
_____ )

D E P O S I T I O N

OF

**VICKI SWICEGOOD**

At Winston-Salem, North Carolina

Friday, August 24, 2018

REPORTER:    ELAINE F. HAYES
                 Notary Public

**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC  28105
980-339-3575

```
 1         So I said, "Okay, that'll be fine."
 2    Q.   So when you first started at PPM, did you have a job
 3         title?
 4    A.   If I did, I never knew.  I mean, people would refer
 5         to me as the office manager.  But officially, if it
 6         was that, I don't know.
 7    Q.   Okay.  And what all did you do in the beginning?
 8    A.   Whatever was required.  When I walked in, the desk
 9         was full.  There was no HR files to speak of.  I just
10         sort of took -- I looked around to see where they
11         were and what needed to be done, and just whatever I
12         saw that came up, whatever Dr. Spivey might have
13         asked.  If he had a particular request, I would do
14         that.  It was one of those things that anything that
15         needed to be done that somebody else didn't do.
16    Q.   Got you.  Did it stay that way the whole time you
17         were there?  In other words, that sort of what you
18         just described, was that your whole tenure there or
19         did that change at some point?
20    A.   By the time I was there, I was doing HR, I was
21         doing -- I would help with the coding.  If there was
22         a problem on the front desk, Annette and I would work
23         out where the problem was, and one of us would handle
24         how to retrain somebody to be more efficient.  If
25         there was a problem -- you'd be surprised how many
```

```
 1         clinical staff.  The final okay would always be
 2         Dr. Spivey's okay for the clinical staff.  But you
 3         may have found three or four people in that room
 4         interviewing the clinical staff.
 5              As far as the support staff, a lot of times I
 6         would just interview those and go ahead and hire
 7         them.
 8    Q.   And you made those decisions?
 9    A.   I would.  A lot of times I would go to Suzanne, and I
10         would discuss what their salary -- we would discuss
11         salary and positions and what was needed.  But I
12         would defer a lot of my questions to Suzanne on the
13         support side.
14    Q.   Okay.  Would Dr. Spivey ultimately have to sign off
15         on those hires?
16    A.   He did on the clinical staff, on the clinical side.
17    Q.   What about on the support side?
18    A.   I don't recall.
19    Q.   What about Mrs. Spivey, was she involved in
20         interviewing for clinical staff?
21    A.   For a long time, no.  It was when we lost our -- we
22         only had three nurses.  And when we lost two of them
23         in the same Friday afternoon, and they weren't coming
24         back on Monday, Sherry showed up.
25    Q.   Roughly when did that happen?
```

1  A.   Oh, gosh, yes.
2  Q.   Why do you say that?
3  A.   I mean, she kept the lab going. And if there was a
4       problem, that was one of those areas you didn't have
5       to worry about because it was going to be taken care
6       of.
7  Q.   And when it comes to running the lab, is that
8       somewhere where Rebecca excels?
9  A.   Oh, I would think so.
10 Q.   And you would have considered her an asset to PPM?
11 A.   Fantastic.
12 Q.   The same question, but for Suzanne Nagelski. Do you
13      remember how you first met her?
14 A.   I met Suzanne as a little girl.
15 Q.   So you've known her for a long time?
16 A.   It seems like somewhere -- I couldn't tell you when I
17      met her, but she was a little girl.
18 Q.   Did you ever have any issues with her while you
19      worked at PPM?
20 A.   I doubt it.
21 Q.   Were you aware of other employees that had issues
22      with Suzanne while you were at PPM?
23 A.   The only issue that ever came up with Suzanne was
24      Annette and Suzanne may have had some kind of
25      disagreement over the billing. And I'm not -- I

     didn't ask enough questions because that was between Annette and Suzanne. But Annette did say something about, "I'm not sure what it is that's going on or what I'm supposed to do, or what I'm -- I'm just not sure."

     And that was -- if there was a problem there, that was the most I ever heard.

Q. Okay. Did Suzanne regularly work remotely?
A. Yeah.
Q. Did other employees work remotely, too?
A. No, not remotely. I took work home, but --
Q. Well, not just you, but other employees who worked there?
A. Not that I am aware.
Q. Well, even though she worked remotely, did you -- well, strike that. You described her as your supervisor, right?
A. I would go to her, directly to her.
Q. Were there ever any problems created by her not physically being there?
A. No, because I had immediate access.
Q. It was very easy to get ahold of her?
A. I always got ahold of her. I never -- there was never a time that the call was not answered. I usually got a response to a question within a very

1    who I was.
2         Gosh, there was just so much laying on the
3    desk.  I couldn't tell you now.  I just remember
4    there was a lot of things that needed to be handled.
5 Q. So when you got there, from what you can remember at
6    PPM, there were maybe three to four personnel files.
7 A. Uh-huh.
8 Q. Is that right?
9 A. Uh-huh.
10 Q. Is that a yes?
11 A. Yes, yes.
12 Q. And at that point, did you have employees that were
13    there at PPM that had no personnel file?
14 A. What I found was like an application, applications.
15    There was a drawer, three or four files with a name
16    on them.  But there was a lot of paperwork,
17    applications, resumes.  There was just a drawer.  And
18    so basically, you took everything out of the drawer.
19         I identified who was working there, made the
20    files, put the resumes somewhere.  I don't know.  But
21    you just cleaned out the drawer to make it something
22    that you could find.  And then started creating their
23    files.
24 Q. And can you recall any of the names of the employees
25    that you created their HR files?

1       supervised, total number of employees?
2  A.   The only supervision I had would be of
3       those -- direct supervision would have been those
4       five. Wait. I forgot Greensboro. I actually did
5       supervise the two on the front desk in Greensboro. I
6       forgot those. So five, six, seven. And what was
7       your question?
8  Q.   So I was trying to clarify the total number of
9       employees that you supervised throughout the two and
10      a half years.
11 A.   Five to seven.
12 Q.   That was the total, or at one time you were
13      supervising five?
14 A.   These would -- that would be at one time.
15 Q.   At one time?
16 A.   Yeah.
17 Q.   Can you think of the number of employees that you
18      supervised during your total two and a half years at
19      PPM, with people coming in and out, the total number?
20 A.   The total number? Oh, the total with the ones that
21      came in? The number of people that -- I would have
22      no idea.
23 Q.   Would you say it was more than 10 people?
24 A.   I'd say 10, 11.
25 Q.   And you'd also testified earlier -- you made a

```
 1        general statement, "By the time I was there, I was
 2        doing HR." What does that entail, if you can
 3        remember, HR?
 4  A.    HR, I would keep the files. I would interview. I
 5        did reviews, listened to a lot of he said/she said,
 6        "I don't like this," complaints, arguing.
 7  Q.    Was it normal for PPM employees to bring their
 8        complaints to you?
 9  A.    A lot of times.
10  Q.    Can you remember any of those complaints?
11  A.    "So-and-so is not doing -- they're not carrying their
12        weight."
13             "Okay. Tell me what it is that they're not
14        doing, not just that they're not carrying their
15        weight." That was a big one.
16             "This person is on her cell phone all the
17        time. We can't get anything done listening to her be
18        on the cell phone all the time." Those are the ones
19        I really recall.
20  Q.    So would you categorize those complaints as typical,
21        everyday --
22  A.    Typical.
23  Q.    -- employee complaints to HR?
24  A.    Uh-huh.
25  Q.    Is that a yes?
```

**CONFIDENTIAL**

Ms. Swicegood                                                    80

```
 1  Q.  Okay.  Back to one of my earlier questions I had
 2      asked you.  You testified, "By the time I was there I
 3      was doing HR."  And so we just talked a little bit
 4      about some of the counselings that you were involved
 5      in.
 6  A.  Uh-huh.
 7  Q.  What about terminations?  Were you involved in any
 8      terminations during your time at PPM?
 9  A.  Oh, yeah.
10  Q.  Tell me about that.
11  A.  There was a problem and we couldn't rectify it or
12      make things a little bit -- to work out.  I do know
13      that there were some people that I did let go.  And
14      don't ask me today their names.  I do not recall
15      their names.  But that did happen.
16  Q.  Can you recall anyone's name that you were involved
17      in their termination at PPM?
18  A.  Not at this time.
19  Q.  The terminations that you were involved in while you
20      were at PPM, would that have included employees
21      working at the front desk?
22  A.  Uh-huh.
23  Q.  Yes?
24  A.  If that was -- if it was necessary.  Now, at the
25      front desk, there was one person, and I could not
```

REED & ASSOCIATES
980-339-3575

Case 1:17-cv-00854-TDS-LPA   Document 42-6   Filed 10/01/18   Page 10 of 14

|   |    |                                                          |
|---|----|----------------------------------------------------------|
| 1 |    | tell you who she was. I can see her sitting there in     |
| 2 |    | the old building. Seem like that was a termination,      |
| 3 |    | but I couldn't tell you why.                             |
| 4 | Q. | So at this point you recall terminating someone that     |
| 5 |    | was at the front desk, but you cannot --                 |
| 6 | A. | I would have --                                          |
| 7 | Q. | -- recall the name?                                      |
| 8 | A. | I would have to have the personnel files to go           |
| 9 |    | through to get that kind of stuff.                       |
| 10| Q. | Now, for that employee specifically, would you have      |
| 11|    | documented in their personnel --                         |
| 12| A. | Yes.                                                     |
| 13| Q. | And I'm just going to say, because it's really tough     |
| 14|    | for the court --                                         |
| 15| A. | Oh, yes.                                                 |
| 16| Q. | It's tough for the court reporter to dictate what we     |
| 17|    | are both saying at the same time. So I know some of      |
| 18|    | my questions are really long, but if you'll just         |
| 19|    | allow me to get the whole question out before you        |
| 20|    | answer, I'd appreciate that, because I want to make      |
| 21|    | sure that, you know, everything that you have to say     |
| 22|    | is recorded as well.                                     |
| 23|    | For any employees that you were involved in              |
| 24|    | their termination, would you have noted that in their    |
| 25|    | personnel file?                                          |

1  A.  Yes.
2  Q.  Do you remember how you would have noted that in
3      their personnel file?
4  A.  I think there was -- if I recall, I had some forms,
5      something about their reviews, and on there it
6      was -- there was a place that had something to do
7      with maybe termination. And I would have used that
8      form.
9  Q.  How did you get this form?
10 A.  I don't know if it was one I brought from a previous
11     office. Was it something Suzanne gave me or was it
12     already there? I have no idea now.
13 Q.  But you do recall some type of termination --
14 A.  I did -- I did have a form. I'm sorry.
15 Q.  That's okay. So you do recall having some type of
16     termination form that you would include in an
17     employee's personnel file?
18 A.  Yes.
19 Q.  And do you remember if you would cite the reasons for
20     their termination on the form?
21 A.  Always.
22 Q.  And you would sign your name on that termination
23     form?
24 A.  Yes.
25 Q.  You testified earlier -- Mr. Herrmann had asked you,

CONFIDENTIAL

1  Q.  Do you still maintain a friendship with Rebecca
2      today?
3  A.  Yes.
4  Q.  Tell me about that.
5  A.  Oh, we have dinner usually about once a month or so
6      together. And occasionally, I have gone to see her
7      at her place at the Isle of Palms.
8  Q.  And that's a house that Ms. Kovalich owns down at
9      Isle of Palms?
10 A.  Uh-huh. Right.
11 Q.  And would you consider yourself still to be friends
12     to this day?
13 A.  Yes.
14         MS. GOFORTH: I'd like to take a short break.
15         (Recess from 12:16 p.m. to 12:23 p.m.)
16 By Ms. Goforth:
17 Q.  Vicki, just a couple more questions. How did you
18     come to learn about this lawsuit?
19 A.  I'm not sure about the very first time I have known
20     about it. But what I read was in that -- there is a
21     Triad Magazine. And I think I got two or three calls
22     about, "Did you see the Triad Magazine?" Or somebody
23     had called somebody, and somebody else called. And
24     so it went through several people like that. But
25     there was an article in this Triad Magazine.

1  Q. And were you the PPM employee that would reach out to
2     Salem Solutions about hiring or ending a temporary
3     staff employee's placement?
4  A. Most of the time, yeah.
5          MS. GOFORTH: No further questions.
6          (The taking of the foregoing deposition was
7           concluded at 12:31 p.m. on Friday, August 24,
8           2018. Signature was reserved.)
9
10                    * * * * *