# EXHIBIT G

**CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and SUZANNE    )
NAGELSKI,                        )
                                 )
        Plaintiffs,             )
                                 )
  vs.                            )
                                 )
PREFERRED PAIN MANAGEMENT & SPINE )
CARE, P.A., DR. DAVID SPIVEY,    )
individually, and SHERRY SPIVEY, )
individually,                    )
                                 )
        Defendants.             )
_____)

D E P O S I T I O N

OF

**GRETCHAN HAWKS**

At Winston-Salem, North Carolina

Friday, August 24, 2018

REPORTER:    ELAINE F. HAYES
                Notary Public

**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC  28105
980-339-3575

```
 1        metabolized through the body.
 2             But the screen does not pick that up.  That
 3        technology does not.  So it's better that you have a
 4        confirmation because, you know, patients can
 5        adulterate a specimen.  So it's more of a definitive
 6        way.
 7   Q.   Okay.  Understood.  What steps happened at PPM for
 8        them to do confirmation testing?
 9   A.   I don't know.
10   Q.   Okay.  Who asked you to start working full-time, or
11        did it just kind of happen?
12   A.   It just -- I think Rebecca did.  I know Rebecca did.
13        I don't think; I know.
14   Q.   Are you familiar with an employee -- I think he's in
15        Greensboro -- named Rodney?
16   A.   Yes.
17   Q.   What is his last name?
18   A.   Leftwich.
19   Q.   Did Rebecca bring him on as well?
20   A.   Well, here's -- she put the feelers out there or -- I
21        don't know if it was Indeed or -- now I know.
22        Crystal Warner, yeah.  Crystal works over at Select
23        or not -- she doesn't work for -- she did -- she was
24        a Select employee.  But she worked in the lab next to
25        ours, and she knew Rodney because she had worked with
```

```
 1         him at Ameritox.
 2               So Rebecca knew Crystal from her husband who
 3         was a -- it's one of those stories where --
 4    Q.   I understand.
 5    A.   If you know Rebecca, Rebecca knows everybody.  So
 6         Rebecca knew --
 7    Q.   All right.  And did you work alongside Rodney?
 8    A.   I still do, yeah.
 9    Q.   You still do?  All right.  Is he a good employee?
10    A.   Oh, yes.
11    Q.   Today, what are your job responsibilities?
12    A.   Well, making sure that everybody's there and keeping
13         our turnaround times low.  I do -- I interpret the
14         data and work on the LC-MS, and I screen as well.
15         I'm capable of doing all those things, but when
16         I'm -- I work more so now with interpretation and
17         with the LC-MS and then oversee that the screening is
18         done because we've got somebody that works part-time
19         that does the screening in the morning.  And when she
20         can't finish it, then I finish it in the afternoon.
21    Q.   Who's that part-time employee?
22    A.   Diamond Pinnex, P-i-n-n-e-x.
23    Q.   Are you exclusively in Greensboro?
24    A.   Yes.
25    Q.   How long have you been in Greensboro?
```

1  Q.   Do you recall any conversations in late 2015 or 2016
2       whatsoever with Dr. Spivey about Rebecca?
3  A.   No, I do not.
4  Q.   How often do you speak with Dr. Spivey?
5  A.   I can't put like once every month because I don't
6       talk to Dr. Spivey a whole lot, not -- maybe once
7       every three months.
8  Q.   As far as you know, did -- it's Rodney Leftwich,
9       right?
10 A.   Rodney Leftwich, yes.
11 Q.   Did he ever tell Dr. Spivey that Rebecca was no
12      longer needed in the lab?
13 A.   I never heard him say that. I can't speak for
14      Rodney, but I wouldn't -- I can give you my opinion
15      on that, and that would be no. But I can't say that
16      because I'm not around Dr. Spivey and Rodney. I
17      mean, they could call each other, for all I know.
18 Q.   It's a very similar question. I just want to ask it
19      a different way with Rebecca. Did you ever tell
20      Dr. Spivey that the duties that Rebecca was doing in
21      the lab were no longer necessary?
22 A.   No.
23 Q.   Okay. Fair enough. Who did you report to? Let's
24      just kind of narrow down the time frame. When
25      Rebecca was still there, who was your direct

```
 1        supervisor?
 2   A.   I considered Rebecca my direct supervisor, that she
 3        was the person between Dr. Spivey and I.
 4   Q.   And what about after Rebecca left?  Who did you
 5        report to then?
 6   A.   Dr. Spivey.
 7   Q.   And is that the same today?
 8   A.   Yes.
 9   Q.   Did you ever report to Sherry Spivey?
10   A.   No.
11   Q.   Did you ever report to Mary Benton?
12   A.   No.  Even though it may try to seem that way, no, no,
13        no.
14   Q.   So who is Mary Benton?
15   A.   Mary Benton is the -- I think her title is the
16        operations manager, operations person, yeah.
17   Q.   Do you know whether she also does real estate work?
18   A.   I've seen that on her e-mail.
19   Q.   Why do you say -- I don't understand; I'm not
20        there -- that some people might say that, or
21        something along those lines, that Mary Benton --
22   A.   What did I say?
23   Q.   When I asked you if you reported to her, you said
24        something like --
25   A.   No.
```

1  A.   They brought some papers over for us to sign.  I
2       can't remember.  Some sort of paperwork about HIPAA
3       or something like that.
4  Q.   Not a very long visit?
5  A.   No.
6  Q.   What do you remember about the second visit?
7  A.   Oh, we just got together and discussed, like, what
8       things would look like in the absence of Rebecca.  We
9       went out to -- I think we -- did we got out to -- I
10      don't know that we -- yeah.  I think that was just
11      it, yeah.
12 Q.   How did things change in the absence of Rebecca?  Did
13      they at the lab?  I mean, what were some differences
14      that you discussed and all that?
15 A.   As far as the lab -- Rebecca was -- by that point in
16      time, we were running pretty well, I mean, like a
17      well-oiled machine, I would say.  And we just -- I
18      mean, and that's why I don't talk to Dr. Spivey very
19      much because, you know, if he don't have any
20      complaints -- I mean, I like Dr. Spivey, but, I mean,
21      he's got a job to do.  He don't need to be messing --
22      you know, as long as we've got things running
23      smoothly, there's no need to call us, you know.
24           And sometimes we need to be called and say,
25      "Look, that turnaround time is stinking.  You need

1           to --"  You know what I'm saying?
2  Q.   Sure, sure.
3  A.   So that's the only time -- I mean, in a business, I
4       think -- well, this is just too much.  But in a
5       business sometimes you just want to hire people that
6       can do their job without you, you know, breathing
7       down their backs, micromanagement.  You just --
8       that's just how it is.
9  Q.   Does Mary Benton have anything to do with your IT?
10 A.   I think Maureen is the IT person.  I know Maureen is
11      the -- and she's the one that I call.  I think -- I
12      think Mary has become more of a delegator, if you
13      will.
14 Q.   Sure.  Do you know whether or not Mary Benton has any
15      oversight in the lab interface?
16 A.   No, no.  No, she does not, no.  I was just thinking
17      about this one time she called one time to get -- no,
18      she does not.
19 Q.   What was that one incident you were thinking of?
20 A.   We have a Tosoh that we needed to get it off of the
21      interface, and she called about that.  And I can't
22      even remember why it needed to be off of the
23      interface, but it did.
24 Q.   What's a Tosoh?
25 A.   Oh, it's just an instrument.

1              questions for me.
2
3                    EXAMINATION BY MS. SMITH
4    Q.   Ms. Hawks, I do have a few questions for you.  Can
5         you tell me what Dr. Spivey's position is in terms of
6         the lab?
7    A.   He's over -- he's like -- in terms of the lab?
8    Q.   Uh-huh.
9    A.   I go to him.
10   Q.   Does he have a title when it comes to the lab?
11   A.   He does, but I can't think of what it is right now.
12        Can you help me with that?  It's in our book, because
13        we have a personnel book on Dr. Spivey, and he is
14        the -- there's a general supervisor and then there is
15        one up from that that has to be a medical doctor.  It
16        can't be a Ph.D.
17   Q.   Okay.
18             THE WITNESS:  (To Mr. Herrmann)  You don't
19                  remember that?
20   Q.   He can't answer --
21   A.   He has a title.
22   Q.   He can't answer your question.
23   A.   I'm sorry.  I'm sorry.
24   Q.   So does the term medical director, does that sound
25        familiar?

```
 1   A.   Yes.  Thank you.  Thank you.
 2   Q.   So Dr. Spivey is the medical director of the lab?
 3   A.   Yes.
 4   Q.   And I think you just testified that the medical
 5        director has to be a medical doctor; it cannot --
 6   A.   Right.  It can't be a Ph.D., like Dr. Wong's a Ph.D.
 7   Q.   And what is Dr. Wong's role in the lab?
 8   A.   Okay.  He's our medical director.  Dr. Wong is the --
 9        I need to do my homework on that.  He is whatever the
10        medical director --
11   Q.   Is he the clinical director?
12   A.   Thank you.
13   Q.   Okay.  So when Ms. Kovalich worked at the lab, was
14        she qualified to be the director of the lab?
15   A.   No.
16   Q.   When Ms. Kovalich worked at the lab, was she
17        qualified to be the clinical director of the lab?
18   A.   No.
19   Q.   And when Ms. Kovalich worked at the lab, was she
20        qualified to run any of the screenings or do any of
21        the confirmation testing at the lab?
22   A.   No.
23   Q.   Okay.  So she did not have the CLIA certifications
24        that she needed?
25   A.   Right, right, right, to do that sort of job.
```

| | | |
|---|---|---|
| 1 | A. | Uh-huh. |
| 2 | Q. | And after she left, I think that's when you said that |
| 3 | | your duties had changed? |
| 4 | A. | Yes. |
| 5 | Q. | And is that because you started doing the LC-MS? |
| 6 | A. | Right. |
| 7 | Q. | Okay. And I have in the company's records that |
| 8 | | Sherdenia left in December of 2016. Does that sound |
| 9 | | right to you? |
| 10 | A. | Yes, it does, yes. |
| 11 | Q. | Okay. So after December -- |
| 12 | A. | Yeah, that's when she left. I'm sorry. |
| 13 | Q. | After December 2016, that's when your duties changed |
| 14 | | and you started doing more of the LC-MS? |
| 15 | A. | Right. |
| 16 | Q. | Okay. Do you know if anyone has been hired to |
| 17 | | replace Ms. Kovalich in what she did at the lab? |
| 18 | A. | No. |
| 19 | Q. | No, you don't know, or no, no one's been hired? |
| 20 | A. | In what she did as far as the liaison between |
| 21 | | Dr. Spivey and myself and with the billing part? |
| 22 | Q. | (Ms. Smith nods head affirmatively.) |
| 23 | A. | Not that I know of. |
| 24 | Q. | So no one has been hired to replace those duties, as |
| 25 | | far as you know? |

1  A.  As far as I know.
2           MS. SMITH:  Let's take a quick break, but I
3              think we're almost done.
4           (Recess from 2:54 p.m. to 2:57 p.m.)
5           MS. SMITH:  Ms. Hawks, that's all.  I don't
6              have any further questions.
7           THE WITNESS:  Is that it?
8           MS. SMITH:  Yes.
9           THE WITNESS:  That's great.
10          MR. HERRMANN:  I don't have any.
11          (The taking of the foregoing deposition was
12             concluded at 2:57 p.m. on Friday, August 24,
13             2018.  Signature was reserved.)
14
15                    * * * * *
16
17
18
19
20
21
22
23
24
25