# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

| | |
|---|---|
| REBECCA KOVALICH and SUZANNE NAGELSKI, <br><br> Plaintiffs, <br><br> vs. <br><br> PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A., DR. DAVID SPIVEY, individually, and SHERRY SPIVEY, individually, <br><br> Defendants. | **DECLARATION OF DR. DAVID SPIVEY** |

Under penalty of perjury as provided by law, the undersigned certifies pursuant to 28 U.S.C. § 1746 that the following statements are true and correct:

1. My name is Dr. David Spivey. I am older than the age of legal majority, suffer from no legal disabilities, and am otherwise competent to give this declaration.

2. This declaration is freely and voluntarily given on my own behalf and is based upon my personal knowledge of the matters contained herein.

3. Sherry Spivey and I married in 1980 and remain married.

4. I graduated medical school from the University of North Carolina in 1981.

5. After graduating from medical school, Sherry Spivey and I moved to California where I practiced medicine for several decades.

6. In 2005, Mrs. Spivey and I returned to North Carolina from the west coast to be close to our aging parents.

7. In 2006, Mrs. Spivey and I decided that I should start my own pain management practice in Winston-Salem, North Carolina. At that time, there was an opportunity to open a pain management practice in Winston-Salem.

8. In 2006, I established what is now known as Preferred Pain Management & Spine Care, P.A. ("PPM") in Winston-Salem and serve as the owner, President, and CEO. PPM is a medical clinic which focuses on providing patients with treatments to reduce their levels of pain and increase their functionality. PPM focuses on interventional pain procedures, supporting medications, and advanced therapies to control and relieve their patient's pain.

9. Currently, PPM has two clinic locations in Winston-Salem and Greensboro. PPM operates a laboratory at a separate location in Greensboro.

***Relationship with Rebecca Kovalich***

10. Rebecca Kovalich married Sherry Spivey's brother Daryl Huffman. Their daughter is Suzanne Nagelski ("Nagelski"). Nagelski is my niece. Sherry Spivey's brother and Kovalich are no longer married.

11. In 2006, I consulted with Rebecca Kovalich ("Kovalich") because she had prior experience operating a lab, and utilized her contacts in the medical community to begin my own practice.

12. Kovalich's principal role was to assist PPM in developing the laboratory which opened in 2013. Kovalich helped with selection of equipment, the location, and marketing. Kovalich also handled the hiring for the lab.

13. Initially, Kovalich worked as an independent contractor providing consulting services to PPM. Later, Nagelski changed Kovalich's status from independent contractor to

employee effective December 1, 2013. When Kovalich became an employee, she did not have an official title or official job description.

### *Relationship with Suzanne Nagelski*

14. Around 2006, I engaged Nagelski to start working for on an independent contractor basis after she obtained her MBA. Initially she performed administrative functions for PPM, including assistance with technology contracts and payroll for the practice. Over time, as the practice grew, Nagelski's duties with PPM evolved. Nagelski assisted with electronic IT security and compliance issues. She also performed human resource ("HR") functions and served as a financial consultant and liaison between PPM and the Company's banks and accountants. In 2013, PPM hired Nagelski as a W-2 employee.

15. The growth of the practice meant that it had become more necessary to have on-site HR support. Sherry Spivey and I repeatedly asked Nagelski to work on-site at least a few days a week to take care of PPM's HR needs. However, Nagelski always refused. As the practice grew, several of the functions originally assigned to Nagelski were assigned to other service providers or on-site employees.

16. Throughout Nagelski's employment, there were several issues with her being insubordinate. On several occasions Nagelski overstepped her authority. For example, she signed contracts on behalf of the Company without any authority to do so. I also discovered Nagelski had purchased an expensive laptop without approval. Another time, PPM had to pay two service providers for the same work because no one at PPM knew Nagelski had already hired someone to do the work.

17. There were also times where Nagelski threatened to resign if she did not have her way. On one particular occasion, she demanded that PPM fire two employees, that were over

forty, or else she would quit. Another time, Nagelski instructed staff to reassign patient scheduling duties to front desk employees. When I told her that it troubled me she would make such a decision without consulting me, especially since it affected my workflow personally, Nagelski responded she was resigning from PPM because I was not supporting her.

18. Nagelski also had conflicts with several staff members throughout her time at PPM. For example, Sherry Spivey asked to see information about the Paid Time Off ("PTO") accrued and used by employees Sherry Spivey supervised because employees were complaining their PTO balances were inaccurate. When Sherry Spivey asked Nagelski for this information, Nagelski refused. Nagelski only provided it after I ordered her to do so. Nagelski also routinely refused to meet with personnel on-site to discuss any HR related questions. Instead, she only wanted to speak with employees by email or over the phone. Had Nagelski not been a relative, I would have separated her employment long before due to her insubordinate behavior. However, I tolerated Nagelski's behavior because she was family.

19. In July 2015, PPM decided to terminate some of its Greensboro employees. I expressed to Nagelski the importance of having HR present during the terminations along with the company's attorney and requested she be there in person. Nagelski had booked a trip to Philadelphia and told me that she wanted to reschedule the termination date. Nagelski told me one of the employees was in a protected class, but never raised any specific allegations of discrimination. As was typical practice with terminations, I asked Nagelski to consult with our attorney. I believed Nagelski was merely making an excuse to avoid having to cancel her trip to Philadelphia to visit her daughter.

20. Sherry Spivey and I began to lose trust in Nagelski because she engaged in a pattern of suspicious behavior, especially related to the Company's finances. For example, while I was

on leave from the practice, Nagelski told me that I should give her power of attorney so that she could handle matters in my absence. However, PPM's attorney advised me otherwise.

21. During this same time, Kovalich and Nagelski attempted to gain access to the Company's patient billing account Ebridge without any authority. Kovalich had a contact with the Company's billing vendor Physician Discoveries, which managed PPM's Ebridge account. Shortly after this incident, Nagelski tried to convince me that bringing billing in house would be a complete failure despite the significant cost savings to PPM. Nagelski also frequently had closed door meetings with Lisa Palmer who handled accounts payable, and shared confidential information with her mother, while at the same time refusing to share information with Sherry Spivey. In late 2015, our BB&T advisors alerted me that there was vulnerability in accounts payable.

22. Further, after PPM hired full-time on-site HR, Nagelski was extremely resistant to turn over payroll. I learned that Nagelski and a few select others had access to PPM's payroll account through Flex-Pay. I did not even have access.

23. I had previously observed Nagelski with a computer icon labeled "e-mail forwarding". When I asked Nagelski about it, she said it was nothing and quickly changed the subject and deleted the icon. Later on, employees reported disappearing emails. We had IT conduct a network investigation which concluded that there were unidentified email accounts routing on the server, suggesting Nagelski's involvement.

24. Around 2014, Sherry Spivey and I began considering the reassignment of Nagelski's HR duties. Finally, in November 2015, we hired Wendy Yontz, who before PPM was working in HR at Belk, to provide full-time on-site HR. Nagelski's HR duties were reassigned to

Ms. Yontz since Ms. Yontz could be on-site full-time. Since PPM hired Ms. Yontz, HR is more organized. Even then, Nagelski was resistant to turning over payroll duties to Ms. Yontz.

*PPM Forced to Cut Expenses*

25. Around 2014, insurance reimbursements dropped throughout the practice. In addition, there was more pain management competition in the area, less outside referrals, and patient volume decreased. Therefore, around 2015, one way PPM began cutting expenses was by reassigning duties and making reductions in personnel.

26. In 2015, Mary Benton began advising the Company on operational strategy in light of the need to cut expenses. PPM had previously used Ms. Benton at the recommendation of Kovalich. In working with Ms. Benton, I found her to be extremely organized and I valued her advice on how to reduce expenses and reorganize the practice. I tasked Ms. Benton with evaluating the practice and finding areas where we could control costs in order for the business to survive. Ms. Benton created an Action Plan recommending the areas and positions PPM needed to evaluate. I considered the Action Plan while the practice was in the process of reorganizing. Ms. Benton specifically advised on the Action Plan that PPM evaluate whether the need for a full-time financial liaison was necessary.

27. Once Nagelski's HR duties were reassigned, her only job function was serving as the financial liaison between the Company, the banks, and the accountants. In evaluating whether the position of financial liaison was necessary, I consulted with Ms. Benton, BB&T wealth management advisors Jonathan Cochrane and Rob Davis, as well the accountants at Turlington & Company Scott Hummel and Brenda Thrower. All advised me that Nagelski's financial liaison position was not needed. Ultimately, Benton and I decided that Nagelski's position was no longer necessary and she was terminated.

28. As of February 1, 2016, Nagelski was no longer an employee of PPM. I sent a letter dated January 17, 2016, to Nagelski indicating that I would consider using her services as a consultant on an as-needed basis. I requested a fee schedule from Nagelski, but she never provided one.

29. As one of the decision makers of Nagelski's termination, I did not consider age, sex, or any protected characteristic, nor did I even think about the Company's Cash Balance Plan in considering or deciding to eliminate Nagelski's position. At the time Nagelski was terminated, I was 63 years old.

30. Lab development ceased in 2015. I had considered terminating Kovalich, but kept paying her because, in part, her salary was to compensate her for the things she had done earlier on in the practice for which I felt that she had not been adequately compensated. Several times I suggested other ways to pay Kovalich including ownership in a new lab and a lump sum. Kovalich declined.

31. In 2016, Ms. Benton recommended we eliminate Kovalich's position because she was rarely at the lab and the employees were handling the day-to-day operations. By June 2, 2016, I had decided to eliminate Kovalich's position since the need for Kovalich's services had become obsolete and the Company needed to cut costs in order to become financially viable—which, included eliminating pay for services that were not necessary to the business. As such, on June 9, 2016, Kovalich's position was eliminated. No one has replaced Kovalich because her position no longer exists.

32. As one of the decision makers of Kovalich's termination, I did not consider age, sex, or any protected characteristic, nor did I even think about PPM's Cash Balance Plan in

considering or deciding to eliminate Kovalich's position. At the time Kovalich was terminated, I was 64 years old.

## *The Company's Cash Balance Plan*

33. PPM created the Preferred Pain Management, PA Cash Balance Plan ("the Plan") as a created as a way for PPM to provide more employee benefits in addition to retirement. The Plan is administered by an outside third-party The Newport Group, Inc. ("Newport Group"). As the third-party administrator, Newport Group oversees the administration of the Plan and ensures its legal compliance. I have a basic understanding of the Plan, but PPM and I rely on Newport Group and its expertise in managing the Plan.

34. The Plan consists of five Participant Groups, A-E. I am the sole Participant in Group A, which receives a contribution of 76% of my compensation. Mrs. Spivey is the sole Participant in Group B, receiving a contribution of 30% of her compensation. Group C consists of lineal ascendants and descendants of more than 5% owners, which is my daughter Jennifer Spivey McGraw, who receives no contribution. Group D consists of non-owner highly compensated employees, which also receives no contribution. All others not in Groups A, B, C, or D, are in Participant Group E, and receive a 3% contribution of their compensation. Prior to December 2016, Participants in Group E received a 2% contribution.

35. Once an employee has been employed by PPM for one year or 1,000 hours, they are eligible to participate in the Plan ("Plan Participant"). The Plan Participants make no contribution themselves. Instead, the Company contributes a percentage of a Plan Participant's compensation into the Plan, depending on which Participant Group they are in as defined by the Plan. After three years of service, the Plan Participant becomes 100% vested in the Plan. Nagelski and Kovalich were in Participant Group E.

*

*

I swear and affirm under the penalties of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

FURTHER DECLARANT SAITH NOT.

Executed this __1ST__ day of October, 2018.

_____
DR. DAVID SPIVEY

4817-2096-0883, v. 1