# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO.: 1:17-cv-00854-TDS-LPA

| | |
|---|---|
| REBECCA KOVALICH and SUZANNE NAGELSKI, | ) ) ) |
| Plaintiffs, | ) ) ) |
| vs. | ) ) |
| PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A., DR. DAVID SPIVEY, individually, and SHERRY SPIVEY, individually, | ) ) ) ) ) ) |
| Defendants. | ) |

**DECLARATION OF SHERRY SPIVEY**

Under penalty of perjury as provided by law, the undersigned certifies pursuant to 28 U.S.C. § 1746 that the following statements are true and correct:

1. My name is Sherry Spivey. I am older than the age of legal majority, suffer from no legal disabilities, and am otherwise competent to give this declaration.

2. This declaration is freely and voluntarily given on my own behalf and is based upon my personal knowledge of the matters contained herein.

3. I became a Registered Nurse ("RN") in 1978.

4. Dr. David Spivey ("Dr. Spivey") and I married in 1980 and remain married.

5. After Dr. Spivey graduated from medical school in 1981, we moved to California and lived out west for several decades.

6. In 2005, Dr. Spivey and I returned to North Carolina from the west coast to be close to our aging parents.

7. In 2006, Dr. Spivey and I decided that he should start his own pain management practice in Winston-Salem, North Carolina. Winston-Salem appeared to be the best location for that opportunity.

8. In 2006, Dr. Spivey established what is now known as Preferred Pain Management & Spine Care, P.A. ("PPM") in Winston-Salem. PPM is a medical clinic which focuses on providing patients with treatments to reduce their levels of pain and increase their functionality. PPM focuses on interventional pain procedures, supporting medications, and advanced therapies to control and relieve their patient's pain. I serve as a Clinical Supervisor for PPM in both locations.

9. Currently, PPM has two clinic locations in Winston-Salem and Greensboro. PPM operates a laboratory at a separate location in Greensboro.

10. Rebecca Kovalich ("Kovalich") married my brother Daryl Huffman. Their biological daughter Suzanne Nagelski ("Nagelski") is my niece. My brother and Kovalich are no longer married.

11. In 2006, Dr. Spivey consulted with Kovalich because she had prior experience operating a lab, and utilized her contacts in the medical community to begin his own practice.

12. Kovalich's principal role was to assist PPM in developing the laboratory which opened in 2013. Kovalich helped with selection of equipment, the location, and marketing. Kovalich also handled the hiring for the lab.

13. While Nagelski was in graduate school, I routinely provided childcare for Nagelski's only daughter.

14. Around 2006, Nagelski began working for PPM on an independent contractor basis after she obtained her MBA. Initially she performed administrative functions for PPM, including assistance with technology contracts and payroll for the practice. Over time, as the practice grew,

Nagelski's duties with PPM evolved. Nagelski assisted with electronic IT security and compliance issues. She also performed human resource ("HR") functions and served as a financial consultant and liaison between PPM and the Company's banks and accountants. In 2013, Nagelski added herself and her mother as W-2 employees.

15. As the practice grew, it was obvious that PPM needed someone who was available on-site to provide HR. I asked Nagelski countless times to report to the PPM office to provide on-site HR. Nagelski always refused. PPM even created an office specifically for Nagelski with special floors so that Nagelski could bring her dogs to work with her. I also asked Nagelski several times if she would give up her HR duties so that PPM could hire full-time on-site HR. Nagelski declined. As the practice grew, several of the functions originally assigned to Nagelski were assigned to other service providers or on-site employees.

16. On July 29, 2013, I exchanged emails to and from my personal Yahoo! email account with Nagelski. A true and accurate copy (except for the added bates number, exhibit label, or CONFIDENTIAL marking) of the emails is attached to this Declaration as Exhibit 1.

17. Between April 8 and 11, 2014, I exchanged emails to and from my personal Yahoo! email account with Nagelski. A true and accurate copy (except for the added bates number, exhibit label, or CONFIDENTIAL marking) of the emails is attached to this Declaration as Exhibit 2.

18. Throughout Nagelski's employment there were issues which included conflicts with several staff members. For example, I asked to see information about the Paid Time Off ("PTO") accrued and used by employees I supervised because employees were complaining their PTO balances were inaccurate. When I asked Nagelski for this information, Nagelski refused. Nagelski only provided it after Dr. Spivey ordered her to do so.

19. Nagelski also routinely refused to meet with personnel on-site to discuss any HR related questions. Instead, she only wanted to speak with employees by email or over the phone.

On one occasion, Jennifer Bailey emailed Nagelski inquiring about PTO discrepancies. Instead, I had to assist Bailey with the matter. I attempted to gain access to PPM's payroll information by calling Flex-Pay directly, but was denied access. I called Flex-Pay a second time at the direction of Dr. Spivey in order to request certain account information and was again denied access because only Nagelski, Vicki Swicegood, Stephanie Vaughn, and another former employee were authorized users. Not even Dr. Spivey had access. Around this time, I exchanged cell phone text messages with Nagelski regarding Flex-Pay. A true and accurate copy (except for the added bates number, exhibit label, or CONFIDENTIAL marking) of the messages is attached to this Declaration as Exhibit 3.

20. Further, after PPM hired full-time on-site HR, Nagelski initially refused to turn over payroll.

21. Another time, Nagelski demanded that PPM fire two employees, that were over forty, or else she would quit.

22. In July 2015, PPM decided to terminate some of its Greensboro employees. Dr. Spivey expressed to Nagelski the importance of having HR present during the terminations along with the company's attorney and requested she be there in person. Nagelski had booked a trip to Philadelphia and told us that she wanted to reschedule the termination date. Nagelski never told me one of the employees was in a protected class. I believed Nagelski was merely making an excuse to avoid having to cancel her trip to Philadelphia to visit her daughter.

23. Dr. Spivey and I began to lose trust in Nagelski because she engaged in a pattern of suspicious behavior, especially related to the Company's finances. For example, while Dr. Spivey was on leave from the practice, Nagelski told Dr. Spivey that he should give her power of attorney so that she could handle matters in his absence. However, PPM's attorney advised Dr. Spivey otherwise.

24. During this same time, Kovalich and Nagelski attempted to gain access to the Company's patient billing account Ebridge without any authority. Kovalich had a contact with the Company's billing vendor Physician Discoveries, which managed PPM's Ebridge account. Shortly after this incident, Nagelski tried to convince Dr. Spivey that bringing billing in house would be a complete failure despite the significant cost savings to PPM. Nagelski also frequently had closed door meetings with Lisa Palmer who handled accounts payable manually, and shared confidential information with her mother, while at the same time refusing to share information with me.

25. In early 2015, while Jennifer Bailey and I were on the phone with one of PPM's attorney, we noticed that emails from Bailey's account suddenly disappeared. Specifically, I noticed a few emails related to a Philadelphia flight schedule for Nagelski were received, but then the next day they were gone. We had IT conduct a network investigation which concluded that there were unidentified email accounts routing on the server, suggesting Nagelski's involvement.

26. Around 2014, Dr. Spivey and I began considering the reassignment of Nagelski's HR duties. I looked into outsourcing HR functions to an outside vendor. Dr. Spivey and I also asked our BB&T wealth management advisor Jonathan Cochrane for a recommendation of someone to handle all of Nagelski's roles. Finally, in November 2015, we hired Wendy Yontz, who before PPM was working in HR at Belk, to provide full-time on-site HR. Nagelski's HR duties were reassigned to Ms. Yontz since Ms. Yontz could be on-site full-time. Since PPM hired Ms. Yontz, HR is more organized and the employees' needs and questions are always addressed. Even then, Nagelski was resistant to turning over payroll duties to Ms. Yontz.

27. I did not have direct input into Kovalich's termination. At the time Kovalich and Nagelski were separated from PPM, I was 64 years old.

28. The Cash Balance Plan ("the Plan") is a way for PPM to provide additional retirement benefits to employees. The Newport Group, Inc. ("Newport Group") is the third-party administrator which oversees the Plan's administration and legal compliance.

29. I participate in the Plan, but do not serve in any administrative capacity. Based on the terms of the Plan, I am a part of Participant Group B. As such, the Company makes a contribution of 30% of my compensation towards my retirement.

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

\*

*

*

I swear and affirm under the penalties of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

FURTHER DECLARANT SAITH NOT.

Executed this \_\_1st\_\_ day of October, 2018.

*Sherry Spivey*
SHERRY SPIVEY

4834-1978-5331, v. 1

# Exhibit 1
# 07/29/2013 Email from Nagelski

# FILED UNDER SEAL

# Exhibit 2
# 04/11/2014 Email from S. Spivey

# FILED UNDER SEAL

I agree with you, on the category of attnys.
All I know is that when DLS called K. Murphy's firm, he was told it could not be discussed with him, because he was not on the permission list. Only you.

> Not true. He has the number. He merely called the wrong location.

Just relaying info.
Had me call flex pay one day, & you're the only one on that too.
He said it was his payroll & they still wouldn't budge.
He said he'd pull the acct.

> Oh - same thing.

No. That call was made to the WS office. None the less. Shouldn't you be sure that he has all that?

> I do and have for past 4.5yrs as confirmed with him
>
> Delivered

I just get 2nd hand info or complaints.
Flex pay said the only people on the list formerly was Annette, Vicki, & Steph. You are the only one now.
And we still don't have the terms of our contract with them.

**EXHIBIT 3**

KN 00385

