IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA

| | |
|---|---|
| REBECCA KOVALICH and SUZANNE NAGELSKI, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A., DR. DAVID SPIVEY, individually, and SHERRY SPIVEY, individually. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

---

**PLAINTIFF KOVALICH'S RESPONSE IN OPPOSITION
TO DEFENDANT PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A.'S
MOTION FOR SUMMARY JUDGMENT**

Viewing the evidence in the light most favorable to Plaintiff Rebecca Kovalich ("Rebecca") shows that a reasonable jury could find for her on the claims below. The Court should deny Defendant Preferred Pain Management & Spine Care, P.A.'s ("PPM") Motion.

**FACTS**

I.   **Rebecca Was a Terrific Employee for PPM for Almost Ten Years, and She Was Instrumental in Bringing it to Life.**

In 2006, Rebecca and Suzanne Nagelski ("Sue") helped Dr. and Mrs. Spivey get PPM off the ground. (Nagelski 76:19–77:9; 78:21–79:7; Kovalich 44:8–46:19, 119: 5–120:10.) Dr. Spivey is PPM's Owner, CEO, and President. (D. Spivey 51:9–51:17; Nagelski 88:6–88:13.) Dr. Spivey

was Sue and Rebecca's supervisor. (Nagelski 89:16–89:23; Kovalich 260:23–261:10.) Mrs. Spivey became PPM's Clinic Manager and she is Sue's aunt. (Nagelski 88:14–89:11.)

In 2007-2008, PPM contacted Rebecca with a question about a piece of laboratory equipment. (Kovalich 123:2–123:14.) Rebecca fixed it, and she hired and trained an employee to work on the machine. (Kovalich 123:15–124:21.) Dr. Spivey wanted Rebecca to stay onboard and they agreed on a contract. (Kovalich 124:22–126:13.) PPM put Rebecca on the payroll in December 2013. (Kovalich 134:18–142:23; Ex. 14.)

## II. PPM Begins an Alleged Reorganization in 2015 that Has Devastating Effects on Older Employees.

### A. PPM's Subjective Reorganization Heavily Targets Older Employees for Termination While Hiring Substantially Younger Workers, and the Statistics Make It Clear that PPM Discriminates Against Older Employees.

PPM claims it began a reorganization (the "Reorganization") in early 2015. (D. Spivey 84:4–84:11; S. Spivey 212:11–213:22.) The Reorganization is still allegedly ongoing today. (S. Spivey 212:11–212:21; D. Spivey 91:19–91:23; Benton 95:11–95:13.) The Reorganization was allegedly "rapid and necessary" because reimbursements from sources like Medicare and private insurance decreased and PPM allegedly needed to save money. (D. Spivey 90:15–91:18.) It had to "make significant reductions in personnel . . ." (Dr. Spivey 13:25–14:3.) However, 2014 and 2015 were banner years in terms of financial success for PPM. (Nagelski Dec. ¶ 4.) And PPM has not actually made a significant reduction in personnel. (Ex. 14.)

PPM's Reorganization is a sham. PPM used no metrics to guide the Reorganization; there were no overarching criteria. (Yontz 62:19–62:25.) PPM did not conduct any cost analyses of the various positions that it might eliminate to help guide it through which employees to fire or keep.

2

(Yontz 63:1–63:8.) PPM also did not utilize any overarching criteria to guide its hiring decisions as part of the Reorganization. (Yontz 63:5–63:8.)

In late 2015, Mary Benton began to play a large role in the Reorganization. (Dkt. Entry 42-13 at ¶ 6; D. Spivey 70:17–70:22.) However, "when it comes to running PPM, the 'buck' stops with [Dr. Spivey]." (Dkt. Entry 37 at 14; D. Spivey 51:9–52:2.) He ultimately makes the Reorganization termination decisions. (Yontz 65:1–65:6.)

Through the Reorganization, PPM disproportionately targeted older workers and hired substantially younger employees. PPM identified 14 as terminated in the Reorganization between 2015 and the present. (Ex. 14.) The average age of those employees is approximately 56.286. (*Id.*; ex. 15.) The median age is 59. (*Id.*) Dr. Spivey was a decisionmaker in the decision to keep or fire each employee. (Ex. 15; 30(b)(6) at 14:4–14:8, 16:13–16:16, 16:21–16:25, 17:5–17:9, 17:20–17:24, 18:7–18:12, 18:15–18:20, 19:18–19:23, 20:6–20:9, 20:15–20:19, 21:8–21:12, 22:14–22:18, 44:25–45:10.) When narrowed to the period following Benton's heavy involvement, zero of the 11 employees terminated were under the age of 44 years old, the average age was approximately 58 (median 59). (Exs. 14 & 15.)

As part of the Reorganization, PPM hired 33 new workers (more than twice the number terminated). (Ex. 16.) The average age of these new hires is approximately 35.63. (*Id.*) The median is 33. (*Id.*)

On the eve of the Reorganization—December 31, 2014—PPM had 40 employees and their average age was approximately 46.25. (Ex. 14; ex. 17; ex. 18; 30(b)(6) at 37:19–37:21, 38:22–38:25, 41:23–42:1, 44:12–44:23.) The median age was 46.5. (Ex. 18.) Sue was supposedly the fifth employee selected for the Reorganization. (Ex. 14; ex. 15) At the time of her

3

termination, there were 42 other employees at PPM (more than at the start of the Reorganization) and their average age was around 46.119 and the median was 45. (Ex. 14; ex. 17; ex. 19; 30(b)(6) at 38:1–38:3, 41:23–42:1, 44:12–44:19.) A few months later, at the time of Rebecca's June 9, 2016, termination, there were still 42 other PPM employees and their average age was then down to approximately 41.904 and the median was 44. (Ex. 14; ex. 17; ex. 20.)

Today PPM has 37 employees, which is only three fewer than when the Reorganization began. (Ex. 14, ex. 17, ex. 18, ex. 21.) Despite the passage of nearly four years since the average age of PPM's workforce was over 46, the average age of PPM's employees today is approximately 41.864 (median 40). (Ex. 14, ex. 21.) Under normal conditions, it would have climbed to 50 with the passage of time. Instead, PPM managed to turn the clock <u>back</u> 5-6 years over this period. PPM's most Reorganization victim (age 65) came on April 10, 2018. (Ex. 14; 30(b)(6) at 13:21–13:23.)

### B. PPM's Employees See Firsthand How PPM Justified Firing Older Employees While Bringing in Much Younger Workers.

The Reorganization is a tool to make the workforce younger, and PPM shuffled roles to evade the law. (Link Dec. ¶¶ 12–15; Ingold Dec. ¶¶ 6–13.) It slowly and strategically stripped older workers of duties and then farcically fired them because there was nothing left for them to do. (Ingold Dec. ¶ 13; Link ¶¶ 6–18.)

Accordingly to former PPM employee Cindy Ingold, "[i]t was extremely common for employee roles to change at PPM. Aside from what happened from me and what I observed happen with my coworkers, there were regular emails and messages saying that certain employees were now doing something else or that someone is gone, and someone else is taken over the role, and so-forth." (Ingold Dec. ¶ 7.) She gave specific examples of this happening.

4

(Ingold Dec. ¶¶ 11–12.) Ingold also declared, "[i]t was obvious that PPM was shuffling roles and duties to eliminate older employees to replace them with younger workers." (Ingold Dec. ¶ 13.)

This same fate befell Ms. Ingold (age 46). In early 2016, PPM changed her duties and gave her a new supervisor. (Ingold Dec. ¶ 6.) PPM then quickly issued her a meritless coaching and fired her. (Ingold Dec. ¶¶ 8–9.) She filed an EEOC Charge alleging age discrimination. (Ex. 22.)

Scarlet Link also filed an age discrimination Charge following her Reorganization-related termination. (Ex. 23; 30(b)(6) at 16:21–16:23.) Like with so many others, PPM stripped Ms. Link of her duties and gave them to significantly younger employees. (Link Dec. ¶ 6.) Ms. Link tried to get more work assigned to her, but PPM ignored her. (Link Dec. ¶ 7–9.) After stripping her duties, giving them to others, and ignoring her requests for more work or to work part-time, PPM claims it chose her for the Reorganization because she lacked work to do. (Link Dec. ¶¶ 16–18; 30(b)(6) at 17:2–17:4.) Aside from those already discussed, at least three other employees filed age discrimination EEOC Charges against PPM. (Ex. 29; Ex. 30; Ex. 31.)

PPM's Reorganization is pretext for age discrimination. Sue, who had access to PPM's financial information and was in charge of human resources, did not learn about any alleged Reorganization before her employment ended in February 2016. The first she heard about it was in this lawsuit. (Nagelski Dec. 5.) Just prior to the onset of the supposedly financially-driven Reorganization, the Spiveys were swimming in extra money. Sue initiated a Cash Balance Program to help them direct more money for retirement. (Nagelski Dec. 3.) She also helped PPM purchase its second Greensboro location, purchased a company vehicle, and approved regular

shareholder distributions to Dr. Spivey's personal wealth management account. (Nagelski Dec. 2–6.) The Reorganization is a *post hoc* rationalization to cover for PPM's age discrimination.

III.     **PPM and the Spiveys Target Rebecca and Sue.**

    A.     **Sue Pushes Back on Discriminatory Practices, and the Spiveys and PPM Target Her.**

In July 2015, PPM sought to fire three Greensboro employees as part of the Reorganization. (Ex. 14, ex. 15.) PPM "laid off" these employees on a Friday and replaced them on Monday. (Ex. 25; S. Spivey 206:1–206:22.) Sue opposed these terminations as violations of Title VII and the ADEA. In response, Dr. Spivey expressly threatened her work status and quickly moved to replace her role in HR and terminate her. (Ex. 24; Nagelski 187:1–188:16 ; Dkt. Entry 42-10 at ¶ 19; Ex. 25.)

    B.     **Dr. Spivey Sexually Harasses Rebecca, Who Rebuffs His Advances and Suffers the Consequences.**

In or around March 2014, Dr. Spivey called Rebecca about a work matter while she was in Charleston, South Carolina. (Kovalich 204:4–204:16.) The conversation took on a sexual nature when Dr. Spivey asked, "what are you wearing?" (Kovalich 204:4–204:20.) He told Rebecca he wanted to drive down to Charleston, but Rebecca told him not to. (Kovalich 247:6–247:18.) Dr. Spivey's testimony on this barely differs. (D. Spivey 261:14–264:8.) The flirting and sexual messages from Dr. Spivey were frequent. In text messages to Rebecca, Dr. Spivey referred to himself as "[y]our wannabe lover" and called Rebecca "[o]bject of my desire." (Ex. 27.) He said, "If business weren't so f…ing important……" and "Rebecca my beauty." (Ex. 27.)

In November 2014, Dr. Spivey told Rebecca, "you know, I gave you a chance." (Kovalich 219:10–221:11.) In February 2015, Dr. Spivey hugged Rebecca in the

parking lot, and this made her uncomfortable. (Kovalich 177:12–177:18, 259:5–259:18, 218:25–219:9.) Kovalich reported Mrs. Spivey's behavior towards her to Dr. Spivey, and he responded that he could not get involved. (Kovalich 184:20–184:23.)

In or around October 2015, Rebecca came to Dr. Spivey's office while he was on the phone. (Kovalich 207:3–207:12.) When the call ended, Dr. Spivey and Rebecca briefly exchanged words. (Kovalich 207:13–207:16.) Then, Dr. Spivey stood up, walked around his desk, grabbed Rebecca and kissed her against her will on her lips. (Kovalich 207:17–207:20, 261:22–261:23.)

Rebecca walked away from him and rebuffed his advance, but she had no one to turn to and the situation was agonizing. (Kovalich 207:3–208:2, 260:23–261:10.) Kovalich regularly told Dr. Spivey to stop flirting and be professional. (Kovalich 204:24–205:9.) Dr. Spivey regularly made verbal romantic comments and propositions to Rebecca—but she kept turning down his advances. (Kovalich Dec. ¶ 7.) The kiss was in no way welcome, and Rebecca made that clear. (Kovalich Dec. at ¶ 6.) After Rebecca rejected Dr. Spivey's kiss in October 2015, nothing was the same. (Kovalich Dec. ¶ 8.)

Rebecca is not the first PPM employee to accuse Dr. Spivey of sexual harassment. One former employee claimed that, in early January 2016, Dr. Spivey grabbed her buttocks in front of a patient and his son, and this former employee found the touching "highly offensive." (Ex. 30.) A different former employee reports that a PPM Physician's Assistant made sexual comments and gestures towards her in September 2011. (Ex. 32.) When she reported it to Dr. Spivey, he asked her to transfer instead of dealing with the harasser. (*Id.*)

7

## IV.   PPM Illegally Fires Rebecca and Sue and Pretextually Lumps Their Terminations into the Reorganization.

### A.   PPM Fires Rebecca for Improper Reasons and Awkwardly Tries to Lump Her Termination into the Reorganization.

Dr. Spivey forced a workplace kiss on Rebecca in October 2015 and he considered firing Rebecca in late 2015. (D. Spivey 225:9–225:11.) Dr. Spivey spoke with Mary Benton about firing Rebecca in early 2016. (D. Spivey 224:7–224:11.) Benton specifically questioned the need for Rebecca when she learned that Rebecca was rarely physically present. (Benton 120:14–120:18, 123:15–124:19.) At the time of her termination, Rebecca's annual salary was $72,499.98. (Ex. 36.)

On January 8, 2016, Sue emailed Dr. Spivey about PPM's EPLI policy and an open EEOC matter. (Ex. 34.) Dr. Spivey forwarded the email to Yontz and told her he was going to fire Sue later that day. (Ex. 34.) On January 17, 2016, Dr. Spivey sent a letter to Sue saying that PPM had fired her. (Ex. 35.)

On February 16, 2016, Sue's undersigned counsel sent a letter of representation to PPM alleging age discrimination and retaliation. (Ex. 37.) On March 9, 2016, having not received a response to the letter, undersigned counsel sent another letter. (Ex. 38.) Dr. Spivey responded on March 11, 2016. (Ex. 39.)

After receiving the second letter, Dr. Spivey called Rebecca. (D. Spivey 249:19–250:11.) Dr. Spivey asked Rebecca to convince Sue to "stop this lawsuit." (Kovalich 74:21–76:24; 243:10–243:20.) He wanted Rebecca to do it because he understood that Sue had retained counsel and contact from him would be inappropriate. (Kovalich 75:20–75:25.) Rebecca heard Mrs. Spivey in the background saying, "retaliation, retaliation." (Kovalich: 76:1–76:18.)

8

Rebecca told Dr. Spivey that she would not to tell Sue to drop her discrimination case. (Kovalich 75:20–76:3.)

Dr. Spivey admits that he called Rebecca and said "I don't understand why Sue has done this" and that he was concerned about Rebecca retaliating "against us for firing her daughter, my concern was that she could hurt us." (D. Spivey 246:14–246:17, 247:4–11.)

With Sue threatening employment discrimination claims against PPM, Dr. Spivey testified, "it was awkward that Ms. Kovalich was still employed and we had terminated her daughter." (D. Spivey 247:4–247:6.) Dr. Spivey admits that Sue's age discrimination allegations were distinct for him from prior accusations. (D. Spivey 245:12–245:22.) "[W]e, as a practice, and we, as a family, and I personally had a different relationship with [Sue] than I did with these other employees. She was family. She had a special status, if you will." (D. Spivey 245:12–245:22.)

On June 9, 2016, PPM fired Rebecca. (Dkt. Entry 42-10 at ¶ 31.) At the time of her termination, Rebecca was developing age management tests for PPM, primarily with Dr. Scheutzow, and this was a good deal of work. (Kovalich Dec. ¶ 2.) She was also handling laboratory numbers and the budget. (*Id.* ¶ 3.) Rebecca approved laboratory invoices as well. (*Id.* ¶ 4.) After Rebecca's termination, Gretchen Hawks—who was 47 at Rebecca's termination— took over much of this work. (*Id.* ¶ 3–4.)

### B. PPM's Explanation for Firing Rebecca Are Not Worthy of Belief.

J.M. is the ultimate comparator. PPM alleges that one of the reasons it reassigned Sue's HR duties and fired her was her lack of presence in the office. (D. Spivey 110:12–110:24; 187:22–191:25; Dkt. Entry 42-10 at ¶ 14.) Sue was allegedly part of the Reorganization, the

9

Reorganization's purposes was allegedly to "control costs for the business to survive." (Dkt. Entry 42-13 at ¶ 17.)

However, J.M.—PPM's Director of Marketing who makes $87,100 per year—is a far worse offender than Sue in every way imaginable. (Nagelski Dec. ¶ 9; Ex. 40;. Ex. 41.) J.M. is currently 34 years old, and was 32 years old at the time of Sue's and Rebecca's terminations. (Ex. 14; ex. 19; ex. 20; ex. 21.) J.M. is still on PPM's payroll. (Ex. 14; Benton 135:8–135:15.) Yet, Benton testified that she never saw J.M. in the office. (Benton 136:1–136:3.) She only met J.M. once—in a non-work-related social setting. (Benton 138:9–138:21.) Benton's alleged Action Plan has a substantial section on "Marketing." (Dkt. Entry 43-10.) But Benton could not identify what J.M. did for PPM. (Benton 135:18–135:22.)

Benton testified that she communicated with PPM's marketing representative (Vermillion) about marketing. (Benton 101:2–19; 136:4–136:11.) Despite being the Director of Marketing, J.M. has never been involved in those conversations. (Benton 136:9–136:15.)

PPM cannot plead ignorance about J.M. As part of the Reorganization, Benton asked others what J.M. did at PPM, and was told that she did some marketing work. (Benton 137:22–138:6.) Benton never asked what specific services J.M. provided PPM, and she is not aware of any marketing work that J.M. has ever actually done. (Benton 137:11–137:13; 138:7–8.)

Yontz testified that J.M. simply was not in the office. (Yontz 35:6–35:7.) The only things that Yontz could identify J.M. doing for PPM was helping Vermillion create brochures and monitor PPM's website. (Yontz 34:11–35:3.) Yontz does not know what that entails. (Yontz 34:11–35:3.) Yontz's understanding about J.M.'s work comes from Benton who, under oath, couldn't identify anything that J.M. did for PPM. (Yontz 63:18–64:7; Benton 135:18–135:22.)

10

PPM analyzed J.M.'s position for the Reorganization and determined that it "doesn't require a full-time position." (Yontz 63:9–64:23.) In 2017, Benton suggested to Dr. Spivey that PPM switch J.M. to a contract role and take her off the payroll, but that never happened. (Benton 137:14–137:21.) Dr. Spivey responded that he thought about it, but ultimately took no action. (Benton 136:16–137:19.)

PPM identified Gretchen Hawks as having input into its decision to fire Rebecca. (Ex. 42.) Dr. Spivey testified that he asked her "if the lab was able to run okay if Ms. Kovalich was gone." (D. Spivey 227:7–227:15.) He testified that Ms. Hawks told him that it could. (D. Spivey 227:16–227:24.)

But this was a lie. Ms. Hawks testified that no such conversation took place. (Hawks 24:15–26:7.) Even when focusing on the duties instead of on Rebecca, specifically, Ms. Hawks denied telling Dr. Spivey that Rebecca's duties were no longer necessary. (Hawks 26:18–26:21.) She viewed Rebecca as a valuable asset to the lab. (Hawks 25:15–25:25.) Scarlett Link worked with Rebecca at Rebecca's previous lab, as well as at PPM, and she knew firsthand that Rebecca was an asset. (Link Dec. ¶ 20.)

## ARGUMENT

### I.     A Jury Must Decide Important Issues of Material Fact.

Summary judgment is only appropriate where evidence shows there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). Courts should seldom grant summary judgment in employment discrimination cases. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 285 (4th Cir. 2015); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994).

**II.** **Rebecca's ADEA Claim Must Be Tried By a Jury.**

    **A.** **Rebecca Meets Her Prima Facie Burden.**

ADEA cases follow the three-strep burden-shifting framework. *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000). In reduction in force or reorganization cases the affected employee establishes an ADEA *prima facie* case by showing that: (1) she was over 40; (2) she was selected for discharge from a larger group of candidates; (3) she "was performing at a level substantially equivalent to the lowest level of those of the group retained"; and (4) "the process of selection produced a residual work force including some persons in the group who were substantially younger than he and who were performing at a level lower than that at which he was performing." *Mosher v. Washington Gas Light Co.*, 18 F. App'x 141, 145 (4th Cir. 2001) (*citing Stokes*, 206 F.3d at 429–30). Plaintiffs are not required to show they were replaced as part of the *prima facie* case. *Stokes*, 206 F.3d at 430; *Matthews v. Allis Chalmer*s, 769 F.2d 1215, 1217 (7th Cir. 1985); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000) ("Where, as here, the discharge in question results from a general reduction in workforce, [the plaintiffs] need not show that they were replaced.").

Here, Rebecca satisfies these elements. As to the first two prongs, Rebecca was 71 at the time PPM picked her for the companywide Reorganization. Dr. Spivey decided who PPM kept and fired for all Reorganization decisions. Rebecca substantially outperformed J.M., who also directly reported to Dr. Spivey and was 32 at the time of Rebecca's termination. Rebecca played an instrumental role in the laboratory, and J.M. did nothing. Yet, PPM continues to retain J.M. Moreover, PPM gave many of Rebecca's duties to Hawks (47 at the time). Hawks had much less experience than Rebecca and could not accomplish many of Rebecca's job duties. (Kovalich

12

Dec. ¶ 3–4.) Rebecca literally started PPM and made its lab what it became. There are countless other employees with less experience and who were substantially younger than Rebecca that PPM retained. (Exs. 14-21.)

There also are additional ways to establish this element where there is a discriminatory pattern. It can be met with "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (*citing Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). "Appropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Barnes*, 896 F. 2d at 1466.

Fourth Circuit law rejects the necessity for an expert even where calculations are much more complicated than anything involved here. *Majeed v. Columbus Cty. Bd. of Educ.*, 213 F.3d 631 (4th Cir. 2000). This Circuit relies on *average* ages when evaluating evidence in age discrimination cases like this one. *See Mereish v. Walker*, 359 F.3d 330, 338 (4th Cir. 2004) ("The average age of the agency's workforce was almost forty-six years, whereas appellants were ages forty-three, forty-eight, and fifty.").

Here, statistics overwhelmingly show that PPM targeted older workers as part of its Reorganization, and Rebecca, at 71-years-old, fell victim to that discriminatory practice. PPM gutted its older workforce and replaced it with workers who are, on average, in their mid-30s.

The Reorganization happened all-across PPM, and Dr. Spivey was the decisionmaker in each decision to fire or retain. Multiple witnesses observed firsthand how PPM removed job

13

duties from older workers and then selected them for the Reorganization because of their lack of job duties. This pattern was not difficult to detect and, at least six employees filed age discrimination Charges. PPM has kept less qualified, younger employees, like J.M and Hawks. Rebecca easily establishes her *prima facie* case.

### B. Defendant's Reasons for Firing Rebecca Are Pretext for Discrimination.

A reasonable jury would find that PPM's explanations are pretext for age discrimination. *See Loveless v. John's Ford, Inc.*, 232 Fed. Appx. 229, 235 (4th Cir. 2007). Rebecca need only present evidence that would allow a reasonable jury to disbelieve PPM's explanation—no additional evidence of discrimination is required. *See Wilson v. Phoenix Speciality Mfg. Co.*, 513 F.3d 378, 387 (4th Cir. 2008); *EEOC v. Sears Roebuck & Co.,* 243 F.3d 846, 852 (4th Cir. 2001); *Blair v. Young Phillips Corp.*, 235 F. Supp. 2d 465, 475–76 (M.D.N.C. 2002).

First, the J.M. comparator evidence proves pretext. *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Courts should apply a common sense factual inquiry to the "similarly situated" question. *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). It is not the "supervisor" that matters. Instead, it is the "decisionmaker" that is relevant to the comparator inquiry. *Cox v. Lowe's Home Centers, LLC*, No. 3:14-cv-679, 2015 WL 7288689, at *5 (W.D.N.C. Nov. 17, 2015) (*quoting Popo v. Giant Foods LLC*, 675 F. Supp. 2d 583, 589 (D. Md. 2009)).

PPM's retention of 32-year-old J.M. through the Reorganization while systematically eviscerating its older workforce is striking. Both reported to Dr. Spivey and made roughly the same salary. PPM took issue with Rebecca's lack of presence in the laboratory. J.M. was never at the office. PPM allegedly thought that Rebecca wasn't doing enough work to justify keeping her.

14

J.M. did not work. Both Rebecca and J.M. are related to the Spiveys. It's hard to imagine a more on-point comparator. PPM's decision to fire Rebecca and keep J.M. establishes pretext.

Second, PPM said it relied on input from Hawks for its decision to terminate Rebecca. When confronted with Dr. Spivey's testimony at her deposition, Hawks swore that no such conversation took place. She viewed Rebecca as a valuable asset to the lab and would have never suggested that her duties weren't necessary at PPM. This establishes pretext. *Ramos v. Carolina Motor Club, Inc.*, 2018 WL 3040028, at *10 (W.D.N.C. June 19, 2018) (finding pretext where individual alleged to have encouraged termination denies making such statement).

Third, the statistics are equally as relevant to pretext and cast doubt on PPM's explanation. Beyond the statistics, PPM's explanation behind the Reorganization itself is highly dubious. Sue was in charge of HR when it was happening, and she never heard about the Reorganization. (Nagelski Dec. ¶ 6.) It was allegedly put in place to reduce personnel, but did not actually do so. No one even tried to analyze whether they were saving costs by enacting it.

Fourth, the abundant "other employee" evidence before the Court shows pretext. Such evidence is neither per se admissible nor inadmissible and courts should analyze how relevant it is to the case at hand under standard 403 analysis. *Calobrisi v. Booz Allen Hamilton, Inc.*, 660 Fed. App'x. 207, 209 (4th Cir. 2016). Rebecca can point to 13 other employees over 40 who PPM lumps into the Reorganization. They were all fired around the same time. *Id.* at 210 (identifying relevant factors). Dr. Spivey was a decisionmaker in all of these decisions, including the decision to fire Rebecca, and they were all otherwise similarly situated. *Id.* Many of them filed EEOC Charges alleging age discrimination.

15

**III.** **Rebecca's Harassment and Retaliation Claims Must Survive Summary Judgment.**

**A.** **The Evidence Supports Rebecca's Sexual Harassment Claim.**

There are two ways plaintiffs can establish Title VII sexual harassment claim—hostile environment and *quid pro quo*. *Okoli v. City Of Baltimore*, 648 F.3d 216, 226 (4th Cir. 2011) Rebecca's claim should go forward under both theories. First, under the hostile environment framework plaintiffs must show that the alleged conduct was (1) unwelcome, (2) based on sex, (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment, and (4) imputable to the employer. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). "In assessing whether harassment is objectively abusive, courts must examine the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 331 (4th Cir. 2018) (*quoting Harris*, 510 U.S. at 23, 114 S.Ct. 367)

Here, Dr. Spivey forced an unwanted kiss on Rebecca in October 2015, and, viewing the evidence in the light most favorable to Rebecca, he wanted to fire her immediately after that. (D. Spivey 225:9–225:11.) Dr. Spivey sent Rebecca flirtatious, romantic text messages when discussing work, and in March 2014 he asked Rebecca what she was wearing on a work call. He also flirted verbally and made propositions, which Rebeca constantly refused. In November 2014, Dr. Spivey told Rebecca, "you know, I gave you a chance"—which meant that she missed an opportunity to romantically be with him.

16

The harassment, specifically including the kiss, was unwelcome. Even before Rebecca rebuffed Dr. Spivey's unwanted kiss, she regularly told him to stop flirting and be professional. PPM's position that Rebecca's texts gave Dr. Spivey *carte blanche* to forcefully kiss her is wrong. Dr. Spivey's acts were based on sex, and those acts were sufficiently severe or pervasive. He harassed Rebecca for years before deciding to fire her. Moreover, the kiss alone is sufficiently severe to meet this element.

PPM's argument about Rebecca not reporting the harassment is a red herring because Dr. Spivey was PPM's Owner. Company presidents and owners are not entitled to the *Faragher-Ellerth* defense because they are essentially proxies for the company. *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998); *E.E.O.C. v. Burlington Med. Supplies, Inc.*, 536 F. Supp. 2d 647, 663 (E.D. Va. 2008). "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013); *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 333 (4th Cir. 2018). Even so, she did complain to Dr. Spivey and made clear that she was not okay with the harassment. The harassment is imputable to PPM, and Rebecca satisfies the fourth element.

PPM's timeliness argument is misguided. Where a termination is a constituent act of the hostile work environment, discrete acts that happened more than 180 days from the charge filing can be considered as part of the hostile environment if the charge is filed within 180 days of the termination. *Guessous v. Fairview Prop. Investments, LLC*, 828 F.3d 208, 223–24 (4th Cir. 2016). Rebecca filed her EEOC Charge within 180 days of her termination. She had no idea that Dr. Spivey wanted to fire her at around the same time she rebuffed his unwanted kiss. PPM cannot avoid liability by running out the shot clock. *See Tuan H. Nguyen v. Austin Quality*

17

*Foods, Inc.*, 974 F. Supp. 2d 879, 892 (E.D.N.C. 2013). Dr. Spivey forced a kiss on Rebecca in October 2015 and then wanted to fire her for rebuffing him. He waited until June 2016 to conceal the obvious connection.

A jury could also find for Rebecca under the *quid pro quo* framework. "In such a claim, the supervisory harasser conditions employment benefits on the employee's submitting to the sexual advances or threatening adverse employment actions if the employee does not submit. *McKinnish v. Donahoe*, 40 F. Supp. 3d 689, 697 (W.D.N.C. 2014), *aff'd sub nom. McKinnish v. Brennan*, 630 Fed. Appx. 177 (4th Cir. 2015); *Tilson v. Every Day is a Holiday, Inc.*, 3:17-CV-00018-GCM, 2017 WL 3277124, at *3 (W.D.N.C. Aug. 1, 2017). "Benefits" includes taking adverse action against an employee who refuses to submit to sexual advances. *Id.*

To establish a *prima facie* case of *quid pro quo* sexual harassment, employees must show that: (1) they belong to a protected group, (2) they were subjected to unwelcome sexual harassment, (3) that the harassment was based on sex, (4) the employees' reaction to the harassment affected the employee's compensation, or terms, conditions or privileges of employment, and (5) the employer knew or should have known but took no remedial action. *Brown v. Perry*, 184 F.3d 388, 393 (4th Cir. 1999); *Sparks v. Pilot Freight Carriers, Inc.*, 830 F. 2d 1554, 1564 (11th Cir. 1987).

Rebecca is a female. The above hostile work environment "unwanted" argument applies equally here. Dr. Spivey harassed and kissed Rebecca because of her sex. Rebecca's reaction to Dr. Spivey's unwanted kiss led to her termination. Dr. Spivey was PPM's Owner, so the fifth prong is also established.

The delay between Dr. Spivey's 2015 desire to fire Rebecca, his early 2016 decision to fire Rebecca, and her June 2016 termination is irrelevant. In the time between the kiss and his desire to fire Rebecca, he had Benton look into it and decided to carry it out, which shows retaliatory animus. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 651 (4th Cir. 2007) (finding that smaller retaliatory actions between protected activity and firing seven months later show retaliatory animus).

**B.** **A Jury Must Decide Rebecca's Title VII and ADEA Retaliation Claims.**

**1.** **The Evidence Shows that Rebecca's Rebuff of Dr. Spivey's Sexual Advances Led to PPM's Decision to Fire Her.**

A jury could also find that Rebecca's opposition to Dr. Spivey's sexual advances played a role in her termination and was illegal as Title VII retaliation for the same reasons. A plaintiff bringing a retaliation claim "must first make a prima facie showing 'that [s]he engaged in protected activity, that the employer took adverse action against [her], and that the adverse action was causally connected to the plaintiff's protected activity." *Yashenko v. Harrah's NC Casino Co.*, LLC, 446 F.3d 541, 551 (4th Cir. 2006). An employee's refusal of sexual advances from his or her supervisor qualifies as protected opposition to an unlawful employment practice under Title VII. *See Fleming v. S.C. Dep't of Corr.*, 952 F. Supp. 283, 288 (D.S.C. 1996). As outlined in the age discrimination section, there are ample reasons to doubt the Reorganization and Rebecca is required to show nothing more. Accordingly, the Court should send this claim to a jury.

**2.** **Rebecca Was the Victim of Third-Party Retaliation Under Title VII and the ADEA.**

Rebecca's Title VII and ADEA third-party retaliation claims—related to Sue's protected activity—should also go to a jury. The Supreme Court has made clear that federal discrimination

laws protect against third-party retaliation so long as the plaintiff "falls within the zone of interests sought to be protected by the statutory provision." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011). "[T]he zone of interests requirement poses a low bar." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Employees of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 771 (D.C. Cir. 2013) Indeed, "[F]iring a close family member will almost always meet the *Burlington* standard, and inflicting a milder reprisal on a mere acquaintance will almost never do so, but beyond that we are reluctant to generalize." *Thompson*, 562 U.S. at 175.

Rebecca can easily meet the *prima facie* elements. Her daughter, Sue, undisputedly engaged in protected activity in February and March 2016 through undersigned counsel. PPM fired Rebecca three months later.

The causal connection evidence is strong. *Laing v. Fed. Exp. Corp.*, 703 F.3d 713, 720 (4th Cir. 2013); *Williams v. Cerberonics*, Inc., 871 F.2d 452, 457 (4th Cir. 1989). Benton admits she openly questioned the need for Rebecca at PPM in March 2016. (Dkt. Entry 42-13 at ¶ 10.) Dr. Spivey admits to discussing firing Rebecca with Benton in "early 2016." (D. Spivey 224:7–225:11.) Dr. Spivey's "retaliation" call in response to undersigned counsel's letters also satisfies this prong alone. Rebecca readily shows pretext for the reasons set out above.

Moreover, Dr. Spivey admitted that firing Sue was different and that Rebecca's continued employment was "awkward." Dr. Spivey's effort to get Rebecca to intervene in Sue's claims also proves pretext in addition to establishing a causal connection for the *prima facie* case. The call(s) directly link Sue's assertion of Title VII and ADEA claims with Rebecca's termination. Thus, the Court should deny PPM's Motion and let a jury decide this claim.

## CONCLUSION[1]

For the reasons set forth above, the Court should deny PPM's Motion.


Respectfully submitted this 31st day of October, 2018.

/s/ Sean F. Herrmann
Sean F. Herrmann (NC Bar No. 44453)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Fax: (704) 749-2638
Email: sean@vankampenlaw.com
*Attorney for Plaintiffs*

---

[1] Rebecca intends to voluntarily dismiss those claims she does not defend in this brief in the event the Court declines to grant summary judgment.

21

## CERTIFICATE OF COMPLIANCE

THE UNDERSIGNED HEREBY CERTIFIES compliance with Local Rule 7.3(d)(1).

The undersigned counsel further certifies that this Memorandum, including the body, heading, and footnotes, does not exceed 6,250 words.

BY:     */s/ Sean F. Herrmann*
        Sean F. Herrmann (NC Bar No. 44453)
        Van Kampen Law, PC
        315 East Worthington Avenue
        Charlotte, North Carolina 28203
        Phone: (704) 247-3245
        Fax: (704) 749-2638
        Email: sean@vankampenlaw.com
        *Attorney for Plaintiffs*

22

## <u>CERTIFICATE OF SERVICE</u>

THE UNDERSIGNED HEREBY CERTIFIES that the document to which this certificate is attached was served upon each party to this action by CM/ECF electronic notification to the attorney of record for each party, or to the party, at their last known address, as stated below.

Ann H. Smith (NC Bar No. 23090)
annsmith@jacksonlewis.com
Caitlin M. Goforth (NC Bar No. 49227)
caitlin.Goforth@Jacksonlewis.com
JACKSON LEWIS, P.C.
3737 Glenwood Avenue Suite 450
Raleigh, North Carolina 27612
Telephone: 919.760.6465
Facsimile: 919.760.6461
*Attorneys for Defendants*

This the 31st day of October, 2018.

/s/ Sean F. Herrmann
Sean F. Herrmann (NC Bar No. 44453)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Fax: (704) 749-2638
Email: sean@vankampenlaw.com
*Attorney for Plaintiffs*