IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and SUZANNE )
NAGELSKI, )
 )
               Plaintiffs, )
    v. )
 )
PREFERRED PAIN MANAGEMENT & )
SPINE CARE, P.A., DR. DAVID SPIVEY, )
individually, and SHERRY SPIVEY, )
individually. )
 )
               Defendants. )

---

**PLAINTIFF NAGELSKI'S RESPONSE IN OPPOSITION
TO DEFENDANT DAVIAD SPIVEY'S MOTION FOR SUMMARY JUDGMENT**

Viewing the evidence in the light most favorable to Plaintiff Rebecca Kovalich ("Rebecca") shows that a reasonable jury could certainly find for her on the claims below. Accordingly, the Court should deny Defendant Sherry Spivey's ("PPM") Motion.

## FACTS

**I.   Rebecca Was a Terrific Employee for PPM for Almost Ten Years, and She Was Instrumental in Bringing it to Life.**

In or around 2006, Rebecca and Suzanne Nagelski ("Sue) helped Dr. and Mrs. Spivey and worked to get PPM off the ground. (Nagelski 76:19–77:9; 78:21–79:7; Kovalich 44:8–46:19, 119: 5–120:10.) Dr. Spivey is PPM's Owner, CEO, and President. (D. Spivey 51:9–51:17; Nagelski 88:6–88:13.) Dr. Spivey was Sue and Rebecca's supervisor. (Nagelski 89:16–89:23;

Kovalich 260:23–261:10.) Mrs. Spivey became PPM's Clinic Manager and she is Sue's aunt. (Nagelski 88:14–89:11.)

In 2007 or 2008, PPM contacted Rebecca with a question about a perceived flawed piece of laboratory equipment. (Kovalich 123:2–123:14.) Rebecca fixed it, and she hired and trained an employee to work on the machine. (Kovalich 123:15–124:21.) Dr. Spivey wanted Rebecca to stay on-board and they agreed on a contract. (Kovalich 124:22–126:13.) PPM put Rebecca on the payroll in or around December 2013. (Kovalich 134:18–142:23; Ex. 14.)

II. **PPM Begins an Alleged Reorganization in 2015 that Has Devastating Effects on Older Employees.**

   A. **PPM's Subjective Reorganization Heavily Targets Older Employees for Termination While Hiring Substantially Younger Workers, and the Statistics Make It Clear that PPM Discriminates Against Older Employees.**

PPM claims it began a reorganization (the "Reorganization") in early 2015. (D. Spivey 84:4–84:11; S. Spivey 212:11–213:22.) The Reorganization is still allegedly ongoing today. (S. Spivey 212:11–212:21; D. Spivey 91:19–91:23; Benton 95:11–95:13.) The Reorganization was allegedly "rapid and necessary" because reimbursements from sources like Medicare and private insurance decreased and PPM allegedly needed to save money. (D. Spivey 90:15–91:18.) It had to "make significant reductions in personnel . . ." (Dr. Spivey 13:25–14:3.) However, 2014 and 2015 were banner years in terms of financial success for PPM. (Nagelski Dec. ¶ 4.) And PPM has not actually made a significant reduction in personnel. (Ex. 14.)

PPM's Reorganization appears to be almost entirely subjective and *ad hoc*. PPM used no metrics to guide the Reorganization; there have been no overarching criteria. (Yontz 62:19–62:25.) PPM did not conduct any cost analyses of the various positions that it might eliminate to help guide it through which employees to fire or keep. (Yontz 63:1–63:8.) PPM also did not

utilize any overarching criteria to guide its hiring decisions as part of the Reorganization. (Yontz 63:5–63:8.)

In late 2015, Mary Benton Began to play a large role in the Reorganization. (Dkt. Entry 42-13 at ¶ 6; D. Spivey 70:17–70:22.) However, "when it comes to running PPM, the 'buck' stops with him." (Dkt. Entry 37 at 14; D. Spivey 51:9–52:2.) Dr. Spivey ultimately makes the Reorganization termination decisions. (Yontz 65:1–65:6.)

PPM has disproportionately targeted older workers and hired substantially younger employees as part of the Reorganization. PPM has identified 14 as specifically terminated as part of the Reorganization between 2015 and the present. (Ex. 14.) The average age of those employees is approximately 56.286. (*Id.*; ex. 15.) The median age is 59. (*Id.*) Dr. Spivey was a decision-maker in the decision to keep or fire each employee. (Ex. 15; 30(b)(6) at 14:4–14:8, 16:13–16:16, 16:21–16:25, 17:5–17:9, 17:20–17:24, 18:7–18:12, 18:15–18:20, 19:18–19:23, 20:6–20:9, 20:15–20:19, 21:8–21:12, 22:14–22:18, 44:25–45:10.) When narrowed to the period following Benton's heavy involvement, zero of the 11 employees terminated were under the age of 44 years old, the average age was approximately 58 and the median age was 59. (Exs. 14 & 15.)

As part of the Reorganization, PPM hired 33 new workers. (Ex. 16.) The average age of these new hires is approximately 35.63. (*Id.*) The median is 33. (*Id.*)

On the eve of the Reorganization—December 31, 2014—PPM had 40 employees and their average age was approximately 46.25. (Ex. 14; ex. 17; ex. 18; 30(b)(6) at 37:19–37:21, 38:22–38:25, 41:23–42:1, 44:12–44:23.) The median age was 46.5. (Ex. 18.) Sue was just the fifth employee selected as part of the Reorganization, and she was only the second selected

3

following Benton's heavy involvement. (Ex. 14; ex. 15) At the time of her termination, there were 42 other employees at PPM (more than at the start of the Reorganization) and their average age was around 46.119 and the median was 45. (Ex. 14; ex. 17; ex. 19; 30(b)(6) at 38:1–38:3, 41:23–42:1, 44:12–44:19.) A few months later, at the time of Rebecca's June 9, 2016, termination, there were still 42 other PPM employees and their average age was then down to approximately 41.904 and the median was 44. (Ex. 14; ex. 17; ex. 20.)

Today PPM has 37 employees, which is only three fewer than when the reorganization began. (Ex. 14, ex. 17, ex. 18, ex. 21.) Despite the passage of nearly four years since the average age of PPM's workforce was over 46, the average age of PPM's employees today is approximately 41.864 and the median is 40. (Ex. 14, ex. 21.) Under normal conditions, it would have climbed to 50 with the passage of time. Instead, PPM managed to turn the clock <u>back</u> 5-6 years over this period. PPM's most recent termination as part of the Reorganization came on April 10, 2018, and the victim was 65-years-old. (Ex. 14; 30(b)(6) at 13:21–13:23.)

    **B.**    **PPM's Employees See First-Hand How PPM Justified Firing Older Employees While Bringing in Much Younger Workers.**

The Reorganization is a tool to make the workforce younger, and PPM shuffled roles to evade the law. (Link Dec. ¶¶ 12–15; Ingold Dec. ¶¶ 6–13.) It slowly and strategically stripped older workers of duties and then farcically fired them because there was nothing left for them to do. (Ingold Dec. ¶ 13; Link ¶¶ 6–18.)

Accordingly to Cindy Ingold, a former PPM employee who was 46 years old at the time of her termination, "[i]t was extremely common for employee roles to change at PPM. Aside from what happened from me and what I observed happen with my coworkers, there were regular emails and messages saying that certain employees were now doing something else or

that someone is gone, and someone else is taken over the role, and so-forth." (Ingold Dec. ¶ 7.) She gave specific examples of this happening. (Ingold Dec. ¶¶ 11–12.) Ingold also declared, "[i]t was obvious that PPM was shuffling roles and duties to eliminate older employees to replace them with younger workers." (Ingold Dec. ¶ 13.)

This same fate befell Ms. Ingold. In early 2016, PPM changed her duties and gave her a new supervisor, but failed to train her on her new role (Ingold Dec. ¶ 6.) PPM then quickly issued her a meritless coaching and fired her. (Ingold Dec. ¶¶ 8–9.) She filed an EEOC Charge alleging age discrimination. (Ex. 22.)

Scarlet Link also filed an EEOC Charge alleging age discrimination following PPM's decision to fire her as part of the Reorganization. (Ex. 23; 30(b)(6) at 16:21–16:23.) Like with so many others, PPM stripped Ms. Link of her duties and gave them to significantly younger employees. (Link Dec. ¶ 6.) Ms. Link tried in earnest to get more work assigned to her, but PPM did not take her requests seriously. (Link Dec. ¶ 7–9.) After stripping Ms. Link of her duties, giving them to others, and ignoring her requests for more work or to work part time, PPM explained that it chose her for the Reorganization because it didn't have enough work for her. (Link Dec. ¶¶ 16–18; 30(b)(6) at 17:2–17:4.) Aside from those already discussed, at least three other employees filed age discrimination EEOC Charges against PPM. (Ex. 29; Ex. 30; Ex. 31.)

PPM's Reorganization is, in reality, just pretext for age discrimination. Sue, who had access to PPM's financial information and was in charge of human resources, did not learn about any alleged Reorganization before her employment ended in February 2016—the first she heard about it was in this lawsuit. (Nagelski Dec. _.) Just prior to the onset of the allegedly financially necessary Reorganization, Sue initiated a Cash Balance Program to help the Spiveys put away

5

more money for retirement. (Nagelski Dec. _.) She also increased the safe harbor non-elective employer contribution to employees from three percent to four, helped PPM purchase its second Greensboro location, purchased a company vehicle, and approved regular shareholder distributions to Dr. Spivey's personal wealth management account. (Nagelski Dec. _.) In reality, the Reorganization is just a *post hoc* way for PPM to get around firing older workers for no legitimate reason and constructing a younger workforce.

### III. PPM and the Spiveys Target Rebecca and Sue.

#### A. Sue Pushes Back on Discriminatory Practices, and the Spiveys and PPM Target Her.

In July 2015, PPM sought to fire three employees at its Greensboro location that it claims as part of the Reorganization, including the only under-40 victim, referenced above. (Ex. 14, ex. 15.) Sue opposed these terminations and expressed that she, with one over 40 year old employee in particular, that it was wrong and, in response, Dr. Spivey threatened her work status. (Ex. 24; Nagelski 187:1–188:16 ; Dkt. Entry 42-10 at ¶ 19; Ex. 25.) PPM fired these employees on a Friday and replaced them on the following Monday. (Ex. 25; S. Spivey 206:1–206:22.) On Saturday, August 1, 2015, Sherry Spivey sent out an email blast explaining that the three Greensboro employees had been let go. (Ex. 26.)

#### B. Dr. Spivey Sexually Harasses Rebecca, Who Rebuffs His Advances and Suffers the Consequences.

In or around March 2014, Dr. Spivey called Rebecca about a work matter while she was in Charleston, South Carolina. (Kovalich 204:4–204:16.) The conversation, which initially centered on the office, suddenly took on a sexual nature when Dr. Spivey asked, "what are you wearing?" (Kovalich 204:4–204:20.) He told Rebecca that he wanted to drive down to

6

Charleston, and Rebecca told him not to. (Kovalich 247:6–247:18.) Dr. Spivey's testimony on this differs little. (D. Spivey 261:14–264:8.) The flirting and sexual messages from Dr. Spivey were regular during Rebecca's time with PPM. In text messages to Rebecca, Dr. Spivey referred to himself as "[y]our wannabe lover" and called Rebecca "[o]bject of my desire." (Ex. 27.) He said, "If business weren't so f…ing important……" and "Rebecca my beauty." (Ex. 27.)

In November 2014, Dr. Spivey told Rebecca, "you know, I gave you a chance." (Kovalich 219:10–221:11.) In February 2015, Dr. Spivey hugged Rebecca in the parking lot, and this made her uncomfortable. (Kovalich 177:12–177:18, 259:5–259:18, 218:25–219:9.) Kovalich reported Mrs. Spivey's behavior towards her to Dr. Spivey, and he responded that he could not get involved because its either his marriage or his practice. (Kovalich 184:20–184:23.)

In or around October 2015, Rebecca came to Dr. Spivey's office while he was on the phone. (Kovalich 207:3–207:12.) When the call ended, Dr. Spivey and Rebecca briefly exchanged words. (Kovalich 207:13–207:16.) Then, Dr. Spivey stood up, walked around his desk, grabbed Rebecca and kissed her against her will on her lips. (Kovalich 207:17–207:20, 261:22–261:23.)

To put it mildly, this put Rebecca in a bad spot. Dr. Spivey was PPM's owner, so she had no one to turn to, and the situation was agonizing for her. (Kovalich 260:23–261:10.) After the forced kiss, Rebecca walked off. (Kovalich 207:3–208:2.) Kovalich regularly told Dr. Spivey to stop flirting and be professional. (Kovalich 204:24–205:9.) Dr. Spivey also regularly made verbal romantic comments and propositions to Rebecca—he was seeing how far he could get, but she kept turning down his advances, and this culminated in her rejecting his unwelcome kiss.

7

(Kovalich Dec. ¶ 7.) The kiss was in no way welcome, and Rebecca made that clear. (Kovalich Dec. at ¶ 6.) After Rebecca rejected Dr. Spivey's kiss in October 2015, nothing was the same. (Kovalich Dec. ¶ 8.) Dr. Spivey treated Rebecca differently, and he was much colder towards her. (*Id.* ¶ 8.)

Rebecca is not the first PPM employee to accuse Dr. Spivey of sexual harassment. One former employee claimed that, in early January 2016, Dr. Spivey grabbed her buttocks in front of a patient and his son, and this former employee found the touching "highly offensive." (Ex. 30.) A different former employee declared under penalty of perjury that a current PPM Physician's Assistant began making sexual comments and gestures towards her in or around September 2011. (Ex. 32.) She alleges that when she reported it to Dr. Spivey he asked her to transfer instead of deal with the harasser. (*Id.*)

**IV. PPM Illegally Fires Rebecca and Sue and Pretextually Lumps Their Terminations into the Reorganization.**

**A. PPM Fires Rebecca for Improper Reasons and Awkwardly Tries to Lump Her Termination into the Reorganization.**

Dr. Spivey forced a workplace kiss on Rebecca in October 2015 and he first considered firing Rebecca in late 2015. (D. Spivey 225:9–225:11.) Dr. Spivey spoke with Mary Benton about firing Rebecca in early 2016. (D. Spivey 224:7–224:11.) Benton specifically questioned the need for Rebecca when she learned that Rebecca was rarely physically present. (Benton 120:14–120:18, 123:15–124:19.) At the time of her termination, Rebecca's annual salary was $72,499.98. (Ex. 36.)

On January 8, 2016, Sue emailed Dr. Spivey about PPM's EPLI policy and an open EEOC matter. (Ex. 34.) Dr. Spivey forwarded the email to Yontz and told her that he was going

8

to fire Sue later that day. (Ex. 34.) On January 17, 2016, Dr. Spivey sent a letter to Sue saying that PPM had fired her. (Ex. 35.)

On February 16, 2016, Sue's undersigned counsel sent a letter of representation to PPM alleging age discrimination and retaliation. (Ex. 37.) On March 9, 2016, having not received a response to the letter, undersigned counsel sent another letter. (Ex. 38.) Dr. Spivey responded on March 11, 2016. (Ex. 39.)

After receiving the second letter, Dr. Spivey called Rebecca. (D. Spivey 249:19–250:11.) Rebecca told Dr. Spivey that, after everything Sue had done for PPM, firing her via a FedEx letter was brutal. (Kovalich 75:1–75:19.) Dr. Spivey responded and asked Rebecca to convince Sue to "stop this lawsuit." (Kovalich 74:21–76:24; 243:10–243:20.) He wanted Rebecca to do it because he understood that Sue had retained counsel and contact from him would be inappropriate. (Kovalich 75:20–75:25.) Rebecca heard Mrs. Spivey in the background saying, "retaliation, retaliation," and then Dr. Spivey demanded that Rebecca tell him that she wouldn't hurt his practice. (Kovalich: 76:1–76:18.)

Rebecca told Dr. Spivey that she would not to convince Sue to drop her discrimination case. (Kovalich 75:20–76:3.) She had "no dog in that fight" and did not want to get in the middle of it. (Kovalich 76:1–76:3.) Rebecca was surprised and confused by the call, but she assured Dr. Spivey that she would not retaliate against PPM. (Kovalich 76:4–76:18.)

Dr. Spivey admits that he called Rebecca and said "I don't understand why Sue has done this" and that he was concerned about Rebecca retaliating "against us for firing her daughter, my concern was that she could hurt us." (D. Spivey 246:14–246:17, 247:4–11.) He testified that Rebecca "could have sabotaged the lab." (D. Spivey 247:11–247:13.) He admits that he asked

9

Rebecca to assure him that she would not retaliate against or hurt PPM. (D. Spivey 248:4–248:9.)

With Sue threatening employment discrimination claims against PPM, Dr. Spivey testified, "it was awkward that Ms. Kovalich was still employed and we had terminated her daughter." (D. Spivey 247:4–247:6.) Dr. Spivey admits that Sue's age discrimination allegations were distinct for him from prior accusations. (D. Spivey 245:12–245:22.) "[W]e, as a practice, and we, as a family, and I personally had a different relationship with [Sue] than I did with these other employees. She was family. She had a special status, if you will." (D. Spivey 245:12–245:22.)

On June 9, 2016, PPM fired Rebecca. (Dkt. Entry 42-10 at ¶ 31.) At the time of her termination, Rebecca was developing age management tests for PPM, primarily with Dr. Scheutzow, and this was a good deal of work. (Kovalich Dec. ¶ 2.) She was also handling laboratory numbers and the budget. (*Id.* ¶ 3.) Rebecca approved laboratory invoices as well. (*Id.* ¶ 4.) After Rebecca's termination, Gretchen Hawks—who was 47 at Rebecca's termination—took over much of this work. (*Id.* ¶ 3–4.)

### B. PPM's Explanation for Firing Rebecca Are Not Worthy of Belief.

J.M. is the ultimate comparator. PPM alleges that one of the reasons it reassigned Sue's HR duties and fired her was her lack of presence in the office. (D. Spivey 110:12–110:24; 187:22–191:25; Dkt. Entry 42-10 at ¶ 14.) Sue was allegedly part of the Reorganization, the Reorganization's purposes was allegedly to "control costs for the business to survive." (Dkt. Entry 42-13 at ¶ 17.)

However, J.M.—PPM's Director of Marketing who makes $87,100 per year—is a far worse offender than Sue in every way imaginable. (Nagelski Dec. ¶ 9; Ex. 40;. Ex. 41.) J.M. is currently 34 years old, and she was 32 years old at the time of Sue's and Rebecca's terminations. (Ex. 14; ex. 19; ex. 20; ex. 21.) J.M. is still on PPM's payroll. (Ex. 14; Benton 135:8–135:15.) Yet, Benton testified that she has never seen J.M. in the office. (Benton 136:1–136:3.) She only met J.M. once, and it was a social meeting and not work-related. (Benton 138:9–138:21.) Benton played a large role in evaluating PPM positions as part of the Reorganization. Benton's alleged Action Plan even has a substantial section on "Marketing." (Dkt. Entry 43-10.) But Benton could not identify what J.M. did for PPM. (Benton 135:18–135:22.)

Benton testified that communicated with PPM's marketing representative—at a company called Vermillion—about marketing. (Benton 101:2–19; 136:4–136:11.) Despite being the Director of Marketing, J.M. has never been involved in those conversations. (Benton 136:9–136:15.)

PPM cannot plead ignorance about J.M. As part of the Reorganization, Benton asked others what J.M. did at PPM, and was told that she did some marketing work. (Benton 137:22–138:6.) Benton never asked what specific services J.M. provided PPM, and she is not aware of any marketing work that J.M. has ever actually done. (Benton 137:11–137:13; 138:7–8.)

Yontz testified that J.M. simply was not in the office. (Yontz 35:6–35:7.) The only things that Yontz could identify J.M. doing for PPM was helping Vermillion create brochures and monitor PPM's website. (Yontz 34:11–35:3.) Yontz does not know what that entails. (Yontz 34:11–35:3.) Yontz's understanding about J.M.'s work comes from Benton who, under oath, couldn't identify anything that J.M. did for PPM. (Yontz 63:18–64:7; Benton 135:18–135:22.)

11

Yontz testified that PPM analyzed J.M.'s position for the Reorganization and determined that it "doesn't require a full-time position." (Yontz 63:9–63:14.) Yontz never even recommended terminating J.M. as part of the Reorganization, but she did have two discussions with Benton about switching her to a contract role. (Yontz 64:8–64:23.)

In 2017, Benton suggested to Dr. Spivey that PPM switch J.M. to a contract role and take her off the payroll, but that never happened. (Benton 137:14–137:21.) Dr. Spivey responded that he thought about it, but didn't know what to do. (Benton 136:16–137:19.)

Moreover, PPM identified Sherry Spivey, Mary Benton, Gretchen Hawks, Rodney Leftwich, and Steven Wong as having input into its decisions to fire Rebecca. (Ex. 42.) With respect to Ms. Hawks, Dr. Spivey testified that in late 2015 or early 2016 he asked her "if the lab was able to run okay if Ms. Kovalich was gone." (D. Spivey 227:7–227:15.) He testified that Ms. Hawks told him that it could. (D. Spivey 227:16–227:24.)

But this was a lie. Ms. Hawks testified that no such conversation took place. (Hawks 24:15–26:7.) Even when focusing on the duties instead of on Rebecca, specifically, Ms. Hawks denied telling Dr. Spivey that Rebecca's duties were no longer necessary. (Hawks 26:18–26:21.) She viewed Rebecca as a valuable asset to the lab. (Hawks 25:15–25:25.) Scarlett Link worked with Rebecca at Rebecca's previous lab, as well as at PPM, and she knew first-hand that Rebecca was extremely knowledgable and a hard worker. (Link Dec. ¶ 20.)

## ARGUMENT

**I.     A Jury Must Decide Important Issues of Material Fact.**

Summary judgment is only appropriate where evidence shows there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). Courts view evidence in the light most favorable to the

12

nonmoving party. *Austin Maint. & Const., Inc. v. Crowder Const. Co.*, 224 N.C. App. 401 (2012). Courts should seldom grant summary judgment in employment discrimination cases. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 285 (4th Cir. 2015); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994).

II. **Rebecca Can Establish a Tortious Interference Claim Against Dr. Spivey.**

Plaintiffs establish tortious interference with contract claims if they show: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *White v. Cross Sales & Eng'g Co.*, 177 N.C. App. 765, 768-69, 629 S.E.2d 898, 901 (2006) (*citing United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)).

Rebecca had an at-will contract with PPM, and Dr. Spivey knew of the contract. Rebecca was damaged when she lost her job and her income. Rebecca can also establish the other elements, as set forth below.

"Any party that 'had a legitimate business interest ... in the subject matter' is a 'non-outsider.' For example, non-outsiders to a contract include employees of an organization with whom the plaintiff has contracted." *Benjamin v. Sparks*, 173 F. Supp. 3d 272, 289–90 (E.D.N.C. 2016) (citations omitted).

"A plaintiff can overcome the presumption that a non-outsider's action was justified by showing that the non-outsider took the action for an improper reason." *Benjamin v. Sparks*, 173

13

F. Supp. 3d 272, 290 (E.D.N.C. 2016) (*citing Embree Constr. Grp., Inc.*, 330 N.C. at 498, 411 S.E.2d at 924). Such plaintiffs must show that defendants acted with malice and for a reason "not reasonably related to the protection of a legitimate business interest." *Benjamin v. Sparks*, 173 F. Supp. 3d 272, 290 (E.D.N.C. 2016) (*citing Sellers v. Morton*, 191 N.C.App. 75, 82 (2008)).

"A person acts with legal malice if he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties." *Biricik v. Wal-Mart Stores E., LP*, No. 7:14-CV-67-BR, 2014 WL 3955085, at *3 (E.D.N.C. Aug. 13, 2014) (*citing Varner v. Bryan,* 440 S.E.2d 295, 298 (N.C.Ct.App.1994)). Employment discrimination, like age discrimination and retaliation, is "beyond the interest of the employer" in tortious interference cases. *Biricik v. Wal-Mart Stores E., LP*, No. 7:14-CV-67-BR, 2014 WL 3955085, at *3 (E.D.N.C. Aug. 13, 2014).

Here, Rebecca's Response in Opposition to Defendant Preferred Pain Management & Spine Care, P.A.'s Motion for Summary Judgment sets forth various ways that PPM terminated her employment in violation of the ADEA and Title VII. Dr. Spivey was behind that decision. For the reasons set forth in the Fact Section and in Rebecca's Response in Opposition to Defendant Preferred Pain Management & Spine Care, P.A.'s Motion for Summary Judgment, Rebecca can also make out this tort's third and fourth elements. Accordingly, the Court should deny Mrs. Spivey's Motion.

## **CONCLUSION**[1]

Therefore, the Court should deny Dr. Spivey's Motion for Summary Judgment.

---

[1] If the Court declines to grant summary judgment on the Dr. Spivey causes of action which Rebecca does not argue, Rebecca will voluntarily dismiss them before trial.

Respectfully submitted this 31st day of October, 2018.

>*/s/ Sean F. Herrmann*
>Sean F. Herrmann (NC Bar No. 44453)
>Van Kampen Law, PC
>315 East Worthington Avenue
>Charlotte, North Carolina 28203
>Phone: (704) 247-3245
>Fax: (704) 749-2638
>Email: sean@vankampenlaw.com
>*Attorney for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

THE UNDERSIGNED HEREBY CERTIFIES compliance with Local Rule 7.3(d)(1). The undersigned counsel further certifies that this Memorandum, including the body, heading, and footnotes, does not exceed 6,250 words.

                BY:    */s/ Sean F. Herrmann*
                          Sean F. Herrmann (NC Bar No. 44453)
                          Van Kampen Law, PC
                          315 East Worthington Avenue
                          Charlotte, North Carolina 28203
                          Phone: (704) 247-3245
                          Fax: (704) 749-2638
                          Email: sean@vankampenlaw.com
                          *Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

THE UNDERSIGNED HEREBY CERTIFIES that the document to which this certificate is attached was served upon each party to this action by CM/ECF electronic notification to the attorney of record for each party, or to the party, at their last known address, as stated below.

Ann H. Smith (NC Bar No. 23090)
annsmith@jacksonlewis.com
Caitlin M. Goforth (NC Bar No. 49227)
caitlin.Goforth@Jacksonlewis.com
JACKSON LEWIS, P.C.
3737 Glenwood Avenue Suite 450
Raleigh, North Carolina 27612
Telephone: 919.760.6465
Facsimile: 919.760.6461
*Attorneys for Defendants*

This the 31st day of October, 2018.

                                                           */s/ Sean F. Herrmann*
                                                           Sean F. Herrmann (NC Bar No. 44453)
                                                           Van Kampen Law, PC
                                                           315 East Worthington Avenue
                                                           Charlotte, North Carolina 28203
                                                           Phone: (704) 247-3245
                                                           Fax: (704) 749-2638
                                                           Email: sean@vankampenlaw.com
                                                           *Attorney for Plaintiffs*