IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and SUZANNE )
NAGELSKI, )
)
           Plaintiffs, )
    v. )
)
PREFERRED PAIN MANAGEMENT & )
SPINE CARE, P.A., DR. DAVID SPIVEY, )
individually, and SHERRY SPIVEY, )
individually. )
)
           Defendants. )

---

**PLAINTIFF NAGELSKI'S RESPONSE IN OPPOSITION
TO DEFENDANT SHERRY SPIVEY'S MOTION FOR SUMMARY JUDGMENT**

Viewing the evidence in the light most favorable to Plaintiff Suzanne Nagelski ("Sue"), shows that a reasonable jury could certainly find for her on the claims below. Accordingly, the Court should deny Sherry Spivey's ("PPM") Motion.

## FACTS

**I. Sue Was an Excellent, Long-Time Employee, Who Played an Instrumental Role Getting PPM Off the Ground.**

In or around 2006, Rebecca and Suzanne Nagelski ("Sue) helped Dr. and Mrs. Spivey and worked to get PPM off the ground. (Nagelski 76:19–77:9; 78:21–79:7; Kovalich 44:8–46:19, 119: 5–120:10.) Dr. Spivey is PPM's Owner, CEO, and President. (D. Spivey 51:9–51:17; Nagelski 88:6–88:13.) Dr. Spivey was Sue and Rebecca's supervisor. (Nagelski 89:16–89:23;

Kovalich 260:23–261:10.) Mrs. Spivey became PPM's Clinic Manager and she is Sue's aunt. (Nagelski 88:14–89:11.)

In late 2006 or early 2007, Sue began working for PPM as a contractor, and she worked with PPM's books, IT vendors, hiring, and human resources. (Nagelski 77:14–77:20, 78:2–78:17.) In 2011, Sue's duties evolved—PPM had to take on its own employees either by transferring them from PCP or through soliciting new hires and Sue had to set up benefit plans, get payrolls transferred, and make sure nobody lost any accrued benefits. (Nagelski 82:12–82:23.) Sue also began working with accountants and financial institutions. (Nagelski 84:13–84:25.) In early 2013, PPM made Sue an employee because she solely worked for PPM since 2006 or early 2007. (Nagelski Dec. ¶ 2; Nagelski 81:1–81:19; Ex. 14.)

## II. PPM Begins an Alleged Reorganization in 2015 that Has Devastating Effects on Older Employees.

### A. PPM's Subjective Reorganization Heavily Targets Older Employees for Termination While Hiring Substantially Younger Workers, and the Statistics Make It Clear that PPM Discriminates Against Older Employees.

PPM claims it began a reorganization (the "Reorganization") in early 2015. (D. Spivey 84:4–84:11; S. Spivey 212:11–213:22.) The Reorganization is still allegedly ongoing today. (S. Spivey 212:11–212:21; D. Spivey 91:19–91:23; Benton 95:11–95:13.) The Reorganization was allegedly "rapid and necessary" because reimbursements from sources like Medicare and private insurance decreased and PPM allegedly needed to save money. (D. Spivey 90:15–91:18.) It had to "make significant reductions in personnel . . ." (Dr. Spivey 13:25–14:3.) However, 2014 and 2015 were banner years in terms of financial success for PPM. (Nagelski Dec. ¶ 3-4.) And PPM has not actually made a significant reduction in personnel. (Ex. 14.)

PPM's Reorganization appears to be almost entirely subjective and ad hoc. PPM used no metrics to guide the Reorganization; there have been no overarching criteria. (Yontz 62:19–62:25.) PPM did not conduct any cost analyses of the various positions that it might eliminate to help guide it through which employees to fire or keep. (Yontz 63:1–63:8.) PPM also did not utilize any overarching criteria to guide its hiring decisions as part of the Reorganization. (Yontz 63:5–63:8.)

In late 2015, Mary Benton Began to play a large role in the Reorganization. (Dkt. Entry 42-13 at ¶ 6; D. Spivey 70:17–70:22.) However, "when it comes to running PPM, the 'buck' stops with him." (Dkt. Entry 37 at 14; D. Spivey 51:9–52:2.) Dr. Spivey ultimately makes the Reorganization termination decisions. (Yontz 65:1–65:6.)

PPM has disproportionately targeted older workers and hired substantially younger employees as part of the Reorganization. PPM has identified 14 as specifically terminated as part of the Reorganization between 2015 and the present. (Ex. 14.) The average age of those employees is approximately 56.286. (*Id.*; ex. 15.) The median age is 59. (*Id.*) Dr. Spivey was a decision-maker in the decision to keep or fire each employee. (Ex. 15; 30(b)(6) at 14:4–14:8, 16:13–16:16, 16:21–16:25, 17:5–17:9, 17:20–17:24, 18:7–18:12, 18:15–18:20, 19:18–19:23, 20:6–20:9, 20:15–20:19, 21:8–21:12, 22:14–22:18, 44:25–45:10.) When narrowed to the period following Benton's heavy involvement, zero of the 11 employees terminated were under the age of 44 years old, the average age was approximately 58 and the median age was 59. (Exs. 14 & 15.)

As part of the Reorganization, PPM hired 33 new workers. (Ex. 16.) The average age of these new hires is approximately 35.63. (*Id.*) The median is 33. (*Id.*)

3

On the eve of the Reorganization—December 31, 2014—PPM had 40 employees and their average age was approximately 46.25. (Ex. 14; ex. 17; ex. 18; 30(b)(6) at 37:19–37:21, 38:22–38:25, 41:23–42:1, 44:12–44:23.) The median age was 46.5. (Ex. 18.) Sue was just the fifth employee selected as part of the Reorganization, and she was only the second selected following Benton's heavy involvement. (Ex. 14; ex. 15) At the time of her termination, there were 42 other employees at PPM (more than at the start of the Reorganization) and their average age was around 46.119 and the median was 45. (Ex. 14; ex. 17; ex. 19; 30(b)(6) at 38:1–38:3, 41:23–42:1, 44:12–44:19.) A few months later, at the time of Rebecca's June 9, 2016, termination, there were still 42 other PPM employees and their average age was then down to approximately 41.904 and the median was 44. (Ex. 14; ex. 17; ex. 20.)

Today PPM has 37 employees, which is only three fewer than when the reorganization began. (Ex. 14, ex. 17, ex. 18, ex. 21.) Despite the passage of nearly four years since the average age of PPM's workforce was over 46, the average age of PPM's employees today is approximately 41.864 and the median is 40. (Ex. 14, ex. 21.) Under normal conditions, it would have climbed to 50 with the passage of time. Instead, PPM managed to turn the clock <u>back</u> 5-6 years over this period. PPM's most recent termination as part of the Reorganization came on April 10, 2018, and the victim was 65-years-old. (Ex. 14; 30(b)(6) at 13:21–13:23.)

B.   **PPM's Employees See First-Hand How PPM Justified Firing Older Employees While Bringing in Much Younger Workers.**

The Reorganization is a tool to make the workforce younger, and PPM shuffled roles to evade the law. (Link Dec. ¶¶ 12–15; Ingold Dec. ¶¶ 6–13.) It slowly and strategically stripped older workers of duties and then farcically fired them because there was nothing left for them to do. (Ingold Dec. ¶ 13; Link ¶¶ 6–18.)

4

Accordingly to Cindy Ingold, a former PPM employee who was 46 years old at the time of her termination, "[i]t was extremely common for employee roles to change at PPM. Aside from what happened from me and what I observed happen with my coworkers, there were regular emails and messages saying that certain employees were now doing something else or that someone is gone, and someone else is taken over the role, and so-forth." (Ingold Dec. ¶ 7.) She gave specific examples of this happening. (Ingold Dec. ¶¶ 11–12.) Ingold also declared, "[i]t was obvious that PPM was shuffling roles and duties to eliminate older employees to replace them with younger workers." (Ingold Dec. ¶ 13.)

This same fate befell Ms. Ingold. In early 2016, PPM changed her duties and gave her a new supervisor, but failed to train her on her new role (Ingold Dec. ¶ 6.) PPM then quickly issued her a meritless coaching and fired her. (Ingold Dec. ¶¶ 8–9.) She filed an EEOC Charge alleging age discrimination. (Ex. 22.)

Scarlet Link also filed an EEOC Charge alleging age discrimination following PPM's decision to fire her as part of the Reorganization. (Ex. 23; 30(b)(6) at 16:21–16:23.) Like with so many others, PPM stripped Ms. Link of her duties and gave them to significantly younger employees. (Link Dec. ¶ 6.) Ms. Link tried in earnest to get more work assigned to her, but PPM did not take her requests seriously. (Link Dec. ¶ 7–9.) After stripping Ms. Link of her duties, giving them to others, and ignoring her requests for more work or to work part time, PPM explained that it chose her for the Reorganization because it didn't have enough work for her. (Link Dec. ¶¶ 16–18; 30(b)(6) at 17:2–17:4.) Aside from those already discussed, at least three other employees filed age discrimination EEOC Charges against PPM. (Ex. 29; Ex. 30; Ex. 31.)

PPM's Reorganization is, in reality, just pretext for age discrimination. Sue, who had access to PPM's financial information and was in charge of human resources, did not learn about any alleged Reorganization before her employment ended in February 2016—the first she heard about it was in this lawsuit. (Nagelski Dec. ¶ 5.) Just prior to the onset of the allegedly financially necessary Reorganization, Sue initiated a Cash Balance Program to help the Spiveys put away more money for retirement. (Nagelski Dec. 4.) She also increased the safe harbor non-elective employer contribution to employees from three percent to four, helped PPM purchase its second Greensboro location, purchased a company vehicle, and approved regular shareholder distributions to Dr. Spivey's personal wealth management account. (Nagelski Dec. ¶ 3.) In reality, the Reorganization is just a *post hoc* way for PPM to get around firing older workers for no legitimate reason and constructing a younger workforce.

### III. Sue Pushes Back on Discriminatory Practices, and the Spiveys and PPM Target Her.

In March 2015, Mrs. Spivey informed Sue that she was going to move a returning employee from full-time to part-time work. (Ex. 43.) Sue did her HR job and cautioned against the sudden move as it would create a "discriminatory environment" and "instigate animosity." (Ex. 43.) When Sue compared how the employee returning from leave's proposed schedule would compare with a peer, Mrs. Spivey gave a one-word response: "Irrelevant." (Ex. 43.) Sue responded that the issues are serious and fall under the wage and hour laws and that Mrs. Spivey should speak with counsel because, in Sue's estimation, it opened PPM up to "exposure." (Ex. 43.) Sue, in good faith, believed that Mrs. Spivey's decision would violate federal discrimination laws. (Nagelski Dec. ¶ 12.)

Mrs. Spivey openly disrespected Sue for doing her job, and referred to her as a mere "consultant." (Ex. 44.) Sue reminded her that her job hadn't changed. (Ex. 44.)

Every employee that PPM chose to fire as part of the Reorganization was over the age of 40 except for S.W., and that employee merit's further discussion. (Ex. 14; Ex. 15; 30(b)(6) at 44:23–45:5.) In March and June 2015, Mrs. Spivey raised issues and suggested terminating this employee who had clearly been dealing with some medical issues. (Ex. 45; Ex. 46; Ex. 47.) In June, Sue pushed back, and laid out a plan: "The first recourse would be documentation of any absenteeisms with MD notes followed by verbal and written notice." (Ex. 48.) Mrs. Spivey responded, "I am not intimidated by legal repercussions that you frequently bring up." (Ex. 48.)

In July 2015, PPM sought to fire three employees at its Greensboro location that it claims as part of the Reorganization, including the only under-40 victim, referenced above. (Ex. 14; ex. 15.) On July 28, 2018, Sue emailed Dr. Spivey and Mrs. Spivey and said, "I am not convinced that the simultaneous dismissal of 3 employees is in PPM's best interests." (Ex. 24.) One of the employees affected, M.J., was over 40, gay, and a military veteran. (Nagelski 187:1–188:2.) She specifically explained to Dr. Spivey that this employee was in a protected class. (Dkt. Entry 42-10 at ¶ 19.) Sue pushed PPM to delay the decision to discuss it with counsel. (Ex. 24.) She expressly stated that she foresaw PPM exposure and envisioned three employees going "to the labor board." (Nagelski 188:10–188:16; Ex. 24.)

Sue's resistance to the terminations was not well received. In a text message, Dr. Spivey told her: "Forget it. Go to Philly. *When you return we will discuss your role in the practice and your salary*." (Ex. 25.) (emphasis added) Obviously frustrated, Sue responded and let him know

7

that he had not supported her and asked, "Are you trying to make me quit?" (Ex. 25.) She continued:

> Regarding HR—I have been covering the company the best I can. I have asked sherry for documented correspondence between her & [S.W.]. [M.J.] has raised concerns as [S.W.]'s supervisor & sherry squashes him. Now she wants to fire [M.J.]-[S.W.]-and [D.M.] on an at-will basis. It's a disaster waiting to happen. There needs to be severance packages & hopes that all 3 don't leave Friday in the same car. This isn't a last minute dismissal that can be taken lightly.

(Ex. 25.)

Shockingly, after the three employees were fired on Friday, new employees replaced them the following Monday. (Ex. 25; D. Spivey 128:18–129:8; S. Spivey 206:1–206:22.) "[W]e had determined that with a total Reorganization and change the way the dynamics were in the Greensboro office that it would be better to have an entire new crew who could start together, learn it together, and work together with a lot more productivity." (S. Spivey 206:8–206:13.) "We had hired employee replacements to start on Monday morning, and that's why we needed to do this on Friday." (S. Spivey 206:14–206:22.)

Sue said that she did not know about the new employees and went on to say, "I highly recommend legal counsel present for your protection. This won't be so clean." (Ex. 25.) PPM claims that these three terminations were part of the Reorganization. (D. Spivey 124:9–124:20; S. Spivey 203:24–206:2.) Sue, in good faith, believed that the decision to terminate M.J. amounted to age discrimination and sexual orientation discrimination in violation of federal employment laws. (Nagelski Dec. ¶ 11–13.) This is why she warned about exposure. (*Id*.)

On Saturday, August 1, 2015, Sherry Spivey sent out an email blast explaining that the three Greensboro employees had been let go. (Ex. 26.)

On October 27, 2015, Mrs. Spivey emailed Sue and asked her to relinquish her HR role. (Ex. 49.) Sue did not report to Mrs. Spivey, and Mrs. Spivey had no power to direct Sue's work. (S. Spivey 119:21–120:1.)

Mrs. Spivey's relationship with Sue soured long before this. In 2014, she had Sue's IT and administrative privileges revoked. (Nagelski 90:15–91:9.) After meeting with Dr. Spivey, he restored Sue's privileges. (Nagelski 91: 5–91:14.)

Mrs. Spivey and Dr. Spivey began speaking with Wendy Yontz about taking over Sue's job in or around November 2014 (Yontz 36:12–37:12, 41:4–41:19.) Yontz and Mrs. Spivey had more than three conversations about Yontz taking over HR. (Yontz 37:8–37:12, 40:10–40:18.) Yontz's conversations about taking over HR with Mrs. Spivey continued until Yontz finally took the job in November 2015. (Yontz 36:12–37:12.) Mrs. Spivey was Yontz's primary contact at PPM. (Yontz 41:23–41:24.) Aside from Yontz, Mrs. Spivey had not been involved in hiring a non-clinic employee since 2012. (D. Spivey 190:16–194:3.)

On July 8, 2015, Mrs. Spivey emailed Jonathan Cochrane, and said that, due to a conflict she had with Sue, that she would like a referral for "anyone that you might recommend to us to step into her role/position should we decided to make a change." (Ex. 50.)

In September 2015, Yontz reached out to Mrs. Spivey about working for PPM and Mrs. Spivey told her that she would speak with Dr. Spivey and get back to her. (Yontz 41:25–42:9.) PPM offered Yontz the position around a month before she actually started working for PPM. (Yontz 42:19–42:25.)

9

IV. **PPM Illegally Fires Rebecca and Sue and Pretextually Lumps Their Terminations into the Reorganization.**

A. **After Nearly a Decade of Instrumental Service PPM Fires Sue.**

Dr. Spivey decided to fire Sue in late 2015 or early January 2016. (D. Spivey 182:16–182:18.) He had decided to strip Sue of her HR duties by November 2015 at the latest. (D. Spivey 185:3–185:13.) At that time, in November 2015, unknown to Sue, Wendy Yontz took over Sue's HR duties. (Ex. 14; ex. 33; Yontz 36:1–36:11.)

On January 8, 2016, Sue emailed Dr. Spivey about PPM's EPLI policy and an open EEOC matter. (Ex. 34.) Dr. Spivey forwarded the email to Yontz and told her that he was going to fire Sue later that day. (Ex. 34.) On January 17, 2016, Dr. Spivey sent a letter to Sue saying that PPM had fired her. (Ex. 35.) At the time of her termination, Sue's annual compensation was $85,509. (Ex. 36.)

Mrs. Spivey wanted Sue gone. She denied having any input into the decision to fire her, but said she was dissatisfied with her performance. (S. Spivey 148:21–149:12.) When asked for specifics, she claimed that Sue wasn't coming to work and employees were disgruntled because Sue changed them from hourly to salary or vice versa. (S. Spivey 149:8–149:17.) PPM claims that it fired Sue as part of the Reorganization. (30(b)(6) at 19:24–20:2.) It claims that it needed HR in the office. (*Id.*) PPM also points to alleged performance issues for why Sue is no longer with PPM. (Dkt. Entry 31 at 13–14.)

But Sue was regularly in the office and was never made aware of any issues related to her not being there until after PPM had already decided to hire Yontz. (Nagelksi Dec. ¶ 7–8.) Likewise, PPM never counseled Sue with respect to the alleged performance issues, and it certainly did not follow its progressive discipline policy if those issues actually existed. (*Id.*)

10

B.     **PPM's Explanations for Firing Sue Do Not Add Up.**

1.     **A Significant Comparator Does Nothing and Never Goes to the Office, but Remains on the Payroll Because She is Substantially Younger than Sue and Rebecca.**

J.M. is the ultimate comparator. PPM alleges that one of the reasons it reassigned Sue's HR duties and fired her was her lack of presence in the office. (D. Spivey 110:12–110:24; 187:22–191:25; Dkt. Entry 42-10 at ¶ 14.) Sue was allegedly part of the Reorganization, the Reorganization's purposes was allegedly to "control costs for the business to survive." (Dkt. Entry 42-13 at ¶ 17.)

However, J.M.—PPM's Director of Marketing who makes $87,100 per year—is a far worse offender than Sue in every way imaginable. (Nagelski Dec. ¶ 9–10; Ex. 40; Ex. 41.) J.M. is currently 34 years old, and she was 32 years old at the time of Sue and Rebecca's terminations. (Ex. 14; ex. 19; ex. 20; ex. 21.) J.M. is still on PPM's payroll. (Ex.14; Benton 135:8–135:15.) Yet, Benton testified that she has never seen J.M. in the office. (Benton 136:1–136:3.) She only met J.M. once, and it was a social meeting and not work-related. (Benton 138:9–138:21.) Bentons played a large role in evaluating PPM positions as part of the Reorganization. Benton's alleged Action Plan even has a substantial section on "Marketing." (Dkt. Entry 43-10.) But Benton could not identify what J.M. did for PPM. (Benton 135:18–135:22.)

Benton testified that she communicated with PPM's marketing representative—at a company called Vermillion—about marketing. (Benton 101:2–19; 136:4–136:11.) Despite being the Director of Marketing, J.M. has never been involved in those conversations. (Benton 136:9–136:15.)

11

PPM cannot plead ignorance about J.M. As part of the Reorganization, Benton asked others what J.M. did at PPM, and was told that she did some marketing work. (Benton 137:22–138:6.) Benton never asked what specific services J.M. provided PPM, and she is not aware of any marketing work that J.M. has ever actually done. (Benton 137:11–137:13; 138:7–8.)

Yontz testified that J.M. was not in the office at all. (Yontz 35:6–35:7.) The only things that Yontz could identify J.M. doing for PPM was helping Vermillion create brochures and monitor PPM's website. (Yontz 34:11–35:3.) Yontz does not know what that entails. (Yontz 34:11–35:3.) Yontz's understanding about J.M.'s work comes from Benton who, under oath, couldn't identify anything that J.M. did for PPM. (Yontz 63:18–64:7; Benton 135:18–135:22.)

Yontz testified that PPM analyzed J.M.'s position for the Reorganization and determined that it "doesn't require a full-time position." (Yontz 63:9–63:14.) Yontz never even recommended terminating J.M. as part of the Reorganization, but she did have two discussions with Benton about switching her to a contract role. (Yontz 64:8–64:23.)

In 2017, Benton suggested to Dr. Spivey that PPM switch J.M. to a contract role and take her off the payroll, but that never happened. (Benton 137:14–137:21.) Dr. Spivey responded that he had thought about it, but didn't know what to do. (Benton 136:16–137:19.) It never happened.

### 2. Sue More than Adequately Did Her Job at PPM.

Gretchen Hawks, who began her employment at PPM in July 2012, never had any issues with Sue. (Ex. 14; Hawks 22:9–22:10.) Vicki Swicegood never had issues with Sue working remotely—even if Sue wasn't in the office, Sue was immediately available, and Swicegood thought Sue did a great job. (Swicegood 62:12–64:6.)

Scarlett Link believed that Sue was "a terrific employee, especially considering all that she had to endure from Dr. Spivey." (Link Dec. ¶ 19.) She never had an issue getting in touch with Sue, and if Link left a message, Sue would call her back promptly. (Link Dec. ¶ 19.) Sue was "honest and frank." (Link Dec. ¶ 19.) Cindy Ingold viewed Sue as "terrific to work with when she was in Human Resources." (Ingold Dec. ¶ 14.) Ingold believed that Sue "understood employees and tried to make sure everyone was treated fairly." (Ingold Dec. ¶ 19.) She continued: "I truly felt like she had both the employees' and the company's best interests in mind, and she took her role seriously. She was incredibly accessible and available, and I never had an issue reaching her." (Ingold Dec. ¶ 19.)

## ARGUMENT

I. **A Jury Must Decide Important Issues of Material Fact.**

Summary judgment is only appropriate where evidence shows there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). Courts view evidence in the light most favorable to the nonmoving party. *Austin Maint. & Const., Inc. v. Crowder Const. Co.*, 224 N.C. App. 401 (2012). Courts should seldom grant summary judgment in employment discrimination cases. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 285 (4th Cir. 2015); *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994).

II. **Sue Can Establish a Tortious Interference Claim Against Mrs. Spivey.**

Plaintiffs establish tortious interference with contract claims if they show: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant

13

intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *White v. Cross Sales & Eng'g Co.*, 177 N.C. App. 765, 768-69, 629 S.E.2d 898, 901 (2006) (*citing United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988)).

Sue had an at-will contract with PPM, and Sherry Spivey knew of the contract. Sue was damaged when she lost her job and her income. Sue can also establish the other elements, as set forth below.

"Any party that 'had a legitimate business interest ... in the subject matter' is a 'non-outsider.' For example, non-outsiders to a contract include employees of an organization with whom the plaintiff has contracted." *Benjamin v. Sparks*, 173 F. Supp. 3d 272, 289–90 (E.D.N.C. 2016) (citations omitted).

"A plaintiff can overcome the presumption that a non-outsider's action was justified by showing that the non-outsider took the action for an improper reason." *Benjamin v. Sparks*, 173 F. Supp. 3d 272, 290 (E.D.N.C. 2016) (*citing Embree Constr. Grp., Inc.*, 330 N.C. at 498, 411 S.E.2d at 924). Such plaintiffs must show that defendants acted with malice and for a reason "not reasonably related to the protection of a legitimate business interest." *Benjamin v. Sparks*, 173 F. Supp. 3d 272, 290 (E.D.N.C. 2016) (*citing Sellers v. Morton*, 191 N.C.App. 75, 82 (2008)).

"A person acts with legal malice if he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties." *Biricik v. Wal-Mart Stores E., LP*, No. 7:14-CV-67-BR, 2014 WL 3955085, at *3 (E.D.N.C. Aug. 13, 2014) (*citing Varner v. Bryan,* 440 S.E.2d 295, 298 (N.C.Ct.App.1994)). Employment discrimination, like age discrimination and retaliation, is "beyond the interest of the employer" in tortious

14

interference cases. *Biricik v. Wal-Mart Stores E., LP*, No. 7:14-CV-67-BR, 2014 WL 3955085, at *3 (E.D.N.C. Aug. 13, 2014).

Here, Sue's Response in Opposition to Defendant Preferred Pain Management & Spine Care, P.A.'s Motion for Summary Judgment sets forth various ways that PPM terminated her employment in violation of the ADEA and Title VII. The evidence shows that Mrs. Spivey was upset with Sue when she opposed, in good faith, what she believed to be unlawful employment decisions. She said, "I am not intimidated by legal repercussions that you frequently bring up." And when Sue strongly pushed back on the Greensboro terminations in late July 2015, Mrs. Spivey had had enough. All the while, she was in contact with Wendy Yontz, who she brought on board to take over most of Sue's duties. She did this despite having no say in any hiring decisions outside the clinic since 2012.

Sue engaged in protected activity, and Mrs. Spivey was instrumental in working to replace her and get her fired. She was also listed as a decisionmaker in Sue's termination and in other terminations as part of the Reorganization. For these reasons and those set forth in Sue's Response in Opposition to Defendant Preferred Pain Management & Spine Care, P.A.'s Motion for Summary Judgment, Sue can also make out this tort's third and fourth elements. Accordingly, the Court should deny Mrs. Spivey's Motion.

## **CONCLUSION**[1]

Therefore, the Court should deny Mrs. Spivey's Motion for Summary Judgment.

---

[1] If the Court declines to grant summary judgment on the Sherry Spivey causes of action which Sue does not argue, Sue will voluntarily dismiss them before trial.

15

Respectfully submitted this 31st day of October, 2018.

>*/s/ Sean F. Herrmann*
>Sean F. Herrmann (NC Bar No. 44453)
>Van Kampen Law, PC
>315 East Worthington Avenue
>Charlotte, North Carolina 28203
>Phone: (704) 247-3245
>Fax: (704) 749-2638
>Email: sean@vankampenlaw.com
>*Attorney for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

THE UNDERSIGNED HEREBY CERTIFIES compliance with Local Rule 7.3(d)(1). The undersigned counsel further certifies that this Memorandum, including the body, heading, and footnotes, does not exceed 6,250 words.

BY: */s/ Sean F. Herrmann*
Sean F. Herrmann (NC Bar No. 44453)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Fax: (704) 749-2638
Email: sean@vankampenlaw.com
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

      THE UNDERSIGNED HEREBY CERTIFIES that the document to which this certificate is attached was served upon each party to this action by CM/ECF electronic notification to the attorney of record for each party, or to the party, at their last known address, as stated below.

Ann H. Smith (NC Bar No. 23090)
annsmith@jacksonlewis.com
Caitlin M. Goforth (NC Bar No. 49227)
caitlin.Goforth@Jacksonlewis.com
JACKSON LEWIS, P.C.
3737 Glenwood Avenue Suite 450
Raleigh, North Carolina 27612
Telephone: 919.760.6465
Facsimile: 919.760.6461
*Attorneys for Defendants*

This the 31st day of October, 2018.

                                          */s/ Sean F. Herrmann*
                                          Sean F. Herrmann (NC Bar No. 44453)
                                          Van Kampen Law, PC
                                          315 East Worthington Avenue
                                          Charlotte, North Carolina 28203
                                          Phone: (704) 247-3245
                                          Fax: (704) 749-2638
                                          Email: sean@vankampenlaw.com
                                          *Attorney for Plaintiffs*