# EXHIBIT A

1          IN THE UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF NORTH CAROLINA
2            File No. 1:17-CV-00854-UA-LPA
3

4   REBECCA KOVALICH AND      )
    SUZANNE NAGELSKI,         )
                             )
5          Plaintiffs,       )
                             )
6   vs.                       )
                             )
7   PREFERRED PAIN            )
    MANAGEMENT & SPINE        )
8   CARE, P.A., DR. DAVID     )
    SPIVEY, individually,     )
9   and SHERRY SPIVEY,        )
    individually,             )
10                            )
           Defendants.        )
11  _____ )
12
13
14                   CONFIDENTIAL
15
      Videotaped Deposition of SUZANNE D. NAGELSKI
16
                 (Taken by Defendants)
17
             Charlotte, North Carolina
18
             Thursday, May 17, 2018
19
20
21
22
23            Reported in Stenotype by
                 Carolyn M. Beam
24  Transcript produced by computer-aided transcription
25  Job No. CS2907300

Case 1:17-cv-00854-TDS-LPA   Document 65-1   Filed 11/14/18   Page 2 of 8

1  Q.  How many employees approximately did PPM

2  have in 2013?

3  A.  I -- I don't -- I could not tell you, off

4  the top of my head.

5  Q.  More than five?

6  A.  More than five.

7  Q.  More than ten?

8  A.  More than ten.

9  Q.  More than 15?

10  A.  I'm not counting after that.

11  Q.  Okay.

12  A.  I'm not quite certain.

13  Q.  Okay.  Okay.  So Mrs. Spivey had talked with

14  you about relinquishing your HR duties as early as

15  2013.  Is that the first time that that had --

16  A.  Yes.

17  Q.  -- came up -- came up?

18  A.  Uh-huh.

19  Q.  So and did Ms. Spivey or Dr. Spivey have

20  additional conversations with you about your HR duties

21  and relinquishing those?

22  A.  No.

23  Q.  That was the only time that happened?

24  A.  In that year, yes.

25  Q.  Anytime after 2013?

1      A.      Not that much.  But we have -- we've had

2  spats.  I mean, there's been either miscommunication

3  or misinterpretation.  And usually, it -- it gets

4  worked out.

5      Q.      Did you ever have spats with Sherry Spivey?

6      A.      I used to.  Usually when -- yes, I have.

7      Q.      How often?

8      A.      Increasingly since 2013, 2014.

9      Q.      So it started back 2013 and has continued

10  until your separation?

11     A.      You would have to define -- or you would

12  have to give me an -- I -- or we would have to discuss

13  those.

14             (NAGELSKI EXHIBIT 7, text messages, KN 00365,

15  marked for identification.)

16  BY MS. SMITH:

17     Q.      Sure.  Okay.  Let's mark this document as

18  Exhibit 7.  I'll take those two pieces of paper.  Do

19  you recognize this document?

20     A.      I do.

21     Q.      Can you tell me what it's about?

22     A.      Me -- actually, it...

23     Q.      Is this a text message between you and

24  Sherry Spivey?

25     A.      This -- yeah.  Yes.  I'm trying to see.

1    Uh-huh.

2        Q.    Do you know when it was?

3        A.    Sometime in August, July or August.

4        Q.    Okay.  Of 2015?

5        A.    Yes.

6        Q.    Okay.  And why do you think it's that time

7    period?

8        A.    It says on the paper.

9        Q.    Okay.  And where does -- oh, I see.  Okay.

10   This one does have the date.  Some of the text

11   messages don't have the date.  And so, at the top, it

12   says, so I don't get a computer until I conform to

13   your schedule?  Why would I change my habits when they

14   worked well for PPM --

15       A.    Uh-huh.

16       Q.    -- for the last ten years?  What habits are

17   you talking about?

18       A.    In this one, I -- I think it would be my

19   remote working.

20       Q.    So you -- you thought that --

21       A.    I'm assuming.  I don't -- I can't quite

22   recall what was leading up to this.

23       Q.    Okay.  But you thought the remote working

24   was working fine for ten years?

25       A.    I believe -- but, see, it wasn't completely

1    remote working.  I was between the office and the

2    house and the office and the house.

3        Q.    As indicated on your mileage reimbursements?

4        A.    Uh-huh.  And she said, the problem is that

5    you refuse to spend every -- even one day in the

6    office.  I would come in the office.  I told her to

7    pick a day that Dr. Spivey was in the office, in case

8    any decisions had to be made.  He is my -- at least,

9    he is my supervisor.  We can all come to some

10    agreement.

11        Q.    And she says, I don't believe that working

12    at any other company would be approved to work totally

13    outside the office, when needed there at times.  Do

14    you see that?

15        A.    Yes.

16        Q.    And then you say, IBM, blackbaud, CH2M --

17        A.    M Hill.

18        Q.    -- Hill.

19        A.    Uh-huh.

20        Q.    And why did you include those?

21        A.    Oh, those were just a list of companies that

22    I knew had remote -- you could have remote offices and

23    commute back and forth.

24        Q.    Do you know if they had remote HR?

25        A.    I am not sure.  I can't answer that.  We

1  were --

2      Q.    Okay.  Let me show you a document.

3      A.    I don't believe that working at any other

4  company, you would be approved to work totally outside

5  the office when needed there at times.  These

6  companies that I listed, you can work remotely.  I do

7  not know about HR.  But I also note too that I wasn't

8  completely outside the office.  I was asking for a

9  time.  They were trying to schedule a time with her to

10  sit down when Dr. Spivey was there, if these are in

11  fact HR issues that she needs to discuss.

12              (NAGELSKI EXHIBIT 8, text messages, KN 00353,

13  marked for identification.)

14  BY MS. SMITH:

15      Q.    Okay.  Let me show you a document.  We'll

16  mark this as Exhibit 8.  And ask if you recognize

17  that.  Do you recognize this, Ms. Nagelski?

18      A.    Uh-huh.

19      Q.    Is this a text message between you and

20  Ms. Spivey?

21      A.    Yes, uh-huh.

22      Q.    And in this message, does Ms. Spivey ask if

23  you would be willing to give up HR?

24      A.    Yes.

25      Q.    Okay.  And do you know when this timeframe

S. Nagelski Dep. Ex. 9

12/21/14 Email

from S. Nagelski

FILED UNDER SEAL