IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA


| | | |
|---|---|---|
| REBECCA KOVALICH and SUZANNE NAGELSKI, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Exhibit 1** |
| PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A., DR. DAVID SPIVEY, individually, and SHERRY SPIVEY, individually. | ) ) ) ) ) | |
| Defendants. | ) | |

```
1            IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF NORTH CAROLINA
2                 File No. 1:17-CV-00854-UA-LPA
3
REBECCA KOVALICH AND    )
4  SUZANNE NAGELSKI,     )
                         )
5        Plaintiffs,     )
                         )
6  vs.                   )
                         )
7  PREFERRED PAIN        )
   MANAGEMENT & SPINE    )
8  CARE, P.A., DR. DAVID )
   SPIVEY, individually, )
9  and SHERRY SPIVEY,    )
   individually,         )
10                       )
         Defendants.     )
11 _____)
12
13
14                    CONFIDENTIAL
15
      Videotaped Deposition of REBECCA L. KOVALICH
16
                  (Taken by Defendants)
17
               Charlotte, North Carolina
18
               Friday, May 18, 2018
19
20
21
22
23
24            Reported in Stenotype by
                 Carolyn M. Beam
25 Transcript produced by computer-aided transcription
```

Case 1:17-cv-00854-TDS-LPA   Document 53-1   Filed 10/31/18   Page 2 of 58

1    A.    No.

2    Q.    Let's talk a moment about your education.

3  Did you graduated from high school?

4    A.    Yes.

5    Q.    When and where?

6    A.    I graduated from Mineral Springs in 1962.

7    Q.    And did you attend college after that time?

8    A.    I attended one year of Appalachian, stopped.

9  But I went back when I married Bob.  I went to Temple

10  University for approximately three years.  And then my

11  last year -- well, we moved back to Winston-Salem, I

12  received my bachelor of science from Gardner-Webb.

13  And -- and then I went on to MBA with Wake Forest.

14    Q.    So the one year of the Appalachian, when

15  would that have been approximately?

16    A.    That was '62.  That was fall of '62 to the

17  spring of '63.

18    Q.    Then you said you went to Temple University

19  for three years.  When approximately was that?

20    A.    That was 19 -- approximately 1978, '79.

21    Q.    And the last year that you attended?

22    A.    Now, I think, because we were moving, I'm

23  trying to -- to '78, '79, '80, or seventy -- anyway,

24  that -- those right there, those three years.  And

25  then I finished in 1986 with Gardner-Webb.

Case 1:17-cv-00854-TDS-LPA   Document 53-1   Filed 10/31/18   Page 3 of 58

1    Q.    And what was your degree in?

2    A.    At that time, it was -- it was business

3    administration.  But it was called computer or

4    management information systems.

5    Q.    Computer or management information systems?

6    A.    Yes.

7    Q.    Okay.

8    A.    Some place -- people call it management

9    information system, MIS or CIS.

10    Q.    Okay.  And then when did you begin attending

11    Wake Forest to obtain your MBA?

12    A.    I went right on to Wake Forest the fall that

13    I graduated from Gardner-Webb.  And graduated in 1988.

14    Q.    Do you have any other degrees, licenses or

15    certifications?

16    A.    No.  Well, I was certified in -- I was, at

17    one time, certified in coding through LabCorp.  They

18    had a certification course.

19    Q.    When did you obtain that certification?

20    A.    That was 2004 or '5.  But you had to re-up

21    every year so --

22    Q.    Did your certification lapse?

23    A.    Oh, yes.

24    Q.    Okay.  Do you remember when that happened?

25    A.    Well, I just didn't go back and take the

Case 1:17-cv-00854-TDS-LPA   Document 53-1   Filed 10/31/18   Page 4 of 58

1    Q.    I'm sorry, what did you say?

2    A.    Bocock-Stroud.  It was a company downtown.

3    Q.    What did they do?

4    A.    Sporting goods.

5    Q.    I see.  And what did you do after that?

6    Actually, let's just --

7    A.    I --

8    Q.    -- do it this way.

9    A.    You want me to --

10    Q.    That -- that's probably --

11    A.    I got a lot of --

12    Q.    -- that's a lot to remember.

13    A.    I've got a lot of years here.

14    Q.    I understand.  What about -- let's do

15    after -- so you were living in Pennsylvania for a

16    period of time?

17    A.    Yes.

18    Q.    Okay.  Were you employed when you were in

19    Pennsylvania?

20    A.    I was employed while, yes, Abington OB/G.

21    Q.    Was that your -- the first position you had

22    in a -- that was medically related?

23    A.    Well, if you want to go way back, 1971, at

24    EENT Associates in Mobile, Alabama.  I was married

25    and -- and being with FBI, we traveled -- we were --

1    we were all over the place.  So I would just grab jobs

2    as we moved.  That was '71 to about '74.

3            And but Philadelphia, I worked at Abington

4    OB/G as the practice administrator.

5        Q.    And how long did you do that?

6        A.    Until we moved, I was going to school at

7    Temple part-time in -- too.  We moved back to

8    Winston-Salem in 1981.

9        Q.    And when you moved back to Winston-Salem in

10   1981, did you start working somewhere?

11       A.    Yes.  Salem Gastroenterology Associates.

12       Q.    And what was your position there?

13       A.    The practice administrator.

14       Q.    And how long did you hold that position?

15       A.    I held that until 19 -- through the end of

16   1991.

17       Q.    So for about ten years you were in that

18   position?

19       A.    Yes.

20       Q.    Why did you leave?

21       A.    Because I started my own business.

22       Q.    And what was that business?

23       A.    Triad Clinical Laboratory.

24       Q.    And when was that?

25       A.    The official opening date was July 1991.

Case 1:17-cv-00854-TDS-LPA   Document 53-1   Filed 10/31/18   Page 6 of 58

1    Q.    And tell me a little bit about how you went
2    about starting your own business.
3    A.    Well, I had experience because, while I was
4    a practice administrator at Salem Gastroenterology,
5    the doctors wanted a laboratory where I worked.  And
6    Roesch came in and I suggested we -- we set one up but
7    let it be a -- when the word got out, other doctors
8    wanted to do it.  So Roesch came in and helped me set
9    up the first physician office laboratory.  And it was
10   called Salem Laboratory, with 27 physicians.
11   Q.    And it was called Salem Laboratory?
12   A.    Yes.
13   Q.    When did that start?
14   A.    That started in 1984.
15   Q.    So you -- what was your role at Salem
16   Laboratory?
17   A.    I was managing partner.  We were all equal
18   partners.  They put in the money; I put in the sweat
19   equity.  And I became the managing partner of Salem
20   Laboratory.
21   Q.    And when -- when you say, they put in the
22   money, who are you talking about?
23   A.    The 27 physicians.
24   Q.    Were you an officer or director of the
25   company?

Case 1:17-cv-00054-TDS-LPA   Document 53-1   Filed 10/31/18   Page 7 of 58

1    A.    I was managing partner.  That's what my
2  title was.
3    Q.    And who was the director of the lab?
4    A.    The director of the lab was Dr. William
5  Austin.
6    Q.    And do you need to be a physician in order
7  to be the director of a lab?
8    A.    Yes.  Well, the medical director of the lab.
9  But he -- he was the president, but he was also the
10  medical director.
11    Q.    So were you working as the managing partner
12  for Salem Laboratory at the same time you were
13  practice administrator --
14    A.    Uh-huh.
15    Q.    -- for Salem Gastro?
16    A.    Yes.
17    Q.    Okay.  How did that work?
18    A.    Well, they encouraged me.  Because the
19  doctors that I worked for were also partners of this
20  laboratory.  So -- so -- and basically, when it
21  started, other doctors wanted to come in too, I mean.
22  So -- and it was good for the physician referrals.
23  So, yes, I had two jobs.
24    Q.    So why did you leave Salem Gastro and Triad
25  Clinical?

Case 1:17-cv-00854-TDS-LPA   Document 53-1   Filed 10/31/18   Page 8 of 58

1    A.    Well, I left Salem Gastro because the Stark

2    rule came in, where doctors could not own their own

3    laboratories and refer to themselves.  So I started my

4    own.

5    Q.    Why did you leave --

6    A.    I sold Salem Gastro; I didn't leave Salem

7    Gastro.

8    Q.    I'm sorry?

9    A.    I mean, I sold Triad Clinical; I didn't

10   leave Triad Clinical.

11   Q.    I see.  Okay.  You said you sold Triad

12   Clinical?

13   A.    Yes.  In 2003.

14   Q.    Let me make sure I got this.  So the two

15   jobs that you had were Salem Gastroenterology's

16   practice administrator, and then you were the managing

17   partner of the Salem Laboratory?

18   A.    Yes.

19   Q.    Okay.  So when you left Salem Laboratory to

20   start Triad Clinical --

21   A.    They -- they closed it down.  I mean, the --

22   the government said, you -- in 1991, we had to

23   dissolve Salem Laboratory because it became a Stark

24   issue.

25   Q.    Were you given any profits or payout or

Case 1:17-cv-00854-TDS-LPA  Document 53-1  Filed 10/31/18  Page 9 of 58

1 Because pathologists, at that time, and probably

2 still, are -- can only be a medical director of up to

3 five labs, at that time. So they -- if they get a

4 better opportunity, they have to drop one of the labs.

5     Q. I see. And these medical directors, were

6 they actual employees of Triad Clinical or were they

7 1099?

8     A. They were 1099.

9     Q. And when you sold Triad Clinical, how much

10 did you sell that for?

11     A. I sold the laboratory -- the laboratory was

12 sold -- did you want the total?

13     Q. Uh-huh.

14     A. It was all broken up.

15     Q. Whatever you remember.

16     A. Well, in parts. But the whole thing came

17 to -- depending on whether it was receivables,

18 whatever, close to $10 million.

19     Q. And was that profit to you at that point?

20     A. Oh, yeah.

21     Q. Were there any other owners at that time

22 or --

23     A. No.

24     Q. -- were you the sole owner?

25     A. I was the sole owner.

Case 1:17-cv-00854-TDS-LPA Document 52-1 Filed 10/31/18 Page 10 of 58

1    insurance companies; you had to hire staff; get the

2    computers; get the marketing; get the location, da,

3    da, da.  And -- and they just didn't have the money to

4    do what needed to be done.

5                I met them in Statesville.  And I'm -- was

6    very knowledgeable about an organization in

7    Winston-Salem called Piedmont Community Physicians.

8    And Piedmont Community Physicians was kind of a --

9    they -- they -- they didn't exactly buy doctors,

10   but -- but doctors could come into the organization

11   and become employees of this Piedmont Community

12   Physicians.  And the CEO was Dickson Capps; still is

13   Dickson Capps.  And that was a good way for Dr. Spivey

14   to quick-start his practice.  Because he could just

15   plug right into the financing, he could plug into the

16   credentialing.  He could plug in and -- and it only

17   took a short time to get him up and going, outside of,

18   you know, finding the location, hiring the staff, da,

19   da, da.

20               Now, Dickson did not do operations.  So I

21   was brought in.  Suzanne was still at the point of

22   helping Sherry and Dr. Spivey get going.  And I came

23   in.  And together, we got -- I didn't want to be

24   office manager; she didn't want to be office manager.

25   Or -- or -- we hired Lisa Palmer, which had been a

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 11 of 58

1   front desk manager at Piedmont Gastroenterology.  And
2   she was -- she's terrific, and she did a great job.
3   And she -- and we hired the staff.  It was a slow --
4   it was -- it was a developing little practice, almost
5   like the laboratory was.  Just very starting -- one or
6   two people, then three and four, and then five and
7   six.  And it was -- it was actually fun.
8       Q.    Can I stop you for just one moment,
9   Ms. Kovalich?
10      A.    Yes.
11      Q.    So you said that you had met with the
12  Spivey's in Statesville.  Do you remember where that
13  was?
14      A.    It was a restaurant that they chose.  And it
15  was sometime -- because they wanted to start in
16  October.  It was in the summer, June, July.  I
17  can't --
18      Q.    Do you remember what year?
19      A.    I -- I believe it's 2006.
20      Q.    And it was at a restaurant?
21      A.    Yes.
22      Q.    And do you remember who all was at that
23  meeting?
24      A.    I brought Dickson Capps.  It was Dickson
25  Capps, me, Dr. and Mrs. Spivey.  And because my

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 12 of 58

1    Ms. Nagelski's separation from PPM?



Case 1:17-cv-00854-TDS-LPA   Document 52-1   Filed 10/31/18   Page 13 of 58

1    A.    In March -- and I think it was March 14th,

2    2016, Dr. Spivey called me on -- I think it was

3    Saturday.  It was Saturday morning.  I think it was

4    the 14th.  I have to look at the calendar.  And said,

5    oh, I guess you know I fired Suzanne.  And I said to

6    him, I think that was a very, very mean thing you did.

7    The way you did it.

8         You can -- I said, Dr. Spivey, you can fire

9    anybody you want to.  I mean, it's your company.  But

10   the -- the brutal way you did it, for someone that has

11   helped you grow your practice and done everything that

12   you've wanted to do and kept your accounting and --

13   and coordinated all of the vendors and -- and did what

14   you -- what Suzanne did, for you to let her go by

15   FedEx letter.  I said, at least you could have just

16   sit down and talked to her and said, Sue, there's no

17   job for you here or doing bad financially, as he told

18   me, or whatever.  But you two needed -- you don't fire

19   somebody by FedEx letter.  And I told him that.

20        And then he said, well, my attorney told me

21   I cannot contact Suzanne now.  But I want you to do a

22   favor.  I want you to get ahold of her and tell her I

23   will pay her whatever she wants if she will drop this

24   lawsuit.  Because Suzanne had gone to Sean and -- with

25   the lawsuit.  And I said, Dr. Spivey, I cannot do that

1   because I -- this is between you and she.  I have no

2   dog in that fight.  I mean, I cannot get in the middle

3   of this situation.

4           And I heard in the back Sherry saying,

5   retaliation, retaliation.  And he said, would you

6   retaliate?  Would you hurt my practice?  I said,

7   Dr. Spivey, why would I -- why would I hurt your

8   practice?  He said, I didn't ask you that, Rebecca.  I

9   asked you, will you hurt my practice?  And I said,

10  there is just no way.  I told you -- you say it yes or

11  no and you speak clearly, yes or no, will you hurt my

12  practice?  I said, no.

13          Well, what's this, a retaliation?  I said, I

14  have no idea.  Why would I retaliate?  I'm employed.

15  I mean, I was thinking, why would I retaliate?  He

16  hadn't fired me, you know.  But nevertheless, we left

17  it at that.  And -- and it was not a very nice phone

18  call.

19     Q.    Is that the only phone call that you had

20  with him about Ms. Nagelski's separation of

21  employment?

22     A.    Yes.

23     Q.    And that's everything you remember about it?

24     A.    Yes.

25     Q.    Okay.  And I had asked you why you had

Case 1:17-cv-00054-TDS-LPA  Document 52-1  Filed 10/31/18  Page 15 of 58

1      A.    Uh-huh.

2      Q.    Dr. and Mrs. Spivey?

3      A.    Uh-huh.

4      Q.    And your husband, John Kovalich?

5      A.    Uh-huh, yes.

6      Q.    Did I get everybody --

7      A.    Yes.

8      Q.    -- listed?

9      A.    You got everybody.

10     Q.    Okay.  So do you remember when that meeting

11 was?

12     A.    It was the summer of 2006.

13     Q.    Okay.  And had Ms. Nagelski finished her MBA

14 at that time?

15     A.    2006.  I finished mine -- I have to go, I

16 think so.

17     Q.    Okay.  What happened after the meeting in

18 Statesville?

19     A.    Well, I -- what happened, that I can recall,

20 Dr. Spivey and Dicskon basically cut a deal.  I mean,

21 but that was between them.  I wasn't involved.  I just

22 was the -- introduced them.  And it would get -- gave

23 him an option of a quick startup.  Because that was

24 what he was most interested in, was a quick startup.

25           And -- and so whether he did or not, I had

Case 1:17-cv-00054-TDS-LPA  Document 52-1  Filed 10/31/18  Page 16 of 58

1    Q.    How did she know that you were trying to

2  help him out?

3    A.    Because I told her I was working with him.

4    Q.    And why would you tell her that?

5    A.    Well, because, at that time, I was trying to

6  run around with Suzanne, too, to get -- to help them

7  get going.

8    Q.    Okay.  So eventually, the -- the financing

9  got straightened out?

10    A.    Well, with Dickson Capps.

11    Q.    Okay.  What's the next things that happened,

12  in terms of your involvement?

13    A.    Well, I had -- you know, I'm not getting

14  paid for any of this stuff.  Dr. Spivey is not paying

15  me.  And that's why I just introduced and tried to get

16  out of the picture.  Suzanne was, in my opinion -- I

17  was in Charleston most of the time and -- so I

18  never -- it wasn't like I was there, watching the --

19  the progress go.

20         So -- but Suzanne had called me and said, we

21  need an office manager.  And so we started looking.

22  And that was when she -- Suzanne recommended -- have

23  you talked to Lisa?  And I knew she was working.  But

24  I said, well, I'll just run it right by her.  I mean,

25  I'm gonna -- I'll run it by her and see if she's

1  interested.  And she said, I might be.  But -- but

2  she's just got the charm for a front desk person.  And

3  she knows how to manage a front office.  So I mean,

4  you kind of put the -- the ability and the talents --

5  the job and the talents together.

6      Q.    Do you know when this was that you had this

7  conversation?

8      A.    Right after they started.  And I don't know.

9  We're talking about -- I'm gonna say the spring of --

10  let's see if you got it.  Spring of -- yeah, April,

11  right here.  Date of hire.

12      Q.    Of what year?

13      A.    Of '07.

14      Q.    Okay.

15      A.    That's right.  Because Dr. Spivey was

16  wanting to get started October, thereabouts, of '06.

17  So yes, the spring of '07.

18      Q.    Okay.  So you had the meeting with Dickson?

19      A.    Uh-huh.

20      Q.    There was the issue with the financing with

21  the bank --

22      A.    Uh-huh.

23      Q.    -- and Debbie Marshall?

24      A.    Uh-huh.

25      Q.    The next involvement you had was with the

1  hire of Lisa Palmer.  Have I missed anything between
2  that time period?
3       A.    As far as I know, I can't -- because I went
4  back to Charleston.
5       Q.    And I'm asking about your involvement,
6  right.  So I'm just --
7       A.    Yeah, I --
8       Q.    -- asking, did I get the list of everything
9  that you had done during that time period?
10      A.    I -- yes.  But I was brought back.  And what
11 I did do was just -- hate to say, hold the fort.
12 Suzanne was not -- because of Ally, she could not --
13 and I was in Winston, I was kind of the -- oh, for
14 maybe 6, 7 months, I'd come in the office at least
15 four hours a day and -- and work with the staff, just
16 to kind of be the central person, until we got Lisa.
17 And then when Lisa came, you know, I went back to
18 South Carolina.
19      Q.    Okay.  So it's your testimony -- because I
20 thought I understood you to say that you had gone to
21 South Carolina and then Sue Nagelski had called you up
22 and said, we need a front desk person, and that you
23 had been in South Carolina during that time period?
24      A.    Well --
25      Q.    Prior to that time period.

Case 1:17-cv-00054-TDS-LPA  Document 52-1  Filed 10/31/18  Page 19 of 58

1    A.    Yes.  But Lisa didn't take the job right

2    away.  I mean, she was already working, so --

3    Q.    Okay.  What was -- how long between the time

4    she was offered the job until she started?

5    A.    I don't know.  I don't know.

6    Q.    When were you holding down the fort, so to

7    speak?

8    A.    It was in the summertime.  And again, I was

9    not getting paid.  I was doing this just to get things

10   organized.

11   Q.    Was this the summer of 2007?

12   A.    It would -- it would have to be.

13   Q.    So this would have been after Lisa Palmer

14   was hired in April of 20 -- 2007?

15   A.    Yes.  But she had -- I was in and out.  I

16   was down in Charleston.  If they needed me, I would --

17   I'd usually -- I usually come up here at least a week

18   or two a month.  So if there's anything that was

19   needed, I would come up here and do it.  I --

20   Q.    Who would call you and ask you to come up

21   here and do it?

22   A.    Well, Susan -- Suzanne did a couple times,

23   because, again, starting a practice wasn't easy.  And

24   Dickson wasn't into operations; he was into

25   administration.  But he -- he didn't go in and hire

Case 1:17-cv-00854-TDS-LPA   Document 52-1   Filed 10/31/18   Page 20 of 58



Case 1:17-cv-00854-TDS-LPA   Document 52-1   Filed 10/31/18   Page 21 of 58



Case 1:17-cv-00854-TDS-LPA   Document 52-1   Filed 10/31/18   Page 22 of 58



800-567-8658                                                                   973-410-4040



Case 1:17-cv-00854-TDS-LPA   Document 52-1   Filed 10/31/18   Page 24 of 58

1    did.  And -- and we bought the reagents, or he bought

2    the reagents from ████████████.  And -- and ██

3    ████████ ran the machine.  It really -- at that time,

4    Dr. Spivey didn't have enough patients for a really --

5    a full-time ████████  But it was -- it grew.  You

6    know, it was like half a day every day and then -- so

7    it -- it grew to where she was working, I think, to

8    four-and-a-half days a week.  But I can't remember

9    that.

10        Q.    Okay.  So in the 2007, 2008 timeframe, you

11   agree to the ██████████ to help deal with the

12   issues related to this piece of equipment.  Did your

13   duties, at some point, change?

14        A.    Well, yes and -- depends on what we were

15   doing and which time period it was.

16        Q.    In other words, did you get duties in

17   addition to the piece of equipment?

18        A.    In addition to the laboratory?  In other

19   words, I was not doing anything -- I wasn't trying to

20   manage the -- run the office or anything.  I was

21   focussed.  And that ████was to make sure that that

22   machine ran correctly.

23        Q.    And that was the one piece of machine that

24   they had in the lab at the time?

25        A.    That was the only piece of machine they had

Case 1:17-cv-00854-TDS-LPA   Document 52-1   Filed 10/31/18   Page 25 of 58

1    in the lab.

2         Q.    Okay.  And you weren't doing anything with

3    the billing or coding or anything of that nature?

4         A.    Well, it was not much.  It was just -- at

5    that time, it was just so simple.  █████████████

6    oversaw.  And then we brought in ████████

7    █████████████ which is the billing service.  I think we

8    used █████ Sherry used █████at first and -- when they

9    bought the machine, she used ███████████████████

10   for their billing.  And --

11        Q.    But that was not your responsibility, to do

12   the billing or coding?

13        A.    No, it -- it was not my responsibility.  It

14   was my responsibility to make sure that what was set

15   out and what was done were -- were the same.

16        Q.    Okay.  And so my question for you was:  At

17   some point, did your duties change from that?

18        A.    I can't understand.  Change how?  More work?

19   Less work?

20        Q.    Exactly.

21        A.    It's a variable situation.  Such as, machine

22   continued to break down.

23        Q.    Correct.

24        A.    And we kept -- even though we'd get it

25   fixed, things would be backed up.  And in -- in

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 26 of 58

1  would stop the changes.  He's working me to death.

2  Because I think we've got the -- the game plan and --

3  and the test he wants, and it's not easy to keep

4  retooling this machine for the test.  And then she

5  said, he'd come in there and change them again.  So

6  there was always something to do at that laboratory.

7  Then --

8      Q.    Did you --

9  ████████████████████████████████████████████████

10 ████████████████████████████████████████████████

11 ████████████  And we -- we were successful the first

12 time.  And -- and -- with ████████████████████████

13 And I don't think we were very successful the second

14 time.

15     Q.    So you said, in 2012 or 2013, you started

16 looking at another machine?

17     A.    Yes.  Well, we had -- there -- there are two

18 machines we were dealing with.  Now, I'll come back to

19 the ██████████  The next machine that Dr. Spivey was

20 interested in, that he had gone to a pain management

21 seminar somewhere and talked to a vendor and they were

22 telling that it's a trend of the day for the doctors

23 to be able to do their ████████████████████  The

24 ████████████  technically, it would do a screening, even

25 though it did give a little number.  But the number

Case 1:17-cv-00054-TDS-LPA  Document 52-1  Filed 10/31/18  Page 27 of 58

1    wasn't reported out as detailed as he would like.

2    Because there were products, shampoos, other medicines

3    that a person could take that would show up as a --

4    you know, maybe an elicit drug because the -- the --

5    the values on the machine were too high.  Well, this

6    ████████████████████████████████████████████████

7    ████████████████████████████    And even -- and only

8    specialty labs, at one time, had this piece of

9    equipment.

10        Q.    So this ██████this is the piece of equipment

11    that he had learned about at the pain management

12    seminar?

13        A.    Yes.  And it's about as big is this table.

14        Q.    And did PPM purchase the ██████

15        A.    Well, he wanted me to go out and see what I

16    could do about getting one as inexpensively as I could

17    because they were running close to ████████████

18        Q.    And did you find a piece of equipment for

19    Dr. Spivey to purchase?

20        A.    Well, I found several.  ████████████████

21    ████████████████████████████    And I still have her

22    card.  And she came out.  ██████████████

23    ████████████████████████████████████████████████

24    But Dr. Spivey wasn't doing -- seeing as many patients

25    then.  And to try to size it to the practice, because

1    you don't want to buy -- buy an expensive piece of

2    equipment that the abilities you're not going to be

3    able to use.

4            And so we had to find out, okay, what do you

5    want, how -- how many -- how many tests do you want to

6    put in here, how fast your turnaround.  Well, he

7    actually -- I did not promote this.  ████████████████

8    ██████████████████████████████████████████████

9    ███████████████████████████████████████ -- a

10   lot of doctors were buying it across the state of

11   North Carolina, and it was a lot -- well, not a lot --

12   ████████████████████████  And it might fit his needs.

13           Now, in that negotiation, it was them.  I

14   stayed out of that.  I -- and █████████████████████████

15   ███████and Dr. Spivey discussed it.  And again, it was

16   less expensive.  It would meet his needs.  And the

17   turnaround wasn't as quick as the ███████████████  But

18   anyway -- he made the decision.  I was there just to

19   implement.

20       Q.    And so he bought the ████████████████████

21       A.    He bought the ████████████████████

22       Q.    Okay.  And then, once Dr. Spivey purchased

23   the █████████████████████ what were your duties in

24   relation to the lab at that point?

25       A.    Well, he said to me, I want to make sure

1    this things works, this thing -- no problems.  Because

2    it's -- ███████████████████  The machine is

3    not like a regular analyzer.  And there is -- you have

4    to have a chemist that is -- is very skilled in

5    running this machine.  Now, some of the big labs like

6    LabCorps, they have them.  But they are -- it was very

7    difficult, initially, to find someone who could do

8    this.  So but --

9        Q.    Was Gretchen Culler-Hawks already on staff

10   at this point?

11       A.    At that point, I'll say maybe yes or no.

12   Because Gretchen, what she would do -- and we needed

13   this -- ████████  I mean, bless her heart, she

14   couldn't take a -- I mean, it -- as his tests

15   increased, ██████████was locked in there and there

16   was no backup, none whatsoever.  So Gretchen Culler

17   was available.  And what -- we started looking for

18   backups.  But it's not easy to find backup.  You want

19   -- for someone with this -- you know, do you want to

20   come in, just work two days a week or whatever?

21            And she was working at a hospital then.  So

22   she would fill in for ██████████  But when she

23   couldn't -- and again, this machine was purchased, the

24   -- ████████ -- we're back to ██████████ but the

25   machine was purchased -- ██████████ needed a backup.

1    He reached out to the owner of -- which he should

2    have, owner of the person who sold it to him and said,

3    we need a -- I mean, we need a backup.  And █████████

4    █████ sent over a backup for ████████████  So that

5    worked -- that worked well for a while.  Then --

6         Q.    My question for you, Ms. Kovalich, was --

7         A.    Uh-huh.

8         Q.    -- was Ms. Gretchen Culler -- and I think

9    she's now Hawks, was she already employed with PPM

10   when the █████████████was purchased?

11        A.    I don't think so.  I think she came in.  She

12   was willing -- her mother was Select Laboratory

13   Partner's CLIA med tech.  I mean, she was a CLIA

14   representative.  And -- and that's how Gretchen got

15   there, because her mother says, you know, you know,

16   she's got the ability.  And she's a BS MT, where ████

17   █████was not.  And it didn't make any difference at

18   the time, just who can run the machine.

19        Q.    So when you -- when PPM purchased this new

20   █████████████ what was your duties in reference to

21   the lab at that point?

22        A.    I had to find a chemist, which I did.  It's

23   not a med tech.  I had to find --

24        Q.    Is that Rodney?

25        A.    Yes, but Rodney had -- before Rodney, there

1  was Gered Brown.  And Gered Brown was excellent, but
2  Gered Brown had to drive from Raleigh.
3        Q.    Is that Jared or Jerry?
4        A.    G-E-R-E-D.
5        Q.    G-E-R-E-D Brown?
6        A.    Yes.
7        Q.    He was the chemist?
8        A.    Yes.
9        Q.    Gotcha.
10       A.    So he came in and --
11       Q.    Were there issues with him coming to work,
12  since he was driving so far?
13       A.    Yes and no.  He was very good.  In fact,
14  Dr. Wong, our -- our technical director from Baptist
15  Hospital, said that he was -- Gered was about as good
16  as they come.  So problem is Gered wanted to come in
17  and then work all night, come in, work all weekend.  I
18  mean, he wanted it on his hours.  And for a while, it
19  worked -- it worked fine.  Because we didn't have that
20  many -- we didn't have that many specimens.
21       Q.    But eventually that changed?
22       A.    But eventually -- and at that time, I think
23  what really -- there are several things that Gered has
24  had to bow out.  One, Dr. Spivey wanted to move that
25  ████ to -- he wanted to move it to his Winston-Salem

Case 1:17-cv-00054-TDS-LPA  Document 52-1  Filed 10/31/18  Page 32 of 58

1    office.  Now, it was kind of -- he had -- and he had

2    bought another building at that time, which ████████

3    ████████████████████████████████████   We had the

4    ████████████████████████  And but Gered said, it's a

5    struggle for me to go to Greensboro.  I just can't go

6    to Winston.  I just can't keep driving -- I couldn't

7    -- if you move the machine here, I can't do it.

8             So, and besides with the ████████████████

9    which sounds like a -- about three motorcycles

10   starting off at the same time, a horrific noise.  It

11   was determined by Dr. Spivey -- and I had a

12   recommendation, let's just -- let's just keep it in

13   Greensboro.  Greensboro had an area, ████████████████

14   ████████████

15        Q.    So going back to your duties in reference to

16   ████████ you had to find a chemist to help operate

17   the machine --

18        A.    Uh-huh.  Yes.

19        Q.    -- and got Gered Brown from Raleigh.  Was

20   there any other duties that you had in reference to

21   the lab at that time, when the ████ was purchased?

22        A.    Well, make -- again, oversee the

23   installation, making sure it worked.  The -- the --

24   and oversee the technical people.  And trying to

25   coordinate it with the -- with the workflow.  Because

1  when you're a tech, you don't have this vision; you've
2  got this.  And -- and -- and to oversee it with
3  Dr. Spivey's office and then the Greensboro office.
4  And again, it coordinated to where, when patients came
5  in, he would have the result is as soon as possible or
6  he could at least pick up the telephone and say, I
7  have a patient here I really need to know, you know,
8  the results of his urine drug test.  And he could have
9  it.
10     Q.    How did you oversee the technologists?  What
11  did you --
12     A.    Because I --
13     Q.    -- mean by that?
14     A.    I oversaw, more or less, the personnel.  And
15  being in a laboratory for so many years, you -- you
16  know what to look for.  But I mean, I did not operate
17  the machine.  But I do know what to look for.
18     Q.    So you were like dealing with scheduling and
19  personality issues and things of that nature?
20     A.    Yes.
21     Q.    Okay.  How many hours a week would you say,
22  during this time period, you were working in the
23  Greensboro location?
24     A.    During this -- for a while, I didn't have to
25  be physically there all the time, but I had to be

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 34 of 58

1  available.  But at that time, I can't tell you how
2  many hours I was there.  But it was at least 30, 35
3  hours a week.
4      Q.    And this was in the 2013 timeframe?
5      A.    Yes.
6      Q.    Or whenever the -- the machine --
7      A.    Yeah.
8      Q.    -- the machine was initially purchased?
9      A.    Yeah.
10     Q.    We can get records of that?
11     A.    Yes.
12     Q.    I think you said it was 2012, 2013
13 timeframe.  And so you said you were working 30 to 35
14 hours per week.  And this was in the Greensboro
15 location, where the lab was located; is that correct?
16     A.    That was -- yes.
17     Q.    Okay.  And how long did that continue?  In
18 other words, how many weeks were you working this 30
19 to 35 hours per week?
20     A.    Well, that's when I had said to Dr. Spivey,
21 I will oversee this because, again, so many things can
22 go wrong because you've got so much -- many needed
23 parts.  I'm not going to do it for $750 a month.  I
24 mean, you can find somebody else.  I mean -- but --
25     Q.    And so is that when you had the conversation

Case 1:17-cv-00854-TDS-LPA   Document 52-1   Filed 10/31/18   Page 35 of 58

Page 142

1    about the $5,000 per month?

2         A.    Well, yes.  He and I -- yes, that was when

3    we had the conversation about the $5,000 a month to

4    oversee, maintain, make sure nothing goes wrong.  And

5    for anyone who hasn't worked within a laboratory, it's

6    almost like working at General Motors.  I mean, the --

7    and all the -- all the cost involved.  And again, you

8    want to make sure that it's working, it's working the

9    way it's supposed to, it's accurate results.  It's

10   compliant.  And, you know, the -- the cost of running

11   the machine, don't outstrip the -- the -- the amount

12   of money coming in.

13        Q.    Gotcha.  So when you started getting paid

14   this $5,000 per month, is that the point that you

15   became a W-2 employee?

16        A.    Around that time, yes.

17        Q.    Okay.

18        A.    Because I would have preferred, at that

19   time, to stay on contract.  But he -- Dr. Spivey did

20   not want to do a contract with me.

21        Q.    Do you know why Dr. Spivey did not want to

22   do a contract with you?

23        A.    No, I don't.

24              (KOVALICH EXH. 4, Employee Confidentiality

25   Agreement, marked for identification.)

Case 1:17-cv-00854-TDS-LPA   Document 52-1   Filed 10/31/18   Page 36 of 58

1   of the staff, but to me, that she was usurping a lot
2   of managers' jobs.
3           Case in point:  We needed a nurse.  Well,
4   she would come in at that time and fill in and help.
5   And she had really had no role.
6   BY MS. SMITH:
7       Q.    Ms. Spivey would come in and --
8       A.    Yes.  And -- and so Vicky Sweisgood was
9   there at -- in her office.  And we interviewed a girl
10  named Cathy.  And I can't think of her last name.
11  And -- and she -- she had worked at another doctor's
12  office that Vicky had know and had glowing
13  recommendations from that office.  And she had quit
14  for whatever reason.  And they said, yes, they would
15  hire her back and she's great.  So, yeah -- so Sherry
16  comes in and -- and throws a fit because we didn't --
17  we hired her without her permission.
18          Well, if we'd known we needed her
19  permission, we wouldn't have hired her.  And so
20  eventually, I remember Dr. Spivey, when the nurse was
21  working, and he was standing in his office.  Said,
22  yeah, I like her.  I --
23      Q.    Was that Cathy Stowers you're talking about?
24      A.    Red-headed, Cathy --
25      Q.    Stowers, Stowers.

1    A.    I know her first name was Cathy, and it

2    probably is that lady.

3    Q.    And so this would have been about January

4    2013?

5    A.    I -- we were still in the old office.

6    That's how I have to keep my dates.  So it probably

7    was.  And but -- it's -- I -- I like to operate on the

8    clear and direct.  And for -- for her to come in and

9    say -- and have a fit.  And Dr. Spivey said the next

10   day that it was miserable at home, and why, da, da,

11   da, da, da, da, da.  And well -- well, we didn't know

12   she had made herself clinic manager.

13        Because at that time, Vicky Sweisgood did

14   the -- did the hiring of the nurses.  I mean, she did

15   the hiring of practically all the staff.  And she

16   helped Dr. Spivey when he hired any doctors or PAs.

17   She would recruit him and she would get -- I mean --

18   and -- and suddenly, from us, if someone had made an

19   announcement, Dr. Spivey made an announcement:  Sherry

20   Spivey is going to start working here, da, da, da.

21   She'll be here full-time.  She's going to run the

22   clinic.  Okay.

23        But without -- from the clear blue, she

24   throws a fit because we hire a nurse without her okay.

25   Well, we've been doing it for how many years.  And

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 38 of 58

1  but -- so it -- it just -- the contentiousness, as I
2  see it, it was just -- it -- it kept on.  It was
3  almost like she came in, as far as I was concerned, to
4  torment, harass -- I hate to say harass.  That's not a
5  good term.  Just -- basically to take over, without
6  formally taking over.  So nobody in the -- in the
7  operation at that time knew what's her role.  What's
8  she doing here?
9          She's in a couple hours, and she's gone.
10  And then she's -- wants to run the show.  So again,
11  it's like she wants to run the office, but on her --
12  whenever she's ready to run it.  And then -- so this
13  is what bothered me.  There was no consistency.  It
14  was just bouncing in, bouncing out, giving a few
15  orders, taking off.  And not being accountable or
16  follow through what she was supposed to be responsible
17  for.  I mean, outside -- I mean, that would have
18  happened no matter who, you know, who she was.
19      Q.   All right.
20      A.   Meaning -- meaning it wasn't her personally;
21  it was just the way it was done.  She just kind of
22  came in and did what she wanted to and disappeared.
23  Nobody knows when she's coming again.  Then she'd come
24  in, do what she want to, da, da, da, da, da, change
25  this, change that, da, da, da, da and disappear.

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 39 of 58

CONFIDENTIAL

Page 178

1   Well, either you're in or you're out.  Either you're a

2   manager or you're not.  You know, what is your role?

3   And that's what bothered me.  Because she really

4   didn't have a role initially; she just -- so...

5           MS. SMITH:  Okay.  Your attorney has asked

6   for a break, Ms. Kovalich.  We'll go ahead and take a

7   break now.  And I'll have some questions for you after

8   the break.

9           THE VIDEOGRAPHER:  Don't forget your

10  microphones.  The time -- we're going off the record

11  at 3:16 p.m.

12              (A recess transpired.)

13          THE VIDEOGRAPHER:  We're going back on the

14  record.  The time on the video monitoring is 3:37 p.m.

15  Please continue.

16  BY MS. SMITH:

17      Q.    Ms. Kovalich, prior to the break, we were

18  talking about Ms. Spivey, and if you had any issues

19  working with Ms. Spivey.  And you had relayed this --

20  this one incident about the hiring of this nurse.  And

21  you said that Ms. Spivey had threw -- thrown a fit at

22  this point.  And I believe this was back in the 2013

23  timeframe.  Maybe I've got that date wrong.  Let me

24  check that.  Yeah, 2013 timeframe.  Did you have any

25  other issues with Ms. Spivey?

Veritext Legal Solutions

800-567-8658                                                    973-410-4040

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 40 of 58

1    A.    Oh, yes.

2    Q.    Okay.  Can you tell me about those?

3    A.    It was probably around the same time period.

4  Excuse me.  Excuse me.  There was a meeting and we

5  were all -- I mean, we were all -- Dr. -- I mean,

6  Sherry Spivey, Brandy, we were having kind of an

7  all-purpose little, maybe an office meeting, kind of

8  coordinating meeting in the conference room.  Okay.

9  And --

10    Q.    At the old location?

11    A.    At the old location.  I forgot what we were

12  talking about.  But it was just a little business

13  thing, keep everybody together.  And for some instant,

14  Sherry Spivey jumps up and she starts needle, needle,

15  needle.  And I can't even remember what she said, it

16  was -- (onomatopoeia).  And she -- I mean, it was

17  like, I'm going to pick a fight with you; I'm gonna

18  pick a fight with you; I'm going to pick a fight with

19  you.  And so what I did --

20    Q.    And was this, she was trying to pick a fight

21  with you?

22    A.    Yes.  And -- and there was no reason.  In

23  other words, we hadn't had an argument, everything was

24  fine, we were sitting around, just talking.  And --

25  and -- and she was -- prior to that, she sat on her --

1  her phone.  And she was doing this the whole meeting.
2  And -- and then, when the meeting was over, she just
3  approached me and started bitching.
4         And -- and it was that needle, needle,
5  needle, you know, trying to get a rise out of me, you
6  know.  I'm going to make you jump or do something or
7  get mad.  I don't know.  And I just ignored her.  I
8  walked into Vicky Sweisgood's office, picked up my
9  coat and started down the hall and never made, you
10 know, eye contact or anything.  I just completely
11 ignored her behavior.
12        And about 15, 20 steps down the hall, where
13 you have to go out the back door.  I hear, fuck you,
14 Rebecca, kaboom.  And I mean the whole wall shook.  I
15 mean, I could not believe what I heard.  And then I
16 was -- I just kept walking.  First thing I did when
17 that happened, I looked at my watch to see the time.
18 Like, who all is in this building?  Who is hearing
19 this?  And it was, I remember, 5:15.
20        So I kept walking at a steady pace.  And by
21 the time I was to the break room, fuck you, Rebecca,
22 kaboom.  And I just -- just walked right on out the
23 door, got in the car.  Now, the next day -- and -- and
24 Brandy was there.
25        Q.   Let me stop you for just one moment.

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 42 of 58

1      A.    No.

2      Q.    Any -- and you said this was in the old

3 building, 2013 timeframe?

4      A.    Uh-huh.

5      Q.    Any other issues that you've had working

6 with Sherry Spivey?

7      A.    Oh, yeah.  And I'm just picking out the --

8 the ones that stand out the most.  I was in Vicky's

9 office, getting ready to leave one evening.

10     Q.    Do you remember the timeframe?

11     A.    Yes, it was about 5:30-ish.

12     Q.    Year?  Do you know what year?

13     A.    It was around the same time as this

14 happened.  So it was, say, 2013-ish.

15     Q.    Okay.  In the old building?

16     A.    Yes, in the old building.  And my phone

17 rang.  I was in Vicky's office.  My cellphone rang.

18 And I answered.  And she just started in on what a

19 basically worthless person Vicky Sweisgood was.  And

20 Vicky's there.  So I put this on speaker, I put it on

21 the desk.  And I said, Sherry, Vicky's here.  Okay.

22 And she starts screaming at Vicky, you don't do your

23 job.  I checked your drawer.  You don't do this; you

24 don't do that.  You're just nothing.

25          I mean, you're just -- oh, I -- it was

1   horrible.  And this went on -- it totally went on

2   probably -- it seemed like at least 30 minutes of her

3   on my cellphone on Vicky's desk.  And she's screaming

4   at Vicky.  She's not screaming at me.  She's screaming

5   at Vicky.

6           And we had all these problems.  And you're

7   causing all these problems.  And you're doing this and

8   you're doing -- well, it got so bad that I went back

9   to the back.  And Dr. Spivey is in there in his

10  office.  And I said, Dr. Spivey, you need to get this

11  stopped and you get -- need to get this stopped now.

12  Either Vicky's going to end up quitting or -- or

13  something bad is going to happen.  Nothing good is

14  going to come of this.

15          And he's said, what happening?  And I'm

16  saying -- and he said, okay, let's go.  So he goes --

17  he follows me down the hall.  And all of a sudden, I

18  don't hear his footsteps anymore.  So I turn around

19  and he's not there.  So I go back into his office and

20  I said, what -- where'd you go?  And he said, I can't

21  get involved.  It's -- it's either -- and he did this

22  exactly, it's my marriage or my practice; it's my

23  marriage or my practice.

24          Well, by that time, when I got back to

25  Vicky's office, the conversation had ended.  And she

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 44 of 58

1    went into -- I think Dr. Spivey called her afterward.

2    I got out of there.  But -- and then the next day --

3    the next day, Vicky said Dr. Spivey was very nice and

4    apologized for Sherry's behavior.  And I think Sherry

5    actually called Vicky back and said, I don't know what

6    happened.  I don't know what happened just...

7         Q.    And how you do you know that?  Did Vicky

8    tell you that?

9         A.    Yes.  And I think there was an email to --

10   that tell -- I think Dr. Spivey -- oh, I emailed Vicky

11   and I said, Dr. Spivey said tonight -- or said to me

12   today that -- and I can't remember.  That it wasn't

13   you, Vicky, it's her.  It's not you, Vicky, it's her.

14        And so -- but Sherry had come back and

15   talked to Vicky or whatever and -- and apologized.  So

16   but issues like this were just -- it was just

17   progressing.

18        Q.    So they had gotten worse from 2013?

19        A.    I -- I can't recall any more screaming

20   outbursts like that.  But she was at the office more

21   and more.  Oh, there was --

22        (KOVALICH EXH. 6, text message, KN 00268,

23   marked for identification.)

24   BY MS. SMITH:

25        Q.    I'm sorry, Ms. Kovalich, let me interrupt

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 45 of 58

1    Q.    Okay.

2    A.    I'm sorry, I got them -- my definitions are

3    horrible.

4    Q.    Okay.  So do you recall any other

5    communications in writing between you and Dr. Spivey?

6    A.    I can't.  We just -- another -- and this was

7    in March 2014.  I've got that -- was that '14 -- I was

8    at -- in Charleston.  And I had four -- five

9    girlfriends.  And we were on the porch.  We were at

10   the -- jumping in and out of the pool, we were having

11   a good time.  And the cellphone rang.  And it was him.

12         He said, I got to see you and I'm coming

13   down.  I said, no, you're not.  I've got a house full

14   of girls here and you're not -- you're not going to do

15   it.  And -- and -- and we started talking a little bit

16   about the office.  And I remember, I said, just --

17   there's some people there, Dr. Spivey, they're just

18   not pulling their weight, they're not doing anything,

19   there's no -- no oversight with them, da, da, da, da.

20   And he said, oh, what you wearing?

21         So and that's why it's sad.  Because I

22   wasn't -- I mean, I am not the person that can do for

23   him what he needs.

24   Q.    Did Dr. Spivey ever have any conversation

25   with you where he said that the relationship just

1    needed to be professional and that the two of you

2    needed to stop flirting with each other?

3        A.    Never.

4        Q.    You don't recall that at all?

5        A.    No.  If you got that in writing, I'd like to

6    see it.

7        Q.    No, I asked if it was a conversation?

8        A.    No.  I mean, no.  No.  In fact, that would

9    be the other way around.  And the -- and the night

10   ███████████████████████████████████he had tried to call.

11   And Suzanne was there.  I said, here.  She said,

12   that -- that's impossible.  And -- and we looked back

13   and he had tried to -- was it -- I can't remember,

14   tried to call in November.  It was two o'clock.  And

15   ██████████████████████████

16          So whatever happened, it made me think maybe

17   they had the skirmish, you know, over me.  I don't

18   know.  I hope not.  I mean, I don't -- I don't -- this

19   is not a comfortable situation for me.  So --

20       Q.    Did you tell Ms. Nagelski about the text

21   messages?

22       A.    At first, I did not.  Because I -- I that

23   was nobody's business.  █████████████████████████   I

24   said -- I told her then.  But as this was going on, I

25   was embarrassed and I didn't want her to think, oh,

1    investigation relating to the text messages?

2        A.    No.  No.  No.

3        Q.    Okay.  Is there anything else that happened

4    with Dr. Spivey?

5        A.    Well, October of 2015, it was kind of an

6    interesting little -- very interesting situation, in

7    that I had walked into his office during the day,

8    active, and -- and he was on the phone with Jennifer

9    Bailey, and they were having a little bit of

10   a (onomatopoeia), Jennifer Bailey (onomatopoeia).

11   And -- and he hung up and he was a little -- I was

12   standing in front of his desk.

13            He was a little bit irritated with Jennifer.

14   And he said, oh, I apologize for Jennifer.  She was a

15   little pissy today.  And I laughed and I said, well,

16   Dr. Spivey, anybody can be pissy.  I can be pissy.

17   You can be pissy.  And then with that, it was like, he

18   became fixated, stood up, walked around the desk

19   and -- and the door was open.  And he grabbed me up

20   and he gave me a smooch.

21            And I mean -- my eyes were open.  I'm

22   looking down the hall because it's a highly active

23   hall.  And I'm just waiting for Sherry or Jennifer or

24   somebody to come down the hall.  And that -- that --

25   it would have been all over.  It would have been all

1    over.  And I just said to him, I think I better go.
2    And I walked off.  It was very --
3         Q.    Do you know what day of the week it was?
4         A.    I don't know.  I want to say it was the end
5    of the week.  But I can't -- I can't -- I do know it
6    was October, the leaves were turning.  And -- and then
7    also -- well --
8         Q.    Do you remember what time of day it was?
9         A.    Actually, it was about one or two o'clock in
10   the afternoon.  I mean, it wasn't at the end of the
11   day or the beginning of the day.  It was a busy time.
12        Q.    Did you tell Ms. Nagelski about this
13   incident?
14        A.    No.
15        Q.    Any reason why?
16        A.    Well, even though I think there's a
17   assumption that Susan and I talk more than we do, we
18   don't.  She is in Huntersville.  I'm in Winston-Salem.
19   She'll go -- most I've really seen her when we were
20   working with PPM was when she'd come into the office.
21   She had her life and -- and she enjoyed her job and
22   she was very busy.  And I was back and forth to
23   Charleston.  So we did not -- I mean, we didn't hang
24   together.
25        Q.    Anything else happen with Dr. Spivey?

Case 1:17-cv-00054-TDS-LPA  Document 52-1  Filed 10/31/18  Page 49 of 58

1          THE VIDEOGRAPHER:  We're going off the
2     record at 4:43 p.m.
3               (A recess transpired.)
4          THE VIDEOGRAPHER:  This is the beginning of
5     media unit number four of the videotaped deposition of
6     Rebecca Kovalich, May the 18th, 2018.  We are on the
7     record at 5:02 p.m.  Please continue.
8     BY MS. SMITH:
9          Q.    Ms. Kovalich, prior to the break, you were
10     talking about the fact that there was a divided
11     loyalty and it was either her staff or his staff.  Who
12     was the her and the his that you were referring to?
13          A.    Well, I understand the first part of your
14     question.  What was the last part?
15          Q.    Yes, ma'am.  Prior to the break you had
16     given some testimony.  And you said that there was a
17     divided loyalty and that it was either her staff or
18     his staff.  And I'm just trying to figure out who the
19     her was.  Is that Sherry --
20          A.    Yes.
21          Q.    -- Spivey?
22          A.    Yes.
23          Q.    And the his, was that Dr. Spivey?
24          A.    Yes.
25          Q.    Okay.  And we talked about some instances

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 50 of 58

1    that you had some issues with Ms. Spivey.  Do you

2    remember any in 2015?

3          A.    I don't recall.  I -- it may have been, but

4    the ones most outstanding, I have already articulated

5    to you.  But there probably have been more.

6          Q.    Okay.  And on -- just to ask the question,

7    were there any issues that you recall with Sherry

8    Spivey in 2016?

9          A.    I don't recall.

10         Q.    And as I said before, if we're going through

11   the deposition, if you remember something and need to

12   go back and refresh your -- rechange your answer,

13   whatever, let me know.  Okay?  You had talked about

14   some various incidents with Dr. Spivey.  And there in

15   the complaint, you talk about an incident November

16   2014.  Said that you were in a conference room with

17   Dr. Spivey and another physician.  Do you remember

18   anything about this?

19         A.    What 2014?  What date?

20         Q.    November 2014.

21         A.    Oh, that was with Dr. Scherzo.  We were

22   looking at what test he felt we needed for

23   Dr. Spivey's age management.

24         Q.    And where were you meeting?

25         A.    We were meeting in the -- the conference

1    room in the new office.
2         Q.    At Maplewood?
3         A.    Yes.  Oh, yes.  There was a -- a small
4    incident there.
5         Q.    And do you remember what time of day this
6    was?
7         A.    This was around six o'clock at night.
8         Q.    Were there any folks there, other than you,
9    Dr. Spivey and Dr. Scherzo?  And I can't say his name,
10   I'm sorry.
11        A.    Scherzo.  Here's the thing, it's so short,
12   short-so.
13        Q.    Short-so, okay, thank you.
14        A.    Not that I know of.  It was Dr. Spivey,
15   Dr. Scherzo and me.  And I don't know if anybody else
16   was in the building or not.  You couldn't tell.
17        Q.    And was the door to the conference room
18   open?
19        A.    Yes.
20        Q.    Tell me what happened?  You said there was a
21   little incident.
22        A.    Well, Dr. Scherzo -- that's why we called
23   him Dr. Mark, took a -- had to take a phone call.  And
24   he went outside the conference room, down the hall to
25   his office.  And Dr. Spivey sat there and said, you

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 52 of 58

1    know, I gave you a chance.  And he got up, walked out

2    the door.  Just -- I mean, it was very small, but it

3    was just so like, this is it, you know, this is it.

4    So I don't know.  He said, you know, I gave you a

5    chance.  And that was all he said and he got up and

6    left.

7         Q.    So those were the only words when the two of

8    you were together?

9         A.    Uh-huh.

10        Q.    Did you say anything in response?

11        A.    No.  There was nothing to say.

12              (KOVALICH EXH. 14, Verification, marked for

13    identification.)

14    BY MS. SMITH:

15        Q.    Let me show you a document, Ms. Kovalich.

16    We'll mark this as Exhibit Number 14.  And ask if you

17    recognize that.

18        A.    I had read it.  I mean, I -- I know what

19    this is.

20        Q.    And is that your signature?

21        A.    Yes, it is.

22        Q.    Okay.  And is that just an -- and

23    affirmation that your interrogatory responses are

24    correct to -- and true, to your knowledge?

25        A.    I say, yes, I mean, they're -- I don't know

Case 1:17-cv-00854-TDS-LPA  Document 52-1  Filed 10/31/18  Page 53 of 58

1    that's possible, but to keep issues with Sherry.  I

2    think Sherry wanted me gone and it -- and it just kind

3    of solved a problem.  Now, again, I'm not saying this

4    is true.  I'm saying this is my perception.  I'm out

5    of there, Sherry is happy, her niece Wendy is running

6    the HR.  And -- and, you know, she's saving money.  I

7    mean -- I think it answers a lot of things.  But I

8    think it made his home life a lot easier, my being

9    gone.

10       Q.    And what is the factual basis for your claim

11   for retaliation?

12       A.    Well, the factual basis is another -- is

13   when Dr. Spivey asked me, called me up and said, go to

14   Suzanne and stop this lawsuit.  And because I wouldn't

15   and because -- well, it's not that I wouldn't.  I

16   mean, I didn't -- it didn't involved me.  And it

17   involved those two, not me.  And I think if -- if --

18   again, my perception is, because I would not step in

19   and talk Suzanne out of this lawsuit, that he got rid

20   of me.

21       Q.    You were over 40 at the time you were hired

22   by PPM, correct?

23       A.    Yes.

24            (KOVALICH EXH. 19, Charge of Discrimination,

25   KN 0772 through 774, marked for identification.)

1    A.    And sometimes he'd come in.  When he first
2    started, he had on green scrubs and looked scruffy.
3    And then he started wearing suit and tie and he
4    really -- I mean, he -- he looked very, very, very
5    handsome.
6        Q.    Paragraph five, you recount an incident in
7    the winter of 2013, when Ms. Spivey slammed the door.
8    Is that what --
9        A.    Uh-huh.
10       Q.    -- you had already testified to --
11       A.    Yes.
12       Q.    -- today?
13       A.    Yes, yes.
14       Q.    Okay.  You also reference, in paragraph 6,
15   in May of 2014, he called you when you were in
16   Charleston and asked what you were wearing?
17       A.    He wanted to come to Charleston.  And I
18   said, I've got a house full of girls.  Absolutely not.
19       Q.    And are you sure that that was in 2014?
20       A.    I -- yes.  Because -- and I can double-check
21   this.  I was taking pictures of the girls jumping in
22   and out of the pool.  And that was where I pulled the
23   -- it's the same date.
24       Q.    Okay.
25       A.    And that's how I could say -- be certain

Case 1:17-cv-00054-TDS-LPA  Document 52-1  Filed 10/31/18  Page 55 of 58

1    Q.    Okay.

2    A.    But he felt like -- well, I know, he felt

3  like he was going to be saving a lot of money doing it

4  himself.

5    Q.    Paragraph nine, you said that, in February

6  2015, you were walking to your car, Dr. Spivey pulled

7  up in his car, he got out, he grabbed me, picked me up

8  and spun me around in circles?

9    A.    Yes.  He had just gotten out of rehab for a

10  couple week.  And I was walking to my car.  It was

11  during the day.  And he was so happy to see me --

12  which was -- and -- and he started -- he got out of

13  his car, he started laughing.  And he just picked me

14  up and started swinging me around the parking lot.  I

15  mean, it was nothing romantic or sexual, it was

16  just -- it was just fun.  But I was very apprehensive

17  about somebody walking out the door and

18  misinterpreting that little -- that little swing.

19    Q.    Okay.  And then you say, in October 2015,

20  that you walked into Dr. Spivey's office to ask him a

21  question.  He was on the intercom.  He looked at you

22  said, she's pissy today.  And who was that -- I think

23  you testified this --

24    A.    Yes.

25    Q.    -- earlier --

1        A.     Yes.

2        Q.     -- is that in reference --

3        A.     That was Jennifer.  He was having a few

4   words with Jennifer.  And he -- I mean it wasn't hot

5   or anything.  But he apologized for her because I

6   could hear her on the speaker phone, and she was

7   pretty short with him.  And he said, well, she just --

8   she's -- you know, excuse her, Rebecca, she's just

9   pissy today.  So, yes, that was Jennifer Bailey.

10       Q.     And then Dr. Spivey, according to your EEOC

11  charge, he grabbed you and kissed you?

12       A.     Oh, yes.  At that -- oh, absolutely, at that

13  time.

14       Q.     Did you report this to Sue Nagelski?

15       A.     No, I mean, kind of -- why -- why?

16       Q.     Did you consider that you were being

17  sexually harassed?

18       A.     Well, who do I report it to?  What was

19  Suzanne going to do?  She was getting ready to get

20  fired.  I mean, what was -- I mean, what could she do,

21  go to Dr. Spivey and say, keep your hands off my mom.

22  I mean, what could she do?

23       Q.     That was not the question.  The question

24  was:  Did you consider that you were being sexually

25  harassed?

1    A.   I felt like I was -- I hate to use the word

2  harass because Dr. Spivey never grabbed me up, threw

3  me in the closet or -- or anything.  But it was

4  sexually -- it was uncomfortable, unprofessional and

5  it put me a -- a bad situation, knowing that Lisa and

6  Suzanne were working in that office.  And it -- it was

7  just not a good thing.  But -- but who do I report it

8  to?  I mean, the -- the chart -- organizational chart,

9  I report directly to Dr. Spivey, everything I do, I

10  report direct to Dr. Spivey.  And...

11    Q.   So you did not report it to human resources?

12    A.   No.

13    Q.   Did you tell anyone about that?

14    A.   I -- I can't recall.  I think I was so

15  stunned -- I can't recall.  I can't recall if I said

16  anything to -- I wouldn't -- I don't think I would

17  have said it to anybody.  I wouldn't say -- if I was

18  going to say it to somebody, I would have told

19  Suzanne.  But there was no purpose at that time.

20    Q.   Did you tell Vicky?

21    A.   I don't know.

22    Q.   Where did Dr. Spivey kiss you?

23    A.   On the lips.

24    Q.   And it was just one kiss?

25    A.   Yes..