IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA

| | | |
|---|---|---|
| REBECCA KOVALICH and SUZANNE NAGELSKI, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | **Exhibit 2** |
| PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A., DR. DAVID SPIVEY, individually, and SHERRY SPIVEY, individually. | ) ) ) ) ) | |
| Defendants. | ) | |

1          IN THE UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF NORTH CAROLINA
2              File No. 1:17-CV-00854-UA-LPA
3

REBECCA KOVALICH AND     )
4    SUZANNE NAGELSKI,        )
                             )
5          Plaintiffs,        )
                             )
6    vs.                      )
                             )
7    PREFERRED PAIN           )
      MANAGEMENT & SPINE       )
8    CARE, P.A., DR. DAVID    )
      SPIVEY, individually,    )
9    and SHERRY SPIVEY,       )
      individually,            )
10                            )
            Defendants.        )
11    _____)
12
13
14                    CONFIDENTIAL
15
        Videotaped Deposition of SUZANNE D. NAGELSKI
16
                   (Taken by Defendants)
17
                 Charlotte, North Carolina
18
                 Thursday, May 17, 2018
19
20
21
22
23             Reported in Stenotype by
                   Carolyn M. Beam
24    Transcript produced by computer-aided transcription
25    Job No. CS2907300

Case 1:17-cv-00854-TDS-LPA   Document 53-2   Filed 10/31/18   Page 2 of 32

1      Q.   Do you belong to any clubs, organizations or

2  churches?

3      A.   No.

4      Q.   And did you graduate from high school?

5      A.   Yes.

6      Q.   When and where?

7      A.   1985, Forsyth Country Day.

8      Q.   And did you attend college?

9      A.   Yes.

10     Q.   And --

11     A.   1989, from UNC Charlotte.

12     Q.   And what was the degree again, a BS in

13  environmental --

14     A.   Science, earth science, environmental

15  science.  It was interchangeable at that time.

16     Q.   And do you have any advanced degrees?

17     A.   I have a MBA from Wake Forest.

18     Q.   When did you obtain that degree?

19     A.   2006.  Formal graduation would have been

20  2007.

21     Q.   Okay.  And when was your daughter born?

22     A.   1995.

23     Q.   And did Sherry Spivey assist with child care

24  when you were in the MBA program at Wake Forest?

25     A.   Yes.

Case 1:17-cv-00854-TDS-LPA  Document 53-2  Filed 10/31/18  Page 3 of 32

1  planning or finances?

2      A.    No.

3      Q.    Okay.  Tell me about your MBA program.

4  Approximately how many hours did you have to -- have

5  to get your MBA?

6      A.    I can tell you, it was the executive

7  program.  It would -- it -- it was the same as any

8  other MB program, MBA program, they just did it at an

9  accelerated rate.

10     Q.    And what types of classes did you take to

11  get your MBA?

12     A.    Oh, everything from quantitative analysis,

13  macro, micro econ, operations, international business,

14  managerial finance, financial accounting, business

15  law.  Oh, they had some electives in there.  And I

16  would have to go back and look at the other ones.

17     Q.    Any classes in human resources?

18     A.    Yes.  They -- yes, they did have the -- I

19  called them the -- what were they called?  Oh, I can't

20  think.  I will let you know.  I can't think of the

21  name.  But there were a lot -- there were two classes

22  in -- yes, there were two classes.  I'm trying to --

23  it's not coming to me.  But I can let you know what

24  they were.

25     Q.    Okay.  So it sounds as if your IT experience

Case 1:17-cv-00854-TDS-LPA  Document 53-2  Filed 10/31/18  Page 4 of 32

1   then was -- came from working with computers on the

2   job and also you said it was a hobby?

3      A.    Yes.

4      Q.    Okay.  And the human resources experience,

5   you had some classes in the MBA program --

6      A.    Uh-huh.

7      Q.    -- two classes that related to human

8   resources.  And with finance, it sounds like you had

9   several finance --

10     A.    Uh-huh.

11     Q.    -- and accounting classes --

12     A.    Yes.

13     Q.    -- in the MBA program?  Okay.

14     A.    Did I say operations too?

15     Q.    I'm sorry, what was that?

16     A.    Operations.

17     Q.    What type of operation?

18     A.    Oh, it was an operations class.

19     Q.    And what -- what kind of operations?  What

20   do you mean by that?

21     A.    Oh, just business operations, whether you're

22   a factory -- or factory management, whether you're

23   looking at inventory management.

24     Q.    Okay.  Have you ever served in the military?

25     A.    No.

Case 1:17-cv-00854-TDS-LPA  Document 53-2  Filed 10/31/18  Page 5 of 32

1   issued against you?

2      A.    No.

3      Q.    Can you -- since you graduated from college,

4   give me your list of employers, start, you know, with

5   the first one that you had after college and then

6   we'll work your way through it.

7      A.    Okay.  My first employer after college was

8   in Pennsylvania.  Do you need their name?

9      Q.    Yes, please.

10     A.    Groundwater Environmental Services.

11     Q.    And what did you do there?

12     A.    I was a staff scientist.

13     Q.    And what was your salary?

14     A.    At that time?  That was 18-, 19,000.

15     Q.    And how long were you employed?

16     A.    I was there a little more than a year

17  before -- right.  I was there a year, a little more

18  than a year.

19     Q.    And where was Groundwater Environment

20  Services located?

21     A.    Exton, Pennsylvania.

22     Q.    And who was your supervisor?

23     A.    I -- I can't -- I couldn't tell you his

24  name.

25     Q.    Why did you leave?

Case 1:17-cv-00854-TDS-LPA   Document 53-2   Filed 10/31/18   Page 6 of 32

1      A.    I left because I got a really good offer
2    from a company in Charlotte.
3      Q.    Were you looking for a job at the time or
4    did they reach out to you?
5      A.    It was a little bit of both.
6      Q.    Tell me how you came to get the job.
7      A.    When I was an undergrad at UNC Charlotte,
8    there were graduate students that we had classes with.
9    And one of them was in Charlotte still, after
10   graduating.  And I had made the comment about wanting
11   to get back to Charlotte.  And he said:  We have a
12   position here, and I'm recommending you.  And would
13   you be interested in flying down to interview?
14     Q.    And what was the employer?
15     A.    National Environmental Technologies.
16     Q.    And who was the individual that recommended
17   you?
18     A.    Jeff Tepsik and Chris Repte.
19     Q.    And Chris -- what was the last name?
20     A.    Repte.
21     Q.    Repte, okay.  And what was your position?
22     A.    Project manager.
23     Q.    And who was your supervisor?
24     A.    Robert Martin.
25     Q.    And what was your salary?

Case 1:17-cv-00854-TDS-LPA  Document 53-2  Filed 10/31/18  Page 7 of 32

1    A.    27.

2    Q.    And when did you start there?

3    A.    Let's see.  Sometime around 1991.

4    Q.    And why did you leave?

5    A.    Actually, it would have been around 1990.

6    So it was 1990, excuse me.

7    Q.    Uh-huh.

8    A.    I -- my daughter was born in '95.

9    Q.    So you left when your daughter was born?

10   A.    Not -- well, not at that time.  I was out on

11   leave and then I came back after leave, and realized

12   that I had to do some balancing.

13   Q.    How long did you work after your daughter

14   was born?

15   A.    I actually only stopped six months, six to

16   eight months.  I left NET.  Yes.

17   Q.    You left NET when?

18   A.    '96.

19   Q.    And your daughter was born in 1995?

20   A.    Right.

21   Q.    Okay.  What was your next job after NET?

22   A.    I worked with Ogden Environmental Services.

23   Q.    When did you start there?

24   A.    '96?

25   Q.    And what did you do there?

Case 1:17-cv-00854-TDS-LPA  Document 53-2  Filed 10/31/18  Page 8 of 32

1    A.    Project manager.

2    Q.    Did you voluntarily leave NET?

3    A.    Yes.

4    Q.    Okay.  Did you sign any sort of severance

5 agreement?

6    A.    With NET?  No.

7    Q.    Have you ever signed a severance agreement

8 with any employer?

9    A.    No.

10    Q.    So how long did you work for Ogden

11 Environmental?

12    A.    Well, probably three to four years.

13    Q.    And what was your salary?

14    A.    That's a tough one.  I can't -- I can't

15 recall.

16    Q.    Do you know if it was more, less or about

17 the same as NET?

18    A.    It was more.

19    Q.    And who was your supervisor?

20    A.    Robert Martin.

21    Q.    Did he recruit you to Ogden?

22    A.    Yes.  But NET was being sold off, consumed

23 by another environmental company.

24    Q.    Okay.  Not Ogden?

25    A.    No.

Case 1:17-cv-00854-TDS-LPA  Document 53-2  Filed 10/31/18  Page 9 of 32

1     Q.     Okay.   And when did you leave Ogden?

2     A.     Around -- I -- I want to say approximately

3  2001, 2000, 2001.

4     Q.     Why did you leave?

5     A.     Because the job was no longer challenging.

6     Q.     Where is the next job that you had?

7     A.     I actually took a job at the veterinary

8  clinic.

9     Q.     When was that?

10     A.     Oh, 2002.

11     Q.     And what was your position?

12     A.     I worked with the avian vet and performed

13  their chemical hygiene -- wrote their chemical hygiene

14  plan.

15     Q.     How long did you work in that position?

16     A.     2004 or '5, 2005, 2005.

17     Q.     So two to three years?

18     A.     Yes.

19     Q.     And what was your salary?

20     A.     It -- I can't recall.   It wasn't much.

21     Q.     What vet clinic did you work at?

22     A.     Lake Cross.

23     Q.     And are all these positions in the Charlotte

24  area that we've talked about, NET, Ogden and Lake

25  Cross?

Case 1:17-cv-00054-TDS-LPA   Document 52-2   Filed 10/31/18   Page 10 of 32

1     A.    NET.  Ogden was in Huntersville.  Lake Cross

2    is in Huntersville.

3     Q.    Where did you go to work after Lake Cross?

4     A.    Oh, I went to -- I went back for my master's

5    degree in 2005.

6     Q.    Did you work while you were getting your

7    master's degree?

8     A.    No.

9     Q.    Did you ever take a position teaching math

10    or science at a school?

11     A.    Oh, that, I did.  That would have been in

12    2000 -- or 1997.

13     Q.    Where was that?

14     A.    Alexander Middle School.

15     Q.    In Charlotte?

16     A.    It was in Huntersville.

17     Q.    What grade did you teach?

18     A.    Middle school.

19     Q.    Subject?

20     A.    Science.

21     Q.    And was that just the one school year?

22     A.    Yes.

23     Q.    Why did you leave?

24     A.    Oh, well, we had no support from the admin.

25    It was very difficult.

Case 1:17-cv-00854-TDS-LPA   Document 52-2   Filed 10/31/18   Page 11 of 32

1     A.    Yes.

2     Q.    You -- are you still currently a member?

3     A.    No.

4     Q.    When did you cease being -- being a member?

5     A.    Two -- I want to -- I'm -- it was either

6   two-thousand -- I'm not sure.  I think it was 2016 or

7   2017.

8     Q.    Would it have been after you separated

9   employment with PPM?

10    A.    Oh sure.  No -- yes.

11    Q.    Okay.  Are there any other education,

12  registrations, activities, publications, groups, that

13  are listed on a current version of your resume that

14  aren't listed on here, that you recall?

15    A.    I do not recall.  But I will get you the

16  current one.

17    Q.    Okay.

18    A.    Or --

19    Q.    Okay.  So let's talk a moment about how you

20  came to be employed with PPM.  Can you tell me that

21  process?

22    A.    Dr. And Mrs. Spivey moved here from

23  California right about the time I was going through my

24  MBA.  And he had worked in Conover.  He decided to

25  start his own practice.  And that's kind of -- his --

Case 1:17-cv-00054-TDS-LPA  Document 52-2  Filed 10/31/18  Page 12 of 32

1  his wife had mentioned, had said, you know, we're
2  gonna need help.
3      Q.    Who did she mention that to?
4      A.    To me.
5      Q.    And what kind of help did she say that they
6  would need?
7      A.    She said financial help, office -- whatever
8  we need.  And I -- I'm paraphrasing that, because I
9  don't recall the exact conversation.
10     Q.    Did you have an interview or application or
11  anything with Dr. or Mrs. Spivey prior to your
12  affiliation with PPM?
13     A.    No.
14     Q.    At first, when you began working with PPM,
15  were you a 1099 independent contractor?
16     A.    Yes.
17     Q.    When approximately did you start working as
18  a 1099 independent contractor?
19     A.    I -- it was 2007, end of 2006, starting
20  2007.  I have -- I -- I'm -- around that time.
21     Q.    Okay.  And who did you have most
22  communication with about what your duties and that
23  sort of thing was going to be?
24     A.    Both.
25     Q.    Both Dr. Spivey and Mrs. Spivey?

Case 1:17-cv-00054-TDS-LPA   Document 52-2   Filed 10/31/18   Page 13 of 32

1     A.     Uh-huh.

2     Q.     Tell me what you understood your duties to

3  be when you started as an independent contractor at

4  the end of 2006 to the beginning of 2007?

5     A.     My duties at that time were working with the

6  parent company, PCP, as -- as -- and making sure our

7  books and theirs -- I want to say sync, for lack of a

8  better term.  But keeping an eye on our -- the money

9  coming in.

10          I did -- well, we interviewed.  I hired

11  Rebecca and I hired Lisa and interviewed several

12  people for the clinic.  So it was part HR.  And then

13  we had an IT vendor I was working with to network our

14  computers.  All the way down to, I wrote the

15  fluoroscopy manual that he edited and used for the

16  longest time.  So when you're a company of five

17  people, you wear many hats.

18     Q.     Where was the initial location for PPMC

19  or --

20     A.     On Charlotte Boulevard.

21     Q.     Okay.  And were they affiliated with -- you

22  said there was another parent company?

23     A.     He was affiliated with Piedmont Community

24  Physicians, which gave the money for the startup.  So

25  they were really a centralized -- they were the -- the

Case 1:17-cv-00054-TDS-LPA   Document 52-2   Filed 10/31/18   Page 14 of 32

1    administrative group over a few care centers, is what

2    they called them.

3        Q.    Okay.  And who initiated that relationship

4    with PCP, Piedmont Community Physician?

5        A.    That would be Rebecca.  Because Dr. Spivey

6    wanted to start his practice up pretty rapidly from

7    the time he left Conover.

8        Q.    Do you know what time he left Conover?

9        A.    No.

10        Q.    Okay.  So when you began working with PPM as

11    an independent contractor, during this time period,

12    when it's starting -- so that's the time period I want

13    to start talking about now -- you said you hired Lisa.

14    Who is the Lisa that you're referring to?

15        A.    Well, we hired -- or Lisa Palmer, in 2007.

16    We had interviewed and offered a position to one of

17    Dr. Hill's nurses who was looking.  Another -- we were

18    looking at a clinic staff, building a clinic staff.

19    And I -- I -- I can't give you any other names than

20    that.  I spend two Saturdays there interviewing.

21        Q.    At the Charlotte Lloyd --

22        A.    Yes.

23        Q.    -- Boulevard location?  Who else

24    participated in the interviews?

25        A.    Rebecca Kovalich.

Case 1:17-cv-00054-TDS-LPA  Document 52-2  Filed 10/31/18  Page 15 of 32

1    Q.    At some point, did your status as an

2    independent contractor change?

3    A.    Yes.

4    Q.    When did that happen?

5    A.    2013.

6    Q.    And what was the reason for the change?

7    A.    The reason for the change was with the onset

8    of the Affordable Care Act.  The IRS was cutting

9    down -- cutting -- cracking down on independent

10   contractors who were being kept as either employees at

11   bay or did not have more than one client.

12   Q.    Uh-huh.

13   A.    So if they -- they could have potentially

14   come down and fined both me and Dr. Spivey.  So I told

15   him I was just -- I was going on payroll.

16   Q.    Uh-huh.  Do you remember when you had this

17   conversation with him?

18   A.    Oh, it would have been around February of

19   '13.

20   Q.    And at that time, did you discuss a salary?

21   A.    It was still my rate is -- I think that's

22   what we agreed upon, was my current rate.

23   Q.    Which was what?

24   A.    It was 25 or 30.  I -- I have to go back and

25   look.  Well, actually I can't look.  It should be --

Case 1:17-cv-00054-TDS-LPA   Document 52-2   Filed 10/31/18   Page 16 of 32

1    it would have been my current rate on payroll.

2        Q.    So when you became an employee, did you do

3    an offer letter for yourself or, you know --

4        A.    No.

5        Q.    -- do sign employee --

6        A.    No.

7        Q.    -- handbook acknowledgements?

8        A.    No.

9        Q.    Do you know when PPM moved to the Maplewood

10   location?

11       A.    January or February of 2014.

12       Q.    At some point, did your duties change from

13   the initial startup time period?

14       A.    They just developed; they didn't really

15   change.

16       Q.    Tell me about that.

17       A.    In 2011, we separated from Piedmont

18   Community Physicians.  So we had to take on our own

19   employees.  I had to set up benefit plans, get

20   payrolls transferred, make sure nobody loses anything

21   on their 401(k).  PPM had to buy out the employees.

22   And -- and then, of course, the insurance contracts

23   had to be changed as well.

24       Q.    What do you mean, PPM had to buy out the

25   employees?

Case 1:17-cv-00854-TDS-LPA   Document 53-2   Filed 10/31/18   Page 17 of 32

1    A.    Right.  They can --

2    Q.    Okay.  And you were saying that your duties

3    had developed and you cited this example in 2011.  Is

4    there any other ways that your duties developed?

5    A.    We had -- well, I -- I oversaw the IT

6    vendors and the networking and putting -- giving

7    employees, you know, user access, which goes right on

8    with payroll and HR work.  And then, going through

9    monthly financials and looking at the overall

10   production of the company, in trying to do basically

11   end-of-the-year analysis on our taxes and a cash flow

12   projection.

13   Q.    Any other ways that your duties developed?

14   A.    I did quite a bit of work with the

15   accountants, as far as, you know, mitigating any tax

16   liabilities.  Doctor -- in 2008, 2009 -- oh, wait, let

17   me back up.  I did -- 2013.  Hmm.  Give me just a

18   minute.  2013, we switched financial institutions.

19   Let me back that up.  Let me back that up to 2012, we

20   did.  Early 2012, we switched financial institutions.

21        And, yes, we started gathering, looking at

22   spinning off the different business unit -- or not

23   spinning off the business unit.  We looked at adding

24   an ancillary service, a physician-owned lab, to the

25   practice.

1  Greensboro for a while.  We finally -- I purchased the
2  building that he's in in 2015.
3      Q.   Do you know when PPM started providing
4  services in Greensboro?
5      A.   I want to say 2011.  I believe that was it.
6  No, 2012?  2011 or '12.
7      Q.   And what were the main services performed
8  out of the Greensboro location?
9      A.   Other than office visits and injections,
10  that was about what he was doing there.
11      Q.   Were there any lab functions in Greensboro?
12      A.   The lab started -- I'm trying to think of
13  the career route.  There were lab -- yes, there were
14  lab functions.  But I can't tell you when they
15  started.
16      Q.   There were lab functions in Greensboro?
17      A.   Yes.  In --
18      Q.   But you don't --
19      A.   In --
20      Q.   -- know when they started?
21      A.   In that patient urines were brought to the
22  office.
23      Q.   And let me make sure I understand what you
24  said.  You said patient urines were brought to the
25  office?

Case 1:17-cv-00054-TDS-LPA  Document 52-2  Filed 10/31/18  Page 19 of 32

1    services to move.

2        Q.    Do you know if your mother, Ms. Kovalich,

3    and Mary Benton had any sort of relationship prior to

4    Mary Benton working with Dr. Spivey and PPM?

5        A.    No.

6        Q.    What is Dr. Spivey's role at PPM?

7        A.    The owner, basically, a hundred percent S

8    Corp owner.

9        Q.    And what kind of duties does he do at PPM?

10       A.    As a business owner and physician, he

11   ensures that everything -- he -- I mean, patient

12   health, all the way to, you know, viability of his

13   company.

14       Q.    What is Sherry Spivey's role with PPM?

15       A.    Prior to our move?

16       Q.    To which location?

17       A.    To Maplewood.  She would be our RN, nurse on

18   call.  She started out as Dr. Spivey's fluoroscopy

19   nurse in -- at the Char Lynn location, until he

20   found -- until he hired somebody.  And -- and then she

21   would fill in.  As time grew, she played more and more

22   of a role as the RN, as a clinic coord -- clinic

23   coordinator, clinic lead, clinic --

24       Q.    Clinic manager?

25       A.    Clinic manager.

Case 1:17-cv-00854-TDS-LPA   Document 53-2   Filed 10/31/18   Page 20 of 32

1    Q.    How would you describe your relationship

2  with Dr. Spivey at the time you began working with PPM

3  as an independent contractor?

4    A.    We never had a relationship.  I mean, a

5  personal one.  So it was professional.  Our personal

6  relationship was that he was Sherry's husband.

7    Q.    How would you describe your relationship

8  with Sherry Spivey at the time you became an

9  independent contractor with PPM?

10    A.    Well, she was his wife, my aunt.  And it was

11  okay.  It was fine.

12    Q.    Did the relationship with Dr. Spivey change

13  over time?

14    A.    I don't -- how so?  Or could you rephrase

15  that?

16    Q.    There is some references in the complaint, I

17  believe, about the relationship changing at some point

18  or things becoming different than they were at the

19  beginning.

20    A.    He was my supervisor.  If -- whatever I

21  needed, if I had a question, he was the one.  If he

22  gives me guidance, I take it.  But I mean, he was my

23  supervisor.

24    Q.    What about your relationship with Sherry

25  Spivey?  Did that change over time during your

Case 1:17-cv-00854-TDS-LPA  Document 52-2  Filed 10/31/18  Page 21 of 32

1  employment with PPM?

2      A.    Well, as she -- she -- it did.  The more

3  time she spent in the clinic and as an employee, it

4  did.  She -- yes, it changed.

5      Q.    How did it change?

6      A.    Well, she -- for example, she and another

7  employee took on looking for an EHR system.  Which was

8  fine.

9      Q.    Is that Jennifer Bailey?

10     A.    Yes.  From an IT perspective, I believe she

11 was enquiring as to our setup.

12     Q.    Is that Sherry Spivey --

13     A.    Yes.

14     Q.    -- or Jennifer?

15     A.    Sherry and Jennifer.  I'm not sure what

16 happened in what order.  But I had my IT privileges

17 revoked, my administrative privileges.  Because

18 Ms. Spivey perceived me as being able to spy on her

19 while she was working on the computer on a file on her

20 thumb drive.  And the way that you would pull up

21 Windows, she misunderstood administrator as, you know,

22 somebody to be able to give privileges to new -- and

23 emails to new employees.  That's considered, you know,

24 administrative access.  But I think she believe it was

25 more along the lines of I could sit there and spy on

Case 1:17-cv-00054-TDS-LPA  Document 52-2  Filed 10/31/18  Page 22 of 32

1  her work while she worked.

2      Q.    And this would have been in 2014; is that

3  correct?

4      A.    Yes.

5      Q.    So when the IT privileges were revoked in

6  2014, did you ever get those back?

7      A.    I had a meeting in March of 2014 that I went

8  through.  I drove up to Winston to meet Dr. Spivey for

9  a planned meeting, was met with these accusation.

10     Q.    By whom?

11     A.    Mrs. Spivey and Jennifer Bailey, in a

12 meeting with Dr. Spivey.  At the conclusion of the

13 meeting, he offered me my IT privileges --

14 administrative privileges back, for which I denied.

15     Q.    Did you have any role in IT after March

16 2014?

17     A.    I did.  But all I would do is make sure that

18 our IT vendors at the time for -- well, 2014, for the

19 remainder of that year, I had them set up new user

20 accounts.

21     Q.    When you were an independent contractor at

22 the beginning of your relationship with PPM,

23 approximately how many hours per week would you work?

24     A.    How many hours a week would I bill is more

25 the question.  In 2007, is that -- I -- I -- I -- I'm

Case 1:17-cv-00854-TDS-LPA  Document 52-2  Filed 10/31/18  Page 23 of 32

1  that I was on site from that IP address.  I mean, I
2  basically went in and sat in the conference room; you
3  couldn't miss me.
4      Q.    And then it's your testimony you were there
5  approximately how often a week?
6      A.    At least twice.
7      Q.    And from what period of time would you say
8  you were there in the office at least two times a
9  week?
10     A.    It -- I can't answer that directly.  It
11 would depend on what I was working on.  For example,
12 the move.  I was there three days, four days.
13     Q.    To help with the move between the Thursday
14 and the Monday?
15     A.    Well, even preceding that.  It all had to go
16 off without a hitch.  So if the demand was there
17 for -- I was there.
18     Q.    Okay.  In the complaint, you reference a
19 ██████████████████████████████████████████████
20 ██████  Can you tell me about what you know about that?
21     A.    I was supposed to talk to Dr. Spivey that
22 Friday.  I wasn't -- we didn't talk.  I wasn't able to
23 get ahold of him.  I -- within the hours, the evening
24 that followed, I had gotten a phone call from
25 Mrs. Spivey, saying that ████████████████████████

Case 1:17-cv-00854-TDS-LPA  Document 52-2  Filed 10/31/18  Page 24 of 32

1   was going to sleep like a baby.

2      Q.   What's the next thing that happened?

3      A.   In our conversation?  I don't understand

4   your question.

5      Q.   Well, I didn't know.  I mean, I'm just

6   asking:  What is the next thing that happened?  I

7   mean, if there were other things said during the

8   conversation, yes, I would like to hear about that.

9      A.   I wanted her to give me the number of our

10  business attorney, so I could contact our business

11  attorney.

12      Q.   And who was that?

13      A.   Jim Wall.

14      Q.   Did she give it to you?

15      A.   No.

16      Q.   Did she say why?

17      A.   She said Elizabeth had the phone and she was

18  going to bed.

19      Q.   Anything else happen during that

20  conversation?

21      A.   No.

22      Q.   What's the next thing that happened?

23      A.   That night, I -- I actually got ahold of Jim

24  Wall.

25      Q.   How did you get his number?

Case 1:17-cv-00854-TDS-LPA   Document 52-2   Filed 10/31/18   Page 25 of 32

1    A.    -- Jim Wall.  Or it was -- it was either --
2 I do not know.  It wasn't -- it didn't come from me.
3 It was -- it didn't come from me.
4    Q.    Did you ever come to understand ████
5 ████████████████████████████████████████
6    A.    There was his story and there was her story.
7    Q.    Okay.  What was Dr. Spivey's story?
8    A.    He was having a nice afternoon.  He was
9 decorating for Christmas.  He did some grocery
10 shopping.  He took his daughter, Elizabeth, for a ride
11 in his new car.  ████████████████████████████
12 ████████████████████████████████████████
13 █████████████████████████████████████████████
14 ████████████████████
15   ██   ███████████████████████████████████
16 ████████████████
17 ████████████████████████████████████████████████
18 ████████████████████████████████████████████████
19 ████████████████████████████████████████████████
20 ████████████████████████████████████████████████
21 ████████████████████████████████████████████████
22 ████████████████████████████████████████████████
23 ████████████████████████████████████████████████
24 ████████████████████████████████████████████████
25 ████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25





          MS. SMITH:  And I want to say that we have a

protective order in the case.  So I'm going to reserve

my right to designated portions of the transcript

confidential.  So we'll just deem the whole transcript

Case 1:17-cv-00854-TDS-LPA  Document 52-2  Filed 10/31/18  Page 28 of 32

1  several days?

2      A.    Several days.  What -- you know, I would try

3  to ask her -- or correspond with her, when is good, or

4  I would try to call her extension, and I couldn't --

5  there was nothing?

6      Q.    So were you in Winston-Salem when you were

7  making these attempts to talk with her or was it --

8      A.    Both.

9      Q.    And when you say both, you're talking about

10  your home office and Winston?

11      A.    Yes.  And if she wanted to sit down and

12  talk, I would be in Winston to sit down and talk.  Or

13  when she said, I will be there at 4:00 one day, she

14  wasn't.

15      Q.    So you attempted to meet up with her, you

16  were unsuccessful, and it just dropped after that?

17      A.    Right.  I'm not sure if she quit or if she

18  was terminated.  You would have to check those

19  records.

20      Q.    Okay.  Who was responsible for setting up

21  the cash balance plan?

22      A.    That was a project that I came -- that Vince

23  and I came up with to enhance Dr. -- well, to provide

24  more employee benefits, including benefits to

25  Dr. Spivey's retirement.

1      Q.    Explain your understanding of how this

2    works.

3      A.    It's a hybrid pension plan.  And the older

4    you are, the more you would have to put in versus the

5    younger employees.  And it's for -- there's -- they

6    have to be completely vested after three years of

7    working at PPM.  And then they would have funds for

8    their retirement.  So much is put away.  If they leave

9    PPM, they do have access -- I believe they have access

10    to them.  I'd have to go back and look at the plan.

11    If you were vested, you would have access to how many

12    years you were employed at -- and a hundred percent

13    vested and based upon your age and time served.

14      Q.    Okay.  And what did you have to do to become

15    one hundred percent vested?

16      A.    You had to be employed for three years.  We

17    actually retro-ed it one year, when we -- the year we

18    initiated it.  We retro-ed it to the previous year.

19    Because you could do that.  And then that would at

20    least chew up some of our tax liability and provide

21    more retirement benefits for the Spiveys.

22      Q.    And do you know when the cash balance plan

23    was put into place?

24      A.    Oh, gosh.  Let's see.  I remember working on

25    it.  I remember getting it into place for 2014.  So it

Case 1:17-cv-00054-TDS-LPA   Document 52-2   Filed 10/31/18   Page 30 of 32



Case 1:17-cv-00854-TDS-LPA   Document 52-2   Filed 10/31/18   Page 31 of 32

