IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA


REBECCA KOVALICH and SUZANNE )
NAGELSKI, )
 )
                 Plaintiffs, )
        v. )                                    **Exhibit 3**
 )
PREFERRED PAIN MANAGEMENT & )
SPINE CARE, P.A., DR. DAVID SPIVEY, )
individually, and SHERRY SPIVEY, )
individually. )
 )
                 Defendants. )

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:17-cv-00854-TDS-LPA


REBECCA KOVALICH and SUZANNE        )
NAGELSKI,                           )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             )
                                    )
PREFERRED PAIN MANAGEMENT & SPINE   )
CARE, P.A., DR. DAVID SPIVEY,       )
individually, and SHERRY SPIVEY,    )
individually,                       )
                                    )
            Defendants.             )
_____)


VIDEOTAPED DEPOSITION

OF

**DAVID SPIVEY, M.D.**




At Raleigh, North Carolina

Friday, August 10, 2018


REPORTER:    VONDA L. REED, CVR-M
             Notary Public


**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC  28105
980-339-3575

1   Q.   When did that conversation take place?

2   A.   Oh, in the past week or two.

3   Q.   About how long did it last?

4   A.   Five minutes each, on each subject.

5   Q.   What did you talk about with Mary Benton?

6   A.   I talked with her mostly to get in my mind sort of

7        time frames and dates and so on about when we had

8        talked about the effects that -- I'm sorry.  Was the

9        question when did I talk with her or --

10  Q.   What did you talk about?

11  A.   -- what was it about?  Sorry.  Excuse me.

12  Q.   That's all right.

13  A.   Let me regroup.  Exactly when we began to discuss the

14       need for reorganization and cost savings as we began

15       to feel the effects of a number of factors that were

16       impacting the practice from a reimbursement

17       standpoint and also from a volume standpoint, because

18       the large players in the area, Wake Forest Baptist

19       Health, who had established a pain practice sometime

20       before, we had seen a falloff in referrals from their

21       physician offices.  And also, more recently, Novant

22       Health has established a pain practice, and they are

23       referring within their organizations.

24            And so referrals have fallen off, so volume

25       has fallen.  We've, over the past, since beginning

1          around 2015, have had to make significant reductions

2          in personnel and reassignment of duties and just

3          trying to keep the practice profitable and survive.

4          So I discussed some of that with her, about when all

5          that had occurred, and that's pretty much it.

6     Q.   When did you have that conversation with Mary Benton?

7     A.   I can't tell you exactly when, but it's been over a

8          period of weeks off and on.  I would think of

9          something and just ask her, you know, "Hey, when did

10         this happen?" and so on.

11    Q.   Sure.  How -- well, it was just probably hard to put

12         a time on it because it was --

13    A.   Total time?

14    Q.   Yeah, if you had to --

15    A.   Sorry.  I'm supposed to let you ask the question.

16    Q.   No, that's all right.

17    A.   So do it.

18    Q.   Yeah.  About how much total time do you think you

19         spoke with Mary Benton about -- to prepare for your

20         deposition for today?

21    A.   30 minutes to an hour.  Maybe longer.  I'm not sure.

22    Q.   All right.  What did you discuss with Sherry Spivey

23         related to your deposition?

24    A.   Oh.  Again, trying to firm up in my mind dates when

25         certain people came on board and when things

1

2  Q.   Any Medicaid?

3

4

5

6

7

8

9  Q.   Sure.  All right.  Getting back to your day-to-day,

10      do you manage -- well, let me back up.  Are you the

11      owner of PPM?

12  A.   Yes.

13  Q.   Do you have any other titles that you've given

14      yourself as the owner/president; I mean, just --

15  A.   I don't know if I agree with the term "given myself,"

16      but I don't know who else would have given it to me.

17      I'm referred to as president and CEO.

18  Q.   Okay.  That's what I was asking.  Yeah, and I

19      wasn't -- since you're the owner, I wasn't trying to

20      be disparaging with that, but I don't know who else

21      would do it.

22  A.   I understand.

23  Q.   So as the owner, president, and CEO of PPM, would it

24      be fair to say, with just running the clinic, the

25      buck stops with you?  Is that fair?

 1   A.   I guess so, yeah.  Everything stops with me if I'm

 2        the president and CEO.

 3   Q.   Yeah.  And are you involved in personnel decisions?

 4   A.   Sometimes, yes.

 5   Q.   Tell me about that.

 6             MS. SMITH:  That's kind of a broad question.

 7   Q.   Sure.  How are you involved in personnel decisions?

 8   A.   Well, particularly, if it is a person who has

 9        applied -- do you mean for hiring, for example?

10   Q.   Yeah.  Let's go with hiring first.

11   A.   Let's say we have a position open in the clinic for a

12        medical assistant, and I delegate all of the search

13        for that person and -- for example, Wendy, HR, may

14        get a number of applicants, and she'll get their

15        resumes and she'll bring them to me, and I'll look

16        them over.  And I may be involved in the process that

17        early on, saying, "Well, I don't think this is a good

18        fit," or "Based on education and experience, this

19        might be a good one."

20             Then that person will be brought in and

21        interviewed by the appropriate head in the case of

22        the clinic.  Sherry Spivey might be involved.  The

23        clinical -- I can never remember the terms, clinical

24        director versus clinical manager.  I can never keep

25        those two straight.  Sorry.  But, anyway, Sherry

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



1       bill paying electronically.  It generates checks and

2       all.

3  Q.   Direct deposit?

4  A.   No.  Name some other things, Mr. Herrmann.

5  Q.   That's all right.

6  A.   Anybody.  Well, I can't do that.

7  Q.   That's okay.

8  A.   You know, where it's done on the computer, basically,

9       you know, and the checks are generated that way.

10      Anyway, I'll think of it in a minute, perhaps;

11      66-year-old brain.

12      ████████████████████████████████████████████████████

13      ████████████████████████████████████████████████████

14      ████████████████████████████████████████████████████

15      in addition to the front office stuff that she was

16      doing.  So now she's my personal assistant and does

17      my scheduling and makes sure I am where I'm supposed

18      to be when I'm supposed to be, et cetera, in addition

19      to her other duties.  And Ms. Benton has done the

20      accounts payable.  And we have a nice organized flow

21      now where we know what's happening and if it should

22      be paid and so on.  It's very accountable.  So she

23      was involved in that decision.

24      ████████████████████████████████████████████████████

25      ████████████████████████████████████████████████████

1   A.   We -- let me think for a minute.

2   Q.   Do you recall that testimony?  That's my question.

3   A.   Oh, yes.

4   Q.   And I think you were heading to where I was going to

5        go.  Do you have a better estimate of when that

6        reorganization would have started?

7   A.   Really started, in earnest, in '15.

8   Q.   Early 2015?

9   A.   Uh-huh.

10  Q.   Yes.

11  A.   Yes.  I'm sorry.  Yes.

12  Q.   That's okay.

13            MR. HERRMANN:  Let's go ahead and -- it's

14                going to take me a while to get through all

15                these.  Let's go ahead and have lunch.

16            VIDEOGRAPHER:  Off record at 12:18 p.m.

17            (Luncheon recess from 12:18 p.m. to 1:22 p.m.)

18            VIDEOGRAPHER:  On record at 1:22 p.m.

19  By Mr. Herrmann:

20  Q.   All right, Dr. Spivey, just one question before we go

21       back into kind of the list of employees.  What is

22       RegenerAge?  Have you heard of that?

23  A.   Yes, I have.

24  Q.   What is it?

25  A.   It's a -- it's not a subsidiary.  It's a section --

1       truthful until they convince me otherwise.  And I

2       have no reason to believe that Scarlet would lie, but

3       all I know is, if she says that she wasn't given any

4       train- -- again, I don't know what she has said.  If

5       she says she was given no training on PrognoCIS, that

6       is an untruth.

7   Q.  When you say "on PrognoCIS," that is the same exact

8       thing as EHR?

9   A.  Correct.  That's our EHR.

10

11

12

13

14

15

16

17

18

19

20

21

22  Q.  Why was it rapid and necessary?

23  A.  The reorganization?

24  Q.  Yes.

25  A.  Beginning in, actually, late 2014, but on through

1       2015, we began to not only see reimbursement drop,

2       not only in the lab, but in other CPT -- other areas

3       as well.  We also would get these notifications from

4       commercial carriers and also from Medicare.  And I'm

5       going to paraphrase, if I may, because I can't quote

6       them.  "By the way, July 1st, we're going to be

7       cutting your reimbursement for filling in the CPT

8       code by X amount."  In particular, they were

9       targeting urine toxicology testing, which was, as

10      mentioned yesterday, at one point over half of our

11      revenue.

12          So we knew -- and they were going to be very

13      aggressive about it.  And they told us they were

14      going to be aggressive about it.  And so we knew that

15      we had to get leaner very quickly.  And at the same

16      time, we're still going through the process of

17      implementing the EHR and everything, and so it was a

18      major reorganization.

19  Q.  Yesterday, your wife testified that it's still

20      ongoing today.  Do you recall that?

21  A.  Yes, I do.

22  Q.  Is that true?

23  A.  Yes.

24  Q.  So tell me how it's rapid.

25  A.  Well, maybe it's not as rapid today as it was

1   A.   Part of your question was had we -- I believe was did

2        we try to find anything else for Ms. Bailey to do at

3        that point.  And just to reiterate, we had already

4        tried her in so many different positions, I didn't --

5        I just really didn't feel there was anyplace where

6        she could have fit in, anything else for her to do.

7   Q.   Okay.  You said, "The enemy of my enemy is my

8        friend," that sort of thing.  And you were talking

9        about, I think, the dynamic between Sherry Spivey,

10       Sue Nagelski, and Jennifer Bailey.

11  A.   Correct.

12  Q.   Could you just explain that a little more?

13  A.   Well, Sherry had become more dissatisfied with

14       Ms. Nagelski's unwillingness to be present at the

15       office.  And that is why we had brought in, I believe

16       at the end of '15 -- I may be wrong on those dates;

17       maybe it was later -- Ms. Yontz to do full-time,

18       on-site HR work.  I'm not sure.  I may be off a full

19       year on that.  But, anyway, she had become very

20       dissatisfied about that.  I had become a little more

21       dissatisfied about it.

22            Your question was about the conflict between

23       Sherry and Ms. Nagelski and Jennifer Bailey; is that

24       right?

25  Q.   Well, specifically, "The enemy of my enemy is my

1     Austria or she was watching a bike race?  What do you

2     remember about why she was going to Austria?

3  A.   My recollection, she was riding.  Whether it was a

4     race or not, I can't remember.  But my recollection,

5     she was actually riding a bike.

6  Q.   Do you recall the details of what she was going to

7     do?

8  A.   No.

9

10

11

12

13

14

15

16

17

18

19

20

21  Q.   Let's go to Exhibit 59.  It should be in your book.

22  A.   Okay.

23  Q.   Now, this was something that was reviewed yesterday,

24     but it's an e-mail chain that involves Michael

25     Jacobson and an employee named Sara Wilson.  Do you

1              Do you see that?

2    A.   I do.

3    Q.   Did you disagree with Ms. Nagelski's assessment at

4         the time?

5    A.   I agreed that it's a potential, quote-unquote,

6         "disaster waiting to happen," end quote.

7    Q.   Why do you agree with that?

8    A.   Well, I think dismissing three employees at one time

9         is a pretty bold move, but necessary at the time.

10   Q.   And then if you look at the next page --

11   A.   What was the -- may I ask a question?

12   Q.   Yeah.

13   A.   What was the date on this?  There's just times.  I

14        don't know what --

15   Q.   Yeah.  Well, if you go down --

16   A.   Oh, here we are, July twenty- -- I'm sorry.  I can

17        see it now.  I got it.  July '15, okay.

18   Q.   So it looks like on Tuesday, July 28th, you respond

19        to Sue and say, quote, "New employees are ready to

20        start on Monday.  The terminations would be done on

21        Friday as planned.  Have the severance packages ready

22        and to Sherry by Thursday noon.  We will handle

23        this."  Right?

24   A.   Yes.

25   Q.   So you were firing three employees in Greenville.

1    A.    Greensboro.

2    Q.    Greensboro.  And new employees were starting there

3          the following Monday, right?

4    A.    The terminations were on Friday.  They were set to

5          start on Monday, yes.

6    Q.    How many new employees did you put in there at the

7          time?

8    A.    I don't know.

9    Q.    Go to Exhibit 62.

10   A.    Okay.

11   Q.    Have you seen this document before?

12   A.    I saw it yesterday.

13   Q.    And it's an e-mail from Sue Nagelski to you on

14         July 28th, right?

15   A.    Yes.

16   Q.    And this was produced to me by your lawyers.

17   A.    Uh-huh.

18   Q.    And again, on this page, Sue says that she can rework

19         her schedule to be present Friday, but HR is only a

20         portion of what's needed.  And she wants legal

21         representation to be there, right?

22   A.    So it says.

23   Q.    Do you think she was lying about that?

24   A.    No.

25   Q.    Did you agree that it was important to have lawyers

1           documented oral warning, written warning, probation,

2           and then discharge.  Is that right?  Or let me put

3           that a different way.  They may involve any of

4           those -- those are the three options:  documented

5           oral warning, a written warning/probation, or

6           discharge.  Right?

7    A.     Yes.

8    Q.     And here even the oral warning says documented,

9           right?

10   A.     Yes.

11   Q.     Now, you've described today some instances where you

12          counseled an employee and didn't document it, right?

13   A.     Yes.

14   Q.     Do you regret not doing that?

15   A.     No.

16                MR. HERRMANN:  I think this will be a new

17                   exhibit.

18                (Plaintiff's Exhibit 90 was marked.)

19   Q.     Vonda is going to hand you Exhibit 90.  Do you

20          recognize that document?

21   A.     Yes.

22   Q.     What is it?

23   A.     It's the summary plan description of our cash balance

24          plan.

25   Q.     And is this something that PPM currently utilizes?

1  A.   Yes.

2  Q.   When did it first start using the cash balance plan?

3  A.   January 1, 2014.

4  Q.   Were you involved in the rollout of the cash balance

5       plan?

6  A.   Can you please define rollout?

7  Q.   Well, let's ask a different question.  Were you

8       involved in the decision to implement a cash balance

9       plan?

10 A.   Yes.

11 Q.   Describe that for me, your involvement.

12 A.   Our wealth management people at BB&T who do our

13      retirement and also our financing and so on, because

14      Sherry and I are near retirement, fairly near

15      retirement, and with input from Ms. Nagelski, wanted

16      to set up an additional bucket, if you will, into

17      which and with which Sherry and I could fund our

18      retirement.

19           So we met with them several times; we, the

20      BB&T folks -- I don't remember if at that time the

21      Verisight, now the third-party administrator --

22      shoot.  Now I can't remember their name.  Anyway, if

23      they were on the phone or if we consulted with them.

24      But, anyway, they designed this plan into which --

25      basically, they said, "We can do this.  It's legal.

1          You're going to have to contribute some for your

2          employees."

3                  And I said, "Fine."  And so that was my

4          involvement.

5   Q.     So am I mischaracterizing this if I say the main

6          driver of this, as you just described it, was to help

7          fund your kind of ending or upcoming retirements?

8   A.     Yes.

9   Q.     And then a secondary benefit would be that your

10         employees would also be able to take part in this,

11         right?

12  A.     Yes.

13  Q.     After that, did you take any other steps to set up

14         the cash balance plan?

15  A.     I know that Ms. Nagelski worked with the BB&T folks

16         and the -- at that time, Verisight.  I can't remember

17         the name now.  But anyway, pretty much, you know, I

18         delegated it.  Was your question did I take any

19         additional steps?

20  Q.     Yeah.

21  A.     No.

22  Q.     And when did this plan go live or become active?

23  A.     January 1st, 2014, I believe.

24  Q.     Are you sure it didn't become live at some date after

25         that, and then it was kind of grandfathered back to

1    Q.    Why did you, in your forward of this e-mail to Wendy

2          Yontz, announce that you were firing or planning to

3          fire Sue Nagelski?

4

5

6

7

8

9          since it was still an ongoing thing and since it was

10         an open case and had not been resolved, and Sue was

11         going to be terminated, I felt it important that we

12

13         Wendy could then assume handling of that and

14         interfacing with the attorney and finding out what

15         was going on and so on.

16   Q.    When did you decide to fire Sue?

17   A.    I guess sometime toward the end of 2015 or early

18         January of 2016.

19   Q.    Tell me about that decision.  Did you consult with

20         anybody to make the decision?

21   A.    Yes.

22   Q.    Who did you consult with?

23   A.    I consulted with the BB&T people.  I consulted with

24         Turlington & Company.  That's pretty much it.

25   Q.    Did you talk to Sherry Spivey about the decision?

1   Q.   Who made the decision to reassign Sue's duties?

2   A.   I did.

3   Q.   And specifically -- I know you just said them,

4        but -- well, let's talk -- the HR.  When did you

5        decide to reassign her HR duties?

6   A.   I think that was late 2015 also.

7   Q.   And let me know if this helps you.  And you can look

8        at it, too, if you want, Exhibit 28.  Wendy Yontz's

9        hire date is listed as November 23rd, 2015.

10  A.   That sounds about right.

11  Q.   Would that sort of be about the same time you decided

12       to reassign Sue's HR duties?

13  A.   Yes.

14  Q.   Okay.  Do you think this conversation that you had

15       with Jonathan Cochrane was before or after

16       November 23rd of 2015?  Again, that's Wendy Yontz's

17       start date.

18  A.   Uh-huh.  Probably after.

19  Q.   Do you know for sure if it was after, or are you

20       guessing?

21  A.   Well, I'm just thinking that -- well, it could be off

22       because that's her start date.  But we had decided to

23       bring HR in-house and everything, so I'm looking at,

24       okay, so that duty is gone.  So it may have been -- I

25       would just say it was around that time.  Like I said,

1   Q.   You said compliance was another duty that was

2        reassigned.  Who was that reassigned to?

3   A.   In part to Maureen O'Sullivan.

4   Q.   When did that happen?

5   A.   When we were putting -- after we put PrognoCIS in.

6        Let's see.  During the time that we were putting

7        in -- implementing PrognoCIS.

8   Q.   So that would have been maybe --

9   A.   Late '15, I think, also.

10  Q.   You referenced conversations that happened before

11       Yontz actually started about having someone take over

12       Sue's HR duties, right?

13  A.   Yes.

14  Q.   When did those conversations start occurring?

15  A.   Long before that.

16  Q.   And just as a time reference, the issue that we

17       looked at earlier with the terminations of the

18       Greensboro employees, that was the last of July,

19       beginning of August of 2015.  Was it around that

20       time?

21  A.   No.  It was before that.

22  Q.   When?  How long before that?

23  A.   I'm not sure.  Maybe as far back as probably 2014.

24       We had been -- Sherry had had some issues.  I had

25       always wanted Sue to be in the office more.  In fact,

1    when we moved to the new building, we created an

2    office for her downstairs.  There was an entire

3    office down there where we were going to put the lab

4    in one area that we had designated and that

5    Ms. Kovalich had set up for us.  We were going to put

6    not only the screening lab, but also the confirmation

7    laboratory down there eventually.  In fact, we had to

8    set it up to make sure it had proper air conditioning

9    and all that stuff, as I recall.

10         And then the front office with the

11   windows -- I realize you can't see this, but there

12   was a nice office there with windows that she was

13   going to share with Ms. Kovalich.  And as a matter of

14   fact, Ms. Nagelski actually had moved some stuff in

15   there.  I think a chair, a table or something.  And

16   there were a couple of items that were there when we

17   bought the building and while we were upfitting that

18   Sue wanted to keep.  And we had put those in there

19   for her.  And so she had known for some time that I

20   really wanted her to be there more.

21         And then there were some issues that Sherry

22   Spivey had with some of the employees under her

23   regarding PTO and change in status and things like

24   that.  And more and more, as we had more and more

25   employees -- and so this began to happen way back,

1       you know, maybe even in '13 -- I don't know -- that

2       employees were griping because they didn't have -- I

3       mean, they had been around and been employed in other

4       areas, and they knew that they were supposed to have

5       someone on-site that would deal with these issues.

6            And so I had implored Suzanne many times,

7       Ms. Nagelski, to at least set aside, you know, a

8       couple of days or three days a week that she could be

9       on-site and talk with these folks.  So as time went

10      on, the pressure to have someone on-site.

11           And then, also, some of these duties in HR

12      that are kind of shared with Maureen, they involve

13      things where you've really got to be there, you know,

14      to take care of issues on a day-to-day basis,

15      compliance and security of the Internet and all that

16      stuff.  So that was all kind of rolled in together.

17      We really needed people to be there.  So --

18  Q.  So my understanding is, you were discussing -- your

19      point of that conversation when we were talking about

20      Jonathan Cochrane was because you were thinking about

21      whether or not you still needed Sue Nagelski to work

22      for PPM, right?

23  A.  Yes.

24  Q.  And that happened at around -- you were already

25      having those conversations at around the same time

1        that you brought Wendy Yontz on, right?

2   A.   Yes.

3   Q.   Do you recall when -- I know she started in November

4        of 2015.  Do you recall when you interviewed

5        Ms. Yontz?

6   A.   I don't.

7   Q.   Do you think it was more than a month before that?

8   A.   I don't think it was more than a month.

9   Q.   And I did assume something.  Did you interview

10       Ms. Yontz?

11  A.   Yes.

12  Q.   Did you personally do that?

13  A.   Yes.  Mrs. Spivey did, and I did too.

14  Q.   You and Mrs. Spivey interviewed Ms. Yontz?

15  A.   Yes.

16  Q.   Why was Ms. Spivey involved in the interview of Wendy

17       Yontz?

18  A.   Mrs. Spivey was the one who was feeling the pressure

19       from employees more than anyone else.  Although, I

20       did get input from other managers; Brandi Frey, for

21       one, and the front office manager at one time.  It

22       wasn't Betty Webb.  But there were rumblings from

23       other areas that, you know, they needed someone

24       on-site.  But a lot of it had come from Sherry.

25            And so, again, I would much have preferred --

1      Sue is very bright, and I would have much preferred

2      to have her on-site and be the HR person.  She didn't

3      like HR stuff very much.  She expressed that, that

4      she didn't enjoy it and didn't want to do it, it was

5      kind of a hassle.  I'm paraphrasing.  I don't want to

6      put words in her mouth.  But she wasn't real fond of

7      it, I think it's fair to say.

8           So Mrs. Spivey was feeling the pressure more

9      of needing to have an HR person on-site.  And she had

10     a -- somehow she interacted with Ms. Yontz, who is

11     Sherry's brother's adopted daughter.  So they got

12     together for some reason.  I don't know if it was a

13     family function or whatever.  And Ms. Yontz told her

14     that, you know, that she had been doing HR for some

15     time and was taking HR courses and had an interest in

16     it and all that.  She was also working on getting her

17     paralegal certification at that time.

18          So I think Mrs. Spivey saw that it was a

19     reasonable resume and came to me and said, "Hey, you

20     know, we need an HR person on-site," and so asked me

21     to talk with her and look at her qualifications and

22     all.

23  Q.  I guess this is obvious, but Wendy Yontz was not a

24     clinic employee, right?

25  A.  No.

1   Q.   And I know Ms. Spivey is involved in hiring people in

2        the clinic.  Right?

3   A.   Yes.

4   Q.   Are you aware of any other nonclinic employees that

5        she has helped interview?

6   A.   Certainly in the past, when we weren't as organized

7        as we are, when we were smaller, and then certainly

8        in the old building and everything.  Clearly she did,

9        yes.

10  Q.   So what years are we talking about?  What time period

11       are you referring to?

12  A.   We're talking 2007, probably through 2010, 2012

13       maybe.  And then at that point, because of the

14       problems we were having with the lab, Ms. Kovalich

15       got reintroduced to us and solved that lab problem,

16       for which we were grateful.  And then she sort of saw

17       that we had some needs for reorganization.  And at

18       that point Ms. Kovalich did a lot of the hiring,

19       basically.  She hired a lot of people during that

20       time.

21  Q.   Right.

22  A.   Some even without my input.  You know, I just trusted

23       her enough and had respect for her business acumen

24       and everything, and her personal skills.  And so I

25       said, "If you think that's the person, get 'em."

1   Q.   Other than Wendy Yontz since 2012, can you name any

2        other employees that were hired outside the clinic in

3        which Ms. Spivey had a role in the interview process?

4   A.   I can't think of anyone offhand.

5   Q.   What specifically did Sue say to you about not liking

6        her HR duties?

7   A.   I can't remember specifically what she didn't like,

8        but she expressed that, you know, she didn't enjoy

9        it.

10  Q.   When did she say that?

11  A.   I have no idea.

12  Q.   Did she just say, "I don't enjoy this," or do you

13       recall the conversation?

14  A.   There was more than one conversation.  Some of them

15       shorter, some of them longer.  But basically she

16       expressed that, you know, she didn't enjoy it very

17       much.

18  Q.   About how many conversations did you have with her

19       about that?

20  A.   Three.

21  Q.   The first of the three, was that in person or over

22       the phone?

23  A.   I don't recall.

24  Q.   The second one, was that in person or over the phone?

25  A.   I can't tell you one, two, and three, but I know that

1          at least one, maybe more than one, were face-to-face.

2          They may all have been face-to-face.  None of them

3          may have been over the phone.

4     Q.   Do you remember any specifics beyond what we've

5          already talked about with those conversations?

6     A.   No.  I think at one point she did mention that she

7          didn't really have any HR training and experience,

8          and so she was kind of doing it -- Sue, to her

9          credit, particularly early on, would offer to assume

10         duties, you know, particularly when we were a real

11         small practice and everything.  And so she starts --

12         sort of picked up HR when we were smaller, in the old

13         building, and ran with it, so to speak.

14    Q.   Prior to Ms. Yontz -- let's go back to 28.  Yeah, you

15         already have it there.

16    A.   Oh.

17    Q.   We're just going to talk about the first page.  So

18         Ms. Yontz came in in November of 2015, right?

19    A.   Is she on here?

20    Q.   Well, these are the terminations, so --

21    A.   Oh.

22    Q.   I'm not ask- -- like, we've just talked about that.

23         Do you recall having that conversation that we just

24         had about --

25    A.   Yes.  November of '15, yes.

1   Q.   Do you know whether or not that conversation was with

2        just Scott Hummel, or were other people present?

3   A.   Brenda Thrower.  I had a conversation with Brenda

4        Thrower too.

5   Q.   The same conversation, or was she --

6   A.   Pretty much.  They're the two folks that we deal with

7        at Turlington & Company.

8   Q.   Sure.  And I asked that poorly.  Was it -- not the

9        content of it being the same, but was it in fact one

10        meeting that you remember that you had with

11        Mr. Hummel and Mrs. Thrower at the same time, or they

12        were separate conversations?

13   A.   I don't remember.

14   Q.   And what did you speak with Mr. Hummel about

15        regarding Sue Nagelski's termination?

16   A.   Well, I didn't ask him about her termination

17        specifically.  What I asked was, you know, "Do we

18        need someone in the position of liaison between

19        PPMSC, BB&T, and Turlington & Company in order to do

20        business?"

21   Q.   And Mr. Hummel said you don't?

22   A.   Correct.

23   Q.   And you had the same conversation with Ms. Thrower?

24   A.   Correct.

25   Q.   And this would have also been in late 2015?

1        decision to terminate Ms. Kovalich?

2   A.   Yes, except somewhere in here I thought it said

3        either -- oh, it does say direct or indirect.  Yes.

4   Q.   Yeah.  And we'll get into that.  I just want to go

5        through each one.

6   A.   Yeah.

7   Q.   So Mary Benton, when did you first specifically

8        discuss the prospect of terminating Rebecca

9        Kovalich's employment?  When did you first have that

10       conversation with Mary Benton, if you did?

11  A.   Probably early '16, spring of '16.

12  Q.   Okay.  And do you recall one conversation or multiple

13       conversations about that with Mary Benton?

14  A.   More than one.

15  Q.   The first one that you recall, do you know if that

16       was in person or over the phone?

17  A.   They were all in person.

18  Q.   What do you recall about the first conversation where

19       you specifically talked about terminating

20       Ms. Kovalich?

21  A.   Mary Benton, as a part of the reorganization process,

22       said, "Why are you paying her?  What is she doing?"

23       And I explained that she was very essential in our

24       development of the laboratory and that I was

25       continuing to pay her for the reason I've already

1        described, to which Ms. Benton likely replied,

2        "You've got a business to run here and you're about

3        to run it into the ground.  You better -- you've got

4        to look at this a little more carefully."  So --

5   Q.   Before Mary Benton made that recommendation, had you

6        considered terminating Ms. Kovalich?

7   A.   Yes.  I considered a lot of different people,

8        terminating a number of different employees.

9   Q.   When was the first time that you considered

10       terminating Ms. Kovalich?

11  A.   Probably in mid to late 2015.

12  Q.   Do you recall a second meeting with Ms. Benton where

13       you discussed terminating Ms. Kovalich?

14  A.   I recall several meetings with Ms. Benton wherein we

15       discussed how we needed to reorganize.  And

16       specifically about Ms. Kovalich, no.  I do recall

17       that she sent me an e-mail expressing some concerns.

18       That may be one of the -- I don't know.  I recall

19       seeing an e-mail where she expressed some concerns

20       about, you know, "Why are you still paying her?"

21       Again, same sort of idea.  And -- anyway.

22  Q.   Would that e-mail have happened after your in-person

23       talk where she said, "Why are you paying her?  What

24       is she doing"?

25  A.   Most likely, yeah.  I'm not certain of that, but most

 1   A.   Specifically, no, I don't.

 2   Q.   And from your answer, I just want to clarify.  It's

 3        possible she did and it's possible she didn't?

 4   A.   Yes.

 5   Q.   You just don't remember?

 6   A.   Yeah.

 7   Q.   Okay.  Gretchan Culler Hawks, what input did she have

 8        into the decision to terminate Ms. Kovalich?

 9   A.   I asked her if the lab was able to run okay if

10        Ms. Kovalich was gone.

11   Q.   When did you ask her that?

12   A.   I don't remember.  Sometime probably around the same

13        time I was talking with Ms. Benton about

14        reorganization, so probably -- it may have been on

15        into 2016.  Sometime late '15, early '16.

16   Q.   What did she say in response?

17   A.   She said that the lab could run okay, that a lot the

18        duties she was doing -- she was doing a lot of the

19        ordering herself and things like that.  And Select

20        was doing all the compliance, regulatory things, and

21        so -- that was my understanding at the time.  And so

22        it didn't look like the position was necessary.  If

23        we weren't developing any new things, if the lab was

24        just sort of running on its own, that they were okay.

25             She is a medical technologist and is certainly

1    A.   If you say so.

2    Q.   Go ahead and take a look at it.

3    A.   I'll take your word for it.

4    Q.   Well, go ahead and look at Exhibit 20.

5    A.   All right.  We're talking Cindy Ingold, right?

6    Q.   Yeah.

7    A.   Okay.  (Witness reviews document.)  Yes.

8

9

10

11

12   Q.   Now, was it different for you when you learned that

13        Ms. Nagelski had accused PPM of age discrimination

14        than it was for these other employees that had done

15        it?

16   A.   Yes.

17   Q.   Why so?

18   A.   Because I felt that we had a -- we, as a practice,

19        and we, as a family, and I personally had a different

20        relationship with her than I did with these other

21        employees.  She was family.  She had a special

22        status, if you will.

23   Q.   And when you learned that she had accused PPM of age

24        discrimination, her mother was still working for PPM,

25        right?

1   A.   Yes.

2   Q.   I mean, maybe it's just a normal reaction.  But, I

3        mean, was that awkward for you?

4   A.   A little bit, yes.

5   Q.   What do you mean by that?

6   A.   Well, I was concerned that -- well, two things.  One,

7        I percolated and -- not percolated.  I thought about

8        this, you know, for some time, so it wasn't an

9        immediate thing.  But I wanted to talk with Sue.  But

10       I knew that I couldn't because she started this

11       action.  So now it's too late.  I can't go back.  I

12       can't talk with her.

13            But I knew that her mother and she, most

14       likely, communicated fairly regularly.  So I called

15       Ms. Kovalich, and I said to her, basically, "I don't

16       understand why Sue has done this.  Please make sure

17       she has read my letter carefully," and that --

18       because in my mind at that time, I wasn't even

19       terminating her.  I realize now that it was a

20       termination of employment.  But I guess in my mind at

21       the time, there was more of a, "Hey, let's still work

22       together, but on a different -- with a different

23       business arrangement," sort of as on a project basis,

24       let's say.

25            So all I -- what I asked Ms. Kovalich to do

1       is, "Please make sure Suzanne has read this.  I know

2       I can't talk with her because of this.  Please make

3       sure she's read this."  And that was about it.

4            There was a later conversation wherein -- as

5       you said, it was awkward that Ms. Kovalich was still

6       employed and we had terminated her daughter.  And

7       Ms. Kovalich was in a position where, at that time

8       with the lab and with our relationship with Select

9       Laboratory and all of that, where if she had wanted

10      to retaliate against us for firing her daughter, my

11      concern was that she could hurt us.  She could have

12      sabotaged the lab.  She could have -- I don't know.

13      I don't mean, you know, mechanically sabotaged it.

14      But I really didn't feel that she would do that

15      because, as I had said before, I had a lot of respect

16      for her as a businesswoman and all that.

17           So as I thought about this, I thought,

18      "There's really no way I can make this perfectly safe

19      for us," but what I wanted to do was just hear from

20      her that despite the fact that I had terminated

21      Suzanne, that she was still in our camp and would

22      still do the -- you know, not do anything to sabotage

23      our laboratory billing.  Because, again, even though

24      our revenue was dropping as a result of the changes

25      in reimbursement for laboratory services, it

1          still -- and still is an important part of our
2          revenue stream for the practice.  It allows us to do
3          other things that we don't get paid for.
4               So I called her back and I just said, "I need
5          to hear from you that my firing of Suzanne is not
6          going to cause you to do anything to retaliate
7          against us, to do anything to hurt us.  I just need
8          to hear you say that."  And she did.  And I said,
9          "Thank you."  And that was it.
10   Q.    Was Ms. Spivey around when you were talking -- when
11         this second call happened; in other words -- let me
12         clarify.  During Ms. Kovalich's deposition, I think
13         she testified to not the exact conversation but
14         something similar.  But one thing she said was that
15         Ms. Spivey was in the background also expressing
16         fears about retaliation.
17   A.    I don't recall that at all.
18   Q.    You don't recall that testimony?
19   A.    Yes, I recall the testimony.
20   Q.    Do you know one way or the other whether Ms. Spivey
21         was there when you had that conversation with
22         Rebecca?  And by "there," I mean like close in
23         proximity to you.
24   A.    The first -- I know I've muddied the waters here with
25         my --

1    Q.    That's okay.

2    A.    The first phone call or the second one?

3    Q.    Yeah.  Let's go through both of them.

4    A.    Okay.

5    Q.    So was Ms. Spivey present -- and when I say

6          "present," again, let's say within the same room as

7          you.

8    A.    Earshot?

9    Q.    Earshot.  That's a good way to put it.  Was she

10         within earshot of you for the first call?

11   A.    No.

12   Q.    Was she within earshot of you for the second call?

13   A.    No.

14   Q.    Are there any other calls that you're aware of?

15   A.    No.  Well, what do you -- time out.  Calls to

16         Ms. Kovalich about those two subjects?

17   Q.    Yes.

18   A.    No.

19   Q.    When in relation to receiving this -- because I know

20         you said that you were aware that Sue was

21         represented, so you couldn't talk to her.

22   A.    Right.

23   Q.    How long do you think after receiving this that you

24         made that first call to Rebecca?

25   A.    I think it was after I had received the second letter

1        from you.  As I said, it was -- or somewhere around

2        that time.  I know I just kind of was in a bit of a

3        tailspin.

4    Q.  If you want to go to 92, that might refresh your

5        recollection on that.

6    A.  Okay.

7    Q.  Is that the second letter that you received from me?

8    A.  Yes.

9    Q.  So you think it was sometime kind of close to this

10       but after March 9th of 2016?

11   A.  Most likely, yes.

12   Q.  Where were you when you -- were you at the office --

13   A.  Yes.

14   Q.  -- when you called Rebecca?

15   A.  Yes.

16   Q.  And the second call, when was that, as best you can

17       put a date on it?  When I say "date," I mean time

18       period.

19   A.  Sometime after this, but not too long after this, I

20       guess.  So it was probably late March.  That's a

21       guess, my best guess.

22   Q.  And if you go ahead and just take a look at

23       Exhibit -- you can take a look at 93 and 94.  They're

24       both really short.  Just they're --

25   A.  Yeah.

1      have been more than ten years ago.  I don't know.

2  Q.  Going back to Exhibit 1, same page, page 8, the stuff

3      I had you review.

4  A.  Hang on, please.  Okay.

5  Q.  Do you recall being informed of -- you know, you

6      heard testimony about it yesterday -- an incident

7      where Ms. Spivey, you know, yelled, "Fuck you,

8      Rebecca," or "Fuck it," or something like that while

9      slamming a door at some time in 2013?  Did you ever

10     find out about that, like, as it happened?

11 A.  No.

12 Q.  Did you just find out about it through this lawsuit?

13 A.  Yes.

14 Q.  Paragraph 36 talks about an occasion where Rebecca

15     was in Charleston and you called and said you had to

16     see her, said you were going to come to Charleston.

17     And she, I believe in her deposition, said that, you

18     know, the conversation also was woven with work

19     stuff.  And she said, "Don't come."  And you

20     interrupted and said, "What are you wearing?"

21         Do you deny calling her and telling her that

22     you had to see her at some point in May 2014?

23 A.  I do.

24 Q.  Do you deny ever calling her and saying that?

25 A.  That I had to see her?

1   Q.   Yeah.

2   A.   I do.

3   Q.   Do you deny that you asked her, quote, "What are you

4        wearing"?

5   A.   Here's my recollection of the conversation.

6   Q.   Sure.

7   A.   Is that permissible?

8   Q.   Yes.

9   A.   Okay.  I called Rebecca to ask her about some stuff

10       about the lab.  Didn't know if she was in Charleston

11       or where she was, and I called her on her cell phone.

12       And she had in the past suggested many times that I,

13       with or without Sherry -- and I'm not suggesting that

14       that was an invitation for a relationship, but with

15       or without Sherry, that I should come down to

16       Charleston and unwind and decompress.  I'm

17       paraphrasing.  Because she knew that -- because she

18       had been around and seen the practice, that it was

19       high pressure and that, you know, there was a lot

20       going on.

21            So when I called her, what I said was,

22       basically, "Man, I need to get down there."  Okay?

23       Like, we had had many conversations where she had

24       suggested that.

25            So it's like -- I have a friend who is a

1      physician.  Well, he's my physician, actually.  And

2      we've talked -- almost every time I go in there we

3      talk about fly fishing, and he knows that I fly-fish.

4      And we've talked about it.  And he said he'd like to

5      try it sometime.  So almost every time I go in there

6      we say the following, "We've got to get together and

7      go fly fishing."  And it never happens.  It's a

8      similar situation.

9              We talked about, you know, coming down and

10     decompressing in Charleston or at the Isle of Palms

11     or whatever many times and would always -- I would

12     say, "Yeah, got to do that.  Got to get down there

13     and do that."  That's what this was.

14  Q.  Okay.

15  A.  As far as the "What are you wearing?" my recollection

16     of the conversation is that Rebecca said, "Well, you

17     can't come now because I've got a bunch of -- I'm

18     having a girl party."  I'm paraphrasing.  "I've got a

19     bunch of girlfriends down here and we're having a

20     pool party."  And so I've got this image in my mind

21     of a number of these women that Rebecca knows and

22     that I knew, you know, down there having a pool

23     party.

24              And so I'm, you know, "Are y'all lolling

25     around in bathing suits?  Are you in evening gowns or

1        what?  So what are you guys wearing?"  And I might

2        have said, "What are you wearing?" referring plural

3        to "you," not to Rebecca specifically.  That's my

4        recollection of the conversation.

5              And then it was all about the lab and the

6        questions I had, something about -- I believe it was

7        about Gretchan.  I can't remember, but it was about

8        the lab.

9    Q.  All right.  The allegations in paragraph 37 about a

10       roughly November 2014 conference room meeting with

11       you and some other physician where you said to her,

12       you know, "I gave you a chance," does this ring any

13       bells to you?

14   A.  The only time that I was in a conference room with

15       Rebecca and another physician was when we were

16       working with Dr. Scheutzow about the age management

17       thing.  And I don't remember this at all, but I can

18       speculate what might have been said.  I don't know if

19       that's admissible or not, but --

20             But it was during the time when I had been

21       giving Dr. Scheutzow chance after chance after

22       chance, you know, going to get more training and all

23       that.  And I might have said something like -- when

24       he left, might have said, "Well, we gave him a

25       chance."  You know?