IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA

| | | |
|---|---|---|
| REBECCA KOVALICH and SUZANNE NAGELSKI, | ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) ) | **Exhibit 4** |
| PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A., DR. DAVID SPIVEY, individually, and SHERRY SPIVEY, individually. | ) ) ) ) ) | |
| Defendants. | ) | |

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CIVIL ACTION NO. 1:17-cv-00854-TDS-LPA

REBECCA KOVALICH and SUZANNE )
NAGELSKI, )
 )
        Plaintiffs, )
 )
  vs. )
 )
PREFERRED PAIN MANAGEMENT & SPINE )
CARE, P.A., DR. DAVID SPIVEY, )
individually, and SHERRY SPIVEY, )
individually, )
 )
        Defendants. )
_____)


VIDEOTAPED DEPOSITION

OF

**SHERRY SPIVEY**


At Raleigh, North Carolina

Thursday, August 9, 2018


REPORTER:    ELAINE F. HAYES
                Notary Public


**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC 28105
980-339-3575

1  Q.  Any specific examples of that?
2  A.  Absolutely.
3  Q.  Any other ones than what you just described?
4  A.  Well, she and Suzanne would have very lengthy
5      meetings behind closed doors without any knowledge of
6      anyone else knowing that she was going to be there,
7      and Lisa would not share that with anyone, if she did
8      know it, because there was a lot of discord from
9      about five employees over some HR issues with
10     Suzanne.
11 Q.  And did those private meetings behind closed doors,
12     did that bother you?
13 A.  Yes.
14 Q.  Why?
15 A.  Because Suzanne would not come to the office, and I
16     even can remember the day -- don't remember the date,
17     but I said, "Could you please come to the office just
18     at least one day a week?"
19         And her comment was, "It's just not going to
20     happen."
21 Q.  Did she report to you?
22 A.  Suzanne?
23 Q.  Yeah.
24 A.  No.
25 Q.  Did you have the power to direct her work?

1  A.  No.
2  Q.  Why did you ask her to come to the office?
3  A.  Because there were employees who wanted to know why
4      their salaries and their PTO were not correct.  They
5      had questions, and she -- her comment would be to
6      either have them send her an e-mail or catch her when
7      she was there, but she was never available for a
8      face-to-face meeting with an employee that I'm aware
9      of that was one of those who was very insistent on
10     having a face-to-face with her.
11 Q.  But none of that was your concern, though, right,
12     because you didn't supervise her?
13 A.  I didn't supervise her, but a couple of those
14     employees were mine, and they were chewing on me
15     about it.
16 Q.  So was Sue different than Vicki Swicegood in that she
17     wasn't free to disregard what you told her to do?
18 A.  She could do whatever she wanted to do that was in
19     agreement with David.  I didn't have any authority
20     over Suzanne.  All I asked was, "I just need your
21     help with these employees," because one of them was
22     so angry she wanted to file suit, but she did not
23     want to file suit against PPM.
24 Q.  Sure.  But you agree you couldn't tell her what to
25     do?

1  A.  Yes.
2  Q.  When did you first meet Rebecca?
3  A.  Let's see.  Probably 1964, '65, somewhere in that
4      area.
5  Q.  And how did that come about?
6  A.  She was dating my brother.
7  Q.  And when was the first time you met Sue?
8  A.  When she was three days old in 1966.  It would have
9      been December the 11th or 12th.  She was born on the
10     8th, I think.
11 Q.  And so are you related to Sue?
12 A.  Yes.
13 Q.  How so?
14 A.  She is my brother's biological child.
15 Q.  If you go back to Exhibit 5 --
16 A.  Okay.
17 Q.  You should have it in front of you.  -- and go ahead
18     and flip to page -- I think it's going to be 8.
19     Yeah.  Go ahead and flip to page 8.
20 A.  Okay.
21 Q.  And I'm going to direct your attention to an
22     interrogatory where I ask, "Identify any individuals
23     who had direct or indirect input into your decision
24     to terminate Plaintiff Nagelski's employment (that
25     is, individuals who were consulted in advance of each

|    |    |                                                             |
|----|----|-------------------------------------------------------------|
| 1  |    | action, whose opinion or input were considered,             |
| 2  |    | and/or who were otherwise given the opportunity to          |
| 3  |    | weigh in before the action occurred.)"  All right.          |
| 4  |    | Do you see that?                                            |
| 5  | A. | Yes.                                                        |
| 6  | Q. | And you see that you are identified here?                   |
| 7  | A. | Yes.                                                        |
| 8  | Q. | So describe to me your input into Ms. Nagelski's            |
| 9  |    | termination.                                                |
| 10 | A. | I didn't have any input into the termination.  I had        |
| 11 |    | input about why I was dissatisfied with the                 |
| 12 |    | performance of her job duties.                              |
| 13 | Q. | And what was -- what specifically?                          |
| 14 | A. | She wasn't coming to work, and as I had said before,        |
| 15 |    | we had employees who were disgruntled because she had       |
| 16 |    | made some changes in their -- from hourly to salary         |
| 17 |    | or vice versa.                                              |
| 18 |    |     And also sometimes -- there was one particular          |
| 19 |    | incident that the schedule was set for Greensboro on        |
| 20 |    | a Monday morning, April the 15th, and she notified me       |
| 21 |    | at 7:30 on Sunday night that I would have to be in          |
| 22 |    | the office at Winston at noon to sign the tax               |
| 23 |    | returns.  And I was working for another nurse in            |
| 24 |    | Greensboro who was out, and I was not pleased about         |
| 25 |    | the lack of notice that I was given, and it wreaked a       |

1       see that?
2    A. I do.
3    Q. And it looks to me like your only response is, "Thank
4       you."
5    A. Uh-huh.
6    Q. Right?
7    A. Yes.
8    Q. Okay.  Now, at the time, did you agree with Suzanne's
9       assessment to give the short severance packages?
10   A. I don't remember, but normally -- in the past -- we
11      don't just -- if there's a termination, we would
12      carry their insurance, I believe, through the month,
13      depending on the day of the termination or the day
14      they go off the payroll or whatever, and we carry
15      them until then.  As far as a severance, are you
16      talking about financial --
17   Q. I'm just talking about what's in this e-mail.  She
18      recommends short severances for these three people.
19      Did you agree or disagree with that at the time?
20   A. I don't see where I stated one way or the other.
21   Q. I'm asking you now.
22   A. I don't know that I -- I don't know.  I don't
23      remember.
24              MR. HERRMANN:  This will be Exhibit 62.
25              (Plaintiff's Exhibit 62 was marked.)

1   Q.  Now, this looks like an e-mail from Sue Nagelski to
2       Dr. David Spivey and you on July 28th, 2015, correct?
3   A.  Yes.
4   Q.  And do you recognize this e-mail?
5   A.  Yes.
6   Q.  Tell me if I'm mischaracterizing this, but the way I
7       look at it is Sue is strongly pushing that legal
8       representation be present at the time these employees
9       are told that they're losing their job.  Is that
10      right?
11  A.  Yes.
12  Q.  And the last sentence says, "The last thing we need
13      is for three employees to leave together and head
14      straight to the labor board.  One complaint is a
15      nuisance.  Three complaints are a problem regardless
16      of the circumstances," right?
17  A.  Right.
18  Q.  Did you agree that it was important to have legal
19      counsel present?
20  A.  Yes.
21  Q.  Why?
22  A.  Because if there was a reason Sue suggested it, I
23      would have entertained the possibility to make sure
24      that everything was done correctly and no one was
25      treated unfairly and also that there would be legal

1      documentation and, frankly, so I wouldn't make any
2      statements that were inaccurate or incorrect.
3  Q.  And you can see kind of in the middle of this, in
4      fact, Sue was kind of -- well, it says, "I'm not
5      convinced the simultaneous dismissal of three
6      employees is in PPM's best interest," right?
7  A.  Right.
8  Q.  So she was concerned about terminating these three
9      employees, right?
10 A.  Right.
11 Q.  And she references that they -- you don't want them
12     to go directly to the labor board, correct?
13 A.  Right.
14 Q.  All right.  And another thing that she wanted here
15     was kind of more time to work through the issues with
16     legal counsel, right?
17 A.  I don't know.
18 Q.  It says, "I would like to pursue this further with
19     Jim tomorrow so we can look for ways to terminate the
20     three employees in a manner of minimal impact to PPM.
21     If you're okay with delaying, I will get with Jim and
22     Sherry to quickly schedule the multiple terminations
23     to a time when we can have all the needed resources
24     present."  Do you see that?
25 A.  I do.

1  Q.  And why were you firing these three employees?
2  A.  We were reorganizing.  And remember, earlier I said
3      that we were going to replace the nursing position
4      with a CMA for economic reasons and because -- did I
5      ██████████████████████████████████████████████████
6      ██████████████████████████████████████████████████
7           And I'd have to look back to see what the
8      situation was on the third one, but we had determined
9      that with a total reorganization and changing the way
10     the dynamics were in the Greensboro office that it
11     would be better to have an entire new crew who could
12     start together, learn it together, and work together
13     with a lot more productivity.
14 Q.  Is your testimony that the reorganization was going
15     to be getting rid of these three employees and having
16     fresh new employees start there?
17 A.  We had hired employee replacements to start on Monday
18     morning, and that's why we needed to do this on
19     Friday.  And also other employees would have left the
20     office, because we close at noon on Friday, so there
21     would have been complete privacy to talk with these
22     three employees.
23 Q.  Who were the replacements that were coming in?
24 A.  I don't remember.  I'd have to -- have to look at
25     that --

1       Thursday noon.  We will handle this."  Right?
2   A.  That's what it says.
3   Q.  All right.  So what was the purpose of this
4       reorganization if you're hiring more employees to put
5       right where they were?
6   A.  Money.  We were hir- -- like I said, different
7       classification of experience and skills and
8       certifications, and related to the work that they
9       were doing, we didn't need what we had and it was
10      another way to save money.
11  Q.  Just a second ago, you said that the reorganization
12      had been ongoing.  When did it start?
13  A.  Oh, gosh.  I think probably for about maybe a year
14      and a half.  I mean, there was always something
15      evolving.
16  Q.  Do you think that would have been sometime in 2014?
17  A.  I'm sure it probably would have.
18  Q.  And that makes sense.  And it was ongoing?
19  A.  Yes.
20  Q.  When did it stop?
21  A.  It hasn't stopped.  It still goes on.
22  Q.  So at sometime from 2014 to the present, you had a
23      practice --
24  A.  Uh-huh.
25  Q.  -- that was a reorganization and it's still going

1        today?
2   A.   It always will, I think, because of the kind of
3        practice it is.
4   Q.   Can you be more specific than 2014?  Because I need
5        to know how to do my math for this case.
6   A.   Okay.  More specific about what?
7   Q.   When this reorganization started.
8   A.   You know, see, that's part of the problem, and I'm
9        not trying to skirt your question.  It's just that if
10       it didn't have to do directly with clinic, I wouldn't
11       be privy to the figures, the salaries, the
12       projections, any of that, unless it had to do with my
13       staff.
14  Q.   But you do acknowledge the existence of a
15       reorganization?
16  A.   I'm sorry?
17  Q.   You acknowledge that there was a reorganization?
18  A.   Oh, absolutely, yes.
19  Q.   And Dr. Spivey would know more about that?
20  A.   Absolutely, uh-huh.
21  Q.   And your best is it was in 2014 to the present?
22  A.   I would say so, yeah.
23  Q.   Okay.  Thank you.
24            MR. HERRMANN:  This will be Exhibit 64.
25            (Plaintiff's Exhibit 64 was marked.)