IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA

| | |
|---|---|
| REBECCA KOVALICH and SUZANNE NAGELSKI, | )<br>)<br>) |
| Plaintiffs, | ) |
| v. | )<br>) |
| PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A., DR. DAVID SPIVEY, individually, and SHERRY SPIVEY, individually. | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**Exhibit 8**

```
                IN THE UNITED STATES DISTRICT COURT

             FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

              CIVIL ACTION NO. 1:17-cv-00854-TDS-LPA


REBECCA KOVALICH and SUZANNE       )
NAGELSKI,                          )
                                   )
            Plaintiffs,            )
                                   )
   vs.                             )
                                   )
PREFERRED PAIN MANAGEMENT & SPINE  )
CARE, P.A., DR. DAVID SPIVEY,      )
individually, and SHERRY SPIVEY,   )
individually,                      )
                                   )
            Defendants.            )
_____)
```

D E P O S I T I O N

OF

**VICKI SWICEGOOD**

At Winston-Salem, North Carolina

Friday, August 24, 2018

REPORTER:   ELAINE F. HAYES
            Notary Public

**REED & ASSOCIATES**
2401 Whirlaway Court
Matthews, NC  28105
980-339-3575

1  Q. So in Dr. Spivey's deposition, he said that in 2014
2     he fired you.  And I asked, "Why did PPM fire Vicki
3     Swicegood?"
4            And he said, "I fired her."
5            And I said, "Why did you fire Vicki
6     Swicegood?"
7            And he said, "For direct insubordination."
8            Do you know anything about that?
9  A. No.
10 Q. And I asked him to tell me more about that, and he
11    said, quote, "I had forbade her to go to Physician
12    Discoveries with Ms. Kovalich and Ms. Nagelski, and
13    she went anyway."  Did that happen?
14 A. If he did tell me not to go, I do not ever recall
15    that.  There were a couple of meetings.  But I recall
16    none of that.
17 Q. Did you go to Physician Discoveries with Ms. Kovalich
18    and Ms. Nagelski?
19 A. They were in the meetings, yeah.
20 Q. Tell me about the meetings.
21 A. Well, there would be a big table, like this, with
22    several people from Physicians Discoveries.  There
23    would be Annette.  There would be several from their
24    company.  It would just be a round table discussion
25    as to what needed to be done, how we could improve

1 the work flow.
2 Q. How many of those meetings do you think you attended?
3 A. I remember two.
4 Q. Was there one very close in time to your termination?
5 A. Not that I recall, because both of them took place
6 while we were in the old building.
7 Q. I asked Dr. Spivey why he forbade you to go to
8 Physician Discoveries, and he said, quote, "Because I
9 needed her to stay in the office to run the front
10 desk and didn't feel she had any need, any business,
11 going to Physician Discoveries."
12 Did he ever tell you that you had no business
13 going to Physician Discoveries?
14 A. If he did, I'm sorry, I do not recall.
15 Q. Do you have any vague memory of that whatsoever?
16 A. No. And there were meetings that they had that I did
17 not attend, but when it came down to work flow or
18 problems with the front desk, then I would attend.
19 Q. Did you ever just go to these meetings because you
20 were Rebecca's buddy?
21 A. No.
22 Q. Why did you attend the two meetings that you went to?
23 A. Again, if I found that there was a problem with
24 gathering insurance information or anything to have
25 to do with the work flow on the front desk that

1  A.  Oh, gosh, yes.
2  Q.  Why do you say that?
3  A.  I mean, she kept the lab going.  And if there was a
4      problem, that was one of those areas you didn't have
5      to worry about because it was going to be taken care
6      of.
7  Q.  And when it comes to running the lab, is that
8      somewhere where Rebecca excels?
9  A.  Oh, I would think so.
10 Q.  And you would have considered her an asset to PPM?
11 A.  Fantastic.
12 Q.  The same question, but for Suzanne Nagelski.  Do you
13     remember how you first met her?
14 A.  I met Suzanne as a little girl.
15 Q.  So you've known her for a long time?
16 A.  It seems like somewhere -- I couldn't tell you when I
17     met her, but she was a little girl.
18 Q.  Did you ever have any issues with her while you
19     worked at PPM?
20 A.  I doubt it.
21 Q.  Were you aware of other employees that had issues
22     with Suzanne while you were at PPM?
23 A.  The only issue that ever came up with Suzanne was
24     Annette and Suzanne may have had some kind of
25     disagreement over the billing.  And I'm not -- I

1     didn't ask enough questions because that was between
2     Annette and Suzanne.  But Annette did say something
3     about, "I'm not sure what it is that's going on or
4     what I'm supposed to do, or what I'm -- I'm just not
5     sure."
6           And that was -- if there was a problem there,
7     that was the most I ever heard.
8  Q. Okay.  Did Suzanne regularly work remotely?
9  A. Yeah.
10 Q. Did other employees work remotely, too?
11 A. No, not remotely.  I took work home, but --
12 Q. Well, not just you, but other employees who worked
13    there?
14 A. Not that I am aware.
15 Q. Well, even though she worked remotely, did you --
16    well, strike that.  You described her as your
17    supervisor, right?
18 A. I would go to her, directly to her.
19 Q. Were there ever any problems created by her not
20    physically being there?
21 A. No, because I had immediate access.
22 Q. It was very easy to get ahold of her?
23 A. I always got ahold of her.  I never -- there was
24    never a time that the call was not answered.  I
25    usually got a response to a question within a very

1     timely manner. I was never frustrated over trying to
2     get in touch with her or trying to get a response
3     from her.
4 Q. And while you were there, in your opinion, was she
5     doing a good job?
6 A. From what I could see, yes.
7     MR. HERRMANN: Let's go ahead and take a
8         break. We've been on the record about an
9         hour and 20 minutes. I won't have a whole
10        lot of questions when I come back.
11    MS. GOFORTH: Okay.
12    (Recess from 11:20 a.m. to 11:37 a.m.)
13 By Mr. Herrmann:
14 Q. If Dr. Spivey had directed you not to go to Physician
15    Discoveries, would you have complied with --
16 A. I would have --
17 Q. Let me finish. I'm sorry. Just to get it on the
18    record.
19 A. Oh, I would have been fine.
20 Q. You would not have gone?
21 A. I would not have gone.
22 Q. Okay. In this book here, can you flip to tab 35? Go
23    ahead and take as long as you need to kind of flip
24    through it. Let me know when you're done and if you
25    recognize what this is.

1  A.  (Witness reviews document.)
2  Q.  And let me just ask this. Does this appear to be
3      text messages between you and Rebecca Kovalich?
4  A.  I don't -- I don't recall.
5  Q.  Is that you at the top?
6  A.  That is me.
7  Q.  Can you go ahead and flip -- in the bottom, you'll
8      see the little numbers where there's a KN. Go to
9      KN 00282, so just a few pages in. And the font is
10     going to get real small.
11 A.  282?
12 Q.  Yeah, 282. And it looks like this. There we go.
13     All right. Go ahead and review that page.
14 A.  (Witness reviews document.) I do remember the door
15     slamming and the yelling.
16 Q.  This looks like the text is from January of 2014. Is
17     that right?
18 A.  Uh-huh.
19 Q.  Yes?
20 A.  Yes.
21 Q.  What do you recall happening? In other words, what
22     does this text --
23 A.  I could not tell you what had preceded. But I do
24     remember this was in the old building. And I do
25     recall -- I mean, the doors -- as Sherry went down

1       through the hallway, it seems like it was the triage
2       room that she went into, slammed the door, yelled out
3       the four-letter words and -- you know, it was quite
4       an exciting moment for staff and members.  And, you
5       know, everybody was trying to figure out what was
6       going on.  And that's all I can recall.
7   Q.  And is the word in this text -- I'll just say for the
8       record -- fuck?  Is that what you recall her yelling?
9   A.  Uh-huh, yeah.
10  Q.  Do you recall her yelling any other obscenities at
11      the time?
12  A.  At that time, no.  I just remember that.
13  Q.  Do you recall any other -- you know, you described
14      what happened on the phone.  There's this incident
15      here.  Anything else, any other incidents like this
16      with Mrs. Spivey or shouting obscenities at work,
17      anything like that, that you recall?
18  A.  Well, I had forgotten about this until you -- until I
19      saw it.  But I do recall this.
20  Q.  Who was present when this happened?
21  A.  Well, who was present?
22  Q.  Yes.
23  A.  I have no idea.  I'm on the other side.  There's a
24      waiting room, and the clinic was on the other side.
25      And I'm on the other side of the waiting room.  And I

1     felt the doors jar. I could tell something was going
2     on. And the doors had not really shut by the time
3     she had used the word. So I could hear the word. I
4     could feel the doors rattling, the building shaking a
5     little bit.
6           Who was present? I have no earthly idea. But
7     it went all over the office just in a heartbeat.
8     Everybody was like, "What just took place?" And they
9     were getting nervous. And I couldn't tell you.
10 Q. Was it loud enough that -- well, tell me if I'm
11    wrong. Could you have heard what happened throughout
12    the office? Was it that loud?
13          MS. GOFORTH: Objection.
14 A. I know that I could hear it, but I'm not sure the
15    people behind me would have heard it. I'm not sure
16    of that. The people in the front desk would have
17    heard it. If there were any patients -- and I can't
18    remember if there were patients or not. They would
19    have definitely have heard it. And I'm sure that the
20    clinical staff, depending on their location, would
21    have heard it.
22 Q. Did you view that incident as appropriate workplace
23    behavior?
24 A. Of course not. no.
25 Q. And why not?

 1  A.  Well, some words you just -- losing your cool like
 2      that is just not one of those things that's done in a
 3      medical office.
 4  Q.  And did you report it to anybody?
 5  A.  I didn't say a word because I didn't have to.  It was
 6      all over the building.
 7          MR. HERRMANN:  All right.  No more questions
 8               for me.  Thanks.
 9
10              <u>EXAMINATION BY MS. GOFORTH</u>
11  Q.  Just a few questions.  Is it okay if I call you
12      Vicki?
13  A.  Please do.
14  Q.  I know we've met before, but again, my name is
15      Caitlin Goforth.  I'm one of the attorneys that's
16      representing the defendants in this case, Dr. and
17      Mrs. Spivey.
18          So just to follow up with a couple of things
19      that you had testified to earlier.  You said that
20      when you arrived at PPM there were no HR files to
21      speak of?
22  A.  To speak of.
23  Q.  So that was accurate what you said earlier?
24  A.  Uh-huh.
25  Q.  HR files nonexistent?