IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:17-cv-00854-TDS-LPA

| | |
|---|---|
| REBECCA KOVALICH and SUZANNE NAGELSKI, | )<br>)<br>) |
| Plaintiffs, | ) |
| v. | )<br>) |
| PREFERRED PAIN MANAGEMENT & SPINE CARE, P.A., DR. DAVID SPIVEY, individually, and SHERRY SPIVEY, individually. | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**Exhibit 10**

# DECLARATION OF SCARLET LINK

**North Carolina**

**County of Davidson**

**I, Scarlet Link, declare that:**

1. I am an adult resident of Davidson County, North Carolina and a former employee of Preferred Pain Management & Spine Care, P.A. ("PPM").

2. PPM hired me in or around September 2009 in the Winston-Salem office. I did insurance pre-certification. For years, I only worked part-time for PPM; typically three days a week.

3. However, in or around October 2015 I started working full-time, which ended up being around four days a week. This meant that I finally got insurance, which I needed.

4. I initially reported to Sherry Spivey. We would go through patients who were coming in for upcoming appointments and make sure they were eligible and if their insurance required an authorization. I also did a lot of work on spinal cord stimulators. Dr. Spivey would email me patients names and the type of procedure that he wanted to be authorized. I would pull information according to the patient's insurance carrier medical policy and correspond with Dr. Spivey's dictation for EHR. I would scheduled the required psychological evaluations. I'd then correspond with the patient. Once the patient passed his or her evaluation, I'd follow-up with the patient and schedule trials and follow-ups. Then, if the patient felt like it was helpful, Dr. Spivey would move to put in a permanent stimulator which would be implanted into the spine. Then, it would be like starting a new case all over again. Only Sherry Spivey and I did this work, and I did it for around six years. I was also the only doing this type of work with verteboplasty and kyphoplasty.

5. In the fall of 2015, Brandi Frey, who had become my supervisor by that time, moved ███ and I upstairs and out of the billing department. The billing department was behind closed-doors and employees had to use an access code to get in. ███ and I kept doing the same type of work, but we were separated from the other billing employees.

6. In or around February 2016, PPM began taking away my duties. After PPM let ███ go, PPM gave tasks that ███ and I were doing to ███ who was around 28 years old at the time. Specifically, ███ and I were doing tens unit authorizations, back braces, knee braces, and injections, among other things.

7. I began speaking with Ms. Frey, Mary Benton, Wendy Yontz, and Sherry Spivey about finding more tasks to do. I wanted more work to do and I sought it out. I was mostly ignored.

8. In the summer of 2016, Mary Benton told me that I could start helping with getting paper charts scanned into EHR. I went to train with her for approximately two days. On the first day, I sat down with Ms. Benton, and there were no notes to go by, so the session was not all that helpful. She wanted me to start dropping charts in on the first day. The next time I went, Ms. Benton was agitated with me and was in and out of the session. She quickly quit using me for this work.

9. Ms. Benton then came to me and said that Dr. Spivey wanted to start picking up on the spinal cord stimulators, and he wasn't sure if I could handle the workload of the stimulators and the EHR. I did some work on the spinal cord stimulators and I continued to help with filing with other PPM employees.

10. Specifically, I continued to help file medical records, and I continued doing EMGs for both offices. I was verifying insurance in both the Greensboro and Winston-Salem offices and for referrals.

11. During my tenure at PPM, I did anything that I was asked to do, and I did a wide-range of tasks, including MRI and CT work. At the time I was let go, I was listed in the billing department. But PPM shuffled people around so often it was hard to keep track.

12. ███████ who was around my age, was let go because PPM allegedly no longer needed her, but PPM then pulled an employee from the front desk (late 20s, early 30s) who eventually did what ███████ had been doing. ███████ was in the billing department. At one time, she was doing MRIs and CT scans, among other things, but they started taking her work away. Her role changed repeatedly before she was let go. PPM continuously shuffled people like this.

13. Here are some other examples. ███████ was up front over the employees in scheduling. Then, PPM moved ███████ to the billing department. ███████ up-front duties were given to ███████ Then, those duties were taken from ███████ and given to ███████ Then, that role was taken from ███████ and given to ███████

14. Another example is ███████ and ███████ ███████ was much younger than ███████, and after PPM let ███████ go, it eventually had ███████ largely doing ███████ former tasks.

15. PPM could always find a role for someone if it wanted them there, and it took roles away from employees to get rid of them. This was a pattern that I observed time and time again.

16. On or around October 27, 2016, Wendy Yontz and Mary Benton came to the office and fired me. I asked why. I asked them what I was supposed to do—I needed the income. I let them know that I had done everything Dr. Spivey had ever asked me to do. Mary Benton said, you know there's not

KN 1894

enough work for you and it is not a full-time job. But I had done part-time work, and they never even offered it me as an option.

17. There was plenty for me to do at PPM if they wanted me to be there. There was a tremendous amount of work in billing and I could have worked in billing doing that type of work. I also could have been put back to part-time.

18. I was almost 60 years old when PPM fired me. I believe that PPM terminated me and many other employees over the last several years on the basis of our ages and, meanwhile, brought in younger employees to do what we had been doing.

19. Suzanne Nagelski was a terrific employee, especially considering all that she had to endure from Dr. Spivey. I never had any issues getting in touch with Ms. Nagelski. If I left a message, she'd call me back promptly. She was honest and frank with me.

20. Rebecca Kovalich was instrumental in helping to get the laboratory started and keeping it going. I worked with Rebecca at her previous lab, and in another prior role, and I know first-hand how knowledgeable she is and how hard she works. She made sure that her labs worked, and it has rewarded her very well.

21. The statements made in this declaration are true and correct.

22. I make this statement based solely upon my own personal knowledge.

23. I make this statement by my own free will and volition without promise of any benefit for doing so and without threat of any penalty or consequence for not doing so.

24. I declare under penalty of perjury under the laws of the United States of America and the State of North Carolina that the foregoing is true and correct.

25. This declaration is made pursuant to 28 U.S.C. § 1746.

This the 31st day of August, 2018.

_Scarlet Link_ (signature)
Scarlet Link

KN 1896