## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PAMELA H. SMITH and PAM'S CLEANING COMPANY, LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:18CV81 |
| PREMIER PROPERTY MANAGEMENT, d/b/a the Edge Flats and d/b/a Deacon Station Townhomes, | ) ) ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Premier Property Management's Motion for Partial Summary Judgment on claims of age discrimination and unfair and deceptive trade practices. (Mot. for Partial Summ. J. [Doc. #23].) Premier Property Management ("Premier") argues that there is no evidence that Plaintiff Pamela H. Smith was terminated because of her age, while the undisputed evidence shows that she was terminated because she did not meet Premier's legitimate performance expectations, and the unfair and deceptive trade practices claim is merely a breach of contract claim. (Id. ¶¶ 1, 2.) For the reasons explained below, the Court agrees and grants the motion.

I.

In February 2016, Smith and her business Pam's Cleaning Company, LLC ("Pam's Cleaning") were providing cleaning services at two apartment complexes

in Winston-Salem, North Carolina, both owned by Premier – Edge Flats and Deacon's Station. (Decl. of Pamela Smith ¶¶ 3, 4 (Dec. 20, 2018); Decl. of Jen Allen ¶ 3 (Nov. 28, 2018).) While cleaning the front office of Edge Flats sometime after February 14, Smith began talking with Jennifer Allen, Vice President of Student Living for Premier. (Decl. of Smith ¶ 7; Decl. of Allen ¶ 1; Dep. of Jennifer Bass Allen 13:19-21, 28:12-16 (Oct. 17, 2018).) Although Allen was based in Florida, she was manning the front office after the property's manager and assistant manager quit abruptly. (Dep. of Allen 10:1-3, 13:19-21, 28:12-16.)

Allen and Smith began talking about Edge Flats' need for a property manager and whether Smith would be interested in the position. (Decl. of Smith ¶ 7; Dep. of Allen 37:4-11.) They discussed the job responsibilities, including working with vendors and maintenance for property upkeep and other services. (Decl. of Smith ¶ 7.) Allen "assured [Smith] she could handle the job with [her] background and that she would support and train" her. (Id.)

Ultimately, Smith (then age fifty-five), Anthony White (then age fifty-four), and LaRobb Billingsley (then age thirty-two) applied to be Edge Flats' property manager. (Dep. of Allen 11:3-15; Decl. of Allen ¶ 5; Decl. of Tracy G. Jones Walker ¶ 12 (Nov. 28, 2018); Dep. of Pamela Smith 23:3-6 (Sept. 20, 2018).) Although Smith had never worked as a property manager, Allen thought Smith was "perfect for it". (Dep. of Allen 37:16-20, 47:10-11; Decl. of Smith ¶ 7.) She had successfully run her own company, Pam's Cleaning, for twenty-five years, and managed employees while doing so. (Dep. of Allen 38:10-11, 16-19; see also

2

Decl. of Smith ¶ 7 (averring that Allen "appeared to be impressed by my experience in running a business for over 25 years" and "by the work my cleaning company performed at the Edge Flats".) She had worked with Edge Flats' developers, with whom she was close. (Dep. of Allen 46:15-17.) This relationship, along with Smith's knowledge of "the building inside and out", was "intangible and part of the reason she was the best candidate." (Id. 46:18-20.) Allen also hoped that Smith would use her business experience and knowledge of Edge Flats to improve the property's occupancy rates, among other things. (Decl. of Allen ¶ 10.)

On March 11, 2016, Allen offered Smith the job as Edge Flats' property manager. (Dep. of Smith 21:3-7, 20-21.) Smith accepted the position and began work on March 14, 2016. (Decl. of Allen ¶ 10; Decl. of Smith ¶ 8.) Smith had previously signed a lease with the property's prior owners, so when she decided to continue to live at Edge Flats as its property manager, she received a twenty-five percent rent reduction, a typical reduction for employees. (Decl. of Walker ¶¶ 18, 19; Dep. of Smith 141:12-17; Dep. of Allen 69:17-18.)

Although it is disputed precisely when Allen gave Smith a written job description, Smith did receive one and discussed it with Allen. (Dep. of Smith 28:2-29:17, 29:23-30:9.) Smith understood the property manager's responsibilities to include the property's condition, staff, vendors, and residents. (Id. 30:13-31:6.) Smith's financial responsibilities included preparing leasing reports, vendor reports, and money flow reports for Allen. (Id. 31:7-12, 33:16-20.) Leasing reports were updated weekly, generated monthly, and detailed who was

3

moving in and out. (Id. 31:16-25, 32:1-3, 33:2-8.) Money flow reports recorded cash flow, rent paid, delinquencies, and petty cash. (Id. 32:4-10.)

To train Smith, the property manager from another of Premier's properties came to Edge Flats for two to three weeks, Tuesday through Thursday, "to help her with day-to-day procedures". (Dep. of Allen 39:20-40:12; cf. Decl. of Smith ¶ 13 (averring that she received no formal training, but another property manager met with her two to three days per week for an hour each day to learn how to input data and how to read data).) Premier's trainer also came to Edge Flats for a week and trained Smith and others on software and "any of the issues that they may not have caught on from what [the other property manager] had provided." (Dep. of Allen 43:5-9.) Premier then hired Malcolm Lindor as a marketing director who trained Smith on ways to market the property and lived there for free during this time, as he was expected to move to other properties and maintained a permanent residence elsewhere. (Id. 43:9-44:2; Decl. of Walker ¶¶ 22-24.) There were also weekly manager calls discussing policies and procedures during which managers could ask questions. (Dep. of Allen 44:4-6.)

In addition to hiring Smith as Edge Flats' property manager, Allen hired Billingsley, who had applied to be property manager, as Edge Flats' leasing manager. (Id. 31:10-18, 32:3-4.) Billingsley, whose salary was half of Smith's, was permitted to live on site for free, based on his compensation and need. (Decl. of Walker ¶ 21; Dep. of Allen 69:13-18.) He was "required to facilitate leases with prospects that [came] in to sign them, make sure the documents [were]

4

correct and entered, and process those" for Smith's approval. (Dep. of Allen 32:5-11.) A manager from Deacon's Station trained Billingsley on the online leasing program, training that Smith did not receive because she was not handling leasing. (Id. 33:9-19; Dep. of Smith 144:19-145:11.)

"Occupancy rates are critical to the financial success and operating conditions of apartment-management companies like Premier." (Decl. of Walker ¶ 4; see also Dep. of Smith 33:21-23 (testifying that "occupancy rate is a very important thing in any property".) When Premier acquired Edge Flats in October 2015, the property was "in a distressed financial condition" because its occupancy rates were at fifty percent or less. (Decl. of Walker ¶¶ 3, 5.) There is a dispute about who bore primary responsibility for increasing the number of leases – Smith, Billingsley, or Lindor. (Decl. of Smith ¶ 15 (averring that Billingsley and Lindor were primarily responsible); Dep. of Allen 32:12-33:4 (testifying that "everyone's job is to lease".) Smith knew that the occupancy rate was forty-three percent when she began as property manager, but she was unaware until several months later in August that Allen expected the rate to increase to ninety percent. (Dep. of Smith 53:4-7, 93:6-17.) Nevertheless, Smith understood that as the property manager, she oversaw leasing and was required to be at all of the events held for residents to ensure their continued enjoyment of the property. (Id. 33:24:-34:11, 67:22-68:5; Decl. of Smith ¶ 15.) Meanwhile, Lindor and the leasing staff went to restaurants or events to pass out Edge Flats flyers, cozies, and magnets to generate new leases. (Dep. of Smith 34:15-35:2.)

5

In June 2016, admittedly worried about obtaining his bonus, Lindor emailed

Allen with a list of concerns about Edge Flats – Billingsley's and Smith's failure to

input a lease, Billingsley's and Smith's failure to resolve internet problems, and

Smith's failure to address resident smoking and unauthorized use of the gym.

(Email from Lindor to Allen (June 20, 2016); Dep. of Smith 76:13-15.)  Allen was

on vacation at the time and asked Tracy Jones, the Human Resources manager, to

counsel Billingsley and Smith on Allen's behalf. (Email from Allen to Lindor (June

20, 2016); Email from Allen to Jones (June 20, 2016).)  That same day, Jones

called Smith to speak with her about these issues and told Smith she was there to

help her. (Decl. of Walker ¶ 29; Dep. of Smith 40:19-25.)  Until this incident,

Smith avers that she "had performed [her] job well and had not received any

complaints from Ms. Allen regarding [her] job performance." (Decl. of Smith ¶ 10.)

Although Smith was surprised by Lindor's complaints, she admitted the internet

problems and her responsibility to contact vendors, difficulty managing Billingsley

who was insubordinate at times, and non-residents' use of the gym despite

community rules prohibiting them from doing so. (Decl. of Walker ¶¶ 29, 30; Dep.

of Smith 43:3-22, 44:14-45:12, 46:5-11, 47:3-48:1.)  She also acknowledged

that Lindor had seen smokers in the stairwell and that she had left a note on the

door after not being able to contact the resident. (Dep. of Smith 48:10-19.)

After Jones' and Smith's telephone conversation, Jones reduced its

substance to writing on an Employee Counseling Report. (June Emp. Counseling

Report, Ex. 4 to Dep. of Smith; Decl. of Smith ¶ 10 (averring that "[i]n June 2016,

6

I was given a 'write up'".) Jones wrote that Smith "asked questions, she listened, she took notes, and she immediately told me that she would follow up on all the issues we discussed." (June Emp. Counseling Report.) They "discussed her ability to improve in the realm of employee and property management" and that both of them wanted her to address employee issues, "ask more questions, improve her leadership skills, follow up on every request, . . . communicate, . . . [and] use the resources around her." (Id.) She was encouraged "to lean on her sister property . . . whenever necessary." (Id.) Jones described Smith as "teachable" and told her that she wanted her to succeed. (Id.) The "Improvement Timetable" was "Immediate", and the "Consequences for Failure to Improve" were "Discipline Up To/Including Termination". (Id.)

During her deposition, Smith agreed with Jones's assessment of their conversation, but disagreed with some of the issues that Lindor raised. (Dep. of Smith 50:11-51:8, 53:16-18.) She believed that Lindor complained to Allen because "he was working really hard to get his bonus." (Id. 51:7-53:3; 76:10-15 (testifying that, to her knowledge, Lindor had no other motivation for making these complaints than earning his bonus).) Smith also did not realize the import of Jones's call, but instead thought it was a conversation to check on the property, which she understood Jones would do in Allen's absence. (Id. 54:16-22.) When Allen returned and gave the Employee Counseling Report to Smith, Smith understood that Allen was in the process of terminating Billingsley and the report was needed to facilitate his termination. (Id. 37:17-38:2; 55:8-16; Decl. of Smith

7

¶ 10 ("I was given the write up allegedly to support Malcolm Lindor's desire to terminate LaRobb Billingsley.").) Indeed, Allen did terminate Billingsley following these events for insubordination toward Smith. (Dep. of Allen 34:17-22; Decl. of Allen ¶ 17.) He was thirty-three years old at the time. (Decl. of Allen ¶ 18.)

After Smith's conversation with Jones and receipt of the Employee Counseling Report, Allen noticed that "Smith tried to improve her performance, including with her management and leadership duties." (Id. ¶ 19.) However, in mid-August, Allen observed that "Smith's deficient management and leadership skills" began causing other problems at Edge Flats. (Id. ¶ 20.) On August 12, 2016, Premier's managing partner, Patrick Wable, emailed Smith, Lindor, and Allen asking for an explanation for inconsistent and conflicting information in leasing reports about occupancy rates and apparent lease cancellations. (Email from Wable to Smith, Lindor, Allen (Aug. 12, 2016); Dep. of Allen 70:24-71:2.) The discrepancies arose when Lindor removed several canceled leases that had remained in the system since February, before Smith's hire, which caused the occupancy rate to change, without notice or explanation to Wable or Allen. (Dep. of Smith 103:11-104:20.) According to Smith, Wable was "very upset" and Allen was concerned about the accuracy. (Id. 104:6-8.) Although Smith believed the issue to be Lindor's and his leasing staff, she was aware of the canceled leases in the program and was admittedly responsible for the accuracy of the reports. (Id. 104:21-106:1.) During her deposition, Smith testified that she wrote "All Started Here" at the top of a copy of Wable's email because "that's when I felt like that

8

the real issues started with – in respect to me. And I'm not feeling like I was doing my job accurately" because if she had been, Wable would have had no reason to contact her. (Id. 106:9-21.)

Around this same time, Allen informed Smith that Edge Flats had entered into an agreement with a local university to provide student housing in one of the property's buildings, both in an effort to increase the property's occupancy rate and to address the university's need for student boarding. (Decl. of Smith ¶ 12; Decl. of Walker ¶ 16; Dep. of Smith 35:10-14, 86:23-87:20.) Smith believed the "dynamics" of the property "completely changed" from "a professional, mature, family-oriented environment to a younger, transient, party-oriented atmosphere", as evidenced by resident complaints. (Decl. of Smith ¶ 12.)

On August 23, 2016, Allen inspected Edge Flats and "noticed a number of upkeep tasks had been neglected at the property, including the failure of staff to clean up spills and pet urine in the hallways at the property, a lack of proper signage to alert residents to rules about the use of gym equipment, and an internet outage at the Edge Flat's office." (Decl. of Allen ¶ 23.) The following day, she emailed Smith and her staff. (Email from Allen to Smith (Aug. 24, 2016).) She entitled her communication, "Things to Do – Edge Team – Post JBA Property Inspection on 8/23/16", listed action items, instructed that the property needed to be walked three times a day, and inquired about property maintenance and inspections. (Id.) She closed by noting that, despite the additional student residents, the occupancy rate was less than seventy percent and described leasing

9

as "still critical". Allen required that the occupancy rise above ninety percent in the following ninety days and recognized "[t]hat's a lot of leases and it takes every member of the team to make this happen." (Id.) After receiving Allen's email, Smith made her own notes in response to many of Allen's observations intending them to serve as the update that Allen requested. (See Ex. 7 to Dep. of Smith; Dep. of Smith 88:7-14, 91:8-10.)

The earlier problems with inaccurate reports to management continued, in part because problems with internet service persisted. On September 9, 2016, Premier management requested updated occupancy numbers. (Dep. of Smith 96:17-18; Decl. of Allen ¶ 26.) The internet was down, so contemporaneous numbers were unavailable. (Dep. of Smith 96:19; Decl. of Allen ¶ 26.) However, Lindor had the previous day's figures on his laptop and provided those. (Dep. of Smith 96:19-22; Decl. of Allen ¶ 26.) "Hours after asked by Premier's management, [Smith] provided leasing statistics based on old numbers, which resulted in an inaccurate leasing report." (Decl. of Allen ¶ 27; see also Dep. of Smith 96:17-97:3, 99:5-21, 101:18-102:6.) Because Allen considered this unacceptable, she issued Smith a written Progressive Discipline Program Form. (Decl. of Allen ¶¶ 28-29; Progressive Discipline Program Form, Ex. 3 to Dep. of Smith.) In the written warning, Allen described the nature of the offense as "Subpar performance with inaccurate reporting & leasing" and noted that "[t]he Property Manager job description lists the expectations of the ownership under 'basic functions' and those are currently not being met." (Progressive Discipline

10

Program Form.) Not only was Smith expected to meet the "basic functions of [the] Property Manager position", but Allen warned that "an improvement on Time Management must be significant and immediately noticeable by Regional Supervisor and ownership." (Id.) This served as a "Final" written warning. (Id.) In addition, Allen planned to have Smith observe Lindor run the office for two weeks, although no evidence suggests this took place. (Dep. of Smith 100:3-11.)

Wable discussed Smith's progress with Allen and the property's overall performance and recommended that they "make a change". (Dep. of Allen 71:14-22, 72:2-6.) However, Allen maintains she was solely responsible for the decision to terminate Smith, a decision she made because they "weren't making enough forward progress and the basic job functions were not being met." (Id. 73:4-13.) On September 20, 2016, to Smith's surprise, just over six months after Allen hired her, Allen terminated her and noted the following on the Employee Counseling Report: "Counseling Type: Termination", "Incident Category: Substandard Work", and "Incident Facts: After training, counseling efforts, the property's overall performance is not meeting ownership expectations with respect to occupancy, leasing and operations." (Sept. Emp. Counseling Report, Ex. 8 Dep. of Smith; Dep. of Smith 95:16-17.) Ownership's "[d]esired [o]utcome" was "a change in management", and Smith's "Immediate Termination" was effected. (Sept. Emp. Counseling Report.) When asked at her deposition if she had any reason to doubt that the property's occupancy rate was not meeting ownership expectations, Smith said "[n]ot other than what she – her comments." (Dep. of Smith 92: 20-

11

23.) At the time, Edge Flats' occupancy rate was approximately sixty-seven percent. (Att. 2 to Decl. of Walker, Property Status Sept. 1-30, 2016.)

Four days later, Smith sent Wable a lengthy and detailed email about "[l]oyalty and important information you should be made aware of". (Email from Smith to Wable (Sept. 24, 2016).) In it, she described herself as a dedicated, hard worker and took "full responsibility" for the inaccurate reporting Wable received. (Id.) But, she expressed frustration that she was expected to do so much with little training and that she was held accountable for occupancy rates when that was Lindor's responsibility. (Id.) Nevertheless, she "was working on a 1 and 2 year plan with the end result being a waiting list." (Id.) She considered herself to be the "scape goat" as "an answer for the issues and problems at hand." (Id.) The focus of the email was Lindor, whom she described as talented and extremely intelligent, but ultimately poisonous to the work environment at Edge Flats because of his treatment of the employees. (Id. (noting that "he brought drama to the work place", "[h]e became bitter" when he was expected to help others, and "present staff is job scared and 'waiting for the axe'").) Apparently, she had previously drafted an email to Wable after Lindor's August 2016 complaints to Allen, but did not send it, because she was concerned about losing her job, the cancellation of Pam's Cleaning's contract, and not following the chain-of-command. (Id.)

After Smith's termination, Allen and Lindor managed the office at Edge Flats until Allen hired Chandler Baker, who was under the age of thirty-five at the time, as property manager of Edge Flats. (Dep. of Allen 59:11-17, 74:19-75:4; Decl. of

12

Smith ¶ 17.) Also, sometime after her termination as property manager, Pam's Cleaning's access to Edge Flats and Deacon's Station was restricted. (Decl. of Smith ¶ 18.) Because the company's keys to the properties were taken, Smith was only allowed on the property when an employee was present during business hours. (Id.) As a result, she could not continue to employ her cleaning staff who required after-hours work with the company nor could she gain additional work to replace her salary as property manager. (Id.) In December 2016 while cleaning a resident's apartment, Smith observed another cleaning company working at Edge Flats, which it was permitted to do any time of day with full access, despite Pam's Cleaning's contract with Edge Flats. (Id. ¶ 19 (averring that the contract was to expire in February 2017).) She also noticed that her business cards were in the trash and had been replaced by with the new company's cards. (Id.) Afterwards, at Deacon's Station, Pam's Cleaning was not permitted to perform any "turns" – cleaning an apartment when a resident moved out before a new resident moved in – from May through August 2017, allegedly because there was no business. (Id. ¶ 20.) However, when Smith was on the property, she observed another cleaning company performing "turns" and other work, despite Pam's Cleaning's contract with Deacon's Station. (Id. (averring that the contract was to expire in February 2018).) As at Edge Flats, her access to the building was restricted, her keys turned in, and her business cards discarded and replaced by the new company's cards. (Id.)

13

After filing a charge of discrimination with and receiving a right to sue letter from the Equal Employment Opportunity Commission, Smith and Pam's Cleaning sued Premier for age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623, and common law wrongful discharge under N.C. Gen. Stat. § 143-422.2[1] (Count One of Amended Complaint), breach of contract (Counts Two and Three of Amended Complaint), and unfair and deceptive trade practices (Count Four of Amended Complaint). Premier has moved for summary judgment as to Counts One and Four.

## II.

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law,' Fed. R. Civ. P. 56(a)." Groves v. Commc'n Workers of Am., 815 F.3d 177, 181 (4th Cir. 2016). The moving party bears the initial burden of establishing "the basis for its motion[] and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex

---

[1] In the same count in which she alleges violations of the ADEA and North Carolina law, Smith alleges the same "wrongful termination due to age discrimination" and "disparate treatment due to age" violated Title VII. However, Title VII prohibits discrimination because of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2. Not only are there no allegations to support such discrimination, but Smith does not proffer evidence or argument of any. Her consistent position is that Premier discriminated against her because of her age. Therefore, Count One is understood to be alleging violations of the ADEA and North Carolina law.

14

Corp. v. Catrett, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)[2]).  The

"mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A dispute is genuine if a reasonable

jury, based on the evidence, could find in favor of the non-moving party. Id. at

248.  The materiality of a fact depends on whether the existence of the fact could

cause a jury to reach different outcomes. Id.   The court cannot weigh the

evidence, by failing to credit contradictory evidence, or make credibility

determinations. Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651 (4th

Cir. 2018).

                                          A.

        As is relevant here, the Age Discrimination in Employment Act ("ADEA")

prohibits an employer from "discharg[ing] any individual or otherwise

discriminat[ing] against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such an individual's age." 29

U.S.C. § 623(a)(1).  Specifically, the ADEA protects individuals forty years of age

or older. 29 U.S.C. § 631(a).  Wrongful discharge claims under NCEEPA are held

to "the same standards that apply under the ADEA." Rishel v. Nationwide Mutual

_____

[2] Rule 56(c) was amended effective December 1, 2010, but the substance of the
rule did not change.

                                          15

Ins. Co., 297 F. Supp. 2d 854, 875 (M.D.N.C. 2003) (dismissing NCEEPA wrongful discharge claim because the ADEA claim failed).

Smith attempts to prove her case by using the burden-shifting scheme in which she must first establish a prima facie case of age discrimination. To do so, she must show that (1) she was a member of a protected class, (2) she suffered adverse employment action, (3) she was meeting Premier's legitimate expectations at the time of the adverse employment action, and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004); see also White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir. 2004) (providing the same first three elements of a prima facie case for disparate treatment and requiring as the fourth element that a similarly situated employee outside the protected class receive more favorable treatment). If Smith proves her prima facie case, the burden of production shifts to Premier "to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Hill, 354 F.3d at 285. If Premier does so, Smith must then prove that Premier's "stated reasons were not its true reasons, but were a pretext for discrimination." Id. (internal quotations omitted); see also id. (explaining that, after the employer provides a legitimate, nondiscriminatory reason for the action, "'the sole remaining issue is discrimination vel non'") (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)). Smith "retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Fin.

16

Servs., Inc., 557 U.S. 167, 177 (2009). She can do so "by showing that [Premier's] proffered explanation is unworthy of credence." Reeves, 530 U.S. at 143. To that end, "the trier of fact may still consider the evidence establishing [her] prima facie case and inferences properly drawn therefrom". Id. (internal quotations omitted). Yet, Premier "would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for [its] decision, or if [Smith] created only a weak issue of fact as to whether [Premier's] reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." Id.

Premier argues that it was Smith's poor performance, not her age, that led to her termination. (Mem. of Law in Supp. of Def.'s Mot. for Partial Summ. J. ("Br. in Supp.") at 14.) It, therefore, contends that Smith cannot prove the third element of her prima facie case. (Id. at 16.) In response, Smith challenges the legitimacy of Premier's expectations of her work performance. (Pls.' Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Br. in Opp'n") at 12-14.) She contends that any expectation related to occupancy rates was illegitimate because she "was never tasked with increasing the occupancy rate"; instead, Billingsley and Lindor were, and any "failure" by Lindor falls on Allen as his supervisor. (Id. at 12-13.) Smith was merely responsible for providing "support and oversight" of leasing. (Id. at 12.) She also argues that Allen's expectations could not have been legitimate because she hired Smith knowing her only from Pam's Cleaning and that she had

17

no experience as a property manager and then provided her little training, which required Smith to learn on the job. (Id. at 13-14.)

While Smith takes issue with the level of responsibility she bore for occupancy rates and now criticizes Allen's hiring of her in the first place, she has proffered no evidence to show that Premier's expectations of her were "phony", Coco v. Elmwood Care, Inc., 128 F.3d 1177, 1179 (7th Cir. 1997), or "were a 'sham designed to hide [Premier's] discriminatory purpose'" or otherwise not legitimate, Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 518 (4th Cir. 2006) (quoting Brummett v. Lee Enters., Inc., 284 F.3d 742, 745 (7th Cir. 2002)). As long as the expectations are bona fide, it is not for the court "to decide whether an employer demands 'too much' of [its] workers". Coco, 128 F.3d at 1179. Smith was hired as Edge Flats' property manager. Accordingly, Premier expected her to manage the property – its staff whom she oversaw, its grounds, its residents, and its operations. Smith's evidence in no way creates a genuine dispute as to whether or not these expectations were bona fide.

To the extent that Smith disputes Allen's assessment of her work performance, the Fourth Circuit Court of Appeals has "repeatedly held" that "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000) (internal quotations omitted) (alteration in original).

The undisputed evidence is that, at the time Smith was terminated, she was not meeting Premier's legitimate expectations of her with respect to "occupancy,

18

leasing and operations". Smith acknowledged that occupancy rates were "very important" and admitted that she was responsible for overseeing and supporting leasing efforts. She also had been preparing a one- and two-year plan for improving the occupancy rate. She was reminded on August 24 that leasing was "still critical", told the occupancy rate remained below seventy percent even with the university's students, and informed that the occupancy rate needed to be above ninety percent in the following ninety days. On September 9, she was disciplined, in part, for poor performance because of "leasing". When Smith was terminated, the occupancy rate was approximately sixty-seven percent.

In addition, it is well documented that Smith had difficulties with the operations of the property. Billingsley was insubordinate, for which he was ultimately terminated, property rules were not successfully enforced, and the internet was repeatedly out of order, which caused inaccurate reports to be provided to Premier's management. Smith was counseled on June 20 about Billingsley and enforcing property rules and warned that she needed to improve immediately and possible consequences for failing to do so included termination. A month later, she received Allen's concerned assessment of the condition of the property. She was then disciplined on September 9 for inaccurate reporting and leasing and not meeting the basic functions of her job and was informed this was the final warning. Less than two weeks later, she was terminated for these very same issues. Smith has not proven that she was meeting Premier's legitimate expectations at the time of her termination.

19

Had she been able to do so, though, she could not overcome the strong inference of non-discrimination where Allen was the same decision-maker who hired Smith when she was fifty-five years old and terminated her approximately six months later. "[W]here the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination" was not the reason for the termination. Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991) (finding inference of discrimination unwarranted where the same individual hired and fired the plaintiff within a six-month period). Said another way, "there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer" and, therefore, that the employer's stated reason was not pretextual. Id. at 798. This is so because "[i]t hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." Id. at 797; see also Sagar v. Oracle Corp., 914 F. Supp. 2d 688, 696 (D. Md. 2012) ("It strains reason to conclude that Sachar would seek to bring a nearly sixty year old man onto his team only to discriminate against him in pursuit of a 'younger' workforce a few months later.").

Smith cites two opinions from Maryland state courts in support of her argument that this is ultimately a jury question because of the changing circumstances under which Allen hired and then terminated Smith. (Pls.' Br. in Opp'n at 8-10 (citing Molesworth v. Brandon, 672 A.2d 608 (Md. 1996) & Magee v. DanSources Tech. Servs., Inc., 769 A.2d 231, 244-49 (Md. Ct. Spec. App.

20

2001)).) Smith describes Allen as "desperate" to fill the position after the previous managers quit without notice and hired Smith because she "was a familiar face, had general knowledge of the property, and was mature enough to handle things in Allen's absence." (Id. at 10.) Allen hired her "in spite of Smith's admitted lack of experience and education" in property management. (Id.) Yet, when Allen terminated Smith, she "had clearly taken the Edge Flats in a different, more youthful direction" such that a jury could find that Allen believed Smith no longer fit the property's image and terminated her because of[3] her age. (Id.)

The Maryland opinions upon which Smith relies have no precedential value here, and federal courts within the Fourth Circuit continue to apply Proud's "same actor inference" at the summary judgment stage. See, e.g., Nzabandora v. Rectors & Visitors of the Univ. of Va., 749 F. App'x 173 (4th Cir. Oct. 19, 2018) (unpublished); Sagar, 914 F. Supp. 2d at 696. It has been recognized, though, that reliance on that inference would be inappropriate at summary judgment where a genuine dispute of material fact exists as to the identity of the individual who hired and terminated an employee. See Burgess v. Bowen, 466 F. App'x 272, 280 n.4 (Feb. 17, 2012) (unpublished). While Allen testified that Wable discussed Smith's performance and suggested they make a change, Allen consistently stated

---

[3] Smith mistakenly argues that a jury could find that Allen's "feelings about Smith's age were a motivating factor at the time of termination." (Pls.' Br. in Opp'n at 10 (emphasis added).) However, as explained above, a plaintiff must prove that but for her age, the employer would not have taken the adverse employment action.

21

that she alone decided to terminate Smith. And, Smith has not argued otherwise. Therefore, because there is no genuine dispute that Allen terminated Smith, the "same actor inference" appropriately applies here.

"While [one] can imagine egregious facts from which a discharge in this context could still be proven to have been discriminatory, it is likely that the compelling nature of the inference arising from facts such as these will make cases involving this situation amenable to resolution at an early stage." Proud, 945 F.2d at 798. Despite the evidence Smith proffers of pretext[4], she cannot not overcome Proud's strong inference. She argues that the improved occupancy rate and the younger employees' free rent, one-on-one training with Allen, and permission to walk dogs off leash supports pretext. (Pls.' Br. in Opp'n at 14-15.) So, too, according to Smith, does Allen's characterization of Billingsley as "young and free" when he missed work and references to Smith as a mamma figure and being Allen's mother's age. (Id. at 15.)

However, not only does the evidence fail to show pretext and overcome the strong same actor inference of non-discrimination, it does not otherwise create a genuine dispute of material fact. First, the occupancy rate had increased, but it had not increased to meet Premier's expectations. Next, Billingsley was permitted to live at Edge Flats rent-free, but that was based on his compensation (half as

---

[4] As the Proud court explained, "[t]he relevance of the fact that the employee was hired and fired by the same person within a relatively short time span comes at the third stage of the analysis" and "creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." 945 F.2d at 798.

much as Smith's) and need. Lindor was also permitted to reside at Edge Flats without paying rent, but he maintained a permanent home elsewhere and was expected to move on to another Premier property. Smith was not required to live at Edge Flats, but chose to do so and received the typical twenty-five percent employee rent reduction. Next, Smith did not receive the same training as Billingsley and Lindor. But, she testified that Billingsley received leasing training because he was the leasing manager with no previous experience and she was not handling leasing. She neither knew of any training Lindor had received nor any training of his during her tenure that she believed she should have received. (Dep. of Smith 145:12-25.) When asked why Allen would have denied her any training, Smith speculated, "Financial." (Id. 139:4-8.) Furthermore, despite any explanation Allen made for Billingsley's absences, she terminated him for being insubordinate to Smith, and he was thirty-three years of age at the time. Next, when asked in her deposition if Allen made comments to her about her age, Smith testified that Allen referred to her as mamma, but Smith did not know if that was because of her age or her role as property manager. (Id. 116:6-12.) She later averred that Allen frequently stated Smith was her mother's age, (Decl. of Smith ¶ 17), yet she neither offered additional details nor testified to that fact when asked. In addition, to the extent that younger employees' permission to walk their dogs off leash is relevant, (id.), there is no evidence or argument that Smith was not permitted to do so. She has not met her burden of persuasion with this evidence, nor the evidence of Allen's posting of photographs on social media of other employees at

23

corporate functions, (see id.; Dep. of Allen 55:12-59:10, 62:11-67:10), Smith's

receipt of insurance one month later than expected which she described as nothing

more than a mistake, (Dep. of Smith144:2-13), or the presence of young students

on the property, (Decl. of Smith ¶ 17).

In sum, Smith has not made a prima facie case of discrimination because the

evidence does not show that she was meeting Premier's legitimate expectations at

the time of her termination. Moreover, she has not overcome the strong inference

of non-discrimination from Allen's having hired and fired her approximately six

months later and, therefore, has not proven that Premier's legitimate, non-

discriminatory reasons for her termination were pretextual. In sum, Smith has not

provided evidence that her age was the but-for cause of her termination or any

other disparate treatment sufficient to overcome summary judgment. Her ADEA

and NCEEPA claim must be dismissed.

B.

"To prevail on a claim of unfair and deceptive trade practices, a plaintiff

must show: (1) defendants committed an unfair or deceptive act or practice; (2) in

or affecting commerce; and (3) that plaintiff was injured thereby." Carcano v.

JBSS, LLC, 684 S.E.2d 41, 49 (N.C. Ct. App. 2009). "A practice is unfair when it

offends established public policy as well as when the practice is immoral,

unethical, oppressive, unscrupulous, or substantially injurious to consumers".

Bumpers v. Cmty. Bank of N. Va., 747 S.E.2d 220, 228 (N.C. 2013). A "practice

is deceptive if it has the capacity or tendency to deceive." Id. "The determination

24

of whether an act or practice is an unfair or deceptive practice that violates N.C.G.S. § 75-1.1 is a question of law for the court." Gray v. N.C. Ins. Underwriting Ass'n, 529 S.E.2d 676, 681 (N.C. 2000). A plaintiff may not simply allege a breach of contract, even if intentional, to support a claim of unfair and deceptive trade practices, but instead "must show substantial aggravating circumstances attending the breach to recover". BB&T Co. v. Thompson, 418 S.E.2d 694, 700 (N.C. Ct. App. 1992).

Smith argues that prior to her termination as property manager, she and the staff of Pam's Cleaning had keys to Edge Flats, worked after hours, and had access to all the common areas. (Pls.' Br. in Opp'n at 17.) After her termination, all of that changed. Their keys were taken, access and hours restricted, and business cards discarded – all while another cleaning company worked at the property despite Pam's Cleaning contract with Edge Flats. (Id.) The same events happened at Deacon's Station during its contract with Pam's Cleaning. (Id.) As a result, Smith could neither continue to employ her staff who required after-hours cleaning work nor find supplemental daytime employment for herself. (Id.) While this evidence may support Smith's breach of contract claims, including intentional breaches, it is not evidence of substantial aggravating circumstances. There is no evidence that Premier acted in a way that offends public policy or is immoral, unethical, oppressive, or unscrupulous. While Premier may have hired another cleaning company without Pam's Cleaning's knowledge, that is not the type of deceptive practice considered to be substantially aggravating and distinguishable

25

from a breach of contract. Accordingly, her unfair and deceptive trade practices claim must be dismissed.

## III.

The dismissal of Counts One and Four leaves only the breach of contract claims for trial. Premier removed this matter to federal court based on federal question jurisdiction, 28 U.S.C. § 1331. Dismissing the ADEA claim – the only claim involving a federal question, the Court has discretion to continue to exercise supplemental jurisdiction over the breach of contract claims, Carlsbad Technology, Inc. v. HIF Bio, Inc., 556 U.S. 635, 639-40 (2009), or to decline to do so, 28 U.S.C. § 1367(c)(3), and remand the matter to state court, Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 357 (1988). It is possible, though, that diversity jurisdiction, 28 U.S.C. § 1332, may also exist. However, neither the pleadings nor any other filings on record adequately provide the Court information to make that determination. Therefore, Smith and Premier are permitted to brief whether or not the Court has diversity jurisdiction and, if so, to provide the requisite support.

## IV.

For the reasons explained in this Memorandum Opinion and Order, IT IS HEREBY ORDERED that Defendant Premier Property Management's Motion for Partial Summary Judgment [Doc. #23] is GRANTED and that Count One and Count Four of the Amended Complaint are DISMISSED. IT IS FURTHER ORDERED that the parties have ten days from the filing of this Memorandum Opinion and Order to

file a brief of no more than ten pages addressing whether or not the Court has diversity jurisdiction over the action.

This the 4th day of March, 2019.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge

27