EXHIBIT B

No *Shepard's* Signal™
As of: March 6, 2019 7:33 PM Z

# Gomez v. Haystax Tech.

United States Court of Appeals for the Fourth Circuit

March 5, 2019, Decided

No. 17-2360

**Reporter**
2019 U.S. App. LEXIS 6618 *

RAMONA RAE GOMEZ, Plaintiff - Appellant, v. HAYSTAX TECHNOLOGY, INC.; NETCENTRICS CORPORATION, Defendants - Appellees,

**Notice:** Decision text below is the first available text from the court; it has not been editorially reviewed by LexisNexis. Publisher's editorial review, including Headnotes, Case Summary, Shepard's analysis or any amendments will be added in accordance with LexisNexis editorial guidelines.

## Opinion

[*1] Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, Senior District Judge. (1:16-cv-01433-TSE-IDD)

Argued: December 12, 2018 Decided: March 5, 2019

Before GREGORY, Chief Judge, and WYNN, and THACKER, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Natalie M. Koss, POTOMAC LEGAL GROUP, PLLC, Washington, D.C., for Appellant. Merrell Beth Renaud, SQUIRE PATTON BOGGS (US) LLP, Tysons Corner, Virginia, for Appellees. **ON BRIEF:** Kassandra Haynes, POTOMAC LEGAL GROUP, PLLC, Washington, D.C.; Ryan Posey, POSEY LEIBOWITZ PLLC, Washington, D.C., for Appellant.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In this appeal, Appellant Ramona Rae Gomez, a former employee of NetCentrics and Haystax Technology (collectively, "Appellees"), asserts that Appellees discriminated against her in violation of (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; (2) the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *etseq.*; (3) Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*; and (4) the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* The district court granted summary judgment in Appellees' favor as to all claims. Gomez challenges the district court's summary judgment ruling and several rulings on motions in limine. For the reasons explained below, [*2] we affirm the district court's judgment.

I.

Appellees are private government contractors based out of Herndon, Virginia. Appellees primarily provide information technology, analytics, cloud computing, network management, and cybersecurity services to federal government agencies, particularly in the United States Department of Defense (the "DOD"). While Appellees' employees typically work on site for the contract to which they are assigned, Appellees also maintain a main headquarters in Virginia, where employees who are not assigned to contracts and non-contract employees work.

2

A.

Gomez's First Assignment

Appellees hired Gomez in May 2013 to work on a contract Appellees were bidding on called Task M. But Appellees did not win the Task M bid. As a result, Gomez was assigned to be the program manager on another contract, the Consumer Financial Protection Bureau Network Support Services contract (the "CFPB contract"). The CFPB contract was a Blanket Purchase Agreement ("BPA"). A BPA is an agreement that governs the relationship between a buyer and a contractor to fulfill the buyer's repetitive needs for

supplies or services without the need to negotiate each order. Under the CFPB contract, [*3] Appellees' responsibility was to implement a dedicated network for the newly created Consumer Financial Protection Bureau (the "Bureau") and to implement and manage the network infrastructure for the Bureau.

In September 2014, Gomez took two weeks of leave under the FMLA to undergo and recover from hip surgery. While Gomez was on leave, the CFPB contract expired, and the government posted a new request for bids for a new CFPB contract. Appellees submitted a new bid for the work but did not win the re-bid. Appellees had some concerns that Gomez may have played a role in the loss of the CFPB contract, specifically, by her failure to grow the contract and acquire new task orders.

B.

Gomez's First Transfer

Despite these concerns, the President of NetCentrics, Cynthia Barreda, recommended Gomez to Kirk Johnson for a position on another contract, the Net-Centric

3

Integrated Enterprise Information Technology Solutions contract (the "NIEITS" contract). As a result, on October 21, 2014, Gomez was offered a transfer of employment from the CFPB contract to the NIEITS contract as a senior project manager on Task Delta ("Task D"). 1 This position was created on Task D specifically "so that [Gomez] could [*4] come on to this contract." J.A. 1016. 2 Although Gomez had fewer responsibilities and was billed at a lower rate as a senior project manager on Task D than she was in her previous program manager position, she received the same compensation.

C.

Second Hip Surgery

On April 21, 2015, Gomez notified Human Resources that she would have to undergo a second hip surgery later in the year and would require six weeks off to do so. Shortly thereafter, in May 2015, Gomez was transferred to a new building. Gomez, who had not been consulted about the change beforehand, engaged in a heated conversation about the move with Curtis Puckett and Chris Cormell, two of her supervisors. Gomez was concerned about the distance she would have to walk between her car and her desk in the new building. The issue was ultimately resolved when Puckett assigned Gomez to a desk and parking space with less distance than her previous location. Gomez took leave

1Task D was a small business task order for the Enterprise Information Technology Services Division of the Washington Headquarters Service of the DOD to provide computer security for the Office of the Secretary of Defense.

2Citations to the "J.A." refer to the Joint [*5] Appendix filed by the parties in this appeal.

4

for her scheduled second hip surgery on December 11, 2015 and returned to work on January 25, 2016.

D.

Task D Contract is Lost

On July 7, 2015, the DOD provided notice of another contract opportunity for which it was accepting proposals for bids on the Technology Engineering Development Services ("TEDS") contract. The work was an extension of the work Appellees had done on Task D, but the original NIEITS Task D contract was set to end on September 30, 2015. And, in order to win the new contract, Appellees would have to submit a new bid. But, Appellees "were not able to bid on this contract as a prime contractor, because it was released under a Government small-business contract vehicle" and Appellees did not qualify as a small business. J.A. 4848. Instead, Appellees partnered with Trowbridge & Trowbridge ("Trowbridge"), a qualifying small business in order to bid on the contract. Trowbridge successfully submitted a bid as a prime contractor with Appellees designated as a subcontractor.

As a result of Appellees' subcontractor status, Appellees were only able to retain roughly half of the positions previously held under the Task D contract and [*6] "everybody that was hired [to work on the TEDS contract] had to go through Trowbridge's approval." J.A. 4676. On September 15, 2015, former Task D employees who had not already found a new position were informed that they were slated for termination, effective September 30, 2015, and were encouraged to apply for other positions. However, Gomez was not terminated at that time because she had been bid as key

5

personnel on a new contract on June 29, 2015, a BPA

with the United States Coast Guard called Technology Enterprise Support Services ("TESS").

E.

### The TESS Contract

On October 1, 2015, Appellees won the TESS contract and Gomez was transferred to the headquarters location in Virginia to work as the Call 2 technical task lead for the TESS contract. The position "placed her on a long-term, five-year contract." J.A. 4379. Starting on October 1, Gomez began working on the TESS contract. But, on October 9, 2015, the TESS contract bid award was protested by SRA International, "an actual or prospective offeror whose direct economic interest [was] affected by the award of a contract or by the failure to award a contract." 48 C.F.R. § 33.101. As a result of the protest, Appellees issued a stop work order, which [*7] meant Gomez could no longer perform billable work on the TESS contract. Instead, Gomez was paid on overhead while preparing for work on the TESS contract. 3 Even during the protest, Appellees "still expected to win" the TESS contract. J.A. 4114.

3 When someone is working "on overhead," it means they are working in positions that cannot be billed to a specific contract, and they are instead paid by the company itself. These positions may include "internal support positions," such as "HR, accounting, finance, [and] admin." J.A. 651.

6

F.

### The TESS Contract is Lost

Upon return from her second hip surgery on January 25, 2016, Gomez continued to work on overhead to prepare for the TESS contract in anticipation of Appellees prevailing in the protest process. However, in response to the protest, the United States Coast Guard -- the soliciting agency for the TESS contract -- submitted a corrective action plan to the Government Accountability Office that "resulted in [an] award to a different vendor." J.A. 5595. Ultimately, on February 16, 2016, Appellees were notified that they had lost the TESS contract.

### G. Gomez's Position is Lost

On February 19, 2016, Barreda met with Gomez and informed her that [*8] her job position had been lost due to the loss of the TESS contract. Barreda advised Gomez that "unless she found another position internally, her last day would be March 1, 2016." J.A. 4384. Barreda also directed Gomez "to talk to recruiting to see if there were any positions that she was interested in or that she would qualify for." Id. at 1192. Additionally, Barreda spoke to various program managers and an executive "to find out if there were any other positions pending, expected, or current that [Gomez] could go into."

Id. at 1187-88. However, the program managers and the executive could not find any positions for Gomez.

On February 29, 2016, Gomez received her final notice from Appellees, which noted that Appellees did not prevail in the protest process for the TESS contract, and "we

7

no longer have the Call 2 Technical Task Lead position available for TESS." J.A. 3218. Again, Appellees urged Gomez "to continue to look internally at [NetCentrics and Haystax Technology] for any position that may be available and a fit for [her] skills and experience." Id. But Gomez did not do so. Gomez "did not apply for a single opening at NetCentrics either prior to her last day or after her last day of [employment on] [*9] March 1, 2016." Id. at 4384.

Instead, on March 1, 2016, Gomez filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that Appellees had discriminated against her because of age, sex, and disability. Specifically, Gomez stated that after she gave Appellees notice of her upcoming second hip surgery, Appellees began to transfer her "from contract to contract with no concern for whether the contract she was working on might be renewed." J.A. 1556. Gomez alleged that she was the "only employee who has been terminated after a contract with the Federal government" was lost, despite a common practice of transferring employees who had been assigned to lost contracts. Id. at 1557. Gomez further asserted that she, a 57 year old disabled woman, had been replaced by two younger men, Matthew Parsons and Carver Pace.

H.

### Gomez Files Suit

The EEOC provided Gomez a right to sue notice in November 2016, and Gomez filed suit in the United States District Court for the Eastern District of Virginia on November 16, 2016. Gomez's First Amended

Complaint asserted four claims against Appellees: (1) disability discrimination, in violation of the ADA; (2) sex discrimination,

8

in violation of Title VII; (3) age [*10] discrimination, in violation of the ADEA; and (4) FMLA

retaliation. Gomez's sex discrimination claim was based, in part, on her interactions with

Puckett. Specifically, she stated in her deposition that she believed she had been moved

from headquarters to a different location, that her position had been downgraded from

program manager to senior project manager due to her sex, and that Puckett "would have

never done that to a man." J.A. 2130. Gomez based her age discrimination claim on the

firing of Jill Czelusniak, 4 Sue Kuiler, 5 as well as on her own firing. Regarding these

firings, Gomez asserted,

They got rid of [Czelusniak] who was older; they got rid of [Kuiler] who was older; and they got rid of me. Now, I could say they did it because I was a female, we were females, or I could say they did it because of disability or I could say that they did it because of gender. It's all three.

Id. at 2131.

4 Czelusniak was the program manager for the NIEITS Task B contract, who was removed from the contract after a government customer complained that she "was not performing her job because she was missing too often and not there to manage the program." J.A. 4622. Shortly after, Czelusniak took medical leave due to [*11] pneumonia. On her return, she began to slowly transition out of her position on Task B, but "the customer lost patience again" and requested that Czelusniak be immediately removed and replaced with Johnson, whom the customer was familiar with. Id. at 4650. Czelusniak worked in Human Resources on overhead for a short period of time but was terminated. Appellees indicated that her termination was due to loss of position.

5 Kuiler was the program manager for the NIEITS Task E contract, which expired on December 18, 2015. Kuiler also briefly worked on the TEDS subcontract but was removed at Trowbridge's request. Kuiler had hip surgery six years before she was hired by Appellees and has stated that she does "not consider [herself] disabled" and does not believe she was terminated because of any discriminatory motive. J.A. 3234-36. Kuiler was terminated on February 2, 2016. Appellees indicated that her termination was due to loss of position.

9

On July 14, 2017 -- the last day of discovery -- Gomez amended her initial discovery disclosures (originally filed on April 13, 2017) to include several new witnesses. These new witnesses included two of Appellees' former employees who Gomez alleged were similarly [*12] situated and had been discriminated against and two employees of a staffing company retained to respond to a particular discovery request. 6

Then, *two hours* before the close of discovery, Gomez filed a second supplemental response to Appellees' interrogatories 7 and alleged that, in addition to being terminated, she had been demoted. Finally, several weeks *after* the close of discovery, Gomez disclosed another potential witness, a former employee of Appellees who had resigned from the company during the course of discovery, citing a hostile work environment on a government contract worksite. In response to Gomez's disclosures, Appellees filed six motions in limine seeking to exclude:

(1) evidence related to a new employment demotion claim;

6 On March 15, 2017, Gomez requested production of "any job advertisements, job openings, job notices -- whether internal or external -- including qualifications, salary, benefits, at NetCentrics from September 2015 to March 2016." J.A. 2549 n.2. Appellees objected to the request as overbroad and the scope was eventually narrowed to include the production of any such information related to positions Gomez would have been qualified for from September [*13] 15, 2015, to March 2016. To respond to this request, Appellees retained the services of the Kenney Staffing Company, a third party staffing company. The Kenney Staffing Company compared Gomez's resume (with identifying information removed) with a list of approximately 200 job postings. This initial review produced a list of 12 positions for which Gomez may have qualified, which was submitted to Appellees for final review. On final review, Appellees determined that Gomez may have qualified for five positions.

7 Gomez's first response to the interrogatories was served on April 24, 2017.

10

(2) evidence related to alleged sex discrimination by Appellees against Courtney Davis, a former employee of Appellees;

(3) evidence from three additional witnesses, Rachel Cumberledge, Dolly Ward, and Randy Garth, former employees of Appellees, related to the claims of disability discrimination and FMLA retaliation;

(4) expert testimony from individuals associated with Kenney Staffing;

(5) evidence from David Thurm, a former employee of Appellees who worked with Gomez on the CFPB contract, that Gomez satisfactorily performed her job duties; and

(6) evidence from Michelle Miranda, a former employee of Appellees [*14] -- who alleges she was transferred for discriminatory reasons and then resigned after discovery had closed -- disclosed three weeks after the close of discovery.

See J.A. 5596-97. The district court issued the following rulings on each of these

motions in limine:

(1) the district court excluded evidence related to the new employment demotion claim, "because [Gomez] failed to exhaust her administrative remedies and raised the claim in an untimely manner with respect to her FMLA retaliation claim." *Id.* at 5617;

(2) the district court allowed evidence related to claims by Davis, because Appellees had initially disclosed Davis as a witness on April 14, 2017, Gomez had mentioned Davis in her EEOC charge, and "the Davis evidence is relevant to [Gomez's] discrimination claims and would not be prejudicial to [Appellees]." *Id.* at 5608;

(3) the district court excluded evidence of discrimination from Cumberledge, Ward, and Garth, because "it was

11

not disclosed in a timely manner, and the Cumberledge and Garth evidence is also excluded because it is irrelevant and unduly prejudicial." *Id.* at 5618;

(4) the district court excluded the testimony of the Kenney Staffing employees as untimely disclosed, by either the expert witness deadline [*15] or the Scheduling Order;

(5) the district court excluded testimony of and evidence from Thurm as untimely disclosed, because he was not disclosed until the final day of discovery; and,

(6) the district court excluded testimony and evidence related to disability discrimination from Miranda as untimely disclosed, because she was not disclosed until three weeks after the close of discovery.

Subsequently, Appellees filed for summary judgment. The district court granted

summary judgment to Appellees and dismissed the action, because it concluded that

Gomez was terminated because of the loss of the TESS contract, and not because of her

age, sex, or disability. And, critically, the district court found that Gomez failed to rebut

Appellees' legitimate, non-pretextual basis for her termination -- the loss of the TESS

contract.

II.

Gomez challenges the district court's orders granting the motions to exclude (1)

evidence related to a new theory of demotion, (2) the testimony of the Kenney Staffing

Company employees, and (3) evidence from Cumberledge, Ward, and Miranda. Gomez

also challenges the district court's award of summary judgment to Appellees. We

address each in turn.

12

A.

Motions in Limine

1.

"We review [*16] for an abuse of discretion both the district court's finding of a disclosure violation and its decision to exclude evidence as a discovery sanction."

*Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). "In doing so, we are mindful of the broad discretion accorded to district courts to supervise discovery, including the imposition of sanctions for discovery abuses, as part of their case-management authority." *Id.*; *see also Wilkins v. Montgomery*, 751 F.3d 214, 221 (4th Cir. 2014). Under this standard, we must "show enough deference" to the district court's judgment that we do "not reverse merely because [we] would have come to a different result in the first instance." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008).

2.

Gomez argues that the district court erroneously excluded several pieces of evidence. The district court excluded the testimony of several witnesses as untimely, and evidence related to a new theory of discrimination as untimely and unexhausted.

Rule 26 of the Federal Rules of Civil Procedure provides that parties must disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information -- along with the subjects of that information -- that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i); *see also id.* 26(a)(1)(E) ("A party is not excused from making its

13

disclosures because it has not fully investigated [*17] the case or because it challenges the

sufficiency of another party's disclosures or because another party has not made its

disclosures."). "The purpose of Rule 26(a) is to allow litigants to adequately prepare

their cases for trial and to avoid unfair surprise." *Bresler v. Wilmington Trust Co.*, 855

F.3d 178, 190 (4th Cir. 2017) (internal quotation marks omitted).

When a party fails to make a disclosure "as required by Rule 26(a) or (e), the party

is not allowed to use that information or witness to supply evidence on a motion, at a

hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R.

Civ. P. 37(c)(1); *see also S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318

F.3d 592, 595 n.2 (4th Cir. 2003) ("The Rule 37(c) advisory committee notes emphasize

that the *automatic sanction* of exclusion provides a strong inducement for disclosure of

material that the disclosing party would expect to use as evidence." (internal quotation

marks omitted) (emphasis supplied)).

In *Southern States*, this court articulated five factors courts can consider when

deciding whether a failure to disclose was substantially justified or harmless. *S. States*,

318 F.3d at 597. In making this determination,

a district court should [*18] be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.

*Id.* The court is not required, however, "to tick through each of the *Southern States*

factors." *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014). "The first four

14

factors . . . relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception." *Bresler*, 855 F.3d at 190. The non-disclosing party "bears the burden of establishing that the nondisclosure was substantially justified or was harmless."

*Id.*

The district court also has authority per Rule 37 of the Federal Rules of Civil Procedure to sanction parties for failure to comply with the scheduling order in the case.

*See* Fed. R. Civ. P. 16(f)(1) ("On motion or on its own, the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney

. . . fails to obey a scheduling or other pretrial order."). Rule 37 provides, in relevant part, that the court may "prohibit[] the disobedient [*19] party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." *Id.* 37(b)(2)(A)(ii).

a.

*Demotion Evidence*

Below, Appellees sought to exclude evidence relating to the alleged discriminatory demotion of Gomez as both untimely and unexhausted. Appellees argued that this new evidence -- identified within the waning hours before the close of discovery -- presented an unanticipated theory that they had not accounted for during discovery. This evidence consisted of Gomez's deposition testimony, taken four days before the end of discovery, and Gomez's supplemental interrogatory responses, produced on the last day of discovery. The district court concluded that the evidence, produced in the

15

eleventh hour of discovery, violated Federal Rule of Civil Procedure 26(e) because Gomez must have known since the time of her alleged demotion in June of 2015 that she was demoted and, therefore, "could have included the demotion claim in her initial disclosures to [Appellees]." J.A. 5603.

i.

As noted, Federal Rule of Civil Procedure 26(a) requires parties to disclose the names "of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(i). "The purpose of [*20] Rule 26(a) is to allow the parties to adequately prepare their cases for trial and to avoid unfair surprise." *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). Rule 26 also imposes a duty to supplement initial disclosures in a timely fashion "if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

Here, contrary to Gomez's assertion, her dilatory disclosure regarding the demotion claim did indeed present a new theory of the case during the tail end of discovery. Gomez did not allege that she had been demoted in either her Complaint, filed November 16, 2016, or in her Amended Complaint, filed April 7, 2017. To the contrary, in both her Complaint and her Amended Complaint, Gomez alleged only that, after she notified Appellees of her need for a second hip surgery, Appellees "moved [Gomez] from contract to contract with no concern for whether the contract she was working on would

16

be renewed." J.A. 43; Compl. at 4 ¶17, *Gomez v. Haystax Tech., Inc.*, 1:16-cv-1433 (E.D. Va. Nov. 16, 2016; filed Nov. 16, 2016), ECF No. 1. Indeed, until Gomez's deposition on July [*21] 10, 2017, all of her claims were premised solely on her termination and lack of reassignment in February of 2016. *See, e.g.*, J.A. 48 ("[Appellees] terminated [Gomez] because of her actual, regarded, or record of disability."); *id.* at 49 ("[Appellees] discriminated and retaliated against [Gomez] after she requested and took [FMLA leave]

. . . and terminated her employment."); *id.* at 50 ("[Appellees] terminated [Gomez's] employment and replaced her position with two men."); *id.* at 51 ("[Appellees] terminated [Gomez's] employment and replaced her position with two younger men."). Given that Gomez must have known of the allegedly discriminatory demotion at the time it occurred in June 2015 but did not disclose it until nearly two years later, we conclude -- as did the district court -- that she violated Rule 26 by failing to disclose the information in a timely fashion.

ii.

The question then is whether Gomez satisfied her burden to prove that the untimely disclosure was harmless or was substantially justified. *See Bresler*, 855 F.3d at 190 (the non-disclosing party "bears the burden of establishing that the nondisclosure was substantially justified or was harmless."). She has not. For this determination, we turn to the *Southern States* factors. [*22] First, the late disclosure caused unfair surprise as Appellees could not have reasonably predicted that Gomez would present an entirely new theory of her case at such a late stage. Second, given that the disclosure was made during the last days of discovery, Appellees did not have a reasonable opportunity to depose witnesses

17

or to fairly prepare any rebuttal to this new theory. Further, Appellees had already conducted numerous depositions -- including Gomez's -- without any inkling of the demotion theory. And, critically, Gomez did not offer any reason at all for her failure to timely disclose. *See* J.A. 5604 ("Plaintiff has provided no explanation as to why she failed to disclose her alleged demotion earlier in discovery."); *id.* at 3507-13.

Therefore, the majority of the relevant *Southern States* factors weigh against finding that the late disclosure was substantially justified or harmless. Thus, Gomez has failed to sustain her burden. We hold that the district court did not abuse its broad discretion in excluding the demotion evidence. *See Bresler*, 855 F.3d at 190.

b.

*Kenney Staffing*

i.

In order to respond to Gomez's discovery requests, Appellees hired the Kenney Staffing Company, who assigned two employees (the "Kenney [*23] Staffing employees") "to review the more than 200 job postings that were posted during the relevant time period to make a preliminary assessment of what jobs [Gomez] might have been qualified/eligible for (had she applied for them)." J.A. 2549 n.2. On July 14, 2017, the last day of discovery, Gomez amended her initial disclosures to list the Kenney Staffing employees as potential witnesses with knowledge of Appellees' staffing practices and Gomez's qualifications for various positions. Gomez did not disclose the Kenney Staffing employees as expert witnesses. But, because of the anticipated testimony and the Kenney Staffing employees' lack of personal knowledge, Appellees sought exclusion of the

18

Kenney Staffing employees as improperly disclosed expert witnesses, improper lay witnesses, and/or as generally untimely disclosed.

The district court excluded the testimony of the Kenney Staffing employees on a number of grounds. First, the district court determined that the Kenney Staffing employees were not properly categorized as lay witnesses because they lacked personal knowledge. Instead, the district court concluded that the Kenney Staffing employees were expert witnesses.

However, the [*24] district court concluded that any inclusion of the Kenney Staffing employees as expert witnesses would be improper, because Gomez had missed the Scheduling Order's May 14, 2017 deadline to designate expert witnesses by two months.

*See* Fed. R. Civ. P. 26(a)(2)(D). The Scheduling Order provided that witnesses must be "disclosed in time to be deposed or to permit the substance of his knowledge and opinions to be ascertained." J.A. 28. Critically, "[b]ecause [Gomez] relied only on her contention that [the Kenney Staffing] employees were lay witnesses," she made no attempt to argue that the late disclosure of the expert witnesses was substantially justified or was harmless under *Southern States*. *Id.* at 5615. On appeal, Gomez asserts that the district court abused its discretion by excluding this evidence.

ii.

We need not address the propriety of the district court's ruling on the proper classification of the Kenney Staffing witnesses. Regardless of the classification, as either lay or expert witnesses, the district court did not abuse its discretion in excluding these witnesses due to untimely disclosure. First, Gomez knew the potential relevance of the

19

Kenney Staffing employees' testimony because Vice President of Human Resources [*25]

Susan Brady testified to as much on June 29, 2017. 8 Nonetheless, Gomez did not

indicate any desire to call such witnesses until the *very last day* of discovery, July 14,

2017. This disclosure was untimely under the Scheduling Order in this case, which

provides that witnesses must be "disclosed in time to be deposed or to permit the

substance of his knowledge and opinions to be ascertained." J.A. 28.

Per Rule 16 of the Federal Rules of Civil Procedure, the exclusion of such

evidence is an appropriate sanction, and well within the district court's discretion. *See*

Fed. R. Civ. P. 16(f)(1) ("On motion or on its own, the court may issue any just orders,

including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney . . . fails

to obey a scheduling or other pretrial order."); *see also id.* 37(b)(2)(A)(ii) (the court may

"prohibit[] the disobedient party from . . . introducing designated matters in evidence").

8Q. Okay. How many positions were there, if you know, in total, whether Ms. Gomez was qualified for them or not, between September 2015 and March 2016?

A. So in reviewing those, I sent the -- we looked at the list and sent them [sic] position descriptions to a third-party recruiter, as well as Ms. Gomez's resume with the name removed, and asked them to assess which positions, [*26] based on that information, which is personal, but that information, what positions they believe she might be eligible for, qualified for.

And then, they returned a response, and then reviewing those, [we] pared it down to ones we believed she would have been qualified for.

J.A. 1367.

20

iii.

Next, Gomez's expert witness disclosure deadline was May 14, 2017. Thus, to the extent the district court properly determined that the Kenney Staffing employees could not testify as lay witnesses, and only as expert witnesses, Gomez's disclosure was clearly untimely, given that the disclosure was not made until July 14, 2017, two months after the disclosure deadline for expert witnesses.

Of note, Gomez did not even attempt to argue that the untimely disclosure was substantially justified or harmless. Such an argument would have been unavailing in any event. Appellees surely lacked the ability to cure any surprise since the situation contemplated here falls well within the confines of *Southern States*, as "the ability to simply cross-examine an expert concerning a new opinion at trial is not the ability to cure, . . . [because] the rules of expert disclosure are designed to allow an opponent to examine [*27] an expert opinion for flaws and *to develop counter-testimony* through that party's own experts." *S. States*, 318 F.3d at 598 (internal quotation marks omitted) (emphasis supplied). No such opportunity was available to Appellees.

iv.

In sum, regardless of whether the Kenney Staffing employees are classified as lay witnesses or expert witnesses, Gomez violated the disclosure requirements of both the Scheduling Order and Rule 26(a) and failed to meet her burden to prove substantial justification or harmlessness. Accordingly, we affirm.

21

c.

*Ward, Cumberledge, and Miranda Testimony*

i.

The district court excluded the testimony of Ward, Cumberledge, and Miranda as untimely.

In the case of Ward and Cumberledge, while Gomez technically disclosed them within the discovery deadline, she failed to comply with the Scheduling Order's requirement that disclosures must be made "in time [for witnesses] to be deposed or to permit the substance of [their] knowledge and opinions to be ascertained." J.A. 28. On the final day of discovery, July 14, 2017, Gomez amended her initial disclosures to include Cumberledge and Ward as potential witnesses.

As to Miranda, Gomez's disclosure was grossly untimely. Gomez did not identify Miranda as a witness [*28] until August 7, 2017, *three weeks after* the close of discovery.

ii.

Gomez asserts that the district court abused its discretion by failing to properly weigh the *Southern States* factors. Gomez further argues that the delayed disclosures were caused by Appellees' failure to comply with discovery orders and, as a result, the late disclosures were substantially justified. Specifically, Gomez argued that Appellees were required to provide, in response to a broad interrogatory, contact information for both Ward and Cumberledge, but failed to so. As a result of this failure to provide contact information, Gomez argues, Appellees cannot claim to have been prejudiced by the late disclosure. And, as to Miranda, Gomez argues that Appellees could not have

22

been prejudiced by the late disclosure because they knew of Miranda, because she had been in their

employment until she resigned during the course of litigation, and thus Appellees could not be prejudiced by the late disclosure.

Parties must disclose, "without awaiting a discovery request, . . . the name and, *if known*, the address and telephone number of each individual likely to have discoverable information . . . that the disclosing party may use [*29] to support its claims or defenses." Fed. R. Civ. P. 26 (a)(1)(A)(i). A party has a duty to supplement or correct such disclosures in a timely manner. *See id.* 26(e)(1)(A). "If a party fails to . . . identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that . . . witness to supply evidence on a motion, . . . unless the failure was substantially justified or is harmless."

*Id.* 37(c)(1).

iii.

Again, we hold that the district court did not abuse its discretion in excluding Gomez's proffered witnesses. The record reflects that the district court evaluated the relevant *Southern States* factors and determined that Gomez was not justified in waiting until the last day of discovery -- or, in the case of Miranda, three weeks *after* the close of discovery -- to disclose these witnesses, particularly where Gomez had been aware of the witnesses for three weeks. 9 Moreover, Gomez's argument that the delay was justified because Appellees failed to timely provide contact information is meritless for another

9 Appellees provided Gomez a list of employees, including both Cumberledge and Ward, on June 21, 2017. Despite this, Gomez never indicated that Cumberledge or Ward would be used to support a claim.

23

reason. Despite Gomez making [*30] this contention at oral argument, there is *zero* indication

in the record that Appellees were ordered to disclose contact information. 10

Gomez was not entitled to delay disclosure in the name of unnecessary

information even if, as Gomez's counsel argued, Gomez "wanted to contact the witnesses

10 During oral argument, Gomez's counsel, purporting to cite directly to the magistrate judge's order on the motion to compel, told this court that the magistrate judge ordered Appellees to disclose "all contact information and identifying information and any information about employees who were terminated from 2013 to the present who were terminated within 3 months of returning from medical leave." Oral Argument at 33:41-56, *Gomez v. Haystax Tech., Inc.*, No. 17-2360 (4th Cir. Dec. 12, 2018), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. Not true. This assertion is entirely unsupported by the record. First, Gomez's own interrogatory does not request contact information. It merely requests the response "identify each individual for whom disability leave has resulted in a loss" with reference to the specific characteristics of the individual. J.A. 4836. Nor did Gomez's motion to [*31] compel request contact information. *See* Mem. of P. & A. in Supp. of Pl. Ramona Rae Gomez's Mot. to Compel Def. NetCentrics Corporation to Respond to Disc. Reqs. at 5, *Gomez v. Haystax Tech., Inc.*, 1:16-cv-1433 (E.D. Va. Nov. 16, 2016; filed May 19, 2017), ECF No. 50. And the transcript of the hearing on the motion to compel contains no reference to contact information -- it was neither requested nor ordered. Finally, while Gomez's counsel cites directly to the magistrate judge's order in an attempt to support her contention, that reliance is unfounded -- the order states only that "Plaintiff's Motion to Compel [Dkt. No. 47] is **GRANTED in part and DENIED in part**." *See* Order, *Gomez v. Haystax Tech., Inc.*, 1:16-cv-1433 (E.D. Va. Nov. 16, 2016; filed June 9, 2017), ECF No. 66 (emphasis in original).

Of note, this is not the only instance of Gomez's lack of candor to the court. Gomez's counsel also argued that Appellees had attempted to limit Gomez's request for any discoverable information related to individuals who had been terminated after taking disability or medical leave to "only produce documents related to any unlawful discrimination related to Cynthia Barreda" and "never tried to [*32] limit it to temporal proximity." But, the filings below clearly contradict this version of events. Oral Argument at 32:54, 33:07-13, *Gomez v. Haystax Tech., Inc.*, No. 17-2360 (4th Cir. Dec. 12, 2018), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. Specifically, Appellees objected to the lack of temporal proximity and various other objections. *See* J.A. 4836-37 ("[Appellees] object[] to this Interrogatory on the grounds that it is overbroad in scope and temporal scope").

24

before we placed them on a witness list." Oral Argument at 7:36-42, *Gomez v. HaystaxTech., Inc.*, No. 17-2360 (4th Cir. Dec. 12, 2018), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments. Litigants need not fully investigate potential witnesses and the specifics of the discoverable information in order to include those witnesses on their Rule 26 initial disclosures. *See* Fed. R. Civ. P. 26(a)(1)(A)(i) (requiring disclosure of name and *subjects* of discoverable information known by witness). That is the point of disclosures followed by discovery.

Given the lack of a valid explanation for the late disclosures, we cannot conclude that the district court abused its broad discretion in holding that Gomez's late disclosure was [*33] not substantially justified.

B.

Summary Judgment

1.

We review the district court's award of summary judgment de novo, "apply[] the same legal standards as the district court, and view[] all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Villa v. CavaMezze Grill,LLC*, 858 F.3d 896, 900 (4th Cir. 2017) (internal quotation marks omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).

25

2.

Gomez argues that the district court erroneously granted summary judgment to Appellees. Even assuming Gomez established prima facie cases of sex, age, and disability discrimination and FMLA retaliation, she cannot prevail on her claims that Appellees discriminated against her on any of these bases. This is because Gomez did not sufficiently rebut Appellees' proffered reason for her termination -- the loss of her position on the TESS contract -- as required by the *McDonnell Douglas* burden-shifting framework.

Gomez presents only circumstantial [*34] evidence of discrimination and retaliation. Thus, each of her claims are addressed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Laing v. Fed.Express Corp.*, 703 F.3d 713, 718-19 (4th Cir. 2013) ("Without the benefit of direct evidence to support her claim, [the employee] next seeks to rely on circumstantial evidence under the *McDonnell Douglas* burden-shifting framework."); *see also Vannoy v.Fed. Reserve Bank of Richmond*, 827 F.3d 296, 304 (4th Cir. 2016) (FMLA retaliation);

*Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015) (sex discrimination);

*Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (disability discrimination); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (age discrimination). Under this framework, the plaintiff bears the burden of establishing a prima facie case of discrimination or retaliation. If the plaintiff succeeds, "the burden of production then shifts to the employer to articulate a non-discriminatory or non-retaliatory reason for the

26

adverse action." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).

"[T]he burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the stated reason for the adverse employment action is a pretext and that the true reason is discriminatory or retaliatory." *Guessous*, 828 F.3d at 216. A plaintiff "may do so by demonstrating that the asserted justifications, even if true, are post hoc rationalizations invented for purposes of litigation." *Jacobs*, 780 F.3d at 576. Beyond that, an employer's inconsistent explanations may also be probative of pretext. *SeeEEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001); *see also* [*35] *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) (noting that pretext is not established "by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it").

Appellees presented evidence that Gomez was terminated due to the fact that her position was eliminated when the TESS contract was lost and because Appellees could not afford to continue to pay Gomez on overhead status. In an attempt to expose this as pretext for discrimination and FMLA retaliation, Gomez points to purported shifting explanations for her

termination, alleged inconsistent statements about what positions were available within the company, and the internal transfers of two male employees.

27

a.

*Shifting Justifications*

i.

Gomez asserts that Appellees initially stated two reasons for her termination: (1) "the loss of the TESS contract," and (2) the "inability to keep her on overhead." Appellant's Br. 49. Gomez argues that Appellees later stated that she "was terminated due to her failure to grow the CFPB contract and because she did not apply for any open positions." *Id.* Gomez argues that, because these later statements were not raised at the time of her termination but rather during litigation, [*36] this is sufficient evidence to establish that the proffered reasons for termination are pretext for discrimination.

"The fact that an employer has offered different justifications at different times for an adverse employment action is, in and of itself, probative of pretext." *Jacobs*, 780 F.3d at 576 (internal quotation marks and alteration omitted). But, while Gomez identifies a variety of purported justifications for her termination in her effort to prove pretext, she nonetheless fails to address the fact that such justifications do not actually speak to the reason for her termination.

ii.

Gomez points to statements by Barreda and Brady that Gomez had failed to grow the CFPB contract and asserts that these statements show that the reasons for her termination have changed. Although it is true that Barreda and Brady stated that Gomez failed to grow the CFPB contract, lacked business development experience, that other individuals (like Parsons) were more qualified for certain positions, and that Gomez

28

failed to apply for such positions, such statements were not offered as reasons considered for Gomez's termination.

Instead, Appellees' statements regarding Gomez's performance on the CFPB contract were to explain, [*37] for example, why Gomez would not have been considered to be qualified for available positions that required business development skills. *See, e.g.,* J.A. 3221 (transition manager for the TESS contract stated Gomez would not have been selected as a TESS program manager, in part, because of the failure to grow the CFPB contract).

iii.

Additionally, while Gomez points to her failure to apply for open positions as one of the shifting reasons for her termination, Appellees did not present Gomez's failure to apply for open positions as a basis for her termination, but as a reason why she was not hired for another position. Significantly, Gomez was advised on several occasions that if the contract she was working on was lost and a suitable alternative position was not available, she would have to find another position or she would be separated from the company. *See* J.A. 4380 ("Gomez was specifically told that if NetCentrics did not win TESS, she would need to find another position, but if there was no position available for her, her employment would be terminated."); *id.* at 4385 ("Gomez was specifically informed on September 15, 2015 that she needed to look for work [within the company] or she would be [*38] terminated if she did not find another position."). Despite this, Gomez did not apply for any other positions between September of 2015 and March of 2016.

29

Nonetheless, at bottom, Gomez was terminated not because she did not apply for other positions, but because the TESS contract was lost. Thus, Gomez has failed to identify any legitimate shifting justifications for her termination.

b.

*Inconsistent Statements*

Gomez next asserts that two of Appellees' employees offered inconsistent statements about what positions were available to her. Specifically, Gomez asserts that Caron Hummer, a recruiter for Appellees, initially testified that there were no positions available for Gomez when she was fired but later testified that there were, in fact, positions for which Gomez may have qualified. In support of her position, Gomez cites generally to several pages of Hummer's testimony. *See* Appellant's Br. 17-18.

As to Gomez's first assertion, Hummer did not contradict herself at her deposition. The testimony to which Gomez cited is taken woefully out of context. Of note, Hummer stated in the portions of her deposition cited by Gomez that at the time of Gomez's termination there were no positions open [*39] in *Gomez's salary range*. See J.A. 478 ("Q[:] Do you recall speaking to Ms. Barreda and then also identifying specific job positions for Ms. Gomez? A[:] I remember letting [Barreda] know that we didn't have anything open that was within [Gomez's] salary range."). Gomez then points to the following testimony:

Q[:] Out of all of these positions, none of them she would have been qualified for?

A[:] She might have been able to do the technical project manager position.

30

J.A. 490-91. These statements clearly do not conflict because the first answer was with regard to positions within Gomez's salary range, while the second was with regard to positions for which Gomez was qualified.

Gomez also points to the deposition testimony of Appellees' corporate designee, Brady, the Vice President of Human Resources. Brady "testified that there were at least 5 positions available" for which Gomez may have been qualified. Appellant's Br. 51. Gomez argues that this contradicts Appellees' statements that Gomez was not qualified for any available positions. While it is true that the Kenney Staffing employees indicated Gomez may have been qualified for certain roles, 11 Brady indicated that three of the five [*40] possible positions were ultimately not filled because they became unnecessary as projects developed. As for the other two possible positions, per Brady, one paid only half of Gomez's salary and the other was already filled. Further, Brady noted that Gomez was not eligible for other positions because Gomez had been listed on the bid proposal for the TESS contract and, thus, was committed to a long term position. Finally, the Kenney Staffing employees had no familiarity with Gomez's actual work performance so as to equip them to judge whether in the perception of the decision maker Gomez would have been competent or appropriate -- as opposed to merely qualified on paper -- for the

11*See, e.g.*, J.A. 3983 (noting that Gomez may been "Very Qualified" for a "Senior Program Analyst" position); *id.* (noting that "Program Managers Make excellent Business Developers or Sr AE because of their Technical Background" with regard to the "Senior Account Executive" position); *id.* at 3985 (noting that a "Task B Program Manager" position "[s]hould be a cake walk").

31

positions. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) ("'[It] is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" (internal quotation marks [*41] omitted)). Therefore, Gomez failed to identify any legitimate inconsistent statements.

c.

*Internal Transfers*

Next, Gomez argues that the district court erroneously failed to consider that Appellees had internally transferred other employees without applications from those employees, but did not do so for her. This argument fails because it ignores the context and differing circumstances associated with each transfer.

Gomez first identifies Darryl Yaplee, an employee who was temporarily transferred from Task D after it ended to a contract support position on a new piece of work to "start working all of the transition pieces." J.A. 4667. Yaplee was informed that once the transition work ended, "if there's no other program manager work or whatever," he would have to be terminated. *Id.* On February 19, 2016, Yaplee was notified that his transition position would end at the end of the month. However, Yaplee was not terminated until April 1, 2016, because "he had asked to continue his employment until April 1, 2016 in order to continue his health benefits and had been doing a good job with the transition work." J.A. 2887; *see also id.* at 3208; *id.* at 5473.

Next, Gomez points to the internal transfer of Kirk [*42] Johnson from the TESS contract to Task B. In Johnson's case, the customer on Task B specifically requested that Johnson be transferred to replace the previous program manager, who had been removed

32

at the customer's request after a series of conflicts. To fill Johnson's position on the TESS contract, Appellees interviewed several candidates and ultimately hired Matthew Parsons.

Finally, Gomez points to the transfer of Parsons after

the TESS contract was lost as the basis for her age and sex discrimination claims. At the time Appellees hired Parsons to work on the TESS contract, Parsons already had a steady job. But Parsons agreed to work for Appellees provided there was a guarantee that Appellees would find him another position if the TESS contract was lost. Appellees agreed to this, in anticipation of winning the TESS contract. When the TESS contract was ultimately lost, Appellees upheld their contractual obligation to Parsons and found him another position on overhead as a senior account executive. While Gomez argues that she was more qualified for this position than Parsons, Parsons was originally hired, in part, for his business development experience -- experience which Gomez's [*43] employers believed she lacked. It is Appellees' perception that matters here, not Gomez's. *See Hawkins*, 203 F.3d at 280 (explaining that plaintiff had proved "only the unremarkable fact that she and [her employer] disagreed about the quality of her work . . . [but i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff" (internal quotation marks omitted)).

Thus, in each of the cases of internally transferred employees identified by Gomez, the individual in question either requested particular work, was specifically requested by a client, or negotiated a contract to account for an unstable job climate. None of these particular circumstances applied to Gomez. As such, Gomez has failed to

33

expose Appellees' justifications as pretext for discrimination, and the district court correctly granted Appellees' motion for summary judgment.

III.

For these reasons, the judgment of the district court is

*AFFIRMED*.

34